FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

## IN THE UNITED STATES DISTICT COURT
## FOR THE DISTICT OF KANSAS

2010 NOV -9  AM 9: 11

TIMOTHY M. O'BRIEN
CLERK
_____ DEPUTY

| | |
|---|---|
| Robert M. Brown, | ) |
|            Plaintiff, | ) |
|     v. | ) Civil Action No. 78-CV-2606 JAR/KMH |
| The University of Kansas, | ) |
| The University of Kansas School of Law, | ) |
| Stephen W. Mazza, an individual, | ) |
| Joyce A. McCray-Pearson, an individual, | ) |
| Gail B. Agrawal, an individual, | ) |
| Wendy Rohleder-Sook, an individual | ) |
| Andy Tompkins in his official capacity as | ) |
|     President the Kansas Board of Regents, | ) |
| Gary Sherrer in his official capacity as | ) |
|     Chair of the Kansas Board of Regents, | ) |
| Ed McKechnie in his official capacity as Vice | ) |
|     Chair of the Kansas Board of Regents, | ) |
| Jarold Boettcher in his official capacity as a | ) |
|     member of the Kansas Board of Regents, | ) |
| Christine Downey-Schmidt in her official | ) |
|     capacity as a member of the Kansas | ) |
|     Board of Regents, | ) |
| Mildred Edwardsin in her official capacity as a | ) |
|     member of the Kansas Board of Regents, | ) |
| Tim Emert in his official capacity as a | ) |
|     member of the Kansas Board of Regents, | ) |
| Richard Hedges in his official capacity as a | ) |
|     member of the Kansas Board of Regents, | ) |
| Dan Lykins in his official capacity as a | ) |
|     member of the Kansas Board of Regents, | ) |
| Janie Perkins in her official capacity as a | ) |
|     member of the Kansas Board of Regents, | ) |
| Bernadette Gray-Little in her official capacity | ) |
|     as Chancellor of the University of Kansas, | ) |
| Stephen W. Mazza in his official capacity as | ) |
|     Interim Dean of the  University of | ) |
|     Kansas School of Law | ) |
| | ) |
|         Defendants | ) |

## **VERIFIED COMPLAINT**

COMES NOW THE PLAINTIFF, Robert M. Brown *Pro Se*, and for his cause of action against the above named defendants states and alleges as follows:

### **JURISDICTIONAL BASIS**

1.     Plaintiff claims federal jurisdiction pursuant to Article III, § 2 of the United States Constitution and Title 28 U.S. Code § 1331.

2.     Plaintiff brings this suit pursuant to Title 42 U.S. Code § 1983, Ex Parte Young, 209 U.S. 123 (1908) and all applicable theories of supplemental jurisdiction for violations by defendants of certain protections guaranteed to him by the Fourteenth Amendment to the United States Constitution.

3.     Jurisdiction of this court for supplemental claims is authorized by F.R.Civ.P. 18(a) and 28 U.S. Code § 1367(a).

4.     Jurisdiction of this court to award money damages and declaratory and injunctive relief against the University of Kansas and the University of Kansas School of Law (the Institutional Defendants) with respect to the supplemental state claims arises pursuant to the Kansas Tort Claims Act, codified at Kan.Stat.Ann. §§ 75-6101 through 6118.

5.     Jurisdiction for vindication of plaintiff's constitutional rights regarding his liberty interest in his right to continued enrollment in a state funded university arises pursuant to Regents of the University of Michigan v. Ewing, 474 U.S. 214, 217 (1985), and pursuant to the due process rights, applicable to all University of Kansas Students, which are created expressly by the University System of Governance.

6.     Jurisdiction for vindication of plaintiff's constitutional rights regarding deprivation of his property interest in his contract right to completion of his Degree Program at

2

the University of Kansas School of Law (the School of Law) arises pursuant to Board of Regents of State Colleges et al. v. Roth, 408 U.S. 564, 577 (1972).

7.      Jurisdiction for vindication of plaintiff's constitutional right to earn his livelihood by any lawful calling and to pursue any livelihood or avocation he wishes arises pursuant to Allgeyer v. Louisiana, 165 US 578, 589 (1897).

8.      Jurisdiction for vindication of plaintiff's constitutional procedural due process claims arises pursuant to Goldberg v. Kelley, 397 U.S. 254, 267 (1970) and Arnett v. Kennedy, 416 U.S. 134, 197 (1974).

9.      Jurisdiction and venue are proper in this district.

## PARTIES

10.     Plaintiff Robert M. Brown is a natural person residing at 6200 W 74th Street, City of Overland Park, County of Johnson, State of Kansas.

11.     Defendant The University of Kansas is a public University funded and governed by the State of Kansas and the Kansas Board of Regents with its Office of University Governance located at Strong Hall, 1450 Jayhawk Blvd., Room 33, City of Lawrence, County of Douglas, State of Kansas.

12.     Defendant The University of Kansas School of Law is a public School of Law within the University of Kansas, with a principal place of business at 1535 W. 15th Street, City of Lawrence, County of Douglas, State of Kansas.

13.     Defendant Stephen W. Mazza (individual capacity) is a natural person residing at 1321 Strong Ave, City of Lawrence, County of Douglas, State of Kansas.

14.     Defendant Joyce A. McCray-Pearson is a natural person residing at 413 Yorkshire Dr., City of Lawrence, County of Douglas, State of Kansas.

3

15. Defendant Gail B. Agrawal is a natural person residing at 2003 Palmer Ct., City of Lawrence, County of Douglas, State of Kansas - at all times pertinent Agrawal was an executive officer of the Univeristy of Kansas School of Law who's actions constituted policy of the University of Kansas School of Law.

16. Defendant Wendy M. Rohleder-Sook is a natural person residing at 2201 W. 26th Street, City of Lawrence, County of Douglas, State of Kansas.

17. Andy Tompkins is the President and CEO of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, City of Topeka, County of Shawnee, State of Kansas.

18. Gary Sherrer is the Chair of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, City of Topeka, County of Shawnee, State of Kansas.

19. Ed McKechnie is the Vice Chair of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, City of Topeka, County of Shawnee, State of Kansas.

20. Jarold Boettcher is a member of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, City of Topeka, County of Shawnee, State of Kansas.

21. Christine Downey-Schmidt is as a member of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, City of Topeka, County of Shawnee, State of Kansas.

4

22.     Mildred Edwardsin is a member of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, City of Topeka, County of Shawnee, State of Kansas.

23.     Tim Emert is as a member of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, City of Topeka, County of Shawnee, State of Kansas.

24.     Richard Hedges is as a member of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, City of Topeka, County of Shawnee, State of Kansas.

25.     Dan Lykins is a member of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, City of Topeka, County of Shawnee, State of Kansas.

26.     Janie Perkins is a member of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, City of Topeka, County of Shawnee, State of Kansas.

27.     Bernadette Gray-Little is the Chancellor of the University of Kansas with a business office located at Strong Hall, 1450 Jayhawk Blvd., Room 230, City of Lawrence, County of Douglas, State of Kansas - at all times pertinent Gray-Little was an executive officer of the Univeristy of Kansas who's actions constituted policy of the University of Kansas.

28.     Stephen W. Mazza (official capacity) is the Associate Dean and Interim Dean of the University of Kansas School of Law, and has a business office located at 1535 W. 15th Street, City of Lawrence, County of Douglas, State of Kansas.

29. Defendants The University of Kansas and the University of Kansas School of Law were, at all times pertinent hereto, the employers of defendants Stephen W. Mazza (individual capacity), Joyce A. McCray-Pearson, Gail B. Agrawal, and Wendy M. Rohleder-Sook (the Individual Defendants), and are liable for their actions pursuant to the doctrine of respondeat superior.

30. Defendant Stephen W. Mazza, at all times pertinent hereto, was purportedly administering and furthering the policies and procedures of a state institution, as established by the office of the Chancellor and under the governance and direction of the Kansas Board of Regents, and was a state actor.

31. Defendant Joyce A. McCray-Pearson, at all times pertinent hereto, was purportedly administering and furthering the policies and procedures of a state institution, as established by the office of the Chancellor and under the governance and direction of the Kansas Board of Regents, and was a state actor.

32. Defendant Gail B. Agrawal, at all times pertinent hereto, was employed by the University of Kansas School of Law as its Dean and was purportedly administering and furthering the policies and procedures of a state institution, as established by the office of the Chancellor and under the governance and direction of the Kansas Board of Regents, and was a state actor.

33. Defendant Wendy M. Rohleder-Sook, at all times pertinent hereto, was purportedly administering and furthering the policies and procedures of a state institution, as established by the office of the Chancellor and under the governance and direction of the Kansas Board of Regents, and was a state actor.

6

34.      Defendant The University of Kansas does not administer, enforce or interpret state law as part of its charge of responsibility from the State of Kansas.

35.      Defendant The University of Kansas School of Law does not administer, enforce or interpret state law as part of its charge of responsibility from the State of Kansas.

36.      The Individual Defendants do not administer, enforce or interpret state law as part of their charge of responsibility from the State of Kansas.

## ALLEGATIONS OF FACT COMMON TO ALL COUNTS

### The University of Kansas System of Government As It Pertains to this Action

37.      Defendant The University of Kansas has its own elaborate system of government, which is published online and available to the general public at the time of this filing at https://documents.ku.edu/policies/governance/GovernanceIndex.htm.

38.      The main governing body of defendant The University of Kansas is the University Senate, and the main governing document of this body is the University Senate Code (U.S.C.), which is published online and available to the general public at the time of this filing at https://documents.ku.edu/policies/governance/UniversitySenateCode.htm.

