EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

1

1           IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
2

3   ROBERT M. BROWN,            )
                     Plaintiff,)
4                               )
              vs.               ) Case No.
5                               ) 10-CV-2606 WEB/KGG
    THE UNIVERSITY OF KANSAS,    )
6   ET AL.,                     )
                     Defendants.)
7

8

9                  D E P O S I T I O N

10

11                         OF

12              ROBERT MAURICE BROWN,

13

14  Taken on behalf of the Defendants, pursuant to Notice,

15  on Friday, August 26, 2011, beginning at 9:00 a.m., at

16  the University of Kansas, Office of General Counsel,

17  245 Strong Hall, 1450 Jayhawk Boulevard, Lawrence,

18  Kansas, before Candace K. Braksick, Certified Shorthand

19  Reporter.

20

21            BRAKSICK REPORTING SERVICE
                    P. O. Box 1173
22            Lawrence, Kansas  66044
                    (785)865-6632
23

24

25

              ***Braksick Reporting Service ***
                    (785)865-6632

                                                        2

1                    APPEARANCES

2      The Plaintiff appears pro se.

3      The Defendants appears by Ms. Sara L. Trower,

4   Associate General Counsel and Special Assistant

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

5  Attorney General, Room 245 Strong Hall, 1450 Jayhawk

6  Boulevard, Lawrence, Kansas, 66045.

7                              *******

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    ***Braksick Reporting Service ***
                           (785)865-6632

♀                                                              3


1                    I  N  D  E  X

2                   W I T N E S S

3  FOR THE DEFENDANTS:  ROBERT M. BROWN

4  Direct Examination by Ms. Trower .....................4

5                   E X H I B I T S

6  No.                              First Referenced

7  1  2009 Application for Admission ...................69
   2  Wait list application ...........................88
8  3  8-27-09 Brown letter to Rohleder-Snook ..........91
   4  Petition for Writ of Certiorari .................92
9  5  9-11-09 Brown letter to Rohleder-Snook ..........95

                        Page 2

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
      6   Brown-Rohleder-Sook email string ................97
10    7   5-3-10 Memorandum .............................156
      8   5-25-10 Agrawal letter to Brown ...............158
11    9   5-27-10 Brown letter to Agrawal ...............164
      10  6-7-10 Agrawal letter to Brown ................169
12    11  6-3-10 McCray Pearson letter to Brown .........170
      Certificate .......................................235
```

13

14

15

16

17

18

19

20

21

22

23

24

25

\*\*\*Braksick Reporting Service \*\*\*
(785)865-6632

♀                                                              4

1               ROBERT M. BROWN,

2   Called as a witness, having been first duly sworn by

3   the reporter, testified under oath as follows:

4                  DIRECT EXAMINATION

5   By Ms. Trower:

6   Q    Would you state your name for the record, please.

7   A    Robert Maurice Brown.

8   Q    And your address, please?

9   A    6200 West 74th Street, Overland Park, Kansas,

10       66204.

11  Q    And how long have you lived at that address?

12  A    I think since 1990, or no, 1989.

13  Q    Okay.  And before that do you know the address at

14       which you lived?

Page 3

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

15  A  I believe it was 11640 Stearns, Apartment 121, in

16     Overland Park.

17  Q  And how long did you reside at the Stearns

18     address?

19  A  Two or three years maybe.

20  Q  Okay.  Mr. Brown, as you know, you have filed a

21     lawsuit that's pending in the Kansas district

22     court and we are here today to take your

23     deposition.  Have you had your deposition taken

24     before?

25  A  Yes.

***Braksick Reporting Service ***
(785)865-6632

5

1   Q  How many times have you had your deposition taken

2      before?

3   A  Once.

4   Q  And in what kind of case was that?

5   A  Civil case.

6   Q  Involving what?

7   A  It was Net Standard vs. Republic Acceptance

8      Corporation.  I was the CFO of Net Standard and I

9      had helped negotiate a, an acquisition of a

10     company called Computer Consultants.  Republic

11     Acceptance Corporation was a factoring

12     corporation.

13  Q  A what?

14  A  A factoring receivables corporation.  They were a

15     subsidiary of U.S. Bank.  The acquisition

16     agreement said that Net Standard was entitled to

17     all unearned revenue, whether prepaid, prebilled

18     or both.  When Republic saw the viscosity of that

19     amount they, they decided to terminate the

Page 4

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

20      agreement and sue.

21  Q   That's enough detail on that.

22  A   All right.

23  Q   When was that that you were deposed?

24  A   1997 or '98.

25  Q   And as I understand how you have explained the

***Braksick Reporting Service ***
(785)865-6632

♀                                                          6

1       case, it was your company for which you were the

2       CFO --

3   A   Yes.

4   Q   -- that -- and chief financial officer or CFO?

5   A   Right.

6   Q   And as such you were testifying in your capacity

7       as an officer and employee of the corporation?

8   A   Correct.

9   Q   You didn't -- you were not an individual plaintiff

10      in that case, were you?

11  A   No.

12  Q   Okay.  With respect to depositions, based on your

13      experience I'll try to make the ground rules short

14      and sweet but I'm sure, you know, you have some

15      knowledge of that, having gone through the

16      process.  In the course of the deposition I'm

17      going to ask you a series of questions and

18      Candace, the court reporter, is going to take your

19      responses down.  She can't take both of us talking

20      at the same time.  Her transcript will not

21      accurately reflect nonverbal statements or other

22      modes of communication so uh-huh, huh-uh, umm,

23      hand gestures, things like that are not going to

24      translate into the written record so try not to

Page 5

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

25      use those means of communication and if you do

***Braksick Reporting Service ***
(785)865-6632

7

1       don't be offended if I prompt you and ask you to

2       verbally articulate what it was you were trying to

3       communicate.

4              You understand that you have taken an oath

5       and that your obligation to give full, complete,

6       accurate and truthful answers here today in the

7       deposition is the same as if you were in court?

8       You understand that?

9   A   Yes.

10  Q   In the course of the deposition if I ask you a

11      question and you don't understand the question ask

12      me to repeat it or rephrase it.  If -- and you

13      will do that if you don't understand; correct?

14  A   Yes.

15  Q   And so if you answer the question I should

16      correctly assume that you understood it.  Is that

17      a correct assumption?

18  A   Yes.

19  Q   Similarly, if in the course of the deposition you

20      realize that you have misspoken or misstated or

21      forgotten something in response to that particular

22      question and you need to go back and correct the

23      record, then my expectation is that you will tell

24      me that and do you agree to do that?

25  A   Yes, yes, I agree.

***Braksick Reporting Service ***
(785)865-6632

8

1   Q   In the course of the deposition, similarly, we may

Page 6

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

2     need a break at some point in time.  If you need

3     to use the rest room, get up and stretch your

4     legs, anything like that you just let me know and

5     we'll try to take the break at that time.

6          Is there any medical, physical, or other

7     reason why you would not be capable of giving

8     full, complete, accurate and truthful answers to

9     my questions here today?

10  A   No.

11  Q   What's your date of birth?

12  A   2-22, 1961.

13  Q   And what's the highest level of education that you

14     have achieved?

15  A   A master's degree in accounting with a taxation

16     focus.

17  Q   And where did you obtain that degree?

18  A   U.M.K.C.

19  Q   And when did you obtain that degree?

20  A   1990-ish.  I'm not certain.  I wouldn't be able to

21     give you the exact date without looking at the

22     transcript but I think it was 1990, thereabout.

23  Q   Okay.  And where did you obtain your -- what was

24     your -- strike that.  What was your undergraduate

25     degree?

***Braksick Reporting Service ***
(785)865-6632

9

1  A   It was a bachelor's degree from Washburn

2     University of Topeka.

3  Q   And Bachelor's of Science, Bachelor of Arts,

4     which?

5  A   It was a Bachelor of Science.  I completed all the

6     requirements for a bachelor's in both accounting

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 7      and information technology.
 8  Q   So did your degree read bachelor's in accounting
 9      and information technology?
10  A   I think it reads bachelor's in accounting with an
11      IT concentration or something like that but I'm
12      not certain.
13  Q   When did you graduate from Washburn?
14  A   1985, I believe.
15  Q   Okay.  And do you have any kind of professional
16      licensure or certification, now or in the past?
17  A   Yes.  I have a Kansas CPA certificate.
18  Q   When did you become licensed as a Kansas CPA?
19  A   I'm not licensed as a Kansas CPA, I am a CPA in
20      private practice.
21  Q   Okay.  To practice as a CPA you don't need a
22      professional license?
23  A   No, not, not if you're working for a corporation.
24  Q   Okay.
25  A   You need, you need to be licensed to practice
```

***Braksick Reporting Service ***
(785)865-6632

10

```
 1      publicly to offer accounting services to the
 2      public at large.
 3  Q   When were you licensed as a CPA?
 4  A   You mean when did I get the certificate, when did
 5      I pass the exam?
 6  Q   Yes.
 7  A   '88, '89.
 8  Q   And did you ever --
 9  A   No, I'm sorry, I'm thinking it must have been
10      later, maybe '90 or '91.  The reason I -- I
11      completed the master's program mostly to be able
```

Page 8

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
12        to take the exam.  I was a few credits short of
13        what they required in accounting.
14   Q    And you got the CPA certificate '88, '89, or '90,
15        '91, in that time frame?
16   A    Yeah.
17   Q    And how long did your certificate remain active?
18   A    It's still active.
19   Q    Okay.  So you've never been licensed as a CPA?
20   A    I've never been licensed to practice publicly.
21   Q    Okay.  Did you have any professional employment,
22        and let me talk about that so that we're talking
23        about the same thing, before you graduated from
24        college?  Professional employment I mean, you
25        know, a real life job, not, you know, waiting
```

***Braksick Reporting Service ***
(785)865-6632

11

```
 1        tables, not, you know, interning, not, you know,
 2        odd job sort of thing.  Were you ever before
 3        college working in what you would consider a
 4        full-time professional job?
 5   A    When you say graduated from college do you mean
 6        undergraduate --
 7   Q    Yes.
 8   A    -- or master's?
 9   Q    Undergraduate.
10   A    No.
11   Q    So would it be fair to say, then, that your first
12        professional real life adult full-time job came
13        sometime after you graduated from undergraduate at
14        Washburn?
15   A    Yes.
16   Q    What was that first full time real life
```

Page 9

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

17      professional job?

18  A   Professional Planners, Incorporated.

19  Q   And what did you do for them?

20  A   I'm not certain I remember what my exact title was

21      but they were a financial planning firm and I

22      developed financial planning templates for them

23      using the Smart software suite.  I also

24      implemented financial plans around the templates

25      and methodologies that I developed for clients of

***Braksick Reporting Service ***
(785)865-6632

                                                        12

1       the firm.

2   Q   And how long were you there, from what period to

3       what period, approximately?

4   A   '85 to '88.

5   Q   And who was your supervisor there?

6   A   Terrence L. Atkinson.

7   Q   A T K I N S O N?

8   A   Yes.

9   Q   And where is Professional Planners, Incorporated,

10      located?

11  A   They started out in Topeka and they moved to

12      Kansas City.

13  Q   Is that a currently ongoing concern?

14  A   I don't believe so.

15  Q   Do you know when they went out of business?

16  A   I don't -- I left in 1988 for a better position.

17  Q   And did you work at both the Topeka and the Kansas

18      City offices when it transferred to Kansas City?

19  A   Yeah, I moved from Topeka to Kansas City to stay

20      with the firm.

21  Q   And what was your next professional full-time

Page 10

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

22      employment?

23  A   Fringe Benefits Design, Incorporated.

24  Q   Where is that located?

25  A   It was located in Overland Park, Kansas.

***Braksick Reporting Service ***
(785)865-6632

♀                                                                              13

1   Q   What did you do for them?

2   A   I was their controller.

3   Q   Was that your formal title?

4   A   Yes.

5   Q   And for a lay person who doesn't do money and

6       doesn't do numbers, a controller is essentially

7       the money person, right, does the financial

8       operations?

9   A   Kind of.  A controller is a liaison between, in

10      most companies, in relatively small companies it's

11      a liaison between the CFO and the accounting

12      staff.

13  Q   Okay.

14  A   They generally do the -- well, I mean in companies

15      that are large enough to have an accounting

16      manager.  Generally in situations like I was in

17      they do the heavy lifting regarding putting

18      together the books and parse out the ministerial

19      reconciliation-related tasks and daily tasks to

20      the accounting staff.

21  Q   Okay.  And during what periods of time were you at

22      Fringe Benefits Design?

23  A   I think it was from 1988 to about 1993 or '94.

24  Q   Who was your supervisor there?

25  A   Raymond D. Wynant, W Y N A N T.

***Braksick Reporting Service ***
Page 11

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt
(785)865-6632

♀                                                                                  14

1  Q   And why did you leave Fringe Benefits Design,
2      Incorporated?
3  A   They outsourced their accounting, ending my
4      position.
5  Q   Were you asked to resign or did you resign or was
6      the separation mutually agreed upon?
7  A   Well, I mean, I was terminated.  They said they
8      were eliminating my position.  There were no
9      options regarding resignation or anything like
10     that.
11 Q   Okay.
12 A   They gave me six months severance.  I thought it
13     was a fairly amicable termination.
14 Q   And then after Fringe Benefits Design,
15     Incorporated, where did you next work?
16 A   The Envelope Man.
17 Q   What is that?
18 A   It is a printing company located in I believe it's
19     Kansas City, Missouri.
20 Q   Okay.  And what did you do for The Envelope Man?
21 A   I was a controller.
22 Q   And the same sort of, when you use that term with
23     respect to this job it's the same sort of duties
24     and responsibilities that you described --
25 A   Yes, yes.

***Braksick Reporting Service ***
(785)865-6632

♀                                                                                  15

1  Q   -- for Fringe Benefits?
2  A   Yes.
3  Q   So you were liaison between the CFO and the

Page 12

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 4        accounting staff?
 5  A     There was no CFO there.
 6  Q     Okay.
 7  A     I reported directly to the operations manager.
 8  Q     And during what period of time were you with The
 9        Envelope Man?
10  A     From, from about six months after I left Fringe
11        Benefits Design until 1997, I'm thinking '96 or
12        '97.
13  Q     And who was your supervisor there?
14  A     Brendon Horan, H O R A N.
15  Q     Why did you leave The Envelope Man in '96 or '97?
16  A     Obtained a more lucrative position with Accutype
17        Medical Services.
18  Q     Can you spell the name of that corporation for
19        Candace, please.
20  A     A C C U T Y P E.
21  Q     And Accutype Medical Services, where is that
22        located?
23  A     Was located in Shawnee Mission at the time but now
24        I believe they are in Overland Park.
25  Q     What did you do for them?
```

***Braksick Reporting Service ***
(785)865-6632

16

```
 1  A     Well, I started out just doing some general
 2        contract accounting work and the position evolved
 3        into a CFO position.
 4  Q     When you say you started out doing general
 5        contract work does that mean that you were an
 6        independent contractor, not a formal employee of
 7        Accutype initially?
 8  A     Well, at about that time I decided to incorporate
```

Page 13

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 9        myself and from that point on I was never a
10        full-time employee of any corporation except my
11        corporation.
12   Q    Okay.  So when did you incorporate, approximately?
13   A    1997.
14   Q    What's the name of your corporation?
15   A    RMB Consulting Group, Inc.
16   Q    And what purpose or services was RMB Consulting
17        Group, Inc., organized and established to perform?
18   A    Business consulting, accounting and technology
19        services.
20   Q    When you say business consulting services, what
21        kinds of things are encompassed in that that your
22        company provides?
23   A    I've negotiated acquisitions and divestitures,
24        I've given advice regarding the potential ROI of
25        business decisions, --
```

***Braksick Reporting Service ***<br>(785)865-6632

♀                                                                          17

```
 1   Q    When you say ROI, --
 2   A    I'm sorry, return on investment of business
 3        decisions that clients have considered, and I have
 4        assisted in interviewing and hiring, helped to put
 5        in place qualified retirement plans, shopped for
 6        health insurance, all sorts of things that just
 7        have to do with day-to-day business that I had
 8        gleaned experience regarding in the process of
 9        being a controller.
10   Q    Okay.  And then I understand your accounting as a
11        general principle but when you're providing
12        accounting consulting services as RMB Consulting
13        Group, Inc., what does that necessarily include?
```

Page 14

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

14  A    It includes whatever the client needs.

15  Q    Any kind of accounting, so you're setting up their

16       books, you're doing audits, you're doing what?

17       Everything with --

18  A    Oh no, I won't do an audit.

19  Q    Okay, so that's what I'm trying to define.  When

20       you say accounting as an --

21  A    The nuts and bolts business of the clients.

22  Q    Okay.

23  A    I have never given an opinion on anything.

24  Q    So you'll set up their accounting, do their

25       accounts receivable, their billings, things like

                    ***Braksick Reporting Service ***
                         (785)865-6632

                                                                18

1        that?

2   A    Oh, I won't do the, I won't do the day-to-day

3        administration, payables and receivables and

4        things like that.

5   Q    So you help them set up the system?

6   A    Right, right.

7   Q    I guess I'm trying to understand exactly.

8   A    They wouldn't want to pay me what I want to charge

9        to do that.

10  Q    Okay.

11  A    They can get somebody to do that for $12 an hour,

12       you know, and I wouldn't recommend that they pay

13       me to do that.

14  Q    So you help them set up --

15  A    I would hate the work and they would get no value.

16  Q    So you help them set up the accounting system is

17       what you --

18  A    Yes, I help them set up the accounting system, if

                          Page 15

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

19      they want me to I'll help them put their personnel

20      in place, you know.

21  Q    Their processes, things like that?

22  A    Yes, right, uh-huh.

23  Q    And --

24  A    And I also implement accounting software as sort

25      of a specialty.  I work with Microsoft Great

***Braksick Reporting Service ***
(785)865-6632

19

1      Plains and Microsoft CRM.  I'm also certified in

2      Solomon, which is another Microsoft ERP solution,

3      and I am a Microsoft certified database

4      administrator.  I integrate between those systems

5      using the commercially available integration

6      platforms E-1 and Scribe and I also write custom

7      programming code using Visual Studio, Javascript

8      and Csharp.net to provide customized solutions

9      that aren't available out of the box.

10  Q    So all of those things that you have described for

11      me there that relate to technology, would that

12      fall under the technology aspect of your RMB

13      Consulting Group services?

14  A    These days it's really difficult to, to

15      differentiate the aspects.  It's difficult to do

16      effective accounting without the use of

17      technology.

18  Q    Okay, so after you incorporated, if I understand

19      your testimony earlier, after you incorporated in

20      '97 as RMB Consulting Group, Incorporated, you

21      thereafter provided your services on a contractual

22      basis as a consultant to the people or companies

23      that you worked for.  Is that right?

Page 16

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

24  A   Well, actually the companies would retain RMB
25      Consulting Group.

1  Q   Okay.  Is there anybody else in RMB Consulting
2      Group besides you?
3  A   The only other owner is my 15-year-old son.  He
4      owns 10 percent of the corporation.
5  Q   Is there any other employee or service provider
6      besides yourself?
7  A   I have had an employee or two from time to time
8      but right now I don't.
9  Q   And again, I'm not trying to misstate your
10     testimony but to kind of simplify, essentially RMB
11     Consulting is you; right?
12  A   Yes, it's me incorporated.
13  Q   Right.  And I guess that's what I'm trying to get
14     at.
15  A   There's no difference between what I do for RMB
16     Consulting and what I'd do if I had a Schedule C
17     basically other than the tax and liability
18     ramifications.
19  Q   I got that.  And I guess what I was trying to
20     establish or make clear in the record is after you
21     incorporated yourself as RMB Consulting you no
22     longer had professional employment as an
23     individual employee.  Is that accurate?
24  A   I'm an employee of RMB Consulting Group.
25  Q   Okay.

EX 1 PAGE 000017

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

1   A   And I have been for that entire time.

2   Q   Okay.  But other than RMB --

3   A   Other than RMB Consulting I haven't been anyone

4       else's employee.

5   Q   After that point in time?

6   A   Right.

7   Q   Okay.  And how long did you contract or did RMB

8       contract with Accutype Medical Services?

9   A   We still do today.

10  Q   Okay.  And who are the other entities or

11      individuals with whom you as RMB Consulting

12      contract and provide services?

13  A   Significant services or anyone ever?

14  Q   Income, if you're reporting income to the

15      corporation, then --

16  A   Well, let's see, I contract programming services

17      out for Quadis Technologies.

18  Q   How do you spell that?

19  A   Q U A D I S.

20  Q   Okay.

21  A   Corren Consulting.

22  Q   How do you spell that?

23  A   C O R R E N.  Gosh.  I'm trying to think of a name

24      but I can't.  The principal's name is Dustin

25      Domerese -- E-Solutions, that's what it is,

***Braksick Reporting Service ***
(785)865-6632

22

1       E-Solutions.  Net Standard, Incorporated.

2       Interscape Development.  TFS Net before their

3       acquisition by Birch Telecom.  And then I've done

4       some various small engagements for tax work,

5       things like that, that I would really have to, I'd

Page 18

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 6        have to go back through my books in some detail to
 7        pull the names of all those clients.
 8   Q    Okay.
 9   A    I guess there are probably about 30 or 40
10        different ones.
11   Q    And with respect to those clients, would you say
12        those were smaller, more limited term engagements?
13   A    Yes.  Well, I mean, you know, even if they, even
14        if they come back next year, you know, --
15   Q    Right.
16   A    -- you're not driving a whole bunch of revenue to
17        the top line.
18   Q    Okay.  Who at Quadis Technologies knows your work
19        or do you report to?
20   A    Dustin Domerese.
21   Q    Can you spell that last name?
22   A    D O M E R E S E.
23   Q    How long have you been working with them?
24   A    They started out as E-Solutions and they were
25        acquired by Quadis Technologies but I've been
```

***Braksick Reporting Service ***
(785)865-6632

23

```
 1        working with Dustin for, oh, I've known Dustin for
 2        probably seven years.  I became acquainted with
 3        him at Net Standard.  He was an employee there and
 4        he broke off to form his own company.
 5   Q    Corren Consulting, who do you work with or report
 6        to?
 7   A    Chad Warren.
 8   Q    How long have you been working with Chad Warren at
 9        Corren Consulting?
10   A    A year.
```

Page 19

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

11  Q    Did you work with somebody before Chad Warren?

12  A    No, no.  They're relatively new.

13  Q    Then E-solutions Technologies, who do you work

14       with there?

15  A    Dustin Domerese.  They've been acquired by Quadis.

16  Q    Okay.  Net Standard, Incorporated, who do you work

17       with there?

18  A    Walter Lane.

19  Q    How long have you worked with Mr. Lane?

20  A    I helped him put the corporation together in 1997.

21       They're the company that was involved in the

22       litigation with Republic Acceptance Corporation.

23  Q    And then the other company was Interscape

24       Development or Interscope Development?

25  A    Interscape.

                    ***Braksick Reporting Service ***
                         (785)865-6632

                                                              24

 1  Q    Inter, I N T E R?

 2  A    S C A P E.

 3  Q    And who do you work with there?

 4  A    That's another one of Walt's ventures.

 5  Q    How long have you worked with Mr. Lane on

 6       Interscape Development?

 7  A    He put me into that shortly after he became

 8       familiar with my work with Net Standard and then

 9       the company has since gone out of business.  It

10       was, they were researching something that didn't

11       pan out technology wise.  They were unable to

12       generate a meaningful stream of revenue so they

13       did not continue.

14  Q    When did Interscape go out of business,

15       approximately?

                         Page 20

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

16  A   I'm guessing six or seven years ago.

17  Q   Then TFS Net, you said you worked with them before

18      they were acquired by?

19  A   Birch Telecom.

20  Q   Right.  So what periods did you work with TFS Net?

21  A   Well, I had done accounting consulting for TFS Net

22      on and off for two or three years probably over

23      the time frame from '97 to 2000 and then in 2000 I

24      negotiated the, the sale of TFS Net to Birch

25      Telecom, which was a much bigger engagement.

***Braksick Reporting Service ***
(785)865-6632

25

1   Q   So do you work with Birch Telecom at all?

2   A   No.  Accutype Medical Services, do you have them?

3   Q   Yes.

4   A   All right.

5   Q   So you're continuing to work with them?

6   A   Yes.

7   Q   And where is RMB Consulting Group, Incorporated,

8      located?

9   A   I work out of my home.

10  Q   And you said that in addition to yourself the only

11      other owner of RMB Consulting Group is your

12      15-year-old son.  Is that correct?

13  A   Correct.

14  Q   His name is?

15  A   Kyler Robert Brown, K Y L E R, Robert Brown.

16  Q   And you said he owned 10 percent of the company?

17  A   Correct.

18  Q   When I asked you whether you'd been deposed before

19      you said you'd been deposed when you were the CFO

20      of Net Standard and you talked about that

Page 21

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
21      litigation not involving you as an individual.  My
22      question is can you identify for me all civil
23      litigations that you have been involved in?  And
24      when I say you involved in I mean as a party,
25      either a plaintiff or a defendant.
```

***Braksick Reporting Service ***
(785)865-6632

26

```
 1  A   In 1994, I think, Robyn Barr sued me for divorce
 2          claiming that there was a common law marriage.
 3          I'm guessing that that is a form of civil
 4          litigation.
 5  Q   It is.  Her last name is spelled B A R R?
 6  A   B A R R.  It's R O B Y N.  And she has changed her
 7          name so it may have been Robyn Graddy at the time,
 8          G R A D D Y.
 9  Q   And that action was filed where?
10  A   Overland Park, Kansas, and I'm uncertain about the
11          exact year but it was in that time frame.
12  Q   Okay.  Were you represented by counsel in that
13          case?
14  A   Yes.
15  Q   Who was your counsel?
16  A   Kevin P. Moriarty.
17  Q   And was Ms. Barr represented by counsel?
18  A   Yes.
19  Q   Who was her counsel?
20  A   Mary Ellen Rose.
21  Q   When was that litigation resolved?
22  A   I think it only lasted for two or three months.
23  Q   How was it resolved?
24  A   It became clear that we weren't common law married
25          and the case was dismissed.  There was no real
```

Page 22

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

***Braksick Reporting Service ***
(785)865-6632

♀                                                                                                        27

```
 1        trial or anything that I recall.
 2   Q    When you say it was dismissed, was it just
 3        dismissed voluntarily by the party or did the
 4        court make a formal determination that, legal
 5        determination that there was no common law
 6        marriage and enter a formal dismissal?
 7   A    I think as the, the evidence regarding the
 8        required elements for common law marriage began
 9        rolling in they decided it would be in their best
10        interests to dismiss it rather than litigate it
11        and they dismissed it voluntarily.
12   Q    Was there any consideration paid by you to achieve
13        the voluntary dismissal?
14   A    No.
15   Q    Any other civil litigation that you have been
16        involved in?
17   A    Yes.  Let's see, about a year after that --
18   Q    So approximately 1995?
19   A    I'm guessing, yes.  I filed an action against Mary
20        Ellen Rose.
21   Q    What's the tile of the case?  So it's Robert Brown
22        vs. Mary Ellen Rose?
23   A    Brown vs. Mary Ellen Rose, yes.
24   Q    Where was that filed?
25   A    Overland Park.
```

***Braksick Reporting Service ***
(785)865-6632

♀                                                                                                        28

