IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROBERT M. BROWN,                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )   Case No. 10-CV-2606 EFM/KGG
                                    )
THE UNIVERSITY OF KANSAS, et al.,   )
                                    )
            Defendants.             )

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, through counsel, provide the following Memorandum in support of their Motion for Summary Judgment.

## Statement of the Case

This case arises out of Robert Brown's application to and dismissal from the University of Kansas, School of Law, for materially misrepresenting his qualifications for admission by failing to disclose his criminal history.

Robert Brown applied to the University of Kansas School of Law on April 8, 2009. The School of Law's application for admission contained the following questions:

27.c.  Have you ever been arrested for, charged with, or convicted of a felony, misdemeanor or infraction other than a traffic violation?  (include diversions, sealed or expunged records, and juvenile offenses)

27.d.  Have you ever been arrested for, charged with or convicted of a traffic offense involving alcohol or a controlled substance?   (include diversions, sealed or expunged records, and juvenile offenses)

The application signed by Mr. Brown and the Law School Admission Council (LSAC) certification signed by Mr. Brown, each provided certifying statement, which indicated that Mr. Brown was certifying that the information he was providing in his application was "true and complete."  In addition, both of those documents advised Mr. Brown that there would be consequences for failure to provide truthful and complete information.  As stated in the application, such failure would constitute cause "for denial of [the] application or dismissal from the School of Law."  The LSAC certification informed Mr. Brown that if false information were provided "admission may be voided and [his] matriculation canceled."

On his application for admission, Mr. Brown answered "no" to the above questions.  Mr. Brown, who had been waitlisted, was offered and accepted admission to the School of Law the day before classes began in August 2009.  Approximately a week later, Mr. Brown delivered a letter advising the School of Law that he wished to amend his application answers to disclose two convictions for domestic battery and two DUI convictions.  Following that initial amendment, Mr. Brown disclosed additional criminal charges and DUI's.  All told, Mr. Brown had four DUI's, four arrests for domestic battery resulting in three convictions, and an arrest for criminal trespass that was dismissed. None of which he disclosed in his application for admission to the School of Law.

On June 7, 2010, after internal Law School review of Mr. Brown's amendments to his application and multiple opportunities for him to provide his explanation for failing to disclose his criminal history in his application, Dean Agrawal informed Mr. Brown that he was being dismissed from the Law School, effective June 8, 2010, based "on

falsification, misrepresentation and failure to supply the required information" in support of his application to the School of Law.

When deposed, Mr. Brown admitted that he was aware of his criminal history when he filed his application for admission to the School of Law.  He admitted that he failed to disclose that record on his application for admission because that information "might be looked upon unfavorably by the people reviewing [his] application for admission."  Exhibit E, Brown Deposition pp. 77:8-21.  Thus, Mr. Brown intentionally concealed the true nature of his qualifications concerning his character and fitness for admission to the School of Law and successfully gained admission through his fraud.

Rather than accept responsibility for his fraudulent actions and the consequences of those actions, which were articulated for him in the application and LSAC certification, Mr. Brown has sued the Board of Regents, the University, the Chancellor (official capacity), and four individuals: 1) former Dean Gail Agrawal; 2) current Dean Stephen Mazza (formerly Associate Dean for Academic Affairs, also sued in his official capacity); 3) former Associate Dean for Student Affairs Wendy Rohleder-Sook; and 4) Joyce McCray Pearson, Chair of the University Judicial Board.

Mr. Brown obtains federal jurisdiction by asserting 42 U.S.C. § 1983 procedural due process claims; the first for continued enrollment in the School of Law, and the second for violation of his right to pursue a lawful calling.  (Doc. 144, pp. 29-30).  Mr. Brown also asserts pendent state claims.  (Doc. 144, pp. 30).

As discussed below, the undisputed material facts establish that there is no genuine issue of material fact to warrant a jury trial. Accordingly, defendants are entitled to judgment as a matter of law.

## Procedural History

In his complaint, Mr. Brown named as a defendant the University of Kansas School of Law. The Court granted the School of Law's Motion to Dismiss, holding that the School of Law was a subordinate unit within the University of Kansas and did not have the capacity to sue or be sued. (Doc. 69).

## Statement of Uncontroverted Facts[1][2]

1. The University of Kansas is a state educational institution. *See* K.S.A. 76-711. S.F. ¶ 1.

2. The University of Kansas, a separate state agency, is funded in part by the State of Kansas. *See* K.S.A. 76-712. S.F. ¶ 2.

3. The Kansas Board of Regents, provided for in Kan. Const., Art. 6 §§ 2, 3, and established by K.S.A. 74-3202a, controls and supervises the Kansas state educational institutions, including the University of Kansas. S.F. ¶ 3.

4. The University of Kansas, School of Law, is an academic unit within the University of Kansas, and it is located at 1535 W. 15th Street, Lawrence, Kansas. S.F. ¶ 4.

---

[1] In accordance with summary judgment rules, these facts are set forth in the light most favorable to plaintiff. *See Rezaq v. Nalley*, 677 F.3d 1001, 1010 (10th Cir. 2012).

[2] The Stipulated Facts ("S.F.") are set forth in the individually numbered paragraphs in the Pretrial Order under ¶ 4.a. *See* Doc. 144.

5.     Gail Agrawal was the Dean of the KU School of Law from August 2006 until June 2010.   During that period, Dean Agrawal was an employee of the University of Kansas. S.F. ¶ 5; Exhibit A, Agrawal Decl. ¶ 1.

6.     In 2009-2010, Defendant Stephen W. Mazza was Associate Dean at the School of Law.   In June 2010, he was named the interim Dean of the School of Law, and in April 2011, he was named Dean of the School of Law.   Stephen Mazza was an employee of the University of Kansas at all times in his various capacities with the KU School of Law. S.F. ¶ 6; Exhibit D, Mazza Decl. ¶ 1.

7.     Andy Tompkins is the President and CEO of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, Topeka, Kansas. S.F. ¶ 7.

8.     Bernadette Gray-Little, Chancellor of the University of Kansas, assumed her duties as Chancellor in August 2009, and as Chancellor is an employee of the University of Kansas. S.F. ¶ 8.

9.     In 2009-2010, Joyce McCray Pearson was employed as a faculty member in the University of Kansas, School of Law, and as such she was an employee of the University.  S.F. ¶ 9; Exhibit C, McCray Pearson Decl. ¶ 1.

10.    During the 2009-2010 academic year, Joyce McCray Pearson was the Chair of the University Judicial Board.   S.F. ¶ 10; *See also* Exhibit C, McCray Pearson Declaration ¶ 3.

11. In 2009-2010, Wendy M. Rohleder-Sook was employed in the University of Kansas, School of Law, as Associate Dean for Student Affairs.   S.F. ¶ 11; Exhibit B, Rohleder-Sook Decl. ¶ 1.

12. The University of Kansas' University Senate Code is published online.  S.F. ¶ 12.

13. The University of Kansas' Faculty Senate Rules and Regulations are published online.  S.F. ¶ 13.

14. Art. 22 of the University's Code of Student Rights and Responsibilities defines "Non-Academic Misconduct."  S.F. ¶ 14.

15. The University of Kansas School of Law admissions committee selects students "with the school's primary mission in mind:  'to prepare students to be outstanding members of the legal profession, well-educated in the law, with a commitment to professional achievement and public service.'"  Deposition Ex. 5.

16. Kansas Supreme Court Rule 705, regarding eligibility for licensure to practice law proves that the applicant must demonstrate by clear and convincing evidence that the applicant "possesses the good moral character and current mental and emotional fitness to engage in the active and continuous practice of law." Kan.Sup.Ct. Rule 705.

17. Kansas Supreme Court Rule 705, regarding character and fitness qualifications for admission to the bar, in relevant part, provides:

> (b) Good moral character includes, but is not limited to, the qualities of honesty, fairness, responsibility, trustworthiness, integrity, respect for and obedience to the laws of the state and nation, and respect for the rights of others and for the judicial process.

(c) In determining whether an applicant possesses good moral character, the Board shall consider evidence of the following:

(1) unlawful conduct;

(2) academic misconduct;

. . . .

(4) acts involving dishonesty, fraud, deceit, or misrepresentation;

(5) acts which demonstrate disregard for the rights or welfare of others;

. . . .

(9) the making of false or misleading statements or omission of relevant information, including any false or misleading statement or omission on law school or bar applications in this state or any jurisdiction;

. . . .

