# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ROBERT M. BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 10-CV-2606 EFM/KGG |
| | ) |
| THE UNIVERSITY OF KANSAS, et al. | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, through counsel, provides the following Response in opposition to defendants' Motion for Summary Judgment.

## Introduction

Robert Brown applied to the University Of Kansas School Of Law on April 8, 2009.  Brown began matriculation on August 20, 2009.  Seven days later, Brown amended his application. Brown made his disclosure within 7 days after his enrollment. Rather than file a proper complaint with the appropriate hearing body and follow proper procedures, the School of Law drug its discipline out until Brown had completed the Fall 2009 and Spring 2010 semesters, was taking classes in the summer of 2010, and was already enrolled for the Fall of 2010 through delay in processes they were never authorized to undertake in the first place.  In so doing, the defendants showed disregard for Brown's due process rights in the face of overwhelming notice.  Meanwhile, every other amending applicant navigated the system with impunity.

Brown did not agree with the actions of the School of Law, and brought this

e

action.

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

1.  The University of Kansas is a state educational institution. *See* K.S.A. 76-711. S.F. ¶ 1.

    **Uncontroverted**

2.  The University of Kansas, a separate state agency, is funded in part by the State of Kansas. *See* K.S.A. 76-712. S.F. ¶ 2.

    **Uncontroverted**

3.  The Kansas Board of Regents, provided for in Kan. Const., Art. 6 §§ 2, 3, and established by K.S.A. 74-3202a, controls and supervises the Kansas state educational institutions, including the University of Kansas. S.F. ¶ 3.

    **Uncontroverted**

4.  The University of Kansas, School of Law, is an academic unit within the University of Kansas, and it is located at 1535 W. 15th Street, Lawrence, Kansas. S.F. ¶ 4.

    **Uncontroverted**

5.  Gail Agrawal was the Dean of the KU School of Law from August 2006 until June 2010. During that period, Dean Agrawal was an employee of the University of Kansas. S.F. ¶ 5; Exhibit A, Agrawal Decl. ¶ 1.

    **Uncontroverted**

6.  In 2009-2010, Defendant Stephen W. Mazza was Associate Dean at the School of

e

Law. In June 2010, he was named the interim Dean of the School of Law, and in April 2011, he was named Dean of the School of Law. Stephen Mazza was an employee of the University of Kansas at all times in his various capacities with the KU School of Law. S.F. ¶ 6; Exhibit D, Mazza Decl. ¶ 1.

**Controverted in that Mazza's Declaration is misleading. Mazza's declaration asserts that he became Interim Dean in "mid-June 2010". Mazza's tenure as Interim Dean actually began on June 1, 2010, and Agrawal was present at the School of Law only one day during the entire month of June 2010. [ASOF ¶¶ 214-215]**

7.  Andy Tompkins is the President and CEO of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, Topeka, Kansas. S.F. ¶ 7.

     **Uncontroverted**

8.  Bernadette Gray-Little, Chancellor of the University of Kansas, assumed her duties as Chancellor in August 2009, and as Chancellor is an employee of the University of Kansas. S.F. ¶ 8.

     **Uncontroverted**

9.  In 2009-2010, Joyce McCray Pearson was employed as a faculty member in the University of Kansas, School of Law, and as such she was an employee of the University. S.F. ¶ 9; Exhibit C, McCray Pearson Decl. ¶ 1.

     **Uncontroverted**

10. During the 2009-2010 academic year, Joyce McCray Pearson was the Chair of the

e

University Judicial Board. S.F. ¶ 10; *See also* Exhibit C, McCray Pearson Declaration ¶ 3.

**Uncontroverted**

11. In 2009-2010, Wendy M. Rohleder-Sook was employed in the University of Kansas, School of Law, as Associate Dean for Student Affairs. S.F. ¶ 11; Exhibit B, Rohleder-Sook Decl. ¶ 1.

    **Uncontroverted**

12. The University of Kansas' University Senate Code is published online. S.F. ¶ 12.

    **Ucontroverted**

13. The University of Kansas' Faculty Senate Rules and Regulations are published online. S.F. ¶ 13.

    **Uncontroverted**

14. Art. 22 of the University's Code of Student Rights and Responsibilities defines "Non-Academic Misconduct." S.F. ¶ 14.

    **Uncontroverted**

15. The University of Kansas School of Law admissions committee selects students "with the school's primary mission in mind: 'to prepare students to be outstanding members of the legal profession, well-educated in the law, with a commitment to professional achievement and public service.'" Deposition Ex. 5.

    **Controverted.   This text appears nowhere in the referenced exhibit and further is irrelevant to these proceedings and may not be considered by the Court.  Fed.R.Civ.P. 56(c)(3)**

e

16.  Kansas Supreme Court Rule 705, regarding eligibility for licensure to practice law proves that the applicant must demonstrate by clear and convincing evidence that the applicant "possesses the good moral character and current mental and emotional fitness to engage in the active and continuous practice of law." Kan.Sup.Ct. Rule 705.

**Uncontroverted, except that the quoted passage should begin with "possesses the requisite good moral character . . ."**

17.  Kansas Supreme Court Rule 705, regarding character and fitness qualifications for admission to the bar, in relevant part, provides:

(b) Good moral character includes, but is not limited to, the qualities of honesty, fairness, responsibility, trustworthiness, integrity, respect for and obedience to the laws of the state and nation, and respect for the rights of others and for the judicial process.
 (c) In determining whether an applicant possesses good moral character, the Board shall consider evidence of the following:
      (1)  unlawful conduct;
      (2)  academic misconduct . . . .
      (4) acts involving dishonesty, fraud, deceit, or misrepresentation;
      (5) acts which demonstrate disregard for the rights or welfare of
         others;
               . . . .
      (9) the making of false or misleading statements or omission of
         relevant information, including any false or misleading
         statement or omission on law school or bar applications in this
         state or any jurisdiction;

**Controverted.  The quoted passage occurs nowhere in Supreme Court Rule 705.**

18.  Plaintiff Robert M. Brown ("Brown") filed an application for admission to the University of Kansas, School of Law, on April 8, 2009. S.F. ¶ 15; Brown Depo.

e

Exhibit 1[3]; Exhibit B, Rohleder-Sook Decl. ¶ 2.a.

**Uncontroverted**

19.   The application for admission to the University of Kansas, School of Law, filed by Brown included under the heading "Character & Fitness" following questions to which Brown answered "No:"

> c.   Have you ever been arrested for, charged with, or convicted of a felony, misdemeanor or infraction other than a traffic violation? (include diversions, sealed or expunged records, and juvenile offenses)
>
> d.   Have you ever been arrested for, charged with, or convicted of a traffic violating involving alcohol or a controlled substance? (include diversions, sealed or expunged records, and juvenile offenses)
>
> If you answered "yes" to any of these questions, please explain on a separate sheet or electronic attachment submitted with your application and provide the date, nature of the offense or proceeding, name and location of the court or tribunal, and disposition of the matter.

S.F. ¶ 16; *See also* Brown Deposition Exhibit 1.

**Uncontroverted**

20.   The application for admission to the University of Kansas, School of Law, filed by Brown included the following certification, which Brown acknowledged by his electronic submission of the application:

I certify, that, to the best of my knowledge, the information stated in this application and in any supporting documents submitted is true and

e

complete. I understand that falsification, misrepresentation or failure to supply required information in connections with this application is sufficient cause for denial of my application or dismissal from the School of Law. I understand that I have the duty to notify the Office of Admissions if there are any changes in my answers after this application is submitted.

S.F. ¶ 17; *See also* Brown Deposition Exhibit 1.

**Uncontroverted**

21.   With his electronically submitted application to the University of Kansas, School of Law, Brown also submitted the "Certification Letter," which he signed, and which included the following statements:

I certify that the information I have provided is true and complete; that I will notify the Office of Admissions immediately if there is any change in the information that I have provided in this application; that I am the author of the statements or additional information included with this application; and that I understand the statements made herein are the basis upon which my application will be decided. In the event that any information is subsequently found to be false, I understand that my admission may be voided and my matriculation canceled. I understand that I have a duty to notify the Office of Admissions in writing if there are any changes in my answers after this application is submitted.

I understand that admission is conditional upon meeting the requirements

e

stated in the University of Kansas School of Law catalog, and any further conditions expressed at the time of admission. The School of Law does not authorize nor is it bound by any requirements or conditions other than those communicated by the Office of Admissions.

S.F. ¶ 18, *See also* Brown Deposition Exhibit 1.

**Uncontroverted**

22.   On April 15, 2009, Brown was offered a spot on the University of Kansas, School of Law's waitlist. S.F. ¶ 19; Exhibit B, Rohleder-Sook Decl. ¶ 2.b.

**Uncontroverted**

23.   On April 21, 2009, Robert Brown accepted the placement on the waitlist by submitting the Law School's standard form. S.F. ¶ 20; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.c.

**Uncontroverted**

24.   By letter dated May 17, 2009, Brown provided additional materials to supplement his application for admission to the School of Law, including a statement about his specific interest in KU Law and an additional optional essay. S.F. ¶ 21; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.d.

**Uncontroverted**

25.   On August 19, 2009, Brown was offered admission to the KU Law fall 2009 entering class. S.F. ¶ 22; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.e.

**Uncontroverted**

e

26.     On August 20, 2009, Brown submitted a seat deposit fee waiver form to the KU School of Law and was admitted. S.F. ¶ 23; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.f.

**Uncontroverted**

27.     The first day of classes for the Fall 2009 academic term at the University of Kansas was August 20, 2009. S.F. ¶ 24.

**Uncontroverted**

28.     On August 27, 2009, after the start of classes at the University of Kansas, School of Law, Brown submitted a letter stating, "I would like to amend my law school application," and amending his answer to question 27, disclosing the following criminal convictions:

| Case No | Tribunal | Charge | Finding |
|---|---|---|---|
| 96DV290 | Jo Co Dist Ct | Domestic | Battery Guilty |
| 96DV740 | Jo Co Dist Ct | Domestic | Battery Guilty |
| 90???? | Jo Co Dist Ct | DUI | Guilty |
| 79???? | Shawnee Co | DUI | Guilty |

S.F. ¶ 25; *See also* Brown Deposition Exhibit 3; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.g.

**Uncontroverted**

29.     On August 27, 2009, in response to Brown's letter, he was asked to provide a further explanation regarding the criminal matters that he had disclosed on that date. S.F. ¶ 26; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.h.

e

**Uncontroverted**

30. On September 3, 2009, Wendy Rohleder-Sook made another request to Robert Brown asking him to provide further explanation regarding the criminal charges that he had disclosed in his August 27, 2009, amendment letter. Exhibit B, Rohleder-Sook Decl. ¶ 2.i. and attached Bates 00046 referenced therein.

**Uncontroverted**

31. On September 11, 2009, Brown provided a letter in which he provided additional information concerning "the facts contained within [his] letter of August 27th, 2009." S.F. ¶ 27; Brown Deposition Exhibit 5; Exhibit B, Rohleder-Sook Decl. ¶ 2.j.

**Uncontroverted**

32. On October 2, 2009, Wendy Rohleder-Sook e-mailed Robert Brown to advise him that additional charges ("12/05/94, Battery, dismissed by prosecutor; 12/21/94, Battery, dismissed by prosecutor; and 4/23/04, Criminal Trespass, dismissed by prosecutor") regarding him had been discovered, and asking him to provide written authorization to the Johnson County District Attorney's office to release full information and documents to the Law School regarding those charges, and an explanation for why he did not disclose those criminal matters on his application for admission or in his subsequent amendment. S.F. ¶ 28; Brown Deposition Exhibit 6; Rohleder-Sook Decl. ¶ 2.l.

**Uncontroverted, but it should be noted that Rohleder-Sook later testified that both 1994 Battery Charges had in fact been disclosed in the information**

e

**provided to her initially with Brown's amendment and Rohlder-Sook later confirmed with the Johnson County DA that the criminal trespass charge had been dropped by the state on its own motion at a hearing Brown was not required to attend. (Def. Rohleder-Sook Dep. 77:19-78-11; [ASOF ¶¶ 64-67, 198-199])**

33.     On October 2, 2009, Robert Brown responded via e-mail to Ms. Rohleder-Sook and provided additional information concerning the charges she had noted in her e-mail. S.F. ¶ 29; Brown Deposition Exhibit 6.

**34.     Uncontroverted, but it should be noted that Rohleder-Sook later testified that both 1994 Battery Charges had in fact been disclosed in the information provided to her initially with Brown's amendment and Rohlder-Sook later confirmed with the Johnson County DA that the criminal trespass charge had been dropped by the state on its own motion at a hearing Brown was not required to attend. (Def. Rohleder-Sook Dep. 77:19-78-11; [ASOF ¶¶ 64-67, 198-199])**

35.     On October 7, 2009, the Law School requested copies of records from the Johnson County District Court Clerk's Office. Sometime thereafter, the District Court Clerk's Office provided a copy of the trial record for the prosecutions in the DV290 and DV740 domestic battery charges against Brown. S.F. ¶ 30; Rohleder-Sook Decl. ¶ 2.m.

**Uncontroverted**

36.     When asked at deposition to recount his criminal history with respect to arrests,

11

e

charges, and convictions, Mr. Brown acknowledged the following record:

e

- 1979 arrest for DUI in Topeka which was pled down to reckless driving;
- 1982 or 1984 arrest in Topeka for DUI for which he received a diversion;
- 1986 arrest in Overland Park for DUI for which he was convicted and sentenced to two days in jail, community service and a 90-day suspension of his driver's license;
- During the period 1994-1996, Mr. Brown was arrested on three separate occasions and charged with four charges of domestic battery, which resulted in his being convicted on three of those charges and his receiving probation;
- 1999 Mr. Brown was arrested for DUI in North Kansas City, Missouri, but that charge was later dismissed.

Exhibit E, Brown Deposition pp. 67:8 – 68:21.

**Controverted.  Brown's deposition testimony was that he had independent recollection of only one DUI arrest even though two of them appeared on the KBI record he ordered *subsequent* to amending his application (Plt. Dep. 73:5-74:13).  Counsel for defendants acknowledged Brown's correction of the record at the close of the deposition. (Plt. Dep. 232:21-25) Brown later informed counsel for Defendants the Topeka records had borne out that there was only one arrest.  Nonetheless, counsel for Plaintiffs has presented the one Topeka incident which occurred in the 1979-1984 timeframe as two separate arrests.  Brown now attaches Exhibit H- Topeka Expungement and Records Check.  [Pl.'s Decl. 58-63; Ex H]  With regards to the 1999 arrest for DUI which was subsequently dismissed, Brown asked to consult with an attorney before taking his breath test, and the officer deemed his request to speak with counsel a refusal.  Brown subsequently requested that he be given the test**

e

**within the time period provided by law, and the arresting officer refused. The criminal Court dismissed the case, and the Western District of Missouri returned Brown's Missouri driving privilege to him. <u>Brown v. Director of Revenue</u>, 34 S.W.3d 166 (Mo.App. W.D. 11/14/2000). Detailed history is available within the text of this published case. In addition to being 27 and 10 years old as of the date of Brown's amendment, respectively, and quite properly disposed of in Brown's favor, neither of these charges was a basis for Brown's dismissal, and thus they are neither relevant to the decision nor admissible. Judicial review of an administrative action is confined to "the grounds . . . upon which the record discloses the action was based." SEC v. Chenery Corp, 318 U.S. 80, 87 (1943)**

36. At deposition, Mr. Brown admitted that at the time that he answered "no" to questions 27c and 27d on his application for admission, he in fact knew that he had incidents in his history that were responsive to those questions:

Q And at the time that you answered question No. 27c no you knew that you had been arrested for domestic battery on three separate occasions; correct?

A Correct.

Q And at the time that you answered question No. 27c no you

knew that you had been charged with misdemeanors

regarding domestic battery on four separate charges; correct?

A Yes.

e

Q And despite knowing that you failed to disclose those

arrests and those charges in response to

question No. 27; correct?

A I felt that they were too remote to be relevant to the

application.

Q That's not the question I asked. You failed to

disclose --

A Yes, I did fail to disclose them.

. . .

Q And in response to question 27d regarding charges involving alcohol or a

controlled substance, at the time that you answered the question no you knew that

you had been arrested for DUI and charged with DUI in 1979 in Topeka; correct?

A Yes.

Q And despite knowing that you failed to disclose that 1979

arrest and charge of DUI in Topeka in your application; correct?

A Yes.

Q All right. At the time that you answered question No. 27d no you

did know that in 1982 or 1984 you were arrested for DUI in

Topeka and received a diversion; correct?

A Yes.

Q And you failed to disclose the 1982 or 1984 arrest for DUI in

Topeka and the diversion that you

e

received on that charge?

A  Yes.

Q At the time that you answered the question 27d, you answered

that question no you knew that in 1986 you had been arrested in

Overland Park for a and were convicted on that offense; correct?

A  Yes.

Q And at the time that you answered no to the question No.

27d you failed to disclose the 1986 Overland Park arrest for

DUI and conviction; correct?

A  Yes.

Q At the time that you filed your application and answered

question No. 27d in the application no you knew that you had

been arrested for DUI in North Kansas City, Missouri, in 1999;

correct? A Yes.

Q And at the time that you answered question No. 27d no you

failed to disclose the 1999 DUI arrest in

North Kansas City, Missouri; correct?

A  Yes.

Exhibit E, Brown Deposition pp. 71:25 – 73:2; 74:14 – 75:16.

**Controverted.  Brown's deposition testimony was that he had independent**

**recollection of only one DUI arrest even though two of them appeared on the**

**KBI record he ordered *subsequent* to amending his application (Plt. Dep.**

e

**73:5-74:13).  Counsel for defendants acknowledged Brown's correction of the record at the close of the deposition. (Plt. Dep. 232:21-25) Brown later informed counsel for Defendants the Topeka records had borne out that there was only one arrest.  Nonetheless, counsel for Plaintiffs has presented the one Topeka incident which occurred in the 1979-1984 timeframe as two separate arrests.**

37.   At deposition, Mr. Brown admitted that at the time he filled out his Law School application, he figured that his criminal history "might be looked upon unfavorably by the people reviewing [his] application for admission." Exhibit E, Brown Deposition pp. 77:8-21.

**Uncontroverted with regards to the testimony.  However, defendants' have placed words in Plaintiff's mouth elsewhere in this document based on that testimony.  At page 3 of Defs.' Mem, defendants state "He admitted that he failed to disclose that record on his application for admission *because* that information "might be looked upon unfavorably by the people reviewing [his] application for admission."  (Citing Exhibit E, Brown Deposition pp. 77:8-21, emphasis added).  Again, on page 27 in its first purported issue, defendants make this same mischaracterization. The attribution of causation appears nowhere in Brown's testimony, which has always been that he did not disclose the prior criminal history because he believed it was too remote to be relevant, and the causation attributed to this testimony at multiple places in this document is misleading.**

17

e

38.     Plaintiff Brown sat for finals in December 2009. S.F. ¶ 31.

         **Uncontroverted.**

39.     Plaintiff Brown received grades for the Fall Semester of 2009. S.F. ¶ 32.

         **Uncontroverted**

40.     On January 19, 2010, the 2008-2009 Law School Admissions Committee
         convened to consider the status of Mr. Brown's application and determined that
         they would have rejected his application if they had known of the criminal
         charges he failed to disclose. S.F. ¶ 33.

         **Uncontroverted, but incomplete and misleading.  The statement as provided
         does not reflect that multiple members of the admissions committee believed
         Brown deserved due process before disciplinary action was taken (Def.
         Rohleder-Sook Dep. 23:21-24:8), and that one of the members of the
         admissions committee actually came to Mazza and Sook recommending that
         Brown's expulsion not be pursued (McKenzie Dep. 61:18-23) because the
         School of Law had taken so long to pursue the complaint (McKenzie Dep.
         56:21-24).  Rohleder-Sook also failed to offer information regarding the large
         number of other amending applicants, leaving the Admissions Committee,
         the DRP hearing panel, and Agrawal to believe that Brown's circumstance
         was an isolated incident. [ASOF ¶¶ 87-88, 154, 156]**

41.     Following the Admissions Committee's decision, Associate Dean Rohleder-Sook
         consulted Associate Dean Mazza, who advised that Mr. Brown would be afforded
         due process through the Law School Dispute Resolution Procedure, and that to

e

initiate that process, Rohleder-Sook should file a complaint regarding Mr. Brown's failure to disclose his criminal history in his application. Exhibit B, Rohleder-Sook Decl. ¶ 3; Exhibit D, Mazza Decl. ¶ 5.

**Uncontroverted, but incomplete and misleading.  Dean Agrawal was also involved in this decision. [ASOF ¶ 93]**

42.    On February 17, 2010, Wendy Rohleder-Sook filed with Associate Dean Stephen Mazza a letter with the reference "Allegation of Academic Misconduct: Robert M. Brown," which outlined as a basis for the charge Mr. Brown's answers to questions 27.c. and 27.d. on his application for admission. S.F. ¶ 34; Exhibit B, Rohleder-Sook Decl. ¶ 4; Exhibit D, Mazza Decl. ¶ 6.

**Controverted.  Rather than being "filed with" Mazza, Mazza actually co-authored the complaint with Rohleder-Sook. [Def. Rohleder-Sook Dep. 35:14-36:5; ASOF ¶ 103-104,108]**

43.    During the pendency of the School of Law's Allegation of Academic Misconduct, Defendant Mazza communicated with plaintiff Brown via emails that had as the subject line: "Disciplinary Procedures." S.F. ¶ 51.

**Uncontroverted.**

44.    Mr. Brown responded to Ms. Rohleder-Sook's February 17, 2010, academic misconduct charge, in a response dated February 28, 2010. S.F. ¶ 35; Exhibit B, Rohleder-Sook Decl. ¶ 4.

**Unontroverted**

e

45.   On April 16, 2010, Rohleder-Sook responded to the procedural objections contained in Mr. Brown's February 28, 2010, response. Exhibit B, Rohleder-Sook Decl. ¶ 4.

**Controverted.  Although the response was signed only by Rohleder-Sook and although Rohleder-Sook initially testified that she was the sole author of the document [Def. Rohleder-Sook Dep. 48:2-7], Rohleder-Sook later admitted that Mazza wrote more of the response than she did.  [Def. Rohleder-Sook Dep. 53:8-17; ASOF ¶¶ 145, 149-150, 157, 165-166, 170-173]**

46.   A hearing panel convened to consider the charge of academic misconduct against Brown issued a Memorandum decision dated May 3, 2010, dismissing the academic misconduct complaint against Brown. S.F. ¶ 36; Exhibit B, RohlederSook Decl. ¶ 5.

**Uncontroverted**

47.   In the School of Law's hearing panel's May 3, 2010 Memorandum decision, the panel stated, in part:

The complaint fails to allege a violation of Section 2.6.1 or, to use the words of U.S.S.R. Section 6.5.3.1(d), any other University rule. Therefore, we hereby dismiss Dean Wendy Rohleder-Sook's complaint of February 17, 2010. S.F. ¶ 37.

**Uncontroverted**

48.   The Law School hearing panel's May 3, 2010 Memorandum decision also stated, in part:

While   we   are   not   aware   of   any   University   rule   prohibiting

e

misrepresentation on an application for admission, we do not believe that is the end of this matter. Mr. Brown's application states "I understand that falsification, misrepresentation or failure to supply the required information in connection with this application is sufficient cause for denial of my application or dismissal from the School of Law." Similarly, Mr. Brown's LSAC letter certifying his electronic application to the Law School states:

I certify that, to the best of my knowledge, the information stated on this application and in any supporting documents submitted is true and complete. I understand the falsification, misrepresentation or failure to supply required information in connection with this application is sufficient cause for denial of my application or dismissal from the School of Law. I understand that I have a duty to notify the Office of Admissions if there are any changes in my answers after this application is submitted.

In each of these documents, singed by Mr. Brown, he acknowledges the Law School's right to dismiss him if his application for admission contains a misrepresentation. Mr. Brown's August 27, 2009, letter to Dean Wendy Rohleder-Sook clearly concedes that he did in fact make misrepresentations on his application. Therefore, we recognize that the Law School has the right to dismiss Mr. Brown even though this Hearing Panel does not have the authority to hear this case.

e

*See* Brown Deposition Exhibit 7.

**Uncontroverted that this is the text.  Controverted that the hearing panel had any jurisdiction or authority based in any University regulation to make such a statement, or that the hearing panel can summarily dispense with due process rights which have been guaranteed in writing. Further, it should be noted that the reason the hearing panel was unaware of any University rule preventing misrepresentation on an application is because they did not look for one. [ASOF ¶¶ 178-185]**

49.  Wendy Rohleder-Sook's formal involvement with Mr. Brown's application and failure to disclose his criminal history in that application was concluded with the May 3, 2010 issuance of the hearing panel's Memordandum decision dismissing the complaint she had filed. Exhibit B, Rohleder-Sook Decl. ¶ 6.