39.      The University Senate Code provides procedural due process guarantees for every member of the University Community who is involved in a grievance or dispute, including the right to a hearing before a disinterested panel, the right to be represented by an advisor or counsel, the right to a written statement of the complaint which indicates the provision or provisions of the University Rules and Regulations alleged to have been violated, the right to introduce into evidence all relevant testimony and documents, the right to a full examination of the evidence presented by the other parties, the opportunity to confront and cross-examine

witnesses, and the assurance that the hearing body shall base its recommendations solely on the evidence received at the hearing. (U.S.C. Art. XIV, § 2).

40. In hearings pursuant to these procedural guarantees, the complaining party has the burden of proof at the hearing. (U.S.C. Art. XIV, § 2).

41. Subject to and in accordance with the control of the Chancellor and the Board of Regents as provided by law, the Student Senate is empowered to formulate such Rules and Regulations as it shall deem wise and proper for the control and government of such affairs of the University as directly and primarily affect the students of the University and to take such steps as it shall deem necessary for their implementation and administration. Affairs of the University include, but are not limited to, student rights, privileges, and responsibilities, student organizations and activities, student publications, and student housing and health. (U.S.C. Art. III, § 5).

42. The body of rules and regulations by which the University Senate Code as it pertains to the Student Senate is administered is The University Senate Rules and Regulations (U.S.R.R.), which is published online and available to the general public at the time of this filing at https://documents.ku.edu/policies/governance/USRR.htm.

43. The due process rights guaranteed in U.S.C. Art. XIV, § 2 apply to disputes within the jurisdiction of the U.S.R.R.

44. Subject to and in accordance with the control of the Chancellor and the Board of Regents and as provided by law, the Faculty Senate is empowered to formulate such Rules and Regulations as it shall deem wise and proper for the control and government of such affairs of the University as directly and primarily affect the faculty of the University and to take such steps as it shall deem necessary for their implementation and administration. Affairs of the University

8

which directly and primarily affect the faculty of the University include, but are not limited to, faculty rights, privilege, and responsibilities, research, scholarly publications, admission and transfer requirements, and credit for resident and non-resident study. (U.S.C. Art. II, § 5.2).

45.    The body of rules and regulations by which the University Senate Code as it pertains to the Student Senate is administered is The Faculty Senate Rules and Regulations (F.S.R.R.), which is published online and available to the general public at the time of this filing at https://documents.ku.edu/policies/governance/FSRR.htm.

46.    The due process rights guaranteed in U.S.C. Art. XIV, § 2 apply to disputes within the jurisdiction of the F.S.R.R.

## The University Code of Student Rights and Responsibilities

47.    Rules and Regulations promulgated by both the University Senate and the Faculty Senate are at all times "[s]ubject to and in accordance with the control of the Chancellor and the Board of Regents[.]"   (U.S.C. Art. III, § 5), (U.S.C. Art. II, § 5.2).

48.    The Kansas University Code of Student Rights and Responsibilities, which is published online and available to the general public at the time of this filing at https://documents.ku.edu/policies/Student_Success/VPSS/Code_Student_Rights_Responsibilitie s.htm, is one such Chancellor's Regulation to which all Student Senate and Faculty Senate rules and regulations are subject and subordinate.

49.    Article 2 of the Code of Student Rights and Responsibilities, entitled "Bill of Rights", guarantees all students certain rights.

50.    Art. 2(E) of the Code of Student Rights and Responsibilities provides that Students will be exempt from disciplinary action that affects their status as students except for academic failure or violation of a published Student Senate, University Senate, University or

Regents rule or regulation. Rules and regulations shall be fully and clearly disclosed in advance of the supposed violations.

51.     Art. 2(F) of the Code of Student Rights and Responsibilities provides that no disciplinary sanctions resulting from a violation of rules and regulations, under Article 2(E), may be imposed upon any student without prior written notice of the nature and cause of the charges, and an opportunity to be heard at a fair hearing. Art. 2(F) further provides that a fair hearing shall include confrontation of witnesses against the accused.

52.     Art. 2(G) of the Code of Student Rights and Responsibilities provides that any student charged with violating University regulations is entitled to a hearing.

53.     Art. 22 of the Code of Student Rights and Responsibilities defines "Non-Academic Misconduct."

54.     Art. 22(C)(2) of the Code of Student Rights and Responsibilities provides that knowingly furnishing false or misleading information to the University by a student or applicant is a type of Non-Academic Misconduct.

55.     Non-Academic Misconduct is within the exclusive jurisdiction of the office of the Vice Provost for Student Services, and a student alleged to have violated provisions of Article 22 is entitled to a hearing in accordance with procedures established by the Office of the Vice Provost for Student Success. (Code of Student Rights and Responsibilities Art. 22(F)(1); U.S.R.R. Art. VI § 4.9).

## Proceedings for Removal of Plaintiff Brown from the Law School

56.     Plaintiff Robert M. Brown ("Brown") filed an application for admission to the University of Kansas School of Law on April 8, 2009.

10

57. Brown failed to include misdemeanor convictions occurring in two 1996 Johnson County Kansas cases in an answer to question 27 on his law school application.

58. Brown believed at the time of filing his application that the misdemeanor convictions were too remote in time to be relevant for the application.

59. Brown was admitted to the University of Kansas School of Law in August of 2009, on the very eve of the first day of law school classes for the entering class of Fall 2009.

60. During the first week of law school in August of 2009, Dean Wendy Rohleder-Sook (defendant Rohleder-Sook) spoke to the entering class of Fall 2009 regarding question 27 and application amendment, and made clear that the law school considered no transgression too remote in time.

61. Defendant Rohleder-Sook explained that the school of law sought to help amending applicants to avoid problems when it came time to take the bar.

62. Defendant Rohleder-Sook explained that students often think their past transgressions are a more serious problem than they really are, and that the most important thing was that students come forward and be honest with the law school.

63. Speakers from the Kansas Bar Association also visited during the first week, and similarly urged amendment of applications.

64. Through its various speakers, the School of Law expressed its intentions to work with applicants who amended to assure that they did not encounter difficulties when it came time to sit for the Bar Exam.

65. Brown came forward and voluntarily amended his application less than two weeks after his admission to the University of Kansas School of Law to disclose the prior thirteen year old misdemeanor convictions.

11

66. Defendant Rohleder-Sook requested more information regarding the prior convictions.

67. Brown promptly provided all requested information, including a signed release for his records from the Johnson County District Attorney's office and court records and pleadings.

68. Defendant Rohleder-Sook's fact-finding was complete by October 7[th,] 2010.

69. Defendant Rohleder-Sook gave no indication to Brown upon completing her investigation that a complaint would be forthcoming.

70. Subsequent to completion of defendant Rohleder-Sook's investigation, but prior to the filing of a complaint by any member of the University community, Brown continued in and satisfactorily completed all the requirements for his courses for the Fall 2009 semester.

71. Subsequent to completion of defendant Rohleder-Sook's investigation, but prior to the filing of a complaint by any member of the University community, Brown sat for Finals in December of 2009.

72. Subsequent to completion of defendant Rohleder-Sook's investigation, to the filing of a complaint by any member of the University community, the University issued grades to Brown in all of his Fall 2009 semester course.

73. Subsequent to completion of defendant Rohleder-Sook's investigation, but prior to the filing of a complaint by any member of the University community, Brown was enrolled automatically in classes which were automatically selected for him for the upcoming Spring 2010 semester by the Admissions Office, which is headed by defendant Rohleder-Sook, for the Spring 2010 semester.

74.     Subsequent to completion of defendant Rohleder-Sook's investigation, but prior to the filing of a complaint by any member of the University community, the admissions office automatically collected Brown's tuition for the upcoming spring semester against a student loan without the requirement of Brown's personal involvement.

75.     Subsequent to completion of defendant Rohleder-Sook's investigation, but prior to the filing of a complaint by any member of the University community, Brown was allowed to begin his fall semester classes in January of 2010.

76.     Subsequent to completion of defendant Rohleder-Sook's investigation, but prior to the filing of a complaint by any member of the University community, Brown continued to devote his full productive effort to the pursuit of his legal education at the School of Law.

77.     By the actions described in paragraphs 69 through 76, the School of Law ratified its contract with Brown, treated the contract as binding, led Brown to believe that the contract was still in full force and effect, and enticed Brown to rely upon the existence of his contract with the School of Law to his substantial detriment.

78.     By the actions described in paragraphs 69 through 76, the School of Law gave up any right to contest brown's enrollment contract later through complaint pursuant to Morse v. Kogle, 162 Kan. 558, Syl at 1-3 (1947) and Schiffelbein v. Sisters of Charity of Leavenworth, 190 Kan. 278, 281-2 (1962) and through the doctrines of waiver and estoppel.

79.     On February 23rd, more than six months after Brown self reported the omission of 13 year old misdemeanors from his law school application, Dean Mazza (defendant Mazza) provided Mr. Brown with a copy of the complaint of the defendant Rohleder-Sook regarding his application.

13

80. At the February 23rd meeting, Brown was provided with a copy of the University of Kansas School of Law Dispute Resolution Procedure (D.R.P.), which stated that he had due process rights which would be protected throughout the dispute (D.R.P. 2(a)), the right to a hearing before and impartial hearing body (D.R.P. 2(d)), the right to information and assistance from an impartial law school ombudsman (D.R.P. 3(a)), and the right to notice via a formal complaint that stated a violation of the University Code, University Senate Code, University Senate Rules and Regulations, the Honor code, or other applicable rule, regulation, or provision of law (D.R.P. 2(b) and 6(b)(4)).

81. At the February 23rd meeting, defendant Mazza explained that since the law school ombudsman had already ruled against Brown at a meeting organized by Rohleder-Sook to reconsider his application, there was no impartial law school ombudsman available for Brown.

82. At the February 23rd meeting, defendant Mazza stated he would act in the stead of the law school ombudsman in an effort to see that Brown's due process rights were protected, and that he would hold in confidence everything said at the meeting.