```
 1   Q    Johnson County District Court?
 2   A    Yes, I'm sorry.
```

Page 23

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

3   Q   And what was the claim?

4   A   Abuse of process.

5   Q   And what was the theory of or what was the factual

6       basis for the legal theory of abuse of process

7       brought in your claim?

8   A   That she knowingly obtained void orders.

9   Q   What do you mean she knowingly obtained void

10      orders?

11  A   The theory of the claim was that she, she knew

12      that the parties were not married.  Ms. Barr had

13      come to her after the domestic violence allegation

14      asking how she could remain in the home and Rose

15      advised her that the temporary orders associated

16      with the divorce proceeding would buy her the time

17      she needed, knowing full well that there was no

18      common law marriage.

19  Q   You said buying her the time she needed.  Time she

20      needed to do what?

21  A   Well, I don't know.  It basically gave her

22      complete control of everything.  They had my bank

23      accounts frozen, they had, they put me out of the

24      house where I was running a business, all my

25      assets were unavailable.  I didn't have a

***Braksick Reporting Service ***
(785)865-6632

29

1       toothbrush.  I couldn't withdraw a dime from an

2       ATM.  You know, I mean, the orders were made or

3       were obtained fraudulently to give an advantage

4       that wasn't deserving, you know, under the law.

5   Q   How long did this litigation pend in Johnson

6       County District Court?

7   A   About a year.

Page 24

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

8  Q    And what was the disposition of the litigation?

9  A    The judge dismissed it.

10 Q    So if it was pending for about a year, then the

11       judge dismissed it in approximately 1996.  Is that

12       the best of your recollection?

13 A    I'm thinking so.  And again, it could go a couple

14       ways either way on that, the years, a couple years

15       either way.

16 Q    When you say the judge dismissed it, what was your

17       understanding of the basis of the dismissal?

18 A    Their argument was that it was dressed up

19       malicious prosecution.

20 Q    So he dismissed it for failure to state a claim,

21       then?

22 A    No.  It was, the statute of limitation on

23       malicious prosecution is one year, the statute of

24       limitations on abuse of process is two years.  The

25       claim was filed after one year had gone by or

***Braksick Reporting Service ***
(785)865-6632

30

1      after two years had gone by.  The basis of the

2      dismissal was the crux of the action was malicious

3      prosecution and therefore the statute had run.

4  Q   Okay.  As part of the dismissal did you have to

5      pay any attorney's fees or anything related to the

6      lawsuit?

7  A   No.  Nobody even offered to settle.

8  Q   Any other civil cases that you've been involved

9      in?

10 A   Yeah, I filed a, I filed a civil case to try to

11     compel the Supreme Court to hear my appeal of

12     right.

Page 25

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

13   Q   What was the style of that case?

14   A   It was probably Brown vs. State.

15   Q   So this is a post judgment relief motion?

16   A   Yes.

17   Q   When did you file that?

18   A   '99 or so.

19   Q   And when you say to compel the Supreme Court,

20       which Supreme Court?

21   A   The Kansas Supreme Court.

22   Q   Were you represented in that case?

23   A   No.  Couldn't afford to be represented in that

24       case.

25   Q   And I forgot to ask you with respect to the Brown

                    ***Braksick Reporting Service ***
                           (785)865-6632

                                                              31

 1       vs. Mary Ellen Rose case, were you represented by

 2       counsel in that case?

 3   A   Yes.

 4   Q   Who was your counsel in that case?

 5   A   David M. Bryan.

 6   Q   B R I or --

 7   A   B R Y A N.

 8   Q   He's an attorney located where?

 9   A   He was located in Overland Park.  I believe now

10       he's an attorney in Boston.

11           MS. TROWER:  Off the record.

12           (Off the record.)

13   Q   Your case Brown vs. State, you said it was a post

14       judgment relief case to compel the Supreme Court

15       to hear your appeal of right.  Who did you --

16       strike that.  In your Brown vs. State post appeal

17       judgment case which case or what matter were you

                           Page 26

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

18      asking the Supreme Court to hear an appeal from?

19   A   The, actually the, a lot of the background in this

20       action has to do with my relationship with Robyn

21       Barr.  Over the course of about three years, I'm

22       thinking from 1996 to 19-, I'm sorry, 1994 to

23       1997, she made numerous claims of domestic

24       violence.  There was never any, never any injury

25       associated with them.  She never went to any kind

                ***Braksick Reporting Service ***
                       (785)865-6632

♀                                                          32

1        of hospital.  She fabricated them and in one of

2        them she used the claim to, to piggyback the

3        fraudulent common law divorce action.

4    Q   Okay.  My question related to what appeal --

5    A   Well, I'm just, this is background for that.

6    Q   Okay.

7    A   In 1996 the Johnson County district attorney

8        brought an action, a criminal action against me

9        and picked up two old cases that had been

10       dismissed and in the time after that one became

11       pending there was another charge so all in all I

12       was up in 1997 for four charges of domestic

13       violence, all against Robyn Barr.  She showed up

14       in court and, and testified that, that she had

15       fabricated the statements to the police.  The

16       judge found me guilty of three of the four counts.

17       My motion for a new trial was denied.  I did not

18       qualify for the appellate defender so I appealed

19       pro se to the Kansas Court of Appeals.

20   Q   And so that's the Brown vs. State case?

21   A   No.  This is still on background.

22   Q   Okay.

                        Page 27

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

23  A    In the Kansas Court of Appeals one of my issues

24       was that I did not waive my right to a jury trial,

25       either on the record or in open court, for charges

***Braksick Reporting Service ***
(785)865-6632

                                                    33

1        that I would have been subject to imprisonment for

2        more than a year for in theory.  The Court of

3        Appeals reasoned that even though that is what the

4        law said, to enforce it that way would have been

5        imposition of an ex post facto law and would have

6        violated my constitutional rights, therefore I was

7        not entitled to a new trial or reversal based on

8        those grounds because even though the law says it

9        the Constitution would have prevented it,

10       therefore the Court of Appeals raised a

11       constitutional issue in its decision.  Under

12       Kansas law I am supposed to have an appeal of

13       right to the Supreme Court in a case where an

14       issue arises under the Constitution of either the

15       State of Kansas or of the United States in the

16       Court of Appeals.  I timely filed my appeal of

17       right.  The Kansas Supreme Court treated it as

18       discretionary and denied it.  The theory of the

19       Brown vs. Kansas case was that it was not

20       discretionary for the Supreme Court, it was an

21       appeal of right and they were duty bound to hear

22       it.

23  Q    Okay, when did the Supreme Court deny the appeal

24       in Brown vs. State?

25  A    Maybe 2000.

***Braksick Reporting Service ***
(785)865-6632

Page 28

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

34

1  Q   Any other civil cases other than the ones that you

2      have listed so far?

3  A   Yes.  I, I sued Sprint.

4  Q   What was the style of that case?

5  A   I believe it was defamation of character.

6  Q   The style, the parties.  Brown versus?

7  A   Oh, Brown vs. Sprint.

8  Q   Brown vs. Sprint.  When was that filed,

9      approximately?

10  A   Couple years ago.

11  Q   Do you have a date, approximately, other than a

12      couple years ago?

13  A   2009.

14  Q   Where was that filed?

15  A   Johnson County.

16  Q   And this is the Sprint that's the Sprint

17      telecommunications giant?

18  A   Yes, the cellular telecommunications company, not

19      the, not the Google company, they're a subsidiary

20      of the huge all-encompassing Sprint Telecom, it's

21      the cellular division.

22  Q   And the claim was for defamation?

23  A   Yes.

24  Q   Did you have counsel in that case?

25  A   No.

                ***Braksick Reporting Service ***
                        (785)865-6632

35

1  Q   Did they have counsel in that case?

2  A   Yes.

3  Q   Who was their counsel?

4  A   Polsinelli.

                        Page 29

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

5   Q   Do you know which attorney?

6   A   Top of head I don't remember.

7   Q   What was the outcome or disposition of that case?

8   A   They settled it.

9   Q   What was the underlying facts that supported the

10      defamation claim?

11  A   They claimed I hadn't returned a phone that they

12      put a belated charge on my account for and I had

13      dealt with them back in I guess 2007 when I left

14      Sprint and I had thought that the whole matter was

15      settled.  In 2000 when I went to try and sign up

16      for Sprint again they had told me that I still

17      owed them for that phone and so I contacted them

18      again to try to get information on what the charge

19      was for.  They gave me specifics of the equipment

20      charge and apparently that had been passed through

21      to them by Asurion.  I contacted Asurion directly

22      and Asurion, who was the telephone insurance

23      company, assured me they had never, never billed

24      Sprint for that.  Sprint had incurred no cost; as

25      far as Asurion was concerned there was no loss.  I

                ***Braksick Reporting Service ***
                        (785)865-6632

                                                        36

1       provided that information to Sprint in writing two

2       or three times.  In the meantime I ran a credit

3       report and found out that it was showing on my

4       credit as derogatory information.  They refused to

5       remove it even though they had no basis for

6       maintaining the charge and never incurred any cost

7       relating to it, and after I had spent about 35

8       hours just talking to Sprint with no result I just

9       decided to go ahead and sue them.

                        Page 30

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

10  Q    What damages did you claim?

11  A    What, for --

12  Q    In the defamation case what damages did you claim?

13  A    Damage to my reputation, credit report.  I mean,

14       basically I settled it for -- I, I guess I'm

15       probably not allowed to say what I settled for.

16  Q    Do you have a settlement agreement that prohibits

17       you from talking about what you settled it for?

18  A    I think so.  I think it does.

19  Q    Do you know that for a fact?

20  A    I'm pretty sure of it, yes.

21  Q    Do you have a copy of the settlement agreement?

22  A    Yes.

23  Q    Okay.  So if I were to ask you what you settled it

24       for you would refuse to answer based upon your

25       understanding that the settlement agreement

                    ***Braksick Reporting Service ***
                           (785)865-6632

                                                              37

1        prohibits you from disclosing that.  Is that

2        correct?

3   A    Yes, but I believe I can disclose it under

4        compulsion of a court process.

5   Q    Okay.  What did you settle it for?

6   A    Is this considered compulsion of court process?

7   Q    I'm not here to advise you.

8   A    All right, I'm not certain that I can disclose it.

9   Q    Okay.  And Asurion is spelled A S S U R I A N, is

10       that correct?

11  A    I O N.

12  Q    I O N.  Any other civil cases?

13  A    Yes, Brown vs. KVC Behavioral Health Care.

14  Q    Where was that filed?

                            Page 31

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

15  A    Johnson County.

16  Q    When was that filed?

17  A    2007.

18  Q    What was the claim in that case?

19  A    42 U.S.C. 1983.

20  Q    Okay.  What were the underlying facts and

21       circumstances that supported your civil rights

22       claim under 42 U.S.C. 1983?

23  A    I was alleging that KVC had removed my children

24       from my home without undertaking the required

25       measures under the Adoption and Safe Families Act

                ***Braksick Reporting Service ***
                        (785)865-6632

                                                              38

 1       to prevent removal and then once they did they

 2       violated several, several Kansas statutes and SRS

 3       policies with regard to completely opposing

 4       reintegration.

 5  Q    Did you have an attorney in that case?

 6  A    In the underlying CINC case or in the lawsuit?

 7  Q    In the Brown vs. KVC Behavioral Health Care System

 8       case that you filed in Johnson County did you have

 9       an attorney representing you?

10  A    I was pro se, I was.  My son was represented by

11       Polsinelli.

12  Q    I'm sorry?

13  A    I was pro se.  My son was represented by

14       Polsinelli.

15  Q    So your son was a party in that suit?

16  A    Yes.

17  Q    So it was you, Robert Brown, and your son, I'm

18       sorry, I've forgotten his last name?

19  A    Kyler.

                        Page 32

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
20  Q    Tyler?
21  A    K, with a K.
22  Q    Kyler.  You were the two plaintiffs in the
23       lawsuit?
24  A    Yes.
25  Q    Did you engage for Kyler Polsinelli or did the
```

***Braksick Reporting Service ***
(785)865-6632

39

```
 1       court appoint him since he's a minor?
 2  A    The court appointed since he's a minor.
 3  Q    And you said that the underlying facts regarding
 4       the 1983 claim had to do with the removal of your
 5       children.  Which children are you speaking about?
 6  A    Kyler Brown and Kelsey Barr.
 7  Q    Kyler?
 8  A    Brown and Kelsey Barr.
 9  Q    Kelsey is K E L S E Y?
10  A    Yes.
11  Q    And who's the mother of your children?
12  A    Robyn Barr.
13  Q    On both of the children?
14  A    Yes.
15  Q    Okay.  Why does Kelsey have a different last name
16       than Kyler?
17  A    Oh, Kelsey is not my biological child.
18  Q    Have you adopted Kelsey Barr?
19  A    I was her legal guardian for the last five years
20       of her life, or five, five years of her minority,
21       I'm sorry.
22  Q    When she was residing with you?
23  A    Yes.
24  Q    Did you misspeak when you said of her life?  She's
```

Page 33

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
25      still alive?
                  ***Braksick Reporting Service ***
                        (785)865-6632
```

♀                                                                40

```
 1  A    Yes, she's still alive.
 2  Q    You meant of her minority?
 3  A    Of her minority, yes.
 4  Q    So what were those five years that she resided
 5       with you and you were her guardian?
 6  A    Let's see, 2004 to 2009, I believe.
 7  Q    And with respect to Kelsey Barr, had Robyn Barr's
 8       parental rights been terminated with respect to
 9       her?
10  A    I believe so.  I know that Robyn Barr asked the
11       court to make me her guardian but I wasn't really
12       a party to that case so I'm not certain what the
13       outcome was for Robyn Barr.
14  Q    Where was Robyn Barr during this period of time?
15  A    Well, she was in the Kansas City area.  It's
16       difficult to say where she's been a lot of the
17       time.
18  Q    Why was she not providing for her daughter and why
19       was her daughter not living with her?
20  A    She has a long history of coming in and out of the
21       children's lives.  I don't know exactly what it's
22       due to.  She's got a long history of mental
23       illness and depression, bipolar, multiple suicide
24       attempts, and then from time to time she would
25       reappear and she'd be, you know, straightening
                  ***Braksick Reporting Service ***
                        (785)865-6632
```

♀                                                                41

```
 1       things out and then she would disappear again.
```

Page 34

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 2   Q    When were your children removed from your home?
 3   A    April of 2008.
 4   Q    And what prompted their removal or what was the
 5        reason that was given for the removal?
 6   A    Nervous breakdown.
 7   Q    You did yourself?
 8   A    Yes.
 9   Q    Were you hospitalized?
10   A    No.
11   Q    Were you under the treatment of a physician?
12   A    No.
13   Q    Okay.  I guess I'm not understanding.
14   A    Well, after that I began to see a therapist.
15   Q    Okay.  Were you incapacitated and unable to care
16        for the children?
17   A    At that time, yes.
18   Q    Okay.  And how did the nervous breakdown manifest
19        itself?
20   A    I, it was on April 15th of 2008 and my equipment
21        malfunctioned and I, I stopped being able to
22        reason.  I just kind of froze with fear.  I began
23        drinking and I was in AA at the time so that was a
24        bad thing, too.  I was afraid to go into my
25        basement, just never been in a position where I
```

***Braksick Reporting Service ***
(785)865-6632

♀                                                              42

```
 1        haven't been able to meet my professional
 2        obligations and I guess there were a lot of other
 3        things bothering me, too, and I just had a basic
 4        Type A personality sort of meltdown.
 5   Q    And how did the children come to the attention of
 6        SRS during that period?  Was it through your
```

Page 35

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 7       contacting them, through them contacting SRS,
 8       through --
 9   A   No, Kelsey went to, with Kyler over to their mom's
10       house and their mom called SRS, Robyn called SRS.
11   Q   Okay.  So there would have been a complaint of
12       abuse or neglect?
13   A   Neglect.
14   Q   So a complaint of neglect was made to SRS?
15   A   CINC petition.  Well, I --
16   Q   Child in need of care?
17   A   They investigated it and filed a CINC petition.
18   Q   And in the children in need of care, CINC, C I N
19       C, matter were you represented?
20   A   Yes.
21   Q   Who was representing you in that matter?
22   A   John P. Gerstle.
23   Q   Okay.  And as part of the children in need of care
24       petition process the children were removed from
25       your house.  Is that correct?
```

***Braksick Reporting Service ***
(785)865-6632

43

```
 1   A   Yes.
 2   Q   When was that, approximately?  You said --
 3   A   On April 18th.
 4   Q   Okay.  April 18th.  And at that time did you agree
 5       that you weren't capable of caring for the
 6       children?
 7   A   Yes.
 8   Q   And where were they removed to?
 9   A   Kyler went to stay with his Aunt Ginger, who was a
10       licensed foster parent, and Kelsey went to stay
11       with Julie Stone, a friend.
```

Page 36

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

12  Q   And Aunt Ginger is your sister or --

13  A   Robyn's.

14  Q   What's her last name, Ginger what?

15  A   O'Dwyer.

16  Q   Can you spell that.

17  A   O apostrophe D W Y E R.

18  Q   And how long were the children removed?

19  A   Till August 11th, I think.

20  Q   And do you know who represented SRS in the

21      children in need of care case?

22  A   I don't think anybody represents SRS.  I think

23      it's the D.A.

24  Q   Okay.

25  A   The D.A.'s name is Don Hymer.

***Braksick Reporting Service ***
(785)865-6632

44

1   Q   So it would have been in Johnson County?

2   A   Yes.

3   Q   And then at some point in time you sought reunion

4       with the children?

5   A   Well, I mean, I sought it pretty actively.

6   Q   Well, I'm just trying to get to, you said that the

7       basis for your claim against KVC Behavioral

8       Services was that they failed to reinstate your

9       relationship with the children so --

10  A   Yeah.  Well, I mean, Kelsey Barr they, their goal

11      for her was OPPLA initiative right out of the

12      chute.

13  Q   What's that?

14  A   OPPLA, which is Other Plan Permanency Living

15      Arrangement, so, I mean, they determined within a

16      matter of hours that she would never come home,

Page 37

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

17          they just sought to terminate our relationship
18          completely forever, and as far as Kyler went, you
19          know, I mean we'd go to court and the judge would
20          say, you know, these children need to be back home
21          and they would fabricate reasons that weren't part
22          of the initial case why they shouldn't be back
23          home.
24     Q    Okay.  So in the KVC Behavioral Health Systems
25          case do you know who represented KVC Behavioral

***Braksick Reporting Service ***
(785)865-6632

45

1          Health Care?
2      A    Niewald, Waldeck.
3      Q    And do you know when that case was disposed of?
4      A    It was either late last year, it was either late
5          2010 or early 2011.
6      Q    Okay.  And how was it disposed of?
7      A    It was settled.
8      Q    How was it settled?
9      A    I am allowed to say that the parties have reached
10          an agreement that's satisfactory to both of them
11          and that KVC has reaffirmed its commitment to
12          training and adherence to Kansas laws and I
13          believe that if you send me a subpoena and I give
14          them a chance to have it quashed, that then I can
15          send you a settlement agreement.
16     Q    Okay.  Was there any monetary consideration as
17          part of the settlement?
18     A    I don't believe I am allowed to say that.
19     Q    Okay.  Was there any admission of liability or
20          wrongdoing?
21     A    On their part?  Well, no, not on anybody's part.

Page 38

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

22  Q    And that case was in Johnson County District

23       Court, that's where it was resolved?

24  A    I'm sorry, that was in federal court.

25  Q    Oh, I'm sorry, I guess I misunderstood you or did

***Braksick Reporting Service ***
(785)865-6632

                                                                46

♀

1        you misstate?

2   A    I'm not sure.

3   Q    So it was in federal court?

4   A    Yes, that one was in federal court.

5   Q    It was filed in federal court?

6   A    Filed in federal court, yes.

7   Q    Any other civil litigation that you've been

8        involved in?

9   A    No, I think that's all of it.

10  Q    Okay.  So I want to ensure, let's go back through

11       it, make sure we've got all of them.  In terms of

12       the civil cases in which you have been a party,

13       either as a plaintiff or a defendant, we have

14       approximately 1994 Robyn Barr sued you for divorce

15       in a common law marriage; correct?

16  A    Yes.

17  Q    In 1995, approximately, you sued in the matter of

18       Brown vs. Mary Ellen Rose for abuse of process?

19  A    Yes.

20  Q    In 1999 you filed a matter styled Brown vs. State

21       seeking to compel the Supreme Court to hear your

22       appeal of right; correct?

23  A    Yeah.

24  Q    In 2009 a case styled Brown vs. Sprint Cellular in

25       Johnson County District Court, you filed a claim

***Braksick Reporting Service ***
Page 39

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt
(785)865-6632

♀                                                                                  47

```
 1        of defamation; correct?
 2   A    Yes.
 3   Q    And then in approximately 2007, case styled Brown
 4        vs. KVC Behavioral Health Care, which includes
 5        both you and your son Kyler as plaintiff, that was
 6        filed in district court for the district of
 7        Kansas?
 8   A    Uh-huh.
 9   Q    Correct?
10   A    Yes.
11   Q    And that's an exhaustive list of the civil cases
12        that you have been involved in?
13   A    Actually I believe I was sued by Southwestern Bell
14        Yellow Pages on a down payment matter.
15   Q    When was that?
16   A    1998 or '99.  It was about the time that, that I
17        was involved in all that criminal stuff regarding
18        Robyn Barr.
19   Q    Okay.
20   A    I was unable to pay for anything basically except
21        attorney fees.
22   Q    Okay.  And in the -- so would the case have been
23        styled Southwestern Bell vs. Robert Brown if I
24        went out and tried to find it?
25   A    Yes, I think it would, Southwestern Bell Yellow
```

***Braksick Reporting Service ***
(785)865-6632

♀                                                                                  48

```
 1        Pages, I think they're a separate company.
 2   Q    And where was that filed?
 3   A    Johnson County District Court.
```

Page 40

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

4  Q   Did you have an attorney in that?

5  A   No.

6  Q   Do you know, did they have an attorney in that

7      case?

8  A   I don't remember who it was.

9  Q   Okay.  And how was that case resolved or disposed

10      of?

11  A   I think they won a judgment.  Oh, and I, is

12      bankruptcy a civil matter?

13  Q   It is.

14  A   Okay, I filed in 2000 in the federal district

15      court for bankruptcy.

16  Q   Styled In the Matter of Robert Brown or --

17  A   I guess.

18  Q   Or your corporation or --

19  A   Oh no, it was --

20  Q   As an individual?

21  A   Yeah, it was just In the Matter of Robert Brown.

22  Q   And how long did the bankruptcy pend before it was

23      discharged?

24  A   Or actually I filed in '97, it was discharged in

25      -- gosh.  No, I, I think I filed in 2000, it was

              ***Braksick Reporting Service ***
                      (785)865-6632

                                                        49

⚲

1      discharged in 2003, I think.  It was a Chapter 13

2      so I made payments to the trustee for three years

3      and then it was discharged.

4  Q   What prompted you to go into bankruptcy?

5  A   I had incurred overwhelming litigation, or

6      litigation and criminal defense expenses.

7  Q   When you say overwhelming, what amount are we

8      talking about?

                    Page 41

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 9  A   Well, I'm guessing that I, I was probably,
10      probably $20,000 into legal fees at that point and
11      a lot of my productive time was going to
12      participating in defense so I was unable to work
13      as much as I needed to to make payments.
14          MS. TROWER:  Why don't we take a quick break.
15          (A recess was taken from 10:14 until
16          10:19.)
17  Q   Mr. Brown, we're back on the record and off the
18      record you asked me or mentioned that you had a
19      petition for certiorari and technically, since it
20      is a, well, I'm not certain because you'll have to
21      tell me, you had a petition for certiorari with
22      the U.S. Supreme Court?
23  A   Yes.
24  Q   When was that, approximately?
25  A   1999 or 2000.
```

***Braksick Reporting Service ***
(785)865-6632

50

```
 1  Q   And that related to your criminal conviction or --
 2  A   Yes, criminal conviction.
 3  Q   Okay.  And that would be for the three counts of
 4      domestic battery that we talked about earlier?
 5  A   Yes.
 6  Q   Out of Johnson County District Court?
 7  A   Right.
 8  Q   Okay.  And how was that disposed of?
 9  A   They declined to hear it.
10  Q   Okay.  And was, I can't remember if you sent me
11      that documentation but was that styled Brown vs.
12      State Petition for Certiorari or how did you style
13      that?  Again, it's not that important if you --
```

Page 42

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

14   A   Yeah, I think it was, I was the appellant, they

15       were the appellee.

16   Q   Okay.  And did you have an attorney in that case,

17       I can't remember, help you with the petition?

18   A   John Gerstle was on the petition.

19   Q   Okay.  So I just want to wrap up, and to the best

20       of your knowledge that, and remembrance this

21       exhausts the list of civil matters in which you

22       have been a party either as a plaintiff or a

23       defendant, is that correct, the list that we've

24       just gone through?

25   A   I think I may have had some small claims

                    ***Braksick Reporting Service ***
                         (785)865-6632

                                                              51

 1       collection matters but other than that, yeah.

 2   Q   Okay.

 3   A   I mean, not, not where I was the person trying to

 4       collect.

 5   Q   Okay.  Have you ever been married?

 6   A   No.

 7   Q   And we know from your earlier testimony that you

 8       have children and that you had a domestic

 9       relationship with Robyn Barr at some period of

10       time.

11   A   Uh-huh.

12   Q   And then she sued you for common law divorce.

13       When did you and Robyn Barr begin a romantic

14       relationship?

15   A   1988 or '89.

16   Q   And when you began the romantic relationship did

17       you move in together?

18   A   No.

                        Page 43

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

19  Q    When did you begin living together?

20  A    She moved in and out a few times.

21  Q    To the best of your recollection what were the

22       periods that you shared a residence?

23  A    I'm trying to think.

24  Q    Okay.

25  A    It's really tough.

***Braksick Reporting Service ***
(785)865-6632

52

1  Q    Sure.

2  A    She lived there for about five, six months in 1994

3       and then I believe that she moved back in in 1990

4       -- no, I'm sorry, she lived there for about five

5       months in 1996 and then I believe that she moved

6       back in in 1999-ish and we were, we tried to, we

7       were actually engaged to be married at that point

8       and I think she was there for probably two or

9       three years that time, maybe closer to two, I

10       don't think we made it three.

11  Q    When was the last period of time --

12  A    That was the last period of time.

13  Q    That you and she lived together --

14  A    Yes.

15  Q    -- or shared a residence?

16  A    Yes.

17  Q    Do you remember what month in 1999, approximately?

18  A    No.

19  Q    Or wait.  In 1999 she began living with you for

20       approximately two to three years so when was the

21       last date, approximately, that she would have

22       shared a residence with you?

23  A    2001.

Page 44

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

24   Q   And she is the mother of your son Kyler?

25   A   Yes.

***Braksick Reporting Service ***
(785)865-6632

♀                                                                53

1   Q   When was Kyler born?

2   A   June 7th, 1996.

3   Q   And were you and she living together at the time

4       of his birth?

5   A   No.

6   Q   Where did she live when she wasn't living with

7       you?  I know that --

8   A   A lot of different places.  I can probably think

9       of 10 different places that she's lived.

10   Q   Where was she at the time that Kyler was born?

11   A   I think she was living on Rainbow Boulevard.

12   Q   When did Kyler come to physically reside with you?

13   A   I think, I think, well, I mean I've always had

14       joint custody and visitation.  I think that, I

15       think I got sole custody seven years ago, so

16       1994-ish (sic).

17   Q   When you said you had joint custody and visitation

18       -- strike that.  He was born in --

19   A   I was the noncustodial parent at the outset and I

20       just paid child support and saw him from time to

21       time for visitation.

22   Q   When did he start residing with you permanently?

23   A   I'm guessing about seven years ago --

24   Q   Okay.

25   A   -- he began residing with me primarily and pretty

***Braksick Reporting Service ***
(785)865-6632

♀                                                                54

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

1     much exclusively.

2  Q   Okay.  And when did Kelsey begin residing with

3     you, Kelsey Barr?

4  A   I think, I think 2000 -- no, well actually, let me

5     take that back.  She, when her mom moved out in

6     2001 she initially did not take Kelsey with her so

7     informally I guess that's when she began residing

8     with me and then she would come back around every

9     now and then and she would take Kelsey, you know,

10    and Kelsey would disappear for awhile and then

11    she'd come back because her mom would become

12    unavailable, and then I think around 2003 Robyn

13    became involved in some sort of CINC case and I, I

14    supported reintegration of Kelsey with her but at

15    the last hearing she had she requested that I be

16    given guardianship in a move that pretty much

17    surprised me and, you know, I, I accepted that and

18    so I believe that Kelsey began to reside with me

19    in my capacity as her legal custodian in 2004.

20  Q   Earlier you said that you thought you had custody

21    of Kelsey for the last five years of her minority.

22    Where is she now?

23  A   She's in North Carolina.

24  Q   And how would I contact her if I wanted to speak

25    with her or subpoena her for deposition?

***Braksick Reporting Service ***
(785)865-6632

55

1  A   You would call (208)724-8168.

2  Q   What's she doing in North Carolina?

3  A   She's, she's married.  She just had a child.

4     Kelsey joined the Marines about six months after

5     she turned 18 and then she ended up stationed in

Page 46

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 6          Okinawa, Japan, for awhile, and she met her
 7          husband in the Marines and he is currently
 8          stationed in North Carolina.
 9   Q      And is her married name still Barr?
10   A      It's Harbor, H A R B O R.
11   Q      Do you have an address for her?
12   A      I do but I don't have it with me.
13   Q      Okay.  And do you have contact information for
14          Robyn Barr?
15   A      Her cell phone number is (816)806-4913.
16   Q      And contact information for your son Kyler?
17   A      Just, well, he has his own cell phone.  Good luck
18          leaving anything but a message.  It's
19          (913)602-4404, and then of course he can be
20          reached at my home.
21   Q      Who are your parents?
22   A      My father is named Robert Marlin Brown.
23   Q      M A R L I or L O N?
24   A      L I N, like a fish.  He has been deceased for I'm
25          thinking around 15 years now.
```

***Braksick Reporting Service ***
(785)865-6632

56

```
 1   Q      Is your mother still alive?
 2   A      Yes.
 3   Q      What's her name?
 4   A      Janice Ann Brown.
 5   Q      Where does she live?
 6   A      Topeka, Kansas.
 7   Q      Address?
 8   A      3113 Burton Road.  No, I think technically it's
 9          Tecumseh.  It's like a suburb of Topeka if it's
10          possible that there can be a suburb of Topeka.
```

Page 47

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
11   Q   Do you have any siblings?
12   A   Yes.
13   Q   What are the names of your siblings?
14   A   Charles Brown and James Brown.
15   Q   What's Charles Brown's name, or excuse me,
16       address?
17   A   He lives in Washington, D.C.  I don't have his
18       address with me right off the top of head.
19   Q   What does he to for a living?
20   A   He's a copy editor, technical copy editor, I
21       believe.
22   Q   Are you estranged from him?
23   A   Well, I'm not sure what you mean by estranged.
24   Q   Well, you don't have his address so you --
25   A   Oh, I have his address at home.
```

***Braksick Reporting Service ***
(785)865-6632

57

```
 1   Q   Oh, I'm sorry, I guess I misunderstood.  So you
 2       see him and speak with him on occasion?
 3   A   I see him and speak with him when he comes into
 4       town.  It's once a year, Christmas usually, or
 5       Thanksgiving.
 6   Q   James Brown --
 7   A   Neither both, never both.
 8   Q   James Brown, where does he live?
 9   A   Lawrence, Kansas.
10   Q   What's his address?
11   A   I don't know it off the top of my head.
12   Q   What does he do for a living?
13   A   He's a federal prosecutor.
14   Q   With the Kansas district court?
15   A   He's a federal prosecutor at the federal building
```

Page 48

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

16      in Topeka.

17  Q   So he prosecutes cases in the federal district

18      court of Kansas?

19  A   Oh, yes, I'm sorry, yes, federal district court of

20      Kansas.

21  Q   Is he older or younger?

22  A   Younger.

23  Q   What's his age?

24  A   Forty-nine.

25  Q   Forty-nine?

***Braksick Reporting Service ***
(785)865-6632

                                                    58

1   A   Forty-nine, I believe.

2   Q   You know his date of birth?

3   A   August, August 1st.  I'm not certain of the exact

4       year.  I don't know if he's 48 or 49.

5   Q   Charles Brown, is he older or younger than you?

6   A   Older.

7   Q   Do you know what his age is, approximately?

8   A   Fifty-two.  His birthday is March 29th.

9   Q   Do you have any other relatives that live here in

10      the Kansas district court's jurisdiction that

11      might be potential members of a jury pool if this

12      case were to proceed to trial?

13  A   In, in, at what venue?  Kansas City?

14  Q   Well, yeah, the case is currently set to be heard

15      in Kansas City, Kansas.

16  A   Then no.

17  Q   If for some reason it were tried in Topeka are

18      there other relatives that would be drawn out of

19      the Topeka jury pool?

20  A   No.  I have a half sister there that I haven't

Page 49

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
21        seen in a long time.
22   Q    What's her name?
23   A    Michelle Brown.
24   Q    M I C H E L L E?
25   A    M I C H E L L E.
```

***Braksick Reporting Service ***
(785)865-6632

59

```
 1   Q    She lives in Topeka?
 2   A    Yes.
 3   Q    How old is she?
 4   A    Well, I haven't, I haven't seen her for a long
 5        time.  I'm guessing she's 40 now.  I really
 6        haven't seen her since my father died.
 7   Q    What does she do for a living?
 8   A    I have no idea.
 9   Q    Did she reside in the home when you were growing
10        up or is she like a child by --
11   A    She's a child by a subsequent wife.
12   Q    So your parents were divorced at the time of your
13        father's death?
14   A    Yes.
15   Q    So he had a second family?
16   A    He had a second marriage.
17   Q    Right.
18   A    Yes.
19   Q    And that's the only sibling or offspring of that
20        marriage?
21   A    Yes.
22   Q    You filed your petition in federal court, stamp
23        filed looks like November 9, 2010, and you labeled
24        it a Verified Complaint.  What did you mean by
25        that label when you --
```

Page 50

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

***Braksick Reporting Service ***
(785)865-6632

⚲                                                                    60

```
 1   A    I meant that I swear to the allegations that are
 2        in it.
 3   Q    So by use of the label Verified Complaint you
 4        meant that you swear or affirm that the
 5        allegations contained in here are true and correct
 6        to the best of your knowledge and belief following
 7        your having made reasonable inquiry?
 8   A    Yes.
 9   Q    In the Verified Complaint you've named numerous
10        defendants.  However, toward the end of the
11        Complaint you refer to people as institutional
12        defendants.  You didn't define that term in your
13        pleading anywhere else so can you tell me what you
14        mean or who you mean when you use the term
15        "institutional defendants" in your Complaint?
16   A    Oh, that would be defendants who are not
17        individuals and not official capacity defendants,
18        to-wit, Kansas University and the K.U. School of
19        Law.
20   Q    So when you used the phrase in your petition
21        "institutional defendants" you were referring not
22        to any individual or any individual named in their
23        official capacity but to the University of Kansas
24        and the University of Kansas School of Law?
25   A    Yes.  Do you mind if I review the Complaint
```

***Braksick Reporting Service ***
(785)865-6632

⚲                                                                    61

```
 1        quickly?  I don't have a copy of it with me.
 2   Q    Sure.  I don't have a clean copy.  Let me grab a
```

Page 51

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 3        clean copy.
 4   A    I mean, I'm guessing I may be answering questions
 5        about it for awhile.
 6            (Off the record.)
 7   Q    What prompted you to want to attend law school?
 8   A    That's what I wanted to do all my life is be an
 9        attorney.
10   Q    When did you first decide that you wanted to be an
11        attorney?
12   A    Well, I've been fascinated by the law since a very
13        young age.  My father was an attorney and I grew
14        up watching him do trials and things like that.  I
15        sort of shot myself in the foot because I didn't
16        go into law just basically because my father
17        wanted me to go into law so I went into accounting
18        instead, discovered pretty quickly that I didn't
19        like it very much.  The systems work I like a lot
20        but just the debits and credits of accounting,
21        there's not much excitement there, and by that
22        time I was in a situation where it would have been
23        difficult for me to afford to go back to law
24        school so that's why I didn't pursue it until
25        this, until recently.
```

***Braksick Reporting Service ***
(785)865-6632

⚥                                                            62

```
 1   Q    Your attorney, or excuse me, your father, Robert
 2        Marlin Brown, he was an attorney?
 3   A    Yes.
 4   Q    And did he practice in the Topeka area?
 5   A    Yes.
 6   Q    And what was the nature or kind of practice that
 7        he engaged in?
```

Page 52

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

8   A   I think it was almost exclusively criminal

9       defense.