18. Plaintiff Robert M. Brown ("Brown") filed an application for admission to the University of Kansas, School of Law, on April 8, 2009.  S.F. ¶ 15; Brown Depo. Exhibit 1[3]; Exhibit B, Rohleder-Sook Decl. ¶ 2.a.

19. The application for admission to the University of Kansas, School of Law, filed by Brown included under the heading "Character & Fitness" following questions to which Brown answered "No:"

c.  Have you ever been arrested for, charged with, or convicted of a felony, misdemeanor or infraction other than a traffic violation? (include diversions, sealed or expunged records, and juvenile offenses)

d.  Have you ever been arrested for, charged with, or convicted of a

---

[3] In paragraph 4.b. of the Pretrial Order, the parties stipulated to the admissibility of all deposition exhibits. *See* Doc. 144 at pp. 17.

traffic violating involving alcohol or a controlled substance? (include diversions, sealed or expunged records, and juvenile offenses)

If you answered "yes" to any of these questions, please explain on a separate sheet or electronic attachment submitted with your application and provide the date, nature of the offense or proceeding, name and location of the court or tribunal, and disposition of the matter.

S.F. ¶ 16; *See also* Brown Deposition Exhibit 1.

20. The application for admission to the University of Kansas, School of Law, filed by Brown included the following certification, which Brown acknowledged by his electronic submission of the application:

I certify, that, to the best of my knowledge, the information stated in this application and in any supporting documents submitted is true and complete. I understand that falsification, misrepresentation or failure to supply required information in connections with this application is sufficient cause for denial of my application or dismissal from the School of Law. I understand that I have the duty to notify the Office of Admissions if there are any changes in my answers after this application is submitted.

S.F. ¶ 17; *See also* Brown Deposition Exhibit 1.

21. With his electronically submitted application to the University of Kansas, School of Law, Brown also submitted the "Certification Letter," which he signed, and which included the following statements:

I certify that the information I have provided is true and complete; that I will notify the Office of Admissions immediately if there is any change in the information that I have provided in this application; that I am the author of the statements or additional information included with this application; and that I understand the statements made herein are the basis upon which my application will be decided. In the event that any information is subsequently found to be false, I understand that my admission may be voided and my matriculation canceled. I understand that I have a duty to notify the Office of Admissions in

> writing if there are any changes in my answers after this application is submitted.
>
> I understand that admission is conditional upon meeting the requirements stated in the University of Kansas School of Law catalog, and any further conditions expressed at the time of admission. The School of Law does not authorize nor is it bound by any requirements or conditions other than those communicated by the Office of Admissions.

S.F. ¶ 18, *See also* Brown Deposition Exhibit 1.

22. On April 15, 2009, Brown was offered a spot on the University of Kansas, School of Law's waitlist.  S.F. ¶ 19; Exhibit B, Rohleder-Sook Decl. ¶ 2.b.

23. On April 21, 2009, Robert Brown accepted the placement on the waitlist by submitting the Law School's standard form.  S.F. ¶ 20; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.c.

24. By letter dated May 17, 2009, Brown provided additional materials to supplement his application for admission to the School of Law, including a statement about his specific interest in KU Law and an additional optional essay. S.F. ¶ 21; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.d.

25. On August 19, 2009, Brown was offered admission to the KU Law fall 2009 entering class.  S.F. ¶ 22; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.e.

26. On August 20, 2009, Brown submitted a seat deposit fee waiver form to the KU School of Law and was admitted. S.F. ¶ 23; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.f.

27. The first day of classes for the Fall 2009 academic term at the University of Kansas was August 20, 2009. S.F. ¶ 24.

28. On August 27, 2009, after the start of classes at the University of Kansas, School of Law, Brown submitted a letter stating, "I would like to amend my law school application," and amending his answer to question 27, disclosing the following criminal convictions:

| Case No | Tribunal | Charge | Finding |
|---------|----------|--------|---------|
| 96DV290 | Jo Co Dist Ct | Domestic | Battery Guilty |
| 96DV740 | Jo Co Dist Ct | Domestic | Battery Guilty |
| 90???? | Jo Co Dist Ct | DUI | Guilty |
| 79???? | Shawnee Co | DUI | Guilty |

S.F. ¶ 25; *See also* Brown Deposition Exhibit 3; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.g.

29. On August 27, 2009, in response to Brown's letter, he was asked to provide a further explanation regarding the criminal matters that he had disclosed on that date. S.F. ¶ 26; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.h.

30. On September 3, 2009, Wendy Rohleder-Sook made another request to Robert Brown asking him to provide further explanation regarding the criminal charges that he had disclosed in his August 27, 2009, amendment letter. Exhibit B, Rohleder-Sook Decl. ¶ 2.i. and attached Bates 00046 referenced therein.

31. On September 11, 2009, Brown provided a letter in which he provided additional information concerning "the facts contained within [his] letter of August 27th,

2009."  S.F. ¶ 27; Brown Deposition Exhibit 5; Exhibit B, Rohleder-Sook Decl. ¶ 2.j.

32.  On October 2, 2009, Wendy Rohleder-Sook e-mailed Robert Brown to advise him that additional charges ("12/05/94, Battery, dismissed by prosecutor; 12/21/94, Battery, dismissed by prosecutor; and 4/23/04, Criminal Trespass, dismissed by prosecutor") regarding him had been discovered, and asking him to provide written authorization to the Johnson County District Attorney's office to release full information and documents to the Law School regarding those charges, and an explanation for why he did not disclose those criminal matters on his application for admission or in his subsequent amendment.  S.F. ¶ 28; Brown Deposition Exhibit 6; Rohleder-Sook Decl. ¶ 2.l.

33.  On October 2, 2009, Robert Brown responded via e-mail to Ms. Rohleder-Sook and provided additional information concerning the charges she had noted in her e-mail.  S.F. ¶ 29; Brown Deposition Exhibit 6.

34.  On October 7, 2009, the Law School requested copies of records from the Johnson County District Court Clerk's Office.  Sometime thereafter, the District Court Clerk's Office provided a copy of the trial record for the prosecutions in the DV290 and DV740 domestic battery charges against Brown.  S.F. ¶ 30; Rohleder-Sook Decl. ¶ 2.m.

35.  When asked at deposition to recount his criminal history with respect to arrests, charges, and convictions, Mr. Brown acknowledged the following record:

- 1979 arrest for DUI in Topeka which was pled down to reckless driving;
- 1982 or 1984 arrest in Topeka for DUI for which he received a diversion;
- 1986 arrest in Overland Park for DUI for which he was convicted and sentenced to two days in jail, community service and a 90-day suspension of his driver's license;
- During the period 1994-1996, Mr. Brown was arrested on three separate occasions and charged with four charges of domestic battery, which resulted in his being convicted on three of those charges and his receiving probation;
- 1999 Mr. Brown was arrested for DUI in North Kansas City, Missouri, but that charge was later dismissed.

Exhibit E, Brown Deposition pp. 67:8 – 68:21.

36.  At deposition, Mr. Brown admitted that at the time that he answered "no" to questions 27c and 27d on his application for admission, he in fact knew that he had incidents in his history that were responsive to those questions:

> Q   And at the time that you answered question No. 27c
> no you knew that you had been arrested for
> domestic battery on three separate occasions;
> correct?
> A   Correct.
>
> Q   And at the time that you answered question No. 27c
> no you knew that you had been charged with
> misdemeanors regarding domestic battery on four
> separate charges; correct?
> A   Yes.
>
> Q   And despite knowing that you failed to disclose
> those arrests and those charges in response to
> question No. 27; correct?
> A   I felt that they were too remote to be relevant to
> the application.
> Q   That's not the question I asked.  You failed to
> disclose --
> A   Yes, I did fail to disclose them.

. . . .

Q    And in response to question 27d regarding charges
involving alcohol or a controlled substance, at
the time that you answered the question no you
knew that you had been arrested for DUI and
charged with DUI in 1979 in Topeka; correct?
A    Yes.

Q    And despite knowing that you failed to disclose
that 1979 arrest and charge of DUI in Topeka in
your application; correct?
A    Yes.

Q    All right.  At the time that you answered question
No. 27d no you did know that in 1982 or 1984 you
were arrested for DUI in Topeka and received a
diversion; correct?
A    Yes.

Q    And you failed to disclose the 1982 or 1984 arrest
for DUI in Topeka and the diversion that you
received on that charge?
A    Yes.