**Controverted.  Rohleder Sook was copied on Brown's requests to the Judicial Board [Brown, Robert v. KU, et al 000396], and was kept apprised of the status in the case. [Def. Rohleder-Sook Dep.  22:10-16].**

50.  In her dealings with Mr. Brown, Wendy Rohleder-Sook acted in good faith in the exercise of her professional judgment and discretion in carrying out her responsibilities as Associate Dean for Student Affairs. Exhibit B, Rohleder-Sook Decl. ¶ 7.

**Controverted.   Rohleder-Sook's complaint was heavily co-authored by Mazza, who later represented to Brown that he was impartial and could act as Ombuds. [ASOF ¶ 103-104,108] Rohleder-Sook's responses to Brown's**

e

Procedural objections were ghost written by Mazza.  As finally disseminated to Brown, they were identical in every way to the draft copy from Mazza's computer except for Rohleder-Sook's initials and the letterhead. Each later testified initially that Rohleder-Sook had been the primary author, and each changed their testimony later on to disclose that Mazza was the author. [ASOF ¶¶ 145, 149-150, 157, 165-166, 170-173] Rohleder-Sook and Mazza failed to disclose to the DRP hearing panel that multiple members of the Admissions Committee had felt Brown deserved additional due process before disciplinary action was taken [ASOF ¶ 89], or that Sandra Craig-McKenzie (a member of Brown's admissions committee) had come to them recommending that his expulsion not be pursued because the School of Law had taken too long to pursue the complaint.  [ASOF ¶ 50, 162, 163] Rohleder-Sook testified that she and Mazza had a "pretty informal relationship" when it came to Brown's complaint. [ASOF ¶ 158-159] Rohleder-Sook omitted information which was favorable to Brown's case from decision makers.  Rohleder-Sook allowed the Admissions Committee, the DRP hearing panel, and Agrawal to believe brown had only initially reported two of four domestic battery convictions although she was aware this was untrue.  [ASOF ¶¶ 64-65, 198] She failed to offer mitigating information in her possession regarding the circumstances of Brown's trial, the transcript, and Brown's Cert petition to the Admissions Committee, the DRP hearing panel, and Agrawal. [ASOF ¶¶ 69, 74-75, 84-86 ]  She failed to

e

**offer information regarding the large number of other amending applicants, leaving the Admissions Committee, the DRP hearing panel, and Agrawal to believe that Brown's circumstance was an isolated incident. [ASOF ¶¶ 87-88, 154, 156]**

51.   Following receipt of the hearing panel's May 3, 2010, Memorandum, Associate Dean Mazza consulted with Dean Agrawal, who determined that the issue of Robert Brown's misrepresentations in his application for admission was her responsibility to decide. Exhibit D, Mazza Decl. ¶ 9; Exhibit A, Agrawal Decl. ¶ 3.

**Controverted.   The statement implies that Agrawal had been heretofore uninvolved.   Agrawal was heavily involved in Brown's action, making critical decisions, beginning on August 27, 2009, the very day Brown amended, but acted as  the sole decision maker in violation of U.S.R.R. 5.2.2(d) (stating that involvement in the complaint precludes involvement in the decision). [ASOF ¶¶ 57, 58, 62, 70-73, 237-240] Agrawal sent an email regarding the case to general counsel the person who requested that Reohleder-Sook obtain more detail from Brown (Defs.' Bates Brown, Robert v. KU, et al 000044).   Agrawal was the person who made the decision that the matter should go before the admissions committee (Defs. Bates Brown v. KU 000447), and that the admissions committee should not convene before the end of Brown's first semester (Defs. Bates Brown v. KU 000447).   Agrawal was also copied on Rohlder-Sook's factfinding (*see* Defs.**

24

e

**Bates Brown v. KU 000448) and was involved in the decision to file the complaint against Brown. (Def. Rohleder-Sook Dep. 19:10-17)   The statement also implies that Mazza approached Agrawal without an agenda. Mazza falsely represented to Agrawal that Brown "admitted that [he] knew that [he] would not have been admitted to the School of Law had "he" disclosed his criminal record. (Mazza Dep. Ex. 18, Bates BROWN v KU 000136)  This statement was false, and inconsistent with Mazza's testimony. [Plt.'s Compl 238; Brown Dep 157:2-9; ASOF ¶ 112-114, 193-196].**

52.   Throughout his dealings with Mr. Brown concerning his misrepresentations on his application for admission to the Law School, Associate Dean Mazza acted in good faith in the exercise of his professional judgment and discretion in carrying out his responsibilities as Associate Dean for Academic Affairs. Exhibit D, Maaz Decl. ¶ 10.

**Controverted.  Mazza was a party to Gail Agrawal's May 31st Email where she instructed general counsel to craft Joyce McCray-Pearson's response to Brown's requests for action before the judicial board. Mazza was also copied on general counsel's response that they would "formulate a plan". Mazza became acting dean of the School of Law the very next day, but took no corrective action. [ASOF ¶¶ 208, 215] Mazza became acting interim Dean of the KU School of Law on June 1, 2010, but allowed Agrawal to represent herself as Dean for purposes of Browns' dismissal on June 7. [ASOF ¶¶ 214-217, 226] In Mazza's sworn Declaration, he stated "During the period 2007**

e

through mid-June 2010, I was the Associate Dean for Academic Affairs." [ASOF ¶ 216] Mazza heavily co-authored Rohleder-Sook's complaint, and later represented to Brown that he was impartial and could act as Ombuds. [ASOF ¶ 103-104,108] Mazza Ghost Wrote Rohleder-Sook's responses to Brown's Procedural objections.  As finally disseminated to Brown, they were identical in every way to the draft copy from Mazza's computer except for Rohleder-Sook's initials and the letterhead. Each later testified initially that Rohleder-Sook had been the primary author, and each changed their testimony later on to disclose that Mazza was the author. [ASOF ¶¶ 145, 149-150, 157, 165-166, 170-173] Rohleder-Sook and Mazza failed to disclose to the DRP hearing panel that multiple members of the Admissions Committee had felt Brown deserved additional due process before disciplinary action was taken [ASOF ¶ 89], or that Sandra Craig-McKenzie (a member of Brown's admissions committee) had come to them recommending that his expulsion not be pursued because the School of Law had taken too long to pursue the complaint.  [ASOF ¶ 50, 162, 163] Mazza communicated to Rohleder-Sook regarding Brown's case saying "what a nightmare". Rohleder-Sook testified that they had a "pretty informal relationship" when it came to Brown's complaint. [ASOF ¶ 158-159] Mazza fabricated his statement to Dean Agrawal that Brown had said he knew he would not have been admitted if he had disclosed his criminal convictions. His later testimony regarding the statement is that he didn't remember what was said

26

e

**at the meeting or the exact words of the statement.   [ASOF ¶ 112-114, 193-196]   Mazza told Brown at their initial meeting this was an "Article 22" matter.  When asked later in email correspondence, Mazza did not deny that he had alluded to Article 22 at his meeting with Brown. [ASOF ¶¶ 111; 130-131, 167]   Although upon filing of a DRP complaint, a hearing panel is supposed to be formed immediately and assume ommunications with the subject of the complaint, Mazza involved general counsel immediately and waited more than a month to form the hearing panel and missed the deadline for Brown's hearing, all the while managing the proceedings himself.  [ASOF ¶¶ 134-148, 151-153]**

53.   Plaintiff Brown is the only student whom defendant Mazza is aware has been removed from the School of Law after filing an amended application. S.F. ¶ 48.

**Uncontroverted**

54.   Dean Mazza testified that he is not aware of any admissions policies of the School of Law other than those posted publicly on the School of Law's website. S.F. ¶ 52.

**Uncontroverted**

55.   Defendant Mazza testified he did not pursue disciplinary measures against Brown. S.F. ¶ 62.

**Uncontroverted**

56.   Brown began attendance at his 2010 summer session Law School class. S.F. ¶ 38.

**Uncontroverted**

e

57.     When the issues of Mr. Brown's misrepresentations on his application for admission to the Law School came to Dean Agrawal's attention for determination, Dean Agrawal sought the legal advice of the University's Office of General Counsel. Exhibit A, Agrawal Decl. ¶ 4.

**Controverted. Rather than seek advice, Agrawal requested that General Counsel make the actual decision. [Defs.' Bates Brown v. KU - - Revised Redactions 000647 – "I would appreciate [counsel's] writing a response to [Brown's] letter for me. Nothing he has said goes to the merits or persuades me that we should not proceed, unless you find merit in his process arguments. I leave that assessment to the practicing, licensed lawyers. (Smile)"]**

58.     In a letter dated May 25, 2010, Dean Gail B. Agrawal advised Mr. Brown that she planned to dismiss him from the School of Law effective June 8, 2010, "for falsification, misrepresentation, and failure to supply complete, accurate and truthful answers to [his] application for admission to the School of Law." Dean Agrawal's letter further advised Mr. Brown: "If you believe that this action is inappropriate or that there are mitigating factors that I should consider before dismissing you, then you must provide me with a written response to this letter by 2:00 p.m. on June 3, 2010." S.F. ¶ 39; *See also* Exhibit A, Agrawal Decl. ¶ 4, and Brown Deposition Exhibit 8.

**Uncontroverted, except the copy Brown received was dated May 26, 2010.**

59.     In a letter dated May 27, 2010, Brown provided to Dean Agrawal his "written

e

response to [her] letter dated May 26, 2010 [sic]" and in that letter "request[ed] a personal meeting with [her] to discuss this matter." S.F. ¶ 40; Brown Deposition Exhibit 9.

**Uncontroverted**

60.   On May 28th, 2010, Agrawal responded to Brown's request for a personal meeting via email, stating: "I see no need to meet with you, and therefore decline your request for a meeting." S.F. ¶ 41.

**Uncontroverted**

61.   After considering Mr. Brown's May 27, 2010 response to her letter advising him of her intent to dismiss him from the School of Law, Dean Agrawal wrote Mr. Brown on June 7, 2010, to advise him that he was dismissed from the School of Law effective, June 8, 2010. Exhibit A, Agrawal Decl. ¶'s 5-6; Brown Deposition Ex. 10.

**Uncontroverted**

62.   Gail Agrawal's June 7, 2010 dismissal letter stated, in part, that the School of Law's transcript would show that plaintiff Brown's dismissal from the Law School was based on "falsification, misrepresentation, and failure to supply required information on [his] application to the School of Law." S.F. ¶ 50; Exhibit A, Agrawal Decl, ¶ 6; Brown Deposition Exhibit 10 referenced therein.

**Uncontroverted**

63.   Gail Agrawal consulted with the Office of General Counsel in composing her June 7, 2010 letter of dismissal to Brown. S.F. ¶ 61.

e

**Controverted. Agrawal asked Counsel to write the June 7 letter. [Defs.'**

**Bates Brown v. KU - - Revised Redactions 000647**

64. The reference in Dean Agrawal's June 7, 2010 letter to her decision to dismiss Mr. Brown from the Law School constituting "final agency action" was included in the letter based on advice of legal counsel. Exhibit F, Response to 3d Interrogatories to Agrawal, Interrogatory No. 3.

**Uncontroverted**

65. In making her decision to dismiss Robert Brown from the School of Law based on his failure to disclose his criminal history on his application for admission, Dean Agrawal acted in good faith, exercising her professional academic judgment and discretion in carrying out her duties and responsibilities as Dean. Exhibit A, Agrawal Decl. ¶ 8.

**Controverted. Agrawal, in a May 31st Email where Mazza was copied, instructed general counsel to craft Joyce McCray-Pearson's response to Brown's requests for action before the judicial board. This ultimately resulted in Brown's process being denied. [ASOF ¶¶ 208, 215] Mazza became acting interim Dean of the KU School of Law on June 1, 2010, but Agrawal represented herself as Dean for purposes of Browns' dismissal on June 7. [ASOF ¶¶ 214-217, 226] In Agrawal's Sworn Declaration, she was vague regarding the exact date when she ceased to function as Dean of the Kansas University School of Law, stating "I assumed my duties as Dean the University of Iowa College of Law on July 1, 2010, and I know that I took**

e

some vacation leave between leaving the University of Kansas and that July 1, 2010 start date." [ASOF ¶ 217] McCray-Pearson's testimony and the fact that she came up with the very same rationale invented by counsel for Agrawal and the Chancellor (F.S.R.R. 2.1.1.) both indicate she very likely was not the author of her letter of June 3, 2010 denying jurisdiction and ignoring the require process for conflict resolution in the preface of the University Senate Code. [ASOF ¶¶ 210-213, 218-223, 227-228, 230-233] Agrawal was heavily involved in Brown's action, making critical decisions, beginning on August 27, 2009, the very day Brown amended, but acted as the sole decision maker in violation of U.S.R.R. 5.2.2(d) (stating that involvement in the complaint precludes involvement in the decision). [ASOF ¶¶ 57, 58, 62, 70-73, 237-240] In sworn responses to interrogatories, Agrawal stated that she had no knowledge of or involvement with Joyce McCray Pearson's judicial board response letter to Brown even though she had directed counsel to craft a response. [ASOF ¶ 208, 209, 215]       In sworn deposition testimony, Agrawal stated that the dispute had come to her at a late stage, and that she didn't know what was involved until it was time for the final decision [ASOF ¶ 240] despite her heavy involvement in the case beginning on the day Brown amended. [ASOF ¶¶ 57, 58, 62, 70-73, 237-240] In her sworn declaration, Agrawal stated that the dispute had come to her at a late stage, and that Brown's case had come to her for review and consideration "after the May 3, 2010 memorandum from the

e

**hearing panel" [ASOF ¶ 241] despite her heavy involvement in the case beginning on the day Brown amended. [ASOF ¶¶ 57, 58, 62, 70-73, 237-240] Agrawal relegated the decision on whether or not to consider Brown's requests for due process entirely to general counsel, stating "I leave that assessment to the practicing, licensed lawyers. (Smile)" [ASOF ¶ 204]**

66.   Dean Agrawal testified she was unaware of any admissions policies of the School of Law other than those published on the School of Law web site. S.F. ¶ 56.

   **Uncontroverted**

67.   In a letter dated May 31, 2010 addressed to the "Chair of the University Judicial Board," Brown submitted a "Request for Initial Hearing before the Judicial Board Pursuant to 6.4.3.1(b) of the University Senate Rules and Regulations and Election to Invoke the Jurisdiction of the University Judicial Board Pursuant to University of Kansas Law School Dispute Resolution Procedure Section (A)(4)(c)." S.F. ¶ 42; Exhibit B, McCray Pearson Decl. ¶ 7.

   **Uncontroverted**

68.   In a letter dated May 31, 2010 address to the "Chair of the University Judicial Board," Brown also submitted a "Request for Jurisdictional Ruling pursuant to 6.5.2.1 of the University Senate Rules and Regulations." S.F. ¶ 43; Exhibit B, McCray Pearson Decl. ¶ 7.

   **Uncontroverted**

69.   In a letter dated June 3, 2010, Joyce McCray Pearson, Chair University Judicial Board, informed Brown:

e

I have reviewed your requests for a jurisdictional ruling and an initial hearing, both dated May 31, 2010. I have also reviewed University Regulations to determine whether they authorize the Judicial Board to exercise jurisdiction in your case. I regret to inform you that I have found no basis for jurisdiction by the Judicial Board.

The Faculty Senate Rules and Regulations (FSRR) 2.1.1 gives the authority for policies on admission to the faculties of the various schools and the College (see excerpt below).

.            .                        .        .

Admission standards lie within the jurisdiction of the schools and College because the academic evaluation lies within the individual department and the professors who have expertise in that field

Pursuant to University Senate Rule and Regulation 6.5.3.1(c), I hereby dismiss your petition. I have concluded that the Judicial Board lacks jurisdiction over the subject matter.

This Judicial Board decision is the final determination of this matter by the university. If you wish to proceed outside the university, Chancellor Bernadette Gray-Little is the agency officer who should receive any service or subsequent petition for judicial review of this action.

S.F. ¶ 44; Exhibit B, McCray Pearson Declaration ¶ 8.

**Uncontroverted**

70.    Joyce McCray Pearson had no knowledge of Robert Brown prior to his May 31,

e

2010, filings with the University Judicial Board. Exhibit B, McCray Pearson Decl. ¶ 8.

**Uncontroverted**

71.   In reviewing and considering Robert Brown's May 31, 2010 Judicial Board filings and determining that the Judicial Board did not have jurisdiction, Joyce McCray Pearson, acted independently and in good faith exercising her independent judgment and discretion in carrying out her responsibilities as Judicial Board Chair. Exhibit B, McCray Pearson Decl. ¶ 10.

**Controverted.   McCray-Pearson's response was prepared by General Counsel at the behest of Gail Agrawal and with the full knowledge of Stephen Mazza, then acting dean.   Rather than examine the situation independently and take the action that was mandated by proper procedures, McCray-Pearson abdicated her responsibilities and acted at the behest of others.**

**After Brown appealed to the University Judicial Board, Agrawal directed the University's General Counsel to "craft[] a response" to Brown's requests to be heard before the Judicial Board on behalf of the Joyce McCray-Pearson. (Defs.' Bates Brown v. KU - - Revised Redactions 630).   General counsel informed Agrawal that they would "formulate a strategy to deal with this issue."   The very next day, McCray-Pearson issued a letter to Brown denying Jurisdiction in the matter, and using the precise language regarding F.S.R.R. 2.1.1 that had appeared in Agrawal's dismissal letter.   (Mazza Dep. Ex. 4,**

e

**Mazza Dep. Ex. 10)  When deposed, McCray Pearson was unable to explain or defend the language, and finally admitted she did not understand it. (McCray-Pearson Dep 78:21-81:9)   As a result, the Judicial Board ignored the procedures that should have been followed in the case of Brown's Judicial Board requests, which raised questions of conflict between various governance documents (Joyce McCray Pearson Deposition Exhibit 27, ¶¶ 9, 13, 14, 46). McCray-Pearson's testimony and the fact that she came up with the very same rationale invented by counsel for Agrawal and the Chancellor (F.S.R.R. 2.1.1.) both indicate she very likely was not the author of her letter of June 3, 2010 denying jurisdiction and ignoring the require process for conflict resolution in the preface of the University Senate Code. [ASOF ¶¶ 210-213, 218-223, 227-228, 230-233]**

72.   McCray Pearson testified that at the time of ruling on Brown's requests before the Judicial Board, she had never seen Wendy Rohleder-Sook's February 17, 2010 academic misconduct complaint against Brown. S.F. ¶ 59.

**Uncontroverted**

73.   In response to interrogatories regarding involvement with other amended applications, defendant Joyce McCray Pearson testified that she had never been involved in any other situation involving an amended application to the School of Law. S.F. ¶ 49.

**Uncontroverted**

74.   In November of 2009, Chancellor Bernadette Gray-Little created an Admissions

e

task force to pursue strategic initiatives of the University of Kansas in the area of Student Success. S.F. ¶ 45.

**Uncontroverted**

75.   Chancellor Gray-Little's charge to the Admissions task force stated that the overarching goal of this enrollment planning initiative was student success. S.F. ¶ 46.

**Uncontroverted**

76.   The University Director of the Office of Admissions has no record of the School of Law having filed with it the School of Law's policies for admission and readmission. S.F. ¶ 47.

**Uncontroverted**

77.   The School of Law's Honor Code, in part, states:

IV. Sanctions:

.          .                    .          .

8. Permanent expulsion from the School of Law. Permanent expulsion should be reserved only for the most serious offenses, especially because disciplinary expulsion of a law student from a member of the Association of the American Law Schools prevents that student from enrolling in any other member schools.

S.F. ¶ 53.

**Uncontroverted**

e

78.   The University of Kansas School of Law Dispute Resolution procedure, states, in part:

Section 2: Rights of Parties

(a)      The Dispute Resolution Procedures shall be applied so as to protect the due process and other rights of parties to the dispute.

(b)      Parties to the dispute shall receive reasonable notice of any charges or allegations against them, of the time and place of any hearing, and of the material issues to be determined.

(c)      With due regard for the authority of the hearing body to exclude irrelevant, immaterial, cumulative or improper evidence, parties to the dispute shall have a full and fair opportunity to present their version of events, present and cross examine witnesses, or otherwise plead their case, and may be represented by counsel at their own expense.

(d)      Parties to the dispute are entitled to a decision by an impartial hearing body based upon the record of the proceedings. Members of the hearing body shall not communicate with each other or with any other person on matters material to the dispute except through the hearing process.

(e)      The hearing body and others administering the dispute resolution procedures shall respect the confidentiality of the proceedings. Confidentiality does not apply to information that is relevant to the investigation or prosecution of a disciplinary action by the Disciplinary

e

Administrator of the Kansas Bar, any matter relating to the admission of an attorney to the bar of any state or federal jurisdiction or court, or in any case where disclosure is required by court order or other legal authority. S.F. ¶ 54.

**Uncontroverted**

79.   The University of Kansas Student Code of Rights and Responsibilities states, in part, that it "applies to all university students, administration, faculty and staff." S.F. ¶ 55.

**Uncontroverted**

80.   The University of Kansas' University Senate Code states, in part, that it "applies to faculty, staff and students." S.F. ¶ 57.

**Uncontroverted**

81.   The Faculty Senate Rules and Regulations, in pertinent part, state:

2.1.1. Policies for admission and readmission are established by the faculties of the various schools or the College, within the parameters of state laws and Regents regulations and within guidelines set by the Faculty Senate. A statement of such requirements shall be published or filed with the Director of Admissions and the Secretary of the Faculty Senate. For undergraduate admission, implementation of these policies by the Director of Admissions includes the initial evaluation of credentials presented by applicants covering academic work done elsewhere. S.F. ¶ 58.

**Uncontroverted**

e

82.  When Brown's notice of pending litigation arrived in the Chancellor's office, it was delivered to the Office of General Counsel, and it was the office of General Counsel that responded. S.F. ¶ 60.

**Uncontroverted**

83.  Brown was academically successful as a law student at the University of Kansas. S.F. ¶ 63.

**Uncontroverted**

84.  The School of Law permitted Brown to enroll in the Fall 2009, Spring 2010, Summer 2010, and Fall 2010 sessions before his removal from the School of Law. S.F. ¶ 64.

**Uncontroverted**

85.  Mr. Brown's deposition testimony made clear that his claim against the Board of Regents is premised not on the Regents having any direct knowledge of or involvement with his enrollment at and dismissal from the University of Kansas School of Law, but simply on the supervisory role that the Board of Regents has over the University of Kansas.

Exhibit E, Brown deposition pp. 107:4-20.

A My claim is that the Board of Regents is beholden to honor my enrollment contract, and perhaps they weren't involved in the minutiae of the enrollment process; hoever, they do oversee the chancellor, they oversee all the universities, they approve the regulations, they establish limits on what can and cannot be done. One important, one important limit

e

that's of that nature is that the actions taken in the universities and regulations that they promulgate can't be contrary to state law and they can't be contrary to federal constitutional law and to the extent that that's happened here the Regents are beholden to correct it and to the extent that the Board of Regents condones what's happened here, then they're in breach of the contract.

**Controverted that this is the entire reason for the Regents' involvement.  K.S.A. 76-713 provides that "The board of regents may be sued and may defend any action brought against the board of regents or any state educational institution."  Brown wants to be sure that whatever Judgment may be forthcoming is not inoperative for want of the proper power to implement that judgment.**

86.   At deposition, Brown admitted that the Board of Regents had no knowledge of him or his claims until it was served with the lawsuit. Exhibit E, Brown deposition pp. 115:22 – 116:17

Q Tell me specifically what facts you can point to that say that the Board of Regents members knew of your specific application to the School of Law before this lawsuit was filed.

A I don't have any facts that say they knew of what was in my application before the lawsuit was filed.

Q And you don't have any facts that they even knew that they had applied to the School of Law; correct? A No,

e

correct, specifically me, no.

Q Yes. And you don't have any facts at all which show that Andy Tomkins knew anything about your dismissal from the School of Law before this lawsuit was filed, correct?

A Not before the lawsuit.

Q And similarly you don't have any facts which say that any of the individual members of the Board of Regents knew anything about your dismissal from the law school before this lawsuit was filed; correct?

A No, not before the lawsuit was filed.

**Uncontroverted that this is the testimony.  Controverted that this testimony in any was affects the propriety of the Regents' involvement.  K.S.A. 76-713 provides that "The board of regents may be sued and may defend any action brought against the board of regents or any state educational institution." Brown wants to be sure that whatever Judgment may be forthcoming is not inoperative for want of the proper power to implement that judgment.**

87.   At deposition, Mr. Brown admitted that the Kansas Board of Regents does not admit students to the University of Kansas, and that he did not submit his application or amended application materials to the Kansas Board of Regents, stating that "the Board of Regents took no overt action" against him, and that his reason for naming them as defendants was solely "legal" because he believed it to be the correct official capacity defendants. Exhibit E, Brown depo. 111:1 – 112:25.

e

**Uncontroverted that this is the testimony.  Controverted that this testimony in any was affects the propriety of the Regents' involvement.  K.S.A. 76-713 provides that "The board of regents may be sued and may defend any action brought against the board of regents or any state educational institution." Brown wants to be sure that whatever Judgment may be forthcoming is not inoperative for want of the proper power to implement that judgment.**

88.    At deposition, Mr. Brown stated that his Count V, state claim for gross and wanton negligence, was against the individual defendants, Agrawal, Mazza, Rohleder-Sook, and McCray Pearson and the University. Exhibit E, Brown depo. pp. 116:23 – 117:12.