83. Ultimately, although promised both verbally and in writing at the time the complaint was made, none of the due process rights enumerated in the written procedural documents hand delivered and personally explained to Brown by defendant Mazza were ever afforded to Brown.

84. At the February 23rd meeting, defendant Mazza explained to Brown that he stood accused of an "Article 22 violation".

85. At the February 23rd meeting, Brown requested dispute resolution.

86. On March 2, 2010, defendant Mazza notified Brown via E-mail that dispute resolution was not an option with respect to defendant Rohleder-Sook's complaint.

14

87. On March 3rd, 2010, Brown made a formal request for mediation to Dean Mazza.

88. On March 4, 2010, via email, brown inquired of defendant Mazza "When we initially spoke, you mentioned that this was an "article 22" issue. I'm not finding article 22 anywhere in the U.S.R.R. Can you help point me to it?"

89. Defendant Mazza responded that same day via email, stating "I should have said 'Question' 22. That's the question on the application asking the applicant to disclose past activity."

90. Defendant Mazza knew full well the difference between Question 27 (the actual number of the application question at issue) and Article 22 of the Student Code of Rights and Responsibilities.

91. Defendant Mazza's March 4, 2010 email response to Brown was intentionally fraudulent, and was designed to mislead Brown with regard to his understanding of the University's dispute processes.

92. If defendant Rohleder-Sook and defendant Mazza had chosen to pursue this complaint as an Article 22 matter, it would have meant surrendering jurisdiction over the proceedings and control over the hearing to the office of the Vice Provost for Student Success.

93. Defendants Rohleder-Sook and Mazza intentionally and fraudulently disguised the complaint as one of "Academic Misconduct", an area over which the Law School's Dispute Resolution Procedures could exercise jurisdiction, in order to keep the proceedings within their reach and control.

94. On March 4th, 2010, Brown requested redacted copies of all prior decisions made pursuant to the Law School Dispute Resolution Procedure which were based on the same or

similar allegations of fact as those charged in the February 17, 2010 complaint pursuant to Section 14 of the School of Law Dispute Resolution Procedure.

95.     On April 16th, 2010, Brown was informed via Email by Dean Mazza that no prior decisions regarding similar circumstances existed.

96.     Brown filed procedural objections on February 28, 2010, stating that the complaint failed to state the code section under which Brown was charged, that it was not truly a complaint of academic misconduct, that it was barred by the legal theories of waiver and promissory estoppel, and that he the law school's insistence upon his removal was arbitrary, unreasonable and inordinately punitive.

97.     Brown received no communication regarding his procedural objections for a month and a half following their filing.

98.     During the pendency of the complaint, Brown was allowed to enroll and pay tuition for the Summer and Fall 2010 terms by the University of Kansas School of Law.

99.     On April 14th, 2010, via email, defendant Mazza stated to Brown "I understand that this process has been protracted. We have not run across this situation before and, *in an effort to preserve your due process rights to the greatest extent possible*, we've had to consider matters very carefully and that has caused delay in processing the complaint." (Emphasis Added).

100.    On April 15th, 2010, Brown again requested mediation. Dean Mazza responded via email "We have decided to forego any mediation. That process is not required by the disciplinary procedures and we cannot think of any settlement other than voiding your admissions application."

16

101.     On April 16th, 2009, defendant Rohleder-Sook filed a response to Brown's procedural objections.

102.     Defendant Rohleder-Sook's April 16th response stated in response to Brown's allegation that the complaint failed to state the University law or regulation violated, that the Law School's dispute resolution procedures were sufficient in and of themselves to constitute the required applicable rule or regulation, or that "[a]lternatively, Mr. Brown's conduct represents Academic Misconduct within the meaning of U.S.R.R. section 2.6.1."

103.     Defendant Rohleder-Sook's April 16th response did not dispute that Brown's challenged conduct did not fall within the Law School's definition of "academic misconduct", but suggested that new forms of academic misconduct could be created on the fly because "the offenses listed in U.S.R.R. section 2.6.1. are not exclusive ('Academic misconduct by a student shall *include, but not be limited to* . . .')."

104.     Defendant Rohleder-Sook's April 16th response dealt with Brown's allegation that the complaint was barred by the legal theories of waiver and promissory estoppel by way of simple disagreement with the objection and by saying that Brown's case law was inapplicable, providing no reasoning or analysis.

105.     On April 16th, Dean Mazza informed Mr. Brown via email that the School of Law had retained counsel to represent complainant Wendy Rohleder-Sook at the hearing regarding his removal, and that Ms. Rohleder-Sook would not be required to attend the hearing personally.

106.     On April 16th, 2010, Brown requested an anonymous tabulation of data regarding other amended law school applications, the nature and age of the charges subsequently disclosed by other applicants, and the ultimate resolutions which occurred with those applicants.

17

107. On April 16th, 2010, defendant Mazza denied Brown's request for information regarding consequences for other candidates who had amended.

108. On April 19th, defendant Mazza provided Brown with the name of the panel chair for the hearing panel he had selected, and explained that all subsequent communications regarding the matter should be between Brown and the panel.

109. On April 20th, 2010, Brown approached Law School Obudsman Sandra Craig McKenzie regarding the possibility of mediation.

110. McKenzie explained that she had already brought up the subject with defendant Mazza, and that he was unwilling to entertain any hope of mediation in Brown's case.

111. In Late April, Brown sat for finals for the Spring Semester of 2010.

112. In early may, the School of Law accepted Brown's tuition payment for the summer semester.

113. Brown began attendance at his summer semester class in the summer of 2010.

114. On May 3rd, defendant Mazza's selected hearing panel conducted a hearing regarding the preliminary matters raised by Mr. Brown more than two months earlier.

115. Brown was not given notice of the May 3rd hearing, and had no opportunity to participate in it.

116. The Hearing Panel, in a memorandum opinion dated May 3rd, 2010, determined that the complaint did not in fact allege academic misconduct, and dismissed the complaint.

117. The hearing panel found that if misconduct had occurred at all, it was non-academic misconduct which is within the exclusive jurisdiction of the Office of the Vice-Provost for Student Success per U.S.R.R. 6.4.9.1, and therefore, it is not within the Law School's unit level jurisdiction pursuant to University of Kansas School of Law Dispute Resolution Procedure.

18

118. The Hearing Panel acknowledged that it did not have the authority to hear and make decisions in the case.

119. The Hearing Panel suggested that Brown could be dismissed without a hearing, although the same panel acknowledged its lack of jurisdiction in the matter.

120. On May 26th, 2010, Dean Gail B. Agrawal sent Brown a letter notifying him that she planned to dismiss him from the School of Law effective June 8, 2010.

121. Defendant Agrawal's letter made no provision for a hearing or any of the other procedural guarantees which the School of Law had previously promised to Brown.

122. On May 27th, Brown responded to Dean Agrawal that dismissal in this manner violated the procedural guarantees of the Article 2 of the Code of Student Rights and Responsibilities.

123. Brown's May 27th response formally demanded, pursuant to the student bill of rights, written notice of the nature and cause of the charges, including what published Student Senate, University Senate, University or Regents rule or regulation the School of Law believed to have been violated.

124. Brown's May 27th response stated "By this writing, I also indicate that I wish to preserve my right to a fair hearing before an impartial hearing body which includes the assistance and participation of my legal counsel and the right to confront witnesses against me, and all other rights I may have under any and all Student Senate, University Senate, University or Regents rules. These are due process rights to which I am entitled as a matter of law. The summary dismissal you contemplate would unlawfully bypass them."

125. On May 27th, 2010 Brown also requested in writing a face to face meeting with Dean Agrawal to discuss the matter.

19

126.    On May 28th, 2010, Agrawal responded to Brown's request via email, stating "I see no need to meet with you, and therefore decline your request for a meeting."

127.    On May 30th, Brown filed a Request For an Initial Hearing before the Judicial Board Pursuant to 6.4.3.1(b) of the University Senate Rules and Regulations and Election to Invoke the Jurisdiction of the University Judicial Board Pursuant to University of Kansas Law School Dispute Resolution Procedure Section (A)(4)(c) with the University Judicial Board.

128.    On May 30th, Brown filed a Request For Jurisdictional Ruling Pursuant to 6.5.2.1 of the University Senate Rules and Regulations with the University Judicial Board.

129.    Brown's requests for Initial Hearing and Jurisdictional Ruling pointed out the inconsistencies between the Law School's handling of the matter and the treatment which the U.S.R.R. required it be afforded.

130.    Brown's requests for Initial Hearing and Jurisdictional Ruling highlighted the unreasoned removal of his due process rights per University Senate Rules and Regulations.

131.    On June 3rd, Law School Professor Joyce McCray-Pearson, in her capacity as the Chair of the University Judicial Board, denied Brown's requests to involve the University Judicial Board based upon application of the Faculty Senate Rules and Regulations to student affairs.

132.    Defendant McCray-Pearson's denial represented an executive policy decision on behalf of Defendant the University of Kansas.

133.    Defendant McCray-Pearson's denial was undertaken in knowing violation of University of Kansas Regulations.

134.    Defendant McCray-Pearson's denial was undertaken in knowing violation of Brown's due process rights.

135. On June 7th, 2010, defendant Agrawal notified Brown that he would be dismissed from Law School effective June 8th, 2010 and that his law school transcript would show that he was dismissed based upon falsification and misrepresentation.

136. Brown's dismissal was undertaken in knowing violation of University of Kansas Regulations.

137. Brown's dismissal was undertaken in knowing violation of Brown's due process rights.

138. Brown's dismissal represented an executive policy decision on behalf of Defendants the University of Kansas and the University of Kansas School of Law.

139. The University of Kansas retained approximately seventeen thousand dollars expended by Brown for tuition, books, parking and expenses for the semesters he attended.

140. Brown incurred twenty thousand dollars in student debt to attend the Fall 2009 and Spring 2010 semesters at the University of Kansas School of Law.