10  Q   Was he in a firm or a solo practitioner?

11  A   Well, I think for awhile he was, he was either the

12      D.A. or he was with the district attorney's office

13      and then he was a judge for awhile and then he

14      went into solo practice.

15  Q   When he was a judge where was he a judge at?

16  A   Topeka.

17  Q   In what level of court?

18  A   District.

19  Q   And was that an appointed or an elected judgeship?

20  A   I'm not certain.  I'm not certain.

21  Q   And do you know what periods of time,

22      approximately, he was judge in the district court

23      in Topeka?

24  A   No, I don't.  It was either while I was too young

25      to remember or before I was born.

                    ***Braksick Reporting Service ***
                          (785)865-6632
                                                            63

1   Q   And did he practice law until his death?

2   A   Yes.

3   Q   So he was an active practitioner until his death?

4   A   Yes.

5   Q   And to your knowledge was he still practicing

6       criminal law at the time of his death?

7   A   Yeah.  Well, he was starting to move into some

8       civil law as well but it was new to him.

9   Q   Okay.  We went through your list of civil matters

10      in which you have been a party.  Let's go through

11      any and all criminal offenses that you have been

12      involved in, including DUI's and the like, so can

                          Page 53

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

13      you give me a list of those?

14   A  Yes.  In 1979 apparently I was arrested on a DUI

15      charge and it was pled to reckless driving.

16   Q  Where was that offense?

17   A  Topeka.

18   Q  In city court or Shawnee district court?

19   A  I don't know.  I don't have an independent

20      recollection.

21   Q  Okay.  Did you pay a fine, were you sentenced to

22      serve time?  What was the penalty?

23   A  I think it was just pled to reckless driving.  I

24      didn't, I didn't remember it until I saw it on the

25      K.B.I. report actually so I, I don't, I don't have

***Braksick Reporting Service ***
(785)865-6632

                                                    64

♀

1      any recollection of the details.

2   Q  Okay.  Any other criminal offenses?

3   A  Yes.  In I think it was 1984, or '82 or '84, I'm

4      not sure when it was, I was arrested for DUI and,

5      in Topeka, diversion.

6   Q  You were given a diversion --

7   A  Yes.

8   Q  -- as the resolution of the case?

9   A  Correct.

10   Q  Okay.

11   A  1990, or no, I'm sorry, '86, I think, in Overland

12      Park I was arrested for DUI and I was convicted.

13   Q  And what was your sentence?

14   A  Two days in jail, community service, 90-day

15      suspension.

16   Q  Okay.  Any other criminal offenses?

17   A  Criminal convictions?

Page 54

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
18   Q    Yes.
19   A    No.  Well, I'm sorry, the domestic battery that we
20        talked about.
21   Q    Okay.  How many charges of that were there?
22   A    There were four total charges.
23   Q    Okay.  And what years were those?
24   A    Between 1994 and 1996.
25   Q    And you were convicted of three of the charges?
```

***Braksick Reporting Service ***
(785)865-6632

♀                                                                    65

```
 1   A    Yes.
 2   Q    And what was the sentence?
 3   A    Probation.
 4   Q    For how long?
 5   A    Six months, I think.
 6   Q    What were the terms and conditions of the
 7        probation?
 8   A    I think just no alcohol and regular reporting.
 9   Q    When you were -- any other criminal offenses that
10        you were charged with?
11   A    Of any type?
12   Q    Yes.
13   A    I've been charged with a couple of nonmunicipal
14        pet violations.
15   Q    When you say muni-, excuse me, I can't talk today,
16        municipal pet violations what do you mean?
17   A    Yeah, I was charged with failure to control an
18        animal when my dog ran away from home.
19   Q    Okay.
20   A    And I think that again I was cited for failure to
21        control an animal when my dog got out of the yard.
22        And here we're just talking about anything I've
```

Page 55

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

23        been charged with; right?

24  Q     Correct.

25  A     Okay.  1999 I had a DUI arrest in Missouri.

***Braksick Reporting Service ***
(785)865-6632

66

1   Q     What county or city?

2   A     I think North Kansas City.

3   Q     What were the circumstances of the arrest?

4   A     I was driving home from a casino and stopped for

5         speeding.

6   Q     And you'd been drinking?

7   A     Well, I had been drinking some, yes.

8   Q     And they gave you, they had you blow or they had

9         you do a field sobriety test and they charged you

10        with --

11  A     Well, the officer, the officer asked me to take a

12        breath test and I said I'd like to talk to my

13        attorney first.  He said that he would consider

14        that refusal and so I said, "Well, then I'd like

15        to take the test," and he said, "Well, you've

16        already refused," and did not permit me to take

17        the test.  I then asked him to be transported to a

18        hospital to get my own test and the officer

19        refused me that, too.  It was dismissed in

20        municipal court.

21  Q     Any other arrests?

22  A     Now you're talking about arrests --

23  Q     Yes.

24  A     -- as opposed to charges?

25  Q     Yes.

***Braksick Reporting Service ***
(785)865-6632

Page 56

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

67

```
 1  A    Okay.  I don't think so.  Well, I mean, the, the,
 2       underlying the DUI stuff, or no, I'm sorry,
 3       underlying the domestic battery stuff there were I
 4       think three separate arrests but I don't remember
 5       the dates.
 6  Q    Any other arrests?
 7  A    No.
 8  Q    Okay.  I want to make sure that I've got an
 9       exhaustive list here.  I'm going to go down
10       through your criminal offenses, which include
11       arrest and/or charge and/or conviction.
12  A    All right.
13  Q    1979, arrest for DUI charge, which was pled down
14       to reckless driving in Topeka; correct?
15  A    Yes.
16  Q    1982 or 1984 you were arrested on a DUI in Topeka
17       and received a diversion?
18  A    Yeah.
19  Q    1986 in Overland Park you were arrested for DUI
20       and convicted, sentenced to two days in jail,
21       community service and 90 days suspension; correct?
22  A    Right.
23  Q    And in the period 1994 through 1996 you were
24       arrested on three separate occasions --
25  A    On four separate occasions -- well no, three
```

***Braksick Reporting Service ***
(785)865-6632

68

```
 1       separate occasions, that's right.
 2  Q    Three separate occasions that resulted in four
 3       charges of domestic battery and you were convicted
 4       on three of those charges, received probation, six
```

Page 57

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 5       months?

 6   A   Yeah, I think it was six months, it may have been

 7       a year, I'm not sure.

 8   Q   You've also been charged with municipal pet

 9       violations on two occasions for failure to control

10       your animal?

11   A   Uh-huh.

12   Q   Yes?

13   A   Yes, that's correct.

14   Q   And in 1999 you were arrested on a DUI in North

15       Kansas City, Missouri, and that charge was later

16       dismissed; correct?

17   A   Correct.

18   Q   Now that's an exhaustive list of all of your

19       criminal matters in which you have been involved;

20       correct?

21   A   Yes.

22   Q   During your matriculation at Washburn for

23       undergraduate studies were you ever sanctioned,

24       disciplined, probated, suspended, anything like

25       that?
```

***Braksick Reporting Service ***
(785)865-6632

69

```
 1   A   No.

 2   Q   Similarly during your master's studies at U.M.K.C.

 3       were you ever sanctioned, probated, suspended,

 4       disciplined for --

 5   A   No.

 6   Q   Mr. Brown, I'm going to hand you what's been

 7       marked as Deposition Exhibit 1 and that document

 8       is headed the University of Kansas School of Law,

 9       Lawrence, Kansas, 2009 Application for Admission.
```

Page 58

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

10      Do you see that document?

11   A  Yes.

12   Q  And would you review that document and confirm for

13      me that that is a true and correct copy of the

14      application that you submitted to the School of

15      Law in 2009?  Excuse me, I guess you submitted it,

16      yeah, you submitted it in 2009.

17   A  Yes.

18   Q  So it is a true and correct copy of the

19      application you submitted?

20   A  Yes.

21   Q  And on page 3 of that application that application

22      contained a section that was headed with a bold

23      highlighted black line and labeled Character &

24      Fitness.  Is that correct?

25   A  Uh-huh.

                ***Braksick Reporting Service ***
                        (785)865-6632

                                                        70

1    Q  Is that yes?

2    A  Yes, yes.

3    Q  And following the Character & Fitness heading

4       there was a question No. 27 which had four

5       subparts; correct?

6    A  That's correct.

7    Q  And 27c, that question which was posed to you

8       under the Character & Fitness section of the

9       application, asked:  "Have you ever been arrested

10      for, charged with, or convicted of a felony,

11      misdemeanor or infraction other than a traffic

12      violation?"  And in parenthetical it says "Include

13      diversions, sealed or expunged records, and

14      juvenile offenses," close parenthetical.  Do you

                        Page 59

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

15    see that question?

16  A   Yes.

17  Q   And on your application in response to that

18      question you marked no.  Is that correct?

19  A   That's correct.

20  Q   And at the time that you marked no in response to

21      that question you knew that answer was materially

22      false and incomplete; correct?

23  A   No, that's not correct.

24  Q   On question No. 27d the question asked:  Have you

25      ever been arrested for, charged with, or convicted

***Braksick Reporting Service ***
(785)865-6632

71

1    of a traffic violation involving alcohol or a

2    controlled substance?"  And in the parenthetical

3    following the question says "include diversions,

4    sealed or expunged records, and juvenile

5    offenses," close parenthetical.  Do you see that

6    question?

7  A   Yes.

8  Q   And in response to that question on your

9      application you answered the question no.  Is that

10     correct?

11  A   Yes.

12  Q   And at the time that you answered that question no

13      you knew that answer was inaccurate and

14      incomplete; correct?

15  A   At the time I answered the questions I believed

16      that there was a period in time before which the

17      law school was not concerned based on my research.

18  Q   That's not the question I asked you.

19  A   Then no.  No was the answer to your question.

Page 60

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

20  Q    On the application there is no statement on the
21       application that any way limits or restricts the
22       time frame that is being inquired to under
23       question 27.  Isn't that correct?
24  A    Yes, that's correct.
25  Q    And at the time that you answered question No. 27c

***Braksick Reporting Service ***
(785)865-6632

72

 1       no you knew that you had been arrested for
 2       domestic battery on three separate occasions;
 3       correct?
 4  A    Correct.
 5  Q    And at the time that you answered question No. 27c
 6       no you knew that you had been charged with
 7       misdemeanors regarding domestic battery on four
 8       separate charges; correct?
 9  A    Yes.
10  Q    And despite knowing that you failed to disclose
11       those arrests and those charges in response to
12       question No. 27; correct?
13  A    I felt that they were too remote to be relevant to
14       the application.
15  Q    That's not the question I asked.  You failed to
16       disclose --
17  A    Yes, I did fail to disclose them.
18  Q    And in response to question 27d regarding charges
19       involving alcohol or a controlled substance, at
20       the time that you answered the question no you
21       knew that you had been arrested for DUI and
22       charged with DUI in 1979 in Topeka; correct?
23  A    Yes.
24  Q    And despite knowing that you failed to disclose

Page 61

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
25        that 1979 arrest and charge of DUI in Topeka in
```
            ***Braksick Reporting Service ***
                    (785)865-6632
                                                                    73

```
 1        your application; correct?
 2   A    Yes.
 3   Q    And at the time that you submitted your
 4        application and responded to question --
 5   A    Well, actually, you're talking about the 1979
 6        charge?
 7   Q    Yes.
 8   A    I was unaware of that until I got the K.B.I.
 9        report.
10   Q    Well, you lived through it, you experienced it.
11        How could you be unaware of it?
12   A    That was, that was 32 years ago.  I still have no
13        independent recollection of what happened with it.
14   Q    Okay.  You don't deny the K.B.I. report to be
15        accurate?
16   A    I, I think it probably is, but at the time I filed
17        the application --
18   Q    Thirty-two years ago --
19   A    -- I did not know about that charge, no.
20   Q    Thirty-two years ago were you frequently involved
21        in criminal matters involving driving under the
22        influence?
23   A    No.
24   Q    So that's an event that in most people's minds
25        stands out or is significant, is it not
```
            ***Braksick Reporting Service ***
                    (785)865-6632
                                                                    74

```
 1        significant in your own mind?
```
                    Page 62

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

2 A I did not recall it and I'm going to object to

3 your questioning now as argumentative.

4 Q Okay. You can interpose the objection but you

5 have to answer the question.

6 A It doesn't stand out in my mind. I considered it

7 much like any other traffic ticket.

8 Q Okay. So you were --

9 A I'm guessing.

10 Q Do you have a recall that you did have a traffic

11 event in 1979 in Topeka that involved alcohol?

12 A No, that's not the answer. No. The answer is no.

13 Asked and answered.

14 Q All right. At the time that you answered question

15 No. 27d no you did know that in 1982 or 1984 you

16 were arrested for DUI in Topeka and received a

17 diversion; correct?

18 A Yes.

19 Q And you failed to disclose the 1982 or 1984 arrest

20 for DUI in Topeka and the diversion that you

21 received on that charge?

22 A Yes.

23 Q At the time that you answered the question 27d,

24 you answered that question no you knew that in

25 1986 you had been arrested in Overland Park for a

***Braksick Reporting Service ***
(785)865-6632

♀                                                      75

1 DUI and were convicted on that offense; correct?

2 A Yes.

3 Q And at the time that you answered no to the

4 question No. 27d you failed to disclose the 1986

5 Overland Park arrest for DUI and conviction;

6 correct?

Page 63

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

7   A    Yes.

8   Q    At the time that you filed your application and

9        answered question No. 27d in the application no

10       you knew that you had been arrested for DUI in

11       North Kansas City, Missouri, in 1999; correct?

12  A    Yes.

13  Q    And at the time that you answered question No. 27d

14       no you failed to disclose the 1999 DUI arrest in

15       North Kansas City, Missouri; correct?

16  A    Yes.

17  Q    Now, since you had knowledge of the criminal

18       offenses that related to question 27c and question

19       27d that we have discussed and that you failed to

20       disclose can you tell me why you did not answer

21       those questions truthfully with the answer "yes"?

22  A    Yes, I had done quite a bit of research on the

23       period of time during which those actions were

24       considered to be too remote by the bar and that

25       was a period of time longer than seven years.  In

***Braksick Reporting Service ***
(785)865-6632

76

1        retrospect that was a terrible decision, it was

2        stupid, it was bad judgment.

3   Q    Okay.

4   A    That is the reason.

5   Q    Okay.  Now, when you said you did research on the

6        period of time that was considered remote by the

7        bar, you understood at the time that you were

8        applying to the School of Law, that the

9        application that you were filling out for the

10       School of Law was the School of Law's application;

11       correct?

Page 64

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
12   A    I knew it was the School of Law's application,
13        yes.
14   Q    Okay.  And so whatever research that you did
15        related to what the bar, which would be the Kansas
16        Supreme Court for admission to the bar as a
17        practicing attorney in Kansas, may have viewed it
18        but you weren't applying for the bar, were you?
19   A    No, I was not.
20   Q    And you knew that the application that you were
21        filling out was not for the Kansas bar; correct?
22   A    That's correct, and I throw myself upon your
23        mercy.  What I did was, was wrong, it was stupid.
24        That's the reason that I did it.  It wasn't a good
25        reason.  I am ashamed of those things.  I wanted
```

***Braksick Reporting Service ***
(785)865-6632

77

```
1    to minimize them.  In retrospect I would do it
2    differently.  You don't, you don't have to
3    interrogate me in order to get me to say that I
4    made a terrible mistake by doing that.
5  Q You said that you wanted to minimize those things
6    and that you are ashamed of those things.
7  A Yes.
8  Q Given your feelings towards those things, at the
9    time that you submitted your application you
10   similarly suspected that that information would be
11   looked upon unfavorably by the individuals
12   reviewing your application for admission to the
13   School of Law; correct?
14 A I, I didn't -- can you repeat the question.
15 Q Can you read the question back.
16      (The pending question was read back by the
```
Page 65

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

17          reporter as requested.)

18  A   Oh, prior criminal history?  Yeah, I, I figured

19      that that might be looked upon unfavorably by the

20      people reviewing my application for admission to

21      the School of Law.

22  Q   Okay.  So at the time that you submitted your

23      application you suspected that if you disclosed

24      your criminal record and the DUI offenses that are

25      part of that criminal record in the course of

                ***Braksick Reporting Service ***
                        (785)865-6632

                                                        78

 1      applying for the law school, that the, those

 2      factors might impact your admission; correct?

 3  A   Well, I didn't know if they'd impact my admission.

 4  Q   But you suspected that; correct?

 5  A   No, I did not know if they would impact my

 6      admission, no.

 7  Q   I didn't ask you whether you knew.  You suspected

 8      --

 9  A   I thought, I suspected they might be looked upon

10      unfavorably by the individuals reviewing it.  I

11      did not know if they would impact my admission.

12  Q   And because you suspected that your criminal

13      record history would be looked upon unfavorably by

14      individuals reviewing your application for

15      admission to the law school, that's why you didn't

16      disclose that information; correct?

17  A   I did not disclose that information because based

18      upon my research it was too remote to be relevant

19      to the decision.

20  Q   If you had nothing to hide and believed that

21      disclosure of that information would not adversely

                        Page 66

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

22      impact how your application was viewed, then why

23      did you not go ahead and disclose it?

24   A   I've never testified that I believed it would not

25      adversely impact my application.  My testimony is

***Braksick Reporting Service ***
(785)865-6632

                                                        79

1      that I did not know.

2   Q   You suspected it would adversely impact your

3      application, though; correct?

4   A   No, that is not my testimony.

5   Q   Well, if you didn't have anything to fear, then

6      why did you hide it?

7   A   I was embarrassed by it.

8   Q   And you were embarrassed about it because you

9      thought that people would look unfavorably upon

10      your application; correct?

11   A   I'm embarrassed about it to people walking down

12      the street that can't affect my life at all.

13   Q   And you understand that a past criminal background

14      is something that people are going to use to judge

15      an individual's character and fitness; correct?

16   A   Well, to a certain point of, of recentness.  I'd

17      like to think that there is a time when an

18      individual can establish himself as a useful

19      member of the community.

20   Q   You understand that in judging an individual's

21      character and fitness an individual's criminal

22      history background is a material fact to persons

23      making judgments about an individual's character

24      and fitness; correct?

25          THE WITNESS:  Can you please re-read the

***Braksick Reporting Service ***
Page 67

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt
(785)865-6632

⚥                                                                80

1      question.

2              (The pending question was read back by the

3              reporter as requested.)

4   A   I understand that a person's criminal history

5       within a reasonable range of remoteness is a

6       factor, yes.

7   Q   And in fact you testified earlier that as part of

8       your experience with RMB -- off the record --

9   A   RMB Consulting Group.

10  Q   Yeah.

11             (Off the record.)

12  Q   You testified earlier that with respect to your

13      experience in the services that you provide with

14      RMB Consulting, that you help some of the

15      companies for which you consult hire and interview

16      people; correct?

17  A   Correct.

18  Q   And isn't it true that when you're advising

19      companies about hiring individuals, that criminal

20      background is a factor that you would advise those

21      companies to consider in making those hiring

22      decisions?

23  A   Well, actually I have advised people in that

24      regard as it's, as it's actually pertained to what

25      they are going to do.  People that have

                  ***Braksick Reporting Service ***
                          (785)865-6632

⚥                                                                81

1       convictions for, for DUI that are remote that

2       aren't going to be driving for the company, I, I

3       wouldn't oppose accounting positions for them.

                          Page 68

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

| | | |
|---|---|---|
| 4 | | However, you know, VCLs, crimes of truth and |
| 5 | | veracity, things like that, those are, those are |
| 6 | | considered somewhat differently.  It's especially |
| 7 | | acute in IT because sometimes you're looking for |
| 8 | | somebody that's got a, a particular skill set and |
| 9 | | if the person who has it isn't squeaky clean, then |
| 10 | | you have to make those sorts of judgments.  I |
| 11 | | guess what I'm saying is that in my experience you |
| 12 | | consider facts and circumstances.  Notwithstanding |
| 13 | | any of that, I was wrong to omit them. |
| 14 | Q | With respect to Exhibit 1, at the bottom of |
| 15 | | Exhibit 1, page 4, -- |
| 16 | A | Yes. |
| 17 | Q | -- the Certification, do you see that? |
| 18 | A | Page 4.  Yes. |
| 19 | Q | Under the Certification that statement says:  "I |
| 20 | | certify that to the best of my knowledge the |
| 21 | | information stated on this application and in any |
| 22 | | supporting documents submitted is true and |
| 23 | | complete."  Do you see that statement? |
| 24 | A | Yes. |
| 25 | Q | And you saw that statement at the time that you |

***Braksick Reporting Service ***
(785)865-6632

82

| | | |
|---|---|---|
| 1 | | submitted your application; correct? |
| 2 | A | Yes. |
| 3 | Q | And by signing your application you were in fact |
| 4 | | acknowledging and representing to the School of |
| 5 | | Law that all of the information that you had |
| 6 | | submitted on your application was true and |
| 7 | | complete; correct? |
| 8 | A | Yes. |

Page 69

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

9   Q   And in fact that statement in your Certification

10      was false because your information that you

11      submitted was not complete.  Is that correct?

12   A   No, it was not complete.

13   Q   And the following sentence, you saw that sentence

14      which says: "I understand that falsification,

15      misrepresentation or failure to supply required

16      information in connection with this application is

17      sufficient cause for denial of my application or

18      dismissal from the School of Law."  You saw that

19      statement at the time that you submitted your

20      application; correct?

21   A   Yes.

22   Q   And so at the time that you submitted your

23      application the law school had informed you that

24      if you falsified, misrepresented or failed to

25      supply required information they reserved the

***Braksick Reporting Service ***
(785)865-6632

♀                                                                    83

1       right to deny your application or to dismiss you

2       from the School of Law; correct?

3   A   That's correct.

4           MS. TROWER:  Off the record.

5           (Off the record.)

6   Q   Let's look at the last page of Exhibit 1.  Along

7       with the actual application is a Certification

8       Letter.  Does that Certification Letter contain

9       your signature, Robert M. Brown, on the, midway

10      down on the left-hand side?

11   A   Yes.

12   Q   And the second paragraph of that Certification

13      Letter it states:  "I certify that the information

Page 70

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
14     I have provided is true and complete."  So when
15     you submitted this certification and affixed your
16     signature to it you again were certifying that the
17     information submitted in support of your
18     application was true and complete; correct?
19   A Yes.
20   Q And at the time that you submitted your
21     Certification Letter certifying that the
22     information was true and complete and you affixed
23     your signature to the Certification Letter that
24     statement was in fact false; correct?
25   A I believed the things that I had not disclosed to
```

***Braksick Reporting Service ***
(785)865-6632

84

```
1     be too remote to be relevant.
2   Q I understand you have an excuse for not having
3     done so but that statement was false, you had not
4     disclosed?
5   A No, I did not consider it false.  I believed that
6     the things I had not disclosed were too remote to
7     be relevant.
8   Q The certification also goes on to tell you that
9     you had a duty to notify the Office of Admissions
10     immediately if there is any change in the
11     information that I have provided in this
12     application; correct?
13   A Which I did.
14   Q You understood that you had an obligation to
15     disclose immediately if there was any change in
16     the information; correct?
17   A Which I did.  I did that.
18   Q The Certification Letter was submitted or has a
```

Page 71

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

19      stamp received date in the Office of Admissions of

20      April 2, 2009; correct?

21  A   Yes.  And on my first day of matriculation it was

22      made clear that she didn't care if it happened

23      when I was in the crib and then I came forward

24      immediately.

25  Q   In the paragraph that we're speaking about on the

                    ***Braksick Reporting Service ***
                          (785)865-6632

                                                            85

1       Certification Letter you see that it also contains

2       the statement I understand the statements made in

3       here are the basis upon which my application will

4       be decided; correct?

5   A   Correct.

6   Q   So based upon that statement you understood that

7       the information that you provided in your

8       application was material to the consideration of

9       that application?

10  A   Yes, I did.

11  Q   And that the decision regarding your application

12      would be based on your information and the

13      truthfulness and completeness of that information?

14  A   Yes.

15  Q   And there's also the statement:  "In the event

16      that any information is subsequently found to be

17      false, I understand that my admission may be

18      voided and my matriculation cancelled."  You saw

19      that statement at the time that you submitted the

20      Certification Letter?

21  A   Yes.

22  Q   So you knew that at the time that you submitted

23      your application if you submitted false or

                        Page 72

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

24      incomplete information the law school had the

25      right to void your admission and cancel your

***Braksick Reporting Service ***
(785)865-6632

⚥                                                                    86

1       matriculation?

2    A  Yes, to void it, cancel the matriculation, neither

3       of which the law school did.

4    Q  And in that last paragraph you see the statement

5       that says:  "The School of Law does not authorize

6       nor is it bound by any requirements or conditions

7       other than those communicated by the Office of

8       Admissions"?  You saw that statement; correct?

9    A  Yes, but I, I assume it's still bound by state

10      constitutional law.

11   Q  You submitted your application, it was dated

12      March 31, 2009, received at the School of Law

13      April 2nd, 2009.  You were informed that you were

14      wait listed; correct?

15   A  Yes.

16   Q  You were offered admission to the School of Law in

17      August, 2009.  Do you know the date off the top of

18      your head?

19   A  It would have been the eve of my very first day of

20      attendance so I'm not sure what that was.  I think

21      maybe it was the 11th, because they were, they

22      have a week for incoming law students where they

23      go through a law school boot camp that the other

24      people aren't subject to.

25   Q  Is it your recollection that you went through

***Braksick Reporting Service ***
(785)865-6632

⚥                                                                    87

Page 73

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 1      that?  Because I was --
 2   A  Yes, I did.
 3   Q  It was my recollection that you did --
 4   A  No, I did.  I was there the very first day.
 5   Q  Okay.  Is that considered class time or
 6      orientation time?
 7   A  I'm not sure.
 8   Q  Because it was my understanding that you were not
 9      offered admission till the day before classes
10      began.
11   A  Well, that, I considered that class.
12   Q  Okay.
13   A  I mean, they did not give me an option as to
14      whether to show up for it.  They said suit up and
15      show up, be here now, and that was the, the same
16      first day that everybody else in my joining class
17      had to.
18   Q  I'm going to hand you what's been marked as
19      Deposition Exhibit 2 and ask you to look at that
20      and to summarize for the Court, it appears that
21      the process at the School of Law for the
22      individuals who are notified that they are wait
23      listed, that they must take action to preserve
24      their spot on the wait list.  Is that your
25      understanding?
```

***Braksick Reporting Service ***
(785)865-6632

⚥                                                      88

```
 1   A  Oh, they have to submit this, yes, this first
 2      sheet.
 3   Q  Right.  So this form talks about maintaining your
 4      spot on the wait list?
 5   A  Yes.
```

Page 74

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

6  Q  And you submitted the form dated April 18, 2009?

7  A  Right.

8  Q  And that's your signature on that; correct?

9  A  Yes, it is.

10  Q  Okay.  And you asked that your application be

11     retained on the wait list through August 14, 2009;

12     correct?

13  A  Yes.

14  Q  Attached to that is supplemental information for

15     the application of Robert M. Brown dated May 17,

16     2009.

17  A  Yes.

18  Q  And that was submitted by you?

19  A  Yes.

20  Q  And what prompted your submission on that?  Was

21     that part of the wait list process?

22  A  That was a list of recommendations online as how

23     to strengthen your possibilities for admission if

24     you were wait listed.

25  Q  At the time that you submitted your completed form

                ***Braksick Reporting Service ***
                        (785)865-6632

                                                            89

1     that is page 1 of Exhibit 2 indicating your desire

2     to be retained on the wait list you did not make

3     any correction to the application that you had

4     submitted in March, 2009; correct?

5  A  No.  My beliefs regarding the application were

6     still the same as they were in March of 2009.

7  Q  When you submitted your March 17, 2009, letter

8     statement, which is three pages and has looks like

9     kind of a resume, experience thing attached to

10    that, --

                        Page 75

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

11  A    Yes, uh-huh.

12  Q    -- similarly you did not update your application

13       to disclose your prior criminal record?

14  A    My beliefs regarding the requirements for the

15       school were still the same at the time.

16  Q    Specifically, however, at the time that you

17       submitted your April 21, 2009, form that is first

18       page of Exhibit 2 you did not correct or

19       supplement questions 27c and 27d; correct?

20  A    No.  My beliefs regarding the requirements for the

21       application were still the same as they were when

22       I initially submitted the application at that

23       time.

24  Q    And when you submitted the May 17, 2009, letter as

25       part of your effort to improve your chances of

                    ***Braksick Reporting Service ***
                           (785)865-6632

⚥                                                              90

 1       admission off the wait list you did not supplement

 2       or correct your answers to question 27c and d

 3       relating to your criminal background, did you?

 4  A    Nothing in this entire exhibit has anything to do

 5       with those questions.  No.

 6  Q    Do you need to take a break for a soda, water?

 7  A    No, I'm good.

 8  Q    You sighed.  I didn't know if you needed a break.

 9  A    Oh, this is just not the most fun I've ever had.

10  Q    If the record shows that you were admitted on

11       August 14, 2009, would you have any reason to

12       disagree with that?

13  A    No.  So that I'm guessing the first day of the

14       boot camp was August 15th.

15  Q    Okay.  Do you remember what day of the week that

                         Page 76

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

16      was?  Typically, I don't know about the law

17      school, typically the university starts on, before

18      this year it was on Thursdays and Fridays.