Q    At the time that you answered the question 27d,
you answered that question no you knew that in
1986 you had been arrested in Overland Park for a
and were convicted on that offense; correct?
A    Yes.

Q    And at the time that you answered no to the
question No. 27d you failed to disclose the 1986
Overland Park arrest for DUI and conviction;
correct?
A    Yes.

Q    At the time that you filed your application and
answered question No. 27d in the application no
you knew that you had been arrested for DUI in
North Kansas City, Missouri, in 1999; correct?
A    Yes.

> Q    And at the time that you answered question No. 27d
> no you failed to disclose the 1999 DUI arrest in
> North Kansas City, Missouri; correct?
> A    Yes.

Exhibit E, Brown Deposition pp. 71:25 – 73:2; 74:14 – 75:16.

37.   At deposition, Mr. Brown admitted that at the time he filled out his Law School application, he figured that his criminal history "might be looked upon unfavorably by the people reviewing [his] application for admission."  Exhibit E, Brown Deposition pp. 77:8-21.

38.   Plaintiff Brown sat for finals in December 2009.  S.F. ¶ 31.

39.   Plaintiff Brown received grades for the Fall Semester of 2009.  S.F. ¶ 32.

**Review within Law School concerning Brown's Application Misrepresentations**

40.   On January 19, 2010, the 2008-2009 Law School Admissions Committee convened to consider the status of Mr. Brown's application and determined that they would have rejected his application if they had known of the criminal charges he failed to disclose.  S.F. ¶ 33.

41.   Following the Admissions Committee's decision, Associate Dean Rohleder-Sook consulted Associate Dean Mazza, who advised that Mr. Brown would be afforded due process through the Law School Dispute Resolution Procedure, and that to initiate that process, Rohleder-Sook should file a complaint regarding Mr. Brown's failure to disclose his criminal history in his application.  Exhibit B, Rohleder-Sook Decl. ¶ 3; Exhibit D, Mazza Decl. ¶ 5.

42. On February 17, 2010, Wendy Rohleder-Sook filed with Associate Dean Stephen Mazza a letter with the reference "Allegation of Academic Misconduct:  Robert M. Brown," which outlined as a basis for the charge Mr. Brown's answers to questions 27.c. and 27.d. on his application for admission.  S.F. ¶ 34; Exhibit B, Rohleder-Sook Decl. ¶ 4; Exhibit D, Mazza Decl. ¶ 6.

43. During the pendency of the School of Law's Allegation of Academic Misconduct, Defendant Mazza communicated with plaintiff Brown via emails that had as the subject line: "Disciplinary Procedures."  S.F. ¶ 51.

44. Mr. Brown responded to Ms. Rohleder-Sook's February 17, 2010, academic misconduct charge, in a response dated February 28, 2010.   S.F. ¶ 35; Exhibit B, Rohleder-Sook Decl. ¶ 4.

45. On April 16, 2010, Rohleder-Sook responded to the procedural objections contained in Mr. Brown's February 28, 2010, response.  Exhibit B, Rohleder-Sook Decl. ¶ 4.

46. A hearing panel convened to consider the charge of academic misconduct against Brown issued a Memorandum decision dated May 3, 2010, dismissing the academic misconduct complaint against Brown.  S.F. ¶ 36; Exhibit B, Rohleder-Sook Decl. ¶ 5.

47. In the School of Law's hearing panel's May 3, 2010 Memorandum decision, the panel stated, in part:

> The complaint fails to allege a violation of Section 2.6.1 or, to use the words of U.S.S.R. Section 6.5.3.1(d), any other University rule.

> Therefore, we hereby dismiss Dean Wendy Rohleder-Sook's complaint of February 17, 2010.

S.F. ¶ 37.

48. The Law School hearing panel's May 3, 2010 Memorandum decision also stated, in part:

> While we are not aware of any University rule prohibiting misrepresentation on an application for admission, we do not believe that is the end of this matter.  Mr. Brown's application states "I understand that falsification, misrepresentation or failure to supply the required information in connection with this application is sufficient cause for denial of my application or dismissal from the School of Law."  Similarly, Mr. Brown's LSAC letter certifying his electronic application to the Law School states:
>
>> I certify that, to the best of my knowledge, the information stated on this application and in any supporting documents submitted is true and complete.  I understand the falsification, misrepresentation or failure to supply required information in connection with this application is sufficient cause for denial of my application or dismissal from the School of Law.  I understand that I have a duty to notify the Office of Admissions if there are any changes in my answers after this application is submitted.
>
> In each of these documents, singed by Mr. Brown, he acknowledges the Law School's right to dismiss him if his application for admission contains a misrepresentation.  Mr. Brown's August 27, 2009, letter to Dean Wendy Rohleder-Sook clearly concedes that he did in fact make misrepresentations on his application.  Therefore, we recognize that the Law School has the right to dismiss Mr. Brown even though this Hearing Panel does not have the authority to hear this case.

*See* Brown Deposition Exhibit 7.

49. Wendy Rohleder-Sook's formal involvement with Mr. Brown's application and failure to disclose his criminal history in that application was concluded with the

16

May 3, 2010 issuance of the hearing panel's Memordandum decision dismissing the complaint she had filed.  Exhibit B, Rohleder-Sook Decl. ¶ 6.

50. In her dealings with Mr. Brown, Wendy Rohleder-Sook acted in good faith in the exercise of her professional judgment and discretion in carrying out her responsibilities as Associate Dean for Student Affairs.  Exhibit B, Rohleder-Sook Decl. ¶ 7.

51. Following receipt of the hearing panel's May 3, 2010, Memorandum, Associate Dean Mazza consulted with Dean Agrawal, who determined that the issue of Robert Brown's misrepresentations in his application for admission was her responsibility to decide.  Exhibit D, Mazza Decl. ¶ 9;  Exhibit A, Agrawal Decl. ¶ 3.

52. Throughout his dealings with Mr. Brown concerning his misrepresentations on his application for admission to the Law School, Associate Dean Mazza acted in good faith in the exercise of his professional judgment and discretion in carrying out his responsibilities as Associate Dean for Academic Affairs.  Exhibit D, Maaz Decl. ¶ 10.

53. Plaintiff Brown is the only student whom defendant Mazza is aware has been removed from the School of Law after filing an amended application.  S.F. ¶ 48.

54. Dean Mazza testified that he is not aware of any admissions policies of the School of Law other than those posted publicly on the School of Law's website.  S.F. ¶ 52.

55.  Defendant Mazza testified he did not pursue disciplinary measures against Brown. S.F. ¶ 62.

56.  Brown began attendance at his 2010 summer session Law School class.  S.F. ¶ 38.

57.  When the issues of Mr. Brown's misrepresentations on his application for admission to the Law School came to Dean Agrawal's attention for determination, Dean Agrawal sought the legal advice of the University's Office of General Counsel.  Exhibit A, Agrawal Decl. ¶ 4.

58.  In a letter dated May 25, 2010, Dean Gail B. Agrawal advised Mr. Brown that she planned to dismiss him from the School of Law effective June 8, 2010, "for falsification, misrepresentation, and failure to supply complete, accurate and truthful answers to [his] application for admission to the School of Law."  Dean Agrawal's letter further advised Mr. Brown:  "If you believe that this action is inappropriate or that there are mitigating factors that I should consider before dismissing you, then you must provide me with a written response to this letter by 2:00 p.m. on June 3, 2010."  S.F. ¶ 39; *See also* Exhibit A, Agrawal Decl. ¶ 4, and Brown Deposition Exhibit 8.

59.  In a letter dated May 27, 2010, Brown provided to Dean Agrawal his "written response to [her] letter dated May 26, 2010 [sic]" and in that letter "request[ed] a personal meeting with [her] to discuss this matter."  S.F. ¶ 40; Brown Deposition Exhibit 9.

60. On May 28th, 2010, Agrawal responded to Brown's request for a personal meeting via email, stating: "I see no need to meet with you, and therefore decline your request for a meeting." S.F. ¶ 41.

61. After considering Mr. Brown's May 27, 2010 response to her letter advising him of her intent to dismiss him from the School of Law, Dean Agrawal wrote Mr. Brown on June 7, 2010, to advise him that he was dismissed from the School of Law effective, June 8, 2010. Exhibit A, Agrawal Decl. ¶'s 5-6; Brown Deposition Ex. 10.

62. Gail Agrawal's June 7, 2010 dismissal letter stated, in part, that the School of Law's transcript would show that plaintiff Brown's dismissal from the Law School was based on "falsification, misrepresentation, and failure to supply required information on [his] application to the School of Law." S.F. ¶ 50; Exhibit A, Agrawal Decl, ¶ 6; Brown Deposition Exhibit 10 referenced therein.