    **Uncontroverted**

89.    At deposition, Mr. Brown stated that his Count VI, state claim for tortious interference with respect to business advantage, was against the same defendants as Count V. Exhibit E, Brown depo. pp. 119:8-14.

    **Uncontroverted**

90.    At deposition, Mr. Brown stated that his Count VIII, state claim for civil conspiracy, was against the individual defendants, and explained the factual basis for his claim was his supposition that they were aware of his due process rights and dismissed him without a personal appearance. Exhibit E, Brown depo. pp. 120:19 – 122:5.

    **Controverted that this is the entire basis of the conspiracy claim.  See ARGUMENTS AND AUTHORITIES, SECTION C – "ACTIONS**

e

**INDICATING BAD FAITH AND/OR CONSPIRACY".**

91.   At deposition, Mr. Brown was unable to identify any specific date or event evidencing a meeting of the minds between the alleged conspirators; rather in describing the factual basis for his claim against each, he identified their having taken an action with which he disagreed. Exhibit E, Brown depo. pp. 122:8 - 132:2.

**Uncontroverted that the cited passage does not evince a meeting of the minds. Controverted that the cited passage is in any way representative of the weight of the evidence regarding conspiracy in this case.**

92.   Since his dismissal from the School of Law, Mr. Brown has not sought admission to any other law school. Exhibit E, Brown Depo. 154:23 – 155:1.

**Uncontroverted**

e

## ADDITIONAL FACTS SHOWING MATERIAL ISSUES IN DISPUTE

### *Facts Regarding University Rules and Regulations*

1.      The University of Kansas has its own system of government, which was available to the general pulic on the internet at the time of the filing of Brown's complaint. [Pl.'s Compl. ¶ 37]

2.      The main governing body of defendant The University of Kansas is the University Senate, and the main governing document of this body is the University Senate Code (U.S.C.), which was published online and available to the general public at the time Brown's complaint was filed. [Pl.'s Compl. ¶ 38]

3.      University Senate Code, Art. XIV, Section 2 provides procedural due process guarantees for every member of the University Community who is involved in a grievance or dispute. [Pl.'s Compl. ¶ 39, Mazza Dep. Ex. 6, University Senate Code, Art. XIV, Section 2]

4.      The University Senate Code applies to "Faculty, Staff and Students". [Mazza Dep. Ex. 6, University Senate Code, Top of Page 1]

5.      Subject to and in accordance with the control of the Chancellor and the Board of Regents as provided by law, the Student Senate is empowered to formulate such Rules and Regulations as it shall deem wise and proper for the control and government of such affairs of the University as directly and primarily affect the students of the University and to take such steps as it shall deem necessary for their implementation and administration.  Affairs of the University include, but are not limited to, student rights,

e

privileges, and responsibilities, student organizations and activities, student publications, and student housing and health. [Pl.'s Compl. ¶ 41, Mazza Dep. Ex. 6, University Senate Code, Art. III, Section 5]

6.      The body of rules and regulations by which the University Senate Code as it pertains to the Student Senate is administered is The University Senate Rules and Regulations, which was published online and available to the general public at the time Brown filed his complaint.  [Pl.'s Compl. ¶ 42, Mazza Dep. Ex. 7, University Senate Rules and Regulations]

7.      Disputes involving alleged violations by a student of the Code of Student Rights and Responsibilities (nonacademic misconduct) [fall under the jurisdiction of the] Vice Provost for Student Success. (Procedures of the Office of the Vice Provost for Student Success.)  [Mazza Dep. Ex. 7, University Senate Rules and Regulations, Section 6.4.9.1]

8.      The Code of Student Rights and Responsibilities applies to "[a]ll university students, administration, faculty and staff". [Mazza Dep. Ex. 3, Student Code, Top of Page 1]

9.      The Kansas University Code of Student Rights and Responsibilities was published online and available to the general public at the time Brown filed his complaint.  [Pl.'s Compl. ¶ 48]

10.     The USRR applies to "Faculty, Staff and Students". [Mazza Dep. Ex. 7, University Senate Rules and Regulations, Top of Page 1]

e

11.     Article 22 of the Code of Student Rights and Responsibilities is entitled "Non-Academic Misconduct".    [Mazza Dep. Ex. 3, Code of Student Rights and Responsibilities]

12.     Article 22 (C), "Offenses Against the Orderly Process of the University", states in relevant part that "An offense against the orderly process of the university is committed when [a] student or applicant knowingly furnishes false or misleading information to the University."   [Mazza Dep. Ex. 3, Code of Student Rights and Responsibilities, Art. 22 (C)(2)]

13.     The University Senate Rules and Regulations mandate that any subordinate unit which wishes to assume unit level jurisdiction over an area of dispute resolution must submit its unit level grievance procedure in writing, stating "Any organizational unit that has developed a grievance procedure shall submit it to the General Counsel of the University.  Unless the General Counsel determines that the procedure as submitted is in conflict with existing law, rules of the Board of Regents, or rules or regulations of the University, it shall become effective thirty calendar days after such submission or upon written approval of the General Counsel, whichever occurs first." [University Senate Rules and Regulations, Article V, Section 2, Subsection 5.2.1.3 Review and Approval (of Unit Level Grievance Procedures)]

14.     Any School of Law unit level grievance procedure which dealt with non-academic misconduct  would be published and in writing, would have been submitted to the office of General Counsel for approval (U.S.R.R. 5.2.1.3), would be on file in the

46

e

Equal Opportunity Office, with the University Ombudsman, and the Judicial Board Chair (U.S.R.R. 5.2.3), would comply with the Procedural Guarantees of Article XIV, section 2, of the University Senate Code (U.S.R.R. 5.2.2), would provide for the opportunity for each side to submit supporting witnesses (U.S.R.R. 5.2.2(b)), would provide the opportunity for each side to be informed of material supporting the action or position of the other side (U.S.R.R. 5.2.2(c)), *would exclude any party involved in the complaint from the rendering of any decision* (U.S.R.R. 5.2.2(d), and would provide for the creation of a record of the proceeding, including audio tape recording of the hearing and a written decision of the hearing body. [Mazza Dep. Ex. 7, University Senate Rules and Regulations, Section 5.2 (Emphasis Added)]

15.     The School of Law's Dispute Resolution Procedure specifically disclaims application to procedures that are within the exclusive jurisdiction of another body pursuant to the U.S.R.R. [Mazza Dep. Ex. 1, School of Law Dispute Resolution Procedure, Section 1, (a)]

16.     In Brown's case, application of the School of Law's Dispute Resolution Procedure was foreclosed by University Senate Rules and Regulations, Article VI, Section 4, Subsection 6.4.9.1 which placed complaints of nonacademic misconduct described in the Code of Student Rights and Responsibilities within the exclusive jurisdiction of the Vice Provost for Student Success. [Mazza Dep. Ex. 1, School of Law Dispute Resolution Procedure, Section 1, (a)]

17.     The Code of Student Rights and Responsibilities, Art. 22 (F)(1), provides

e

as follows:    "A student or organization alleged to have violated prov1s1ons of Article 22 is entitled to a hearing in accordance with procedures established by the Office of the Vice Provost for Student Success. Any appeal from such a hearing shall be directed to the University Judicial Board." [Mazza Dep. Ex. 3, Student Code, Art 22 (F)(1)]

18.    The Code of Student Rights and Responsibilities, Art. 24, provides the Senate Code not be inconsistent with the University Senate Rules and Regulations as follows:  "Subject to the approval of the Chancellor, authority for the development of rules concerning student non-academic conduct resides in the Student Senate pursuant to Article V, Section 4, of the University of Kansas Senate Code. Nothing in this Code shall be construed to be inconsistent with the intent or purpose of the University of Kansas Senate Code."  [Mazza Dep. Ex. 3, Student Code, Art 24]

19.    The U.S.R.R. provides a specific avenue of appeal for a decision involving the misconduct of which Brown is accused, setting forth that "[t]he decision [in a dispute involving alleged violations by a student of the Code of Student Rights and Responsibilities (nonacademic misconduct)] may be reviewed by an appropriate administrative officer and/or an appeals panel of the Judicial Board may consider the appeal pursuant to section 6.7 of the University Senate Rules and Regulations." [Mazza Dep. Ex. 7, University Senate Rules and Regulations, Section 6.4.9.2 (regarding appeals)]

20.    Defendant Rohleder-Sook testified that compliance with the Code of Student Rights and Responsibilities is mandatory, not discretionary, for the School of Law faculty. [Def. Rohleder-Sook Dep. 67:20-25]

e

21.     The Office of the Vice Provost for Student Success (now the Office of the Vice Provost for Student Affairs), and not the School of Law, has the authority to administer the Code of Student Rights and Responsibilities. [Mazza Dep. Ex. 3, Student Code, Art 23]

22.     Chancellor Bernadette Gray-Little testified that University employees do not have discretion to undermine established accepted University Policy, which includes any policy that is formally adopted by the university and published for the general public at large to see. [Gray-Little Dep. 19:17-24]

23.     The University Senate Code establishes procedural guarantees which pervade the entire university system of Governance, stating in Section 2 (Procedural Guarantees) that "The 'due process' to be accorded shall include, but not be limited to, the following elements:

a)  Subject to Section 6.5.3 of the University Senate Rules and Regulations, every member of the University community with a grievance or complaint that comes within the jurisdiction of an established University body shall be entitled to a hearing before a disinterested panel. Specific procedures for each type of grievance or complaint that is within the jurisdiction of an established University body are set forth in this Code.
b)  Each party to a proceeding may represent itself or be represented by an advisor or counsel of his, her, or its choice.
c)  A party against whom a complaint or grievance is brought shall have the right to a written statement of the complaint or grievance against him or her, which statement shall set forth with particularity the facts upon which the complaint or grievance is based and shall indicate the provision or provisions of the University Rules and Regulations alleged to have been violated, or the acts of established University bodies or officials alleged to have been unlawful, arbitrary, or capricious. In cases involving alleged violations of University parking and traffic regulations the usual printed and completed summons or citation shall be deemed a sufficient written statement of the charge.
d)  A party against whom a complaint or grievance is brought shall have the

e

privilege of remaining silent and refusing to give evidence, and he or she shall be informed of this privilege during the initial state of the proceedings.

e) Each party to a proceeding shall have the right to introduce into evidence all relevant testimony and documents. Each party to a proceeding shall be entitled to a full examination of the evidence presented by the other parties, including the opportunity to cross-examine witnesses. The hearing body shall base its recommendations solely on the evidence received at the hearing.

f) In any hearing or appeal, the parties are entitled to a decision based upon the record of the hearing or appeal. Decision making bodies shall avoid communication with a party or witness pertaining to the substance of a matter before that body unless all the parties have been duly notified of the nature and content of the contact. Copies of any written communications shall be provided to all parties. This provision shall not prevent the Judicial Board Chair from providing general information and assistance to the parties in accordance with the provisions of the University Senate Rules and Regulations.

g) When an audio tape or written record is made of a proceeding, each party to that proceeding is entitled to a copy. The cost of making the copy shall be born e by the requesting party or parties.

h) Each party to a proceeding shall be entitled to prompt, written notice of the decision of the hearing body hearing his or her complaint or grievance.

i) Where the procedures provide for an appeal beyond the hearing, a party aggrieved by a decision of the hearing body shall be entitled to appeal in accordance with such procedures.

j) In all proceedings, the party supporting the application of sanctions to individual members of the University community shall have the burden of persuading the hearing body of the facts upon which the application of such sanctions must be based.

k) Special procedures for hearings held by the Faculty Rights Board shall be developed, approved, and made publicly available according to applicable provisions of the Faculty Senate Rules and Regulations."

[Mazza Dep. Ex. 6, University Senate Code, Section Article XIV, Section 2 (Procedural Guarantees)]

24.     The due process rights guaranteed in U.S.C. Art. XIV, § 2 apply to disputes within the jurisdiction of the U.S.R.R. [Pl.'s Compl. ¶ 42, Mazza Dep. Ex. 7, University Senate Rules and Regulations, Section 5.2.2]

25.     The University Senate Code contains specific procedures for each type of grievance or complaint that is within the jurisdiction of an established University body.

e

[Mazza Dep. Ex. 6, University Senate Code, Section Article XIV, Section 2 (a)]

26.    The Code of Student Rights and Responsibilities, Art. 2 (E), provides as follows: "Students will be exempt from disciplinary action that affects their status as students except for academic failure or violation of a published Student Senate, University Senate, University or Regents rule or regul ation. Rules and regulations shall be fully and clearly disclosed in advance of the supposed violations." [Mazza Dep. Ex. 3, Student Code, Art 2 (E)]

27.    The Code of Student Rights and Responsibilities, Art. 2 (F), provides as follows: "No disciplinary sanctions resulting from a violation of rules and regulations, under Article 2(E), may be imposed upon any student without prior written notice of the nature and cause of the charges, and an opportunity to be heard at a fair hearing. A fair hearing shall include confrontation of witnesses against him or her and the assistance of a person of his or her own assistance or with the prior approval of the Office of the Vice Provost for Student Success, up to three persons of the student's choosing." [Mazza Dep. Ex. 3, Student Code, Art 2 (F)]

28.    The Code of Student Rights and Responsibilities, Art. 2 (G), provides as follows: "A student, a student organization, or a campus organization charged with violating University regulations is entitled to a hearing. A student or an organization may waive the right to a hearing when the party chooses to admit responsibility for misconduct and accept disciplinary sanctions from the University." [Mazza Dep. Ex. 3, Student Code, Art 2 (G) ]

e

29.      The Code of Student Rights and Responsibilities, Art. 3 (B), provides as follows: "The term 'student' includes all persons enrolled at the Lawrence campus, Capitol Complex and Edwards Campus, either full time or part time, pursuing undergraduate, graduate, or professional studies, as well as nondegree students. This also includes individuals who confirm their intent to enroll in programs, those attending orientation sessions, and those that were enrolled at the date of an alleged incident. Persons who withdraw after allegedly violating the student code or who are not officially enrolled for a particular term but who have a continuing relationship with the university are considered 'students.'"  [Mazza Dep. Ex. 3, Student Code, Art 3 (B)]Sss

30.      In a complaint such as the one leveled against Brown, U.S.R.R. section 5.2.2 (a) provides that there is a time limit of thirty calendar days between the filing of a complaint and a hearing on the complaint. [Def. Rohleder-Sook Dep. 61:11-63:10]

31.      There was a procedure, adopted 10/6/94, in place at the time of the School of Law's Complaint against Brown for interpretation and resolution of conflict among various University codes, which provided as follows: "Interpretation of, or Conflict among, Various Governance Documents:  On 10/6/94, the University Council approved the following procedure for interpretation of, or conflict among, the University Senate Code, University Senate Rules and Regulations, Faculty Senate Rules and Regulations, the Handbook for Faculty and Unclassified Staff, and the Student Senate Rules and Regulations:

1. Contact the Office of University Governance, 864-5169, or via e-mail at govern@ku.edu, with questions about conflict or interpretation.

e

2. If the Governance Office cannot resolve the question, it will be referred to the chair of the Senate Executive Committee.

3. If the Senate Executive Committee cannot satisfactorily resolve the conflict, it may refer it to a committee of the following:
   1) Chair of the Judicial Board.
   2) Chair of the Academic Policies & Procedures Committee.
   3) Chair of the Faculty Rights, Privileges & Responsibilities Committee.
   4) Chair of the Organization & Administration Committee.
   5) Chair of the Student Rights Committee of Student Senate."

[University Senate Code as Currently Published, P.1, Preface]

*Timeline of Events*

32.      As a young child, plaintiff Brown fell victim to childhood sexual abuse by a trusted family member.  As a result, his adolescence and adulthood were filled with repressed memories, confusion, dysfunctional relationships exclusively with other victims of childhood sexual abuse, irrational fear, intense shame, periodic abuse of alcohol, depression, suicidal ideations, and a feeling that nothing was in its place unless everything was out of place.  [*See* Exhibit A – Wayne Witcher Report Dated March 12, 2012, Pl.'s Bates BROWN v. KU 000654-000656; Exhibit B – Wayne Witcher Curriculum Vitae, Pl.'s Bates BROWN v. KU 000654-000656; Pl.'s Decl. ¶ 2]

33.      In Brown's late 30's, he discovered that he had been sexually abused as a child in therapy with Dr. Wayne Witcher, Ph.D., using guided imagery and hypnosis. [*See* attached Exhibit A – Wayne Witcher Report Dated March 12, 2012, Exhibit B – Wayne Witcher Curriculum Vitae, Pl.'s Bates BROWN v. KU 000600-000601; Pl.'s Decl. ¶ 3]

34.      On April 15, 2008, Brown's dysfunctional past and failure to deal with his family of origin issues in a meaningful way culminated in a nervous breakdown. [*See*

e

Brown Dep. 41:6-42:4; Pl.'s Decl. ¶ 4]

35.     On April 18, 2008, Brown began daily AA meetings and regular therapy to address the family of origin issues which had caused his anxiety and controlled the first 47 years of his life. [Pl.'s Decl. ¶ 5]

36.     Brown is a current member of AA, and his sobriety date is April 18, 2008. [Pl.'s Decl. ¶ 6]

37.     Approximately a year into his recovery, Brown made the decision to apply to the University of Kansas School of Law.  [Pl.'s Decl. ¶ 7]

38.     At that point in time, Brown was only in the beginning stages of being able to constructively deal with the intense feelings of shame which had characterized his entire life through that date. [Pl.'s Decl. ¶ 8]

39.     At the time Brown made application, he was still experiencing intense fear, shame, and denial about traumatic events in his past. [Pl.'s Decl. ¶ 9]

40.     Plaintiff Brown ("Brown") filed an application for admission to the University of Kansas School of Law on April 8, 2009. [Pl.'s Compl. ¶ 56; S.F. ¶ 15]

41.     In his application, Brown made irrational attempts to reason away the applicability of question 27 of the School of Law's application through conversations with family members and legal research which indicated that prior transgressions became too remote for consideration by the Bar association after the passage of a certain amount of time. [Pl.'s Decl. ¶10]

42.     Brown ultimately convinced himself that convictions occurring more than 7

e

years in the past were too remote to be relevant based upon *In re Ketter*, 268 Kan. 146, 154-5 (1999) and *In Matter of Pistotnik*, 254 Kan. 294 (1993).  [See Defs.' Bates Brown, Robert v. KU, et al 000170]

43.     Brown did not include his prior criminal history in his answer to question 27 of the School of Law application (regarding his prior criminal record) based upon his research indicated they were too remote in time to be relevant. [Pl.'s Compl. ¶ 58; Mazza Dep. Ex. 8 Section 5(C)(ii); Brown Dep. 72:13-14, 75:22-76:4, 78:17-19; 83:25-84:7; Pl.'s Decl. ¶¶10-11]

44.     In making his determination that the prior criminal history was too remote, Brown relied on *In re Ketter*, 268 Kan. 146, l54-55 (1999) and  *In re Pistotnik*, 254 Kan. 294, 296 (1993), which indicated that the passage of seven years rendered prior criminal activity too remote for consideration by the bar. [Mazza Dep. Ex. 8 Section 5(C)(ii); Brown Dep. 72:13-14, 75:22-76:4, 78:17-19; 83:25-84:7; Pl.'s Decl. ¶¶10-11]

45.     Brown was admitted to the University of Kansas School of Law on August 20, 2009. [Pl.'s Compl. ¶ 59]

46.     During the first week of law school in August of 2009, Dean Wendy Rohleder-Sook (defendant Rohleder-Sook) spoke to the entering class of Fall 2009 regarding question 27 and application amendment, and made clear that the law school considered no transgression too remote in time. [Pl.'s Compl. ¶ 60; Def. Rohleder-Sook Dep. 24:18-28:3; Pl.'s Decl. ¶12]

47.     Defendant Rohleder-Sook explained that the school of law sought to help

e

amending applicants to avoid problems when it came time to take the bar. [Pl.'s Compl. ¶ 61]

48. Defendant Rohleder-Sook explained that students often think their past transgressions are a more serious problem than they really are, and that the most important thing was that students come forward and be honest with the law school. [Pl.'s Compl. ¶ 62]

49. Through its various speakers, the School of Law expressed its intentions to work with applicants who amended to assure that they did not encounter difficulties when it came time to sit for the Bar Exam. [Pl.'s Compl. ¶¶ 63-64]

50. Brown came forward and voluntarily amended his application 7 days after his admission on August 27, 2009. [S.F. ¶ 25, Defs.' Mem. P.10, Pl.'s Decl. ¶ 13]

51. Brown's August 27, 2009 amendment came 50 days before the October 15, 2009 due date of tuition for the fall 2009 Semester. [Pl.'s Bates BROWN v KU 000492]

52. Contemporaneously with his August 27th, 2009 Amendment, Brown provided Defendant Rohleder-Sook a copy of his Petition for Certiorari as filed in the Supreme Court of the United States with respect to the four charges of domestic violence. [Brown Dep. Ex. 5; Def. Rohlder-Sook Dep. 78:2-7]

53. In Brown's August 27th Amendment, he disclosed every non-traffic and non-pet related charge which had ever been adjudicated against him, whether by conviction, diversion, or plea bargain. [Pl.'s Decl. ¶ 13]

54. At the time of his amendment, Brown stupidly rationalized that charges

e

which had been dropped without consequence need not be disclosed in the amendment. [Pl.'s Decl. ¶ 14]

55. Upon receiving Brown's amended application, the decision on whether or not to take any further action was left to the sole discretion of defendant Rohleder-Sook. [Mazza Dep. 164:20-165:9]

56. Defendant Rohleder-Sook requested more information regarding the prior convictions. [Pl.'s Compl. ¶ 66, S.F. ¶ 26]

57. Defendant Agrawal was involved in the August 27, 2009 decision to request more information from Brown after he amended his application. [Defs.' Bates Brown v. KU 000044]

58. On the same day Brown amended his application, defendant Agrawal authored email communications with general counsel regarding Brown's amendment. [Defs.' Bates Brown v. KU 000443]

59. On September 11, 2009, Brown provided the additional information requested. [S.F. ¶ 27]

60. Brown's September 11 letter to Rohleder-Sook, Brown explained in part "Robyn Barr Is the mother of my son, Kyler. She has a long history of false allegations of varying sorts In the Johnson County Kansas Court system, and a very questionable reputation for truth and veracity. Her allegations of domestic violence were untrue, and she so testified in open court. On the day of my trial, my counsel (Kevin Morlarty) left to attend to a matter in another courtroom and never returned, leaving in his stead the firm's

e

most Junior associate, who was then only three months a lawyer and had just been handed the case file. I was found guilty in both cases in a bench trial despite the lack of direct evidence and the recantation of Ms. Barr on the witness stand."   [Defs.' Bates Brown, Robert v. KU, et al 000047-000048]

61.     Brown's September 11, 2009 letter and the Cert Petition previously submitted with his amendment made clear that his primary basis for mitigation with respect to the domestic battery charges was his innocence.  [Defs.' Bates Brown, Robert v. KU, et al 000047-000049; Brown Dep. Ex. 4 – Cert Petition]

62.     On September 30, 2009, defendant Agrawal directed defendant Rohleder-Sook to "get the procedural history of the cases, and touch base with Jim P's office about how to proceed." [Defs.' Bates Brown v. KU 000435]

63.     On October 2, 2009, Rohleder-Sook emailed Brown with questions regarding two of the four counts of domestic battery which had been documented in the information provided to her with his Amended application and an arrest for which the charges had subsequently been dismissed, also involving Robyn Barr, on 04/23/2004. [S.F. ¶ 28]

64.     On October 2, 2009, Brown responded via email to Rohleder-Sook advising her that the two counts of domestic battery she had questions about had been included in the documentation he had originally provided with his amendment. [S.F. ¶ 29; Brown, Robert v. KU, et al 000162]

65.     Rohleder-Sook subsequently testified that contrary to her prior assertion,

e

the documentation provided to her by Mr. Brown had disclosed all four incidents of domestic battery rather than just two as she had previously thought. [Def. Rohleder-Sook Dep. 77:19-78-11]

66.    On October 2, 2009, Brown responded via email to Rohleder-Sook advising her that with respect to the criminal trespass charge, the Johnson County Prosecutor had subsequently determined that it's complaining witness, Robyn Barr, was lying and had dropped the charges of its own initiative. [S.F. ¶ 29; Brown, Robert v. KU, et al 000162; Pl.'s Decl. ¶¶ 52-57 ]

67.    Rohleder-Sook subsequently obtained documentation from the Johnson County prosecutor confirming that Criminal Trespass charge had been dismissed on 10/27/2004, by motion of the State, at a hearing Brown did not attend. [Defs.' Bates Brown, Robert v. KU, et al 000080-000081]

68.    On October 7, 2009, Brown voluntarily provided a signed release for all information in the possession of the Johnson County Prosecutor to the School of Law. [Defs.' Bates Brown, Robert v. KU, et al 000094]

69.    On November 18, 2009, Defendant Rohleder-Sook spoke to the assistant DA at the Johnson County DA's office who made her aware that "the victim did recant her story at trial", and communicated with Mazza and Agrawal about the results of her conversation via email, inquiring as to whether they wanted to order a copy of the transcript. [Defs.' Bates Brown v. KU 000448]

70.    On November 30, 2009, Rohleder-Sook again inquired of Mazza and

e

Agrawal regarding proceeding with obtaining the transcript. [Defs.' Bates Brown v. KU 000448]

71.     On November 30, 2009, Defendant Agrawal made the decision as to whether and how to proceed by e-mailing Defendants Mazza and Rohleder-Sook "[w]e need to get this in front of the admissions committee, and I suspect a transcript will be requested. If I'm right, then we might as well go ahead, get the transcript, and complete the file." [Defs.' Bates Brown v. KU 000447]

72.     On November 30, 2009, Defendants Agrawal and Rohleder-Sook made the decision to defer reconvening the admissions committee until after the break. [Defs.' Bates Brown v. KU 000446]

73.     Agrawal reasoned that action should be postponed until after Winter break "just because it's so hard to get a group together with faculty candidates coming through, exams being written, given, and graded, and time out of the building." [Defs.' Bates Brown v. KU 000446]

74.     Subsequent to November 30, 2009, Rohleder-Sook obtained the transcript of Brown's domestic battery trial. [Ex. C – Trial Transcript, Defs.' Bates Brown, Robert v. KU, et al 000193-000318]

75.     The transcript contained the following testimony from Barr regarding the reason she had made false allegations against Brown:

> A.   Bob wasn't really Bob to me. I mean, I don't see Bob as Bob. So when I fight with him, I'm not fighting with him; and I'll do anything to hurt him, get him in trouble, put him in jail.
> Q.   When you say he's not Bob, who is he?

e

A.  He's my stepfather. What I was going to say before the recess is that I was molested and raped when I was --

MR. HOWE: Judge, I object as nonresponsive to the question asked.