141. Brown appealed to the office of Chancellor Bernadette Gray-Little in writing through his attorney John P. Gerstle on June 17, 2010.

142. The June 17, 2010 letter asked for reinstatement as a full and complete remedy in lieu of any legal action.

143. The Chancellor's office responded by letter on June 25, 2010, denying the requested remedy.

144. The Chancellor's June 25, 2010 letter stated that the authority to bypass process otherwise guaranteed to Brown came from the Faculty Senate Rules and Regualtions, Art. II, § 1.1.

145.    Subsequent negotiations ensued between Brown's attorney and the University's general counsel, but the negotiations ended without success.

146.    Chancellor Gray-Little's refusal to mandate that The University of Kansas and the University of Kansas School of Law and the University of Kansas follow their own self imposed and publicly published mandates regarding Brown's due process represented both an intentional failure to properly supervise and an executive policy decision on behalf of Defendants the University of Kansas, the University of Kansas School of Law, and defendant Gray-Little.

### Brown's Enrollment Was a Contract with Defendants

147.    Brown's initial application to the School of Law constituted an offer to contract.

148.    The School of Law's admittance of Brown in the Fall of 2009 and the acceptance of Brown's tuition constituted acceptance of that offer.

149.    Brown's amended application in August of 2009 constituted an offer to continue his enrollment subject to the information contained in his amended application.

150.    The School of Law's unequivocal enrollment of Brown to the School of Law in the Spring of 2010 and unqualified acceptance of Brown's tuition, *without qualification or reservation*, constituted acceptance of that offer based on Brown's amended application.

151.    By enrollment for the Spring Semester of 2010 and acceptance of Brown's tuition, defendants created a binding enrollment contract with plaintiff Brown whereby they would accept his tuition and in return provide a legal education which would lead to a Juris Doctor degree.

152.    Before enrolling at the University of Kansas School of Law, Brown reviewed both the University and the School of Law website and the School of Law catalog at great length.

22

153. The representations made therein led Brown to believe that enrollment contemplated an agreement with the University and the School of Law that he would be allowed to complete his studies there if he met the required academic standards and paid the requisite fees and tuition.

154. The law school's online catalog presented the curriculum in total (for the entire program) rather than singling out different years of enrollment.

155. The messages on the Web Site of the Vice Provost for Student Success led Brown to believe that the University would help him in every way possible to succeed in his undertaking to Graduate and to succeed in his law career.

156. While there is no formal "enrollment contract", the written, published and quasi-judicially enforced custom of the university is that those who enroll are permitted to continue and graduate so long as they maintain a 2.0 or higher G.P.A. and pay the tuition and fees.

157. Since there is no formal enrollment contract, the agreement is ambiguous in many respects, and the details of the agreement must be determined with reference to the customs and published policies of the University and the School of Law.

158. The University and the School of Law's published Rules, Regulations and Procedures constitute custom which is valid in this circumstance for determining the intent and extent of the enrollment contract. Havens v. Safeway Stores, 678 P.2d 625, 629 (Kan. 1984) (Custom and usage may be shown to elucidate or explain something ambiguous in a contract[.] )

159. Even if defendants' argument that they had the right to invalidate the enrollment based upon false statements for the Fall semester of 2009 were to be accepted, it would not affect the contract the defendants created with Brown by accepting his amended application and enrolling him without qualification in the Spring of 2010.

160.     Brown has exceeded all the academic requirements of the University and the School of Law, has always timely paid his tuition, and has never been in breach of the contract created by the University and the School of law upon accepting his amended application and enrolling him without qualification in the Spring of 2010.

161.     The University and the School of Law breached their contract with Brown by removing him from the school of law after accepting his amended application, accepting his tuition for the Spring 2010 semester, providing him instruction, consuming his full productive effort, issuing him grades for the Spring 2010 semester, accepting his tuition for the Summer 2010 semester, and beginning to provide instruction during the Summer 2010 Semester.

162.     The fact that defendants have retained plaintiff Brown's tuition as compensation for contract services performed both before and after he amended his application is further indication that defendants' claim that the contract was somehow "canceled" or "voided" is disingenuous.

163.     Plaintiff Brown's contract with the University creates a property interest which is subject to Fourteenth Amendment protection. Board of Regents of State Colleges et al. v. Roth, 408 U.S. 564, 577 (1972).

## Defendants' Policies Regarding Admissions

164.     In November of 2009, Chancellor Bernadette Gray-Little created an Admissions task force to pursue strategic initiatives of the University of Kansas in the area of Student Success.

165.     Chancellor Gray-Little's charge to the Admissions task force, which is published online and available to the general public at the time of this filing at http://chancellor.ku.edu/strategic/admissions_charge.pdf, states "This task force is responsible

24

for recommending admissions criteria that supports the overarching goal of this enrollment planning initiative: student success."

166. In Chancellor Gray-Little's comments regarding the Admissions task force, which are published online and available to the general public at the time of this filing at http://chancellor.ku.edu/strategic/admissionscomments.shtml, the Chancellor elaborated on what is meant by "Student Success", stating "[t]he true goal must be graduation . . . Admissions plays an integral role in our efforts to improve retention and graduation of students, as well enhancing the scholarly work performed at KU, such as through the recruitment of graduate students."

167. In the Admission Task Force Report which was dated March 3, 2010, the task force outlined its top two objectives as improvement of retention rates and improvement of graduation rates.

168. The Faculty Senate Rules and Regulations provides that "[p]olicies for admission and readmission are established by the faculties of the various schools or the College, within the parameters of state laws and Regents regulations and within guidelines set by the Faculty Senate. A statement of such requirements shall be published or filed with the Director of Admissions and the Secretary of Faculty Senate." (F.S.R.R. Art. II, § 1.1).

169. The School of Law's admissions policies are summarized online at the time of this filing at http://www.law.ku.edu/~kulaw/prospective/admissions/faq/ under the heading "How are students selected for admission?" (Published Admissions Guidelines).

170. The Published Admissions Guidelines state that admissions are undertaken with the School of Law's primary mission in mind – "to prepare students to be outstanding members of the legal profession, well-educated in the law, with a commitment to professional achievement and public service."

171. The Published Admissions Guidelines state that the School of Law's goals in the admission process are (1) to educate lawyers who will contribute to the profession in Kansas and in the nation, and (2) to provide high-quality legal training to Kansas citizens.

172. The Published Admissions Guidelines state that the School of Law's admissions focus is on potential academic success and legal ability, and that they seek persons who "show great promise of contributing to and succeeding in the complex business of studying and practicing law." In mentioning criteria which may indicate such promise, the published guidelines include employment, professional experience, diversity of background and experience, and demonstrated ability to overcome financial or other disadvantages. The published guidelines also provide that "[t]he School of Law is committed to providing meaningful access to a legal education for men and women of all races, religions, ethnic and socioeconomic backgrounds, sexual orientations, and physical abilities. To that end, the School of Law engages in active recruitment of potential applicants with diverse backgrounds and characteristics."

173. Both the Chancellor's top down charge and the published admissions guidelines indicate that the primary goal of admissions at the School of Law should be and is selection of applicants who possess the ability to succeed.

174. There is no written admissions policy in existence within the Board of Regents, Chancellor, Provost, University of Kansas, or University of Kansas School of Law, which states or indicates that the University should or may terminate students based upon remote prior criminal convictions which have nothing to do with the student's prospects of success.

175. Neither F.S.R.R. Art. II, § 1.1 or any other written Rule, Regulation or Policy provides that the Chancellor, the University, or the School of Law may exercise unfettered discretion to deny due process otherwise guaranteed to students.

## Inconsistency of Defendants' Actions with Uniform Application of the Written Admissions Policies of the Chancellor, the University and the School of Law

176. The School of Law based Brown's dismissal without the required process on F.S.R.R. Art. II, § 1.1.

177. Even assuming *arguendo* the F.S.R.R. can somehow provide permission to completely disregard the due process rights guaranteed within the D.P.R., the U.S.R.R., the University Senate Code, and the Code of Student Rights and Responsibilities, any dismissal would still need to be based upon violation of policies for admission which have been established by the faculty and filed with the Director of Admissions and the Secretary of Faculty Senate pursuant to F.S.R.R. Art. II, § 1.1.

178. At the time of plaintiff Brown's removal, his Grade Point Average was 3.14.

179. At the time of plaintiff Brown's removal, he was in the top half of his law school class.

180. At the time of plaintiff Brown's removal, his attendance was good, he came to each and every class prepared, and he participated in class.

181. At the time of plaintiff Brown's removal, he was active in the Summer 2010 semester and was already enrolled in the Fall 2010 semester.

182. At the time of plaintiff Brown's removal, he had demonstrated his ability to succeed in Law School.

183.    Brown's removal was in direct conflict with Chancellor Gray-Little's overarching goal for admissions (student success), because it removed a successful student from the University without any legitimate purpose.

184.    Brown's removal was in direct conflict with Chancellor Gray-Little's edict regarding admissions, because it divested the University of a student who's retention was otherwise guaranteed and eliminated any chance for Brown to graduate.

185.    Brown's removal was in direct conflict with the admissions task force's primary goals, because it unnecessarily damaged both the School of Law's retention rate and its graduation rate.

186.    Brown's removal was in direct conflict with the mission statement of the School of Law, because it eliminated any possibility to prepare a student to be an "outstanding member[] of the legal profession, well educated in the law, with a commitment to professional achievement and public service."

187.    Brown's removal was in direct conflict with the Published Admissions Guidelines, because it eliminated any possibility of educating a prospective Kansas lawyer and providing a high-quality legal education to a prospective student.

188.    Brown's removal was in direct conflict with the Published Admissions Guidelines, because it ignored the diversity presented by his employment background, his professional experience, and his age – Brown was 49 years old at the time of his dismissal.