19  A   It was not on Monday, I know that.  I had got a

20      call while I was at client site to tell me that I

21      had been admitted and I rearranged a whole bunch

22      of things for the next workday but that's all I

23      remember, but I'll betcha that if I was admitted

24      on the 14th, then it was the 15th, whatever day

25      that is, but --

***Braksick Reporting Service ***
(785)865-6632

91

1   Q   You were admitted to school on August 14, 2009,

2       and then on August 27, 2009, you supplemented your

3       application for admission; correct?

4   A   Yes.

5   Q   I hand you what's been marked as Deposition

6       Exhibit 3 and would you agree with me that's an

7       August 27, 2009, letter from you to Wendy

8       Rohleder-Sook in which you identify supplemental

9       information that you are disclosing in relation to

10      question No. 27; correct?

11  A   Yes, but in addition to this I also provided the

12      petition for certiorari which goes into much

13      greater detail about the multiplicity of the

14      charges of domestic battery and the dates of

15      arrest and conviction.  I provided that at the

16      time I provided this.

17          MS. TROWER:  Okay.  Let's go off the record

18      just a second.

19          (Off the record.)

20  Q   Back on the record.  I'm going to mark, hand you

Page 77

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

21       what's been marked as Exhibit 4.  Is that the writ
22       of certiorari or petition for certiorari that you
23       just referenced in your answer?
24   A   Yes.
25   Q   And so it's your testimony that Exhibit 4, the

***Braksick Reporting Service ***
(785)865-6632

♀                                                                92

1        petition for certiorari, was also submitted along
2        with your August --
3    A   Yes, that is my testimony.
4    Q   Okay.  For housekeeping purposes, Bob, so I don't
5        forget before we get to the end of the thing,
6        rather than putting this actual copy in the record
7        what I would like to do at the end of the
8        deposition is make a copy of this.
9    A   I've already sent you the text, they have been
10       Bates labeled.
11   Q   No, I know that, but I have marked this as an
12       exhibit --
13   A   Oh, all right.
14   Q   -- so what I would like to do is Xerox this copy,
15       substitute the Xerox copy for this actual --
16   A   That's fine, yes.
17   Q   Okay.  You have no objection to my doing that?
18   A   No, I have no objection to you doing that.
19   Q   Okay.  Mr. Brown, in your August 27, 2009, letter
20       in which you supplemented your answers to question
21       No. 27 --
22   A   Uh-huh.
23   Q   -- you did not disclose that you had had a second
24       DUI charge in Topeka; correct?
25   A   The 1979 one?

Page 78

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

***Braksick Reporting Service ***
(785)865-6632

93

1  Q   Well, you told me you had two, one in 1979 and the
2      other in 1982 or 1984.
3  A   Yeah.  The, the diversion would be the second one
4      and apparently it happened later than I thought
5      but in Topeka there were things in 1979 and 1982
6      on the K.B.I. report.  I was guessing about the
7      dates, obviously that's the reason for the
8      question marks after them.  I was unable to find
9      these things online.
10 Q   And, however, as to the number of charges, you did
11     not indicate that you had had a second DUI charge
12     in Shawnee County; correct?
13 A   I disclosed every, every DUI charge in Shawnee
14     County that I could think of.
15 Q   But the reality is that you only disclosed one and
16     you have a second one in Shawnee County; correct?
17     You would agree with me that there's no reference
18     here to the second one that occurred in Shawnee
19     County, second DUI?
20 A   Well, there is a reference to the diversion.
21     There is no reference to the one that was reduced
22     to a reckless driving.  The one I remembered was
23     the diversion.
24 Q   And similarly in respect to the August 27, 2009,
25     letter in which you were supplementing and

***Braksick Reporting Service ***
(785)865-6632

94

1      updating your question No. 27 you did not disclose
2      the 1999 DUI arrest in North Kansas City; correct?

Page 79

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

3  A    No.  I was, I was disclosing convictions.

4  Q    The question 27, however, did not ask simply for

5         convictions, it asked for arrests; correct?

6  A    Well, I recall that now.

7  Q    Well, you knew that at the time that you had

8         submitted your application to the law school and

9         at the time that you were supplementing your

10       application to the law school, which is the

11       August 27, 2009, letter?

12  A   Well, let me put it this way.  I handed you a

13       letter that said, okay, I've got, and a petition

14       for certiorari that says I've got four charges,

15       three convictions for domestic battery, a

16       diversion on DUI, a guilty finding on DUI.  I

17       figured if there was going to be an issue, then

18       that would certainly be enough to make the case,

19       you know, make or break, you'd let me know what

20       action you planned to take on it within a

21       reasonable period of time.

22  Q   That's not the question I asked, Mr. Brown.  At

23       the time that you submitted your August 27, 2009,

24       letter supplementing question 27 you still

25       understood that question 27 did not simply ask for

***Braksick Reporting Service ***
(785)865-6632

95

1       convictions but it also asked for arrests?

2  A   No, I was under the misapprehension that I was

3       only to provide convictions, which is why I only

4       provided convictions.  I, I know now that that is

5       what the question says.

6  Q   And you knew that at the time that you submitted

7       your application and at the time that you

Page 80

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

8       submitted your August 27, 2009, supplementation,

9       that the question asked for arrests, not simply

10      convictions.

11   A   I, I know that the question asks for arrests, yes.

12   Q   After you submitted your August 27, 2009,

13      supplemental disclosure regarding question No. 27

14      you were asked to provide a written explanation

15      elaborating upon the facts and circumstances of

16      those criminal charges; correct?

17   A   Yes.

18   Q   I hand you what's been marked as Exhibit 5.  Is

19      that a letter from you dated September 11, 2009?

20   A   Yes.

21   Q   And is the letter dated September 11, 2009, is

22      that your written response to the request for

23      additional information concerning the answers or

24      the matters that you disclosed on the August 27,

25      2009, supplemental disclosure concerning question

***Braksick Reporting Service ***
(785)865-6632

                                                        96

1       27?

2    A   Yes.

3    Q   In the September 11, 2009, letter you did not

4       disclose the second arrest for DUI that had

5       occurred in Shawnee County; correct?

6    A   I was not aware of it.

7    Q   But you did not disclose it; correct?

8    A   I did not disclose it.  I was not aware of it.  I

9       still don't have any independent recollection of

10      it to this moment.

11   Q   In the September 11, 2009, letter you did not

12      disclose the 1999 DUI arrest in North Kansas City,

Page 81

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

13       Kansas, or Missouri; correct?

14    A   Correct.  Oh, and there, there's also a 2004

15       arrest for criminal trespass.

16    Q   Okay.  So we need to add the 2004 criminal arrest

17       for trespass to your list of criminal arrests and

18       convictions?

19    A   Yes, right, right.  No, arrests.

20    Q   Arrests and convictions?

21    A   Right.  It's an arrest.

22    Q   Right.  I'm sorry, if you misunderstood what I was

23       saying, it's, we're adding it to the list of

24       criminal offenses.

25    A   Right.  I just want to be clear that it is an

                    ***Braksick Reporting Service ***
                          (785)865-6632

                                                              97

1        arrest for which there was no conviction or even a

2        trial.

3     Q   And where was the criminal arrest for trespass?

4     A   Overland Park.

5     Q   Were charges ever filed?

6     A   Yes.

7     Q   Charges were filed in Johnson County District

8        Court, then?

9     A   Yes.

10    Q   And disposition was a dismissal?

11    A   Yeah, the State moved to dismiss after examining

12       the credibility of their complaining witness,

13       Robyn Barr.

14    Q   In the September 11, 2009, letter you did not

15       disclose the 2004 criminal arrest -- arrest for

16       criminal trespass; correct?

17    A   No, I did not.

                         Page 82

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

18  Q   Mr. Brown, I'm going to hand you what's been
19      marked as Deposition Exhibit 6 and for purposes of
20      identifying it for the record would you agree with
21      me that that is an e-mail string that began with
22      an October 2nd, 2009, e-mail from Wendy
23      Rohleder-Sook, R O H L E D E R hyphen S O O K, to
24      you and then on the top of that is an October 2nd,
25      2009, e-mail response from you to

                    ***Braksick Reporting Service ***
                            (785)865-6632

                                                              98

1       Ms. Rohleder-Snook; correct?
2   A   Yes.
3   Q   And in the original or initiating e-mail in that
4       string from Ms. Rohleder-Sook to you she
5       references the law school being in receipt of your
6       September 11, 2009, letter amending your
7       application for admission and requests that you
8       provide a written authorization to obtain records.
9       Is that correct?
10  A   Yes.
11  Q   And in your response to Ms. Rohleder-Sook you
12      provide additional explanation or information
13      concerning what you disclosed in your prior
14      letters; correct?
15  A   Yes.
16  Q   Oh, actually in terms of the exchange there their
17      review had identified two additional battery
18      charges and the criminal trespass charge. Isn't
19      that correct?
20  A   Well, they hadn't identified any additional
21      battery charges, they were all disclosed in the
22      petition for certiorari.

                        Page 83

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

23  Q    She identifies three additional criminal offenses,
24       12/5/94 battery, 12/21/94 battery, 4/23/04
25       criminal trespass and she asks you to provide

***Braksick Reporting Service ***
(785)865-6632

99

1        information concerning that and that's what you
2        responded with in your October 2nd, 2009, e-mail
3        sent at 11:25 a.m.; correct?
4   A    The information regarding the battery charges was
5        provided in mind-numbing detail in the petition
6        for certiorari that she was provided when I
7        initially amended.  Those counts were recharged
8        and I think that they were actually one of the
9        counts I was convicted of.  If she read what I
10       gave her she would have been fully aware of them.
11       There was also discussion of combination of the
12       counts that included them under 60-455.  It's
13       quite clear that there were four underlying counts
14       there.
15  Q    Okay.  Mr. Brown, I'm going to hand you the
16       petition for certiorari that's been marked as
17       Deposition Exhibit 4 and ask you to give me
18       citations specifically in that petition to where
19       the criminal charges are clearly identified and
20       enumerated so that a reader might understand.
21  A    This case involved four incidents of domestic
22       battery alleged to have been committed by
23       petitioner against RKG.  It's on page 4 under the
24       heading Background.  Then you want other
25       instances, too?

***Braksick Reporting Service ***
(785)865-6632

Page 84

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

100

1   Q     Yes.
2   A     All right.  Okay, in the Court of Appeals it
3         refers to the three counts that I was convicted
4         on.  That starts at appendix A-1.  There's another
5         petition in the Supreme Court case where it again
6         enumerates the convictions at A-26.
7   Q     Page A-26?
8   A     A-26, appendix 26.  The combination of the
9         accounts, of the counts is discussed at page A-36,
10        again making clear the discussion that there were
11        multiple counts.  The multiple counts are
12        discussed again at A-42.  The 60-455 motion where
13        the State sought to consolidate four counts is
14        discussed at A-54.  That's all I can find on the
15        first pass through it.
16  Q     Okay, thank you.  Mr. Brown, why did you name Andy
17        Tompkins, president of the Kansas Board of
18        Regents, in his official capacity as a defendant
19        in this lawsuit?
20  A     I found case law where they had suggested
21        dismissal of one of these suits because the Regent
22        hadn't been named individually, the one had just
23        named the Board of Regents rather than the
24        members.
25  Q     But that was a claim against the Board of Regents

***Braksick Reporting Service ***
(785)865-6632

101

1         itself?
2   A     No, it was a claim against a university.
3   Q     Do you know which university?
4   A     I believe it was Kansas University.

Page 85

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

5   Q    You remember what the case was about?

6   A    No.  It's been a long time since I found it so --

7   Q    Do you remember the style of the case?

8   A    No.

9   Q    All right.  If I asked you that question with

10       respect to each of the individual members would

11       that answer be the same or --

12  A    Yes, it would be the same.  That's because I

13       believed that that was the correct way to, to name

14       the university was by naming the members of the

15       Board of Regents.

16  Q    You know that the Kansas Board of Regents is a

17       separate statutorily-created entity separate and

18       distinct from the University of Kansas; do you

19       know that?

20  A    Yes, but it governs the University of Kansas.

21  Q    But you still understand that they're two separate

22       and distinct state entities created separately by

23       statute?

24  A    Yes.

25  Q    Board of Regents and the University of Kansas are

                    ***Braksick Reporting Service ***
                              (785)865-6632

                                                                    102

1        two separate entities?

2   A    That's correct.

3   Q    Two separate legal entities?

4   A    Yes.

5   Q    Two separate statutorily-created entities?

6   A    Yes.

7   Q    Okay.

8   A    Regardless, I have to name them personally.  Even

9        though it is a legal fiction I am under the

                              Page 86

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
10        impression that I have to name them personally
11        rather than board.
12   Q    Okay.  I want to make sure that I understand, and
13        I think I do but I just want to make sure that I
14        understand your Complaint, so I'm going to ask you
15        some, which I apologize if they seem like stupid
16        questions but I just want to make sure that we're
17        on the same page.  Your Count I in your Complaint
18        is a claim brought under 42 U.S.C. section 1983
19        and that's titled a procedural due process
20        deprivation; correct?
21   A    Uh-huh, yes.
22   Q    That claim is not brought against the Board of
23        Regents; correct?
24   A    It's brought through the Board of Regents in their
25        official capacities.
```

***Braksick Reporting Service ***
(785)865-6632

103

```
 1   Q    Are you alleging that the Board of Regents and
 2        their members and their chief executive officer,
 3        Mr. Tompkins, did anything to violate your due
 4        process?
 5   A    No.  That's why it is an official capacity.
 6        That's why they're official capacity defendants.
 7        It's a legal fiction through which I reach the
 8        entities that are subordinate to them.  All of the
 9        regents are official capacity defendants.
10   Q    I understand that and you have a claim that seeks
11        injunctive relief but as to -- I understood your
12        claims to be separate, that you're -- and maybe
13        I'm misunderstanding your claim.  I understood
14        your Count I claim for alleged procedural due
```

Page 87

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

15      process violations to be really related to

16      noninjunctive relief, to money damages?

17  A   Yes.

18  Q   Okay.  And I understood your claim in Count I to

19      be related, because it relates to money damages,

20      to persons and entities who are not the Board of

21      Regents.  Did I misunderstand?

22  A   It's actually only against the individual

23      defendants.

24  Q   Okay.  So I guess we --

25  A   Mazza, Rohleder-Sook, Mazza, Rohleder-Sook,

***Braksick Reporting Service ***
(785)865-6632

104

1       Agrawal, and McCray-Pearson.

2   Q   Okay.  And that's what I was trying to clarify.

3   A   Yes.

4   Q   So Count I is not against the Board of Regents and

5       Mr. Tompkins, --

6   A   That's correct, it is not.

7   Q   -- Count I --

8   A   I'm not asking for money damages from the

9       university, I'm not asking for money damages from

10      Kansas, under that count.

11  Q   Right.

12  A   I'm asking for it from the individuals.

13  Q   Okay.  So Count I deals solely with respect to

14      claims for money damages against Stephen Mazza as

15      an individual; correct?

16  A   Yes.

17  Q   Count I deals with money damages only against Gail

18      Agrawal as an individual; correct?

19  A   Yes.

Page 88

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

20  Q    Count I deals only with a claim for money damages

21       against the individual Wendy Rohleder-Sook;

22       correct?

23  A    Yes.

24  Q    And Count I, does it relate to Joyce

25       McCray-Pearson as an individual or not?

                    ***Braksick Reporting Service ***
                         (785)865-6632

♀                                                        105

 1  A    Yes.

 2  Q    Okay.

 3  A    Those are the only people that I'm asking for

 4       money damages from.

 5  Q    And those are the only ones that you've claimed --

 6  A    Under that count.

 7  Q    -- a due process violation in Count I as

 8       individuals, against those four people?

 9  A    No.  Those are the only people that I'm asking

10       money for.  The entire, the entire group has

11       violated my due process, it's just that for

12       Eleventh Amendment reasons I can't reach any of

13       the other people.

14  Q    And Count II is again for money damages only for

15       substantive due process violations?

16  A    Okay, what I'm saying is the violation was

17       committed by everyone but the money damages, yes,

18       only go to the individuals on Count II.

19  Q    Your Count IV, which is a claim for declaratory

20       and injunctive relief, --

21  A    Yes.

22  Q    -- paragraph 3 of 6 asks for a declaration that

23       defendants have entered into a binding enrollment

24       contract with plaintiff.  See that statement?

                         Page 89

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

25  A    Yes.

***Braksick Reporting Service ***
(785)865-6632

106

1  Q    Okay.  When you're saying defendants there, which

2        defendants are you claiming entered into a binding

3        enrollment contract with you?

4  A    Well, all of them.

5  Q    When you say all of them who do you mean?

6  A    Well, the University of Kansas and the University

7        of Kansas School of Law, all the individuals and

8        the official capacity defendants are beholden to

9        uphold that contract.

10  Q   Okay, what's your factual basis for believing that

11       the Board of Regents enrolls students?

12  A   You're asking me for a legal conclusion now.

13  Q   No, I'm asking you for your factual basis for

14       asserting that the Board of Regents enrolls

15       students.

16  A   Well, it doesn't say that it enrolls students.

17  Q   Well, in order to have an enrollment contract with

18       the Board of Regents they have to be enrolling

19       students so what's the factual basis for your

20       assertion that the Board of Regents enrolls

21       students?

22  A   I guess my assertion is that as the governing body

23       of all the subordinate entities the Board of

24       Regents is beholden to uphold the enrollment

25       contract.

***Braksick Reporting Service ***
(785)865-6632

107

1  Q    What's your factual basis for your assertion that

Page 90

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 2      you have an enrollment contract with the Board of
 3      Regents?
 4   A  My claim is that the Board of Regents is beholden
 5      to honor my enrollment contract, and perhaps they
 6      weren't involved in the minutiae of the enrollment
 7      process; however, they do oversee the chancellor,
 8      they oversee all the universities, they approve
 9      the regulations, they establish limits on what can
10      and cannot be done.  One important, one important
11      limit that's of that nature is that the actions
12      taken in the universities and the regulations that
13      they promulgate can't be contrary to chancellor's
14      rules and they can't be contrary to state law and
15      they can't be contrary to federal constitutional
16      law and to the extent that that's happened here
17      the Regents are beholden to correct it and to the
18      extent that the Board of Regents condones what's
19      happened here, then they're in breach of the
20      contract.
21   Q  You asserted that the Board of Regents approves
22      university regulations.  What's your factual basis
23      for that claim or assertion?
24   A  I, I didn't say that.  I said the Board of Regents
25      governs the people who approve the university
```

***Braksick Reporting Service ***
(785)865-6632

108

```
 1      regulations.
 2          MS. TROWER:  Can you read his answer back?  I
 3      think he said that they approve regulations.  Can
 4      you read that back to me.
 5          (The record was read back by the reporter
 6          as requested.)
```

Page 91

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 7   Q    That's enough.  Mr. Brown, we have had the answer
 8        that you've given read back and as you heard the
 9        answer read back you had stated in your answer
10        that the Board of Regents approves regulations.
11        What's your factual basis for asserting that the
12        Board of Regents approves university regulations?
13   A    Well, I was under the impression that the, I
14        didn't say university regulations, I said approves
15        regulations, and I was under the impression that
16        they approve strategic initiatives that emanate
17        from the chancellor's office and that they
18        establish parameters for those initiatives.
19   Q    Okay, when you said approves regulations, what
20        regulations is the Board of Regents approving?
21   A    Well, I would need to research that offline and
22        get back with you on the answer to that request
23        for a purely legal answer.
24   Q    So as you sit here today you can't tell me which,
25        if any, regulations the Board of Regents approves?
```

***Braksick Reporting Service ***
(785)865-6632

109

```
 1   A    I can't tell you without the opportunity to resort
 2        to some research materials, no.
 3   Q    As you sit here today you can't tell me which
 4        specific University of Kansas regulations or
 5        procedures, if any, the Board of Regents has ever
 6        reviewed and approved?
 7   A    No.  I doubt that they have actually gotten down
 8        to that level.  I would imagine that the Board of
 9        Regents works through the chancellor and the
10        chancellor works through the universities.
11   Q    So when you say that you doubt that the Board of
```

Page 92

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

12    Regents has gotten down to that level of approving

13    specific university regulations, you said that

14    that's because you understand they work through

15    the chancellor and others at the university, you

16    don't have any factual basis for asserting or

17    claiming here that the Board of Regents has any

18    knowledge about the law school admissions process;

19    correct?

20  A   That is incorrect.

21  Q   Okay.  What's your factual basis for believing

22    that the Board of Regents knows anything about the

23    University of Kansas School of Law's admission

24    process?

25  A   Because the Board of Regents establishes

***Braksick Reporting Service ***
(785)865-6632

110

1    parameters outside which the subordinate entities

2    that they govern may not transgress.

3  Q   Besides your belief about the role of the Board of

4    Regents that you've just articulated do you have

5    any specific factual knowledge that the Board of

6    Regents, its members and its chief executive

7    officer, Mr. Tompkins, have any specific knowledge

8    about the University of Kansas School of Law's

9    admissions process?

10  A   I'll probably be able to give you a more complete

11    answer to that question after they answer the

12    discovery but at this point I don't have the

13    specifics you're looking for.

14  Q   Okay, so your answer is no, you have no factual

15    basis for knowing what, if any, knowledge the

16    Board of Regents' members and its chief executive

Page 93

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

17    officer have about the University of Kansas School

18    of Law's admissions process?

19  A  They are official capacity defendants.  They are

20    simply passthrough entities to enable the lawsuit

21    to take place.  Their level of specific knowledge

22    is irrelevant.  They are charged with governing

23    the schools and they need to be accountable when

24    that governance goes wrong because legally the

25    state cannot.

***Braksick Reporting Service ***
(785)865-6632

111

1  Q  What's your factual basis for believing that the

2    Board of Regents has the authority to compel your

3    admission to the University of Kansas School of

4    Law?

5  A  That's based on my reading of the statutes.

6  Q  And what did that reading lead you to believe?

7    Again, what's the fact -- reading of the statutes

8    doesn't tell me anything.  What's --

9  A  They govern the defendants University of Kansas

10    and the University of Kansas School of Law.

11  Q  Okay.  What specific authority in the statute,

12    other than the general authority that you

13    understand that they govern the university, can

14    you point to which says that the Board of Regents

15    has the authority to compel your admission to the

16    University of Kansas School of Law?

17  A  Well, the Board of Regents has broad powers to

18    govern and through those they acquire specific

19    powers.

20  Q  And where are you getting that belief from?  Give

21    me the citation or the factual case that says

Page 94

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

22      that.

23  A   Well, I mean, there's not going to be one.  Let's

24      say that Officer Jones sees you committing a crime

25      and then he walks over to you and he says, "You're

***Braksick Reporting Service ***
(785)865-6632

112

1       under arrest," and you say, "Officer Jones, can

2       you please show me the specific statute that says

3       that you can arrest me right here right now?"  You

4       know, there's not going to be one.  That doesn't

5       mean he can't do it.

6   Q   You did not submit an application at any time to

7       the Board of Regents; correct?

8   A   No.

9   Q   You did not submit your supplemental materials

10      updating your application to the School of Law to

11      the Board of Regents; correct?

12  A   No, I did not.

13  Q   The Board of Regents is not the entity who

14      contacted you and advised you that you were going

15      to be dismissed from the law school for failing to

16      provide complete, accurate and truthful answers on

17      your application for admission; correct?

18  A   Correct.  The Board of Regents took no overt

19      action.

20  Q   Do you have any factual basis for knowing or

21      asserting that the Board of Regents even was aware

22      of your application to the School of Law?

23  A   My basis for naming the Regents is legal.  I

24      believe that they are the correct official

25      capacity defendants.

***Braksick Reporting Service ***
Page 95

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt
(785)865-6632

♀                                                                          113

```
 1  Q    That's not my question.  Do you have any factual
 2       basis for asserting that the Board of Regents had
 3       any knowledge whatsoever about your application to
 4       the School of Law?
 5  A    At the time I made it or now?
 6  Q    At any time.
 7  A    Yes, I believe they're aware of it now.
 8  Q    Okay.  As a result of your having sued them?
 9  A    This lawsuit, yes.
10  Q    Okay.  Before your having sued them do you have
11       any factual basis for believing that the Board of
12       Regents and its chief executive officer,
13       Mr. Tompkins, had any knowledge about your
14       application to the School of Law?
15  A    Not before but I believe what they think of it
16       after the fact is certainly relevant.
17  Q    That's not the question I asked.  Do you have any
18       factual basis for believing that the Board of
19       Regents and its chief executive officer,
20       Mr. Tompkins, had any knowledge about your
21       application to the School of Law before this
22       lawsuit was filed?
23  A    Yes.  I believe that Mr. Tompkins and every Regent
24       have knowledge about how these matters should be
25       administered.
```

***Braksick Reporting Service ***
(785)865-6632

♀                                                                          114

```
 1  Q    That's not the question I asked, Mr. Brown.
 2  A    That is knowledge about my application.
 3  Q    No, Mr. Brown.
```

Page 96

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

4   A    That is the question you asked.

5   Q    Mr. Brown, I am not going to argue with you and

6        you're not going to play games with me here.  Your

7        specific application, that's what we're talking

8        about here.  Do you have any factual basis for

9        asserting that the Board of Regents and

10       Mr. Tompkins knew about your specific application

11       to the School of Law before this lawsuit was

12       filed?

13  A    To the extent that it is an application for the

14       admission to the School of Law, yes, I believe

15       that they understand how that should be

16       administered in their capacity as the members who

17       govern the educational institutions to which the

18       application is made.

19  Q    Mr. Brown, if you continue to play these games and

20       refuse to answer the specific question that I'm

21       asking you I'm going to certify the question and

22       then I'm going to go to the court and I'm going to

23       ask that you be sanctioned for not answering the

24       questions appropriately.  Do you understand?

25  A    I've answered the question.

***Braksick Reporting Service ***
(785)865-6632

115

1   Q    No, you did not, Mr. Brown.  I am talking about

2        your specific application.  Tell me how it is that

3        you know that Andy Tompkins knew about your law

4        school application before this lawsuit was filed.

5   A    Are you asking me if he knew what was actually

6        written in my specific application?  The answer is

7        no, of course he didn't.

8   Q    Tell me how it is that you claim that any of the

Page 97

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 9       Board of Regents members knew about your specific

10       application to the School of Law before this

11       lawsuit was filed.

12   A   About my specific application?

13   Q   Yes.  Yes.  It's a simple question.  You're a

14       smart guy.  You understood the question.

15   A   Do you think that you could try to dial your

16       demeanor back a little bit?  I'm trying to answer

17       the questions.

18   Q   Mr. Brown, answer the question.

19   A   Okay.  Can you read it back?

20   Q   I'll ask it again.

21   A   Okay.

22   Q   Tell me specifically what facts you can point to

23       that say that the Board of Regents members knew of

24       your specific application to the School of Law

25       before this lawsuit was filed.
```

***Braksick Reporting Service ***
(785)865-6632

♀

116

```
 1   A   I don't have any facts that say they knew what was

 2       in my application before the lawsuit was filed.

 3   Q   And you don't have any facts that they even knew

 4       that you had applied to the School of Law;

 5       correct?

 6   A   No, correct, specifically me, no.

 7   Q   Yes.  And you don't have any facts at all which

 8       show that Andy Tompkins knew anything about your

 9       dismissal from the School of Law before this

10       lawsuit was filed; correct?

11   A   Not before the lawsuit.

12   Q   And similarly you don't have any facts which say

13       that any of the individual members of the Board of
```

Page 98

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

14      Regents knew anything about your dismissal from

15      the law school before this lawsuit was filed;

16      correct?

17   A  No, not before the lawsuit was filed.

18         MS. TROWER:  Candace, what time is it?

19         THE REPORTER:  12:17.

20         MS. TROWER:  Let's take a lunch break.

21         (The lunch recess was taken from 12:17

22         until 12:55.)

23   Q  Okay, Mr. Brown, we're back on the record.  Count

24      V is a state claim for gross and wanton

25      negligence.

                  ***Braksick Reporting Service ***
                        (785)865-6632

                                                    117

1    A  Yes.

2    Q  Can you tell me who that claim is against?

3    A  Well, it's against the individual defendants.

4    Q  So when you say the individuals, you are referring

5       to Mazza, Agrawal, Rohleder-Sook and Joyce

6       McCray-Pearson?

7    A  Yes.  And then it's also against K.U. and the

8       Kansas University School of Law within the

9       boundaries of damages that can be awarded under

10      the Kansas Tort Claims Act.  I believe there is a

11      $500,000 aggregate limit on Kansas Tort Claims Act

12      damages.

13   Q  It's not against the Regents or Andy Tompkins,

14      however; right?

15   A  No, and I mean I can, I can probably save you a

16      lot of time.  I'm not saying that the Regents knew

17      anything about my applications or the facts before

18      the lawsuit was filed, I'm saying that they know

                  Page 99

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
19        how it should have been handled and that's all
20        after the fact, and that's going to be true with
21        respect to every count.
22    Q   Okay, and I appreciate that clarification.  Again,
23        though, you know, when your pleading says people
24        should have acted, you can't act if you don't know
25        about something so you would agree with me or you
```

***Braksick Reporting Service ***
(785)865-6632

118

```
 1        would concede that the Regents didn't know
 2        anything about this --
 3    A   Well, they're, they're official capacity
 4        defendants.
 5    Q   No, I understand that, but they can only act as
 6        human beings, so the Regents didn't know anything
 7        about this matter, whether it's your application,
 8        whether it's your dismissal, whether it's your
 9        attempt to invoke the judicial board's
10        jurisdiction here at the university, whether it's
11        your writing the chancellor --
12    A   I'm willing to concede they didn't know anything
13        about it before the fact.
14    Q   When you say before the fact, meaning before they
15        received --
16    A   Before the lawsuit.
17    Q   Before they filed the lawsuit -- before you filed
18        the lawsuit?
19    A   Yes.
20    Q   Yes?
21    A   Yes.  They do know whether what was done is right
22        or wrong.
23    Q   Okay.
```

Page 100

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

24  A    They're uniquely qualified to know that as

25       Regents.

***Braksick Reporting Service ***
(785)865-6632

                                                            119

 1  Q    But that's after the fact, after?

 2  A    That's after the fact.

 3  Q    After they got the lawsuit?

 4  A    So I think that will save us about eight hours

 5       here today.

 6  Q    Okay, appreciate that.  Thank you.

 7  A    Uh-huh.

 8  Q    And so Count VI, your state claim for tortious

 9       interference with respect to business advantage,

10       who is that against?

11  A    The same defendants as Count V.

12  Q    Okay, so that's the individual defendants Agrawal,

13       Mazza, Rohleder-Sook, Joyce McCray-Pearson?

14  A    And then also against K.U. and the School of Law.

15  Q    Okay.

16  A    Within the bounds of the Kansas Tort Claims Act.

17  Q    And it's not against the Board of Regents?

18  A    Not against the Board of Regents for monetary

19       damages.  I'm not asking for monetary damages

20       against any individual -- any official capacity

21       defendant.

22  Q    Right.  But in terms of a tortious interference,

23       to the extent that you're claiming either a

24       tortious interference or negligence, again, you've

25       conceded that the Board of Regents knew nothing

***Braksick Reporting Service ***
(785)865-6632

                                                            120

Page 101

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 1       about this matter, had no opportunity to intervene
 2       until after they received the lawsuit; correct?
 3   A   No, I'm conceding there I don't know for a fact
 4       whether they knew or not.
 5   Q   Okay.  You don't know for a fact?
 6   A   Right.
 7   Q   Okay.
 8   A   I don't know what they knew before.  I'm pretty
 9       sure they knew after it landed on their desk that
10       it was an issue.
11   Q   Okay.  Your Count VIII is a claim for civil
12       conspiracy?
13   A   Yes.
14   Q   Tell me specifically who it is that conspired.
15   A   The individual defendants, each and all.
16   Q   Which is, again, Rohleder-Sook, Mazza, Joyce
17       McCray-Pearson and --
18   A   Gail Agrawal.
19   Q   -- Gail Agrawal?  Okay, so Count VIII relates to
20       those four individuals?
21   A   Yes, and it's also against the institutional
22       defendants pursuant to the theories espoused in
23       paragraphs 251 through 254.
24   Q   Other than the fact that you were dismissed from
25       the School of Law what is the factual basis for
```

***Braksick Reporting Service ***
(785)865-6632

121

```
 1       your assertion that the individual defendants
 2       conspired to deprive you of your rights?
 3   A   Well, it's, it's based on the fact that they all
 4       were aware of my due process rights.
 5       Rohleder-Sook referenced DRP in all of her
```

Page 102

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

6    correspondence.  Mazza not only referenced it in

7    his e-mails but talked about how careful they had

8    been to protect my due process rights throughout

9    the pendency of the process.  I cited the code to

10   Agrawal and she dismissed me notwithstanding it

11   and denied me the opportunity for a personal

12   appearance.  And then, let's see, when it got to

13   McCray-Pearson the thing was summarily dismissed

14   that same day without any sort of consideration to

15   the very detailed explanation that I had laid out

16   in the documents that I filed.  I guess what I'm

17   trying to say is it would be impossible, given the

18   materials that these people were confronted with

19   and in many cases that they acknowledged, for them

20   not to know that they were just throwing due

21   process to the wind.  They took me through a

22   process that's for students who are members of the

23   academic community whose academic status is placed

24   in jeopardy and everyone acknowledged that this is

25   the right process and that you, Mr. Brown, have

***Braksick Reporting Service ***
(785)865-6632

122

1    these due process rights.  Then, at the 11th hour,

2    when their action was dismissed, they said, well,

3    due process be damned, we're just going to go

4    ahead and dismiss him, and everyone all the way up

5    the food chain supported that.