63. Gail Agrawal consulted with the Office of General Counsel in composing her June 7, 2010 letter of dismissal to Brown. S.F. ¶ 61.

64. The reference in Dean Agrawal's June 7, 2010 letter to her decision to dismiss Mr. Brown from the Law School constituting "final agency action" was included in the letter based on advice of legal counsel. Exhibit F, Response to 3d Interrogatories to Agrawal, Interrogatory No. 3.

65. In making her decision to dismiss Robert Brown from the School of Law based on his failure to disclose his criminal history on his application for admission, Dean Agrawal acted in good faith, exercising her professional academic judgment and

discretion in carrying out her duties and responsibilities as Dean.   Exhibit A, Agrawal Decl. ¶ 8.

66. Dean Agrawal testified she was unaware of any admissions policies of the School of Law other than those published on the School of Law web site.  S.F. ¶ 56.

**Brown's Attempt to Invoke University Judicial Board Jurisdiction**

67. In a letter dated May 31, 2010 addressed to the "Chair of the University Judicial Board," Brown submitted a "Request for Initial Hearing before the Judicial Board Pursuant to 6.4.3.1(b) of the University Senate Rules and Regulations and Election to Invoke the Jurisdiction of the University Judicial Board Pursuant to University of Kansas Law School Dispute Resolution Procedure Section (A)(4)(c)."  S.F. ¶ 42; Exhibit B, McCray Pearson Decl. ¶ 7.

68. In a letter dated May 31, 2010 address to the "Chair of the University Judicial Board," Brown also submitted a "Request for Jurisdictional Ruling pursuant to 6.5.2.1 of the University Senate Rules and Regulations."   S.F. ¶ 43; Exhibit B, McCray Pearson Decl. ¶ 7.

69. In a letter dated June 3, 2010, Joyce McCray Pearson, Chair University Judicial Board, informed Brown:

> I have reviewed your requests for a jurisdictional ruling and an initial hearing, both dated May 31, 2010.  I have also reviewed University Regulations to determine whether they authorize the Judicial Board to exercise jurisdiction in your case.  I regret to inform you that I have found no basis for jurisdiction by the Judicial Board.
>
> The Faculty Senate Rules and Regulations (FSRR) 2.1.1 gives the authority for policies on admission to the faculties of the various schools and the College (see excerpt below).

.    .    .    .

Admission standards lie within the jurisdiction of the schools and College because the academic evaluation lies within the individual department and the professors who have expertise in that field

Pursuant to University Senate Rule and Regulation 6.5.3.1(c), I hereby dismiss your petition. I have concluded that the Judicial Board lacks jurisdiction over the subject matter.

This Judicial Board decision is the final determination of this matter by the university. If you wish to proceed outside the university, Chancellor Bernadette Gray-Little is the agency officer who should receive any service or subsequent petition for judicial review of this action.

S.F. ¶ 44; Exhibit B, McCray Pearson Declaration ¶ 8.

70. Joyce McCray Pearson had no knowledge of Robert Brown prior to his May 31, 2010, filings with the University Judicial Board. Exhibit B, McCray Pearson Decl. ¶ 8.

71. In reviewing and considering Robert Brown's May 31, 2010 Judicial Board filings and determining that the Judicial Board did not have jurisdiction, Joyce McCray Pearson, acted independently and in good faith exercising her independent judgment and discretion in carrying out her responsibilities as Judicial Board Chair. Exhibit B, McCray Pearson Decl. ¶ 10.

72. McCray Pearson testified that at the time of ruling on Brown's requests before the Judicial Board, she had never seen Wendy Rohleder-Sook's February 17, 2010 academic misconduct complaint against Brown. S.F. ¶ 59.

73.  In response to interrogatories regarding involvement with other amended applications, defendant Joyce McCray Pearson testified that she had never been involved in any other situation involving an amended application to the School of Law.  S.F. ¶ 49.

74.  In November of 2009, Chancellor Bernadette Gray-Little created an Admissions task force to pursue strategic initiatives of the University of Kansas in the area of Student Success.  S.F. ¶ 45.

75.  Chancellor Gray-Little's charge to the Admissions task force stated that the overarching goal of this enrollment planning initiative was student success.  S.F. ¶ 46.

76.  The University Director of the Office of Admissions has no record of the School of Law having filed with it the School of Law's policies for admission and readmission.  S.F. ¶ 47.

77.  The School of Law's Honor Code, in part, states:

>    IV. Sanctions:
>
>    .        .        .        .
>
>    8. Permanent expulsion from the School of Law.  Permanent expulsion should be reserved only for the most serious offenses, especially because disciplinary expulsion of a law student from a member of the Association of the American Law Schools prevents that student from enrolling in any other member schools.

S.F. ¶ 53.

78.  The University of Kansas School of Law Dispute Resolution procedure, states, in part:

Section 2:  Rights of Parties

(a) The Dispute Resolution Procedures shall be applied so as to protect the due process and other rights of parties to the dispute.

(b) Parties to the dispute shall receive reasonable notice of any charges or allegations against them, of the time and place of any hearing, and of the material issues to be determined.

(c) With due regard for the authority of the hearing body to exclude irrelevant, immaterial, cumulative or improper evidence, parties to the dispute shall have a full and fair opportunity to present their version of events, present and cross examine witnesses, or otherwise plead their case, and may be represented by counsel at their own expense.

(d) Parties to the dispute are entitled to a decision by an impartial hearing body based upon the record of the proceedings. Members of the hearing body shall not communicate with each other or with any other person on matters material to the dispute except through the hearing process.

(e) The hearing body and others administering the dispute resolution procedures shall respect the confidentiality of the proceedings. Confidentiality does not apply to information that is relevant to the investigation or prosecution of a disciplinary action by the Disciplinary Administrator of the Kansas Bar, any matter relating to the admission of an attorney to the bar of any state or federal jurisdiction or court, or in any case where disclosure is required by court order or other legal authority.

S.F. ¶ 54.

79.  The University of Kansas Student Code of Rights and Responsibilities states, in part, that it "applies to all university students, administration, faculty and staff." S.F. ¶ 55.

80.  The University of Kansas' University Senate Code states, in part, that it "applies to faculty, staff and students."  S.F. ¶ 57.

81.  The Faculty Senate Rules and Regulations, in pertinent part, state:

> 2.1.1.  Policies for admission and readmission are established by the faculties of the various schools or the College, within the parameters of state laws and Regents regulations and within guidelines set by the Faculty Senate.  A statement of such requirements shall be published or filed with the Director of Admissions and the Secretary of the Faculty Senate. For undergraduate admission, implementation of these policies by the Director of Admissions includes the initial evaluation of credentials presented by applicants covering academic work done elsewhere.

S.F. ¶ 58.

82. When Brown's notice of pending litigation arrived in the Chancellor's office, it was delivered to the Office of General Counsel, and it was the office of General Counsel that responded.  S.F. ¶ 60.

83. Brown was academically successful as a law student at the University of Kansas. S.F. ¶ 63.

84. The School of Law permitted Brown to enroll in the Fall 2009, Spring 2010, Summer 2010, and Fall 2010 sessions before his removal from the School of Law. S.F. ¶ 64.

**Factual Basis for Brown's Claim against Kansas Board of Regents**

85. Mr. Brown's deposition testimony made clear that his claim against the Board of Regents is premised not on the Regents having any direct knowledge of or involvement with his enrollment at and dismissal from the University of Kansas School of Law, but simply on the supervisory role that the Board of Regents has over the University of Kansas.

> Exhibit E, Brown deposition pp. 107:4-20.

24

A   My claim is that the Board of Regents is beholden to honor my enrollment contract, and perhaps they weren't involved in the minutiae of the enrollment process; hoever, they do oversee the chancellor, they oversee all the universities, they approve the regulations, they establish limits on what can and cannot be done. One important, one important limit that's of that nature is that the actions taken in the universities and regulations that they promulgate can't be contrary to state law and they can't be contrary to federal constitutional law and to the extent that that's happened here the Regents are beholden to correct it and to the extent that the Board of Regents condones what's happened here, then they're in breach of the contract.

86.   At deposition, Brown admitted that the Board of Regents had no knowledge of him or his claims until it was served with the lawsuit.