THE COURT: The question was, why she gave false information to the police.

MR. HARE: Uh-huh.

THE COURT: I'll allow it.

Q.  (By Mr. Hare) Go ahead, ma'am. Answer it.

A.  Ever since I started getting into adult relationships with men, I found out -- well, I'm starting to find out now why -- but I've always had physical arguments, and I lose my temper. And if they try to leave me, I will grab them, I will hit them, I will lie, because I'm taking it all out on them. I mean, I don't know how to explain it. My therapist couldn't explain it better. But they become my abuser. And I called the police, because they're supposed to be protecting me. But it's not -- they weren't there when I was five, and I keep waiting for them to protect me.

[Defs.'  Bates Brown, Robert v. KU, et al 000237-000238]

76.     Brown was not given notice that his status as a Student would be placed in jeopardy, but instead was allowed to continue in classes and was automatically re-enrolled by Defendants for the next semester. [Pl.'s Compl. ¶ 69, ¶ 73; Pl.'s Decl. ¶¶16-17]

77.     After voluntary provision of the signed release on October 7, 2009 for all information in the possession of the Johnson County Prosecutor to the School of Law, Brown heard nothing from the School of Law regarding his application until he was contacted regarding the matter by Dean Rohleder-Sook and Dean Mazza in February of 2010. [Pl.s' Decl. ¶ 16; Pl.'s Compl. ¶ 69, ¶ 73]

78.     Between October 7, 2009 and February of 2010, Brown continued in and satisfactorily completed all the requirements for his courses for the Fall 2009 semester, was allowed to sit for finals, and received grades in all his courses. [Pl.s' Decl. ¶ 17; Pl.'s Compl. ¶¶ 70,71; S.F. ¶¶ 31-32]

e

79.     Between October 7, 2009 and February of 2010, Brown was automatically enrolled in the next semester and his tuition automatically collected against a student loan by Dean Wendy Rohleder-Sook's office without the requirement of so much as a mouse click on Brown's part.  [Pl.s' Decl. ¶ 17; Pl.'s Compl. ¶ 73, 74]

80.     Between October 7, 2009 and February of 2010, Brown was allowed to begin his fall semester classes in January of 2010. [Plt.'s Compl. ¶75]

81.      Between October 7, 2009 and February of 2010, Brown continued to devote his full productive effort to the pursuit of his legal education at the School of Law. [Plt.'s Compl. ¶76]

82.     Between October 7, 2009 and February of 2010, Brown was given no indication that his status as a student was in jeopardy, or that his removal was being sought. [Pl.s' Decl. 17; Pl.'s Compl. ¶¶ 68-69, 78]

83.     On January 19, 2010, the 2008-2010 Law School Admissions Committee convened to consider the status of Brown's application [S.F. ¶ 33, Defs.' Mem. ¶ 40]

84.     Rohlder-Sook was aware of Barr's powerful recantation [Defs.' Bates Brown, Robert v. KU, et al 000448; Defs.'  Bates Brown, Robert v. KU, et al 000237-000238], but did not present it to the Admissions Committee, instead including only the finding of guilt [Def. Rohleder-Sook Dep. 78:16-79:7]

85.     Rohleder-Sook later testified she was aware that Barr's testimony indicated either that Barr had falsified the police reports or perjured herself on the witness stand. [Def. Rohleder-Sook Dep. 79:7-84:4]

e

86.     Rohleder-Sook did not present Brown's Petition for Writ of Certiorari in the Supreme Court of the United States to the admissions committee  [Brown Dep. Ex. 4, Cert Petition], although it had been the most substantial part of the documentation presented to Rohleder-Sook in concert with Brown's amendment.  [Brown Dep. Ex. 5; Def. Rohlder-Sook Dep. 78:2-7]

87.     In Rohleder-Sook's four and a half years at the school of law, she estimated that she had received between 40 and 80 amended applications.   Of those, only Brown's had resulted in a complaint and only Brown's had resulted in dismissal. [Def. Rohleder-Sook Dep. 16:20-17:11]

88.     After Rohleder-Sook's presentation to the admissions committee, committee member Sandra Craig-McKenzie was unaware of whether there had been other amended applications in the five year period in proximity to Brown's amended application. [McKenzie Dep. 58:4-17]

89.     Multiple members of the admissions committee that reconvened on January 19, 2010 believed Brown deserved due process before disciplinary action was taken. [Def. Rohleder-Sook Dep. 23:21-24:8]

90.     No unanimous decision was reached at the January 19, 2010 admissions committee, and no vote was taken with everybody present. [McKenzie Dep. 17:10-17]

91.     The admissions committee did not ever agree on or make any recommendation as to what action should be taken regarding Brown's continued enrollment. [McKenzie Dep. 18:18-20]

e

92.     Defendant Rohleder-Sook later reported, after further communication with the committee members, that they would have rejected Brown's application if they had known of the criminal charges. [S.F. ¶ 33, Defs.' Mem. ¶ 40, McKenzie Dep. 17:10-18:20]

93.     Following the Admissions Committee's decision, Defendants Rohleder-Sook, Mazza, and Agrawal collectively decided that Brown would be afforded due process through the Law School Dispute Resolution Procedure, and that to initiate that process, a complaint regarding Brown's failure to disclose his criminal history in his application should be filed pursuant to that procedure. [Exhibit B, Rohleder-Sook Decl. ¶ 3; Defs. Mem. Exhibit D, Mazza Decl. ¶ 5.; Def. Rohleder-Sook Dep. 19:10-17; Def. Rohleder-Sook Dep. 20:5-9]

94.     Sandra Craig-McKenzie ("McKenzie"), the School of Law's Dispute Resolution Procedure Ombuds and a member of Brown's admissions committee, testified that she was unaware of any procedure which could allow the due process rights under the DRP to be withdrawn once afforded to a party, and further testified that "if the intent was to withdraw rights, that it would be in writing that they could be withdrawn." [McKenzie Dep. 54:17-55:1]

95.     McKenzie testified that she was unaware of any basis in procedure, equity, or common law which would permit the withdrawal of the Due Process rights under the DRP once they have attached.  [McKenzie Dep. 55:8-23]

96.     McKenzie testified that Students who are the subject of a grievance under

e

the DRP are entitled to the rights that given to students under the University Senate Code and the University Senate Rules and Regulations. [McKenzie Dep. 39:14-20]

97.    McKenzie testified that she was competent to interpret the University's various codes.  [McKenzie Dep. 40:16-41:5]

98.    McKenzie testified that the due process protections for the parties in a dispute pursuant to the DRP become effective upon the filing of the complaint. [McKenzie Dep. 41:7-42:2]

99.    McKenzie testified that the rights afforded to parties under the DRP inlcude the right to a full and fair opportunity to present their version of events, to present and cross examine witnesses, to be represented by counsel at their own expense, and to have a decision by an impartial hearing body based on the record of the proceedings. [McKenzie Dep. 43:2-44:7]

100.    McKenzie testified that under the DRP, parties have the right to examine evidence and cross examine witnesses at a hearing.  McKenzie testified that at such hearing, the complainant would have the burden to establish that a violation had occurred using the "clear and convincing evidence" standard. [McKenzie Dep. 47:5-48:17]

101.    McKenzie testified that the DRP creates an avenue of appeal pursuant to U.S.R.R. 6.4 in the event a party is dissatisfied with the outcome.  [McKenzie Dep. 47:5-48:17]

102.    McKenzie testified that parties to complaints under the DRP had the right to examine prior decisions (properly redacted) on request. [McKenzie Dep. 47:5-48:17]

e

103.   Between January 19, 2010 and February 17, 2010, Defendants Rohleder-Sook and Mazza collaborated to jointly prepare a complaint against Brown under the Law School Dispute Resolution Procedure. [Def. Rohleder-Sook Dep. 35:14-36:5]

104.   Although it was the joint work product of both defendants Rohleder-Sook and Mazza, the complaint was signed only by Rohlder-Sook, who then "filed" it with co-author Mazza on February 17, 2010. [Brown, Robert v. KU, et al 000129-000163; S.F. ¶ 34; Defs.' Mem. Exhibit B, Rohleder-Sook Decl. ¶ 4; Defs.' Mem. Exhibit D, Mazza Decl. ¶ 6]

105.   On February 23rd, 2010, nearly six months after Brown self reported the omission of 13 year old misdemeanors from his law school application, defendant Mazza provided Brown with a copy of the Shool of Law's complaint under the DRP. [Joyce McCray Pearson Deposition Exhibit 27, ¶8; Pl.'s Compl. ¶ 79]

106.   At the February 23rd meeting, Brown was provided with a copy of the University of Kansas School of Law Dispute Resolution Procedure (D.R.P.), which stated that he had due process rights which would be protected throughout the dispute (D.R.P. 2(a)), the right to a hearing before and impartial hearing body (D.R.P. 2(d)), the right to information and assistance from an impartial law school ombudsman (D.R.P. 3(a)), and the right to notice via a formal complaint that stated a violation of the University Code, University Senate Code, University Senate Rules and Regulations, the Honor code, or other applicable rule, regulation, or provision of law (D.R.P. 2(b) and 6(b)(4)). [Joyce McCray Pearson Deposition Exhibit 27, ¶9; Pl.'s Compl. ¶ 80]

e

107. At the February 23rd meeting, defendant Mazza stated to Brown that his permanent removal from School of Law, "the ultimate sanction" was being sought. [Joyce McCray Pearson Deposition Exhibit 27, ¶8; Pl.'s Compl. ¶ 80; Pl.s Dec. ¶ 19]

108. At the February 23rd meeting, defendant Mazza explained that since the law school ombudsman had already ruled against Brown at a meeting organized by Rohleder-Sook to reconsider his application, there was no impartial law school ombudsman available for Brown. [Brown, Robert v. KU, et al 000319 ; Pl.'s Compl. ¶ 81; Pl.s Dec. ¶ 20]

109. At the February 23rd meeting, defendant Mazza stated he would act in the stead of the law school ombudsman in an effort to see that Brown's due process rights were protected, and that he would hold in confidence everything said at the meeting. [McKenzie Dep, Ex. 36; Pl.'s Compl. ¶ 82; Pl.s Dec. ¶ 20]

110. At the February 23rd, 2010 meeting, Brown explained to Mazza that he had understood he would have the opportunity to amend if his assumptions regarding remoteness had been incorrect, and that he had never intended to mislead the School of Law. [Pl.s Decl. ¶ 21]

111. At the February 23rd, 2010 meeting between Brown and Mazza, Mazza mentioned to Brown on multiple occasions that the Complaint was an "Article 22"matter. [Pl.s Decl. ¶ 23]

112. At the February 23rd, 2010 meeting with Dean Mazza, Brown did not make the statement "I knew I would not have been admitted if I had disclosed my criminal

e

history", or any similar statement to that effect. [Pl.s Decl. ¶ 22]

113.   At the February 23rd, 2010 meeting with defendant Mazza, Brown requested informal dispute resolution. [Pl.'s Compl. ¶ 85]

114.   The February 23rd, 2010 meeting between Brown and Mazza was the only meeting at which Brown and Mazza ever spoke face to face regarding the complaint. [Pl.s Decl. ¶ 18]

115.   On February 28th, 2010, Brown responded to the School of Law's complaint pursuant to the D.R.P. with his written notice that he intended to file a response to the complaint, which was delivered by email and subsequently hand delivered to defendant Mazza.  [Mazza Dep. Ex. 8, S.F. ¶ 35]

116.   Brown received no communication regarding letter of February 28th, 2010, which contained his procedural objections, for a month and a half following providing it to the School of Law. [Pl.'s Compl. ¶ 97]

117.   Brown's letter of February 28th, 2010, asserted that "[t]he Complaint fails to meet the requirements of 6.3.1.1 in that it does not specify the provision(s) of the Faculty Code of Conduct, University Senate Code, The University Senate Rules and Regulations, the Code of Student Rights and Responsibilities, or other applicable rule, regulation, or law allegedly violated and should be dismissed pursuant to U.S.R.R. 6.5.3.1(d)" [Mazza Dep. Ex. 8, P.1, S.F. ¶ 35]

118.   Brown's letter of February 28th, 2010, asserted that "[t]he Complaint fails to make allegations which, if proven, would constitute Academic Misconduct as defined

e

within U.S.R.R. 6.2.6.1. and should be dismissed pursuant to 6.5.3.l(d)." [Mazza Dep. Ex. 8, P.1, S.F. ¶ 35]

119.   Brown's letter of February 28th, 2010, asserted that "[t]he action requested by the Complainant is foreclosed by Kansas common law [] and therefore the jurisdiction of the Judicial Board is superseded by U.S.R.R. 6.6.1.6. The complaint should be dismissed pursuant to 6.5.3.1(c)." [Mazza Dep. Ex. 8, P.1, S.F. ¶ 35]

120.   Brown's letter of February 28th, 2010 pointed out that in months that elapsed between the University's last contact with him and the filing of the complaint, he had continued in and satisfactorily completed all requirements of all his Fall 2009 semester courses, sat for finals in December of 2009, received grades for Fall 2009 semester courses, been enrolled for the Spring 2010 semester pursuant to action taken directly by the Kansas University School of Law Admissions Office of their own initiative and without his personal request or intervention, had his tuition collected by the Kansas University School of Law Admissions Office (which was managed by defendant Rohleder-Sook) pursuant to University action of their own initiative and without his personal request or intervention, and begun classes in January of the following year, all the while receiving no indication that his amended application had not been accepted. [Mazza Dep. Ex. 8, §5.A., S.F. ¶ 35]

121.   Brown's letter of February 28th, 2010 placed the University on notice that he had incurred tens of thousands of dollars in expenses in reliance on the actions the University had taken subsequent to his amended application.  [Mazza Dep. Ex. 8, §5.B.,

e

S.F. ¶ 35]

122.   Brown's letter of February 28th, 2010, asserted that the Complaint was superseded by Kansas contract law regarding waiver and rescission, and supported this assertion with Kansas case law, as follows:

1. One who seeks to rescind a contract on the grounds of fraud must do so with reasonable promptness after discovery of the fraud.
2. If, after discovery or knowledge of facts which would entitle a party to a contract to rescind the contract, he treats the contract as binding and leads the other party to believe that the contract is still in effect, he will have waived his right to rescind.
3. In order to constitute such a waiver, it is not necessary that there be an express ratification of the contract after discovery of the fraud which might make the equitable remedy of rescission available. Acts or conduct inconsistent with an intention to rescind it, or in recognition of the contract, may have the effect of affirming it.

Morse v. Kogle, 162 Kan. 558, Syl. at 1-3 (1947)

[Mazza Dep. Ex. 8, §5.A., S.F. ¶ 35]

123.   When asked why its right to dismiss Brown had not become forfeit under Morse v. Kogle, the University responded "Morse v. Kogle, 162 Kan. 558 (1947) involved a dispute arising out of a contract to purchase real estate. That case, therefore, is inapposite to the facts and circumstances presented by Mr. Brown's failure to provide complete and accurate information regarding his criminal history in his application for admission to the School of Law." [Def. KU's Resp. to Brown's 3rd Interrogs., Int. 4]

124.   Brown's letter of February 28th, 2010, asserted that the Complaint was superseded by Kansas contract law regarding equitable and promissory estoppel, and supported this assertion with Kansas case law as follows:

e

Whether the principle is described as equitable estoppel, quasi estoppel, waiver, ratification, election, or as a requirement of consistency in conduct, is not very important. The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced .... The rule is well recognized that where a party with full knowledge, or with sufficient notice or means of knowledge, of his rights and of all the material facts remains inactive for a considerable time or abstains from impeaching a contract or transaction, or freely does what amounts to a recognition thereof as existing, or acts in a manner inconsistent with its repudiation and so as to affect or interfere with the relation and situation of the parties, so that the other party is induced to suppose that it is recognized, this amounts to acquiescence and the transaction, although originally impeachable, becomes unimpeachable.

Schiffelbein v. Sisters of Charity of Leavenworth, 190 Kan. 278, 281-2 (1962)

[Mazza Dep. Ex. 8, §5.B., S.F. ¶ 35]

125.    When asked why its right to dismiss Brown had not become forfeit under Schiffelbein v. Sisters of Charity of Leavenworth, the University responded "Schiffelbein v. Sisters of Charity of Leavenworth, 190 Kan. 278 (1962), is a case that reverses dismissal of a complaint for failure to state a cause of action. The language quoted in Mr. Brown's February 28, 2012 letter is not the holding in Schiffelbein. That case, therefore, is inapposite to the facts and circumstances presented by Mr. Brown's failure to provide complete and accurate information regarding his criminal history in his application for admission to the School of Law." [Def. KU's Resp. to Brown's 3rd Interrogs., Int. 4]

126.    At deposition, defendant Rohleder-Sook could not provide any reason why the school of law's complaint was not superseded by Brown's arguments in Section 5 of his procedural objections. [Def. Rohleder-Sook Dep. 58:8-19]

127.    In responding to Brown's case law, the University did not assert that it is not governed by Kansas Contract law. [Def. KU's Resp. to Brown's 3rd Interrogs., Int. 4]

e

128.    Defendant Mazza testified that administration of student admissions applications are governed by Kansas contract law. [Mazza Dep. 168:16-169:19]

129.    On March 2, 2010, defendant Mazza informed Brown via email that in his case, there was little possibility of a "settlement of some sort". [Defs.' Bates Brown, Robert v. KU, et al 000328]

130.    On March 3, 2010, via email, brown inquired of defendant Mazza "When we initially spoke, you mentioned that this was an 'article 22' issue.  I'm not finding article 22 anywhere in the U.S.R.R.  Can you help point me to it?"   [Pl.'s Compl. ¶ 88; Defs.' Bates Brown, Robert v. KU, et al 000323]

131.    On March 3, 2010, in response to Brown's questions regarding Article 22, Defendant Mazza responded email, stating "I should have said 'Question' 22.  That's the question on the application asking the applicant to disclose past activity." [Pl.'s Compl. ¶ 88; Defs.' Bates Brown, Robert v. KU, et al 000323]

132.    On March 3rd, 2010, Brown made a formal request for mediation to Dean Mazza pursuant to U.S.R.R. 6.2.3.1. [Defs.' Bates Brown, Robert v. KU, et al 000328; Mazza Dep. Ex 1, Section 14; Pl.'s Compl. ¶ 87]

133.    On March 4th, 2010, Brown requested redacted copies of all prior decisions made pursuant to the Law School Dispute Resolution Procedure which were based on the same or similar allegations of fact as those charged in the February 17, 2010 complaint pursuant to Section 14 of the School of Law Dispute Resolution Procedure. [Defs.' Bates Brown, Robert v. KU, et al 00339; Mazza Dep. Ex 1, Section 14; Pl.'s Compl. ¶ 94]

e

134.    Although U.S.R.R. section 5.2.2 (a) provided that there was a time limit of thirty calendar days between the filing of a complaint and a hearing on the complaint, the March 19, 2010 deadline for Brown's hearing passed with neither hearing nor request for an extension of time by the School of Law. [Def. Rohleder-Sook Dep. 61:11-63:10; Mazza Dep. Ex. 7 §5.2.2 (a)]

135.    As of March 24, 2010, the responses to Brown's procedural objections had not yet been prepared and no hearing panel had yet been selected, although selection of the hearing panel is required upon receipt of the written complaint which occurred on February 17, 2010. [Brown, Robert v. KU, et al 000402; Mazza Dep. Ex. 1 Section 5; S.F. ¶ 34]

136.    On April 14th, 2010, via email, defendant Mazza stated to Brown "We've heard back from the KU General Counsel's office and Dean Wendy will be filing very shortly a brief response denying all your procedural objections to her initial complaint. The next step is to schedule the hearing. I've gone through the process of identifying the members of the 3-judge panel. According to the disciplinary rules, a hearing involving a student cannot be held during the final examination period. As a result, unless you agree to waive this restriction, we'll need to hold the hearing sometime next week. If you'll let me know your availability next week and the availability of your representative, should you choose to have one, I would appreciate it. Alternatively, if you agree, we can hold the hearing after the exam period concludes. I must warn you, however, that just because the hearing is deferred until after the exam period does not mean that this additional delay

e

will be taken into account when determining your guilt or innocence. Please let me know your thoughts about whether we should schedule the hearing next week or wait until finals conclude." [Defs.' Bates Brown v. KU 000800]

137.    On April 14th, 2010, via email, defendant Mazza stated to Brown "I understand that this process has been protracted.  We have not run across this situation before and, in an effort to preserve your due process rights to the greatest extent possible, we've had to consider matters very carefully and that has caused delay in processing the complaint." [Pl.'s Compl. ¶ 99; Defs.' Defs.' Bates Brown v. KU 000800]

138.    On April 15th, 2010, via email, Brown responded to defendant Mazza "I presume the hearing will be regarding the procedural objections, correct? Also, what about my request for mediation?" [Defs.' Bates Brown v. KU 000800]

139.    On April 15th, 2010, via email, defendant Mazza replied to Brown "We'll handle the procedural objections and the underlying substantive issue as part of the same hearing." [Defs.' Bates Brown v. KU 000800]

140.    On April 15th, 2010, Brown reiterated his request for mediation.  Dean Mazza responded via email "We have decided to forego any mediation.  That process is not required by the disciplinary procedures and we cannot think of any settlement other than voiding your admissions application." [Pl.'s Compl. ¶ 100; Defs.' Bates Brown v. KU 000800]

141.    On April 15th, 2010, via email, Brown responded to defendant Mazza "I intend to represent myself regarding the procedural objections. I intend to have paid

74

e

representation regarding the substantive issues if the case is not dismissed on procedural grounds. It will cost me about $4,000 to prepare with my attorney in Kansas City and then have him travel here. I don't want to do that unless its [sic] necessary. I'm ready for the procedural hearing anytime you'd like, but I'd like to have that hearing before we proceed on the substantive questions. It may keep me from spending countless hours and thousands of dollars in hearing preparation." [Defs.' Bates Brown v. KU 000799]

142.    On April 16th, 2010, via email, defendant Mazza replied to Brown "Based on advice from the KU General Counsel's office I am denying your request to hold separate hearings on the procedural and substantive matters. The Counsel's office agrees that the issues are sufficiently intertwined so that a separate hearing is unnecessary and would be unproductive. Please let me know whether you would prefer to the hold the hearing next week or wait until the final exam period. Once you and your representative talk about dates, I'll notify the General Counsel's office. It's my understanding that one of their representatives will participate in the hearing on behalf of Wendy Rohleder-Sook." [Defs.' Bates Brown v. KU 000799]

143.    On April 16th, 2010, via email, Brown responded to defendant Mazza "I have not yet begun preparation of my response, as I have been waiting to hear from you regarding both the procedural objections and the request for prior decisions. As I have previously notified you in writing, I do intend to file a response if this action moves forward." [Defs.' Bates Brown v. KU 000798]

144.    On April 16th, 2010, via email, Brown responded to defendant Mazza

e

"Where are we on my March 4 request [regarding prior decisions on amended applications]?" [Defs.' Bates Brown v. KU 000798]