189.    No reason has ever been given for Brown's removal which is rooted in the school's admissions policies or criteria, and no valid reason exists in any such published criteria.

190.    Even assuming there was some Faculty Senate regulation or policy which permitted or mandated Brown's removal, because the F.S.R.R. is "[s]ubject to and in accordance

28

with the control of the Chancellor and the Board of Regents," such policy would be superseded as a means of unfettered discretion by the process guaranteed by the University's Code of Student Rights and responsibilities. (U.S.C. Art. III, § 5); (U.S.C. Art. II, § 5.2); (F.S.R.R. Art. II, § 1.1)(Admissions policies are subject to, and therefore subordinate to, regents regulations.)

## Refusal to Mediate

191. Mediation and informal dispute resolution are the preferred means of conflict resolution within the University Community.

192. The University Senate Rules and Regulations provide that "the University community is best served through informal compromise resolution of disputes. Thus, before pursuing formal grievance procedures, a grievant should ordinarily attempt to resolve the matter informally through direct or indirect consultation with the other party or through discussions with supervisory personnel." U.S.R.R., Art. VI, § 2.1.

193. The University Senate Rules and Regulations provide that "[i]nformal mediation shall be available to resolve disputes within the University community. Unless either party to a dispute waives mediation, mediation shall occur prior to a hearing on the dispute." U.S.R.R., Art. VI, § 2.3.1.

194. The School of Law's Unit Level Dispute Resolution Procedure provides that "parties are encouraged to resolve disputes informally before resorting to formal procedures." D.R.P. § 3.

195. The School of Law's Unit Level Dispute Resolution Procedure provides that "[a] complaining party should first discuss his or her complaint with the Law School Ombudsman, who shall consider the matter with an eye to seeking a conciliatory solution." D.R.P. § 3(b).

196. Brown requested mediation verbally at the initial February 23, 2010 meeting with defendant Mazza, formally in writing via email to defendant Mazza on March 3, 2010, in writing via email to defendant Mazza on April 15, 2010, and on April 20, 2010 through the Law School Ombudsman.

197. The School of Law persistently and continually refused Browns reasonable requests to undertake any type of mediation or other discussion regarding this matter, foreclosing mediation or any other means of informal dispute resolution proceedings as an option from the very outset.

198. The School of Law never provided a reason for its staunch refusal to undertake the dispute resolution procedures which are recommended and in some cases required as a first resort by both the U.S.R.R. and the D.R.P.

199. The School of Law's refusal to undertake dispute resolution evidences a myopically prosecutorial bent toward Brown's removal from the outset of the filing of the complaint which was wholly unwarranted by the Admissions policies of the Chancellor, the University and the School of Law.

200. The School of Law's failure to ever make informal dispute resolution available to plaintiff Brown violated his due process rights as guaranteed to him in writing by the U.S.R.R.

201. The School of Law's refusal to undertake dispute resolution is inconsistent with the letter and the intent of the rules under which defendant Rohleder-Sook's complaint was originally brought.

## Failure to Timely Provide a Hearing

202. Per U.S.R.R. Art. V, §2.2, all unit level proceedings must provide a hearing within "thirty calendar days from the written submission of a complaint to its hearing[.]"

203.     The School of Law did not even assemble a hearing panel until 45 days after its
filing of the complaint.

204.     Plaintiff Brown was ultimately never provided a hearing.

205.     The School of Law's failure to even assemble a hearing panel within the required
time limit for provision of a hearing violated Brown's due process rights as guaranteed to him in
writing by the U.S.R.R.

206.     The School of Law's failure to provide the required hearing violated Brown's due
process rights as guaranteed to him in writing by the U.S.R.R.

207.     The School of Law's failure to provide the required hearing violated Brown's
federal Constitutional due process rights to an opportunity to be heard in a meaningful manner at
a meaningful time before and impartial hearing body as provided in Goldberg v. Kelley, 397
U.S. 254, 267 (1970); Arnett v. Kennedy, 416 U.S. 134, 197 (1974).

## Disparate Treatment of Plaintiff and All Other Amending Applicants

208.     Over the past decade, many other School of Law applicants have come forward
and amended, including other applicants in plaintiff Brown's entering class.

209.     The great majority of transgressions reported on other amended School of Law
applications are much more recent than Mr. Brown's thirteen year old misdemeanor convictions.

210.     Brown is the first Law Student in the history of the School of Law to be
permanently removed after coming forward and amending.

211.     No proper secular purpose supports this disparate treatment of Brown from every
other student in the history of the School of Law who is or has been similarly situated

212.   This disparate treatment of Brown from every other student in the history of the
School of Law who is or has been similarly situated was unfair, arbitrary, capricious, and
unsupported by any valid secular purpose.

**The School of Law's Belated Withdrawal of Previously Promised Due Process Rights**

213.   At the initial February 23, 2010 meeting, defendant Mazza explained that the
School of Law placed a high value on plaintiff Brown's due process rights, and provided him
with a copy of the School of Law's dispute resolution procedure which guaranteed those due
process rights in writing.

214.   Defendant Mazza's April 14, 2010 email to plaintiff Brown made clear that he
and defendant Rohleder-Sook had taken up Brown's procedural objections with the University's
General Counsel, stating "we've heard back from the KU General Counsel's office[.] [I]n an
effort to preserve your due process rights to the greatest extent possible, we've had to consider
matters very carefully and that has caused delay in processing the complaint."

215.   Defendant Mazza's April 14, 2010 email evidences that even the University's
General Counsel, after "consider[ing] matters very carefully", felt plaintiff Brown was entitled to
the due process rights originally promised in writing by defendant Mazza and the University's
Rules and Regulations.

216.   Plaintiff Brown spent more than one hundred hours participating in the School of
Law's Dispute Resolution process, as set forth in the writing handed to him by defendant Mazza.

217.   All actions in this dispute which were taken between the delivery of defendant
Rohleder-Sook's complaint on February 23, 2010 and the dismissal of defendant Rohleder-
Sook's complaint on May 3, 2010 indicated that the entire University community, including the
degreed and licensed attorneys who administer the School of Law and the University, and the

University's general counsel, acknowledged and respected Brown's due process rights as guaranteed by defendant Mazza and the University's Rules and Regulations as personally presented to Brown in writing.

218.     Plaintiff Brown's perceptions regarding his due process rights were also the law school's perceptions regarding his due process rights until the hearing panel dismissed the complaint on May 3rd, 2010.

219.     After dismissal of defendant Rohleder-Sook's complaint on May 3, 2010, it became impossible for the School of Law to continue its prosecution of Mr. Brown while still observing his due process rights, and the theory of unfettered administrative discretion under F.S.R.R. 2.1.1 was invented in order to circumvent Brown's constitutional rights entirely.

220.     There is no provision within any of the admissions policies the School of Law Faculty has established and filed with the Director of Admissions and the Secretary of the Faculty Senate which entitles the School of Law, the University, the Chancellor, or the Board of Regents to deny Brown the procedural guarantees which the D.R.P, the University's Rules and Regulations, and the Student Code of Rights and Responsibilities afford to every other member of the University Community except plaintiff Brown.

221.     It is improper for State Actors to change the rules when those rules do not yield the results personally desired by State Actors.

222.     The School of Law invited plaintiff Brown to participate in its own process, according to its own published rules and regulations, and then chose to completely disregard those same rules and regulations when the outcome was not as they had planned.

223.     Defendants' actions make clear that the "process" guaranteed to plaintiff Brown was merely a predetermined outcome countenanced as a quasi-legal process, and that the

defendants intended at all times to manipulate that process to assure that Brown was permanently removed, no matter what the cost to the integrity of the process.

224. The actions taken here denied Brown the protections afforded to every other similarly situated student in the State of Kansas without any valid secular purpose.

**Intentional and Permanent Destruction of Plaintiff's Legal Career**

225. The Honor Code of the University of Kansas School of Law correctly points out at Art. IV, §that "[p]ermanent expulsion should be reserved only for the most serious offenses, especially because disciplinary expulsion of a law student from a member of the Association of the American Law Schools prevents that student from enrolling in any other member schools."

226. Defendant Agrawal's May 25, 2010 letter states "[t]he School of Law's transcript will show that your dismissal was based on your falsification, misrepresentation, and repeated failure to supply complete and accurate information in your application to the school of law."

227. The School of Law has permanently expelled plaintiff Brown, and has so noted in his transcript.

228. This action will prevent plaintiff Brown from ever being accepted to any other ABA Accredited School of Law, thus permanently foreclosing and prospect of a career as an attorney.

229. This transcript notation was added to plaintiff Brown's application without the required due process, without any hearing whatsoever, and without the opportunity even for a face to face meeting with the decision maker, defendant Agrawal.

230. This transcript notation was added by the School of Law with the specific intention that Brown be forever denied admission to any ABA Accredited School of Law.

34

231.    This transcript notation, much like retention of Plaintiff Brown's tuition for two complete semesters, is completely inconsistent with Defendants' theory of "voiding" or "cancellation" of Brown's enrollment, which would result in no transcript at all.

232.    Plaintiff Brown's permanent and documented expulsion has wrongly, intentionally, maliciously, without secular purpose, without due process of law, and forever denied plaintiff Brown his constitutional right to earn his livelihood by any lawful calling and to pursue any livelihood or avocation he wishes. Allgeyer v. Louisiana, 165 US 578, 589 (1897)

## Other University Actions Which are Inconsistent with University Policy

233.    Defendant Mazza's April 16th email indicated that the University had obtained representation to prosecute Brown and that a representative from the General Counsel's offices would "participate in the hearing on behalf of Wendy Rohleder-Sook."

234.    Plaintiff Brown's numerous requests for information regarding prior amended applications and disciplinary proceedings regarding those applications were denied although the right to this information was guaranteed to Brown by D.R.P. § 14.