6  Q   Okay.  When did the conspiracy begin?

7  A   When did the conspiracy begin?

8  Q   Yeah.  You said the four individual defendants

9      conspired.  When did the conspiracy arise?

10 A   Well, the earliest that that, that I can say with

Page 103

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

11      absolute certainty would be the date at which I

12      was notified by, well, actually, okay, with

13      respect to Mazza it's probably, his involvement

14      began on the day that he intentionally misled me

15      about what the proper code section in university

16      policy was for this action.  He originally

17      described it as an Article 23 matter, referring to

18      Article 23 of the Student Code of Rights and

19      Responsibilities, and then later on when I asked

20      him to tell me about that he said, no, I should

21      have said question 23, when the actual question is

22      27.  He knew that the proper avenue of

23      jurisdiction in this would have been as

24      nonacademic misconduct through the Office of the

25      Vice Provost for Student Success and what he was

                    ***Braksick Reporting Service ***
                              (785)865-6632

                                                              123

1       doing was trying to make sure that it stayed

2       within the law school so that the law school could

3       achieve its desired adjudication on the matter.

4       Dean Rohleder-Sook knew full well that the

5       requirements for a response to my procedural

6       objections had long since passed.  They both knew

7       that the requirement for them to actually assemble

8       a panel within 30 days had long since passed.  And

9       then after, after the actual disciplinary action

10      was dismissed and they decided to dismiss me from

11      the university, notwithstanding that and without

12      regard to the numerous due process protections

13      that they had both, both abided by and

14      acknowledged in writing, then that's when Agrawal

15      joined in, because she knew she couldn't do that

                          Page 104

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

16        and so did Mazza and Rohleder-Sook, by virtue of

17        their participation in the proceedings pursuant to

18        the DRP.  I mean, they can't have it both ways,

19        either there is jurisdiction under the DRP or

20        there isn't.  You can't pick your forum.  You

21        can't say, okay, well, we're bound by the DRP if

22        we're gonna get you out of here, but if we're not,

23        then we're not bound by anything.  And then of

24        course McCray-Pearson, what I'm saying is she knew

25        full well that her actions were wrongful and she

***Braksick Reporting Service ***
(785)865-6632

124

1        just summarily dismissed it anyway out of

2        deference to her colleagues.

3   Q    Okay, with respect to Stephen Mazza, you say that

4        he intentionally misled you about the proper code

5        section, citing Article 22.  How do you know he

6        intentionally misled you?

7   A    Our very first meeting he mentioned Article 22 but

8        then, then he --

9   Q    That's what he said but --

10        THE REPORTER:  One at a time, please.

11  Q    Strike that.  I apologize, Candace.  I understand

12        he mentioned Article 22 but how do you know that

13        he intended to mislead you?  What's your factual

14        basis for knowing his intent?

15  A    Well, okay, the first day we talked he said this

16        is an Article 22 matter.  Now, coincidentally, I

17        suppose, if you're willing to indulge it that far,

18        the Student Code of Rights and Responsibilities

19        just happens to deal with this very subject in

20        Article 22 of the Student Code of Rights and

Page 105

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

21    Responsibilities.  Later when I was asking about

22    procedural implications and I mentioned Article 22

23    he acted as though he had never heard of it and

24    actually give the wrong number for the question,

25    question 22, and I guess what I'm saying is a

***Braksick Reporting Service ***
(785)865-6632

125

1    reasonable fact-finder could certainly infer, as I

2    do, that he knew full well what Article 22 was but

3    he also knew that that would result in

4    transference of jurisdiction of the matter outside

5    of the School of Law's DRP.

6  Q   Again, you keep stating these conclusions about

7    what he knew but how do you know that he knew

8    that?  What's your factual basis for confirming

9    his knowledge?

10 A   Okay, he said it's an Article 22 matter, he said

11    it several times the first time we met.  Then when

12    I asked about Article 22 he had suddenly forgotten

13    completely about Article 22.  To say that, that he

14    knew nothing of it is to attribute him being able

15    to pull out of the ether, through osmosis or some

16    other telekinetic process, the exact code section

17    by which the dispute should have been adjudicated.

18    It's ludicrous.

19 Q   You would concede with me that it's possible that

20    he just misspoke?

21 A   No, it's not possible.  I would not concede that.

22 Q   Why is it not possible?

23 A   I just told you.

24 Q   Why is it not possible?  Do you not misspeak?

25 A   Okay.

Page 106

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

***Braksick Reporting Service ***
(785)865-6632

⚥                                                                        126

    1   Q    It's somehow impossible, you're telling me it's

    2        impossible that he misspoke?

    3   A    It's --

    4   Q    How do you know that factually that it's

    5        impossible he misspoke?

    6   A    Because he can't know what Article 22 is the first

    7        time we talk and then forget completely about it.

    8        He's the dean of the law school.

    9   Q    You don't concede that --

    10  A    No, I don't concede that.

    11  Q    -- his mistake could have been coincidence?

    12  A    No, I don't concede that.

    13  Q    You said that, with respect to Dean Agrawal, she

    14       joined in the conspiracy when she knew that she

    15       couldn't do that.  What was it that she knew she

    16       couldn't do?

    17  A    Oh, she knew that she was completely going around

    18       all my rights under the DRP and the Student Code

    19       of Rights and Responsibilities.

    20  Q    Okay, how do you, again, how do you know what her

    21       knowledge is?

    22  A    Because I put it in writing to her in a very

    23       detailed letter spelling those rights out and

    24       citing to the university code and the university

    25       regulations.  If she didn't know it, then it's

                 ***Braksick Reporting Service ***
                         (785)865-6632

⚥                                                                        127

    1        certainly beholden upon her to take a look.

    2   Q    Okay.  And with respect to your, aside from your

                              Page 107

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

3     having put in writing what you thought your rights

4     were, do you have any other factual basis for

5     knowing what she knew?

6  A   I didn't put in writing what I thought my rights

7     were.  I put in writing citations from the various

8     codes of conduct that up until now you had had me

9     going through procedures based upon.  Those are

10    not suppositions on my part, they're pulled from

11    your published university rules and regulations

12    that are available for every citizen of this state

13    to see.

14  Q   Aside from what you provided to her in your

15    writings showing citations to the codes of conduct

16    how do you know what she knew with respect to

17    processes and procedures that were required?  Do

18    you have any basis for knowing that?

19  A   Yes.  My second basis would probably be that she's

20    the dean of the School of Law and that she talked

21    to us in lectures about how to choose classes,

22    about how important a thorough knowledge of

23    administrative law had become for her as an

24    administrator of the School of Law, and then

25    lastly I'm drawing some inferences from her

***Braksick Reporting Service ***
(785)865-6632

128

1     outright unwillingness to have any contact or

2     discussion with me in any way regarding it.

3  Q   With respect to Joyce McCray-Pearson, you said she

4     knew full well her actions were wrongful.  How do

5     you know Joyce McCray-Pearson knew that her

6     actions were wrongful?

7  A   I sent her an exhaustive rundown of everything

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

8      that had happened below, below her and I made a
9      proper request to invoke the jurisdiction of the
10     University Judicial Board and that was denied.
11     Further, as the chair of the judicial board she's
12     got to be in touch with how the procedures are
13     administered because she's, she's key in
14     administering those on a day-to-day and
15     minute-to-minute basis as things arise within the
16     student body.  I mean, in order to say that she
17     didn't have that knowledge you have to be willing
18     to believe that she's completely ignorant of the
19     processes and procedures she's charged with
20     setting into motion and carrying out.
21  Q  Okay.  I understand your speculation and
22     conjecture but do you know how many, do you know
23     how long Joyce McCray-Pearson has served as chair
24     of the judicial board?
25  A  I know that --

*** Braksick Reporting Service ***
(785)865-6632

129

1   Q  Do you know?
2   A  I know that she's an attorney who can read.
3   Q  That's not the question I asked.  How long has
4      Joyce --
5   A  I don't know that.
6   Q  How many cases has Joyce McCray-Pearson overseen
7      as chair of the judicial board?
8   A  I do not know that.
9   Q  How many cases like yours has Joyce McCray-Pearson
10     had presented to her in the course of her being
11     the chair of the judicial board?
12  A  I don't know.

Page 109

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

13  Q    How many different policies and procedures are
14       potentially subject to being part of a complaint
15       presented to the judicial board?
16  A    It would be anything in the University Senate
17       rules and regulations.
18  Q    That's not the question I asked.  How many?  How
19       many different policies and procedures?  Do you
20       know?
21  A    Oh, you mean exact count?
22  Q    Yeah.
23  A    No, I can't count them.  I mean, I, I could if I
24       had a lot of time and I somehow felt like for some
25       reason that would be a worthwhile endeavor.

                   ***Braksick Reporting Service ***
                          (785)865-6632

                                                              130

 1  Q    You said that Joyce McCray-Pearson summarily
 2       dismissed your judicial board complaint out of
 3       deference to her colleagues.
 4  A    No, I didn't file a judicial board complaint.
 5  Q    Your judicial board request to invoke its
 6       jurisdiction, whatever you want to call it.
 7  A    Request to invoke that jurisdiction of the
 8       University Judicial Board.
 9  Q    You said she summarily dismissed that request out
10       of deference to her colleagues.
11  A    Well, I mean, --
12  Q    What's the factual basis for asserting or how do
13       you know factually that she deferred to her
14       colleagues?
15  A    Well, I guess the official line is that the
16       Faculty Senate Code of Rights and
17       Responsibilities, since it allows the Faculty
                          Page 110

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

18    Senate to set forth written policies that are

19    handed off to be memorialized, also gives them

20    unfettered discretion to do anything they want

21    with regard to admissions and that is absolutely a

22    ridiculous position.  It's impossible to read the

23    rights and responsibilities and codes by which

24    you've governed this process from the moment you

25    instigated it and by which she drug it out for,

***Braksick Reporting Service ***
(785)865-6632

131

1    for six months and not have some understanding of

2    what they say.

3  Q   Again, other than your speculation and conjecture

4    how do you know for a fact that Joyce

5    McCray-Pearson's denial of your request to invoke

6    the jurisdiction of the judicial board was

7    motivated out of a desire to defer to her

8    colleagues?

9  A   By the obviously frivolous position she took in

10    defense of it.

11  Q   Anything else other than the obviously frivolous

12    position she took?

13  A   Yes, her refusal to answer any of the, the

14    specific factual matters raised and addressed, her

15    --

16  Q   She didn't tell you she was deferring to her

17    colleagues; correct?

18  A   No, she didn't tell me in writing that "I'm

19    deferring to my colleagues."

20  Q   No one else has told you that they heard Joyce

21    McCray-Pearson say I'm deferring to my colleagues;

22    correct?

Page 111

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

23  A    Right, that's correct.

24  Q    So again, it's based upon your supposition --

25  A    Well, and common sense, yes.  I mean, if she told

***Braksick Reporting Service ***
(785)865-6632

132

1       me the moon was made of green cheese I would

2       suppose it wasn't.

3  Q    Paragraph 357 under your Count VIII, again, with

4       the conspiracy claim, says the institutional

5       defendants, which you've already clarified for me

6       that means the university and the School of Law as

7       institutions.

8  A    Uh-huh.

9  Q    How does an institution know of a conspiracy?

10  A    Well, an institution knows of improper action when

11       the action is elevated through all proper channels

12       within the university.  I took this thing as far

13       up the food chain as anybody would listen to me.

14       After escalation to the University Judicial Board

15       I contacted the Office of the Vice Provost of

16       Student Success.  After the Office of the Vice

17       Provost of Student Success said, well, whatever

18       the University Judicial Board says goes I

19       contacted the Office of the Chancellor.  Then they

20       contacted you.  It's impossible for top management

21       of K.U. and the University of Kansas School of Law

22       not to know what happened here and not to know

23       that it was wrong based on the facts and

24       circumstances and therefore they're liable

25       pursuant to Gallagher v. Shelton and

***Braksick Reporting Service ***
(785)865-6632

Page 112

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

133

```
 1       Brammer-Hoelter v. Twin Peaks.
 2            MS. TROWER:  Off the record.
 3            (Off the record.)
 4    Q   Paragraph 91 of your Complaint, do you see that?
 5    A   Yes.
 6    Q   We've already talked a little bit about this but
 7        what's the factual basis for your assertion that
 8        Dean Mazza intentionally sent you a fraudulent
 9        message designed to mislead you?
10    A   That's because it's clear he knew the difference
11        between Article 22 and question 27.
12    Q   And that's, again, based upon your supposition
13        that he couldn't have misspoken; correct?
14    A   Well, I mean, he would have had to misspeak both
15        about whether it was an article versus a question
16        and also about the number of the article versus
17        the number of the question.
18    Q   Paragraph 93, you say defendants Rohleder-Sook and
19        Mazza intentionally and fraudulently disguised the
20        complaint as one of academic misconduct.  How do
21        you know that defendants Rohleder-Sook and Mazza
22        intentionally and fraudulently disguised this
23        matter?
24    A   Well, Mazza it's basically because of the Article
25        22 versus question 27 dilemma in the e-mail and
```

***Braksick Reporting Service ***
(785)865-6632

134

```
 1        also because it was pointed out to him in the
 2        procedural objections, as later confirmed by the
 3        judicial -- by the panel that he, that he put
 4        together that it really wasn't academic
```

Page 113

Brown082611.txt

5      misconduct.

6            As far as Rohleder-Sook, she actually took

7      the position in writing and her answers, in her

8      related answers that the DRP itself could be

9      considered a university regulation that just gave

10     her the power to administer and take action

11     against anything she thought might harm the

12     university.  I think she knows better than that.

13  Q  What makes you think she knows better than that?

14     What makes you think it's anything other than

15     being mistaken or not being very smart?

16  A  Is that what it is, she's just not very smart?

17  Q  That's the question.  What makes you think --

18     you're saying that it's an intentional thing and

19     I'm asking based on what?  How come it's not a

20     mistake?  How come it's not because she's not very

21     smart about this particular subject matter?  How,

22     you know, why is it, again, not a mistake or some

23     other explanation other than intentional?

24  A  Well, how can, how can the dean of student

25     services come forth with such a, a baseless

                  ***Braksick Reporting Service ***
                          (785)865-6632

                                                              135

1      response?

2   Q  Okay, you're viewing it as baseless.

3   A  And so did the judicial panel.

4   Q  Okay.  That's not what they said.  They said that

5      there was a mistake about whether they had

6      jurisdiction.  They did not believe they had

7      jurisdiction.

8   A  Because it was not a complaint of academic

9      misconduct.  That's why they said they didn't have

                        Page 114

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

10      jurisdiction.

11  Q   Okay.  But to act with intention to defraud, that

12      suggests a malicious intent.  What's the factual

13      basis for your belief that Wendy Rohleder-Sook had

14      a malicious intent in the actions that she took

15      throughout this process with you?

16  A   Well, I guess what I'm trying to say is if you

17      take a look at the baseless response that she put

18      together, saying, okay, we don't need a university

19      regulation, we don't even need a self-governing

20      procedure of a unit level organization that's

21      subject to a university regulation, all we need is

22      my interpretation of a unit level self-governance

23      procedure that it's subject to a university

24      regulation.  I mean, I don't see how a reasonable

25      person can look at that and not, not see where

                    ***Braksick Reporting Service ***
                          (785)865-6632

                                                         136

1       this is going.

2   Q   Okay, that really doesn't answer my question.  My

3       question is what facts, evidence, or evidence can

4       you point to that shows that Wendy Rohleder-Sook

5       had a malicious intent toward you?

6   A   I believe that the nature of her actions would

7       give a reasonable fact-finder plenty of reason to

8       believe that she had a malicious intent and I've

9       already explained to you several times why I think

10      that's true and at this point I'm going to say

11      asked and answered.

12  Q   Okay.  I don't believe you answered the question

13      but I'll ask the question a different way, or I'll

14      ask other questions.  Before your application to

                         Page 115

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

15      the School of Law did Wendy Rohleder-Sook know

16      you?

17   A   No.

18   Q   Before your application to the School of Law did

19      Wendy Rohleder-Sook know anybody that knew you?

20   A   No.

21   Q   Are you aware of any facts which would indicate

22      that Wendy Rohleder-Sook had any reason to be

23      biased against you?

24   A   Yes.

25   Q   What are those facts?

                  ***Braksick Reporting Service ***
                          (785)865-6632

                                                            137

1    A   Both defendant Rohleder-Sook and defendant Agrawal

2       are very active in Jana Mackey Distinguished

3       Lecture Series.  Jana Mackey was a K.U. law

4       student who for some reason decided to live with a

5       person who was a convicted felon who had been

6       involved in violence before and she was outspoken

7       for the rights of domestic violence victims and

8       her roommate and felon, convicted felon/roommate

9       killed her two years before this happened.  It, it

10      created a great deal of emotion and outrage

11      towards domestic violence within the K.U.

12      community and especially with regards to

13      defendants Agrawal and Rohleder-Sook, who actually

14      both have been on public record speaking with

15      regard to that lecture series.  I believe that

16      that's evidence that they were both predisposed

17      against anybody who has a conviction for domestic

18      violence.

19   Q   Other than Gail Agrawal and Wendy Rohleder-Sook's

                          Page 116

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

20      association with the Janet Mackey lecture

21      series --

22   A   Jana, it's J A N A.

23   Q   Jana --

24   A   Yes.

25   Q   -- Mackey lecture series is there any other facts

                    ***Braksick Reporting Service ***
                          (785)865-6632

                                                            138

1        that you can point to that demonstrate that they

2        were biased against you or had a bias against you?

3    A   Just the way that they conducted the proceedings.

4        The fact that they did not observe published

5        university regulations and rules after they were

6        brought to their attention several times indicates

7        that maybe there's another agenda there.

8    Q   Did anyone ever tell you that Gail Agrawal was

9        biased against you?

10   A   No.

11   Q   Did anyone ever tell you Wendy Rohleder-Sook was

12       biased against you.

13   A   Yes.

14   Q   Who told you that Wendy Rohleder-Sook was biased

15       against you?

16   A   Stephen W. Mazza.

17   Q   When did Stephen Mazza tell you that Wendy

18       Rohleder-Sook was biased against you?

19   A   He told me that she was on the committee to

20       reconsider my application and that she wasn't open

21       to mediation or considering any other outcome

22       other than dismissal.  I would consider that

23       evidence of bias.

24   Q   When did Stephen Mazza make these statements to

                          Page 117

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

25      you that Wendy Rohleder-Sook was on the committee

***Braksick Reporting Service ***
(785)865-6632

139

1      and would not consider any other, would not

2      consider mediation or any other resolution besides

3      dismissal?

4    A   The very day he handed me the complaint.

5    Q   So you had this conversation with him in person?

6    A   In person.  He described it as them desiring the

7      ultimate sanction.  I still remember his words,

8      rings in my head, the ultimate sanction, and he

9      reiterated it in e-mail as time went on as well.

10     Neither I nor anybody else within the law school

11     is interested in considering anything other than

12     your dismissal.  If that doesn't indicate bias I

13     don't know what possibly could.  It's in writing.

14     I was also informed by Sandra Craig McKenzie that

15     the reason they were seeking my dismissal in this

16     case was because my convictions were for domestic

17     violence at the meeting that I got with her when I

18     asked for somebody to guide me through the

19     process.

20   Q   Well, you would acknowledge that a domestic

21     violence conviction is a conviction for violence;

22     correct?

23   A   Yes.

24   Q   And you would acknowledge that somebody who has a

25     history of violence presents a picture that may

***Braksick Reporting Service ***
(785)865-6632

140

1      cause an individual to think that maybe they don't

Page 118

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 2        possess the character and fitness to be admitted
 3        into law school?
 4   A    Well, I would acknowledge that that's something
 5        that you'd certainly want to look into but you see
 6        nobody looked.  It was decided before anybody
 7        talked to me that I needed to be out.  Your normal
 8        process is mediation.  Your code even says
 9        mediation is always preferred.  In this case I was
10        told there would be no mediation.  My request to
11        talk to people was refused, my requests to appear
12        in front of people were refused.  No one would
13        give me the time of day.  As a matter of fact, I
14        had to sue you to sit down with somebody from your
15        university.
16   Q    Okay.  Mr. Brown, with respect to your reference
17        to mediation, it says mediation may be had or may
18        be skipped if either party does not wish to
19        participate in it.  You would acknowledge that
20        there's nothing in that provision that mandates
21        mediation; correct?
22   A    No, but highly recommends it.  It's preferred.
23   Q    They're, preferred does not mandate it, does it?
24   A    No, it's not mandatory.  I guess all I'm trying to
25        say is there was no investigation.  There's a
```

                   ***Braksick Reporting Service ***
                          (785)865-6632

                                                          141

```
 1        difference between looking into something and, and
 2        taking into account facts and circumstances and
 3        trying to get to know somebody who's become part
 4        of your academic community for a year and rushing
 5        to a summary judgment based on your own personal
 6        preferences and biases and in this case the latter
```

                          Page 119

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 7        is what happened.
 8   Q    And, Mr. Brown, as you have acknowledged earlier
 9        in the deposition, you would not have been in this
10        situation to begin with had you disclosed the
11        convictions in response to questions 27c and d;
12        correct?
13   A    I don't know that.
14   Q    You would not have lied on your application if you
15        had disclosed truthful and accurate information in
16        response to questions 27c and d.  You did not do
17        that, did you?
18   A    What my testimony was, that I should in retrospect
19        have disclosed them.  The fact remains that I did
20        disclose as soon as I became aware that you didn't
21        care about how, how remote or old they were and I
22        did that despite the nature of them.
23   Q    You understand that candor and honesty is a trait
24        that lawyers and prospective lawyers should
25        possess, don't you?
```

***Braksick Reporting Service ***
(785)865-6632

142

```
 1   A    Yes.
 2   Q    And if you were going to see a lawyer you would
 3        want to see a lawyer who you knew had a reputation
 4        for candor and honesty, wouldn't you?
 5   A    Yes, and zealous representation.
 6   Q    And so when you don't answer questions that are
 7        unambiguous and don't put a time limit on it and
 8        you don't disclose information that's responsive
 9        to those questions you would agree with me that
10        someone might think that you don't possess candor
11        and honesty, wouldn't you?
```

Page 120

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

12   A    Okay, this question has been asked and answered in

13        many different ways.  Initially I felt that they

14        were too remote to have anything to do with the

15        process.  Once Dean Rohleder-Sook made clear that

16        nothing is too remote, that something that

17        happened while I had a pacifier in my mouth is not

18        too remote I came forward and disclosed it.

19   Q    Mr. Brown, you attempted to substitute your

20        judgment for the judgment of the law school which

21        was stated in its clear and unambiguous questions,

22        you made a judgment that they don't need to know

23        that and you didn't disclose it.  Isn't that

24        right?

25   A    No, I disagree with that as you've stated it.  And

                    ***Braksick Reporting Service ***
                           (785)865-6632

♀                                                                    143

 1        furthermore, I admitted wrongdoing.  I'm not

 2        saying that some disciplinary sanction is not

 3        appropriate, all I'm saying is I should have been

 4        given the process that you guarantee and that

 5        perhaps beheading is not the appropriate

 6        disciplinary sanction in this case.

 7   Q    Mr. Brown, I understand that you're not happy with

 8        the judgment that the law school made but you can

 9        put yourself in the position of the law school and

10        you would acknowledge that it's the law school

11        that has the discretion to determine who is fit to

12        be admitted to its school; you would agree with me

13        on that, wouldn't you?

14   A    First, I don't acknowledge that the law school

15        made that decision.  Any decision made by the law

16        school would have been needed to be made pursuant

                              Page 121

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

17     to the, the processes that guarantee the rights of

18     its students.  Now, if you had wanted at the time

19     I came forward to say, well, you know, we can't

20     have this, cancel and void my application, we

21     probably wouldn't be here today, but you didn't do

22     that.  After I came forward and I gave it all to

23     you, then what happened is Wendy Rohleder-Sook

24     enrolled me for the next semester, picked all my

25     classes, took all my money out of a loan and

                    ***Braksick Reporting Service ***
                              (785)865-6632

                                                                144

1      basically by doing that said to me, all right,

2      we've accepted your revised application and you're

3      still in.  I was allowed to devote an entire year

4      of 100 percent of my productive effort to this and

5      then told, well, we've decided it never happened.

6   Q  Let's go to a different topic.  Do I need to get

7      you -- off the record.

8          (Off the record.)

9   Q  Okay, in paragraph 139 you say that the University

10     of Kansas retained approximately $17,000 expended

11     by Brown for tuition, books, parking and expenses

12     for the semesters he attended.  In your Rule 26

13     disclosures, and the reason I'm asking this, this

14     would be I'm assuming an element of your damages

15     that you're claiming?

16  A  Yes, it is, and I'm going to have to --

17  Q  I don't have any documentation that documents

18     that.  Do you have documentation that documents

19     that?

20  A  I will try to get it from the university in

21     discovery.

                              Page 122

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

22  Q    Okay.

23  A    I mean, you would have the documentation except

24       for my credit card statements, well, and the

25       withdrawals from the student loans, both of which

***Braksick Reporting Service ***
(785)865-6632

145

1        I need access to your website to prove up.

2   Q    Okay.  So, but really my answer was you would

3        agree with me that you've not provided me

4        documentation that reflects that $17,000 figure?

5   A    No.

6   Q    Okay.

7   A    No.

8   Q    And your paragraph 140 says you incurred $20,000

9        in student debt.  I didn't find any documentation

10       in your Rule 26 disclosure or your supplemental

11       disclosure, those documents that you sent me

12       documenting that.  Did you send any of that to me?

13  A    No, but if you request it I'll be happy to provide

14       it.

15  Q    Okay.  You understand that you have an obligation

16       to prove up your damages and so the Rule 26

17       disclosure asks for you to produce documents that

18       are reasonably related to claims that you're going

19       to be putting forth so --

20  A    Well, the problem is the School of Law has most of

21       the definitive sources of that documentation and

22       they've excluded me from their system.

23  Q    Okay.  Who was your student loan with or through?

24  A    The, it was through the government.

25  Q    Okay, so it was a direct student loan?

***Braksick Reporting Service ***
Page 123

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt
(785)865-6632

146

```
 1  A   Yeah.
 2  Q   And so is that then delivered to the university
 3      and then you drew down on it?
 4  A   Yeah, yeah.
 5  Q   Okay, we're talking over one another, which will
 6      drive Candace crazy, --
 7  A   I'm sorry.
 8  Q   -- so if you can just wait, I'm sorry, I talk sort
 9      of slowly, so if you can just wait, I know you
10      know where I'm going, you want to give me that
11      answer, but if you just wait for me to complete
12      the questions.
13  A   Okay.
14  Q   So the student loan funds were sent to the
15      university and then you drew out of, drew from the
16      university the direct student loan fees or monies?
17  A   Well, the university drew from the student loan.
18  Q   Okay.
19  A   I didn't, I didn't have to touch any money.
20  Q   Okay.
21  A   The university did it automatically.
22  Q   Okay.  So you don't have any individual payment
23      stubs, receipts, anything --
24  A   The student loan went into the university and the
25      university collected its monies from the student
```

***Braksick Reporting Service ***
(785)865-6632

147

```
 1      loan and then they would send me the difference if
 2      there was one.
 3  Q   Okay.  Did you, was there a difference at any
```

Page 124

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 4      point in time?

 5   A  At one point in time I believe there was.

 6   Q  Do you know how much that was?

 7   A  I don't.  I can get it.

 8   Q  And have you been required to start paying back

 9      that student loan?

10   A  Yes.

11   Q  And what's your -- when did you start repaying

12      that student loan?

13   A  I think eight or nine months ago.

14   Q  And what's your monthly payment on that?

15   A  250.

16   Q  Do you know what the period of repayment is?  Is

17      it the standard 10 years?

18   A  Yeah, probably.  I didn't do anything to change

19      it.

20   Q  Okay.  You were enrolled in the summer of 2010

21      session.  Isn't that right?

22   A  Yes.

23   Q  And when you were dismissed from the law school

24      those monies were refunded to you, weren't they?

25   A  Yes, correct.
```

***Braksick Reporting Service ***
(785)865-6632

148

♀

```
 1   Q  Okay.  So you got a full refund for the summer of

 2      2010 period?

 3   A  Except for the time I spent, yes.

 4   Q  Mr. Brown, I'm not seeing it here but I know it's

 5      in the documentation somewhere so I'll attempt to

 6      paraphrase what I want to talk to you about.