Exhibit E, Brown deposition pp. 115:22 – 116:17

Q   Tell me specifically what facts you can point to that say that the Board of Regents members knew of your specific application to the School of Law before this lawsuit was filed.
A   I don't have any facts that say they knew of what was in my application before the lawsuit was filed.

Q   And you don't have any facts that they even knew that they had applied to the School of Law; correct?
A   No, correct, specifically me, no.

Q   Yes.  And you don't have any facts at all which show that Andy Tomkins knew anything about your dismissal from the School of Law before this lawsuit was filed, correct?
A   Not before the lawsuit.

Q   And similarly you don't have any facts which say that any of the individual members of the Board of Regents knew anything about your dismissal from the law school before this lawsuit was filed; correct?
A   No, not before the lawsuit was filed.

87.   At deposition, Mr. Brown admitted that the Kansas Board of Regents does not admit students to the University of Kansas, and that he did not submit his

application or amended application materials to the Kansas Board of Regents, stating that "the Board of Regents took no overt action" against him, and that his reason for naming them as defendants was solely "legal" because he believed it to be the correct official capacity defendants.  Exhibit E, Brown depo. 111:1 – 112:25.

**Brown's claims**

88.  At deposition, Mr. Brown stated that his Count V, state claim for gross and wanton negligence, was against the individual defendants, Agrawal, Mazza, Rohleder-Sook, and McCray Pearson and the University.  Exhibit E, Brown depo. pp. 116:23 – 117:12.

89.  At deposition, Mr. Brown stated that his Count VI, state claim for tortious interference with respect to business advantage, was against the same defendants as Count V.  Exhibit E, Brown depo. pp. 119:8-14.

90.  At deposition, Mr. Brown stated that his Count VIII, state claim for civil conspiracy, was against the individual defendants, and explained the factual basis for his claim was his supposition that they were aware of his due process rights and dismissed him without a personal appearance.  Exhibit E, Brown depo. pp. 120:19 – 122:5.

91.  At deposition, Mr. Brown was unable to identify any specific date or event evidencing a meeting of the minds between the alleged conspirators; rather in describing the factual basis for his claim against each, he identified their having taken an action with which he disagreed.  Exhibit E, Brown depo. pp. 122:8 -

132:2.

92. Since his dismissal from the School of Law, Mr. Brown has not sought admission to any other law school.  Exhibit E, Brown Depo. 154:23 – 155:1.

## ARGUMENT AND AUTHORITIES

### I.   Questions Presented.

**A.** Whether Mr. Brown, who admits that he purposely concealed his criminal history on his application for admission to the School of Law because he was concerned it would not be looked upon favorably, can demonstrate a genuine issue of material fact on his § 1983 due process claims against the individual defendants Agrawal, Mazza, Rohleder-Sook, and McCray-Pearson.

**B.** Whether defendants are entitled to qualified immunity on Mr. Brown's 42 U.S.C. § 1983 claims.

**C.** Whether the defendants are entitled to immunity from liability on Mr. Brown's pendent state claims under the Kansas Tort Claims Act discretionary function exception.

**D.** Whether Mr. Brown's pendent state law claims are barred by the doctrine of equitable estoppel.

**E.** Whether Mr. Brown can demonstrate the existence of a genuine issue of material fact on his state claim for gross and wanton negligence.

**F.** Whether Mr. Brown can demonstrate the existence of a genuine issue of material fact on his state for tortious interference with a prospective business advantage.

**G.** Whether Mr. Brown can demonstrate the existence of a genuine issue of material fact on his state claim for civil conspiracy.

**H.** Whether Mr. Brown is entitled to seek punitive damages.

## II.    Summary Judgment Standard.

Summary judgment is "designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate when the evidence is "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir.2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998)).

A party opposing a motion for summary judgment "cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988). Nor can the party avoid summary judgment by "repeating conclusory opinions, allegations unsupported by specific fact, or speculation." *Tadlock v. United States DOT*,

2013 U.S. Dist. LEXIS 30868; 2013 WL 823309 (March 6, 2018), *citing* Fed.R.Civ.P. 56(c)(4), *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).  Instead, the party must provide reference "to an affidavit, a deposition transcript, or a specific exhibit incorporated therein" to establish the existence of a genuine disputed issue of material fact.  *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

A fact is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

**III.    Defendants are Entitled to Summary Judgment as a Matter of Law.**

**A.  Board of Regents should be dismissed based on lack of evidence of any involvement in this matter.**

Mr. Brown has named the Kansas Board of Regents as a defendant in this case.  It is clear that the only reason that Mr. Brown has named the Board of Regents is because the Board, pursuant to statute, has supervisory and oversight responsibility for the Regents institutions, including the University of Kansas.  However, Mr. Brown has admitted that the Board of Regents had no knowledge of him and no involvement in his admission to the University of Kansas School of Law or dismissal therefrom.  Facts ¶'s 85-87.  In fact, he admitted that the Board of Regents knew nothing of Mr. Brown until he served his lawsuit on it.  Facts ¶ 86.

It is well established that a § 1983 claim cannot be supported based on *respondeat*

*superior.  McKee v. Heggy*, 703 F.2d 479, 483 (10th Cir. 1983) (citing *McClelland v.*

*Facteau*, 610 F.2d 693 (10th Cir. 1979)).  Similarly, in order to find liability on any other

claim, whether it be injunctive or otherwise, Brown must show some actual connection

by the Board of Regents to the alleged injuries he has suffered.  This he cannot do.

Accordingly, the Regents should be granted judgment as a matter of law and dismissed.

### B.  Brown's 42 U.S.C. § 1983 Procedural Due Process Claims.

Mr. Brown claims that his procedural due process rights guaranteed him under the

fourteenth amendment were violated by defendants Agrawal, Mazza, Rohleder-Sook, and

McCray Pearson as a result of his dismissal from the School of Law.  On these claims,

Mr. Brown requests not only damages against the individual defendants, but he also seeks

prospective injunctive relief against "the Official Capacity Defendants."  Compl. pp. 46.

The fourteenth amendment provides that the states shall not "deprive any person

of life, liberty, or property, without due process of law."  Const. amendment XIV, § 1.

Courts agree that an expectation of receiving process, is not, without more, a liberty or

property interest protected by the due process clause of the fourteenth amendment.  *See*

*Olim v. Wakinekona*, 461 U.S. 238, 250 n. 12, 103 S.Ct. 1741, 1748 n. 12, 75 L.Ed.2d

813 (1983).

Procedural due process claims are evaluated by asking first, "whether there exists

a liberty or property interest which has been interfered with by the State," and second,

"whether the procedures attendant upon that deprivation were constitutionally sufficient."

*Lauck v. Campbell Cnty.*, 627 F.3d 805, 811-12 (10th Cir. 2010) (quoting *Ky. Dep't of*

*Corr. V. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L. Ed. 2d. 506 (1989)).

In this case, Brown claims that he had "a legitimate claim of entitlement to his continued enrollment in the School of Law" and a right to pursue a lawful calling of his own choosing, which he claims are protected property or liberty interests that were violated when he was dismissed from the School of Law.  (Doc. 144, pp. 30).

Initially, it must be noted that the record establishes that the decision to dismiss Mr. Brown from the School of Law was made by Dean Gail Agrawal alone.  (Facts ¶ 51, 58, 61-62, 64).  Accordingly, the undisputed evidence establishes that Associate Dean Mazza, Associate Dean Rohleder-Sook, and Judicial Board Chair McCray Pearson did not dismiss Mr. Brown from the School of Law.  Therefore, as a matter of law, Mr. Brown has failed to state a claim against defendants Mazza, Rohleder-Sook, and McCray Pearson, each of whom should be granted summary judgment.[4]

### 1.  Brown's claimed property interest in continued enrollment.

Turning to the substance of Mr. Brown's due process claims, "[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-72, 33 L.Ed.2d 548, 92 S.Ct. 2701 (1972).  In order to demonstrate the existence of a property or liberty interest, a plaintiff "must have more than an abstract need or desire for

---

[4] Defendants believe they are entitled to judgment because they are not the individuals who dismissed Mr. Brown from the School of Law; that decision instead was Dean Agrawal's.  However, if the Court disagrees with these defendants' analysis of Mr. Brown's claim and the cause giving rise to his claim, then they ask that the Court consider them in the arguments that are put forward concerning the claims against Dean Agrawal, for the legal analysis and factual deficiencies in Mr. Brown's claims are the same with respect to these defendants.

it . . . [or] a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972). Property interests are derived from "existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

In the higher education context, the existence of a property interest generally has been assumed rather than found in cases involving matriculated, or at least admitted, students. For example, the Supreme Court has assumed that a student enrolled in a degree program has either a property interest, *See Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 223, 88 L. Ed. 2d 523, 106 S. Ct. 507 (1985) (holding that university's dismissal of student did not violate substantive due process), or a liberty interest in continued enrollment. *See Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 84-85, 55 L. Ed. 2d 124, 98 S. Ct. 948 (1978) (finding that the university's medical school's dismissal of student did not violate substantive due process).