145.   On April 16th, 2010, via email, Brown responded to defendant Mazza "Please forward a copy of Dean Wendy's Response to the procedural objections as mentioned in your earlier email." [Defs.' Bates Brown v. KU 000798]

146.   On April 16th, 2010, via email, Brown responded to defendant Mazza "Absent your agreement, I will request a separate hearing on the procedural matters from the board directly as soon as you notify me of the identity of the chair." [Defs.' Bates Brown v. KU 000798]

147.   On April 16th, 2010, via email, Brown responded to defendant Mazza "I still have yet to be informed of what specific University Code, University Senate Rules and Regulations, [or] Honor Code provision I have violated. It will be impossible to prepare a response without that information. Notice of the specific violation is also a basic element of due process." [Defs.' Bates Brown v. KU 000799]

148.   On April 16th, 2010, via email, defendant Mazza replied to Brown "I have reviewed the Honor Code file in the Dean's Office and there are no prior decisions based on the same or similar allegations of fact." [Defs.' Bates Brown v. KU 000798]

149.   On April 16th, 2010, via email, defendant Mazza replied to Brown "I will forward you Dean Wendy's response as soon as I receive it. I expect to have it no later than Monday afternoon." [Defs.' Bates Brown v. KU 000798]

150.   On April 16th, 2010, via email, defendant Mazza replied to Brown "It is my

e

understanding that the provision upon which the charges are based will be included in Dean Wendy's response." [Defs.' Bates Brown v. KU 000798]

151.   On April 16th, 2010, via email, defendant Mazza replied to Brown "Given that you intend to file another response, can I assume that you will not have the response prepared in time for a hearing next week? The Dispute Resolution Procedures provide that a hearing involving a student may not be scheduled during the final examination period. As a result, if you would prefer to hold the hearing at a later time, I propose that we do it during the week of May l0th, after the conclusion of the examination period. As I mentioned to you before, it is the position of the Law School that your status as a student in good standing is unaffected by the fact that you will be allowed to sit for the spring exams." [Defs.' Bates Brown v. KU 000798]

152.   On April 16th, 2010, via email, Brown replied to defendant Mazza "With regard to the hearing, I would be happy to agree to a hearing regarding the procedural issues anytime starting immediately. [I]f we cannot agree to hold this portion of the hearing separately, then I will request a separate preliminary determination personally from the chair of the board. I will not agree to any hearing on the merits until the 'Preliminary Matters' described in Section 6 of the Law School Dispute Resolution Procedures have been decided, or until the board denies my request for a hearing or consideration of a written motion on those matters. It is unfair to require me to expend thousands of dollars toward my defense before we have conclusively established that the dispute will proceed in this forum. The Procedures make clear not only that these matters

e

should be decided before a hearing on the merits is scheduled, but also that the scheduling and control of hearings and communication with the parties is the province of the board and its chair." [Defs.' Bates Brown v. KU 000797]

153.    On April 16th, 2010, via email, Brown requested information regarding all the amendments to question 27 of applications the admissions department had received during the semester he enrolled, characterizing them as prior decisions to take no action. [Defs.' Bates Brown v. KU 000797]

154.    Rohleder-Sook testified that School of Law received between 10 and 20 amended applications per year. [Def. Rohleder-Sook Dep. 16:20-17:11]

155.    Rohleder-Sook testified that although she was aware Brown had requested the prior decisions on amended applications pursuant to the DRP, they were never provided. [Def. Rohleder-Sook Dep. 42:20-43:12]

156.    On April 16th, 2010, via email, defendant Mazza replied to Brown stating "the Law School's position is that you are not entitled to a separate hearing and we will oppose your request." [Defs.' Bates Brown v. KU 000797]

157.    On April 18th, 2010, via email to defendant Rohleder-Sook, defendant Mazza stated "Here is a draft of your response to Brown's procedural objections. Could you take a look at it, make any changes you like, then print out and get an initialed copy to me tomorrow morning? The hearing panel will meet at 11:00 to elect a chair and consider preliminary issues surrounding this case. I'd like to have it prepared before then." [Defs.' Bates Brown v. KU 000375]

e

158.   On April 18th, 2010, via email regarding Brown's case to defendant Rohleder-Sook, defendant Mazza stated "What a nightmare." [Defs.' Bates Brown v. KU 000375]

159.   Rohleder-Sook testified that she and Mazza a "pretty informal relationship" with respect to their discussions surrounding the complaint against Brown. [Def. Rohleder-Sook Dep. 75:8-12]

160.   In an April 18, 2010 email to Sandra Craig McKenzie, Brown stated he had originally thought that Dean Mazza was acting in the role of ombudsman, but no longer believed this to be true. [McKenzie Dep. Ex. 36]

161.   McKenzie stated she could be impartial, and agreed to meet with Brown on April 19, 2010 after their class. [McKenzie Dep. Ex. 36]

162.   McKenzie testified that she felt the School of Law had waited too long to proceed with its complaint against Brown. [McKenzie Dep. 56:21-24]

163.   McKenzie, a member of the admissions committee who had re-examined Brown's application after amendment, went before Mazza and Rohleder-Sook without request from Brown to recommend that Brown's expulsion not be pursued. [McKenzie Dep. 61:18-23]

164.   After her requests for mediation on Brown's behalf, McKenzie reported back to Brown that there was no hope for mediation in his case. [McKenzie Dep. 66:12-20; McCray-Pearson Dep. Ex 27, ¶ 31]

165.   On April 19th, 2010 defendant Rohleder-Sook placed a response to

e

Brown's procedural objections dated April 16th, 2010 in his School of Law mailbox. [Mazza Dep. Ex. 16; Defs.' Bates Brown v. KU 000375]

166.   At deposition, Mazza produced Deposition Exhibit 39, which was identical in every way to Rohleder-Sook's procedural response to Brown's procedural objections except for her initials and the letterhead, and testified "I'm not sure whether I was the sole author[.]" [Mazza Dep Ex. 16; Mazza Dep Ex. 39; Mazza Dep. 180:9-16]

167.   Mazza and Rohleder-Sook's answers to Brown's procedural objections argued that the general language of the University of Kansas School of Law Dispute Resolution Procedure which describes the general scope of the procedure could be used as an independent basis for inclusion of complaints which are arguably within that scope, or alternatively, the University of Kansas School of Law Dispute Resolution Procedure represents an "other applicable rule, regulation"" within the meaning of U.S.R.R. 6.3.1.1, or alternatively, the conduct complained of represents Academic Misconduct within the meaning of U.S.R.R. section 2.6.1." [Mazza Dep Ex. 16, ¶ 3]

168.   Mazza and Rohleder-Sook's answers to Brown's procedural objections did not address the assertions and case law within those objections that the Complaint was superseded by Kansas contract law regarding waiver, rescission, and estoppel; instead they simply stated  the conclusory opinion that the complaint was not superseded by proper application of any state or federal law pursuant to U.S.R.R. 6.1.6. [Mazza Dep. Ex. 16, ¶ 5]

169.   When asked at deposition to comment on the application of the case law

e

cited by Brown in his letter of February 28, 2010, defendant Mazza testified that for purposes of administering the Disciplinary procedure, he would not have been the one who would have reviewed Brown's letter, and that he would not have given an opinion on whether or not Brown's legal assertions were correct or incorrect. [Mazza Dep. 97:4-99:20].

170.    The responses to Brown's letter, of which Mazza testified he may have been the sole author, stated "The provision in section 6.1.6. does not limit the jurisdiction of the panel to hear the complaint. No provision of federal or state law, including those cited by Mr. Brown in Section 5 of his objections supersedes the complaint."  [Mazza Dep Ex. 16; Mazza Dep Ex. 39; Mazza Dep. 180:9-16]

171.    The School of Law's response to Brown's procedural objections bore only defendant Rohleder-Sook's name and initials as indicia of authorship. [Mazza Dep. Ex. 16]

172.    Rohleder-Sook initially testified that she was the sole author of the School of Law's response to Brown's procedural objections. [Def. Rohleder-Sook Dep. 48:2-7]

173.    Rohleder-Sook admitted in later testimony that defendant Mazza was the primary author of the School of Law's response to Brown's procedural objections. [Rohleder-Sook Dep. 53:8-17]

174.    On April 19th, 2010, defendant Mazza provided Brown with the name of the panel chair and explained that all subsequent communications regarding this matter should be between Brown and the panel chair. [Defs.' Bates Brown v. KU 000464]

e

175.    After Brown's April 20, 2010 contact with Ombuds McKenzie, he studied and sat for his finals for the Spring Semester of 2010, and heard no more regarding the complaint until he received defendant Agrawal's May 26th, 2010 letter of pending dismissal 37 days later. [McCray-Pearson Dep. Ex. 27, ¶¶32-34 ]

176.    Between his last contact with Mazza on April 20, 2010 and Agrawal's May 26th, 2010 letter, Brown was allowed to enroll and pay tuition for the Summer and Fall 2010 terms by the University of Kansas School of Law, and began attending summer classes at the School of Law. [Pl.'s Compl. ¶ 98; S.F. ¶ 38]

177.    The School of Law permitted Brown to enroll in the Fall 2009, Spring 2010, Summer 2010, and Fall 2010 sessions before his removal from the School of Law [S.F. ¶ 64]

178.    Between the time the Hearing Panel in Brown's case was convened by defendant Mazza on April 19, 2010 and the time the Hearing Panel issued it's MEMORANDUM dated May 3, 2010, the Hearing Panel met on three to four different occasions. [Miller Dep. 5:21-6:2]

179.    Panel Member Robin Miller testified that the Hearing Panel, after reviewing Brown's statement that he had mistakenly believed the prior incidents too remote to be relevant, "applied [their] reasoning to the facts of Brown's case to determine that it was a misrepresentation rather than a misunderstanding[.]" [Miller Dep. 30:14-31:13]

180.    Brown was never asked to appear before the Hearing Panel and was never

e

given the opportunity to present any evidence, witnesses, or testimony. [Miller Dep. 31:18-32:1]

181.   The hearing panel never discussed student rights within the law school, and nobody worked with the hearing panel to explain or provide understanding of the various Unversity Policies and Procedures that might come into play. [Miller Dep. 34:10-20]

182.   Panel Member Robin Miller testified that due process considerations did not apply to what the panel was doing in Brown's case, that due process was not a consideration in what the hearing panel was doing, and that due process was not discussed by the hearing panel. [Miller Dep. 35:24-36:5]

183.   Panel Member Robin Miller testified that concerns of contract law were never discussed by the hearing panel in making its joint decision. [Miller Dep. 36:7-10]

184.   Panel Member Robin Miller testified that she did not recall discussion of the University Senate Code, the University Senate Rules and Regulations or the Student Code of Rights and responsibilities during the Hearing Panel's deliberations in Brown's case. [Miller Dep. 36:11-21]

185.   Panel Member Robin Miller testified that she did not recall the University Senate Code, the University Senate Rules and Regulations or the Student Code of Rights and responsibilities being made available as resources during the deliberations in Brown's case. [Miller Dep. 36:11-21]

186.   On May 3rd, 2010 the Hearing Panel issued a MEMORANDUM decision dismissing the complaint of Academic Misconduct, stating "The complaint fails to allege

e

a violation of section 2.6.1 or, to use the words of U.S.R.R. section 6.5.3.l(d), any other 'University rule'. Therefore, we hereby dismiss Dean Wendy Rohleder-Sook's complaint of feb. 17, 2010." [S.F. ¶¶36,37; Mazza Dep. Ex. 9, P.3]

187.   In its May 3rd MEMORANDUM decision, the hearing panel went on to state "While we are not aware of any University rule prohibiting misrepresentation on an application for admission, we do not believe that is the end of this matter. [] Mr. Brown's Aug. 27, 2009, Letter to Dean Wendy Rohleder-Sook's clearly concedes that he did in fact make misrepresentations on his application. Therefore, we recognize that the Law School has the right to dismiss Mr. Brown even though this Hearing Panel does not have the authority to hear this case."  [S.F. ¶¶36,37; Mazza Dep. Ex. 9, P.3]

188.   Panel Member Robin Miller testified that she was unaware of any provision of the School of Law Dispute Resolution Procedures which empowered the Hearing Panel to give opinions beyond the bounds of the DRP complaint. [Miller Dep. 9:14-10:8]

189.   On May 24, 2010, Gail Agrawal critiqued the proposed draft of Brown's dismissal letter which had been provided to her by the School of Law's General Counsel, stating: "I have a couple of questions that I raise on the attached draft. I think I put each of them in all caps. My instinct is to keep this letter as brief and concise as possible, keeping in mind that [Brown] is very likely to sue. I deleted the two lead in paragraphs as a result; no use giving him cause to engage in a discussion about whether a law school is or is not a gatekeeper for the profession or even whether the Bar might consider his conduct as establishing lack of character and fitness to practice law. The key points for

e

the law school's action seem to be the facts that he failed to disclose material information; that the law school application gives the law school the right to act on the basis of information later learned that should have been disclosed; and that he exacerbated his non-disclosure with his later incomplete disclosures. The relevant 'process' is the reconvening of the admissions committee, providing the members with the later disclosures and posing the question whether he would have been admitted, as well as the later hearing panel's acknowledgement that he could be dismissed for non-disclosure." [Defs.' Bates Brown v. KU 000591]

190.   In a letter dated May 26, 2010, Dean Agrawal notified Brown that she planned to dismiss him from the school of law. [Mazza Dep. Ex. 18]

191.   Defendant Agrawal's May 26, 2010 letter stated "When Associate Dean Stephen Mazza discussed with you your failure to disclose in your application to the School of Law the criminal matters that subsequently came to light, you admitted that you knew that you would not have been admitted to the School of Law had you disclosed your criminal record." [Mazza Dep. Ex. 18; Defs.' Bates BROWN v KU 000136]

192.   Defendant Agrawal's May 26, 2010 letter stated "You admitted to Associate Dean Mazza that you knew that you would not have been admitted to the School of Law had you disclosed your criminal record when you made your application. Such an admission acknowledges a knowing and purposeful attempt by you to conceal and misrepresent the true nature of your qualifications for admission to the School of Law." [Mazza Dep. Ex. 18; Defs.' Bates BROWN v KU 000136-000137]

e

193.    Mazza, who was copied on Agrawal's letter proposing dismissal, testified regarding the only face to face meeting he ever had with Brown "I don't recall specifically what we discussed at the first meeting and I don't remember when the first meeting was and I don't remember when in the cycle, you know, when in the timeline we first met." [Mazza Dep. 55:24-56:3; Pl.s' Decl. ¶ 16]

194.    Mazza, who was copied on Agrawal's letter proposing dismissal, testified that he did not remember Brown's exact words, and had paraphrased to the best of his recollection Brown's statement regarding having knowledge of his dismissal. [Mazza Dep. 24:21-24]

195.    The statement attributed to Brown and communicated to Agrawal by Mazza regarding Brown's alleged knowledge that he would not have been admitted had he disclosed his criminal record was false and extremely prejudicial. [Brown Dep. 158:14-17; Compl. ¶ 238; Pl.s' Decl. ¶ 20]

196.    The statement attributed to Brown and communicated to Agrawal by Mazza regarding Brown's alleged knowledge that he would not have been admitted had he disclosed his criminal record was based upon allegations of Brown's personal knowledge of facts Brown could not possibly have known. [Brown Dep. 158:14-17]

197.    Defendant Agrawal's May 26, 2010 letter stated "I further find that your August 27, 2009 letter seeking to amend your application was also materially inaccurate and incomplete by failing to disclose the three additional criminal charges cited in Associate Dean Rohleder-Sook's communication with you."  [Mazza Dep. Ex. 18; Defs.'

e

Bates BROWN v KU 000137]

198.   Rohleder-Sook, who was copied on Agrawal's letter proposing dismissal, testified that the documentation provided to her by Mr. Brown disclosed all four incidents of domestic battery, rather than only two as claimed by Agrawal. [Mazza Dep. Ex. 18; Def. Rohleder-Sook Dep. 77:19-78-11]

199.   Rohleder-Sook, who was copied on Agrawal's letter proposing dismissal, had obtained documentation from the Johnson County prosecutor confirming that Criminal Trespass charge had been dismissed on 10/27/2004, by motion of the State, at a hearing Brown did not attend. [Mazza Dep. Ex. 18; Defs.' Bates Brown, Robert v. KU, et al 000080-000081; Pl.s' Decl. ¶ 55]

200.   Every fact which was stated in Agrawal's letter as a basis of dismissal was already known to the School of Law by October 2, 2009 -  before Brown continued in and satisfactorily completed all requirements of all his Fall 2009 semester courses, before he sat for finals in December of 2009, before he received grades for Fall 2009 semester courses, before he was enrolled for the Spring 2010 semester pursuant to action taken directly by the Kansas University School of Law Admissions Office, before the School of Law Admissions Office collected his tuition for the Spring 2010 semester, and before he began classes in January without warning that a complaint was pending and that his status as a student might be in jeopardy. [Mazza Dep. Ex. 8, §5.A., S.F. ¶ 35; Brown, Robert v. KU, et al 000043-000046]

201.   Defendant Agrawal's May 26, 2010 letter stated "You may provide me with

e

a written response to this letter by 2:00 p.m. on Thursday, June 3, 2010 if you believe your dismissal is inappropriate or if there are mitigating circumstances you believe I should consider before the effective date of the dismissal. If you fail to provide me with a written response by 2:00 p.m. on June 3, 2010, or if your written response fails to convince me that your dismissal is unwarranted, then your dismissal from the School of Law will be effective June 8, 2010. The School of Law's transcript will show that your dismissal was based on your falsification, misrepresentation, and failure to supply required information on your application to the School of Law." [Mazza Dep. Ex. 18; Defs.' Bates BROWN v KU 000137]

202.  On May 27, 2010, Brown responded to Agrawal's letter proposing dismissal, stating

> "I believe my dismissal in this manner is inappropriate because it violates the Code of Student Rights and Responsibilities as promulgated by the University Senate. Article 2(E) states: 'Students will be exempt from disciplinary action that affects their status as students except for academic failure or violation of a published Student Senate, University Senate, University or Regents rule or regulation. Rules and regulations shall be fully and clearly disclosed in advance of the supposed violations.' Article 2(F) states: 'No disciplinary sanctions resulting from a violation of rules and regulations, under Article 2(E), may be imposed upon any student without prior written notice of the nature and cause of the charges, and an opportunity to be heard at a fair hearing. A fair hearing shall include confrontation of witnesses against him or her and the assistance of a person of his or her own assistance or with the prior approval of the Office of the Vice Provost for Student Success, up to three persons of the student's choosing.' Pursuant to the student bill of rights, I respectfully request written notice of the nature and cause of the charges, including what published Student Senate, University Senate, University or Regents rule or regulation you believe has been violated. By this writing, I also indicate that I wish to preserve my right to a fair hearing before an impartial hearing body which includes the assistance and participation of my legal counsel and the right to confront witnesses against me, and all other rights I may have under any and all Student Senate, University

e

Senate, University or Regents rules. These are due process rights to which I am entitled as a matter of law. The summary dismissal you contemplate would unlawfully bypass them. I would also like to request a personal meeting with you to discuss this matter. I will attempt to reach you tomorrow, or I would welcome your call anytime. My number is 816-721-4512."

[Mazza Dep. Ex. 23]

203.    On May 28th, 2010, Agrawal declined Brown's request for a face to face meeting via email, stating "I see no need to meet with you, and therefore decline your request for a meeting." [S.F. ¶ 41; Defs.' Bates Brown v. KU - Revised Redactions 000644]

204.    On May 28, 2010, Agrawal relegated the duty of responding to Brown to general counsel, stating via email "I would appreciate [counsel's] writing a response to [Brown's] letter for me.  Nothing he has said goes to the merits or persuades me that we should not proceed, unless you find merit in his process arguments.  I leave that assessment to the practicing, licensed lawyers. (Smile)" [Defs.' Bates Brown v. KU - - Revised Redactions 000647]

205.    On May 31st, 2010, Brown filed a Request For an Initial Hearing before the Judicial Board Pursuant to 6.4.3.1(b) of the University Senate Rules and Regulations and Election to Invoke the Jurisdiction of the University Judicial Board Pursuant to University of Kansas Law School Dispute Resolution Procedure Section (A)(4)(c) with the University Judicial Board. [McCray-Pearson Dep. Ex. 27; S.F. ¶ 42; Pl.'s Compl. ¶ 127]

206.    On May 31st, Brown filed a Request For Jurisdictional Ruling Pursuant to 6.5.2.1 of the University Senate Rules and Regulations with the University Judicial

e

Board. [McCray-Pearson Dep. Ex. 28; S.F. ¶ 43; Pl.'s Compl. ¶ 128]

207.    On May 31, 2010, after becoming aware of Brown's requests to the Judicial Board, Dean Agrawal expressed disbelief via email that Joyce McCray Pearson, "who is our library director", was actually the chair of the Judicial Board. [Defs.' Bates Brown v. KU - - Revised Redactions 000630]

208.    In a May 31, 2010 email where Defendant Mazza was copied, Agrawal instructed General Counsel to "craft[] a response" to Brown's requests to McCray-Pearson on behalf of the Judicial Board.  In response, general counsel informed Agrawal, again with copy to Mazza, that they would "formulate a strategy to deal with this issue." [Defs.' Bates Brown v. KU - - Revised Redactions 000630]

209.    In her sworn Response to Brown's Second Set of Interrogatories regarding McCray-Pearson's June 3, 2010 response to Brown, Agrawal stated "I had no knowledge of or involvement with Joyce McCray Pearson's [] writing of the letter[] to Mr. Brown[.]" [Def. Agrawal's Resp. to Brown's 2nd Interrogs., Int. 1]

210.    Brown notified the university Judicial Board in his Request for an Initial Hearing before the Judicial Board on May 31, 2010 that there was conflict among the various governance documents regarding his case, stating "There is evidence to suggest that the law school has known from the outset that these proceedings were not properly within the jurisdiction of the Law School at the unit level, but that it chose to pursue them as 'Academic Misconduct' in order to avoid relinquishing jurisdiction to the appropriate University hearing body.( 9, 13, 14)" [McCray-Pearson Dep. Ex. 27, ¶¶ 9, 13, 14, 46]

e

211.    Paragraphs 9, 13, 14, and 46 of Brown's May 31, 2010 Request for an Initial Hearing before the Judicial Board dealt with Mazza's initial mention that this was a matter regarding Article 22 of the Student Code of Rights and Responsibilities, and Mazza's later statement that when he said "Article 22" he meant to say  "question 27". [McCray-Pearson Dep. Ex. 27, ¶¶ 9, 13, 14, 46]

212.    Procedures contained within the University Senate Code regarding interpretation and resolution of conflict among various University codes adopted 10/6/94 required that McCray-Pearson take following steps:

1.  Contact the Office of University Governance, 864-5169, or via e-mail at govern@ku.edu, with questions about conflict or interpretation.
2.  If the Governance Office cannot resolve the question, consult the chair of the Senate Executive Committee.
3.  If the Senate Executive Committee cannot satisfactorily resolve the conflict, assemble a committee of the following:
    1) Chair of the Judicial Board.
    2) Chair of the Academic Policies & Procedures Committee.
    3) Chair of the Faculty Rights, Privileges & Responsibilities Committee.
    4) Chair of the Organization & Administration Committee.
    5) Chair of the Student Rights Committee of Student Senate.

 [University Senate Code as Currently Published, P.1, Preface]

213.    McCray-Pearson did not follow the procedure spelled out in the University Senate Code regarding interpretation and resolution of conflict among various University codes.  [Mazza Dep. Ex. 4]

214.    In a May 25, 2010 mail with the subject "RE:Confidential - - Robert Brown - - Caution", Agrawal notified the team she would only be present at the KU School of law one day at most during the entire month of June. [Brown v. KU - - Revised

e

Redactions 000576]

215.   On June 1, 2010, Mazza began his tenure as acting interim Dean of the University of Kansas School of Law.  [Brown v. KU - - Revised Redactions 000576]

216.   In his sworn Declaration, Mazza stated "During the period 2007 through mid-June 2010, I was the Associate Dean for Academic Affairs." [Defs.' Mem. Ex. D, Mazza Decl. ¶ 1]

217.   In her Sworn Declaration, Agrawal was vague regarding the exact date when she ceased to function as Dean of the Kansas University School of Law, stating "I assumed my duties as Dean the University of Iowa College of Law on July 1, 2010, and I know that I took some vacation leave between leaving the University of Kansas and that July 1, 2010 start date."  [Defs.' Mem. Ex. A, Agrawal Decl. ¶ 7]

218.   On June 3, 2010, defendant McCray-Pearson responded in writing to both Brown's Request for Initial Hearing and his Request for a Jurisdictional Ruling before the Judicial Board. [Mazza Dep. Ex. 4; S.F. 44]

219.   McCray-Pearson's June 3, 2010 response began "I have reviewed your requests for a jurisdictional ruling and an initial hearing, both dated May 31, 2010. I have also reviewed University Regulations to determine whether they authorize the Judicial Board to exercise jurisdiction in your case. I regret to inform you that I have found no basis for jurisdiction by the Judicial Board." [Mazza Dep. Ex. 4]

220.   Regarding her knowledge of application of University Regulations to her decisions, McCray-Pearson testified as follows:

e

Q   And what guidelines do you use for making your decisions?
A   University governance documents.
Q   Can you please list those?
A   I just know them by tons of acronyms.
Q   Okay.
A   Well, let's see.  University Senate Rules and Regs, I think it's USRR -- this is going to be totally inaccurate because I just read them.
Q   Okay.
A   All sources of grievance faculty -- you know, I don't know anything other than just USRR and -- oh, gosh, what are the other ones?  I'd have to be looking at them.  And there's -- I have files of them in my office.