235.    Plaintiff Brown's law school class was not completely full even at the beginning of the Fall 2009 semester, because some students who accepted neither enrolled nor cancelled, and there is no waiting list for Brown's seat in the School of Law's class of 2012.

236.    Plaintiff Brown's seat will never be filled, and his unreasoned dismissal will cost the School of law approximately $35,000 in foregone tuition and fees which will never be recouped.

237.    Notwithstanding the revenue loss to the School and the taxpayers, the Individual Defendants refused to so much as speak with Brown regarding any alternative solution by which they might retain the revenue (and perhaps even exact a sanction).

238. The contents of both the Memorandum Decision of May 3, 2010 and defendant Agrawal's letter of May 26, 2010 indicate that defendant Mazza made false, extrajudicial, and extremely prejudicial representations to both the hearing panel and defendant Agrawal regarding incriminating statements he claimed were made by plaintiff Brown.

239. These representations, even if they had been true, would have been protected by defendant Mazza's assurances to plaintiff Brown at the February 23, 2010 meeting that defendant Mazza would serve as an intermediary and hold everything Brown said in confidence.

240. Plaintiff Brown was never given the opportunity to confront defendant Mazza regarding these representations, despite the requirements of the University Senate Code, the Code of Student Rights and Responsibilities, the DRP and the U.S.S.R.

241. Despite the lack of hearing or other meaningful confrontation, both the hearing panel and defendant Agrawal cited Mazza's statements, although false not subject to confrontation by Brown, as a primary basis for their decisions.

## Defendants' Improper Ulterior Motive

242. During the dispute process, plaintiff Brown was made aware by University personnel that defendants sought his permanent removal because of the nature of the crimes of which he was convicted thirteen years prior.

243. Plaintiff Brown's record is clear of any conviction other than minor traffic violations since the 1996 cases at issue.

244. Kansas Case law regarding Bar Discipline suggests seasoning periods of five to seven years for misdemeanors, after which time such cases are considered too remote for consideration. In re Pistotnik, 254 Kan. 294, 296 (1993) (Misdemeanor offenses involving violent behavior, pleading no contest to a misdemeanor charge of hit and run in violation of city

36

ordinance, negligent failure to monitor a case resulting in its dismissal, and misrepresenting to an insurer facts of a case in which insurer had a subrogation interest were too remote in time to consider after the passage of five years time); In re Ketter, 268 Kan. 146, 154-5 (1999) (Seven year old misdemeanor convictions for lewd and lascivious behavior were too remote in time to consider.)

245.    The University is a State Funded Institution which consumes more than half a billion dollars in taxpayer owned funds per year.

246.    As such, the University must administer and enforce its policies, rules and regulations in an even handed way and treat all similarly situated Kansas Citizens equally.

247.    Defendants' personal moral judgments, to the extent they do not affect a student's ability to succeed professionally or academically, are not proper considerations when considering the permanent removal of an already admitted student who's application and tuition have been accepted by the School of Law without reservation and who's academic performance and payment history are exemplary..

248.    Defendants have improperly posited their personal moral judgments regarding the nature of plaintiff Brown's 13 year old convictions as University Admissions policy, and then used state machinery under the guise of University Legal Process to improperly, maliciously and permanently enforce their personal moral judgments and to forever deprive plaintiff Brown the opportunity to pursue a career as an attorney anywhere in the United States.

249.    Defendants persisted in their prosecution even after their improper claim was dismissed by the hearing panel, at the expense of the integrity of the University and the School of Law's process, rules, regulations and notions of fundamental fairness.

250. Defendants' proposed justification for their sudden withdrawal and termination of Brown's due process rights as guaranteed verbally, in writing, and though written communication is a transparent attempt to build form over lack of substance, and represents compelling evidence of defendants' improper ulterior motive.

## Liability of the Institutional Defendants

251. Defendants Mazza, Rohleder-Sook, Agrawal, and McCray-Pearson (the Individual Defendants) were at all times pertinent governed and/or employed by defendants the University of Kansas and the School of Law (the Institutional Defendants).

252. The Institutional Defendants had a duty to properly supervise defendants Mazza, Rohleder-Sook, Agrawal, and McCray-Pearson (the Individual Defendants) and failed to do so even after escalation of this matter through all proper channels - they are liable pursuant to *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir.2009)

253. There is a direct causal link between the actions of the Institutional Defendants and the constitutional deprivations which resulted, and these actions were in many cases undertaken by top policy makers within the Institutional Defendants – they are liable pursuant to *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1212 (10th Cir. 2007).

254. The prompt and ill-considered actions undertaken by all involved actors within all Institutional Defendants indicate a custom and policy to support any decision promulgated by personnel within the University Community, no matter how wrongful or unconstitutional, and the Institutional Defendants are therefore liable under the doctrine of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)

## Knowing, Improper and Unlawful State Action by the Individual Defendants

255. Defendants Mazza, Rohleder-Sook, Agrawal, and McCray-Pearson (the Individual Defendants) are all licensed, degreed and credentialed professional attorneys and administrators, trained in constitutional law, and knowledgeable in the proper application of the Rules and Regulations of the Board of Regents, the office of the Chancellor, the University and the School of Law.

256. The Individual Defendants knew at all times pertinent that the actions they took regarding Brown's dismissal violated Brown's rights to due process of law.

257. The Individual Defendants knew at all times pertinent that the actions they took regarding Brown's dismissal singled brown out from others similarly situated within the University community.

258. The Individual Defendants knew at all times pertinent that the actions they took regarding Brown's dismissal were outside the scope of Kansas Law, Regents rules and regulations, Chancellor's rules and regulations, University rules and regulations, and School of Law rules and regulations.

259. The Individual Defendants both possessed and breached a contractual duty to plaintiff Brown to act within the bounds of existing State, Regents, Chancellor's, University and School of Law policies, laws, and regulations.

260. The Individual Defendants both possessed and breached a fiduciary duty to the State of Kansas to act within the bounds of existing State, Regents, Chancellor, University and School of Law policies, laws, and regulations.

261. The Individual Defendants at all times pertinent purported to be taking the actions herein alleged on behalf of the State of Kansas, and were clothed in the authority of the State of Kansas.

262. The Individual Defendants' actions were undertaken with reckless or callous indifference to the rights of and harm to plaintiff Brown.

263. The Individual Defendants' actions were carried out to exact a severely punitive purely personal agenda of retribution for perceived actions that had nothing to do with the policies or interests of the State institutions they purported to represent.

264. The Individual Defendants abused the power of the State for personal and improper purposes.

## Damages

265. As a direct and proximate result of defendants' intentional and improper actions, plaintiff Brown has incurred thousands of dollars in legal expenses which would have proved unnecessary absent defendants' improper actions.

266. As a direct and proximate result of defendants' intentional and improper actions, plaintiff Brown has expended more than fifteen thousand dollars to attend the University of Kansas School of Law for which he now has no hope of ever realizing any benefit.

267. As a direct and proximate result of defendants' intentional and improper actions, plaintiff Brown has incurred twenty thousand dollars in student debt to pay expenses while attending the University of Kansas School of Law which he is now struggling to repay due to his removal from school without the ability to generate revenues with his education, and which would not have been incurred if defendants had acted promptly to assert the rights they now claim they had from the outset of the D.R.P. Proceedings to dismiss Brown.

268. As a direct and proximate result of defendants' intentional and improper actions, plaintiff Brown has devoted ten months of his productive effort to attendance and study at the

School of Law, and as a result has foregone tens of thousands of dollars in compensation which he could otherwise have earned.

269. As a direct and proximate result of defendants' intentional and improper actions, Brown unnecessarily jeopardized and in many cases lost his working relationships with key business clients, affecting his ability to earn revenues in the future, with the expectation of recouping this revenue loss with the proceeds of his legal career.

270. As a direct and proximate result of defendants' intentional and improper actions, plaintiff Brown has been forever precluded from pursuing a legal career as an attorney at which he would otherwise have been successful, affecting his ability to earn millions of dollars in future revenues.

271. As a direct and proximate result of defendants' intentional and improper actions, plaintiff Brown has been forever precluded from pursuing a legal career as an attorney, depriving him of his fundamental liberty interest in pursuit of a lawful calling of his own choosing.

272. As a direct and proximate result of defendants' intentional and improper actions, plaintiff Brown devoted more than one hundred hours to defense and litigation pertaining to assertion of the rights which defendants promised initially but now claim never existed.

273. As a direct and proximate result of defendants' intentional and improper actions, plaintiff Brown was denied his Fourteenth Amendment right to due process of law regarding the deprivation of his liberty interest in Continuing Enrollment at a State University.

274. As a direct and proximate result of defendants' intentional and improper actions, plaintiff Brown was denied his Fourteenth Amendment right to due process of law regarding the deprivation of his property interest in his contract rights with the University and the School of Law.

275. As a direct and proximate result of defendants' intentional and improper actions, plaintiff Brown has suffered and continues to experience emotional pain, suffering, humiliation, inconvenience, fear of State Machinery, mental anguish, loss of enjoyment of life and other non-pecuniary losses.

276. Defendants' intentional and improper actions were undertaken with reckless or callous indifference to the rights of and harm to plaintiff Brown, and represent personal, self serving, severely punitive acts countenanced as State Action. Punitive damages are appropriate.

## COUNT 1: 42 U.S.C. § 1983 PROCEDURAL DUE PROCESS DEPRIVATIONS REGARDING PLAINTIFF'S LIBERTY AND PROPERTY INTERESTS IN CONTINUED ENROLLMENT

277. Plaintiff repeats and incorporates by reference the allegations in paragraphs 1 through 276 above with the same force and effect as if herein set forth.

278. Plaintiff has a constitutionally protected liberty interest in continued enrollment at the University of Kansas School of Law pursuant to Regents of the University of Michigan v. Ewing, 474 U.S. 214, 217 (1985)(Assumed without deciding.)