 7      Someplace in the documentation in relating why you

 8      answered the question on the admissions
```

Page 125

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 9       application as you did you made some reference to

10       having consulted your brother, who was an

11       attorney.  Do you remember that?

12    A  Well, I talked to him about it, yeah.

13    Q  Okay.

14    A  He just said that after, after seven years they'll

15       even let a convicted, convicted felon be admitted

16       to the bar.

17    Q  Okay, that's what I wanted to ask you about.  So

18       when --

19    A  That was just one factor that led to the

20       determination.

21    Q  Okay.  So your brother, again, that's James Brown,

22       the attorney?

23    A  Yeah, right.

24    Q  Okay.  When did you have that discussion with him?

25    A  Oh, it's been when I was thinking about applying.
```

***Braksick Reporting Service ***
(785)865-6632

149

```
 1    Q  Okay.  And what specifically did he say to you,

 2       that seven years was the lookback period?

 3    A  He said that after, that seven years after a

 4       felony they'd consider you for admission to the

 5       bar.

 6    Q  Did your brother James tell you what the basis of

 7       his belief on that after seven years the bar would

 8       consider an individual for admission despite the

 9       felony?  That's a poorly asked question.

10    A  No, he, he didn't.  I didn't -- I posed it to him

11       in passing.  I didn't even tell him why I was

12       asking.

13    Q  Other than your brother being a lawyer, is there
```

Page 126

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

| | | |
|---|---|---|
| 14 | | any special reason why you would believe that to |
| 15 | | be an accurate statement? |
| 16 | A | Oh yeah, the, the research that I did on VersusLaw |
| 17 | | confirmed it.  There were two cases.  I know |
| 18 | | Pistotnik was one.  I'm not sure what the other |
| 19 | | one is.  I listed them in my response to the |
| 20 | | School of Law if you want to look it up, but yeah, |
| 21 | | I mean basically no, no Kansas court, no bar |
| 22 | | disciplinary action has ever considered anything |
| 23 | | past seven years to be not too remote. |
| 24 | Q | Did you contact the Board of Bar Examiners -- |
| 25 | A | No, I did not. |

***Braksick Reporting Service ***
(785)865-6632

150

| | | |
|---|---|---|
| 1 | Q | -- or the Supreme Court?  Why did you not contact |
| 2 | | the Board of Bar Examiners or the Supreme Court to |
| 3 | | determine how they might view your eligibility for |
| 4 | | admission in light of your criminal background? |
| 5 | A | It never occurred to me. |
| 6 | Q | In the documentation you reference some sort of |
| 7 | | presentation that, was it Stan Hazlett or somebody |
| 8 | | from the bar -- |
| 9 | A | Oh yes. |
| 10 | Q | -- came and made to the first year law students? |
| 11 | A | Yes, uh-huh. |
| 12 | Q | Do you remember that? |
| 13 | A | Yes. |
| 14 | Q | And who was it from the bar or representative of |
| 15 | | the bar that came and made that -- |
| 16 | A | Stan Hazlett was one of the speakers.  There were |
| 17 | | two others from the bar association, too.  Both of |
| 18 | | them were women. |

Page 127

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

19  Q    Carol Green?

20  A    Yes, Carol Green was one.  I don't remember the

21       other one, I think that she was the administrative

22       assistant down there.

23  Q    And what did they tell you with respect to

24       application for the bar and the degree of candor

25       that was expected in applying for the bar?

                    ***Braksick Reporting Service ***
                            (785)865-6632

                                                            151

1   A    Applying for the bar?

2   Q    Yeah.

3   A    Oh, they said that they, they expected everything

4        to be disclosed in applying for the bar.

5   Q    I thought it was that meeting that prompted you to

6        make your supplemental disclosure.  Did I

7        misunderstand?

8   A    Huh?  Well, I mean, Wendy Rohleder-Sook made it

9        pretty clear on the first day that I was wrong

10       about my remoteness assumptions and then, you

11       know, they just basically seconded that but the

12       very first day I showed up Wendy Rohleder-Sook

13       gave a, a speech with regard to that particular

14       question that made it clear she didn't care how

15       old it was, but yeah, I mean, the Stan Hazlett

16       speech was encouraging for me because, I mean,

17       what they were basically saying was, look, you

18       know, we know people are human and you've had

19       problems in your past, you know, we just need you

20       to, to come clean with those and we'll deal with

21       them together and we'll work to make sure that you

22       don't have any problems when it comes time to take

23       the bar.

                            Page 128

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

24  Q    On your first day of classes when Wendy

25      Rohleder-Sook made it clear to you that your

***Braksick Reporting Service ***
(785)865-6632

♀                                152

1       assumption in answering the rule 27c and d

2       questions about the remoteness in time and what

3       they were looking for in response to that was

4       erroneous why didn't you tell her that day that

5       you had a problem?

6  A    Well, she gave us a time frame actually.  She said

7       she'd expect our amendments within the month and

8       then she joked if we get to Thanksgiving break,

9       you know, I'm going to think you're sandbagging

10      me.

11  Q    You characterized your brother's statement

12      regarding the seven years after a felony being a

13      period when someone could be eligible for

14      admission to the bar being a question that you

15      posed to him in passing.

16  A    Yes.

17  Q    Since it was a question that was posed in passing

18      is it something that you documented or that he

19      documented or any notes on that or --

20  A    I mean, most of, most of the stuff that I

21      documented I presented in my Answer.

22  Q    Okay.

23  A    I mean, I presented the two cases that I had

24      researched in my answer to the original complaint

25      for academic misconduct.

***Braksick Reporting Service ***
(785)865-6632

♀                                153

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

1  Q    Okay.

2  A    I mean, I put special weight on what he said

3       because he's a lawyer but it's not like he even

4       knew he was giving me advice.

5  Q    Okay.  If I asked him about giving you that advice

6       would he even have any recollection of the

7       conversation?

8  A    Probably.

9  Q    Have you had discussions with him about that?

10  A    No.

11  Q    You said that you had this passing conversation

12       with him sometime before submitting your

13       application when you were thinking about applying.

14  A    Uh-huh.

15  Q    We've already established that your application

16       was submitted March, or was signed by you

17       March 31, 2009.  How far in advance of that

18       March 31, 2009, submission did you have that

19       conversation with your brother?

20  A    Four or five months probably.  I mean, I think it

21       was around the time I was starting to take the

22       LSAT.

23  Q    In addition to the K.U. Law School what other law

24       schools did you apply to?

25  A    U.M.K.C.

***Braksick Reporting Service ***
(785)865-6632

154

1  Q    And what was the result of your application there?

2  A    It was accepted.

3  Q    And your U.M.K.C. acceptance, did that acceptance

4       come before or after you were wait listed here at

5       the University of Kansas?

Page 130

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

6  A   Came after I was wait listed but before I was

7      accepted.

8  Q   Okay.  And why did you not accept the acceptance

9      that U.M.K.C. had given you and matriculate there?

10 A   I would have had to pay out-of-state tuition and

11     it would have cost more than twice as much.

12 Q   Okay.  On the application for admission to the

13     U.M.K.C. School of Law do you recall whether they

14     had a similar question to the questions contained

15     in question 27 on the K.U. Law School application?

16 A   No, I don't recall.

17 Q   Do you have a copy of your U.M.K.C. Law School

18     application?

19 A   Yes.

20 Q   So if I were to ask you to produce that you could

21     produce it?

22 A   Yes.

23 Q   Since being dismissed from K.U. Law School have

24     you submitted any applications for admission to

25     any other law school?

***Braksick Reporting Service ***
(785)865-6632

155

1  A   No.

2  Q   Why not?

3  A   Well, it would be pointless.  You're going to show

4      on my transcript that I was dismissed permanently

5      for misconduct.  That would keep any ABA

6      accredited law school in the country from ever

7      admitting me.

8  Q   Okay.  How do you know that?  Have you polled all

9      --

10 A   It's in your published materials.

Page 131

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

11    Q    What's in my published materials?

12    A    It's in the university's published materials.

13    Q    What's in the university's published materials?

14    A    That a notation on a transcript that somebody was

15         expelled permanently for misconduct will keep them

16         from ever being admitted to any other ABA

17         accredited law school.  I know it because the

18         U.S.S.R. -- the U.S.R.R. regs told me.

19    Q    Okay.  Again, how do you know that you can't get

20         admitted to any other law school if you've not

21         tried?

22    A    I was going by what you have published in your

23         regulations.  That wouldn't be the first time

24         that's come back to bite me.

25    Q    You told me some months ago that you had obtained

                    ***Braksick Reporting Service ***
                         (785)865-6632

♀                                                           156

 1         a copy of your K.U. transcript; correct?

 2    A    Yes.

 3    Q    And you told me that that K.U. transcript did not

 4         contain a notation; correct?

 5    A    Right.  I mean, nonetheless I'm assuming that the

 6         dean would keep her written promise if it were to

 7         go to another law school for the purpose of

 8         evaluating me.

 9    Q    Mr. Brown, I'm going to hand you what's been

10         marked as Exhibit 7 and for purposes of the record

11         that is a memorandum dated May 3, 2010, from the

12         hearing panel composed of Sonja Kramer, Robin

13         Miller and Stephen Ware.  Is that correct?

14    A    Yes.

15    Q    In paragraph 238 of your Complaint you say the

                    Page 132

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

16      contents of the memorandum decision of May 3,

17      2010, indicate that Defendant Mazza made false

18      extrajudicial and extremely prejudicial

19      representations to the hearing panel regarding the

20      incriminating statements made by Plaintiff Brown.

21      What specifically are you referencing in paragraph

22      238 when you say that the memorandum indicates

23      that Mazza made extrajudicial and extremely

24      prejudicial representations to the hearing panel?

25   A   This is the entire letter?

                    ***Braksick Reporting Service ***
                           (785)865-6632

                                                              157

1    Q   I believe so.

2    A   Then perhaps I'm referring to Gail Agrawal's

3        letter.  In one of the letters it states that,

4        that Mazza said that I knew that I wouldn't be

5        admitted to the School of Law if I didn't put that

6        on and therefore I voluntarily withheld the

7        information.

8    Q   Okay.

9    A   And no such statement was ever made.  That was

10       certainly in Agrawal's letter.  I thought it was

11       in this one, too.

12   Q   Okay.

13   A   Or perhaps Agrawal just simply said that Mazza

14       said it before the hearing panel, but if you

15       require me to amend the Complaint in that regard I

16       will.  If you want the pleadings to conform to the

17       evidence and leave it at that, then that's fine,

18       too.

19   Q   Okay.  But you would admit that that statement in

20       paragraph 238, based upon your review of Exhibit

                           Page 133

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

21      7, is inaccurate?

22  A   Yeah, it relates to a different document provided

23      by the School of Law, not this document.

24  Q   Okay.  I hand you what's been marked as Exhibit 8.

25      For purposes of the record that is a letter to you

***Braksick Reporting Service ***
(785)865-6632

158

1       dated May 25th, 2010, signed by Gail Agrawal;

2       correct?

3   A   Yeah.

4   Q   Can you find in that letter what you're talking

5       about in paragraph 238 when you say that Defendant

6       Mazza made false extrajudicial and extremely

7       prejudicial representations to Agrawal regarding

8       incriminating statements he claimed were made by

9       Plaintiff Brown?

10  A   You admitted to Associate Dean Mazza you knew that

11      you would not have been admitted to the School of

12      Law had you disclosed your criminal record when

13      you made your application.  It's on the last page.

14      That's a patently false statement.  Furthermore,

15      it would have been impossible for me to know such

16      a thing.  I'd have to read the mind of every

17      member of the admissions committee.

18  Q   So if I understand correctly, and I want to make

19      sure that I do understand correctly, in paragraph

20      238 of your Complaint the only sentence that

21      you're referring to that relates to the assertion

22      that Mazza made false extrajudicial and extremely

23      prejudicial representations is the sentence on the

24      last page which reads:  "You admitted to Associate

25      Dean Mazza that you knew that you would not have

Page 134

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

***Braksick Reporting Service ***
(785)865-6632

♀                                                              159

1    been admitted to the School of Law had you

2    disclosed your criminal record when you made your

3    application."  Is that correct?

4  A  Yeah.  He's walking up to the ultimate

5    decisionmaker and saying yeah, he walked up to me

6    and admitted he intentionally falsified it just to

7    get over on us.

8  Q  Now, with respect to the May 25th, 2010, letter,

9    which has been marked as Exhibit 8, --

10  A  Uh-huh.

11  Q  -- Dean Agrawal states in that letter that she's

12    writing to advise you that she plans to dismiss

13    you effective as of June 8th, 2010, for

14    falsification, misrepresentation and failure to

15    supply complete, accurate and truthful answers to

16    your application.

17  A  Yes.

18  Q  And she states in there that if you believe this

19    action is inappropriate or that there are

20    mitigating factors that she should consider before

21    dismissing you, then you should provide her a

22    written response by June 3.

23  A  Right.

24  Q  Okay.  In the May 25, 2010, letter under the

25    heading Facts Warranting Dismissal she outlines

***Braksick Reporting Service ***
(785)865-6632

♀                                                              160

1    her reasons for or in support of the proposed

2    dismissal; correct?

Page 135

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

3   A   She outlines her reasons.

4   Q   Yes.

5   A   Yes.

6   Q   I mean, is there anything in here in the May 25,

7       2010, letter that has been -- strike that.  Dean

8       Agrawal subsequently dismissed you?

9   A   Yes.

10  Q   She advised you on May 25, 2010, why she was

11      contemplating dismissal and provided you the

12      reasons for that; right?

13  A   Yes.

14  Q   Okay.  And then she subsequently dismissed you?

15  A   Yes.

16  Q   And this may be a poorly worded question but let

17      me see if I can communicate what I'm trying to get

18      at.  Do you believe that there is any reason that

19      she relied upon for dismissing you that is not

20      articulated in her May 25, 2010, letter?

21  A   Yes.

22  Q   What is that?

23  A   The nature of my convictions.

24  Q   So the alleged bias that we talked about earlier?

25  A   Yes.

***Braksick Reporting Service ***
(785)865-6632

161

1   Q   Okay.

2   A   Well, that and the, the complete -- I mean, I did

3       respond to her timely and I pointed out all the,

4       all the reasons why the due process afforded to

5       every student said that more is required when you

6       put somebody's academic standing in jeopardy, a

7       well reasoned statement, you know, and she just

EX 1 PAGE 000136

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

8       chose to, to look past all that.

9  Q    No, I --

10  A   She cited, she cited Mazza's false statement.  I

11      was never given a chance to confront him even

12      though I'm guaranteed that right.  Dean Agrawal at

13      a, at a speech before, she gave before us when we

14      were getting ready spoke to us about her prowess

15      in administrative law and how she'd become

16      proficient in administering the university's

17      procedures.

18  Q   I --

19  A   But now she's forgotten they exist?  That doesn't

20      make sense.

21  Q   I understand that, --

22  A   All right.

23  Q   -- Mr. Brown.  That's not really the question I

24      was asking.  I --

25  A   Well, all I'm trying to say is common sense, --

***Braksick Reporting Service ***
(785)865-6632

162

1  Q    Okay.

2  A    -- somebody of her learning and background and

3       knowledge would not simply ignore the procedures

4       and processes that are important to the university

5       for no reason at all.

6  Q    Okay.  You completed your first year of law

7       studies?

8  A    Yes.

9  Q    You have a basic understanding of due process?

10  A   Right.

11  Q   You would agree with me that due process in its

12      most simplest form is expressed as notice and an

Page 137

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

13      opportunity to be heard; correct?

14  A   Well, if there's no written due process, yes.

15  Q   And in terms of notice, that's what I'm trying to

16      get here, she notified you of the reasons why she

17      intended to dismiss you; correct?

18  A   The law school, the School of Law and the

19      university both have extensive written

20      procedures --

21  Q   I understand --

22  A   -- for what constitutes due process.  Further,

23      this is the kind of thing that you would do the

24      day I amended or the week I amended or the month I

25      amended or at least before I devoted a year of my

                ***Braksick Reporting Service ***
                        (785)865-6632

                                                      163

1       life to your school and took finals for classes

2       twice and put $15,000 into your institution.  You

3       can't say on the one hand yeah, you have the due

4       process, just bear with us, we'll get to the end

5       of the line, we'll see what happens, and then when

6       it doesn't come out your way just so say no, you

7       never had the due process, sorry about all the

8       money you spent, sorry about all the time you

9       wasted.

10  Q   Okay.  I'm trying to ask you just a basic simple

11      question.

12  A   Okay, this does not constitute notice under due

13      process.

14  Q   That's your opinion.  That's a legal conclusion.

15      That's part of what we're going to debate here.

16  A   All right.

17  Q   But factually you would agree with me that she

                        Page 138

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

18      provided you a statement of why she intended to

19      dismiss you and she invited you to provide a

20      response; correct?

21  A   Well, she, she provided me with a statement of

22      reasons she was giving to dismiss me.

23  Q   Okay.  And she invited you to provide a response;

24      correct?

25  A   Yes, which she ignored.

                    ***Braksick Reporting Service ***
                         (785)865-6632

                                                              164

 1  Q   Okay.

 2  A   And I, I provided her with an invitation to speak

 3      which she also ignored.  I believe her exact

 4      response was, "I see no reason to meet with you

 5      personally," and let's not make a mistake, the fix

 6      was in.

 7  Q   Going to hand you what's been marked as Exhibit 9

 8      and that's your letter dated May 27, 2010, and

 9      that's your written response to Dean Agrawal's

10      May 25, 2010, letter; correct?

11  A   Right.

12  Q   Can I ask a question?  Let's do that off the

13      record.

14          (A recess was taken from 2:20 until 2:25.)

15  Q   Back on the record.  Mr. Brown, off the record we

16      had a discussion about Exhibit 8 being dated

17      May 25, 2010, and about your Exhibit 9 referencing

18      having received Dean Agrawal's letter which she

19      referenced as dated May 26, 2010, and what we

20      determined was that the May 25, 2010, letter came

21      to you via U.S. certified mail and a copy of that

22      also came to you electronically and for whatever

                    Page 139

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
23        reason the electronic copy, although it has the

24        same content as the May 25, 2010, letter shows a

25        May 26, 2010, date.  Is that right?
```
                    ***Braksick Reporting Service ***
                            (785)865-6632

                                                                    165

```
 1   A    Yes.  They appear to be the same letter to me.

 2   Q    Okay.  And in your May 27, 2010, letter you were

 3        responding to Dean Agrawal's May 25, 2010, notice

 4        to you that she intended to dismiss you; correct?

 5   A    Yes.

 6   Q    And in your May 27, 2010, letter what information

 7        or material were you not able to -- strike that.

 8        Is there anything that you were not able to

 9        provide to Dean Agrawal in response to her May 25,

10        2010, letter?  She asked you to provide any

11        information you wish her to consider with respect

12        to whether you believe the action is inappropriate

13        or there are mitigating factors that she should

14        consider.  Was there any information that you were

15        not able to provide in your May 27, 2010, letter

16        to her?

17   A    Yeah.

18   Q    What was that?

19   A    Well, I mean, I mean, leading up to that point my

20        life had been fairly tumultuous.  I'm a recovering

21        alcoholic and my sobriety date was April 18th of

22        2008 and, you know, I was in the process of trying

23        to make several life changes.  I mean, I take

24        responsibility for bad decisions that I've made in

25        the past.  As you already know, I don't agree with
```
                    ***Braksick Reporting Service ***
                            (785)865-6632

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

166

1       everything that the courts decided in the domestic
2       battery matters but the, the arrest stuff is
3       nobody's fault but mine, you know, I mean I
4       haven't had a drink since my sobriety date and it
5       doesn't look like I'm going to be drinking today
6       or tomorrow and I guess what I would have said to
7       Dean Agrawal had I had the chance to stand before
8       her was I feel like you should probably take a
9       look at a person's situation as it stands now.  I
10      mean, I'm someone who's been in trouble personally
11      but I'm not damaged goods.  I still have some
12      potential value to society and I'd just like the
13      chance to actually use that.  I've never been
14      prouder of anything than I was being a student at
15      the Kansas University School of Law and I would
16      love the chance to complete my education and I
17      would ask that she, just ask maybe take that into
18      account before she summarily dismissed me for
19      things that happened 13 and 14 years ago.
20   Q  What prevented you from being able to put that
21      information in your May 27, 2010, letter?
22   A  I hoped that I'd get a chance to speak with her.
23   Q  Okay.  But, you know, she asked you to submit
24      anything in writing so aside from your hope that
25      you'd get a chance to speak with her, what, if
                  ***Braksick Reporting Service ***
                         (785)865-6632

167

1       anything, prevented you from being able to put
2       that in writing?
3    A  Well, I mean, I had more than hoped that I'd get a
4       chance to speak with her, I thought finally, okay,
                              Page 141

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 5        we're getting to a point where this has reached,
 6        you know, the voice of reason.  I counted on Dean
 7        Agrawal not to completely ignore black letter law
 8        and procedures as they related to the university
 9        and, I mean, when, when I got her response, you
10        know, that I see no reason to speak with you I
11        knew it was pointless at that point.
12   Q    Okay.  I understand all of that, but again, Bob,
13        or Mr. Brown, tell me why -- strike that.
14        Mr. Brown, there's nothing that prevented you from
15        sharing all the information that you just shared
16        with me here in the May 27, 2010, letter, is
17        there?
18   A    I wanted the chance to speak with Dean Agrawal
19        personally.  That's what prevented me from doing
20        it.
21   Q    I understand that you wanted that chance.
22   A    I was confident I'd get that chance.  It didn't
23        pan out.
24   Q    Okay.
25   A    Looking back maybe I should have but we don't get
```

***Braksick Reporting Service ***
(785)865-6632

168

```
 1        to live in hindsight.
 2   Q    Okay.  But there's nothing that prevented you, had
 3        you chosen to do so, to put that information in
 4        this May 27, 2010, letter, is there?
 5   A    Yeah, my faith in Dean Agrawal's integrity
 6        prevented me from doing it.
 7   Q    Okay.  You said your faith in Dean Agrawal
 8        prevented you from --
 9   A    In her integrity.
```

Page 142

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

10  Q    In her integrity prevented you or caused you to

11       make the decision not to include additional

12       information in your May 27, 2010, letter.

13       However, earlier you said that Dean Agrawal was

14       biased against you.  How do you reconcile your

15       belief or confidence in her integrity when you

16       believed she had bias against you because of her

17       association with the Jana Mackey lecture series?

18  A    Well, this is, this is a partial cause of that

19       belief and I didn't realize until after all of

20       this had happened that there even was a Jana

21       Mackey Distinguished Lecture Series.

22  Q    Okay.  So after your dismissal is when you learned

23       that Dean Agrawal had some association with the

24       Jana Mackey lecture series?

25  A    Well, not just some association, I mean, she has

***Braksick Reporting Service ***
(785)865-6632

169

1        published speeches for lectures she's given.

2   Q    Okay.  I understand that, but again, --

3   A    Yes, it was after this letter.

4   Q    When in the process subsequent to receipt of the

5        May 25, 2010, letter from Dean Agrawal did you in

6        fact learn of Dean Agrawal's association with the

7        Jana Mackey lecture series and the purported bias

8        that flows from that?

9   A    I think it was while I was doing research to

10       prepare the Complaint.

11  Q    So sometime last summer --

12  A    Probably.

13  Q    -- or fall?

14  A    Yeah, probably.

Page 143

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

15   Q   Going to hand you what's been marked as Exhibit
16       10, Mr. Brown, and for purposes of the record
17       Exhibit 10, would you agree with me, is a June 7,
18       2010, letter addressed to you from Dean Gail
19       Agrawal?
20   A   Yes.
21   Q   And in this June 7, 2010, letter Dean Agrawal
22       informs you that she is in fact dismissing you,
23       proceeding with the dismissal effective June 8th,
24       2010; correct?
25   A   Correct.

***Braksick Reporting Service ***
(785)865-6632

170

1   Q   In that letter she also advises you in the last
2       paragraph of the letter that the university is an
3       agency of the State of Kansas and this letter is
4       intended to serve as a notice of a final agency
5       action by the University of Kansas; correct?
6   A   Right.
7           MS. TROWER:  I'm going to have my assistant
8       start copying this.
9           (There was a pause in the proceedings.)
10  Q   Mr. Brown, I'm handing you what's been marked as
11      Exhibit 11.  We already talked a little bit about
12      it earlier on the record when you filed your
13      request to both the judicial board's jurisdiction
14      so this letter puts that request in context.  Is
15      this a June 3, 2010, letter addressed to you from
16      Joyce McCray-Pearson?
17  A   Uh-huh.
18  Q   Yes?
19  A   Yes.

Page 144

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

20  Q   And in that letter she advises you her decision
21      finding that the judicial board does not have
22      jurisdiction to hear the matter that you attempted
23      to bring to them.  Is that correct?
24  A   Yes.
25  Q   And she in her letter dated July, or excuse me,

***Braksick Reporting Service ***
(785)865-6632

171

1       June 3, 2010, which has been marked as Exhibit 11,
2       she cites for you Faculty Senate rules 2.1.1 and
3       states that admission standards lie within the
4       jurisdiction of the schools and college because of
5       the academic evaluation lies within the individual
6       department and the professors who have expertise
7       in that field.  Correct?
8   A   Well, don't confuse that paragraph you just read
9       with Faculty Senate rules and regulations 2.11.
10      That's just a statement by McCray-Pearson.
11  Q   I understand.  She's outlined and given you the
12      actual substance of 2.1.1.
13  A   Which has nothing whatsoever to do with what she
14      says subsequently.
15  Q   And then in her paragraph as the reason for the
16      dismissal she is stating that admission standards
17      lie within the jurisdiction of the schools.  Isn't
18      that what she's saying?
19  A   Well, that's what she's saying, and she's using
20      that to simply whisk aside the student codes of
21      rights and responsibilities and the U.S.R.R.
22  Q   And with respect to Joyce McCray-Pearson's
23      rejection of your request to invoke the
24      jurisdiction of the judicial board she states in

Page 145

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

25        that last paragraph that the judicial board

***Braksick Reporting Service ***
(785)865-6632

172

1        decision is the final determination of this matter

2        by the university.  If you wish to proceed outside

3        the university, Chancellor Bernadette Gray-Little

4        is the agency officer who should receive any

5        service of subsequent petition for judicial review

6        of this action; correct?

7    A   Yes, but neither the K.U. School of Law nor the

8        judicial board are agencies under Kansas law

9        because they don't administer any force or

10       interpret state law.

11   Q   You've never filed in the district court of

12       Douglas County or any other Kansas State district

13       court a petition for judicial review asking the

14       district court to review the dismissal decision of

15       Dean Agrawal.  Isn't that true?

16   A   Yes.  That's based on my belief that this is not

17       agency action.  All your questions in this vein

18       will be answered the same way.

19   Q   Okay.  Bob, don't get offended.

20   A   I'm just trying to save us some time.

21   Q   And similarly you've never filed a petition for

22       judicial review in the Douglas County District

23       Court or in any other Kansas district court

24       regarding Joyce McCray-Pearson's dismissal of your

25       attempt to invoke the judicial board's

***Braksick Reporting Service ***
(785)865-6632

173

1        jurisdiction; correct?

Page 146

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

2   A   Correct, because it didn't result from any
3       administration, enforcement or interpretation of
4       state law, therefore it is not agency action.
5   Q   And that belief or that conclusion on your part is
6       based upon your reading of the statute, --
7   A   Yes.
8   Q   -- your interpretation of cases, advice from
9       attorneys, what?
10  A   My reading of the statutes and cases, yes.
11  Q   Has any attorney advised you that -- strike that.
12      Besides your own reading and interpretation of the
13      statutes is there any other information or
14      authority on which you rely as a basis for your
15      belief that it would not have been appropriate to
16      file a petition for judicial review to challenge
17      either the dean's dismissal action or Joyce
18      McCray-Pearson's dismissal of your judicial board
19      petition?
20  A   To the extent that Mr. Gerstle has already
21      represented me in this action I'm going to claim
22      privilege.
23  Q   I didn't ask you to disclose privileged
24      information.
25  A   Yes, there is someone.

***Braksick Reporting Service ***
(785)865-6632

174

1   Q   And so you have privileged information?
2   A   Yes.
3   Q   Paragraph 247 of your Complaint, you say
4       defendants' personal moral judgments, to the
5       extent that they do not affect the student's
6       ability to succeed professionally or academically,

Page 147

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 7        are not proper considerations when considering the
 8        permanent removal of an already admitted student,
 9        and then it goes on there.  It's defendants'
10        plural, plural possessive, so my first question is
11        which defendants are you referring to in that
12        paragraph?
13   A    Well, I mean only the individual defendants.
14   Q    So Agrawal, McCray-Pearson, Mazza and
15        Rohleder-Sook?
16   A    Well yeah, I mean it would be any defendant but, I
17        mean, obviously the, the School of Law and
18        University of Kansas can't think except through
19        their agents and, as you said so eloquently, the
20        Regents weren't involved before the lawsuit.
21   Q    Okay.  What's your factual basis for asserting
22        that Stephen Mazza made a personal judgment of
23        value?
24   A    Oh, there are several:  The, his initial
25        understanding and then immediate forgetfulness of
```

***Braksick Reporting Service ***
(785)865-6632

175

```
 1        what the proper venue was, his constant rejections
 2        of my requests for mediation, his written
 3        statements that the law school does not want to
 4        consider any alternative that involves me staying
 5        at the School of Law, the way that he repeatedly
 6        turned down any requests for face to face contact.
 7        It was discussed from the outset.
 8   Q    Okay.  That's your interpretation of his actions.
 9   A    Well, that's my basis.
10   Q    Okay.
11   A    The only basis I have is my interpretation of his
```

Page 148

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
12        actions.
13   Q    Okay.
14   A    He didn't come out and say to me, "Bob, I find you
15        morally reprehensible."
16   Q    Okay.  If I ask you the same question with respect
17        to Ms. Agrawal, Ms. Rohleder-Sook and
18        Ms. McCray-Pearson can you point to me
19        specifically any facts other than your own spin or
20        projection on what actions they took that supports
21        your statement that they made a moral judgment
22        about you?
23   A    Well, I mean, I have already given you the, the
24        actions that I believe evidence that so I'm going
25        to say asked and answered.
```

***Braksick Reporting Service ***
(785)865-6632

176

```
 1   Q    Now, again, I guess you're not understanding the
 2        question.
 3   A    Okay, I'll repeat.  Mazza's characterization --
 4   Q    No, I was asking --
 5   A    -- of Rohleder-Sook as having no interest in
 6        anything but dismissal for me from the time that I
 7        initially talked to him; the involvement of
 8        Rohleder-Sook and Agrawal in the Jana Mackey
 9        Distinguished Lecture Series; the, the reliance of
10        both Gail Agrawal and McCray-Pearson on baseless
11        and ridiculous positions that completely ignore
12        the due process that exists within the university.
13   Q    Okay.  You characterize or assert affirmatively in
14        your Verified Complaint that defendants' personal
15        moral judgment.  Aside from your own
16        characterization of their actions as being a
```

Page 149

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

17       reflection of a moral judgment do you know for a

18       fact that they made a moral judgment about you?

19    A    Yes, I believe it for a fact.

20    Q    I didn't ask you if you believe it for a fact.  Do

21       you know for a fact because Joyce Agrawal said "I

22       find you morally reprehensible" or --

23    A    No one has ever said, none of them ever said to me

24       they find me morally reprehensible.  None of them

25       ever used the word "moral" when they talked to me.

               ***Braksick Reporting Service ***
                    (785)865-6632

                                                      177

1    Q    Have any of them ever said that morally they made

2       a judgment about you?