Following the Supreme Court's lead, other courts have similarly assumed the existence of a property or liberty interest. *See Martin v. Helstad*, 699 F.2d 387, 390 (7th Cir. 1983) (assuming existence of property interest where plaintiff was admitted to law school but then had admission revoked when school learned application failed to disclose felony conviction); *Amelunxen v. University of P.R.*, 637 F. Supp. 426, 430 (D.P.R. 1986), aff'd 815 F.2d 691 (1st Cir. 1987) ("[Defendants] may assume, as the Supreme Court has done, and we will do, that a student has either a property or liberty interest in

32

continuing education.").

In contrast, other courts have found that an admitted student does not have a property interest. *See Unger v. National Residents Matching Program, 928 F.2d 1392, 1397 (3rd Cir. 1991)* (holding student accepted into university hospital residency program that was discontinued prior to her enrollment did not have property interest in pursuit and continuation of medical education).

Whether a property interest exists is a question of law. *Burns v. Bd. of Comm'rs of Cnty. of Jackson, Kan.*, 197 F.Supp. 2d 1278, 1287 (D. Kan. 2002) (citing *Tarabisi v. McAlester Reg. Hosp.*, 827 F.2d 648, 651 (10th Cir. 1987)). Mr. Brown asserts that his interest in continued enrollment in the School of Law is "derived from Kansas contract law." (Doc. 144, pp. 32 ¶ 1). Mr. Brown, however, admits that "there is no formal enrollment contract." (*See* Complaint ¶ 156)[5]

Acknowledging the absence of an express written contract, Mr. Brown instead asserts that his application to the School of Law was an offer to contract, which was accepted when he was admitted in Fall 2009. *See* Complaint ¶'s 147-148. And that when his tuition was accepted for the Spring 2010 term, the University "created a binding enrollment contract . . . [to] provide a legal education which would lead to a Juris Doctor degree." *See* Complaint ¶ 151.

Mr. Brown has not identified any Kansas case, and counsel likewise has been unable to find any, holding that a contract is created between a student and a State

---

[5] **Because the Law School curriculum is a prescribed three-year course of study not capable of completion within a year, the statute of frauds would require that any contract between Mr. Brown and the University of Kansas be an express, written agreement.  *See* K.S.A. 33-106.**

university when the student is admitted or tuition is accepted. Even if Kansas law recognized the creation of such a contract, it does not mean a contract was established in this case.

Mr. Brown's contract argument ignores the critical fact concerning the manner in which he obtained admission to the School of Law. Mr. Brown, knowing that his application would not be considered favorably if he were truthful and disclosed his criminal history, instead chose to fraudulently conceal that information and the true nature of his character and fitness qualifications for admission. By his fraudulent act, he induced the School of Law to admit him. Further, the evidence before the Court proves the omission was material; first by the presence of the questions on the application itself, and second by the attestations contained in the application and the LSAC certification.

Kansas law is clear that fraud vitiates whatever it touches, including contracts. *Stegman v. Professional & Business Men's Life Ins. Co.*, 173 Kan. 744, 751, 252 P.2d 1074 (Kan. 1953), citing *Klemp v. Winter*, 23 Kan. 699, 703 (Kan. 1880); *U.S. v. 1,557.28 Acres of Land in Osage County, Kansas*, 486 F.2d 445, 448 (10th Cir. 1973); *See also Martin v. Helstad*, 699 F.2d 387, 389 (7th Cir. 1983) (Expressing concern whether a mutually explicit understanding based on offer and acceptance can exist when the offer is procured by the applicant's fraud. (Citation ommitted)). Accordingly, Kansas law establishes that Mr. Brown's fraudulent inducement voided any contract that otherwise might have been formed in the course of his dealings with the School of Law. In the absence of a contract, Mr. Brown has no property interest that is subject to protection under the fourteenth amendment. Therefore, his § 1983 due process property

interest claim fails as a matter of law, and defendants are entitled to judgment.

### 2.  Brown cannot prove alleged violation of a liberty interest.

Liberty interests protected by the Fourteenth Amendment may arise from two sources - - the Due Process Clause itself and the laws of the States.  *Meachum v. Fano*, 427 U.S. 215, 223-227 (1976).

Brown's claim for violation of his right to pursue a lawful calling of his own choosing claims that his dismissal from the Law School allegedly precludes him from "pursuing a legal career as an attorney."  (Compl., ¶ 271).  Thus, this claim appears premised on a liberty interest.  *See Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 76 L.Ed. 1042 (1923) ("Liberty denotes not merely freedom from bodily restraint but also the right of the individual . . . to engage in any of the common occupations of life.") However, it is unclear from Mr. Brown's Complaint or the articulation of his claims in the Pretrial Order, exactly what is the source of the claimed liberty interest.  As noted earlier, *Roth* requires that there be evidence of more than "a unilateral expectation," and instead "a legitimate claim of entitlement to" a privilege or benefit before it implicates the fourteenth amendment's due process protections.  *Roth*, 408 U.S. at 576.

In this case, there is no evidence whatsoever that demonstrates that Mr. Brown has anything other than a "unilateral expectation" that he might one day practice law. Prerequisites to the practice of law require not only graduation from an accredited law school, but also passage of the required examinations for admission, and passage of the applicable bar's character and fitness assessment of the candidate.  Having accomplished none of those things, it is purely speculative whether Mr. Brown will ever qualify to

practice law.  Accordingly, Mr. Brown cannot establish a protected liberty interest, and his claim must fail as a matter of law.

Alternatively, it appears that Mr. Brown may be attempting to assert a liberty interest claim based on alleged damage to his reputation.[6]  In that event, Mr. Brown's claim still fails.

The statements implicating Mr. Brown's reputational interest in this case appear to be Dean Agrawal's statements in her May 25, 2010 letter proposing Mr. Brown's dismissal and her June 7, 2010 letter confirming his dismissal, each of which stated that the dismissal was "for falsification, misrepresentation, and failure to supply complete, accurate and truthful answers to [his] application for admission to the School of Law." Brown Depo. Ex. 8.; Brown Depo. Ex. 10.

The Tenth-Circuit applies a four-part test to demonstrate deprivation of a liberty interest in one's good name and reputation:  1) the statements must impugn the good name, reputation, honor or integrity of the individual; 2) the statements must be false; 3) the statement must occur in the course of dismissing the student or must foreclose other educational opportunities; and 4) the statements must be published. *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994) (citations omitted); *See also Melton v. City of Oklahoma City*, 928 F.2d 920, 926-27 (10th Cir. 1991) (en banc) (elements not disjunctive; all must be satisfied).

In this case, Mr. Brown cannot prevail on his liberty interest claim because he

---

[6] *See* Pretrial Order (Doc. 144, pp. 29) discussion by Mr. Brown in which he states that his fundamental right to pursue an avocation of his choosing is implicated "[s]ince disciplinary expulsion eliminates the possibility of my attendance at any other AAIA school."

cannot show that Dean Agrawal's statements were false.  The uncontroverted record before the Court shows that Mr. Brown indeed misrepresented his qualifications for admission on his application and provided false and incomplete responses concerning his character and fitness.  Thus, the undisputed facts show that Dean Agrawal's statements were true.  *See Fenje v. Feld*, 398 F.3d 620, 627 (7th Cir. 2005) (Resident physician who was dismissed from the residency program after it was learned he had failed to disclose prior dismissal from another program on his application could not state a liberty interest claim because the statements concerning the reasons for his dismissal were true.)

Mr. Brown also cannot show that he is foreclosed from other educational opportunities as a result of Dean Agrawal's statements.  Mr. Brown has not applied to any other law schools since his dismissal from the KU School of Law.  Fact ¶ 92.  Thus, without such evidence, Mr. Brown cannot satisfy the third element of a liberty interest claim.