[McCray-Pearson Dep. 17:16-18:5]

[ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ]

Q   So what does USRR stand for?
A   I could take a guess of University Senate Rights and Responsibilities -- Student Rights and Responsibilities.

[McCray-Pearson Dep. 18:16-19]

221.   In her June 3, 2010 letter denying Brown's Judicial Board Requests, defendant McCray-Pearson stated as follows:

The Faculty Senate Rules and Regulations (FSRR) 2.1.1 gives the authority for policies on admission to the faculties of the various schools and the College (see excerpt below).

The Faculty Senate Rules and Regulations
Section 1. Policies and Procedures

2.1.1 Policies for admission and readmission are established by the faculties of the various schools or the College, within the parameters of state laws and Regents regulations and within guidelines set by the Faculty Senate. A statement of such requirements shall be published or filed with the Director of Admissions and the Secretary of Faculty Senate. For undergraduate admission. implementation of these policies by the Director of Admissions includes the initial evaluation of credentials presented by applicants covering academic work done elsewhere.

[Mazza Dep. Ex. 4]

e

222.   At deposition, defendant McCray-Pearson was unable to articulate even

basic support for the position taken in her letter denying access to the University Judicial

Board under F.S.R.R. 2.1.1., testifying as follows:

Q    Okay.  So then what rights does the first sentence of FSRR 2.1.1 give to the
     faculties of the various schools other than the right to establish policies for
     admission and readmission?
A    That's it.  That's what it says.
Q    Okay.
A    Gives the faculties --
Q    The rights to establish policies for the admission and readmission?
A    Uh-huh.
Q    That's all it gives them; correct?
MS. TROWER:  Objection.  Form.
Q    Correct?
MS. TROWER:  Objection.  Form.
A    I don't know.
BY MR. BROWN:
Q    Can you see from that sentence that it gives them anything else?
A    It's a pretty open sentence, but probably not.
Q    All right.   And then the next sentence says, "A statement of such
     requirements shall be published or filed with the Director of Admissions and
     the Secretary of Faculty Senate." So once they establish the policies for
     admission and readmission, they have to write them down somewhere, don't
     they?
MS. TROWER:  Objection.  Form.
A    Probably correct.  Correct.
BY MR. BROWN:
Q    Okay.  And so what you're telling me is that without reviewing those
     policies, you assumed that wherever they are, they must preclude
     jurisdiction in this case? --
MS. TROWER:  Objection.  Form.
Q     -- correct?
MS. TROWER:  Objection.  Form.
A    I'm going by what 2.1.1, that first sentence, says.
BY MR. BROWN:
Q    You just testified that it only gives them the power to establish policies for
     admission and readmission.
A    That's all we're talking about here.
Q    Okay.  What policy for admission or readmission removes jurisdiction in

e

student matters?

A     2.1.1.

Q     So the right to establish policies for admission and readmission essentially gives the faculty unfettered license to do as they please then --

MS. TROWER:  Objection.

Q     -- correct?

MS. TROWER:  Objection.  Form.

A     I disagree.

BY MR. BROWN:

Q     Okay.  I'm having trouble, then, understanding how the existence of the power to establish policies can affect jurisdiction in totally unrelated student procedures that have written guarantees.  Can you please explain that?

A     No.

Q     Why can you not explain it?

A     It's outside my purview.

Q     It's outside your purview of knowledge?

A     Perhaps.

[McCray-Pearson Dep. 78:21-81:9]

223.    McCray-Pearson testified that the University General Counsel is a resource she uses in frequently in her decision-making as the Judicial Board Chair. [McCray-Pearson Dep. 17:4-7]

224.    On Friday, June 4, 2010, Brown called and spoke with Jane Tuttle at the Office of the Vice Provost for Student Success (now the office of the Vice Provost for Student Affairs) explaining that her office had proper jurisdiction in the matter and requesting the hearing to which Brown was entitled under the Student Code of Rights and Responsibilities. [Pl.s' Decl. ¶ 24]

225.    Brown was informed that since the Chair of the Judicial Board had already ruled on his case, there was nothing the Office of the Vice Provost for Student Success could do. [Pl.s' Decl. ¶ 25]

226.    On June 7, 2010, defendant Agrawal wrote Brown a letter dismissing him

e

effective June 8, 2010. [Mazza Dep. Ex. 10]

227.   Agrawal's June 7, 2010 letter was originally drafted by General Counsel Sara Trower.  [Def. Agrawal's Resp. to Brown's 3rd Interrogs., Int. 1]

228.   Agrawal's June 7, 2010 letter based Brown's dismissal without due process on the same University Regulation (F.S.R.R. 2.1.1) which McCray-Pearson had used to deny Brown Judicial Review at the University Judicial Board level. [Mazza Dep. Ex. 10]

229.   Brown, through his attorney, John P. Gerstle, appealed to the Chancellor's office, who replied through Danny J. Anderson on June 25, 2010. [Defs.' Bates Brown, Robert v. KU, et al 000409-000410]

230.   Anderson's June 25, 2010 letter was written by General Counsel Sara Trower. [Def. KU's Resp. to Brown's 3rd Interrogs., Int. 1; S.F. ¶ 60]

231.   Anderson's June 25, 2010 letter based Brown's dismissal without due process on the same University Regulation (F.S.R.R. 2.1.1) which McCray-Pearson and Agrawal had used in their responses to Brown. [Defs.' Bates Brown, Robert v. KU, et al 000409-000410]

232.   The University admits that the Office of the University Governance and the University Director of the Office of Admissions have no record of any admissions policies pursuant to F.S.R.R. 2.1.1 ever being filed as required by F.S.R.R. 2.1.1. [Def. KU's Resp. to Brown's 2nd RFA, Req. 2]

233.   The University admits that there is no provision in the FSRR which provides that the FSRR may override, nullify, cancel the effect of, or otherwise make

e

meaningless provisions of other University Codes, Rules and/or Regulations. [Def. KU's Resp. to Brown's 2nd RFA, Req. 12]

234.   Ultimately, none of the due process rights enumerated in the University's written procedural documents were ever afforded to Brown. [Pl.'s Compl. ¶ 83]

235.   During the pendency of the School of Law's Allegation of Academic Misconduct, Defendant Mazza communicated with plaintiff Brown via emails that had as the subject line: "Disciplinary Procedures." [S.F. ¶ 51]

236.   Gail Agrawal's June 7, 2010 dismissal letter stated, in part, that the School of Law's transcript would show that plaintiff Brown's dismissal from the Law School was based on "falsification, misrepresentation, and failure to supply required information on [his] application to the School of Law." [S.F. ¶ 50]

*Conflicting Accounts of Dean Agrawal's Involvement*

237.   U.S.R.R. 5.2.2(d) excludes any party involved in the complaint from the rendering of any decision regarding the complaint. [Mazza Dep. Ex. 7, U.S.R.R. § 5.2.2(d)]

238.   Rohleder-Sook testified that she had multiple conversations on a continuing basis with Agrawal regarding Brown from just after the amendment up until January, 2010. [Def. Rohleder-Sook Dep. 20:18-21:9]

239.   Records provided by Defendants in disclosure show the following emails from Gail Agrawal in 2009, beginning on the day Brown amended his application:

8/27/2009 (Communication with Counsel Regarding Brown) [Defs.' Bates Brown v. KU 000443]

e

9/20/2009 (Investigation of Brown's Background) [Defs.' Bates Brown v. KU 000435]

9/20/2009 (Strategy for Requesting Information from Brown) [Defs.' Bates Brown v. KU 000436]

9/29/2009 (Strategy Discussion with Rohleder-Sook and Mazza) [Defs.' Bates Brown v. KU 000438]

9/30/2009 (Authorization to Request Information from Brown) [Defs.' Bates Brown v. KU 000438]

11/30/2009 (Getting in Front of the Admissions Committee) [Defs.' Bates Brown v. KU 000447]

12/3/2009 (Reconvening Adm Committee) [Defs.' Bates Brown, Robert v. KU, et al 000191]

12/3/2009 (Court Records Regarding Brown) [Defs.' Bates Brown v. KU 000445]

240.   At deposition, Agrawal testified "My part in the dispute came relatively late.  So until that relatively late stage -- in other words, until it came to me for a final decision, I knew there was a student who had made misstatements on a law school application that were considered material.  I didn't know until relatively late who the student was, and I didn't know, as I recall, until relatively late exactly what was involved, but I knew there was an on-going matter that was being handled by my associate deans, which is typical.  That's what I knew." [Agrawal Dep. 10:25-11:13]

241.   In her sworn declaration, Agrawal stated that Brown's matter first came to her for review and consideration "after the May 3, 2010 memorandum from the hearing panel."  [Defs.' Mem. Ex. A, Agrawal Decl. ¶ 3]

*The Individual Defendants' Knowledge of Student Rights*

242.   When asked if everything listed in the Bill of Rights of the United States Constitution was a right, defendant Mazza testified "I'm not a constitutional scholar. I would think it would depend upon how you define a right." [Mazza Dep. 47:1-25]

243.   Defendant Mazza co-authored a work entitled "Constitutional Limitations

e

on the Legislative Power to Tax in the United States" for which Mazza takes credit in his Curriculum Vitae, which contains a primer on fundamental protections of individual liberties and rights that exist under United States Constitutional law and the court and administrative agencies and systems that have primary responsibility for protecting those liberties and rights. [Def. Mazza's Resp. to Brown's 2nd RFA, Req. 2, Req. 1, 2; RFA Exhibit A, RFA Exhibit B]

244.   When asked why, in her opinion, the University did not forfeit its right to dismiss Plaintiff Brown from the School of Law based upon the defenses set out in Brown's letter dated February 28, 2010 (EXHIBIT B) under numbered section 5 (EXHIBIT B: BROWN v KU 000187 - BROWN v KU 000189), Agrawal answered "I did not formulate an opinion regarding the legal questions or authorities raised in your interrogatory. I sought the advice of the University's Office of General Counsel in the matter involving your application for admission to the School of Law and my decision." [Def. Mazza's Resp. to Brown's 3rd Interrogs., Int. 4]

245.   When asked at deposition why Brown's dismissal was not foreclosed by State Law as set forth in Section 5 of his February 28th letter containing his procedural objections, Agrawal testified "[i]f I were to independently examine and research the foundation for your argument, I would not be incapable of forming my own legal analysis because I'm a lawyer.  But in this case I was a client, and I relied on advice of counsel." [Agrawal Dep. 54:2-7]

246.   Defendant Gail Agrawal testified that she clerked for Justice Sandra Day

e

O'Connor in the United States Supreme Court [Agrawal Dep. 4:24:5-1], that while clerking for Justice O'Connor she was in the Cert Pool on constitutional questions [Agrawal Dep. 9:16-20], and that her research has probably found its way into decisions of the Supreme Court of the United States [Agrawal Dep. 8:8-10].

247.    In email communications regarding Counsel's proposed draft of her letter of intent to dismiss, Agrawal schooled General Counsel, admonishing that Brown was "very likely to sue" and explaining to her counsel what the School of Law's theory of "process" should be. [Defs.' Bates Brown v. KU - - Revised Redactions 000591]

248.    Initially in the amendment process, Rohleder-Sook was the sole arbiter of whether a student's academic standing would be placed in jeopardy after amending an application. [Def. Mazza Dep. 149:24-150:3]

249.    Rohleder-Sook testified she didn't know whether or not she had a duty to protect the due process rights of any of the University Students. [Def. Rohleder-Sook Dep. 86:16-22]

250.    Rohleder-Sook testified that she had no opinion on whether Brown had been afforded the due process set forth in the University's policies and procedures. [Def. Rohleder-Sook Dep. 84:8-85:3]

251.    Defendant McCray-Pearson testified that she did not know whether or not Section 2(F) of the Student Code of Rights and Responsibilities was a student right [McCray-Pearson Dep. 62:10-63:3], that due process protections involving the state were outside her purview [McCray-Pearson Dep. 14:4-9], and that she was unable to provide

e

an exhaustive list of her responsibilities as the Judicial Board Chair. [McCray-Pearson Dep. 16:19-23]

*The Sanction of Permanent Removal*

252.    Disciplinary expulsion of a law student from a member of the Association of the American Law Schools prevents that student from enrolling in any other member schools. [S.F. ¶ 53]

253.    In an adjudication involving Student [(name completely redacted)], an Honor Code Committee acknowledged that permanent removal from the School of law "would permanently prevent from attending any member school of the Association of American Law Schools." (Defs.' Bates Brown v.KU000954) [Defs.' Bates Brown v.KU000954]

254.    In an adjudication involving Student (name completely redacted), Dean Michael J. Davis acknowledged that permanent removal from the School of law "would prevent [(name completely redacted)] from ever becoming a lawyer[.]"  [Defs.' Bates Brown v.KU000978-000980]

255.    Sandra Craig-McKenzie, the only Ombuds the School of Law has ever had in the history of the School's Dispute Resolution Procedure testified that she is unaware of any student other than Brown who has been permanently removed from the School of Law for any disciplinary reason. [McKenzie Dep. 8:11-20, 9:20-10:19]

256.    Defendant Mazza testified that he is not aware of any other student in the history of the School of Law who has been removed after coming forward and amending

e

his or her School of Law application.  [Mazza Dep. 108:24-109:10]

*Other Disciplinary Cases within the School of Law – Student 1*

257.   [Student 1] amended to disclose seventeen separate arrests, ten of which were dismissed and seven of which resulted in convictions. [Defs.' Bates Brown v. KU 001107]

258.   In his amendment, [Student 1] disclosed adult convictions for Interference with the conduct of public business/building, driving w/out liability insurance (Kansas), Failure to appear on a misdemeanor, driving on a suspended license, and driving without liability insurance (State 2). [Defs.' Bates Brown v. KU 001107]

259.   In his amendment, [Student 1] disclosed juvenile convictions for Running away from home and Running away from a group home facility.  [Defs.' Bates Brown v. KU 001107]

260.   In his amendment, [Student 1] disclosed dismissed arrests for Auto Tampering, Property Damage, Driving on suspended license, Driving w/out liability insurance, Assault, three separate counts of Minor in possession of alcohol, Fake ID, and Running from Police. [Defs.' Bates Brown v. KU 001107]

261.   [Student 1]'s explanation was that he had run away first from his mother's home, then from a group home, had experienced a troubled childhood and early adulthood, and had at some point made the determination to change his life. [Defs.' Bates Brown v. KU 001108]

262.   [Student 1]'s amended application went before the admissions committee,

e

which could not agree on a proposed course of action. [Defs.' Bates Brown v. KU 001105]

263.    In attempting to resolve the issue, Associate Dean Webb Hecker wrote "I'm also bothered, but one distinction that hasn't really been articulated is that it isn't a complete nondisclosure, it's a late disclosure. There is still plenty of culpability, but I think this case is essentially different than someone who never made disclosure and was found out in some other way. As soon as [Student 1] realized that it was a big deal, he came forward. In this respect he's no different than [redacted], [redacted], or [redacted]. The only difference between those three and [Student 1] is the number (not the nature-- remember [redacted] beat up his girlfriend) of offenses, and maybe that's why two members of the Admissions Committee couldn't separate the omission from the offenses. As for the number (and nature) of his offenses, [Student 1]'s explanation speaks for itself. He doesn't come from a single-parent family, a blended family or a dysfunctional family. He comes from no family. How many kids could go through what he's gone through and not end up in Lansing or Leavenworth? He ended up, if memory serves, with a 3.8 UGPA and a 161 LSAT. Nothing has changed my mind from last week. This is an enormous turning point in [Student 1]'s life and an enormous responsibility for us. I think we need to keep him." [Defs.' Bates Brown v. KU 001105]

264.    Ultimately, no complaint was ever filed in [Student 1]'s case. [McKenzie Dep. 59:14-60:18]

*Other Disciplinary Cases within the School of Law – Student 2*

e

265. On March 2, 2011, Student [Student 2] amended his Law School application. [Defs.' Bates Brown v. KU Brown v. KU 000899].

266. [Student 2]'s amendment came three years and sixty-seven days after his application to the School of Law. [Brown v. KU Brown v. KU 000916]

267. [Student 2], while on Campus at UMKC during his undergraduate work, had unplugged the surveillance cameras and then proceeded to remove a ceiling tile near the door to the office of a University Professor. When confronted by the University Professor, Student [Student 2] made up a lie and fled the scene. [Defs.' Bates Brown v. KU 000884]

268. [Student 2] was later confronted by campus police. In his March 08, 2011 explanation to defendants Rohleder-Sook and Mazza that he was "cited with tampering with campus security camera(s) and attempted unauthorized entry". [Defs.' Bates Brown v. KU 000884]

269. The campus police reports showed that [Student 2] had actually been investigated by the campus police for Attempted Burglary. [Defs.'Bates Brown v. KU 000904-000905]

270. Records subsequently obtained by the KU school of law showed that [Student 2] admitted and accepted discipline on charges that he had "[a]ttempted an unauthorized entry" to the room [Defs.' Bates Brown v. KU 000900], and that as part of his consequence at his prior State University, [Student 2] had written an essay explaining what the consequences of his actions would have been had the University charged him

e

criminally in which he admitted that his conduct met the requirements of the Missouri statutes, section 569.170, Burglary in the Second Degree, which is a Class C Felony. [Defs.' Bates Brown v. KU 000912; R.S.M.O. 569.170]

271.    [Student 2] explained to defendants Rohleder-Sook and Mazza that he did not disclose this incident because he had been told by his prior State University that they "would have no records of this when [he] would apply to KU Law." [Defs.' Bates Brown v. KU 000884]

272.    Defendant Rohleder-Sook informed Student [Student 2] that his amended application would be put before the admissions committee, and offered Student [Student 2] the opportunity to submit "any other information [he] would like the admissions committee to consider as it reviews this matter." [Defs.' Bates Brown v. KU 000916-000917]

273.    The admissions committee met and found that the omission was material and had they known about it at the time of his application, they would have denied [Student 2] admission, as well as that "his continuing failure to disclose the information for three years was deceptive and itself provides an additional, alternative basis for voiding his admission." [Defs.' Bates Brown v. KU 000919]

274.    The admissions committee summarized its findings regarding Student [Student 2] by stating "The committee unanimously found substantial grounds for questioning [Student 2's] candor and honesty, both because of his vague explanation of the offense even now after he has finally disclosed it, and his unpersuasive purported

e

reasons for not disclosing this offense on his original application or during the past three years. Thus, the committee unanimously voted to void [Student 2's] admission and cancel his matriculation to the School of Law." [Defs.' Bates Brown v. KU 000919]

275.   Defendant Mazza " made the decision that [Student 2] would get to appear before the Admissions Committee to reconsider its decision." [Mazza Dep. 150:19-21]

276.   Defendant Mazza also met with [Student 2]'s wife. [Defs.' Bates Brown v. KU 000928]

277.   [Student 2] and his wife were given the opportunity to submit additional letters and documentation to both defendant Mazza and the admissions committee. [Defs.' Bates Brown v. KU 000920-000932]

278.   The School of Law facilitated [Student 2]'s personal appearance before the admissions committee, which resulted in reversal of the decision to cancel Student [Student 2]'s enrollment by a 3-2 majority vote of the admissions committee members. [Mazza Dep. 150:24-151:11]

279.   [Student 2] was notified by defendant Mazza that he would be permitted to graduate.  [Defs.' Bates Brown v. KU 000931]

280.   Sixty six days elapsed between the date [Student 2] amended his application and the date the final determination was made regarding his case. [Defs.' Bates Brown v. KU Brown v. KU 000899, Brown v. KU Brown v. KU 000916, Brown v. KU 000931]

*Other Disciplinary Cases within the School of Law – Various Examples*

e

281.   [Student 3] was a student who pled guilty to violating section III.A.2 and III.A.3 of the Honor Code of the University of Kansas School of Law (Honor Code), which invole cheating and plagerism, respectively. [Student 3] exacerbated these wrongdoings by, on multiple occasions, denying cheating and plagiarism in response to inquiries by his instructor and the director of the Lawyering program.   [Student 3] received the following punishment for cheating, plagerism, and subsequent dishonesty:

1)   a failing grade of "F" in the Fall 2008 Lawyering class;
2)   an oral reprimand from defendant Mazza;
3)   a permanent written reprimand in his or her official transcript;
4)   disciplinary probation for the remainder ofthe Spring 2009 semester;
5)   suspension from Law School for the Summer 2009 and Fall 2009 semesters; and
6)   exclusion from representing the K.U. School of Law on any moot court team or on any school-sanctioned organization, including without limitation the Kansas Law Review or the Kansas Journal of Law and Public Policy.

[Defs.' Bates Brown v. KU 000821]

282.   [Student 4] pled guilty of violating the Honor Code by cheating during an in class final.  For cheating in class during a final, [Student 4] received the following punishment:

1)   a grade of "F" in the course in which the violation occurred;
2)   the Honor Code proceeding becoming a permanent part of A.B.'s student file;
3)   exclusion from being a representative of the law school in any school sponsored activity or organization during the 2002-03 academic year, and
4)   a one semester suspension.

[Defs.' Bates Brown v. KU 000849]

283.   [Student 5] was charged by a Faculty Member with violating the Honor Code of the K.U. School of Law. Since B.P. had already graduated by the time an Honor Code Committee could be convened, the complaint became moot and was dismissed on procedural grounds.  Upon inquiry from a Licensure Analyst from the Texas Board of Law Examiners, Dean Hecker  advised "It is important to note that although Mr. P is alleged to have violated the Honor Code, no hearing was held, no evidence was received,

e

and there was no finding of guilt on the merits." [Defs.' Bates Brown v. KU 000857-000860]

284.   [Student 6] was charged and found guilty of plagiarism under the Law School Honor Code.  [Student 6] was given a hearing and found guilty.  For plagiarism, [Student 6] received the following punishment:

1)  the record of this Honor Code violation became a permanent part of J.P.'s official law school file;
2)  J.P. was not be permitted to complete the requirements for graduation during the Spring 2002 semester;
3)  J.P. was removed from an academic team that was scheduled to compete nationally;
4)  J.P. was removed from the editorial board of the Kansas Law Review; and
5)  J.P. was excluded from  representing the KU Law School on any KU team or as the representative of any school-sanctioned organization.

[Defs.' Bates Brown v. KU 000865-000866]

285.   [Student 7] was found guilty of using unauthorized materials during a final exam under the Student Honor Code. For cheating, [Student 7] received the following punishment:

1)  An "F" in the course [Student 7] cheated in.
2)  A temporary written notice with [Student 7]'s transcript, to be removed when [Student 7] successfully completed the course [Student 7] cheated in and assuming that [Student 7] had no further Honor Code problems before that time.

[Defs.' Bates Brown v. KU 000871-000872]

286.   [Student 8] sent suggestive messages under the sexually explicit moniker "Mistah Bizsnatch" to two staff members and two students.  Determining that Mistah Bizsnatch was actually [Student 8] required an investigation performed by the University's IT department.  Sample repartee from [Student 8]'s emails includes the

e

following: "We have yet to enjoy each other's conversation, but I am quite smitten with your delicious cuteness. If I may persuade you to e-mail me, then we can begin the dance. Mistah Bizsnatch -- I am as smooth as buttered yams."  For this behavior, [Student 8] received the following punishment:

1) [Student 8] was made to deliver written and in person apologies to the four victims;
2) [Student 8] was banned from using law school computer resources, except Lexis and Westlaw, for the remainder of the then current semester;
3) [Student 8] was placed on probation for one year with respect to his full tuition and fee scholarship, with the proviso that if he were to engage in any misconduct during this probationary period, he might lose his scholarship;
4) the disciplinary memorandum was to remain in [Student 8]'s law school file for two years, at which time it would be removed.