279. Plaintiff has a constitutionally protected property interest in his contract for continued enrollment at the University of Kansas School of Law which arises pursuant to the School of Law's acceptance of his application for admission, the School of Law's acceptance and retention of his tuition, the representations made publicly by Defendants regarding the requirements for and the rights appurtenant to continued enrollment, the U.S.R.R., D.R.P., Code of Student Rights and Responsibilities, and University Senate code, all of which expressly guarantee that right to plaintiff and every other student who is enrolled at the University of Kansas School of Law.

42

280. Plaintiff was entitled to a meaningful opportunity to be heard before an impartial decision maker before the discontinuation of his enrollment pursuant to Goldberg v. Kelley, 397 U.S. 254, 267 (1970) and Arnett v. Kennedy, 416 U.S. 134, 197 (1974).

281. Plaintiff was entitled to a meaningful opportunity to be heard before an impartial decision maker before the discontinuation of his enrollment pursuant to the University Senate Code, the U.S.R.R., the D.P.R. and the Code of Student Rights and responsibilities.

282. The Individual Defendants, through knowing, intentional and malicious misuse of a state legal process for personal ends and without a valid secular purpose, intentionally, wrongfully and illegally deprived plaintiff Brown of his rights to procedural due process regarding the deprivation of both his liberty interest in and his contractual property interest regarding his continued enrollment at the University of Kansas.

283. At all times pertinent, the Individual Defendants were "persons" for purposes of 42 U.S.C. § 1983.

284. At all times pertinent, the Individual Defendants were acting under color of state law, and purported that their actions were undertaken on behalf of the state and pursuant to state authority and procedure.

285. At all times pertinent, the Individual Defendants were acting in violation of Federal Constitutional Law, Kansas Law, the University Senate Code, the D.R.P., the U.S.R.R., the F.S.R.R. and the Code of Student Rights and responsibilities.

286. The Individual Defendants had no lawful discretion to act as they did, and were not performing discretionary functions.

287. The Individual Defendants were not administering, interpreting or enforcing any state law or policy.

288. At all times pertinent, the conduct of the Individual Defendants was subject to 42 U.S.C. § 1983.

289. At all times pertinent, the Individual Defendants, each severally and all or in any combination jointly as conspirators, knew or should have know that their actions were unlawful and unconstitutional.

290. The conduct of all the Individual Defendants involved reckless or callous indifference to plaintiffs' federally protected rights.

291. As a direct and proximate result of this conduct, plaintiff Brown suffered damages as set forth in paragraphs 265 through 276 above.

WHEREFORE plaintiff Brown prays for judgment as follows:

Against the Individual Defendants each individually for damages in excess of two million dollars as are just, fair and reasonable, for punitive damages, for reasonable attorneys' fees, and for costs herein incurred.

## COUNT 2: 42 U.S.C. § 1983 SUSTANTIVE DUE PROCESS REGARDING PLAINTIFF'S RIGHTS TO PURSUE A LAWFUL CALLING OF HIS OWN CHOOSING

292. Plaintiff repeats and incorporates by reference the allegations in paragraphs 1 through 291 above with the same force and effect as if herein set forth.

293. Plaintiff has a fundamental right to earn his livelihood by any lawful calling and to pursue any livelihood or avocation he wishes pursuant to Allgeyer v. Louisiana, 165 US 578, 589 (1897).

294. The Individual Defendants, through knowing, intentional and malicious misuse of a state legal process for personal ends and without a valid secular purpose, intentionally, wrongfully and illegally deprived plaintiff Brown of his right to choose and pursue his chosen calling.

295. At all times pertinent, the Individual Defendants were acting under color of state law, and purported that their actions were undertaken on behalf of the state and pursuant to state authority and procedure.

296. At all times pertinent, the Individual Defendants were acting in violation of Federal Constitutional Law, Kansas Law, the University Senate Code, the D.R.P., the U.S.R.R., the F.S.R.R. and the Code of Student Rights and responsibilities.

297. The Individual Defendants had no lawful discretion to act as they did, and were not performing discretionary functions.

298. The Individual Defendants were not administering, interpreting or enforcing any state law or policy.

299. At all times pertinent, the conduct of the Individual Defendants was subject to 42 U.S.C. § 1983.

300. At all times pertinent, the Individual Defendants, each severally and all or in any combination jointly as conspirators, knew or should have know that their actions were unlawful and unconstitutional.

301. The conduct of all the Individual Defendants involved reckless or callous indifference to plaintiffs Brown's federally protected rights.

302. As a direct and proximate result of this conduct, plaintiff Brown suffered damages as set forth in paragraphs 265 through 276 above.

WHEREFORE plaintiff Brown prays for judgment as follows:

Against the Individual Defendants each individually for damages in excess of two million dollars as are just, fair and reasonable, for punitive damages, for reasonable attorneys' fees, and for costs herein incurred.

## COUNT 3: 42 U.S.C. § 1983 PROSPECTIVE INJUNCTIVE RELIEF PURSUANT TO EX PARTE YOUNG

303. Plaintiff Brown repeats and incorporates by reference the allegations in paragraphs 1 through 302 above with the same force and effect as if herein set forth.

304. Plaintiff Brown's removal and exclusion from enrollment at the School of Law was unconstitutional, and a federal constitutional violation undertaken by State Actors is perpetuated so long as that removal and exclusion is allowed to continue.

WHEREFORE plaintiff Brown prays for prospective injunctive relief pursuant to the doctrine of Ex Parte Young as follows:

1. That defendants Andy Tompkins, Gary Sherrer, Ed McKechnie, Jarold Boettcher, Christine Downey-Schmidt, Mildred Edwardsin, Tim Emert, Richard Hedges, Dan Lykins, Janie Perkins, Bernadette Gray-Little, and Stephen W. Mazza, all as named in their official capacities (the Official Capacity Defendants), be ordered to immediately reinstate plaintiff Brown to the University of Kansas School of Law.

2. That the Official Capacity Defendants be ordered to remove all references regarding the School of Law's dismissal of plaintiff Brown all negative remarks from plaintiff Brown's transcript.

3. That the Official Capacity Defendants be ordered to refrain from pursuing future removal of Brown based on the grounds other than those set forth in published laws, University Rules and Regulations, Regents Rules and Regulations, Chancellor's Rules and Regulations, and the Code of Student Rights and Responsibilities.

4. That the Official Capacity Defendants be ordered to refrain from attempting to remove Brown based upon his amended application because they may not lawfully do so under theories of waiver and estoppel.

46

5. That the Official Capacity Defendants be ordered to provide reimbursement for reasonable attorneys' fees and for costs incurred herein.

## COUNT 4: STATE CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO to K.S.A. 60-1701 *et. seq.,* 60-257, 60-902 and 60-903

305.    Plaintiff Brown repeats and incorporates by reference the allegations in paragraphs 1 through 304 above with the same force and effect as if herein set forth.

306.    Plaintiff is entitled to a declaration, pursuant to K.S.A. 60-1701 *et. seq.,* and 60-257 that defendants have entered into a binding enrollment contract with Plaintiff Brown which they may not repudiate for reasons other than those set forth in published laws,  University Rules and Regulations, Regents Rules and Regulations, Chancellor's Rules and Regulations, and the Code of Student Rights and Responsibilities.

307.    Plaintiff is entitled to a declaration, pursuant to K.S.A. 60-1701 *et. seq.,* and 60-257 that defendants are estopped from repudiation based upon Brown's amended application because they accepted the amended application, enrolled him for the Spring 2010 semester, accepted his tuition and began performance of the underlying contract without expressing any qualification or reservation, and are now precluded from doing so pursuant to Morse v. Kogle, 162 Kan. 558, Syl at 1-3 (1947), Schiffelbein v. Sisters of Charity of Leavenworth, 190 Kan. 278, 281-2 (1962), and the theories of waiver and estoppel.

308.    Pursuant to K.S.A. 60-902 and 60-903, plaintiff is entitled to the issuance of a temporary restraining order that defendants refrain from enforcing his removal from the University of Kansas School of Law until this matter has been decided.

309.    There is a substantial likelihood that plaintiff will prevail on the merits of his claim for declaratory relief as set forth above.

310. Without a temporary injunction, plaintiff will continue to suffer ongoing and irreparable harm, which includes the loss of his constitutional procedural and substantive due process rights, delay in completing his law degree, absence from the curriculum for a period of time which may severely hinder his progress and require extensive remedial measures once he resumes school, unwarranted damage to his reputation in the legal community, his inability to enroll at any ABA accredited school of law other than the University of Kansas, loss of the value of his substantial initial investment in his legal education, and unwarranted interference with his fundamental right to pursue his chosen lawful calling and to pursue the livelihood or avocation he wishes.

311. The temporary injunction is in no way adverse to the public interest, and instead will actually add approximately $35,000 to University Funding and support the enforcement of meticulously crafted policies and procedures which exist within the University community.

312. The harm to plaintiff greatly outweighs the damage to defendants, since defendants are unable to articulate any harm which might begin to weigh against the benefit of the exemplary work Brown has done since he began matriculation at the University of Kansas School of Law, the furtherance of the Chancellor's admissions goals of retention and graduation, and the procurement of Brown's continued tuition..

313. No remedy at law is adequate in this case to timely protect plaintiff from the damage to his constitutional rights and career prospects as described above.

WHEREFORE plaintiff Brown prays that judgment be entered in his favor granting him the declaratory and injunctive relief described above, for the issuance of an appropriate and adequate temporary restraining order and temporary injunction as described above, that the court

order a speedy hearing pursuant the K.S.A. 60-257, for his costs, and for whatever other and further relief the Court deems just and equitable.

## COUNT 5: STATE CLAIM FOR GROSS AND WANTON NEGLIGENCE

314.    Plaintiff Brown repeats and incorporates by reference the allegations in paragraphs 1 through 313 above with the same force and effect as if herein set forth.