3    A    What was that -- I remember the, the ombudsman

4       that I talked to, I'm trying to remember her name,

5       I gave it to you a little earlier.  She did point

6       out yeah, it was the nature of the crimes I was

7       accused of that were the reason they wanted me out

8       of the school, so I, I felt that that was pretty

9       strong indicia that this was a moral judgment.

10    Q    Okay, that's her opinion, that's not her -- and

11       that's, again, you felt it was a moral judgment,

12       she's saying it's the nature of the crimes.

13       Again, it's a crime of violence.  That doesn't

14       have anything to do with morality.

15    A    I would disagree on that.

16    Q    Okay.  Paragraph 248 you said that defendants'

17       posited their personal moral judgments.  How did

18       Joyce McCray-Pearson posit her personal moral

19       judgment?

20    A    Well, I believe that Joyce McCray-Pearson was just

21       kind of pulled along for the ride but the civil

                    Page 150

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
22        conspiracy count makes her equally culpable as the

23        rest.  I believe that she just wanted to support

24        what had been done with it.

25   Q    Okay.  Have you ever had a discussion with Joyce
```

***Braksick Reporting Service ***
(785)865-6632

178

```
 1        McCray-Pearson about her views on morality?

 2   A    No.

 3   Q    Do you have any factual basis for saying "I know

 4        for a fact what Joyce McCray-Pearson's views of

 5        morality are"?

 6   A    What I'm saying is Joyce McCray-Pearson was a

 7        conspirator in a conspiracy that involved positing

 8        the moral judgments.  I'm not saying that any of

 9        them were words particularly.

10   Q    That's not the question I asked.

11             MS. TROWER:  Can you read back the question,

12        Candace.

13             (The pending question was read back by the

14             reporter as requested.)

15   A    No, and I've never said that.

16   Q    Do you have a factual basis for saying that you

17        know specifically and definitively what Steven

18        Mazza's views on morality are?

19   A    Just general morality?

20   Q    Morality, yes.  You said he made a moral judgment

21        so how can you say he made a moral judgment if you

22        don't know what his views on morality are?

23   A    Well, I mean, it's -- God, what was the -- Sandra

24        Craig McKenzie basically told me that the reason

25        they wanted me out of the school was because my
```

***Braksick Reporting Service ***
Page 151

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt
(785)865-6632

♀
                                                                    179

      1        convictions were for domestic violence.  That's my
      2        basis for those three, for Agrawal, for Mazza, for
      3        Rohleder-Sook.
      4   Q    Okay.  Have you ever talked to Gail Agrawal about
      5        her views on morality?
      6   A    No.  I offered and she refused.
      7   Q    You offered to have a discussion with her about
      8        her views on morality?
      9   A    I offered to have a discussion with her about this
     10        whole thing.
     11   Q    When did you offer to have a discussion with her
     12        about morality?
     13   A    I requested a face to face meeting with her.
     14   Q    Related to her May 25, 2010, letter?
     15   A    Yes.
     16   Q    What did her May 25, 2010, letter reference as
     17        morality?
     18   A    Well, this whole thing has to do with morality,
     19        doesn't it?
     20   Q    No.  That's your spin on it.  Where anywhere in
     21        the letter does it reference morality?
     22   A    Well, I mean, you, you're telling me that you
     23        don't agree with my spin on it.
     24   Q    I'm not the one who filed a Verified Complaint
     25        using these terms, Bob, and so I am entitled to
                      ***Braksick Reporting Service ***
                              (785)865-6632

♀
                                                                    180

      1        inquire as to the factual basis for these
      2        assertions that you've made in the Complaint.
      3   A    But I have given it to you over and over and over
                              Page 152

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

4       again, I've given you the actions that I base

5       these things on and I can repeat them and they

6       won't change.  I believe that the facts that I've

7       stated thus far in my deposition with respect to

8       each of these defendants and in my Complaint

9       provide ample basis for a reasonable fact-finder

10      to determine by a preponderance of the evidence

11      that the actions complained of took place.  That

12      is all that is required.

13   Q  Let's talk about your contractual claim.  In your

14      Complaint you assert that you had a contract with

15      the School of Law.  When was the contract formed?

16   A  It was formed after I amended my application and

17      they became aware of the additional circumstances

18      and they nonetheless allowed me to sit for finals,

19      enrolled me automatically for the next semester,

20      took my money automatically out of my account.

21   Q  Okay.  So the contract then was formed when?

22   A  When they, well, --

23   Q  When they accepted your money in --

24   A  First it was formed when they failed to repudiate

25      within a reasonable amount of time.  It was

***Braksick Reporting Service ***
(785)865-6632

♀

181

1       further solidified when they took action that

2       caused reasonable reliance on my part and to my

3       detriment that I would be allowed to continue as a

4       student by accepting my payment of tuition and by

5       enrolling me for the next semester.

6    Q  Okay.  When is the earliest date that you believe

7       the contract was formed?

8    A  The earliest date?

Page 153

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 9  Q    Yeah.  What was the date that the contract was
10       formed?
11  A    I'm guessing a month after Rohleder-Sook's
12       awareness of the underlying facts.
13  Q    Okay.  Which was when?
14  A    October.
15  Q    So October.  October what?
16  A    October 1st let's say.  I mean, I guess what I'm
17       saying is by that time she had had ample
18       opportunity to at least let me know that my status
19       as a student was in jeopardy.
20  Q    Okay, so --
21  A    Then she went ahead and took my money and enrolled
22       me for the upcoming semester and scheduled all my
23       classes, I didn't click a mouse, I didn't do a
24       thing, so I spent another $7,500.  I devoted a
25       hundred percent of my productive effort to the
```

***Braksick Reporting Service ***
(785)865-6632

♀                                                                        182

```
 1       program and I relied to my detriment on the
 2       reasonable belief that I would remain a student.
 3  Q    So for your assertion that you had a contract the
 4       date of the formation of the contract is
 5       October 1, 2009, that's your statement?
 6  A    No, the, you said the earliest date.  I'm saying
 7       that there are several events, okay.
 8  Q    Okay, I'm just trying to figure out when a
 9       contract was formed.  It's your allegation that a
10       contract was formed so you ought to be able to
11       tell me what date the contract was formed.
12  A    Okay, I'm telling you the date at which there is
13       absolutely no doubt there was a contract is when
```

Page 154

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

14       they took my money and enrolled me in the next

15       semester.

16   Q   Okay, what date was that?

17   A   I don't know, I'd have to look at my records.  I'm

18       guessing that it was somewhere around early

19       December.

20   Q   So early December, 2009, is when the contract was

21       formed?

22   A   Well, I'm just saying after that there was

23       absolutely no doubt.  I believe that it was formed

24       earlier in theory by failure to timely repudiate.

25       I'm sorry there's no black and white answer for

***Braksick Reporting Service ***
(785)865-6632

                                                      183

1        your question.

2    Q   Well, you know, when a contract is formed, since

3        it's a matter of mutual agreement and negotiation

4        parties typically know when that contract is

5        formed.  You're the one that's asserting that

6        there was a contract claim.  Tell me when the

7        contract was formed.

8    A   And I guess what I'm telling you is --

9    Q   You don't know when a contract was formed?

10   A   No, that's not what I'm telling you.  I'm saying

11       it may have been earlier but undoubtedly there was

12       a contract formed when you took my money and

13       enrolled me for the next semester.

14   Q   Okay.  So you don't know what date the contract

15       was formed, you can't give me a specific date here

16       today where you can say definitively "I know the

17       contract was formed on this date"?

18   A   Okay, if the court entertains a theory of failure

Page 155

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

19       to timely repudiate, October 1st.  If the Court

20       entertains a theory of promissory estoppel, early

21       December.  That's the best I can do.

22   Q   For purposes of ease of reference, since you've

23       got two different theories of when the contract

24       may have been formed which affects the date, can

25       we just say fall of 2009 contract --

               ***Braksick Reporting Service ***
                       (785)865-6632

                                                          184

1   A   Okay, all right.

2   Q   -- for purposes of this discussion?

3   A   All right.

4   Q   Can we do that?

5   A   Yes.

6   Q   Okay.  For this next series of questions, what

7       were the terms and conditions of the fall, 2009,

8       contract?

9   A   Well, the terms and conditions were I would pay

10      money, you'd provide education pursuant to the

11      published rules and regulations and guidelines and

12      benefits that you have for every student who goes

13      to the University of Kansas School of Law.

14  Q   There is no written contractual agreement between

15      you and the School of Law or the University of

16      Kansas; correct?  There is no written contractual

17      agreement between you and the University of Kansas

18      School of Law or you and the University of Kansas;

19      correct?

20  A   Not for enrollment per se.  All it takes for a

21      contract is offer and acceptance.

22  Q   Where were the terms and conditions that's not

23      reduced to writing as a document per se, where are

                    Page 156

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

24      the terms and conditions of the contract

25      articulated?

***Braksick Reporting Service ***
(785)865-6632

185

1   A   Well, in a situation like this where there is no

2       specific written contract courts often look to

3       customs and unwritten rules the way that

4       institutions have done things for years in

5       situations like that and in this case they are in

6       writing and they are published publicly and there

7       is an abundance of them.

8   Q   Okay.  Specifically what are the terms and

9       conditions of the contract?

10  A   Okay, I will pay my money; the School of Law will

11      provide me an education.

12  Q   That's all, that's the term and condition of the

13      contract?

14  A   No, that's not all, that's not all.

15  Q   Well, Bob, you know, I'm getting a little

16      frustrated here.  I asked a simple question, what

17      are the terms and conditions of the contract.

18      That's an easy question.

19  A   All right, and then you interrupted me before I

20      was done answering it and said "And that's all?"

21  Q   I believe you said that's all.  What are the terms

22      and conditions of the contract?  Give me each term

23      and condition of the contract.

24  A   All right.  I'll just tell you when I'm done,

25      okay?  The, the university by extracting the money

***Braksick Reporting Service ***
(785)865-6632

186

Page 157

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

1      from a student loan and enrolling me in its

2      classes pretty much made an offer for me to

3      matriculate there.

4   Q  Okay, not pretty much made an offer.  What, what

5      are, what's the, what's the express language of

6      the offer?  You're a smart guy.  You're in

7      business, Bob.  You've seen contracts out the

8      wazoo I suspect in your 30 years of practice as an

9      accountant.  Where's the contract here?  What are

10     the terms and conditions of the contract?  That's

11     what I want to know, not probably, not maybe, not,

12     you know, it's been interpreted to be this.  What

13     are the specific terms and conditions of the

14     contract that you claim as a basis of your

15     lawsuit?

16  A  Okay, can we try it again with the I'm done thing

17     in force, where you don't --

18  Q  Could you try answering the question rather than

19     evading it?

20  A  I'm really trying to answer the question.

21  Q  Okay.

22  A  Okay.  When you take somebody's money and put in

23     place an infrastructure where you're going to

24     provide them a service that is offer and

25     acceptance.  Both of those things were done by the

***Braksick Reporting Service ***
(785)865-6632

187

♀

1      university without any participation on my part.

2      I accepted that because I wanted to attend the

3      university so there was an agreement there.  There

4      was a meeting of the minds.  If there hadn't been

5      a meeting of the minds the university would not

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

6     have taken my $7,500 and given me a list of

7     textbooks that I needed to buy for another

8     thousand dollars.  Now, when there is a, an

9     agreement that's not reduced to writing, then you

10    look at the customs of the university.

11    Fortunately for us, so that we don't have to

12    guess, this university's customs are all

13    published.  They're published in the form of the

14    Student Code of Rights and Responsibilities.  They

15    are published in the form of the University Senate

16    regulations.  They are published in the form of

17    the Faculty Senate rules and regulations.  They're

18    published in the form of chancellor's regulations.

19    Purportedly they apply to all of the students of

20    the university similarly and they provide a

21    framework whereby the students don't have to be

22    placed in jeopardy for their academic standing

23    without the provision of certain due process

24    protections.  That was part of the contract, so

25    the contract was formed when you took my money and

***Braksick Reporting Service ***
(785)865-6632

188

1     enrolled me in your courses and the terms of the

2     contract are the published customs and procedures

3     and rules that all of the students and that the

4     university and the chancellor's office live by.

5  Q  And what are those?  Give me the whole universe of

6     those published rules and customs that you claim

7     are part of the contract.

8  A  The University Senate Code, the University Senate

9     rules and regulations, the Student Code of Rights

10    and Responsibilities.

Page 159

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

11  Q  Is that it?

12  A  Those are the ones that are -- that may not be it

13     but those are the ones that are relevant to this

14     discussion and I'm saying that those are part of

15     the contract.  I'm done.

16  Q  Why didn't you have a contract with the university

17     when the university admitted you in August of 2009

18     and accepted your payment for the fall semester?

19     Why didn't you have a contract then?

20  A  Well, I did.

21  Q  That's not what you told me.

22  A  No, I did have a contract.

23  Q  That's not what you told me.

24  A  What I'm saying is at the time I amended my

25     application the university had a temporary window

***Braksick Reporting Service ***
(785)865-6632

189

1      during which they could have repudiated, voided

2      the agreement, cancelled the enrollment.  They

3      chose not to do that.

4   Q  Okay.  I guess I'm just too damn stupid, Bob,

5      because when I asked you specifically what

6      contract is the subject of your claim you told me

7      it's the one that arose either in early December

8      or October 1, 2009.  You never mentioned any

9      contract occurring in August, 2009, when you were

10     enrolled and admitted, so is that a contract

11     that's also subject to this lawsuit or not?

12  A  What made the, the agreement that -- let me, let

13     me put it this way, okay?  I signed on to be a

14     student.  At that point there was a contract.

15     When I amended my application you could have, you

Page 160

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

16      could have rescinded on the basis of fraud and

17      chosen to void the contract, in which case you

18      would have refunded my tuition to me, you wouldn't

19      have held me on for a full year of my life, you

20      would have just eliminated my record, you know.

21      You didn't do that.  You took more of my money.

22      You reenrolled me.  So I enrolled in August.

23      There was an contract.  I amended.  You had an

24      opportunity to get out of it but you didn't.  Then

25      in December you took more of my money and put me

***Braksick Reporting Service ***
(785)865-6632

190

1       in classes.  Then there was a contract you

2       couldn't get out of.

3   Q   Okay, Bob, you said that Wendy Rohleder-Sook

4       enrolled you and took your money without your

5       knowledge or --

6   A   No, I'm not, I'm not saying without my knowledge.

7   Q   -- your doing anything affirmatively to do that?

8   A   Correct.

9   Q   If you believed that you shouldn't have been

10      enrolled, then why didn't you withdraw at that

11      point in time?

12  A   Obviously I didn't believe I shouldn't have been

13      enrolled.  What I'm saying is she had a duty to

14      act within a reasonable period of time if that was

15      her desire.

16  Q   Where is that duty articulated?

17  A   In Kansas common law.

18  Q   And articulate for me what the Kansas common law

19      duty is that you're relying upon for an assertion

20      that there is such a duty.

Page 161

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

21  A    I, I don't have that case off the top of my head

22       but it's in the materials that I provided to you.

23  Q    That's not the question I asked, Bob.  You're

24       asserting that Kansas common law says she has a

25       duty to act within a time frame.  What does Kansas

***Braksick Reporting Service ***
(785)865-6632

191

1        common law define as a reasonable time frame?

2   A    It's a, a time frame that allows the, the person

3        who is the subject of the repudiation to proceed

4        without unnecessary expense over reliance that the

5        contract will continue.

6   Q    What time frame is the time frame that's

7        recognized?  Does it have a number of days, number

8        of months, number of years?  Are you telling me

9        it's not a defined time period?

10  A    No, it's a facts and circumstances type.

11  Q    Paragraph 205 says the law school's failure to

12       assemble a hearing panel within the required time

13       limit for provision of a hearing violated Brown's

14       due process rights as guaranteed to him in writing

15       by the U.S.R.R.  Do you --

16           (Proceedings interrupted by phone

17           ringing.)

18  A    Yeah, the U.S.R.R. provides --

19  Q    I didn't finish the question.  Let's start over

20       since we had the ringing of the phone.  Paragraph

21       205 states that the law school's failure to

22       assemble a hearing panel within the required time

23       violated Brown's due process rights as guaranteed

24       to him in writing by the U.S.R.R.  My question is

25       specifically how were your due process rights

Page 162

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

***Braksick Reporting Service ***
(785)865-6632

192

1        violated?
2    A    Well, they were supposed to assemble a hearing
3         panel within 30 days of the complaint and then
4         they drug it on and on and on for four or five
5         months.  If they had just gone ahead and assembled
6         the hearing panel, then at least I could have
7         mitigated some of the damages that were ultimately
8         going to be caused when they dismissed me without
9         any process at all.  I mean, basically what they
10        need to do is give me the process that they say in
11        writing that I have.
12   Q    Okay, other than your disagreement with the
13        outcome or the result, which was your dismissal
14        from the law school, how were you substantively
15        harmed by the alleged failure to follow the
16        process?
17   A    Because I wasted my time participating in a
18        process that was just a smoke screen.  The outcome
19        was already predetermined.
20   Q    How do you know the outcome was predetermined?
21   A    Well, because otherwise when the complaint was
22        dismissed, then that would have been it.
23   Q    Meaning?
24   A    Meaning the complaint was dismissed.
25   Q    Meaning what that would have been it?  That would

***Braksick Reporting Service ***
(785)865-6632

193

1        have been it what?  What would have been it?
2    A    All right, they put me in a process.  They said

Page 163

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

3      this is the process we're going to follow.  Under
4      this process you have due process rights.  Dean
5      Mazza e-mailed me from time to time several times
6      talking about how they're being careful to observe
7      my due process rights and protect my due process
8      rights so then we get to the end of the line with
9      the hearing panel and the hearing panel says we
10     don't have jurisdiction, it's not academic
11     misconduct, complaint dismissed, at which point
12     your defendants say, well, we're going to kick him
13     out anyway.
14  Q  Okay, paragraph 207 says that you were denied an
15     opportunity to be heard in a meaningful manner.
16     What more would you have said, could you have
17     said?  I guess I don't understand substantively
18     how you did not get a meaningful hearing.
19  A  Well, I mean, basically --
20  Q  How did you --
21  A  -- the School of Law has defined what is a
22     meaningful hearing under these circumstances.  The
23     university, the Student Code of Rights and
24     Responsibilities and the U.S.R.R. both give
25     detailed protections and processes for those

***Braksick Reporting Service ***
(785)865-6632

194

1      hearings and then so does the law school's DRP.
2      All three of them do.  They say what's a
3      meaningful hearing.  They say what's a meaningful
4      manner.  They say when a student's academic status
5      is in jeopardy this is what happens.  I did not
6      receive the process or protections of any of
7      those, not anything close.  I wasn't given the

Page 164

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 8      chance to confront anybody, I wasn't given the
 9      chance to call in counsel, I wasn't given the
10      chance to stand before a hearing panel, I wasn't
11      given the chance to tell my story, I wasn't given
12      the chance to present mitigating circumstances,
13      nothing.
14  Q   You said you weren't given the opportunity to
15      confront anybody.  Who would you have confronted,
16      your own record?
17  A   Mazza for one.
18  Q   What do you mean Mazza for one?
19  A   Well, I mean, his, his statement that Agrawal
20      relied on that we talked about earlier.
21  Q   So aside from confronting a statement that's
22      referenced in Dean Agrawal's May 25, 2010 letter,
23      which was marked as Exhibit, is that 10?
24  A   I'm not sure.
25  Q   Exhibit 10.
```

***Braksick Reporting Service ***
(785)865-6632

195

```
 1  A   No, I don't think that's it.  This is it.  Exhibit
 2      8.
 3  Q   Exhibit 8?
 4  A   Yes.
 5  Q   Is there anybody else who you should have been
 6      provided an opportunity to confront?
 7  A   Yeah, I probably would have also liked to confront
 8      Wendy Rohleder-Sook and Sandra Craig McKenzie and
 9      then I would have liked the opportunity to present
10      mitigating circumstances.  I would have liked the
11      chance to stand before a hearing panel.
12  Q   Okay.
```

Page 165

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

13   A   An impartial hearing panel.

14   Q   You submitted written documentation that explained

15       your rationale for answering the questions explain

16       mitigating circumstances about your significant

17       other, Ms. Barr, and the criminal issues that you

18       were involved in.  How in light of all of that

19       information did Dean Agrawal not have everything

20       she needed to make the decision?

21   A   Dean Agrawal can't just make the decision.  That's

22       the reason you have processes.  It's the reason

23       you have a University Senate Code, it's the reason

24       you have a U.S.R.R., it's the reason that you have

25       rules and regulations.

***Braksick Reporting Service ***
(785)865-6632

196

1   Q   Okay.  Again, I understand that you think that the

2       procedure should have been different but --

3   A   There was no procedure.

4   Q   -- what substantive information would you have put

5       in the record that you could not have, that you

6       did not put in the record in your writings?

7   A   It's, it's really difficult to tell.

8   Q   Point to me specifically what substantive

9       information you did not put in the record in your

10      writings that you submitted to the law school.

11      What substantively did you not put in there?

12  A   Well, there's tons of substantive stuff.  I never

13      got the chance to prepare anything for the law

14      school.  They could have heard from Robyn Barr,

15      for example.  She would have been a witness for

16      me.

17  Q   Your Complaint talks about --

Page 166

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

18  A    They could have heard from my character

19       references.

20  Q    Well, they had as part of the application process

21       references for you so that was available to them;

22       correct?

23  A    Well, I'm glad that you think what was done was

24       enough.  What I'm trying to tell you is what was

25       done is not what they were supposed to do.

***Braksick Reporting Service ***
(785)865-6632

197

1   Q    Well, you only know that in hindsight in terms of

2        there not being in your mind information that

3        would have changed the circumstances.  Even if

4        you'd put all this information out there that you

5        claim that you were denied an opportunity to

6        present you can't say definitively and certainly

7        here today that but for my doing that there would

8        have been a different result, can you?

9   A    Oh, I can say absolutely.

10  Q    How can you say that?

11  A    Because one of the protections that I am entitled

12       to is to appear before an impartial hearing panel,

13       in this case impossible unless it gets out of the

14       School of Law.

15  Q    In your complaint you talk about disparate

16       treatment and in your sworn Verified Complaint you

17       say that the great majority of transgressions

18       reported on other amended School of Law

19       applications are much more recent than Mr. Brown's

20       13-year-old misdemeanor convictions.  Okay, which

21       amended School of Law applications are you

22       referring to in paragraph 209 of your complaint?

Page 167

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

23  A   I wasn't given access to any of them even though I

24      requested it pursuant to procedures that say I'm

25      entitled to it.

***Braksick Reporting Service ***
(785)865-6632

198

 1  Q   That's not the question I asked.

 2  A   That's based on my discussion with Sandra Craig

 3      McKenzie.  That's the reasonable basis for my

 4      statement.

 5  Q   And what's the factual basis for your assertion in

 6      paragraph 10 that you were the first law student

 7      in history to be permanently removed after coming

 8      forward and amending?

 9  A   That's based on both my discussion with Sandra

10      Craig McKenzie and e-mails from Stephen W. Mazza.

11  Q   Are you telling me that there is a specific e-mail

12      from Mazza in which he says you are the first I've

13      ever removed?

14  A   Says, yes, we've never encountered this situation

15      before, that's what he says.

16  Q   Well, never encountered the situation.  He doesn't

17      say that you are the first to have been removed

18      after coming forward?

19  A   Well, and he doesn't deny it either in his

20      answers.

21  Q   Well, he wasn't asked that, was he?  All he

22      commented --

23  A   No, he was asked that and he said denied as

24      stated, whatever that means. and McKenzie out and

25      out said that no one else had ever been removed

***Braksick Reporting Service ***
(785)865-6632

Page 168

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

199

1       under these circumstances before.

2  Q    When did she say that?

3  A    In my meeting with her.

4  Q    What date?

5  A    The only day we met.  I can get it by reference to

6       my records but I don't have it top of head.

7  Q    Fall, spring, summer?

8  A    It was, it was spring.

9  Q    Before or after the --

10 A    I'm guessing it was about March.

11 Q    Anybody else present in that meeting with you and

12      she?

13 A    No, there wasn't.

14 Q    That meeting was in person?

15 A    Yes.

16 Q    Where did the meeting take place?

17 A    Her office.

18 Q    How long did the meeting last?

19 A    About 45 minutes.

20 Q    Did you take any notes?

21 A    No.

22 Q    She take any notes?

23 A    Don't know.

24 Q    Did you observe her taking any notes?

25 A    I did not observe her taking any notes.

***Braksick Reporting Service ***
(785)865-6632

200

1  Q    Did she send any confirmatory documentation to you

2       reflecting the discussion that you had with her?

3  A    No.

4  Q    In your March --

Page 169

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 5  A   Well, she, she did confirm that she had approached
 6      Dean Mazza again about mediation and he had said
 7      that it wasn't an option after our initial
 8      meeting.
 9  Q   That wasn't the question I asked.  Did you -- and
10      again, Candace is going to throw her phone at you
11      and I if we don't quit --
12  A   I hope it's a nice one.
13  Q   We can't keep talking over each other.  But did
14      she send any kind of documentation to you which
15      outlined or confirmed the substance of your
16      discussions with her in March during that meeting
17      in her office?
18  A   No.
19  Q   Did you send her any confirmatory documentation
20      that outlined or confirmed the sum and substance
21      of the conversation that you had had with her
22      during that March meeting in her office?
23  A   Well, I mean, other than our e-mail repartee back
24      and forth and the only issue that we looked at
25      which was open, which was mediation, no.  I mean
```

***Braksick Reporting Service ***
(785)865-6632

201

```
 1      there was documentation that yes, the meeting took
 2      place, you know.  There's no picklist of
 3      everything we talked about in it.
 4  Q   Paragraph 140, or excuse me, 153 says the
 5      representations made led Brown to believe that
 6      enrollment contemplated an agreement.  What
 7      specific representations are you referring to
 8      there?
 9  A   Oh, there were a lot of representations,
```

Page 170

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
10          representations regarding the evenhanded way they
11          treated their students, representations that they
12          had policies and procedures in place that applied
13          to the entire student body, the kind of things
14          that you don't get at a private university, you
15          know, all the, all the published materials on the
16          website, the things about the admissions
17          standards, the things about the U.S.R.R.,
18          University Senate Code.
19   Q      Those representation, how did those
20          representations lead you to believe that there was
21          an agreement which constituted a contract?
22   A      Well, it's because you know that if you have a
23          dispute it's guaranteed in writing that it's going
24          to be handled in an evenhanded way.  I mean, you
25          certainly wouldn't want to sign up for law school
                    ***Braksick Reporting Service ***
                            (785)865-6632
```

                                                              202

```
1           and then just have them kick you out.
2    Q      Okay, in the summer 2010, before the June 8th, the
3           date of your dismissal, you had signed up for the
4           Defender Project; correct?
5    A      Yes.
6    Q      And as part of that Defender Project clinic the
7           students have to interact with clients who are
8           individuals who are housed in various correctional
9           facilities; correct?
10   A      Yes.
11   Q      And you understand that as part of a student's
12          participation in that, that the various federal
13          and state prisons where those students may be
14          interacting, they have to do a background check
```
                         Page 171

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

15        and they have to clear the student for access to
16        those individuals?
17    A   Yes.
18    Q   Do you know why the prison at Leavenworth flagged
19        your thing and advised us that they were not going
20        to admit you?
21    A   Well, Gene, the instructor, told me that it was
22        because there was a, an actual inmate there who
23        had just been released who had my same identifying
24        information with no distinguishing birth date or
25        anything, had just been released a year earlier

                  ***Braksick Reporting Service ***
                        (785)865-6632

                                                              203

1         for felony sexual charges and that that had shown
2         up on my record.  She also assured me that, based
3         on the record that I have, there's no reason why I
4         would have been precluded from attending.
5     Q   Paragraph 187 says that your removal from the
6         School of Law eliminated the possibility of
7         educating a prospective Kansas lawyer.  What
8         factual basis do you rely upon to assert that you
9         knew that you would be able to become a Kansas
10        lawyer?
11    A   I was in the top half of my class.  I don't have
12        any idea why I wouldn't have been able to become a
13        Kansas lawyer.
14    Q   Okay.  You understand that there are a lot of
15        people who graduate from law school and never
16        become licensed as an attorney in the particular
17        states where they apply, that admission to
18        practice is a decision by the particular supreme
19        courts in those states and the particular federal

                          Page 172

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

20      courts where the attorney seeks admission; you
21      understand that, right?
22   A   Yes.
23   Q   Okay.  You have no reason to believe that -- I
24      mean, you have no certainty that you could have
25      become a licensed Kansas practitioner?

***Braksick Reporting Service ***
(785)865-6632

204

1    A   I have no certainty that I would have been until
2       the end of the curriculum but there is a high
3       probability of it.
4    Q   When you attended classes in fall, 2009, and
5       spring, 2010, as you have outlined in your
6       Complaint you received education in those classes,
7       you took exams, you received grades, so you got
8       what you paid for in those two semesters; correct?
9    A   No, absolutely not.
10   Q   Well, you got -- what did you not get in those two
11      semesters that you --
12   A   The reason I enrolled and paid that kind of money
13      was so that I'd be able to sit for the bar.
14   Q   Okay.
15   A   I wanted to be a lawyer.  I don't want to be
16      somebody that says he took a year of law school.
17   Q   Point to me specifically where it's guaranteed
18      that once you're enrolled you're going to
19      successfully continue to be enrolled and
20      successfully complete the law school education.
21      Where is that statement?
22   A   Well, with regard to my abilities it's not but
23      with regard to your permitting me to stay in it's
24      guaranteed in the Student Code of Rights and

Page 173

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

25    Responsibilities and the U.S.R.R. and in the DRP.

***Braksick Reporting Service ***
(785)865-6632

205

1  Q    Where specifically in those documents?
2  A    In the enumeration of due process, which you did
3       not provide in this case.
4  Q    Okay, so in those documents it says once admitted
5       a student is guaranteed that they will be allowed
6       to graduate?
7  A    No.  It says that their academic standing will not
8       be placed in jeopardy without certain protections
9       being afforded to them, none of which you afforded
10      to me.
11 Q    Your academic standing wasn't placed in jeopardy,
12      you were dismissed from the law school for lying
13      on your application.
14 A    So my academic standing is not placed in jeopardy
15      if I'm dismissed?  I beg to differ.
16 Q    Your application, as was stated in the application
17      itself and in the letter of certification, said I
18      can be dismissed if I've been untruthful or failed
19      to disclose information, which you have admitted
20      you did; correct?
21 A    No, it said that my application could be voided
22      and I could be dismissed but that didn't happen.
23 Q    No, you were dismissed.
24 A    It didn't say that we can dismiss you sometime a
25      year hence.  In between the time you had the

***Braksick Reporting Service ***
(785)865-6632

206

1       opportunity to dismiss and repudiate and the time

Page 174

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 2      you enrolled me for the next semester you gave up
 3      that right by reenrolling me and taking my money
 4      and putting me back in after you were fully aware
 5      of the circumstances.
 6   Q  Paragraph -- strike that.  You need to take a
 7      break?
 8   A  No.
 9   Q  Paragraph 259 says individual defendants breached
10      a contractual duty to Plaintiff Brown.  What
11      contract did Gail Agrawal have with you?
12   A  She had an obligation as an employee of the
13      university to honor its rules and regulations as
14      they are incorporated into my enrollment contract.
15   Q  What contract did Stephen Mazza as an individual
16      have with you that he breached?
17   A  He had an obligation as an employee of the
18      university to honor the university's procedures as
19      incorporated into my enrollment contract.
20   Q  What contract did Joyce McCray-Pearson as an
21      individual have with you that she breached?
22   A  The same answer.
23   Q  What contract with you did Wendy Rohleder-Sook as
24      an individual have that she breached?
25   A  The same answer.
```

***Braksick Reporting Service ***
(785)865-6632

207

```
 1   Q  What is the fiduciary duty that you claim Gail
 2      Agrawal had in paragraph 260 of your complaint?
 3   A  To pay attention to what the university
 4      regulations and the chancellor's regulations and
 5      the law school's regulations say in her dealings
 6      with me.  It's going to be the same answer for the
```

Page 175

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 7        other three as well.
 8   Q    Okay.  So if I ask -- I'm going to ask you the
 9        first one a little bit differently.  What
10        fiduciary duty is it that you claim that Wendy
11        Rohleder-Sook breached with you?  What is the
12        fiduciary duty that Wendy Rohleder-Sook owed you
13        that you claim she breached in paragraph 260?
14   A    Oh, to follow the school's published rules and
15        regulations in her dealings with me.
16   Q    And what is the fiduciary duty that you claim
17        Joyce McCray-Pearson owed you in paragraph 260
18        that she breached?
19   A    To, to treat the University Senate as a system of
20        government, governance and not as a social club,
21        to pay attention to what the regulations say.
22   Q    And what do you claim to be the fiduciary duty
23        that Stephen Mazza allegedly breached in paragraph
24        260 of the Complaint?
25   A    That he breached a duty of honest dealing but he
```

***Braksick Reporting Service ***
(785)865-6632

208

```
 1        also breached a duty to administer the procedures
 2        surrounding my dismissal in accordance with the
 3        rules and regulations of the university and the
 4        chancellor's office and the School of Law.
 5   Q    Paragraph 265 says that you've got thousands of
 6        dollars in legal expenses.  To whom are those
 7        legal expenses owed?
 8   A    John -- well, they're paid.  To John Gerstle.
 9   Q    Where are the documents which should have been
10        enclosed or included in your Rule 26 disclosures
11        that reflect the legal expenses that have been
```

Page 176

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
12        incurred?
13   A    I'll supplement the whole thing for damages here
14        shortly.
15   Q    What is the total amount of legal expenses that
16        you claim have been incurred?
17   A    Maybe $5,000.
18   Q    Paragraph 268 says that you devoted 10 months of
19        your productive effort to attendance and study.
20        How do you value your 10 months of time?
21   A    Well, it would be by the income that I wasn't
22        given an opportunity to earn in other endeavors.
23   Q    Okay.  And before you attended law school what was
24        your income?
25   A    Oh, I was, I was clearing 80,000 a year.
```

***Braksick Reporting Service ***
(785)865-6632

209

```
 1   Q    Based on how many hours a work week?
 2   A    Between 30 and 50 depending on what kind of demand
 3        there was.
 4   Q    And in the 10 months that you were in law school
 5        --
 6   A    Never more than, never more than 15 hours a week.
 7   Q    And what's the claimed reduction in your earnings
 8        during that period?
 9   A    It's about $60,000.
10   Q    That you did not earn?
11   A    Yes.
12   Q    Going to provide your tax returns that document
13        your earnings?
14   A    Sure.
15   Q    And you're going to provide your contracts which
16        show your agreements with your clients and the
```

Page 177

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

17       loss of business that would justify the $60,000

18       loss?