Similarly, Mr. Brown cannot prove publication of the allegedly damaging statements.  There is no evidence that Dean Agrawal's statements have been communicated to anyone outside the University other than Mr. Brown himself.  Such intra-governmental communications do not constitute publication for purposes of a liberty interest claim.  *See Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079 48 L.Ed.2d 685 (1976); *McCarty v. City of Bartlesville*, 8 Fed.Appx. 867,874, 2001 WL 246196, *5 (10th Cir. 2001) (discussion of case with district attorney was intra-governmental dissemination and not publication); *Custodio v. Parker*, 65 F.3d 178, 1995

WL 523123, *4 (10th Cir. 1995) (false statement to plaintiff's superiors was intra-government dissemination and not publication).

Based on the foregoing, Mr. Brown cannot establish the elements of a liberty interest claim.  Accordingly, summary judgment should be granted.

### 3. Evidence shows Brown was provided due process.

Assuming for purposes of this motion that Mr. Brown has established that he had a protected property or liberty interest in continued enrollment in the School of Law and in pursuing the calling of his choosing, both of which were allegedly violated with his dismissal from the School of Law, his due process claims still fail as a matter of law.

The undisputed facts establish that Mr. Brown was provided notice by Dean Agrawal on May 25, 2010, of her intent to dismiss him based on his "falsification, misrepresentation, and failure to supply complete, accurate and truthful answers" in his application for admission to the School of Law.  Fact ¶ 58.  That letter invited Mr. Brown to provide a written response if he "believe[d] that this action is inappropriate or that there are mitigating factors" that she should consider before dismissing him.  Fact ¶ 58.  Mr. Brown provided a written response on May 27, 2010.  Fact ¶ 59.

At its core, due process is notice and the opportunity to be heard prior to the deprivation of a protected property or liberty interest.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L. Ed. 2d 494 (1985).  Due process is a flexible concept that "'calls for such procedural protections as the particular situation demands.'"  *Gilbert v. Homar*, 420 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120

(1997) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)).

In evaluating the adequacy of procedural protections in a particular case, the court considers "'[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.'" *Id.* 520 U.S. at 931-32, 117 S.Ct. 1807 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

In *Goss v. Lopez*, 419 U.S. 565 (1975) the Supreme Court held in the case of student's suspension from public school for disciplinary reasons, due process requires "that the student be given oral or written notice of the charges against him, and if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581.

In *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 55 L.Ed.2d 124, 98 S.Ct. 948 (1978), a medical student was dismissed when it was determined that she did not possess the clinical abilities required to perform adequately as a physician. *Id.* at 89-90. The Supreme Court discussed the amount of due process owed, and in its analysis, the Court made a distinction between dismissals based on an "academic" rationale as opposed to a dismissal that could be characterized as "disciplinary." *Id.* at 89-90.

The *Horowitz* Court characterized an academic dismissal as one that is "more subjective and evaluative" than the "typical factual questions presented in the average

disciplinary decision." *Id*. at 90. It noted that disciplinary dismissals involve "the violation by a student of valid rules of conduct" or "disruptive and insubordinate behavior," and as such are not dependent upon the analytical expertise of professional academicians." *Id*. at 88-89.

In this case, Mr. Brown attempts to characterize his dismissal from the School of Law as a disciplinary dismissal. In reality, although Mr. Brown's own wrongful and deceptive conduct may have been the triggering event, this case involves a determination about qualifications for admission to the School of Law. Character and fitness is an important consideration in determining one's fitness to pursue a legal education because that education leads to a profession that requires good character and ethical conduct. Fact ¶'s 15-17. The certification statement on the application itself and on the LSAC certification, each providing that the application may be denied and matriculation cancelled or the student dismissed for misrepresentations or omissions on the application, evidence the importance of candor and honesty as a qualification for admission. Thus, the evidence demonstrates this dismissal was based on an academic decision concerning Mr. Brown's fitness and qualifications for admission, not a disciplinary decision.

Regardless of whether the dismissal is characterized as academic or disciplinary, Mr. Brown was provided notice and an opportunity to respond before he was dismissed from the School of Law. The notice and opportunity afforded him was consistent with that found sufficient in similar cases. *See Horowitz*, 435 U.S. at 90-91; *Fenje*, 398 F.3d at 625 ("In the case of academic dismissals, procedural due process does not require any form of hearing before a decision making body, either before or after the termination

40

decision is made."); *Martin v. Helstad*, 699 F.2d 387, 389 (7th Cir. 1983) (Opportunity to be heard by letter, affidavit or other documentary material was all the process due to a law school applicant who had failed disclose a conviction on his application for admission.); *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976); *Gaspar v. Bruton*, 513 F.2d 843 (10th Cir. 1975).

The undisputed facts show that Mr. Brown was notified of the reasons for his dismissal and provided an opportunity to respond. Thus, he was provided due process before his dismissal, and defendants are entitled to judgment.

### 4. Defendants are entitled Qualified Immunity.

Qualified immunity shields governmental officials performing discretionary functions from liability for damages when their conduct does not violate established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007). Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 512 (1985), *Holloway v. Vargas*, 535 F.Supp.2d 1219, 1223 (D. Kan. 2008).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-part test for reviewing whether qualified immunity applied. *Id.* at 201. *Saucier's* two-part test first required analysis of the threshold question of whether "taken in the light most favorable to the party asserting injury, . . . the facts alleged show the officer's conduct violated a constitutional right?" *Id.* If so, the second prong of the *Saucier* analysis then

moved to determining "whether the right was clearly established . . . in light of the specific context of the case." *Id.*    In answering that question, the court must decide "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." *Id.*; *Cassady v. Goering*, 467 F.3d 628, 643-44 (10th Cir. 2009).

In *Pearson v. Callahan*, 129 S.Ct. 808 (2009), the Supreme Court relaxed the rigid application of the two-part analysis mandated in *Saucier*, allowing application of the two-part analysis in whatever sequence the court finds most appropriate. *Id.*, 129 S.Ct. at 818.

Once a defendant raises the qualified immunity defense, the plaintiff must "come forward with facts or allegations sufficient to show both that the defendant's alleged conduct violated the law and that [the] law was clearly established when the alleged violation occurred." *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988).  If the material facts of the case are uncontroverted, the question of objective reasonableness is for the court rather than the jury to decide.  *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007).

In order to survive summary judgment, the "clearly established" right must be "particularized" meaning that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected unless that very action in question has previously been held unlawful, but it is to say that in light of the pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).  Thus, in order for the right to be clearly established, it would be expected that there would "be a Supreme Court or Tenth Circuit decision on point, or

clearly established weight of authority from other courts." *Holloway v. Vargas*, 535 F.Supp.2d 1219, 1226 (D. Kan. 2008) (finding that "clearly established law under Supreme Court and Tenth Circuit precedent foreclosed a stop based only on an anonymous tip that did not include any indicia of reliability" thus denying summary judgment); *See also Prison Legal News, Inc. v. Simmons*, 401 F.Supp.2d 1181, 1192 (D. Kan. 2005) (holding that "ordinarily a court would expect to see cases from at least three other circuits before concluding that a right is clearly established based on the 'clearly established weight of authority from other courts.'").

As discussed in regards to Mr. Brown's due process claims, the cases on similar facts as those presented in this case have found the process afforded sufficient. Mr. Brown cannot identify any cases that establish that the process Mr. Brown was afforded was not sufficient such that the defendants could have reasonably known their conduct was unlawful. Accordingly, defendants are entitled to qualified immunity and judgment should be entered in their favor.

### C. Brown's pendent state law claims are without merit and should be dismissed.

#### 1.     Discretionary Function Immunity.

Before turning to the substantive elements of each of Mr. Brown's pendent state law claims, defendants believe that they are entitled to immunity under the Kansas Tort Claims Act discretionary function exception on each of the claims. All of Mr. Brown's pendent state law claims against the defendants arise out of their involvement in his application for admission and subsequent actions taken to respond to his disclosure that

he had failed to disclose his criminal history on his application.  Thus, defendants actions were taken within the exercise of their discretion as academics and university employees.

Governmental immunity from tort liability in Kansas is governed by the KTCA, and liability is the rule, not the exception.  *Dougan v. Rossville Drainage Dist.,* 243 Kan. 315, 318, 757 P.2d 272 (1988).  In order to avoid tort liability, a qualified government entity must prove that one of the exceptions in 75-6104 applies. *Jackson v. U.S.D. 259,* 268 Kan. 319, 322, 995 P.2d 844 (2000).  A governmental entity claiming immunity bears the burden of showing it fits within one of the exceptions to liability. *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.,* 249 Kan. 348, 364, 819 P.2d 587 (1991).