[Defs.' Bates Brown v. KU 000874-000882]

287.   [Student 9] was found guilty of making unwelcome sexual advances towards two of his legal aid clients and then misrepresenting those actions to the legal aid supervisors at the legal clinic where he was undertaking his internship. As punishment, [Student 9] agreed that a statement that he "was found guilty of an honor code violation which involved the intentional misrepresentation to a faculty member of facts regarding the course of his legal representation of a client while enrolled in the [redacted] Legal Aid clinical program" could be released to the Bar and disclosed to the legal community. [Defs.' Bates Brown v. KU 000961-000969]

288.   Student [Student 10] admitted to falsifying his resume as distributed to prospective employers by the KU School of Law via an elevation of LSAT score from 605 to 705, elevation of his law school GPA from 2.95 to 3.10, elevation of his undergraduate GPA from 2.90 to 3.83, and increase of his pre-law employment from 6

e

months to 16 months.  As punishment, he was suspended for a year, had to send a letter of apology to the prosepective employers who received the falsified resumes, was placed on disciplinary probation for the rest of his law school career, and had a temporary letter of reprimand placed in his file. [Defs.' Bates Brown v. KU 000976-000980]

289.   [Student 11] pled guilty to cheating on a Law School test, and as a consequence received an "F" in the course cheated in and a temporary written notice on his transcript.   [Defs.' Bates Brown v. KU 000983-000985]

290.   [Student 12] pled guilty to cheating on her Professional responsibility exam.  As a consequence, her professor was notified of the outcome of the disciplinary proceedings, she received an "F" in professional responsibility, she received a permanent written reprimand was attached to her transcript, and she was placed on disciplinary probation for a year. [Defs.' Bates Brown v. KU 000987 ]

291.   [Student 13] provided false information on a resume that was distributed by the School of Law to prospective employers, and as a consequence received
   1)   an oral reprimand from the Dean;
   2)   the requirement to clear up the false information with prospective employers; and
   3)   the requirement to draft letters of apology to two Professors and a Dean.

[Defs.' Bates Brown v. KU 000991-000992]

292.   [Student 14] amended on September 27, 2010 to disclose "minor consuming alcohol" and trespassing arrests, both of which were subsequently reduced. No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001044]

e

293.    [Student 15] amended to disclose charges of curfew violation.  [Student 15] additionally disclosed that "[t]he police also charged that my companions and I had performed malicious acts in an attempt to vandalize or damage the automobile or home of a Wichita resident".  No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001046]

294.    [Student 16] amended to disclose cheating on a test during undergraduate work.  No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001048]

295.    [Student 17] amended to disclose a diversion for "theft through purchasing stolen property." No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001050]

296.    [Student 18] amended to disclose a finding of cheating by a professor in undergraduate work, and arrest for a Minor in Consumption charge for which community service was served, and a diversion for a second Minor in Consumption charge. No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001057-001058]

297.    [Student 19] amended to disclose to episodes of alcohol related discipline occurring in the KU dorms during undergraduate work at K.U. No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001062]

298.    [Student 20] amended to disclose prior charges of theft, DUI, and underage

e

drinking. No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001063-001064]

299.    [Student 21] amended to disclose a DWI arrest that was reduced to reckless driving.  The arrest was less than a year old.  No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001068]

300.    [Student 22] amended to disclose a diversion for shoplifting. No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001070]

301.    [Student 23] amended to disclose a DUI and alcohol related accident and an MIP.  No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001077-001078]

*Missed Opportunities for Mitigation*

302.    Brown's Cert Petition, Barr's recantation, and Barr's mental instability, Barr's fraudulent common law divorce petition, Barr's fraudulent protection from abuse order, and the unique and well documented circumstances within Brown's declaration would all have been available for presentation to a hearing body.  [Pl.'s Decl ¶¶ 26-57, 72; Exhibit C – Trial Transcript,  Defs.'  Bates Brown, Robert v. KU, et al 000237-000238; Brown Dep. Ex. 4, Cert Petition]

303.    Brown's struggles with childhood sexual abuse and the resultant carnage it wrought up on his life, including the testimony of Dr. Witcher would have been available for a hearing panel.  [Pl.'s Decl ¶¶ 2-14,73; Exhibit A – Wayne Witcher Report Dated

e

March 12, 2012, Pl.'s Bates BROWN v. KU 000654-000656; Exhibit B – Wayne Witcher Curriculum Vitae, Pl.'s Bates BROWN v. KU 000654-000656]

304. Brown's contrition and acceptance of responsibility, as indicated both in his statements to Dean Mazza and his deposition testimony, could have been considered by the hearing panel. [Pl.'s Decl ¶ 21; Brown Dep. 76:12-77:4]

305. Brown's willingness to raise Barr's child as his own and Barr's election to have Brown do so could have been considered in mitigation by a hearing panel. [Brown, Robert v. KU, et al 000048, 000061-000064]

306. The fact that Brown was but one of hundreds of amending KU School of Law applicants and that no one in the School of Law's history had ever been permanently expelled after coming forward and amending could have been considered by a hearing panel. [Def. Rohleder-Sook Dep. 16:20-17:11; McKenzie Dep. 8:11-20, 9:20-10:19; Mazza Dep. 108:24-109:10]

307. The testimony of Robyn Barr and Wayne Witcher. [Pl.'s Decl. ¶¶ 72-73]

308. Even to the extent the mitigation raised in ASOF ¶¶ 302-306 may not be admissible in a court of law, it still would be admissible under the Univerity Rules for hearings. [Mazza Dep. Ex. 7, Section 6.6.4.3 ("Admissibility of Evidence . . . Strict rules of evidence do not apply[.]") ]

*Brown's Academic Success*

309. Brown's GPA at the time he was permanently expelled was 3.12 and he was in the top half of his class. [Pl.'s Decl. ¶¶ 69-70]

e

310.   It is uncontroverted that Brown was academically successful.  [S.F. ¶ 63]

*Representations of the University as an Inducement to Contract*

311.       Before enrolling at the University of Kansas School of Law, Brown reviewed both the University and the School of Law website and the School of Law catalog at great length. [Pl.s' Compl. 152]

312.   The representations made therein led Brown to believe that enrollment contemplated an agreement with the University and the School of Law that he would be allowed to complete his studies there if he met the required academic standards and paid the requisite fees and tuition. [Pl.s' Compl. 153]

313.   The law school's online catalog presented the curriculum in total (for the entire program) rather than singling out different years of enrollment. [Pl.s' Compl. 154]

314.   The messages on the Web Site of the Vice Provost for Student Success led Brown to believe that the University would help him in every way possible to succeed in his undertaking to Graduate and to succeed in his law career. [Pl.s' Compl. ¶ 155]

*Valuation of Brown's Future Interests as an Attorney and Damages*

315.   I am a Kansas CPA with decades of experience in valuation, sale, purchase, and Mergers and Acquisitions involvement regarding closely held businesses. [Pl.'s Decl. ¶ 64]

316.   Since making my desire to complete Law School known, I have received a verbal offer of employment upon graduation from John P. Gerstle, a Johnson County Kansas attorney.  [Pl.'s Decl. ¶ 65]

e

317.    Since making my desire to complete Law School known, I have received verbal commitments of the bulk of tax law, M&A, contract, and litigation work upon graduation from the principals of Accutype Medical Services, Inc. and NetStandard, Inc., both greater  Kansas City area corporations.  [Pl.'s Decl. ¶ 66]

318.    Based upon my expertise and experience, I prepared and produced to defendants in disclosure Exhibit I, a schedule of the estimate present value of my foregone compensation, assuming a retirement age of 71 years of age, and I will be testifying as a non-retained expert at trial regarding this matter. [Ex. I, Pl.'s Bates BROWN v KU 000478; Pl.'s Decl. ¶ 67]

319.    In the proposed Pretrial Order in this case, jointly prepared with counsel for defendants, I disclosed the following Summary of Damages.

| | |
|---|---:|
| Present Value of Foregone Comp | 2,146,197.68 |
| Expenditures for Unnecessary Student Loan | 27,518.27 |
| Reduction in Earnings During Matriculation | 36,851.00 |
| Tuition & Fees retained by KU School of Law | 15,883.84 |
| Travel Expenses to Attend KU School of Law | 1,456.47 |
| Legal Fees | 4,111.20 |
| Wayne Witcher Expert Fee | 600.00 |
| Mazza Deposition | 686.25 |
| Agrawal Deposition | 515.50 |
| Rohleder-Sook Deposition | 653.70 |
| Pearson & McKenzie Depositions | 900.50 |
| Ware and Miller Deposition | 631.00 |
| Mazza Supplemental Deposition | 66.50 |
| Gray-Little and Phillips Deposition | 421.00 |
| Expenses for Law School Study Aids | 1050.37 |
| | |
| Total Damages, Including PV of Foregone Comp | 2,237,543.28 |

Past and future attorney's fees are sought pursuant to 42 U.S.C. § 1988.

e

[*See* 10-cv-02606, Doc. 144, pp. 39-40; Pl.'s Decl. ¶ 68]

Availability of Witnesses

320.    Robyn Barr is on my witness list as disclosed to Defendants, and she agreed to testify on my behalf at any hearing I was able to obtain within the University of Kansas or the University Of Kansas School Of Law.

321.    Dr. Wayne Witcher is on my witness list as disclosed to Defendants, and he agreed to testify on my behalf at any hearing I was able to obtain within the University of Kansas or the University Of Kansas School Of Law.

e

## ARGUMENT AND AUTHORITIES

### A. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." Id. In considering a motion for summary judgment, the Court must examine the evidence in a light most favorable to the nonmoving party. *Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party need not disprove the nonmoving party's claim, but must only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987). If this initial burden is met, the nonmovant must then set forth specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323. In doing so, the opposing party may not rely on mere allegations or denials in its pleadings, but must present significant admissible probative evidence supporting its allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256

e

(1986).

## B.  WHAT SHOULD HAVE HAPPENED

*The Proper Avenue of Action Was Clearly Dictated by University Rules*

Even excluding theories of Federal Due Process of Law and State Contract Law, the School of Law's options in this case were very clearly defined within the University Senate Code, the University Senate Rules and Regulations, and the Student Code of Rights and Responsiblities, and they were mandatory, not optional for the defendants in this case.

Per defendant Agrawal, Brown stood accused of (and was ultimately dismissed for) "falsification, misrepresentation, and failure to supply required information on [his] application to the School of Law." [ASOF ¶201].   That transgression is described in Article 22(C) of the Code of Student Rights and Responsibilities, which states "An offense against the orderly process of the university is committed when [a] student or applicant knowingly furnishes false or misleading information to the University." [ASOF ¶ 12]  The offense described finds its home under Article 22 of the Code of Student Rights and Responsibilities, which is entitled "Non-Academic Misconduct". [ASOF ¶ 11] In summary, Brown was charged with an offense described as a type of non-academic misconduct within the Code of Student Rights and Responsibilities.

Disputes involving alleged violations by a student of the Code of Student Rights and Responsibilities which constitute nonacademic misconduct fall under the jurisdiction of the Vice Provost for Student Success, and are administered pursuant to the procedures

e

of the Office of the Vice Provost for Student Success (now called the Vice Provost of Student Affairs).  [ASOF ¶ 7]

Article 22 (F)(1) of the Code of Student Rights and Responsibilities provides that "[a] student or organization alleged to have violated provisions of Article 22 is entitled to a hearing in accordance with procedures established by the Office of the Vice Provost for Student Success.  Any appeal from such a hearing shall be directed to the University Judicial Board." [Mazza Dep. Ex. 3, Student Code, Art 22 (F)(1); ASOF ¶ 17]

Upon learning of Brown's transgressions, then, the School of Law should have filed a complaint with the Office of the Vice Provost for Student Success.  That is the arm of University Governance within the University Community which has exclusive jurisdiction over such matters, and that is the arm of University Governance whose procedures must be followed when such an issue arises.

*Unit Level Grievance Procedures*

The School of Law may feel it should not have to relegate decisions regarding this type of non-academic misconduct to the Office of the Vice Provost for Student Success(/Affairs).  The U.S.R.R. provides an easy avenue for the School of Law to make such an election by providing that any subordinate unit which wishes to assume unit level jurisdiction over an area of dispute resolution may develop a unit level grievance procedure and submit it to the General Counsel of the University.  Unless the General Counsel determines that the procedure as submitted is in conflict with existing law, rules of the Board of Regents, or rules or regulations of the University, it shall become

e

effective thirty calendar days after such submission or upon written approval of the General Counsel, whichever occurs first. [ASOF ¶ 13]   By university rule, such a procedure would have to meet numerous requirements.  It would be published and in writing, would have been submitted to the office of General Counsel for approval, would be on file in the Equal Opportunity Office, with the University Ombudsman, and the Judicial Board Chair, would comply with the Procedural Guarantees of Article XIV, section 2, of the University Senate Code, would provide for the opportunity for each side to submit supporting witnesses, would provide the opportunity for each side to be informed of material supporting the action or position of the other side, *would exclude any party involved in the complaint from the rendering of any decision*, and would provide for the creation of a record of the proceeding, including audio tape recording of the hearing and a written decision of the hearing body. [ASOF ¶ 14]  The School of Law currently has no unit level grievance procedure for non-academic misconduct.  The only proper avenue within the entire University Community for the School of Law's complaint against Brown was with the Office of the Vice Provost for Student Success.

*University Rules are Mandatory*

University Senate Code, Art. XIV, Section 2 provides procedural due process guarantees for <u>every member</u> of the University Community who is involved in a grievance or dispute. [ASOF ¶ 3]   The code makes no exceptions when University Administrators cannot figure out where to look for the process.

The Chancellor makes no exceptions, either. University employees do not have

e

discretion to undermine established accepted University Policy, which includes any policy that is formally adopted by the university and published for the general public at large to see. [ASOF ¶ 22]

Kansas State Law as well does not permit the University to ignore its own rules. The University admits it is a State Agency. [DSOF ¶ 3; S.F. ¶ 2]   When a Kansas State Agency violates its own rules, it violates the law.

> (1) [agency] regulations properly issued have the force and effect of laws, citing <u>Carpenter v. Johnson</u>, 231 Kan. 783, 789, 649 P.2d 400 (1982); (2) agency regulations are issued for the benefit of both the agency and the public and an agency must be held to the terms of its regulations, citing <u>United States v. 2,116 Boxes of Boned Beef</u>, 516 F. Supp. 321, 348 (D. Kan. 1981); and (3) as a general rule an administrative agency may not violate or ignore its own rules, and where it fails to follow the rules which it has promulgated, its orders are unlawful, again citing <u>Kansas Commission on Civil Rights</u>, 212 Kan. 398, Syl. ¶ 1.
>
> <u>Murphy v. Nelson</u>, 260 Kan. 589, 595, 921 P. 2d 1225 (1996)

*Knowledge of and Compliance with the University's Regulations is Defendants' Legal Duty*

The United States Supreme Court has created a special standard for those public workers who take charge of decisions which have implications regarding the constitutional rights of students - they have a duty to know what those constitutional rights are.

> The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice. To be entitled to a special exemption from the

e

categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, [a person] who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, <u>must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges.</u> Such a standard imposes neither an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system.

*Wood v. Strickland*, 420 U.S. 308, 321-22 (1975) (Emphasis Added)

*Wood* also articulates a sound, measured legal duty which is properly cognizable under Kansas State law for purposes of Plaintiff's Gross and Wanton Negligence claim.

## C. ACTIONS INDICATING BAD FAITH AND/OR CONSPIRACY

Below is a listing by defendant or conspiratorial group of intentional acts of bad faith on the parts of the named defendants. They show both the meeting of the minds and the unlawful overt acts required to prove conspiracy.

*Stephen Mazza-Gail Agrawal*
- Agrawal, in a May 31st Email where Mazza was copied, instructed general counsel to craft Joyce McCray-Pearson's response to Brown's requests for action before the judicial board. Mazza was also copied on general counsel's response that they would "formulate a plan". Mazza became acting dean of the School of Law the very next day, but took no corrective action. [ASOF ¶¶ 208, 215] A rational fact finder could conclude Mazza and Agrawal cooperated in the use of the School of Law's counsel to keep the Judicial Board process from working to protect Brown's due process rights.
- Mazza became acting interim Dean of the KU School of Law on June 1, 2010, but allowed Agrawal to represent herself as Dean for purposes of Browns' dismissal on June 7. [ASOF ¶¶ 214-217, 226] In Mazza's sworn Declaration, he stated "During the period 2007 through mid-June 2010, I was the Associate Dean for Academic Affairs." [ASOF ¶ 216] In Agrawal's Sworn Declaration, she was vague regarding the exact date when she ceased to function as Dean of the Kansas University School of Law, stating

e

"I assumed my duties as Dean the University of Iowa College of Law on July 1, 2010, and I know that I took some vacation leave between leaving the University of Kansas and that July 1, 2010 start date." [ASOF ¶ 217] A rational fact finder could conclude that they cooperated to deceive both Brown and the Court about who was acting Dean on June 7, 2010 when Agrawal represented in her dismissal letter that she was acting Dean.

*Stephen Mazza-Wendy Rohleder-Sook*

- Rohleder-Sook's complaint was heavily co-authored by Mazza, who later represented to Brown that he was impartial and could act as Ombuds. [ASOF ¶ 103-104,108] A rational fact finder could conclude that the true authorship of the complaint was concealed so that Brown would maintain the mistaken impression that the process was actually working as intended by the DRP.
- Rohleder-Sook's responses to Brown's Procedural objections were ghost written by Mazza.  As finally disseminated to Brown, they were identical in every way to the draft copy from Mazza's computer except for Rohleder-Sook's initials and the letterhead. Each later testified initially that Rohleder-Sook had been the primary author, and each changed their testimony later on to disclose that Mazza was the author. [ASOF ¶¶ 145, 149-150, 157, 165-166, 170-173]   A rational fact finder could conclude that the letter was ghost written by Mazza and represented to Brown as Rohleder-Sook's work so that Brown would maintain the mistaken impression that the process was actually working as intended by the DRP.
- Rohleder-Sook and Mazza failed to disclose to the DRP hearing panel that multiple members of the Admissions Committee had felt Brown deserved additional due process before disciplinary action was taken [ASOF ¶ 89], or that Sandra Craig-McKenzie (a member of Brown's admissions committee) had come to them recommending that his expulsion not be pursued because the School of Law had taken too long to pursue the complaint.  [ASOF ¶ 50, 162, 163]   A rational fact finder could conclude that Mazza and Rohleder-Sook were providing only information which was likely to result in Brown's removal.
- Mazza communicated to Rohleder-Sook regarding Brown's case saying "what a nightmare".  Rohleder-Sook testified that they had a "pretty informal relationship" when it came to Brown's complaint. [ASOF ¶ 158-159]   A rational fact finder could conclude that the proceedings were handled un-professionally and with a bias against Brown.

*Stephen Mazza-Gail Agrawal-Joyce McCray-Pearson*

- McCray-Pearson's testimony and the fact that she came up with the very same rationale invented by counsel for Agrawal and the Chancellor (F.S.R.R. 2.1.1.) both indicate she very likely was not the author of her

e

letter of June 3, 2010 denying jurisdiction and ignoring the require process for conflict resolution in the preface of the University Senate Code. [ASOF ¶¶ 210-213, 218-223, 227-228, 230-233]   A rational fact finder could conclude that the letter was ghost written by general counsel at Agrawal's direction, with Mazza's knowledge, and that Mazza and Agrawal successfully used McCray-Pearson (through counsel) to keep the Judicial Board process from working to protect Brown's due process rights.

*Gail Agrawal*

- Agrawal was heavily involved in Brown's action, making critical decisions, beginning on August 27, 2009, the very day Brown amended, but acted as the sole decision maker in violation of U.S.R.R. 5.2.2(d) (stating that involvement in the complaint precludes involvement in the decision). [ASOF ¶¶ 57, 58, 62, 70-73, 237-240]
- In sworn responses to interrogatories, Agrawal stated that she had no knowledge of or involvement with Joyce McCray Pearson's judicial board response letter to Brown. [ASOF ¶ 208, 209, 215]   A rational fact finder could conclude that Agrawal intentionally omitted her request to general counsel to write McCray-Pearson's response from her answer.
- In sworn deposition testimony, Agrawal stated that the dispute had come to her at a late stage, and that she didn't know what was involved until it was time for the final decision [ASOF ¶ 240] despite her heavy involvement in the case beginning on the day Brown amended. [ASOF ¶¶ 57, 58, 62, 70-73, 237-240] A rational fact finder could conclude that Agrawal perjured herself to conceal her day to day involvement, which would have precluded her from being involved in the decision.
- In her sworn declaration, Agrawal stated that the dispute had come to her at a late stage, and that Brown's case had come to her for review and consideration "after the May 3, 2010 memorandum from the hearing panel" [ASOF ¶ 241] despite her heavy involvement in the case beginning on the day Brown amended. [ASOF ¶¶ 57, 58, 62, 70-73, 237-240] A rational fact finder could conclude that Agrawal perjured herself to conceal her day to day involvement, which would have precluded her from being involved in the decision.
- Agrawal indicated in communications with Mazza and General Counsel on May 24, 2009 that she felt Brown was likely to sue.  A rational fact finder could conclude she was aware of due process problems with the case. [ASOF ¶ 189]
- Agrawal relegated the decision on whether or not to consider Brown's requests for due process entirely to general counsel, stating "I leave that assessment to the practicing, licensed lawyers. (Smile)" [ASOF ¶ 204]   A

e

rational fact finder could conclude she was making light of intentionally refusing to form or provide an opinion.

*Wendy Rohleder-Sook*

- Rohleder-Sook omitted information which was favorable to Brown's case from decision makers.  She allowed the Admissions Committee, the DRP hearing panel, and Agrawal to believe brown had only initially reported two of four domestic battery convictions.   [ASOF ¶¶ 64-65, 198] She failed to offer information in her possession regarding the circumstances of Brown's trial, the transcript, and Brown's Cert petition to the Admissions Committee, the DRP hearing panel, and Agrawal. [ASOF ¶¶ 69, 74-75, 84-86 ]  She failed to offer information regarding the large number of other amending applicants, leaving the Admissions Committee, the DRP hearing panel, and Agrawal to believe that Brown's circumstance was an isolated incident. [ASOF ¶¶ 87-88, 154, 156] A rational fact finder could conclude that Rohleder-Sook was providing only information which was likely to result in Brown's removal.

*Stephen Mazza*

- Mazza fabricated his statement to Dean Agrawal that Brown had said he knew he would not have been admitted if he had disclosed his criminal convictions. His later testimony regarding the statement is that he didn't remember what was said at the meeting or the exact words of the statement. [ASOF ¶ 112-114, 193-196]  A rational fact finder could conclude Mazza was helping to ensure Brown was removed.
- Mazza told Brown at their initial meeting this was an "Article 22" matter. When asked later in email correspondence, Mazza did not deny that he had alluded to Article 22 at his meeting with Brown.   [ASOF ¶¶ 111; 130-131, 167]  A rational fact finder could conclude Mazza knew the whole time jurisdiction was improper under the DRP.
- Although upon filing of a DRP complaint, a hearing panel is supposed to be formed immediately and assume communications with the subject of the complaint, Mazza involved general counsel immediately and waited more than a month to form the hearing panel and missed the deadline for Brown's hearing, all the while managing the proceedings himself.  [ASOF ¶¶ 134-148, 151-153]   A rational fact finder could conclude that this complaint was never intended to be handled through normal channels.

## D.  THE BOARD OF REGENTS IS A PROPER DEFENDANT

The defendants argue that the Kansas Board of Regents cannot be a proper

e

defendant because they had no knowledge of the transgressions which occurred below within the University.   In support of this claim, Defendants cite case law which shows that Brown my not pursue the Regents under the doctrine of *respondeat superior*.

But the Board of Regents is named only as an official capacity defendant.   No damages are sought from the Regents either individually or as a Board.   Brown's claims include claims for prospective injunctive relief pursuant to the doctrine of Ex Parte Young and a state claim for similar relief pursuant to K.S.A. 60-902.  [Doc. 144 – Pretrial Order, p. 41]

The Regents' involvement in such cases is contemplated by statute.   K.S.A. 76-713 provides that "The board of regents may be sued and may defend any action brought against the board of regents or any state educational institution."  Brown wants to be sure that whatever equitable Judgment may be forthcoming is not inoperative for want of the proper power to implement that judgment.   The involvement of the Board of Regents assures that appropriate resources will be brought to bear.

### E.  BROWN'S 42 U.S.C. § 1983 PROCEDURAL DUE PROCESS CLAIMS

*What Process Was Due Assuming No University Regulations*

In Goss v. Lopez, the Supreme Court dealt with a case where students had been suspended, without a hearing, for periods up to ten days.

> The Due Process Clause [] forbids arbitrary deprivations of liberty. Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied. School authorities here suspended appellees from school for periods of up to 10 days based on charges of misconduct. If sustained and recorded, those charges could seriously damage the students'

e

standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment. It is apparent that the claimed right of the State to determine unilaterally and without process whether that misconduct has occurred immediately collides with the requirements of the Constitution.