315.    The Individual Defendants owed plaintiff Brown a duty of Care in the administration of the policies, procedures and protections of the U.S.R.R., D.R.P., Code of Student Rights and Responsibilities, and University Senate code which had been offered as an inducement for enrollment and used to secure the collection of Brown's tuition.

316.    Defendants owed plaintiff Brown a duty of Care with respect to treating his enrollment contract in accordance with published University customs, policies and procedures which were applicable to all admitted students within the University Community.

317.    By explaining to Plaintiff Brown that he had due process rights and the presenting Brown with a written document which spelled out those rights, Defendants assumed a duty of care to see that Brown's due process rights were enforced.

318.    As public employees and State Actors charged with control of a State Funded Institution which consumes more than half a billion dollars in taxpayer owned funds per year., defendants had a duty to treat all similarly situated Citizens equally by virtue of their special relationship as public servants beholden both to state and federal constitutional law and to students, and this duty extended to plaintiff Brown.

319.    As professional administrators, the Individual Defendants had a duty to know the rules and limitations on their disciplinary processes and to act in a prompt and judicious manner

49

if, as they contend, no due process was required so as to avoid reliance damages on plaintiff Brown's part and unnecessary waste of Brown's resources..

320.    The Individual Defendants breached each and all of the duties listed in Paragraphs 315 through 319.

321.    As a direct, actual and proximate result of breach by the Individual Defendants of the duties owed to plaintiff Brown, Brown incurred damages as set forth in Paragraphs 265 through 276 above.

322.    The breach by the Individual Defendants of the duties owed to plaintiff Brown was undertaken wrongfully, knowingly, and intentionally by the Individual Defendants with no regard or concern for the damages which were easily foreseeable and certain to result.

323.    The breach by the Individual Defendants of the duties owed to plaintiff Brown was undertaken in knowing violation of multiple policies, procedures and protections of the U.S.R.R., D.R.P., Code of Student Rights and Responsibilities, and University Senate code.

324.    The breach by the Individual Defendants of the duties owed to plaintiff Brown was undertaken in knowing violation Brown's constitutional rights.

325.    The acts of the Individual Defendants indicate a realization of the imminence of the danger of the damages which resulted and a reckless disregard or a complete indifference or an unconcern for the probable consequences of the wrongful acts.

326.    The acts of the Individual Defendants were malicious and intentionally fraudulent.

327.    At all times pertinent, the Individual Defendants were acting under color of state law, and purported that their actions were undertaken on behalf of the state, pursuant to state authority and procedure, and within the scope of their employment with the State.

328.    The Individual Defendants had discretion neither to perform the unconstitutional

acts they undertook nor to disregard the U.S.R.R., D.R.P., Code of Student Rights and

Responsibilities, and University Senate code, and were not performing discretionary functions.

329.    At all times pertinent, the Institutional Defendants were liable as described in

Paragraphs 251 through 254 above.

WHEREFORE plaintiff Brown prays for judgment as follows:

Against the Individual Defendants each individually for damages in excess of two million

dollars as are just, fair and reasonable, for punitive damages, for reasonable attorneys' fees, and

for costs herein incurred.

Against the Institutional Defendants as a collective group for damages of five hundred

thousand dollars with such sum being apportioned between each of the Institutional Defendants

pursuant to K.S.A. § 75-6105, for reasonable attorneys' fees, and for costs incurred herein.

## COUNT 6: STATE CLAIM FOR TORTIOUS INTERFERENCE WITH A
## PROSPECTIVE BUSINESS ADVANTAGE

330.    Plaintiff Brown repeats and incorporates by reference the allegations in

paragraphs 1 through 329 above with the same force and effect as if herein set forth.

331.    Plaintiff Brown had a legitimate business expectancy in his future as a practicing

attorney.

332.    The Individual Defendants were aware of the business expectancy which is

appurtenant to a law degree from the University of Kansas

333.    The Individual Defendants' intentional and wrongful misconduct interfered with

the Plaintiff Brown's business expectancy in his future as a practicing attorney.

334. But for the intentional and wrongful conduct of the Individual Defendants, Plaintiff Brown was reasonably certain to realize his business expectancy in his future as a practicing attorney.

335. As a direct, actual and proximate result of the Individual Defendants' intentional and wrongful actions, Brown incurred damages as set forth in Paragraphs 265 through 276 above.

336. The wrongful acts of the Individual Defendants were malicious and intentionally fraudulent.

337. At all times pertinent, the Individual Defendants were acting under color of state law, and purported that their actions were undertaken on behalf of the state, pursuant to state authority and procedure, and within the scope of their employment with the State.

338. The Individual Defendants had discretion neither to perform the unconstitutional acts they undertook nor to disregard the U.S.R.R., D.R.P., Code of Student Rights and Responsibilities, and University Senate code, and were not performing discretionary functions.

339. At all times pertinent, the Institutional Defendants were liable as described in Paragraphs 251 through 254 above.

WHEREFORE plaintiff Brown prays for judgment as follows:

Against the Individual Defendants each individually for damages in excess of two million dollars as are just, fair and reasonable, for punitive damages, for reasonable attorneys' fees, and for costs herein incurred.

Against the Institutional Defendants as a collective group for damages of five hundred thousand dollars with such sum being apportioned between each of the Institutional Defendants pursuant to K.S.A. § 75-6105, for reasonable attorneys' fees, and for costs incurred herein.

## **COUNT 7: STATE CLAIM FOR ABUSE OF PROCESS**

340.    Plaintiff Brown repeats and incorporates by reference the allegations in paragraphs 1 through 339 above with the same force and effect as if herein set forth.

341.    The Individual Defendants made knowing, intentional and malicious misuse of the State's legal power for an improper purpose, to wit: they dismissed plaintiff Brown from the University, in violation of university policies, university procedures, university rules, and Brown's constitutional rights, to serve their own personal moral values of righteous indignation and retribution regarding the nature of Brown's prior misdemeanors.

342.    As a direct, actual and proximate result of misuse of the State's legal power by the Individual Defendants of the duties owed to plaintiff Brown, Brown incurred damages as set forth in Paragraphs 265 through 276 above.

343.    The actions of the Individual Defendants were undertaken in knowing violation of multiple policies, procedures and protections of the U.S.R.R., D.R.P., Code of Student Rights and Responsibilities, and University Senate code.

344.    The actions of the Individual Defendants were undertaken in knowing violation of Brown's constitutional rights.

345.    The actions of the Individual Defendants were malicious and intentionally fraudulent.

346.    At all times pertinent, the Individual Defendants were acting under color of state law, and purported that their actions were undertaken on behalf of the state, pursuant to state authority and procedure, and within the scope of their employment with the State.

347. The Individual Defendants had discretion neither to perform the unconstitutional acts they undertook nor to disregard the U.S.R.R., D.R.P., Code of Student Rights and Responsibilities, and University Senate code, and were not performing discretionary functions.

348. At all times pertinent, the Institutional Defendants were liable as described in Paragraphs 251 through 254 above.

WHEREFORE plaintiff Brown prays for judgment as follows:

Against the Individual Defendants each individually for damages in excess of two million dollars as are just, fair and reasonable, for punitive damages, for reasonable attorneys' fees, and for costs herein incurred.

Against the Institutional Defendants as a collective group for damages of five hundred thousand dollars with such sum being apportioned between each of the Institutional Defendants pursuant to K.S.A. § 75-6105, for reasonable attorneys' fees, and for costs incurred herein.

## COUNT 8: STATE CLAIM FOR CIVIL CONSPIRACY

349. Plaintiff Brown repeats and incorporates by reference the allegations in paragraphs 1 through 348 above with the same force and effect as if herein set forth.

350. The Individual Defendants were, at all times pertinent to their involvement in this action, conspirators.

351. The Individual Defendants had an object to be accomplished, to wit: to dismiss plaintiff Brown from the University, in violation of university policies, university procedures, university rules, and Brown's constitutional rights, to serve their own personal moral values of righteous indignation and retribution regarding the nature of Brown's prior misdemeanors.

352. The actions described above indicate a meeting of the minds on the parts of the Individual Defendants regarding Brown's wrongful dismissal.

353. The actions which furthered this conspiracy were fraudulent, wrongful, unlawful and overt.

354. As a direct, actual and proximate result of misuse of the State's legal power by the Individual Defendants, Brown incurred damages as set forth in Paragraphs 265 through 276 above.

355. At all times pertinent, the Individual Defendants were acting under color of state law, and purported that their actions were undertaken on behalf of the state, pursuant to state authority and procedure, and within the scope of their employment with the State.

356. The Individual Defendants had discretion neither to perform the unconstitutional acts they undertook nor to disregard the U.S.R.R., D.R.P., Code of Student Rights and Responsibilities, and University Senate code, and were not performing discretionary functions.

357. At all times pertinent, the Institutional Defendants were liable as described in Paragraphs 251 through 254 above.

WHEREFORE plaintiff Brown prays for judgment as follows:

Against the Individual Defendants each individually for damages in excess of two million dollars as are just, fair and reasonable, for punitive damages, for reasonable attorneys' fees, and for costs herein incurred.

Against the Institutional Defendants as a collective group for damages of five hundred thousand dollars with such sum being apportioned between each of the Institutional Defendants pursuant to K.S.A. § 75-6105, for reasonable attorneys' fees, and for costs incurred herein.

## **JURY DEMAND**

Plaintiff hereby demands a trial by Jury of any issue triable of right by a Jury.

## **DESIGNATION OF PLACE OF TRIAL**

Kansas City, Kansas.

Respectfully submitted this 9th day of November, 2010, by,

Robert M. Brown, *Pro Se*
6200 W 74th Street
Overland Park, KS 66204
Phone:      816-721-4512
Fax:         866-610-4630
Email:      bbrown@netstandard.net

56