19   A   How would my contracts show loss of business?

20   Q   Well, I'm assuming that the contract, I mean,

21       kinds of services you engage in are services that

22       are ongoing services.  Did you lose clients in the

23       10 months that --

24   A   I turned away work in order to attend the School

25       of Law.

                ***Braksick Reporting Service ***
                        (785)865-6632

                                                            210

1    Q   Okay, you turned away work --

2    A   Yes.

3    Q   -- but that doesn't mean that you lost clients so

4        if you have, you know, a pool of clients and

5        you're earning 80K and you start law school you

6        still have that pool of clients, you should still

7        be generating 80K.  I understand that you may have

8        had to turn away new clients but --

9    A   Not when you're -- when you're working between 30

10       and 50 hours a week you make more money than you

11       do when you're working 15 hours a week.  It's not

12       a straight retainer.  I work hourly.

13   Q   Okay.  So your consulting services are billed on

14       an hourly basis?

15   A   Yes.

16   Q   What's the hourly basis or what's the hourly rate

17       at which your consulting services are billed?

18   A   It's between 65 and a hundred.  It probably

19       averages 75.

20   Q   So you don't have any contracts or agreements

21       where you have essentially a flat lump sum that

                        Page 178

Brown082611.txt

22      you're paid regardless of how many hours you work?

23   A   No, and if I had they would have been discontinued

24      as soon as I only had 15 hours of availability

25      each week.  Make no mistake, I uprooted my whole

***Braksick Reporting Service ***
(785)865-6632

211

1      life to do this.

2   Q   Paragraph 269 says you lost working relationships

3      with key business clients.  Specifically which key

4      business clients did you lose working

5      relationships?

6   A   The most significant one was Net Standard.  I was

7      unable to provide them service at the same level I

8      had before and then they took on a salaried staff

9      member to do the same kind of things that they

10      used to outsource to me for CRM customization.

11   Q   When did you lose your Net Standard client?

12   A   Well, I mean, I didn't lose them totally, they

13      still give me bits and pieces, but I tried to go

14      back to them after I was out of school and they,

15      they didn't have that kind of volume anymore.

16   Q   Okay.  Again, I didn't ask for the most

17      significant client.

18   A   It would be, it would be pretty much a month after

19      I started law school.

20   Q   And with respect to paragraph 269, it says you

21      lost your working relationship with key business

22      clients.  When I asked the question to identify

23      specifically those key clients I didn't ask for

24      the most significant one, I wanted each and every

25      key client that you claim you lost as a result of

***Braksick Reporting Service ***
Page 179

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt
(785)865-6632

♀                                                                          212

```
 1        this.
 2    A   Well, it would be, it would be every client I
 3        have.  It would be Net Standard, Accutype,
 4        E-Solution Technologies; not Quadis or Corren
 5        because I've recently started my relationships
 6        with them but I mean those were things I had to do
 7        to supplant loss of business that I had from when
 8        I started school.
 9    Q   Okay.  Besides Net Standard, Accutype and
10        E-Solution is there any other key business client
11        --
12    A   There's no one else who's notable besides those
13        three.
14    Q   Damages doesn't talk about notable.  I mean, you
15        said key clients so as an element --
16    A   Those are the only ones.
17    Q   Those are the only three business entities that
18        you're going to claim as a basis for your damages
19        alleged in paragraph 269?
20    A   Yes.
21    Q   Okay.  How much revenue did you lose from Net
22        Standard?
23    A   I'm still trying to work that out.  I'm trying to
24        engage an expert to go over the stuff with me.
25    Q   How much revenue did you lose from Accutype?
```

***Braksick Reporting Service ***
(785)865-6632

♀                                                                          213

```
 1    A   Same answer.
 2    Q   Okay.  How much revenue did you lose from
 3        E-Solutions?
```

Page 180

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

4   A    The same answer.

5   Q    Paragraph 270 says you've been forever precluded

6        from pursuing a legal career.  How has that, how

7        have you been -- what's the factual basis for your

8        assertion that you've been forever precluded?

9   A    It's Dean Agrawal's statement that the School of

10       Law's transcripts will show that your permanent

11       dismissal was based on your falsification,

12       misrepresentation and failure to supply required

13       information on your application to the School of

14       Law.  That will be permanent disciplinary

15       expulsion that will be forever documented on my

16       K.U. transcript.  That will keep me from ever

17       being accepted to another ABA-accredited law

18       school.

19  Q    Okay, you don't know that for certain because

20       you've never applied to another ABA law school;

21       correct?

22  A    It's in your published documentation.

23  Q    I understand that, but you have never ever applied

24       to another law school since your dismissal so you

25       cannot say for certainty, for certain that you

***Braksick Reporting Service ***
(785)865-6632

214

1        would not be admitted by another law school?

2   A    No, I'm pretty certain I would not be admitted by

3        another law school.

4   Q    Paragraph 272 says you devoted more than a hundred

5        hours to defense and litigation pertaining to this

6        matter and assertion of your rights.  What records

7        are you keeping that will support your assertion

8        in paragraph 272?

Page 181

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 9   A   Just, just records of the hours I've spent

10       preparing the Complaint, responding to pleadings.

11   Q   That's not the question I asked, and maybe it was

12       a poor question.  When I say what records that's

13       generally understood.  What form have the records

14       taken that you have kept that will document your

15       time spent in relation to your claim in paragraph

16       272?

17   A   It's just timekeeping in a spreadsheet.

18   Q   Why did you not produce that in your Rule 26

19       disclosure?

20   A   I don't know.

21   Q   Are you going to produce it?

22   A   Yes.  I mean, it's obvious I need to supplement

23       disclosure with respect to damages.

24   Q   With respect to specifically the Board of Regents

25       and you've named the individual members of the
```

***Braksick Reporting Service ***
(785)865-6632

215

♀

```
 1       Board of Regents in their official capacities, --

 2   A   Yes.

 3   Q   -- would it be a fair statement to say that the

 4       reason that you have named the Board of Regents is

 5       based upon what you understand their supervisory

 6       responsibility to be over the University of

 7       Kansas?

 8   A   Well, and my understanding that they were the

 9       correct official capacity defendants.  There was

10       another case I saw, I believe it was a Kansas

11       case, where somebody just named the Board of

12       Regents as an institution and then there was some

13       dicta by the court that it should have been kicked
```

Page 182

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

14      because 42 U.S.C. 93 requires that you name a
15      person and they said notwithstanding that the,
16      both the plaintiffs and defendants seemed to have
17      acknowledged that they're addressing the Board of
18      Regents in their official capacities --
19   Q  Okay.
20   A  -- but that they, they put out there that that
21      could be a basis for dismissal, --
22   Q  Okay.
23   A  -- which is why I named the Regents individually.
24   Q  In their official capacities?
25   A  Yes.

***Braksick Reporting Service ***
(785)865-6632

216

1   Q  So aside from trying to make sure that you have
2      legally invoked the Board of Regents as an entity
3      it's fair to say that, again, the reason they're
4      in this lawsuit is because of your belief that
5      they have supervisory responsibility over the
6      University of Kansas?
7   A  That's one reason.
8   Q  Are there other reasons?
9   A  Yes.
10  Q  What are those?
11  A  Well, I believe that they have unique individual
12     knowledge about how this should have been done.
13  Q  Okay.  Why do you believe they have unique
14     individual knowledge about what the university and
15     its employees should have done in your case?
16  A  Because they're the governing body of the
17     university and its employees.
18  Q  Okay.  You can be a governing body but, you know,

Page 183

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
19      each of the Regents institutions is a very large
20      institution that has lots of moving parts in them.
21      On what factual basis are you asserting that the
22      Board of Regents gets down in the weeds and knows
23      what all of those universities are doing and what
24      all the individuals in those universities are
25      doing?
```

***Braksick Reporting Service ***
(785)865-6632

217

```
 1   A   If it gets to the point where blatant
 2       constitutional violations are so frequent that
 3       they're down in the weeds, then there is a
 4       systemwide problem.  I think that this is
 5       something the Board of Regents is and should be
 6       concerned with.
 7   Q   What makes you think that the Board of Regents is
 8       concerned with this, your case?
 9   A   Well, because I believe that they want the state's
10       processes to be administered fairly and in an
11       evenhanded way and according to the goals and
12       strategic initiatives that are published out of
13       the board's office and the chancellor's office.
14   Q   Okay.  With respect to Andy Tompkins, the
15       president and CEO of the Board of Regents, is
16       there anything unique about him that's different
17       than the board and the members of the board named
18       in their official capacity, I mean, as to why he's
19       named in this lawsuit?  What makes you think he
20       has authority to exercise control over the
21       university?
22   A   No, there's nothing different about him than any
23       of the other Regents.
```

Page 184

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
24   Q    Okay.  Is there anything that -- what's the

25        factual basis for your belief that he as the
```

***Braksick Reporting Service ***
(785)865-6632

♀                                                                    218

```
 1        president of the Kansas Board of Regents has any

 2        authority over the university?

 3   A    Well, the Regents collectively have authority over

 4        the university.

 5   Q    He's not a Regent.  What's your assertion that he

 6        as the president of the Kansas Board of Regents --

 7   A    Oh, the president of the Kansas Board of Regents

 8        is not a Regent?

 9   Q    No.

10   A    I did not know that.

11   Q    Okay.

12   A    I mean, he's listed as a member of the board on

13        their website.

14   Q    He's not a member of the board.  I don't believe

15        that's how he's listed.

16   A    He is, but, I mean, that's where I pulled it from.

17        Meet the members.  I just copied it straight off

18        their web page.

19   Q    That may be the section or that may be what it's

20        labeled but it's not -- he's an employee of the

21        board, he's not a board member.  The board members

22        are appointed by the Governor.  Andy Tompkins is

23        an employee of the board, he's not appointed by

24        the Governor.

25   A    Oh, well, that would be, that would be a
```

***Braksick Reporting Service ***
(785)865-6632

♀                                                                    219

Page 185

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 1      misunderstanding on my part if it turns out to be
 2      true.
 3  Q   Okay.
 4  A   I did not perceive anything special about Andy
 5      Tompkins --
 6  Q   Okay.
 7  A   -- other than his involvement as a Regent as I
 8      perceived it.
 9  Q   Okay.  So if he is not in fact a Regent but is
10      simply an employed administrator of the Board of
11      Regents is there anything about that that would
12      lead you to believe, or what's your factual basis
13      for believing that he has any authority to direct
14      or control the university?
15  A   Well, my factual basis is that he was listed on
16      the website as a Regent.  That's my only factual
17      basis.
18  Q   So if in fact you're mistaken about his being a
19      Regent, then you would also be mistaken about his
20      authority to control or supervise the university?
21  A   Well, I'd appreciate an opportunity to take
22      offline and consider it because I haven't had a
23      chance to fully research it.
24  Q   Okay.
25          MS. TROWER:  What time do you have, Candace?
```

***Braksick Reporting Service ***
(785)865-6632

220

```
 1          THE REPORTER:  Five till 4:00.
 2  Q   I want to make sure, and Bob, I don't want to, or
 3      Mr. Brown, I don't want to rehash ground that
 4      we've already plowed but I want to make sure that
 5      I have covered this with you, and I think I did,
```

Page 186

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

6    but so I want to make sure my notes are clear.

7    Paragraph 242 of your Complaint says you were made

8    aware by university personnel that defendants

9    sought his permanent removal because of the nature

10   of the crimes.  In that paragraph the person that

11   you're referencing is Sandy Craig McKenzie?

12  A  Yes.

13  Q  And that's no other person, right, just Sandy

14   Craig McKenzie?

15  A  No other person.

16  Q  Okay.

17  A  There is other factual support for it, you know,

18   insofar as the Jana Mackey lecture series goes

19   and, you know, Mazza's statements that no one on

20   the admissions committee wants to consider

21   anything other than my permanent removal.

22  Q  Paragraph 280 you said Dean Agrawal was not an

23   impartial decisionmaker.  Why was she not an

24   impartial decisionmaker?

25  A  Her, her refusal to grant me an audience or chance

***Braksick Reporting Service ***
(785)865-6632

221

1    to appear before her, her complete disregard for

2    university regulations and policies and procedures

3    and her involvement with the Jana Mackey

4    Distinguished Lecture Series.

5  Q  Paragraph 282 you said the individual defendants,

6    which would be --

7  A  The same four that we've talked about all

8    deposition.

9  Q  Okay, those four individuals through their

10   intentional and malicious misuse of the state

Page 187

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
11      legal process for personal ends.  What personal
12      ends did, what personal end was Stephen Mazza
13      pursuing?
14  A   What I'm saying is that they collectively
15      conspired to grind an axe against me because I've
16      been convicted of domestic violence.
17  Q   Paragraph 286 says that the individual defendants
18      had no discretion.  What's your factual basis for
19      asserting that they had no lawful discretion?
20  A   It's basically that they ignored the processes by
21      which they're bound and the state law.  They run
22      a, they run a state university.  They can't just
23      say, well, in my opinion the process didn't work
24      out right so we're going to try something else,
25      time to wing it.
```

***Braksick Reporting Service ***
(785)865-6632

222

```
 1  Q   So you don't believe that the law school
 2      application statement, the certification that you
 3      signed on the law school application and the
 4      statement on the Certification Letter provide them
 5      discretion to remove you?
 6  A   It provided them that discretion for a reasonable
 7      amount of time but rather than removing me and
 8      voiding the application and simply refunding my
 9      tuition, sending me on my way, then just to keep
10      me in the program, offer me due process rights in
11      lieu of that opportunity and waste a year of my
12      life and at that point they gave up the right to
13      repudiate.
14  Q   You claim damages in the amount of $2 million.
15      What's the factual basis for your claim of
```

Page 188

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

16      $2 million in damages?

17   A   The difference between what I would have made in

18       my lifetime as an attorney and what I'll make

19       doing what I am now, adjusted for present value,

20       and I'll provide that computation when I

21       supplement my damages.

22   Q   And in terms of your earnings, and again, I kind

23       of want to understand this computation, you said

24       before you went to law school you were averaging

25       approximately $80,000 a year?

                ***Braksick Reporting Service ***
                      (785)865-6632

                                                          223

1    A   After, after expenses.

2    Q   Okay, so $80,000 after expenses.  Based upon your,

3        or strike that.  You said that the $2 million

4        figure is what you could have earned as an

5        attorney --

6    A   Over my remaining productive life.

7    Q   -- over your practice reduced to the present

8        value?

9    A   Right.

10   Q   Okay.  Had you continued with your law school, you

11       were admitted '09-10, '10-11, you would have

12       graduated in May '12 had you gone straight through

13       essentially; correct?

14   A   Yes.

15   Q   So the earliest you could have then sat for the

16       bar would have been July of '12?

17   A   Uh-huh.

18   Q   Is that right?

19   A   Yes.

20   Q   And then if you were to have passed the bar in

                    Page 189

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

21      July of '12 the earliest you could have been sworn

22      in is October, 2012, that's when you would have

23      been admitted?

24   A   Right.

25   Q   That's typically when they admit people.

***Braksick Reporting Service ***
(785)865-6632

224

1    A   All right.

2    Q   In terms of the, if we were to assume that you

3        would have been admitted, licensed and began

4        practicing as an attorney in October, 2012, what

5        period of time are you figuring your practice to

6        continue after that date, how many years?

7    A   Twenty.

8    Q   Twenty years.  So in October of 2012 how old would

9        you have been?

10   A   Fifty-one.

11   Q   Fifty-one.  So you're figuring that you would have

12       practiced until you were 71?

13   A   Yes.

14   Q   Okay.  And in terms of that practice, what figure

15       are you assuming that you would have made or

16       earned yearly as an attorney?

17   A   I'm working on that with the expert that I'm

18       trying to retain now.

19   Q   Okay.  Well, you've got, I understand you're going

20       to have an expert do the figures and whatever but

21       you made a statement that you could have earned

22       $2 million and that would have been the

23       difference.  Did you just pick that number out of

24       the air or did you figure that an attorney

25       licensed in October of 2012 practicing for 20

Page 190

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

***Braksick Reporting Service ***
(785)865-6632

225

1     years is going to then earn X amount each year?
2  A  Well, I'm guessing that starting out there would
3     be maybe a $10,000 day taunt which would increase
4     as I became more experienced.
5  Q  Okay, so what do you think your entry level
6     earnings rate would have been as an attorney in
7     October, 2012?
8  A  I had figured it up in a spreadsheet in
9     preparation for this.  It came out to a little bit
10    more than 2 million under my assumptions.  They're
11    pretty complicated.  If you'd like I can just
12    supplement my discovery with that as well.
13 Q  Yeah, I want you to provide me your assumptions
14    but, you know, you've made the assumptions and I
15    guess I'm trying to determine what those
16    assumptions are and so --
17 A  And I'll provide it all to you in detail, all
18    right?  I'll supplement the Rule 26 disclosures
19    with all the damages information you asked about
20    today.
21 Q  Are you telling me here today that you don't
22    recall the assumptions that formulated your --
23 A  I don't recall the specific assumptions over time.
24 Q  Okay.  Do you recall the beginning assumption?
25 A  Yeah, the beginning assumption was that I would

***Braksick Reporting Service ***
(785)865-6632

226

1     make roughly the same amount, the ending
2     assumption was that I would be clearing more than

Page 191

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 3        $130,000 a year.
 4   Q    Okay.  So your beginning assumption was that you
 5        would earn 80,000 a year?
 6   A    Uh-huh.
 7   Q    And over 20 years at the end of that 20 years you
 8        would be earning 130,000 a year?
 9   A    Yeah, at least, yes.
10   Q    Okay.  And how did you arrive at your assumption
11        that your starting salary would be $80,000 a year?
12   A    Well, I mean, if I don't get the kind of work I'm
13        looking for as attorney, then I'll just supplement
14        it with systems work.
15   Q    Okay.  And in terms of the type of attorney work,
16        because that's going to impact, you know, the
17        earnings, if you were to have graduated and been
18        licensed and admitted and started practicing in
19        October, 2012, what kind of attorney work did you
20        assume you would be doing?
21   A    Family law and civil litigation.
22   Q    In what size firm?
23   A    Sole practitioner.
24   Q    As a sole practitioner?
25   A    Yes.  Mr. Gerstle has expressed a lot of interest
```

***Braksick Reporting Service ***
(785)865-6632

♀

227

```
 1        in taking me under his wing in that regard and
 2        giving me some work as well.
 3   Q    Have you done any salary surveys or -- strike
 4        that.  What market area would you be working in in
 5        October, 2012?
 6   A    Geographical?
 7   Q    What market, legal market?  Salaries are dependent
```

Page 192

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

8     upon the legal market so geographic market.

9  A   Oh, Greater Kansas City.

10  Q   Greater Kansas City, okay.  What, if any, surveys

11     or other information have you looked at to try to

12     determine what the representative earnings are for

13     an attorney who would have a like practice doing

14     family, a solo practitioner doing family law and

15     civil practice?

16  A   Well, I mean, the, most of those surveys apply to

17     people that accept positions with legal sweat

18     shops straight out of law school.  I've got

19     somebody who's interested in helping me build a

20     practice and I've got an avenue where I can

21     supplement my income to whatever extent I need to

22     in the meantime so those probably don't apply in

23     my case.

24  Q   So the individual who is willing to help you with

25     your practice, is that Mr. Gerstle?

***Braksick Reporting Service ***
(785)865-6632

228

1  A   Yes.

2  Q   In terms of paragraph 331, you say that you had a

3     legitimate business expectancy in your future as a

4     practicing attorney.  What's the factual basis for

5     your claim that you had a legitimate business

6     expectancy?

7  A   That I was succeeding in law school and had

8     already cultivated employment interest in the

9     business community.

10  Q   And when you say that you had already cultivated a

11     business interest, or excuse me, an interest in

12     the business community what do you mean?

Page 193

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

13  A    Well, as I said, Mr., Mr. Gerstle has expressed an
14       interest in hiring me if I'm ever able to actually
15       go to school.
16  Q    Anybody else besides Mr. Gerstle who expressed an
17       interest in hiring you as an attorney?
18  A    Well, I'm sure that my background would make me
19       more valuable to tax clients as well.
20  Q    That's not the question I asked.  Anybody else
21       besides Mr. Gerstle who expressed an interest in
22       hiring you as an attorney?
23  A    No, not full time, no.
24  Q    That's not the question I asked.  Not full time,
25       not part time, the question I asked is anybody

***Braksick Reporting Service ***
(785)865-6632

♀
                                                            229

1        else besides Mr. Gerstle ever express an interest
2        in hiring you as an attorney?  It's a yes or no
3        question.
4   A    Well yes.
5   Q    Who?
6   A    Well, I mean several people just in passing
7        conversations.
8   Q    Okay.  Who has expressed an interest in hiring you
9        as an attorney?
10  A    Let's see, Robert Anderson.
11  Q    Robert Anderson?
12  A    Yes.
13  Q    Okay.
14  A    One of, one of my son's friend's fathers.
15  Q    Okay.  How would I contact him?
16  A    I don't know, I'd have to get you his number.  I
17       mean, these are just conversations you have with
Page 194

Brown082611.txt

18    people in passing when you tell them you're going
19    to law school, you know.
20  Q  Okay.  Who else?
21  A  I don't, I don't know.  Nobody else.
22  Q  And did Mr. Anderson, this conversation that you
23    had with him in passing when he wanted --
24  A  He's not satisfied with the way that his attorneys
25    are handling his property matters.

***Braksick Reporting Service ***
(785)865-6632

♀                                                        230

1   Q  Okay.  So that was the question I was going to
2      ask.  In terms of the nature of the legal work
3      that he would engage you for did he tell you what
4      that was?
5   A  Yes.
6   Q  And what was the nature of that legal work that he
7      would like to engage you for?
8   A  Contract work.
9   Q  Contracts relating to what?
10  A  Property.
11  Q  What does he do related to property?  Is he a
12     developer, is he a --
13  A  He's a real estate investor and speculator.  I
14     mean, most of, most of my optimism is based on my
15     belief that I can cultivate a successful practice,
16     and I know that that is speculative.
17     MS. TROWER:  Need to take a quick break,
18     check something, and then we'll probably finish up
19     here pretty quick.
20     (A recess was taken from 4:13 until 4:16.)
21  Q  Mr. Brown, besides the persons who we've named
22     here in the course of discussions of the
Page 195

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

23      deposition, and not all of them would have

24      knowledge about this but what I'm trying to do is

25      define the universe of persons who you believe

                ***Braksick Reporting Service ***
                        (785)865-6632

                                                        231

 1      have knowledge about the facts and circumstances

 2      of the claims that you have asserted in your

 3      Complaint, whether that be damages or the actual

 4      underlying claims that give rise to the

 5      substantive claims raised in each count, are

 6      there, is there anyone else who we have not

 7      discussed here today?

 8  A   I don't believe there's anyone that's not

 9      mentioned in either one of our Rule 26

10      disclosures.

11  Q   Okay.

12  A   Robyn Barr's in there; right?

13  Q   I'm sorry, what?

14  A   Robyn Barr is in there; right?

15  Q   I didn't see her but maybe it didn't register with

16      me.

17  A   If she's not I know she should be but I'm going

18      to, I'm going to have to --

19  Q   Supplement?

20  A   -- supplement anyway so I'll put her in if she's

21      not in that universe, put her in there if she's

22      not.  I believe she was in yours but I'm not sure.

23  Q   She's not specifically enumerated in yours.  I

24      mean, do you enumerate the persons identified by

25      defendants in their disclosure?

                ***Braksick Reporting Service ***
                        (785)865-6632

                        Page 196

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

232

♀

```
 1  A    Robyn Barr then.

 2  Q    And what would Robyn Barr testify about?

 3  A    Well, she will testify that her domestic violence

 4       allegations were false, just like she did in court

 5       the day I was convicted of them.

 6  Q    Just like the day she did in court what?

 7  A    Just like she did in court the day I was convicted

 8       of them and the judge said no one would believe

 9       her but me.

10  Q    For purposes of the record, we talked earlier

11       about substituting a copy of Exhibit 4 for the

12       copy that had or the original that had been

13       marked.  I'm handing you a copy of that.  Can you

14       confirm that that's been accurately reproduced and

15       you're okay with my substituting that for the

16       original marked Exhibit 4?

17  A    I'm not Rain Man but appears to have been

18       accurately reproduced.

19         MS. TROWER:  Okay.  Let's go off the record.

20         (Off the record.)

21  Q    Mr. Brown, at the start of the deposition I asked

22       that you advise me if there were any

23       misstatements, corrections or anything like that.

24       I think there was one correction that you made in

25       the course of the deposition.  As we wrap up here
```

***Braksick Reporting Service ***
(785)865-6632

233

♀

```
 1       has your testimony been complete and accurate to

 2       the best of your knowledge and ability?

 3  A    Yes.

 4  Q    Has there been anything that has prevented you
```

Page 197

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
 5        from being able to answer the questions fully and

 6        completely and to the best of your knowledge?

 7   A    No.

 8   Q    You have the right to read and sign the deposition

 9        so the court reporter will be providing you a

10        transcript and directions with respect to the

11        errata sheet, so --

12   A    Okay.

13            MS. TROWER:  Thank you for your time today.

14        I would like an electronic copy, and if you would

15        attach the exhibits to the transcript.

16            (Deposition concluded at 4:22.)

17                          *****

18

19

20

21

22

23

24

25
```

***Braksick Reporting Service ***
(785)865-6632

234

```
 1

 2        I declare under penalty of perjury that the

 3   foregoing is true and correct.  Executed this _____

 4   day of _____, 2011.

 5            _____

 6                  ROBERT M. BROWN

 7

 8        Subscribed and sworn to before me this _____ day

 9   of _____, 2011.
```

Page 198

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

Brown082611.txt

```
10               _____
11               Notary Public
12  My commission expires:_____.
13                          *****
14
15
16
17
18
19
20
21
22
23
24
25

            ***Braksick Reporting Service ***
                  (785)865-6632
```

                                                    235

```
 1                 C E R T I F I C A T E
 2   STATE OF KANSAS      )
 3   COUNTY OF JEFFERSON ) SS.
 4
 5        I, Candace K. Braksick, Certified Shorthand
     Reporter commissioned as such by the Supreme Court of
     the State of Kansas and authorized to take depositions
 6   within said state pursuant to KSA 60-228 and authorized
     to administer oaths to witnesses pursuant to KSA
 7   20-913, certify that there came before me at 245 Strong
     Hall, 1450 Jayhawk Boulevard, Lawrence, Douglas County,
 8   Kansas, on August 26, 2011, beginning at 9:00 a.m.,
     ROBERT M. BROWN, who was by me first duly sworn to
 9   testify the truth, the whole truth, and nothing but the
     truth concerning the matters in controversy in this
10   cause, and that the deposition given as herein set
     forth was taken by me in shorthand in the presence of
11   said witness and afterwards transcribed under my
     supervision; that I am not a relative or attorney of
12   any party, or clerk or stenographer of any party, or
     otherwise interested in the elements of the action or
13   proceeding.
14        IN TESTIMONY WHEREOF, I have hereunto set my hand
```

Page 199

EXHIBIT 1 TO REPLY TO RESPONSE TO MOTION TO COMPEL

```
                         Brown082611.txt
            and seal this 12th day of September, 2011.
15
                                   _____
16                                 CANDACE K. BRAKSICK, CSR
                                   Kansas Supreme Court No.
17  0386

18

19  REPORTER'S FEE: $_____

20

21

22

23

24

25
```

```
                 ***Braksick Reporting Service ***
                        (785)865-6632
```