The discretionary function exception under the Kansas Tort Claims Act provides immunity for:

> (e) any claim based upon the exercise or performance or failure to perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved.

K.S.A. § 75-6104(e).

In *Hopkins v. State,* 237 Kan. 601, 610, 702 P.2d 311 (1985), the Supreme Court said:

> Discretion implies the exercise of discriminating judgment within the bounds of reason. [Citation omitted.] It involves the choice of exercising of the will, of determination made between competing and sometimes conflicting considerations. Discretion imparts that a choice of action is determined, and that action should be taken with reason and good conscience in the interest of protecting the rights of all parties and serving the ends of justice.

In deciding whether the discretionary function exception applies, it is the nature and quality of the discretion exercised which should be the focus rather than the status of the employee exercising the judgment. *Robertson v. City of Topeka*, 231 Kan. 358, 361-62, 644 P.2d 458 (1982) "The test is whether the judgment of the governmental employee is of the nature and quality which the legislature intended to put beyond judicial review." *Id.* "The more a judgment involves the making of policy the more it is of a 'nature and quality' to be recognized as inappropriate for judicial review." *Kansas State Bank & Tr. Co.,* 249 Kan. at 365, 819 P.2d 587.

The facts of this case clearly demonstrate that the judgments and actions taken by the defendants involved the exercise of the kind of discretion that is protected from liability.  Accordingly, defendants are entitled to immunity from Mr. Brown's pendent state claims.

## 2.        Equitable estoppel bars claims.

In this case, the undisputed facts establish that Mr. Brown set upon a course to gain fraudulent admission to the School of Law through his failure to disclose his criminal history.  In this lawsuit, Mr. Brown attempts to further capitalize on that fraud by pursuing his various pendent state law theories of recovery against the defendants.

"Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightly relied and acted

45

upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. [Citation omitted.]" *Iola State Bank v. Biggs,* 233 Kan. 450, 458 (1983).

"A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. *Wichita Federal Savings & Loan Ass'n v. Jones,* 155 Kan. 821, 130 P.2d 556; 31 C.J.S., Estoppel, § 59, p. 367.

When the facts are undisputed, the court may rule on the availability of the doctrine as a matter of law. *Rex v. Warner*, 183 Kan. 763, 769, 332 P.2d 572 (1959). In this case, the facts are not in dispute concerning Mr. Brown's fraudulent concealment of his criminal history. Mr. Brown should not be allowed to profit from his own misdeed. Therefore, defendants request that the court apply the doctrine of equitable estoppel to bar his claims.

### 3. Brown's state claim for gross and wanton negligence.

Brown asserts that the defendants were guilty of gross and wanton negligence in their actions with him. In order to recover on a claim for gross and wanton negligence, Mr. Brown must produce evidence that shows that the defendants were more than simply negligent. Instead, he must prove wantonnes, meaning that the "act[ions] [of the defendants] must indicate a realization of the imminence of danger and a reckless disregard and complete indifference and unconcern for the probable consequences of the

46

wrongful act." *Bailey v. Resner*, 168 Kan. 439, 442, 214 P.2d 323 (1950).

The undisputed facts presented, however, establish that the defendants acted reasonably and carefully in attempting to carry out their duties and responsibilities. Accordingly, Mr. Brown cannot show the requisite wantonness to prevail on this claim, and summary judgment, therefore, should be granted.

### 4.         Brown's tortious interference claim.

The tort of intentional interference with a prospective contract or business relation is defined in <u>Restatement 2d of Torts</u>, Section 766B, which provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) Inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> (b) preventing the other from acquiring or continuing the prospective relation.

Kansas recognizes a cause of action for tortious interference with a prospective contract or business relationship. The requirements for this tort are:

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) reasonable certainty that, except for the conduct of the defendant, the plaintiff would have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

*Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 423, 77 P.3d 130 (2003).   This tort is aimed at preserving future or potential contractual relations. *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986).

47

A claim for intentional interference with a prospective contract or business relationship requires proof of intentional misconduct by the alleged tortfeasor. *Burcham v. Unison Bancorp, Inc*. 276 Kan. at 423. Thus, the claim is predicated on malicious conduct by the defendant. *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986). Legal malice is defined in PIK 4th 103.05 as "a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse."

Mr. Brown's claim for tortious interference is premised on his assertion that he had a "legitimate business expectancy in his future as a practicing attorney." Comp. ¶ 331. However, Mr. Brown cannot produce evidence of such an expectancy as he has not completed law school, has not shown he can pass the requisite exams for licensure as an attorney, or that he can pass the applicable admitting jurisdictions character and fitness assessment for licensure. Accordingly, Mr. Brown's stated expectancy is nothing more than illusory and aspirational, which is insufficient as a matter of law to state a claim.

If the Court determines that Mr. Brown has presented evidence sufficient to believe he had a legitimate expectancy in practicing law, then his claim still fails based on the defense of justification. The Court in *Turner* observed that justification has not been susceptible to precise definition. *Turner*, 240 Kan. at 12-13. Instead, "it is employed to denote the presence of exceptional circumstances which show that no tort has been in fact committed and to connote lawful excuse which excludes actual or legal malice." *Id*. (citation omitted).

In determining whether a defendant's conduct is improper, the following factors should be considered:

> (1) the nature of the defendant's conduct; (2) the defendant's motive; (3) the interests of the other with which the defendant's conduct interferes; (4) the interests sought to be advanced by the defendant; (5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the other; (6) the proximity or remoteness of the defendant's conduct to the interference; and (7) the relations of the parties.

*Reebles, Inc. v. Bank of America, N.A.*, 29 Kan.App.2d 205, 211, 25 P.3d 871 (2001).

The *Turner* Court recognized that the analysis of the factors regarding justification will depend on the circumstances in each particular case. *Turner*, 240 Kan. at 13. The Court, however, as a general rule stated:

> Generally, a circumstance is effective as a justification if the defendant acts in the exercise of a right equal or superior to that of the plaintiff, or in the pursuit of some lawful interest or purpose, but only if the right is as broad as the act and covers not only the motive and purpose but also the means used.

*Id.*

Applying the factors used to analyze justification, it is clear that Mr. Brown's own conduct in concealing the true nature of his character and fitness by failing to disclose his criminal convictions is the reason for his being dismissed from the School of Law. The School of Law has the right to enforce its academic standards, including those standards with respect to the character and fitness required of those it admits. Accordingly, the actions taken by the defendants were justified and summary judgment should be granted.

### 4. Brown's Civil Conspiracy Claim.

Mr. Brown claims that the defendants conspired to dismiss him from the Law School. Compl. ¶ 351.

The five elements of a civil conspiracy are (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds in the object or cause of action, (4) one or more unlawful overt acts, and (5) damages as the proximate result thereof.  *Stoldt v. City of Toronto*, 234 Kan. 957, Sul. Para. 5, 678 P.2d 153 (1984).

Mr. Brown cannot satisfy the elements necessary to establish a civil conspiracy. There is no evidence of any meeting of the minds by these defendants, nor was there any evidence of unlawful overt acts taken in furtherance of the conspiracy.   Accordingly, defendants are entitled to summary judgment.

## Conclusion

Mr. Brown, knowing that his criminal history would cause his application for admission to the School of Law to be looked on unfavorably, chose to conceal that history in order to fraudulently obtain admission to the School of Law.   All of the consequences of which he now complains and which form the basis of his claims in this lawsuit flow from the circumstances that he himself created and set in motion.   The undisputed facts demonstrate that Mr. Brown's claims are without merit, and that defendants are entitled to judgment for the reasons outlined above.   Defendants, therefore, respectfully request that the Court grant them judgment and dismiss Mr. Brown's claims.

Respectfully submitted,

By:  /s  Sara L. Trower

Sara L. Trower, Ks. # 21514
Associate General Counsel and Special
Assistant Attorney General
Room 245 Strong Hall
1450 Jayhawk Blvd.
Lawrence, KS 66045
Tel:  (785) 864-3276
Fax:  (785) 864-4617
E-mail:  strower@ku.edu
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document was electronically filed with the clerk of the

court on August 13, 2013, by using the CM/ECF system which will provide notice of

filing to:

Robert M. Brown, Pro Se
6200 W. 74th Street
Overland Park, KS 66204
Phone: 816-721-4512
Fax: 866-610-4630
Email: robertmbrown@live.com


/s   Sara L.Trower_____
        *Attorney for Defendants*

51