*Goss v. Lopez*, 419 US 565, 574-75 (1975)(Citations and punctuation omitted)

The *Goss* Court went on to require that there be at least an informal hearing between student and disciplinarian, preferably prior to the suspension. *Id* at 584. The Court then further qualified its ruling, stating "We should also make it clear that we have addressed ourselves solely to the short suspension, not exceeding 10 days. Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures. Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required." *Id*

There is an impressive body of consensus that any expulsion from a state university or college must comport with the due process clause of the Fourteenth Amendment. *See* <u>Jones v. Snead</u>, 431 F.2d 1115 (8th Cir. 1970); <u>Esteban v. Central Missouri State College</u>, 415 F.2d 1077 (8th Cir. 1969), cert. den., 398 U.S. 965, 26 L. Ed. 2d 548, 90 S. Ct. 2169 (1970); <u>Dixon v. Alabama State Board of Education</u>, 294 F.2d 150 (5th Cir.), cert. den., 368 U.S. 930, 7 L. Ed. 2d 193, 82 S. Ct. 368 (1961); <u>Goss v. Lopez</u>, 419 U.S. 565, 576 n.8, 42 L. Ed. 2d 725, 95 S. Ct. 729, (1975); <u>Wood v. Strickland</u>, 420 U.S. 308, 95 S. Ct. 992, 43 L. Ed. 2d 214, 43 U.S. L.W. 4293, 4298, n. 15 (1975); <u>Edwards v. Board of Regents of Northwest Mo. St. U.</u>, 397 F. Supp. 822, 827 (W.D.Mo. 07/8/1975)

e

Brown agrees with Defendants that Courts set a lower bar where the dismissal is academic rather than disciplinary in nature [Defs.' Mem. p. 39], but it stretches the imagination to characterize this permanent expulsion as Academic. Defendant Agrawal's June 7, 2010 dismissal letter stated Brown's transcript would permanently show he was dismissed based on "falsification, misrepresentation, and failure to supply required information on [his] application to the School of Law." [S.F. ¶ 50; ASOF 236]   During the pendency of the School of Law's Allegation of Academic Misconduct, Defendant Mazza communicated with plaintiff Brown via emails that had as the subject line: "Disciplinary Procedures". [S.F. ¶ 51].   It is uncontroverted in this action that Brown was academically successful.   [ASOF ¶¶ 309-10].   The action Brown is accused of is specifically described as "non-academic misconduct" in University Regulations.   [ASOF ¶ 12]  The action taken here was disciplinary.

In short, applicable precedent, clearly established Brown's right to present his side of the matter at a hearing before permanent disciplinary dismissal.

*What Process Was Due According to University Regulations*

In a complete vacuum of University Regulations, Brown would have been entitled to due process and a hearing before dismissal.   University Governance documents eliminate all speculation about what type of process is due.

University Senate Code, Art. XIV, Section 2 provides procedural due process guarantees for every member of the University Community who is involved in a grievance or dispute. [ASOF ¶ 3].  Those rights include:

e

a)  A hearing before a disinterested panel. Specific procedures for each type of grievance or complaint that is within the jurisdiction of an established University body are set forth in this Code.

b)  Each party to a proceeding may represent itself or be represented by an advisor or counsel of his, her, or its choice.

c)  The right to a written statement of the complaint or grievance against him or her, which statement shall set forth with particularity the facts upon which the complaint or grievance is based and shall indicate the provision or provisions of the University Rules and Regulations alleged to have been violated.

e)  The right to introduce into evidence all relevant testimony and documents, and to a full examination of the evidence presented by the other parties, including the opportunity to cross-examine witnesses. The hearing body shall base its recommendations solely on the evidence received at the hearing.

f)  In any hearing or appeal, the parties are entitled to a decision based upon the record of the hearing or appeal.

i)  Where the procedures provide for an appeal beyond the hearing, a party aggrieved by a decision of the hearing body shall be entitled to appeal in accordance with such procedures.

j)  In all proceedings, the party supporting the application of sanctions to individual members of the University community shall have the burden of persuading the hearing body of the facts upon which the application of such sanctions must be based.

USC Art. XIV protections extend to procedures within every jurisdiction of the University. [ASOF ¶ 23]

Defendants' reasoning completely ignores the University's rules, regulations and procedures which are published in writing and on the internet for every member of the University Community and every citizen of the State of Kansas to see. Administrative Agencies in Kansas are not permitted to simply disregard administrative rules and regulations – they have the force and effect of law. Murphy v. Nelson, 260 Kan. 589, 595, 921 P. 2d 1225 (1996)

*What Process Was Due According to University Regulations*

Defendants also claim that there was no contract formed between Brown and the

e

University when Brown enrolled and the University accepted Brown's tuition.  But the formation of a contract requires only "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty".  Second Restatement of Contracts § 1.

Brown's initial application to the School of Law constituted an offer to contract. The School of Law's admittance of Brown in the Fall of 2009 and the acceptance of Brown's tuition constituted acceptance of that offer.  Brown's amended application in August of 2009 constituted an offer to continue his enrollment subject to the information then know to the University. The School of Law's unequivocal enrollment of Brown to the School of Law in the Spring of 2010 and unqualified acceptance of Brown's tuition, without qualification or reservation, constituted acceptance of that offer.

The school of law made many representations in its published literature, online catalog, and online policies.  Brown relied on these representations, and they served as an inducement for him to contract with the University by enrolling. [ASOF ¶¶ 311-314]

The University and the School of Law's published Rules, Regulations and Procedures constitute custom which is valid in this circumstance for determining the intent and extent of the enrollment contract. *Havens v. Safeway Stores*, 678 P.2d 625, 629 (Kan. 1984) ("Custom and usage may be shown to elucidate or explain something ambiguous in a contract[.]" )

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

e

Second Restatement of Contracts § 90(1)

Defendants' hesitance to acknowledge the existence of a contract is somewhat new.  At deposition, defendant Rohleder-Sook could not provide any reason why the school of law's complaint was not superseded by Brown's arguments in Section 5 of his procedural objections. [ASOF 126]  In responding to Brown's case law, the University did not assert that it is not governed by Kansas Contract law. [ASOF 127]  Defendant Mazza testified that administration of student admissions applications are governed by Kansas contract law. [ASOF 128]

*Brown's Enrollment Contract is not Vitiated by Fraud*

Brown amended his application 7 days after enrolling [ASOF ¶ 50].  Every fact upon which Brown's dismissal in June of 2010 was based was known to the School of Law by October 2, 2009.  [ASOF ¶ 66]  Yet the School of Law's enrolled Brown in the Spring of 2010 of its own volition and without Brown's personal request or involvement. [ASOF ¶¶ 77-82]  The School of Law finalized the first round of Brown's tuition and accepted a second round, without qualification or reservation.

Defendants now argue that fraud vitiates whatever it touches.  Assuming fraud, and not misunderstanding, was ever proven (which would require a hearing), that would be true upon discovery of the fraud.

But in the months that elapsed between the University's discovery of the alleged fraud and the filing of the complaint, the University allowed Brown to continue in and

e

satisfactorily completed all requirements of all his Fall 2009 semester courses, sit for finals in December of 2009, and receive grades for Fall 2009 semester courses.  The University then enrolled Brown for the Spring 2010 semester pursuant to action taken directly by the Kansas University School of Law Admissions Office of their own initiative and without his personal request or intervention, had his tuition collected by the Kansas University School of Law Admissions Office (which was managed by defendant Rohleder-Sook) pursuant to University action of their own initiative and without Brown's personal request or intervention, and allowed Brown to begin classes in January of the following year, all the while receiving no indication that his amended application had not been accepted. [ASOF ¶ 315] Brown incurred tens of thousands of dollars in expenses in reliance on the actions the University had taken subsequent to his amended application. [ASOF ¶ 316]   Therefore, the Complaint was superseded by Kansas contract law regarding waiver, rescission, and promissory estoppel:

1. One who seeks to rescind a contract on the grounds of fraud must do so with reasonable promptness after discovery of the fraud.
2. If, after discovery or knowledge of facts which would entitle a party to a contract to rescind the contract, he treats the contract as binding and leads the other party to believe that the contract is still in effect, he will have waived his right to rescind.
3. In order to constitute such a waiver, it is not necessary that there be an express ratification of the contract after discovery of the fraud which might make the equitable remedy of rescission available. Acts or conduct inconsistent with an intention to rescind it, or in recognition of the contract, may have the effect of affirming it.

Morse v. Kogle, 162 Kan. 558, Syl. at 1-3 (1947)

Whether the principle is described as equitable estoppel, quasi estoppel, waiver, ratification, election, or as a requirement of consistency in

e

conduct, is not very important. The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced .... The rule is well recognized that where a party with full knowledge, or with sufficient notice or means of knowledge, of his rights and of all the material facts remains inactive for a considerable time or abstains from impeaching a contract or transaction, or freely does what amounts to a recognition thereof as existing, or acts in a manner inconsistent with its repudiation and so as to affect or interfere with the relation and situation of the parties, so that the other party is induced to suppose that it is recognized, this amounts to acquiescence and the transaction, although originally impeachable, becomes unimpeachable.

Schiffelbein v. Sisters of Charity of Leavenworth, 190 Kan. 278, 281-2 (1962)

If a party, knowing of an alteration that discharges his duty, asserts a right under the original contract or otherwise manifests a willingness to remain subject to the original contract or to forgive the alteration, the original contract is revived.

Second Restatement of Contracts § 287(2)

Even assuming the contract were to be vitiated by fraud, we would be talking about rescission or cancellation, with the appropriate remedy being to place the parties in the same positions they were in before entering into the contract. This would have meant the refund of Brown's tuition and the denial of his application for admission. Instead, the School of Law chose to drag Brown through a protracted process during which he was told he had rights (which were later withdrawn), to allow him to devote his full productive effort to his education at the School of Law, and then to send him on his way while retaining fifteen thousand dollars in tuition which would have been refundable if the School of Law had acted promptly. Further, the School of Law insists on permanent

e

notation in Brown's transcript that he was permanently dismissed for "falsification, misrepresentation, and failure to supply required information on [his] application to the School of Law." [ASOF ¶ 236].  This will prevent Brown from enrolling in any AALS accredited Law School and will prevent him from ever becoming a lawyer.  [ASOF ¶¶ 252-254]

### Brown Has a Protected Liberty Interest

Defendants claim Brown cannot show a liberty interest, and then re-characterize his liberty interest claim as a reputational interest claim.  Brown has never claimed that he has a reputational interest that was damaged.

Brown claims that he has the fundamental right to earn his livelihood by any lawful calling and to pursue any livelihood or avocation he wishes pursuant to *Allgeyer v. Louisiana*, 165 US 578, 589 (1897).

Defendants argue that Brown cannot show he is foreclosed from further educational opportunities because he has not applied to other Schools of Law and because there is no evidence that Dean Agrawals statements have been communicated to anyone outside the University.  [Defs.' Mem. p. 37]

But it is unconverted that Gail Agrawal's June 7, 2010 dismissal letter stated, in part, that the School of Law's transcript would show that plaintiff Brown's expulsion from the Law School was based on "falsification, misrepresentation, and failure to supply required information on [his] application to the School of Law." S.F. ¶ 50; Exhibit A, Agrawal Decl, ¶ 6; Brown Deposition Exhibit 10 referenced therein; Defs.' Mem. 62]

e

It is similarly uncontroverted that disciplinary expulsion of a law student from a member of the Association of the American Law Schools prevents that student from enrolling in any other member schools. [S.F. ¶ 53; ASOF ¶ 252] Both a school of law Honor Code Committee and a school of law Dean have stated that permanent removal from the School of law "would permanently prevent from attending any member school of the Association of American Law Schools" [ASOF ¶ 253] and would prevent the student removed "from ever becoming a lawyer[.]" [ASOF ¶ 254] If Agrawal's June 7, 2010 letter is truthful, then Brown is deprived of his liberty interest. He should not be expected to humiliate himself in order to prove it while the resolution of this matter is still pending.

Defendants also argue that Brown cannot prove he would one day practice law because he would first need to graduate, pass the bar, and meet the character and fitness requirements. Our Supreme Court understands that it's not always the kill – its' the thrill of the chase. Brown has the right *to pursue* any livelihood or avocation he wishes. *Allgeyer v. Louisiana*, 165 US 578, 589 (1897).

"One may not have a constitutional right to go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law." Jones v. Board of Ed. of Tenn., 397 US 31, 34 (Mr. Justice Douglas - Dissenting) The School of Law may conjecture about Brown's future, but they may not deny him the right to try.

It is also important to note that Brown was academically successful and in the top

e

half of his KU Law School Class before his expulsion [ASOF ¶¶ 309-310], and that this very School of Law has seen fit to pass hundreds of applicants with disciplinary challenges in their backgrounds on to take their chances with the Bar [ASOF ¶¶ 257-301].

### Defendants Rohleder-Sook, Mazza and McCray-Pearson

Defendants argue that since the final dismissal was purportedly undertaken by defendant Agrawal, that defendants Rohleder-Sook, Mazza, and McCray-Pearson cannot possibly have any liability.  But the defendants each separately and jointly as conspirators undertook overt, unlawful actions to deprive Brown of his due process rights, as explained in Section C – "ACTIONS INDICATING BAD FAITH AND/OR CONSPIRACY".


### Defendants' Claims that Adequate Due Process was Provided

Defendants' claim that Agrawal's letter of May 26, by inviting Brown to file a written response if there were other matters he wanted her to consider, afforded Brown all the process he was due.

Agrawal's letter of May 26 indicated that she had consulted with witnesses in the matter of Brown's dismissal, accepted their statements as true, and made up her mind about Brown's dismissal.  [ASOF ¶¶ 190-192]  Brown was asked to respond in writing if he felt his dismissal was inappropriate [ASOF ¶ 201], and he did so with a request for the due process protections guaranteed in writing by the university rules and regulations and

e

for a hearing. [ASOF ¶ 202]

With regards to Brown's request that Agrawal meet with him face to face, she responded "I see no need to meet with you, and therefore decline your request for a meeting." [ASOF ¶ 203]  With regards to Brown's request that he be afforded the due process protections promised in writing by the University's Rules and Regulations, Agrawal took no action at all apart from dismissal.  It is disingenuous for the University now to assert that Brown received due process because he was given a chance to ask for and be denied due process.

Further, the *Goss* Court required that there be at least an informal hearing between student and disciplinarian, a face to face hearing, even in the case of elementary school suspensions of ten days or less.  *Goss v. Lopez*, 419 US at 584. The Court was careful to point out that longer suspensions or expulsions may require more formal procedures.  *Id*   In Brown's case, although he is being forever deprived of the right to pursue his chosen avocation, he was deprived of even the face to face meeting a grade school student would have received before a ten day suspension.

*Defendants' Actions were so Arbitrary as to be per se Due Process Violations*
"The Due Process Clause [] forbids arbitrary deprivations of liberty."  *Goss v. Lopez*, 419 US 565, 574-75 (1975)  Brown is the only student known to any defendant to have ever been permanently removed from the School of Law for any reason.

Student 1 amended to disclose 17 arrests and ten convictions, but was allowed to amend and continue without disciplinary action.   The committee

e

considered that he had been homeless. [ASOF ¶¶ 257-264]

Student 2 amended right before his graduation, waiting more than three years to make his disclosures. The admissions committee initially and unanimously voted that they would not have admitted him and that he should be permanently removed him (as opposed to Brown's case, when they found they would not have admitted but recommended no particular action with some members opting for due process before any discipline). Defendant Mazza made the decision that he would get to appear before the admissions committee. There was no particular mitigation in this case – just a lot of begging. Ultimately, student 2 was allowed to graduate without discipline. [ASOF ¶¶ 265-280]

There are many other examples included in the facts presented, but they are just examples. It is by no means an exhaustive list. The examples presented include students who cheated and then lied about cheating multiple times, students who sexually harassed both students and teachers, students who falsified their resumes materially and then used the University to distribute the falsified resumes, and plenty of students who amended to disclose criminal activity. Not ONE was permanently removed. [ASOF ¶¶ 281-301]

Brown does not know to this day what made him so special. What is clear is that the action taken here is arbitrary beyond constitutional bounds.

### F. THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY OR DISCRETIONARY FUNCTION IMMUNITY

The University of Kansas has a carefully crafted system of Rules, Regulations, and

e

Procedures which are designed to assure that grievances, no matter how they arise, are dealt with in an even handed and consistent manner which respects the boundaries of due process.   As previously set forth in Section B - ("WHAT SHOULD HAVE HAPPENED"), Brown's alleged transgression was clearly defined in the Code of Student Rights and Responsibilities.  So were the proper procedures for handling it.  There was no unit level grievance procedure in place, and Jurisdiction was with the Office of the Vice Provost for Student Success.  University Senate Code, Art. XIV, Section 2 spelled out clear and specific procedural due process protections which the defendants were required to follow in *any* disciplinary proceeding within the University.  The University Rules were explained to the defendants as mandatory, according to the chancellor, according to the rules themselves, and according to Kansas State Law.   Murphy v. Nelson, 260 Kan. 589, 595, 921 P. 2d 1225 (1996)

Assuming arguendo that the individual defendants were entitled to ignore the rules as they did, *Goss v. Lopez*, 419 US 565 stood as a safety net.

Thus, the law is clearly established, and is Mandatory (not discretionary) for these defendants.  All they had to do to protect themselves completely was follow the written rules of the Agency. The defendants are not entitled to Discretionary Function Immunity.

Each of the individual defendants occupied roles which were absolutely vital to the protections of student due process within the University.  Initially in the amendment process, Rohleder-Sook was the sole arbiter of whether a student's academic standing would be placed in jeopardy after amending an application. [ASOF 248]   McCray-

e

Pearson was in a position to field and direct every appeal within the University Community.   Agrawal was the Dean and Chief Executive Officer of the School of Law during the processing of much of the school of Law's complaint against Brown, and Mazza was the Dean and Chief Executive Officer of the School of Law on the date of Brown's dismissal and during subsequent communications with the offices of the Judicial Board and the Chancellor.

*Wood v. Strickland*, provides that ignorance or disregard is never an excuse which justifies qualified immunity for an official who takes the due process rights of students into his or her care.   "[A]n act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice." *Wood v. Strickland*, 420 U.S. 308, 321-22 (1975)

In short, the law was more than clear, and these defendants are in a special category of Officials who are not permitted to explain their transgressions away based on good faith.

Lastly, each of the individual defendants undertook overt actions in bad faith, as explained in Section C – ("ACTIONS INDICATING BAD FAITH AND/OR CONSPIRACY").   Plaintiff argues that the acts listed in this section can be neither in good faith nor discretionary.

The Defendants are not entitled to qualified immunity.

### G. EQUITABLE ESTOPPEL DOES NOT BAR BROWN'S CLAIMS

e

Brown came forward a week after he began enrollment and amended. While Brown admits to poor judgment, he has never admitted to intentional fraud as claimed by defendants. As we know, no hearing has been held.  Further, much as is the case with the right to cancel or rescind, defendants waived any claim of estoppel when they chose to re-enroll Brown despite knowledge of every fact upon which his dismissal was subsequently based.  Lastly, it is Brown, not the school of law, who has been prejudiced. The doctrine of equitable estoppel does not bar Brown's claims.  Allowing this tactic to succeed would be yet another excuse to simply disregard clearly defined, written due process requirements that should have applied in the case of a student.

## H. BROWN'S CLAIM FOR GROSS AND WANTON NEGLIGENCE

*Wood* articulates a sound, measured legal duty which is properly cognizable under Kansas State law for purposes of Plaintiff's Gross and Wanton Negligence claim.

> [A person] who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges. Such a standard imposes neither an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system.

*Wood v. Strickland*, 420 U.S. 308, 321-22 (1975)

The individuals in this case have a legal duty, recognized under federal law, to know the basic, unquestioned constitutional rights of students.

In Kansas, wantonness means action which indicates 1) a realization of the imminence of harm, and 2) a reckless disregard or a complete indifference or an

e

unconcern for the probable consequences of the wrongful act.  *Boaldin v. University of Kansas*, 242 Kan. 288, 293, 747 P.2d 811 (1987) (quoting *Lee v. City of Fort Scott*, 238 Kan. 421, Syl. ¶ 1, 710 P.2d 689 [1985]); *see* PIK Civ. 2d 3.02.

In this case, Plaintiff has alleged that he was unconstitutionally deprived of a property interest under state contract law, a property interest pursuant to State law regarding agency regulations, and a liberty interest regarding pursuit of his chosen avocation.  The case law which governs each more than a decade old.

An organization can only act through its employees and agents, and The University of Kansas is vicariously liable with respect to the State claims pursuant to the Kansas Tort Claims Act, codified at Kan.Stat.Ann. §§ 75-6101 through 6118. Additionally, Plaintiff claims that top policy makers within The University of Kansas' organization have been deliberately indifferent to the wrongful actions of the individual defendants.

The plaintiff can prevail on his State Gross and Wanton Negligence claim if he can show that The University of Kansas and the individual defendants breached their duty to know and observe the basic fundamentals of law regarding his constitutional rights (or in the alternative, the special duty a University owes a student), and that such departure from the standard of care indicated knowledge of imminent danger and a reckless disregard, complete indifference, or unconcern for the probable (and in this case actual) consequences.

Plaintiff issued at least five formal, written warnings (four personally and one through counsel) to The University of Kansas regarding the liberty and property interest

142

e

(contract rights) at issue and the potential for unconstitutional deprivation of constitutional rights by the removal of that interest without due process of law:  1) Plaintiff's March 1, 2010 request to dismiss the School of Law's disciplinary complaint; 2) Plaintiff's May 27, 2010 response to Dean Gail Agrawal's notice of dismissal; 3) Plaintiff's May 31, 2010 Request for an Initial Hearing before the University Judicial Board; 4) Plaintiff's May 31, 2010 Request for an Jurisdictional Ruling by the University Judicial Board;  and 5) Plaintiff's June 21, 2010 notice of pending litigation submitted to Chancellor Bernadette Gray-Little via Plaintiff's attorney.  These written notices contain dozens of pages of extraordinarily detailed explanation regarding The University of Kansas' potential (now actual) due process violations, the probable (now actual) damages, and the underlying contract theory, disseminated at every level of The University of Kansas' organization.  The four propounded by Brown were presented as some point to each of the individual defendants. The last went to the office of the chancellor.

Yet even now, the testimony of the individual defendants indicates they are either unwilling or unable to weigh in on student rights. [ASOF ¶¶ 242-251]  If the defendants didn't understand those rights upon receiving multiple notices, it was incumbent upon them to undertake education.   This type of intentional disregard in the face overwhelming notice that a student's rights are in jeopardy is enough to make the claim.

But there is much more.  Each of the individual defendants undertook overt actions in bad faith, as explained in Section C - ("ACTIONS INDICATING BAD FAITH AND/OR CONSPIRACY").  Agrawal even went so far as to direct counsel to craft a

e

response to Brown's procedural objections before the Judicial Board and then present them as the work of the board chair, with acting Dean Mazza's knowledge and approval. As a result, Chair McCray-Pearson simply ignored the procedures for conflict resolution in the preface of the University Senate Code. [Exhibit J]

The actions listed in Section C move the individual defendants out of the realm of intentional disregard and into the realm of malicious intent.  The evidence, interpreted as it must be here, supports Brown's claim of Gross and Wanton negligence.

## I.  BROWNS CLAIM FOR TORTIOUS INTERFERENCE

Defendants's argument that this tort is "aimed at preserving future or potential contractual relations" misstates the Cited Case, which deals only with contract claims.

Defendants argue that this tort requires proof of intentional misconduct.  Brown argues that it is shown within the detail explanation provided in Section H – ("BROWN'S CLAIM FOR GROSS AND WANTON NEGLIGENCE") and that the reasoning presented there is equally applicable here.  Specific acts evidencing intentional malice are presented in Section C - ("ACTIONS INDICATING BAD FAITH AND/OR CONSPIRACY").

Defendant argues that Brown has not presented evidence of a legitimate business expectancy.  That evidence is provided in [ASOF ¶¶ 315-319].  The document attached as exhibit I was disclosed to Defendants months ago, but have not challenged the figures presented.  Now the time is too late.

Last, defendants argue for the defense of justification, but this is yet another

e

exercise in making what should be very simple turn out to be very complicated.  The school of law alleged that Brown had violated a rule. Brown made his disclosure within 7 days after his enrollment.  Rather than file a proper complaint with the appropriate hearing body and follow proper procedures, the School of Law drug its discipline out until Brown had completed the Fall 2009 and Spring 2010 semesters, was taking classes in the summer of 2010, and was already enrolled for the Fall of 2010 through delay in processes they were never authorized to undertake in the first place.  In so doing, the defendants showed disregard for Brown's due process rights in the face of overwhelming notice.  Meanwhile, every other amending applicant navigated the system with impunity.

This set of circumstances falls short of establishing the defense of justification.

## <u>CONCLUSION</u>

Plaintiff respectfully requests that Defendants Motion to Dismiss be denied.


Respectfully submitted,



By:     <u>/s Robert M. Brown</u>
        Robert M. Brown, *Pro Se*
        6200 W 74th Street
        Overland Park, KS  66204
        816-721-4512
        866-610-4630 (fax)
        bbrown@netstandard.net

e

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 13th day of September, 2013, the above and foregoing was electronically filed with the United States District Court for the District of Kansas using the CM/ECF system, which caused notification to be sent to the following:

Sara L. Trower, Esq.
Associate General Counsel and Special
Assistant Attorney General
Room 245, Strong Hall
1450 Jayhawk Blvd.
Lawrence, KS  66045
Tel:  (785) 864-3276
Fax:  (785) 864-4617
Email: strower@ku.edu

*Attorney for Defendants*

<u>/s Robert M. Brown</u>
Robert M. Brown, *Pro Se*

e