## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ROBERT M. BROWN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No. 10-CV-2606 EFM/KGG** |
| | ) |
| **THE UNIVERSITY OF KANSAS, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

### DEFENDANTS' REPLY MEMORANDUM IN SUPPORT
### OF MOTION FOR SUMMARY JUDGMENT

Mr. Brown has done his best in his Response to create the appearance of disputed fact issues by littering the record with three hundred and twenty-one paragraphs of additional irrelevant and immaterial facts, which are in no way probative of the claims stated in this case.  Moreover, despite Mr. Brown's attempt to cloud the record with these distractions, the uncontroverted facts remain that Brown lied on his law school application, that he testified he did so because he knew his application would not be favorably considered if he disclosed his criminal record, and he was provided notice and an opportunity to respond to explain his untruthful answer on his application before Dean Agrawal dismissed him from the Law School.  The undisputed facts compel a conclusion that Brown received all of the process due him and that defendants are entitled to judgment as a matter of law on his claims.

## <u>REPLY REGARDING STATEMENT OF UNCONTROVERTED FACTS</u>[1]

Plaintiff Brown's response, in accordance with D. Kan. Rule 56.1, responded to the Defendants' Statement of Uncontroverted Facts.  For the Court's convenience in identifying the source of the factual statements, Defendants' facts and replies below will appear in regular text, while Mr. Brown's response to defendants' uncontroverted facts will appear in bold text.

1. The University of Kansas is a state educational institution. *See* K.S.A. 76-711. S.F. ¶ 1.

   **<u>Brown Response</u>:  Uncontroverted**

2. The University of Kansas, a separate state agency, is funded in part by the State of Kansas. *See* K.S.A. 76-712. S.F. ¶ 2.

   **<u>Brown Response</u>:  Uncontroverted**

3. The Kansas Board of Regents, provided for in Kan. Const., Art. 6 §§ 2, 3, and established by K.S.A. 74-3202a, controls and supervises the Kansas state educational institutions, including the University of Kansas. S.F. ¶ 3.

   **<u>Brown Response</u>:  Uncontroverted**

5. The University of Kansas, School of Law, is an academic unit within the University of Kansas, and it is located at 1535 W. 15th Street, Lawrence, Kansas. S.F. ¶ 4.

   **<u>Brown Response</u>:  Uncontroverted**

---

[1]   In accordance with summary judgment rules, these facts are set forth in the light most favorable to plaintiff.  *See Rezaq v. Nalley*, 677 F.3d 1001, 1010 (10th Cir. 2012).

6. Gail Agrawal was the Dean of the KU School of Law from August 2006 until June 2010. During that period, Dean Agrawal was an employee of the University of Kansas. S.F. ¶ 5; Exhibit A, Agrawal Decl. ¶ 1.

**Brown Response**:  **Uncontroverted**.

7. In 2009-2010, Defendant Stephen W. Mazza was Associate Dean at the School of Law. In June 2010, he was named the interim Dean of the School of Law, and in April 2011, he was named Dean of the School of Law. Stephen Mazza was an employee of the University of Kansas at all times in his various capacities with the KU School of Law. S.F. ¶ 6; Exhibit D, Mazza Decl. ¶ 1.

**Brown Response**:  **Controverted in that Mazza's Declaration is misleading. Mazza's declaration asserts that he became Interim Dean in "mid-June 2010". Mazza's tenure as Interim Dean actually began on June 1, 2010, and Agrawal was present at the School of Law only one day during the entire month of June 2010.  (Brown v. KU - - Revised Redactions 000576).  Apart from that, the statement is uncontroverted.**

Defendants' reply:  The e-mail cited by Brown (000576) does not state what Brown's says in this response.  Brown's response is argument not a factual response, and as such, it should be disregarded under Rule 56.  Finally, the response does not create a genuine dispute of material fact because it is irrelevant when Mazza became interim dean.

8. Andy Tompkins is the President and CEO of the Kansas Board of Regents with a business office located at 1000 SW Jackson Street, Suite 520, Topeka, Kansas. S.F.

¶ 7.

**Brown Response**:  **Uncontroverted.**

9.   Bernadette Gray-Little, Chancellor of the University of Kansas, assumed her duties as Chancellor in August 2009, and as Chancellor is an employee of the University of Kansas. S.F. ¶ 8.

**Brown Response**:  **Uncontroverted.**

10.  In 2009-2010, Joyce McCray Pearson was employed as a faculty member in the University of Kansas, School of Law, and as such she was an employee of the University. S.F. ¶ 9; Exhibit C, McCray Pearson Decl. ¶ 1.

**Brown Response**:  **Uncontroverted.**

11.  During the 2009-2010 academic year, Joyce McCray Pearson was the Chair of the University Judicial Board. S.F. ¶ 10; *See also* Exhibit C, McCray Pearson Declaration ¶ 3.

**Brown Response**:  **Uncontroverted.**

11.  In 2009-2010, Wendy M. Rohleder-Sook was employed in the University of Kansas, School of Law, as Associate Dean for Student Affairs. S.F. ¶ 11; Exhibit B, Rohleder-Sook Decl. ¶ 1.

**Brown Response**:  **Uncontroverted**

12.  The University of Kansas' University Senate Code is published online. S.F. ¶ 12.

**Brown Response**:  **Uncontroverted**

13.  The University of Kansas' Faculty Senate Rules and Regulations are published online. S.F. ¶ 13.

**Brown Response**:  **Uncontroverted**

14. Art. 22 of the University's Code of Student Rights and Responsibilities defines "Non-Academic Misconduct." S.F. ¶ 14.

    **Brown Response**:  **Uncontroverted**

15. The University of Kansas School of Law admissions committee selects students "with the school's primary mission in mind: 'to prepare students to be outstanding members of the legal profession, well-educated in the law, with a commitment to professional achievement and public service.'" Deposition Ex. 5.

    **Brown Response**:  **Controverted.   This text appears nowhere in the referenced exhibit and further is irrelevant to these proceedings**.

    Reply:  Mr. Brown is wrong; the quoted text in paragraph 15 does appear in Deposition Ex. 5 in the first paragraph under the heading "How are students selected for admission?"

16. Kansas Supreme Court Rule 705, regarding eligibility for licensure to practice law proves that the applicant must demonstrate by clear and convincing evidence that the applicant "possesses the good moral character and current mental and emotional fitness to engage in the active and continuous practice of law." Kan.Sup.Ct. Rule 705.

    **Brown Response**:  **Uncontroverted, except that the quoted passage should begin with "possesses the requisite good moral character . . ."**

17. Kansas Supreme Court Rule 705, regarding character and fitness qualifications for admission to the bar, in relevant part, provides:

(b) Good moral character includes, but is not limited to, the qualities

of honesty, fairness, responsibility, trustworthiness, integrity, respect

for and obedience to the laws of the state and nation, and respect for

the rights of others and for the judicial process.

(c) In determining whether an applicant possesses good moral

character, the Board shall consider evidence of the following:

(1) unlawful conduct;

(2) academic misconduct . . . .

(4) acts involving dishonesty, fraud, deceit, or misrepresentation;

(5) acts which demonstrate disregard for the rights or welfare of

others;

. . . .

(9) the making of false or misleading statements or omission of

relevant information, including any false or misleading

statement or omission on law school or bar applications in this

state or any jurisdiction;

. . . .

**Brown Response:  Controverted.  The quoted passage occurs nowhere**

**in Supreme Court Rule 705.**

Defendants' Reply:  There was a typographical error in the citation, which

should have read Supreme Court Rule 707, instead of Rule 705.

18. Plaintiff Robert M. Brown ("Brown") filed an application for admission to the

University of Kansas, School of Law, on April 8, 2009. S.F. ¶ 15; Brown Depo. Exhibit 1[3]; Exhibit B, Rohleder-Sook Decl. ¶ 2.a.

**Brown Response**:  **Uncontroverted.**

19. The application for admission to the University of Kansas, School of Law, filed by Brown included under the heading "Character & Fitness" following questions to which Brown answered "No:"

> c.   Have you ever been arrested for, charged with, or convicted of a felony, misdemeanor or infraction other than a traffic violation? (include diversions, sealed or expunged records, and juvenile offenses)
>
> d.   Have you ever been arrested for, charged with, or convicted of a traffic violating involving alcohol or a controlled substance? (include diversions, sealed or expunged records, and juvenile offenses)
>
> If you answered "yes" to any of these questions, please explain on a separate sheet or electronic attachment submitted with your application and provide the date, nature of the offense or proceeding, name and location of the court or tribunal, and disposition of the matter.

S.F. ¶ 16; *See also* Brown Deposition Exhibit 1.

**Brown Response**:  **Uncontroverted**.

20. The application for admission to the University of Kansas, School of Law, filed by Brown included the following certification, which Brown acknowledged by his electronic submission of the application:

I certify, that, to the best of my knowledge, the information stated in this application and in any supporting documents submitted is true and complete. I understand that falsification, misrepresentation or failure to supply required information in connections with this application is sufficient cause for denial of my application or dismissal from the School of Law. I understand that I have the duty to notify the Office of Admissions if there are any changes in my answers after this application is submitted.

S.F. ¶ 17; *See also* Brown Deposition Exhibit 1.

**Brown Response:  Uncontroverted**

21. With his electronically submitted application to the University of Kansas, School of Law, Brown also submitted the "Certification Letter," which he signed, and which included the following statements:

I certify that the information I have provided is true and complete; that I will notify the Office of Admissions immediately if there is any change in the information that I have provided in this application; that I am the author of the statements or additional information included with this application; and that I understand the statements made herein are the basis upon which my application will be decided. In the event that any information is subsequently found to be false, I understand that my admission may be voided and my matriculation canceled. I understand that I have a duty to notify the Office of Admissions in

writing if there are any changes in my answers after this application is submitted.

I understand that admission is conditional upon meeting the requirements stated in the University of Kansas School of Law catalog, and any further conditions expressed at the time of admission. The School of Law does not authorize nor is it bound by any requirements or conditions other than those communicated by the Office of Admissions.

S.F. ¶ 18, *See also* Brown Deposition Exhibit 1.

**Brown Response:  Uncontroverted**

22. On April 15, 2009, Brown was offered a spot on the University of Kansas, School of Law's waitlist. S.F. ¶ 19; Exhibit B, Rohleder-Sook Decl. ¶ 2.b.

**Brown Response:  Uncontroverted**

23. On April 21, 2009, Robert Brown accepted the placement on the waitlist by submitting the Law School's standard form. S.F. ¶ 20; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.c.

**Brown Response:  Uncontroverted**

24. By letter dated May 17, 2009, Brown provided additional materials to supplement his application for admission to the School of Law, including a statement about his specific interest in KU Law and an additional optional essay. S.F. ¶ 21; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.d.

**Brown Response:  Uncontroverted**

25. On August 19, 2009, Brown was offered admission to the KU Law fall 2009 entering class. S.F. ¶ 22; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.e.

   **Brown Response**:  **Uncontroverted**

26. On August 20, 2009, Brown submitted a seat deposit fee waiver form to the KU School of Law and was admitted. S.F. ¶ 23; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.f.

   **Brown Response**:  **Uncontroverted**

27. The first day of classes for the Fall 2009 academic term at the University of Kansas was August 20, 2009. S.F. ¶ 24.

   **Brown Response**:  **Uncontroverted**

28. On August 27, 2009, after the start of classes at the University of Kansas, School of Law, Brown submitted a letter stating, "I would like to amend my law school application," and amending his answer to question 27, disclosing the following criminal convictions:

| Case No | Tribunal | Charge | Finding |
|---|---|---|---|
| 96DV290 | Jo Co Dist Ct | Domestic | Battery Guilty |
| 96DV740 | Jo Co Dist Ct | Domestic | Battery Guilty |
| 90???? | Jo Co Dist Ct | DUI | Guilty |
| 79???? | Shawnee Co | DUI | Guilty |

S.F. ¶ 25; *See also* Brown Deposition Exhibit 3; Brown Depo. Exhibit 2;

Exhibit B, Rohleder-Sook Decl. ¶ 2.g.

   **Brown Response**:  **Uncontroverted**

29.  On August 27, 2009, in response to Brown's letter, he was asked to provide a further explanation regarding the criminal matters that he had disclosed on that date. S.F. ¶ 26; Brown Depo. Exhibit 2; Exhibit B, Rohleder-Sook Decl. ¶ 2.h.

**Brown Response:  Uncontroverted**

30.  On September 3, 2009, Wendy Rohleder-Sook made another request to Robert Brown asking him to provide further explanation regarding the criminal charges that he had disclosed in his August 27, 2009, amendment letter. Exhibit B, Rohleder-Sook Decl. ¶ 2.i. and attached Bates 00046 referenced therein.

**Brown Response:  Uncontroverted**

31.  On September 11, 2009, Brown provided a letter in which he provided additional information concerning "the facts contained within [his] letter of August 27th, 2009." S.F. ¶ 27; Brown Deposition Exhibit 5; Exhibit B, Rohleder-Sook Decl. ¶ 2.j.

**Brown Response:  Uncontroverted**

32.  On October 2, 2009, Wendy Rohleder-Sook e-mailed Robert Brown to advise him that additional charges ("12/05/94, Battery, dismissed by prosecutor; 12/21/94, Battery, dismissed by prosecutor; and 4/23/04, Criminal Trespass, dismissed by prosecutor") regarding him had been discovered, and asking him to provide written authorization to the Johnson County's office to release full information and documents to the Law School regarding those charges, and an explanation for why he did not disclose those criminal matters on his application for admission or in his

subsequent amendment. S.F. ¶ 28; Brown Deposition Exhibit 6; Rohleder-Sook Decl. ¶ 2.l.

**Brown Response:  Uncontroverted, but it should be noted that Rohleder-Sook later discovered that both 1994 Battery Charges had in fact been disclosed in the information provided to her initially with Brown's amendment. (Def. Rohleder-Sook Dep. 77:19-78-11)**

Defendants' reply:  This response does not create a genuine dispute of material fact as it is irrelevant and immaterial to the claims in this case.

33. On October 2, 2009, Robert Brown responded via e-mail to Ms. Rohleder-Sook and provided additional information concerning the charges she had noted in her e-mail. S.F. ¶ 29; Brown Deposition Exhibit 6.

**Brown Response:  Uncontroverted, but it should be noted that Rohleder-Sook later discovered that both 1994 Battery Charges had in fact been disclosed in the information provided to her initially with Brown's amendment. (Def. Rohleder-Sook Dep. 77:19-78-11)**

Defendants' reply:  This response does not create a genuine dispute of material fact as it is irrelevant and immaterial to the claims in this case.

34. On October 7, 2009, the Law School requested copies of records from the Johnson County District Court Clerk's Office. Sometime thereafter, the District Court Clerk's Office provided a copy of the trial record for the prosecutions in the DV290 and DV740 domestic battery charges against Brown. S.F. ¶ 30; Rohleder-Sook Decl. ¶ 2.m.

12

**Brown Response:  Uncontroverted**

35. When asked at deposition to recount his criminal history with respect to arrests, charges, and convictions, Mr. Brown acknowledged the following record:

> 1979 arrest for DUI in Topeka which was pled down to reckless driving;

> 1982 or 1984 arrest in Topeka for DUI for which he received a diversion;

> 1986 arrest in Overland Park for DUI for which he was convicted and sentenced to two days in jail, community service and a 90-day suspension of his driver's license;

> During the period 1994-1996, Mr. Brown was arrested on three separate occasions and charged with four charges of domestic battery, which resulted in his being convicted on three of those charges and his receiving probation;

> 1999 Mr. Brown was arrested for DUI in North Kansas City, Missouri, but that charge was later dismissed.

Exhibit E, Brown Deposition pp. 67:8 – 68:21.

**Brown Response:  Controverted.  Brown's deposition testimony was that he had independent recollection of only one DUI arrest even though two of them appeared on the KBI record he ordered *subsequent* to amending his application (Plt. Dep. 73:5-74:13).**

Defendant's reply:  Irrelevant and immaterial.

13

**Counsel for defendants acknowledged Brown's correction of the record at the close of the deposition. (Plt. Dep. 232:21-25)**

Defendants' reply:  This deposition citation does not state this.

**Brown later informed counsel for Defendants the Topeka records had borne out that there was only one arrest.  Nonetheless, counsel for Plaintiffs has presented the one Topeka incident which occurred in the 1979-1984 timeframe as two separate arrests.**

Defendants' reply:  Controverted because there is not citation in the record to support this statement.

36.  At deposition, Mr. Brown admitted that at the time that he answered "no" to questions 27c and 27d on his application for admission, he in fact knew that he had incidents in his history that were responsive to those questions:

> Q And at the time that you answered question No. 27c
>
> no you knew that you had been arrested for
>
> domestic battery on three separate occasions;
>
> correct?
>
> A Correct.
>
> Q And at the time that you answered question No. 27c
>
> no you knew that you had been charged with
>
> misdemeanors regarding domestic battery on four
>
> separate charges; correct?
>
> A Yes.

14

Q And despite knowing that you failed to disclose

those arrests and those charges in response to

question No. 27; correct?

A I felt that they were too remote to be relevant to

the application.

Q That's not the question I asked. You failed to

disclose --

A Yes, I did fail to disclose them.

. . . .

Q And in response to question 27d regarding charges

involving alcohol or a controlled substance, at

the time that you answered the question no you

knew that you had been arrested for DUI and

charged with DUI in 1979 in Topeka; correct?

A Yes.

Q And despite knowing that you failed to disclose that

1979 arrest and charge of DUI in Topeka in your

application; correct?

A Yes.

Q All right. At the time that you answered question No. 27d

no you did know that in 1982 or 1984 you were arrested for

DUI in Topeka and received a diversion; correct?

15

A Yes.

Q And you failed to disclose the 1982 or 1984 arrest for DUI

in Topeka and the diversion that you

received on that charge?

A Yes.

Q At the time that you answered the question 27d, you

answered that question no you knew that in 1986 you had

been arrested in Overland Park for a and were convicted

on that offense; correct?

A Yes.

Q And at the time that you answered no to the question

No. 27d you failed to disclose the 1986 Overland Park

arrest for DUI and conviction; correct?

A Yes.

Q At the time that you filed your application and

answered question No. 27d in the application no you

knew that you had been arrested for DUI in North

Kansas City, Missouri, in 1999; correct? A Yes.

Q And at the time that you answered question No. 27d

no you failed to disclose the 1999 DUI arrest in

North Kansas City, Missouri; correct?

A Yes.

Exhibit E, Brown Deposition pp. 71:25 – 73:2; 74:14 – 75:16.

**Brown Response:  Controverted.  Brown's deposition testimony was that he had independent recollection of only one DUI arrest even though two of them appeared on the KBI record he ordered *subsequent* to amending his application (Plt. Dep. 73:5-74:13).  Counsel for defendants acknowledged Brown's correction of the record at the close of the deposition. (Plt. Dep. 232:21-25) Brown later informed counsel for Defendants the Topeka records had borne out that there was only one arrest.  Nonetheless, counsel for Plaintiffs has presented the one Topeka incident which occurred in the 1979-1984 timeframe as two separate arrests.**

Defendants' reply:  This is a restatement of Brown's response to ¶ 36, therefore defendants' incorporate their reply to that response in ¶ 36.  Further, this is irrelevant and immaterial to Brown's having lied on his application or to the claims in this case.  Therefore, Brown's response does not create a disputed issue of material fact.

37.  At deposition, Mr. Brown admitted that at the time he filled out his Law School application, he figured that his criminal history "might be looked upon unfavorably by the people reviewing [his] application for admission." Exhibit E, Brown Deposition pp. 77:8-21.

**Brown Response:  Uncontroverted with regards to the testimony.  However, defendants' have placed words in Plaintiff's mouth elsewhere in this document based on that testimony.  At page 3 of Defs.' Mem, defendants state "He**

**admitted that he failed to disclose that record on his application for admission *because* that information "might be looked upon unfavorably by the people reviewing [his] application for admission." (Citing Exhibit E, Brown Deposition pp. 77:8-21, emphasis added). Again, on page 27 in its first purported issue, defendants make this same mischaracterization. The attribution of causation appears nowhere in Brown's testimony, which has always been that he did not disclose the prior criminal history because he believed it was too remote to be relevant, and the causation attributed to this testimony at multiple places in this document is misleading.**

Defendants' reply: Brown acknowledges the testimony is uncontroverted. However, he then goes on to argue about what that testimony means, which is an improper response under Rule 56 and, therefore, should be ignored.

38. Plaintiff Brown sat for finals in December 2009. S.F. ¶ 31.

   **Brown Response: Uncontroverted.**

39. Plaintiff Brown received grades for the Fall Semester of 2009. S.F. ¶ 32.

   **Brown Response: Uncontroverted**

40. On January 19, 2010, the 2008-2009 Law School Admissions Committee convened to consider the status of Mr. Brown's application and determined that they would have rejected his application if they had known of the criminal charges he failed to disclose. S.F. ¶ 33.

   **Brown Response: Uncontroverted, but incomplete and misleading. The statement as provided does not reflect that multiple members of the**

18

**admissions committee believed Brown deserved due process before disciplinary action was taken (Def. Rohleder-Sook Dep. 23:21-24:8), and that one of the members of the admissions committee actually came to Mazza and Sook recommending that Brown's expulsion not be pursued (McKenzie Dep. 61:18-23) because the School of Law had taken so long to pursue the complaint  (McKenzie Dep. 56:21-24)**.

<u>Defendants' reply</u>:  Controverted as irrelevant and immaterial and not creating a genuine dispute of material fact.  Also, this paraphrase does not accurately capture Ms. Rohleder-Sook's testimony, in which she responds to the question why she pursued a complaint, and states because she "believed" some members of the admissions committee "believed the Law School should afford some additional due process."  Further, the cited testimony attributed to McKenzie does not state this.  Rather, it states: "You indicated that there was a complaint file or process.  I believe I probably indicated that I thought it was somewhat late in the semester to be proceeding with that."

41. Following the Admissions Committee's decision, Associate Dean Rohleder-Sook consulted Associate Dean Mazza, who advised that Mr. Brown would be afforded due process through the Law School Dispute Resolution Procedure, and that to initiate that process, Rohleder-Sook should file a complaint regarding Mr. Brown's failure to disclose his criminal history in his application. Exhibit B, Rohleder-Sook Decl. ¶ 3; Exhibit D, Mazza Decl. ¶ 5.

**Brown Response:  Uncontroverted, but incomplete and misleading.  Dean Agrawal was also involved in this decision**.

19

Defendants' Reply:   Contrary to the requirements of Fed.R.Civ.P. 56(c), Plaintiff Brown has provided no citation to the record or any sworn testimony or exhibit that supports his statement concerning Dean Agrawal being involved in this decision.   Accordingly, his assertion is unsupported and must be disregarded.

42. On February 17, 2010, Wendy Rohleder-Sook filed with Associate Dean Stephen Mazza a letter with the reference "Allegation of Academic Misconduct: Robert M. Brown," which outlined as a basis for the charge Mr. Brown's answers to questions 27.c. and 27.d. on his application for admission. S.F. ¶ 34; Exhibit B, Rohleder-Sook Decl. ¶ 4; Exhibit D, Mazza Decl. ¶ 6.

**Brown Response:   Controverted.   Rather than being "filed with" Mazza, Mazza actually co-authored the complaint with Rohleder-Sook. (Def. Rohleder-Sook Dep. 35:14-36:5)**

Defendants' reply:  This response does not create a genuine dispute of material fact as it is irrelevant to Brown's lying on his application.

43. During the pendency of the School of Law's Allegation of Academic Misconduct, Defendant Mazza communicated with plaintiff Brown via emails that had as the subject line: "Disciplinary Procedures." S.F. ¶ 51.

**Brown Response:  Uncontroverted**.

44. Mr. Brown responded to Ms. Rohleder-Sook's February 17, 2010, academic misconduct charge, in a response dated February 28, 2010. S.F. ¶ 35; Exhibit B,

Rohleder-Sook Decl. ¶ 4.

**Brown Response: Uncontroverted**.

45. On April 16, 2010, Rohleder-Sook responded to the procedural objections contained in Mr. Brown's February 28, 2010, response. Exhibit B, Rohleder-Sook Decl. ¶ 4.

**Brown Response: Controverted. Although the response was signed only by Rohleder-Sook and although Rohleder-Sook initially testified that she was the sole author of the document (Def. Rohleder-Sook Dep. 48:2-7), Rohleder-Sook later admitted that Mazza wrote more of the response than she did. (Def. Rohleder-Sook Dep. 53:8-17)**

<u>Defendants' reply</u>: This response does not create a genuine dispute of material fact as it is irrelevant to Brown's lying on his application.

46. A hearing panel convened to consider the charge of academic misconduct against Brown issued a Memorandum decision dated May 3, 2010, dismissing the academic misconduct complaint against Brown. S.F. ¶ 36; Exhibit B, Rohleder-Sook Decl. ¶ 5.

**Brown Response: Uncontroverted**.

47. In the School of Law's hearing panel's May 3, 2010 Memorandum decision, the panel stated, in part:

> The complaint fails to allege a violation of Section 2.6.1 or, to use the words of U.S.S.R. Section 6.5.3.1(d), any other University rule. Therefore,

we hereby dismiss Dean Wendy Rohleder-Sook's complaint of February

17, 2010. S.F. ¶ 37.

**Brown Response:  Uncontroverted**.

48.  The Law School hearing panel's May 3, 2010 Memorandum decision also stated,

in part:

> While we are not aware of any University rule prohibiting
> misrepresentation on an application for admission, we do not believe
> that is the end of this matter. Mr. Brown's application states "I
> understand that falsification, misrepresentation or failure to supply
> the required information in connection with this application is
> sufficient cause for denial of my application or dismissal from the
> School of Law." Similarly, Mr. Brown's LSAC letter certifying his
> electronic application to the Law School states:
>
>> I certify that, to the best of my knowledge, the information
>> stated on this application and in any supporting documents
>> submitted is true and complete. I understand the
>> falsification, misrepresentation or failure to supply
>> required information in connection with this application is
>> sufficient cause for denial of my application or dismissal
>> from the School of Law. I understand that I have a duty to
>> notify the Office of Admissions if there are any changes in
>> my answers after this application is submitted.

In each of these documents, singed by Mr. Brown, he acknowledges the Law School's right to dismiss him if his application for admission contains a misrepresentation. Mr. Brown's August 27, 2009, letter to Dean Wendy Rohleder-Sook clearly concedes that he did in fact make misrepresentations on his application. Therefore, we recognize that the Law School has the right to dismiss Mr. Brown even though this Hearing Panel does not have the authority to hear this case.

*See* Brown Deposition Exhibit 7.

**Brown Response:  Uncontroverted that this is the text.  Strongly controverted that the hearing panel had any jurisdiction or authority based in any University regulation to make such a statement, that the hearing panel can summarily dispense with due process rights which have been guaranteed in writing, or that three lay persons not licensed to practice law should be a source of sound legal advice for an entire State University**.

Defendants' reply:  This response does not create a genuine dispute of material fact as it is irrelevant to Brown's lying on his application and instead is argument.

49. Wendy Rohleder-Sook's formal involvement with Mr. Brown's application and failure to disclose his criminal history in that application was concluded with the May 3, 2010 issuance of the hearing panel's Memorandum decision dismissing the complaint she had filed. Exhibit B, Rohleder-Sook Decl. ¶ 6.

**Brown Response:  Controverted.  Rohleder Sook was copied on Brown's requests to the Judicial Board (Brown, Robert v. KU, et al 000396), and was kept apprised of the status in the case. (Def. Rohleder-Sook Dep.  22:10-16**).

Defendants' reply:  This response does not create a genuine dispute of material fact as it is irrelevant to Brown's lying on his application.

50.  In her dealings with Mr. Brown, Wendy Rohleder-Sook acted in good faith in the exercise of her professional judgment and discretion in carrying out her responsibilities as Associate Dean for Student Affairs. Exhibit B, Rohleder-Sook Decl. ¶ 7.

**Brown Response:  Controverted.  Rohleder-Sook represented Mazza's writings as her own to give the false impression that the process was being administered in an even handed way. (Def. Rohleder-Sook Dep. 48:2-7; 53:8-17) Rohleder-Sook failed to provide the Admissions committee with the following testimony from the transcript the School of Law received from Johnson County:**

> A.      Bob wasn't really Bob to me. I mean, I don't see Bob as Bob. So when I fight with him, I'm not fighting with him; and I'll do anything to hurt him, get him in trouble, put him in jail.
> Q.      When you say he's not Bob, who is he?
> A.      He's my stepfather. What I was going to say before the recess is that            I was molested and raped when I was --
> MR. HOWE: Judge, I object as nonresponsive to the question asked.
> THE COURT: The question was, why she gave false information to the police.
> MR. HARE: Uh-huh.
> THE COURT: I'll allow it.
> Q.      (By Mr. Hare) Go ahead, ma'am. Answer it.

24

> A. Ever since I started getting into adult relationships with men, I found out -- well, I'm starting to find out now why -- but I've always had physical arguments, and I lose my temper. And if they try to leave me, I will grab them, I will hit them, I will lie, because I'm taking it all out on them. I mean, I don't know how to explain it. My therapist couldn't explain it better. But they become my abuser. And I called the police, because they're supposed to be protecting me. But it's not -- they weren't there when I was five, and I keep waiting for them to protect me.

   (Defs.' Bates Brown, Robert v. KU, et al 000237-000238)

Rohlder-Sook was aware of the alleged victim's powerful recantation, and had shared that information with Agrawal and Mazza on November 18, 2009 by email. (Defs.' Bates Brown, Robert v. KU, et al 000448) This information directly supported the entire focus of Brown's September 11 explanatory statement that there was no direct evidence and the victim recanted. Rohleder-Sook later testified she was aware that Barr's testimony indicated either that she had falsified the police reports or perjured herself on the witness stand (Def. Rohleder-Sook Dep. 79:7-84:4), but that she nonetheless had chosen to include only the finding of guilt (Def. Rohleder-Sook Dep. 78:16-79:7).

Further, Rohleder-Sook was one of the authors of the complaint, but omitted from it that multiple members of the admissions committee believed Brown deserved due process before disciplinary action was taken (Def. Rohleder-Sook Dep. 23:21-24:8), and that one of the members of the admissions committee actually came to Mazza and Sook recommending that Brown's expulsion not be pursued (McKenzie Dep. 61:18-23) because the School of

**Law had taken so long to pursue the complaint  (McKenzie Dep. 56:21-24). This misled the hearing panel to believe that every member of the admissions committee supported dismissal without process.  After the decision was communicated to her, Rohleder-Sook did nothing to correct this misconception.  Rohleder-Sook testified she didn't know whether or not she had a duty to protect the due process rights of any of the University Students. (Def. Rohleder-Sook Dep. 86:16-22)**

Defendants' reply:  Defendant objects to Brown including multiple arguments and purported facts in this response in violation of the D. Kan. Rule 56.1 procedure for summary judgment.   Defendants also note that these same statements are contained in Brown's additional facts to which defendants responded below. Defendants' incorporate those responses here and controvert that Brown's response creates a genuine dispute of material fact.

51.   Following receipt of the hearing panel's May 3, 2010, Memorandum, Associate Dean Mazza consulted with Dean Agrawal, who determined that the issue of Robert Brown's misrepresentations in his application for admission was her responsibility to decide. Exhibit D, Mazza Decl. ¶ 9; Exhibit A, Agrawal Decl. ¶ 3.

**Brown Response:  Controverted.  The statement implies that Agrawal had been heretofore uninvolved.  Actually, Agrawal was the person requested the Reohleder-Sook obtain more detail from Brown (Defs.' Bates Brown, Robert v. KU, et al 000044).  Agrawal was the person who made the decision**

26

**that the matter should go before the admissions committee (Defs. Bates Brown v. KU 000447), and that the admissions committee should not convene before the end of Brown's first semester (Defs. Bates Brown v. KU 000447).  Agrawal was also copied on  Rohlder-Sook's factfinding (*see* Defs. Bates Brown v. KU 000448) and was involved in the decision to file the complaint against Brown. (Def. Rohleder-Sook Dep. 19:10-17)**

**The statement also implies that Mazza approached Agrawal without an agenda.  Mazza falsely represented to Agrawal that Brown "admitted that [he] knew that [he] would not have been admitted to the School of Law had "he" disclosed "his" criminal record. (Mazza Dep. Ex. 18, Bates BROWN v KU 000136)  This statement was patently false.  (Plt.'s Compl 238; Brown Dep 157:2-9).  Mazza did much more than "consult".**

Defendants' reply:  Defendant objects to Brown including multiple arguments and purported facts in this response in violation of the D. Kan. Rule 56.1 procedure for summary judgment.   Defendants also note that these same statements are contained in Brown's additional facts to which defendants responded below. Defendants' incorporate those responses here and controvert that Brown's response creates a genuine dispute of material fact.

52.   Throughout his dealings with Mr. Brown concerning his misrepresentations on his application for admission to the Law School, Associate Dean Mazza acted in good faith in the exercise of his professional judgment and discretion in carrying out his responsibilities as Associate Dean for Academic Affairs. Exhibit D, Mazza Decl. ¶

10.

**Brown Response:   Controverted.   Mazza allowed Rohleder-Sook to misrepresent his writings as her own to give the false impression that the process was being administered in an even handed way. (Def. Rohleder-Sook Dep. 48:2-7; 53:8-17) Mazza failed to provide the Admissions committee with the following testimony from the transcript the School of Law received from Johnson County:**

> A.    Bob wasn't really Bob to me. I mean, I don't see Bob as Bob. So when I fight with him, I'm not fighting with him; and I'll do anything to hurt him, get him in trouble, put him in jail.
> Q.    When you say he's not Bob, who is he?
> A.    He's my stepfather. What I was going to say before the recess is that I was molested and raped when I was --
> MR. HOWE: Judge, I object as nonresponsive to the question asked.
> THE COURT: The question was, why she gave false information to the police.
> MR. HARE: Uh-huh.
> THE COURT: I'll allow it.
> Q.    (By Mr. Hare) Go ahead, ma'am. Answer it.
> A. Ever since I started getting into adult relationships with men, I found out -- well, I'm starting to find out now why -- but I've always had physical arguments, and I lose my temper. And if they try to leave me, I will grab them, I will hit them, I will lie, because I'm taking it all out on them. I mean, I don't know how to explain it. My therapist couldn't explain it better. But they become my abuser. And I called the police, because they're supposed to be protecting me. But it's not -- they weren't there when I was five, and I keep waiting for them to protect me.

**(Defs.' Bates Brown, Robert v. KU, et al 000237-000238)**

**Mazza had been informed of the alleged victim's powerful recantation in a November 18, 2009 email from Defendant Rohleder-Sook.   (Defs.' Bates Brown, Robert v. KU, et al 000448)   This information directly supported the**

entire focus of Brown's September 11 explanatory statement that there was no direct evidence and the victim recanted.  Further, Mazza was one of the authors of the complaint, but omitted from it that multiple members of the admissions committee believed Brown deserved due process before disciplinary action was taken (Def. Rohleder-Sook Dep. 23:21-24:8), and that one of the members of the admissions committee actually came to Mazza and Sook recommending that Brown's expulsion not be pursued (McKenzie Dep. 61:18-23) because the School of Law had taken so long to pursue the complaint   (McKenzie Dep. 56:21-24).   This misled the hearing panel to believe that every member of the admissions committee supported dismissal without process.  After the decision was communicated to him, Mazza did nothing to correct this misconception.

Mazza falsely represented to Agrawal that Brown "admitted that [he] knew that [he] would not have been admitted to the School of Law had "he" disclosed "his" criminal record. (Mazza Dep. Ex. 18, Bates BROWN v KU 000136)  This statement was patently false.  (Plt.'s Compl 238; Brown Dep 157:2-9)

Mazza allowed Agrawal to dismiss Brown at a time when he was acting Dean. (Brown v. KU - - Revised Redactions 000576; Mazza Dep. Ex 10) and then misrepresented the timeframe of his tenure as Interim Dean to this tribunal via a false statement in a sworn declaration.  (Defs.' Mem. Ex. D,

Mazza Decl. ¶ 1) Mazza was a party, during his time as acting Dean, to an email from Agrawal directing the University's General Counsel to "craft[] a response" to Brown's requests to be heard before the Judicial Board on behalf of the Joyce McCray-Pearson. (Defs.' Bates Brown v. KU - - Revised Redactions 630).   General counsel informed Agrawal, again with copy to Mazza, that they would "formulate a strategy to deal with this issue."   The very next day, McCray-Pearson issued a letter to Brown denying Jurisdiction in the matter, and using the precise language regarding F.S.R.R. 2.1.1 that had appeared in Agrawal's dismissal letter.  (Mazza Dep. Ex. 4, Mazza Dep. Ex. 10)  When deposed, McCray Pearson was unable to explain or defend the language, and finally admitted she did not understand it.  (McCray-Pearson Dep 78:21-81:9)   As a result, the Judicial Board ignored the procedures that should have been followed in the case of Brown's Judicial Board requests, which raised questions of conflict between various governance documents (Joyce McCray Pearson Deposition Exhibit 27, ¶¶ 9, 13, 14, 46).   The correct procedure from the current University Senate Code is excerpted as follows:

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### Interpretation of, or Conflict among, Various Governance Documents

On 10/6/94, the University Council approved the following procedure for interpretation of, or conflict among, the University Senate Code, University Senate Rules and Regulations, Faculty Senate Rules and Regulations, the Handbook for Faculty and Unclassified Staff, and the Student Senate Rules and Regulations

1. **Contact the Office of University Governance, 864-5169, or via e-mail at govern@ku.edu, with questions about conflict or interpretation.**
2. **If the Governance Office cannot resolve the question, it will be referred to the chair of the Senate Executive Committee.**
3. **If the Senate Executive Committee cannot satisfactorily resolve the conflict, it may refer it to a committee of the following:**
   1) **Chair of the Judicial Board.**
   2) **Chair of the Academic Policies & Procedures Committee.**
   3) **Chair of the Faculty Rights, Privileges & Responsibilities Committee.**
   4) **Chair of the Organization & Administration Committee.**
   5) **Chair of the Student Rights Committee of Student Senate.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**(Current University Senate Code, Preface, Page 1):**

**This was done with Mazza's full knowledge and consent at a time when he was acting Dean.**

**At the February 23rd meeting, Mazza informed Brown that he would act in the stead of the law school ombudsman in an effort to see that Brown's due process rights were protected, and that he would hold in confidence everything said at the meeting, even though he had actually co-authored the complaint. (Plt.'s Compl. ¶¶ 81 -82; Def. Rohleder-Sook Dep. 35:12-36:5) In communications with Defendant Rohleder-Sook, Mazza described the administration of the complaint against Brown as "a nightmare". (Defs.' Bates Brown, Robert v. KU, et al 000375)   Mazza informed Brown at their first meeting that this was an "Article 22 violation" (Plt.'s Compl. ¶ 84). When Brown asked him for more information on Article 22, Mazza did not deny that he had said "article 22" but said that he should have said**

**'Question' 22, referring the Question 27 on the application.  (Plt.'s Compl. ¶¶ 88-93)  Article 22 is the correct area of Student Governance under which to hear the complaint against Brown, but Mazza did not want to relinquish jurisdiction to the Office of the Vice Provost for Student Services, so instead he pretended to know nothing about proper administration of the complaint. (Plt.'s Compl. ¶¶ 92-94)**

**Mazza not only permitted, but orchestrated Brown's dismissal without process.  The procedures and policies of the University's system of governance are mandatory, not optional for Mazza.**

<u>Defendants' reply</u>:  Defendant objects to Brown including multiple argument and purported facts in this response in violation of the D. Kan. Rule 56.1 procedure for summary judgment.  Defendants also note that these same statements are contained in Brown's additional facts to which defendants responded below. Defendants' incorporate those responses here and controvert that Brown's response creates a genuine dispute of material fact.

53.  Plaintiff Brown is the only student whom defendant Mazza is aware has been removed from the School of Law after filing an amended application. S.F. ¶ 48.

**Brown Response:  Uncontroverted.**

54.  Dean Mazza testified that he is not aware of any admissions policies of the School of Law other than those posted publicly on the School of Law's website. S.F. ¶ 52.

**Brown Response**:  **Uncontroverted**.

55. Defendant Mazza testified he did not pursue disciplinary measures against Brown. S.F. ¶ 62.

**Brown Response**:  **Uncontroverted**.

56. Brown began attendance at his 2010 summer session Law School class. S.F. ¶ 38.

**Brown Response**:  **Uncontroverted**.

57. When the issues of Mr. Brown's misrepresentations on his application for admission to the Law School came to Dean Agrawal's attention for determination, Dean Agrawal sought the legal advice of the University's Office of General Counsel. Exhibit A, Agrawal Decl. ¶ 4.

**Brown Response**:  **Controverted.  Rather than seek advice, Agrawal requested that General Counsel make the actual decision.  (Defs.' Bates Brown v. KU - - Revised Redactions 000647 – "I would appreciate [counsel's] writing a response to [Brown's] letter for me.  Nothing he has said goes to the merits or persuades me that we should not proceed, unless you find merit in his process arguments.  I leave that assessment to the practicing, licensed lawyers.")**

Defendants' Reply:  Contrary to Plaintiff Brown's assertion, the cited information does not contradict the statement made in ¶ 56 that Dean Agrawal sought advice of legal counsel nor does it purport, as Plaintiff Brown erroneously asserts, to demonstrate that Dean Agrawal abdicated the decision to counsel.  Rather, Dean Agrawal's statement that "Noting he has said goes to the merits or persuades me

that we should not proceed . . . ." indicates her decision after considering Brown's information he provided.

58. In a letter dated May 25, 2010, Dean Gail B. Agrawal advised Mr. Brown that she planned to dismiss him from the School of Law effective June 8, 2010, "for falsification, misrepresentation, and failure to supply complete, accurate and truthful answers to [his] application for admission to the School of Law." Dean Agrawal's letter further advised Mr. Brown: "If you believe that this action is inappropriate or that there are mitigating factors that I should consider before dismissing you, then you must provide me with a written response to this letter by 2:00 p.m. on June 3, 2010." S.F. ¶ 39; *See also* Exhibit A, Agrawal Decl. ¶ 4, and Brown Deposition Exhibit 8.

**Brown Response:  Uncontroverted**.

59. In a letter dated May 27, 2010, Brown provided to Dean Agrawal his "written response to [her] letter dated May 26, 2010 [sic]" and in that letter "request[ed] a personal meeting with [her] to discuss this matter." S.F. ¶ 40; Brown Deposition Exhibit 9.

**Brown Response:  Uncontroverted**.

60. On May 28th, 2010, Agrawal responded to Brown's request for a personal meeting via email, stating: "I see no need to meet with you, and therefore decline your request for a meeting." S.F. ¶ 41.

**Brown Response:  Uncontroverted**.

61. After considering Mr. Brown's May 27, 2010 response to her letter advising him

of her intent to dismiss him from the School of Law, Dean Agrawal wrote Mr. Brown on June 7, 2010, to advise him that he was dismissed from the School of Law effective, June 8, 2010. Exhibit A, Agrawal Decl. ¶'s 5-6; Brown Deposition Ex. 10.

**Brown Response**:  **Uncontroverted**.

62.  Gail Agrawal's June 7, 2010 dismissal letter stated, in part, that the School of Law's transcript would show that plaintiff Brown's dismissal from the Law School was based on "falsification, misrepresentation, and failure to supply required information on [his] application to the School of Law." S.F. ¶ 50; Exhibit A, Agrawal Decl, ¶ 6; Brown Deposition Exhibit 10 referenced therein.

**Brown Response**:  **Uncontroverted**.

63.  Gail Agrawal consulted with the Office of General Counsel in composing her June 7, 2010 letter of dismissal to Brown. S.F. ¶ 61.

**Brown Response**:  **Uncontroverted**.

64.  The reference in Dean Agrawal's June 7, 2010 letter to her decision to dismiss Mr. Brown from the Law School constituting "final agency action" was included in the letter based on advice of legal counsel. Exhibit F, Response to 3d Interrogatories to Agrawal, Interrogatory No. 3.

**Brown Response**:  **Uncontroverted**.

65. In making her decision to dismiss Robert Brown from the School of Law based on his failure to disclose his criminal history on his application for admission, Dean Agrawal acted in good faith, exercising her professional academic judgment and

discretion in carrying out her duties and responsibilities as Dean. Exhibit A, Agrawal Decl. ¶ 8.

**Brown Response**:  **Controverted.  Agrawal to dismissed Brown at a time when she was not acting Dean. (Brown v. KU - - Revised Redactions 000576; Mazza Dep. Ex 10) and then gave a vague and misleading statement regarding the timeframe of her tenure as acting Dean to this tribunal  (Defs.' Mem. Ex. A, Agrawal Decl. ¶ 7 – "I assumed my duties as Dean the University of Iowa College of Law on July 1, 2010, and I know that I took some vacation leave between leaving the University of Kansas and that July 1, 2010 start date.")   Agrawal represented to this tribunal that Brown's matter first came to her for review and consideration "after the May 3, 2010 memorandum from the hearing panel." Defs.' Mem. Ex. A, Agrawal Decl. ¶ 3) In actuality, Agrawal was the person requested the Reohleder-Sook obtain more detail from Brown (Defs.' Bates Brown, Robert v. KU, et al 000044).  Agrawal was the person who made the decision that the matter should go before the admissions committee (Defs. Bates Brown v. KU 000447), and that the admissions committee should not convene before the end of Brown's first semester (Defs. Bates Brown v. KU 000447).  Agrawal was also copied on Rohlder-Sook's factfinding (*see* Defs. Bates Brown v. KU 000448) and was involved in the decision to file the complaint against Brown. (Def. Rohleder-Sook Dep. 19:10-17)**

After Brown appealed to the University Judicial Board, Agrawal directed the University's General Counsel to "craft[] a response" to Brown's requests to be heard before the Judicial Board on behalf of the Joyce McCray-Pearson. (Defs.' Bates Brown v. KU - - Revised Redactions 630).   General counsel informed Agrawal that they would "formulate a strategy to deal with this issue."  The very next day, McCray-Pearson issued a letter to Brown denying Jurisdiction in the matter, and using the precise language regarding F.S.R.R. 2.1.1 that had appeared in Agrawal's dismissal letter.  (Mazza Dep. Ex. 4, Mazza Dep. Ex. 10)  When deposed, McCray Pearson was unable to explain or defend the language, and finally admitted she did not understand it. (McCray-Pearson Dep 78:21-81:9)   As a result, the Judicial Board ignored the procedures that should have been followed in the case of Brown's Judicial Board requests, which raised questions of conflict between various governance documents (Joyce McCray Pearson Deposition Exhibit 27, ¶¶ 9, 13, 14, 46).  The correct procedure from the current University Senate Code is excerpted as follows:

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Interpretation of, or Conflict among, Various Governance Documents

On 10/6/94, the University Council approved the following procedure for interpretation of, or conflict among, the University Senate Code, University Senate Rules and Regulations, Faculty Senate Rules and Regulations, the Handbook for Faculty and Unclassified Staff, and the Student Senate Rules and Regulations

1. **Contact the Office of University Governance, 864-5169, or via e-mail at govern@ku.edu, with questions about conflict or interpretation.**
2. **If the Governance Office cannot resolve the question, it will be referred to the chair of the Senate Executive Committee.**
3. **If the Senate Executive Committee cannot satisfactorily resolve the conflict, it may refer it to a committee of the following:**
   1) **Chair of the Judicial Board.**
   2) **Chair of the Academic Policies & Procedures Committee.**
   3) **Chair of the Faculty Rights, Privileges & Responsibilities Committee.**
   4) **Chair of the Organization & Administration Committee.**
   5) **Chair of the Student Rights Committee of Student Senate.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**(Current University Senate Code, Preface, Page 1):**

**Agrawal orchestrated Brown's dismissal without process by surreptitiously usurping the normal operation of the University's system of governance. The procedures and policies of the University's system of governance are mandatory, not optional for Agrawal.**

Defendants' reply:  Defendants object to Brown including multiple argument and purported facts in this response in violation of the D. Kan. Rule 56.1 procedure for summary judgment.   Defendants also note that these same statements are contained in Brown's additional facts to which defendants responded below. Defendants' incorporate those responses here and controvert that Brown's response creates a genuine dispute of material fact.

66.  Dean Agrawal testified she was unaware of any admissions policies of the School of Law other than those published on the School of Law web site. S.F. ¶ 56.

**Brown Response:  Uncontroverted.**

38

67. In a letter dated May 31, 2010 addressed to the "Chair of the University Judicial Board," Brown submitted a "Request for Initial Hearing before the Judicial Board Pursuant to 6.4.3.1(b) of the University Senate Rules and Regulations and Election to Invoke the Jurisdiction of the University Judicial Board Pursuant to University of Kansas Law School Dispute Resolution Procedure Section (A)(4)(c)." S.F. ¶ 42; Exhibit B, McCray Pearson Decl. ¶ 7.

**Brown Response**:  **Uncontroverted**.

68. In a letter dated May 31, 2010 address to the "Chair of the University Judicial Board," Brown also submitted a "Request for Jurisdictional Ruling pursuant to 6.5.2.1 of the University Senate Rules and Regulations." S.F. ¶ 43; Exhibit B, McCray Pearson Decl. ¶ 7.

**Brown Response**:  **Uncontroverted**.

69. In a letter dated June 3, 2010, Joyce McCray Pearson, Chair University Judicial Board, informed Brown:

> I have reviewed your requests for a jurisdictional ruling and an initial hearing, both dated May 31, 2010. I have also reviewed University Regulations to determine whether they authorize the Judicial Board to exercise jurisdiction in your case. I regret to inform you that I have found no basis for jurisdiction by the Judicial Board.
>
> The Faculty Senate Rules and Regulations (FSRR) 2.1.1 gives the authority for policies on admission to the faculties of the various schools and the College (see excerpt below).

.    .    .    .

> Admission standards lie within the jurisdiction of the schools and College because the academic evaluation lies within the individual department and the professors who have expertise in that field
>
> Pursuant to University Senate Rule and Regulation 6.5.3.1(c), I hereby dismiss your petition. I have concluded that the Judicial Board lacks jurisdiction over the subject matter.
>
> This Judicial Board decision is the final determination of this matter by the university. If you wish to proceed outside the university, Chancellor Bernadette Gray-Little is the agency officer who should receive any service or subsequent petition for judicial review of this action.

S.F. ¶ 44; Exhibit B, McCray Pearson Declaration ¶ 8.

**Brown Response: Uncontroverted**.

70. Joyce McCray Pearson had no knowledge of Robert Brown prior to his May 31, 2010, filings with the University Judicial Board. Exhibit B, McCray Pearson Decl. ¶ 8.

**Brown Response: Uncontroverted**.

71. In reviewing and considering Robert Brown's May 31, 2010 Judicial Board filings and determining that the Judicial Board did not have jurisdiction, Joyce McCray Pearson, acted independently and in good faith exercising her independent judgment and discretion in carrying out her responsibilities as Judicial Board Chair.

40

Exhibit B, McCray Pearson Decl. ¶ 10.

**Brown Response**:  **Controverted.  McCray-Pearson's response was prepared by General Counsel at the behest of Gail Agrawal and with the full knowledge of Stephen Mazza, then acting dean.  Rather than examine the situation independently and take the action that was mandated by proper procedures, McCray-Pearson allowed the system to be hijacked, and then presented Agrawal and Mazza's designs as her own independent findings.**

**After Brown appealed to the University Judicial Board, Agrawal directed the University's General Counsel to "craft[] a response" to Brown's requests to be heard before the Judicial Board on behalf of the Joyce McCray-Pearson. (Defs.' Bates Brown v. KU - - Revised Redactions 630).  General counsel informed Agrawal that they would "formulate a strategy to deal with this issue."  The very next day, McCray-Pearson issued a letter to Brown denying Jurisdiction in the matter, and using the precise language regarding F.S.R.R. 2.1.1 that had appeared in Agrawal's dismissal letter.  (Mazza Dep. Ex. 4, Mazza Dep. Ex. 10)  When deposed, McCray Pearson was unable to explain or defend the language, and finally admitted she did not understand it. (McCray-Pearson Dep 78:21-81:9)   As a result, the Judicial Board ignored the procedures that should have been followed in the case of Brown's Judicial Board requests, which raised questions of conflict between various governance documents (Joyce McCray Pearson Deposition Exhibit 27, ¶¶ 9,**

**13, 14, 46).  The correct procedure from the current University Senate Code**

**is excerpted as follows:**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Interpretation of, or Conflict among, Various Governance Documents**

On 10/6/94, the University Council approved the following procedure for interpretation of, or conflict among, the University Senate Code, University Senate Rules and Regulations, Faculty Senate Rules and Regulations, the Handbook for Faculty and Unclassified Staff, and the Student Senate Rules and Regulations

1. Contact the Office of University Governance, 864-5169, or via e-mail at govern@ku.edu, with questions about conflict or interpretation.
2. If the Governance Office cannot resolve the question, it will be referred to the chair of the Senate Executive Committee.
3. If the Senate Executive Committee cannot satisfactorily resolve the conflict, it may refer it to a committee of the following:
     1) Chair of the Judicial Board.
     2) Chair of the Academic Policies & Procedures Committee.
     3) Chair of the Faculty Rights, Privileges & Responsibilities Committee.
     4) Chair of the Organization & Administration Committee.
     5) Chair of the Student Rights Committee of Student Senate.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

(Current University Senate Code, Preface, Page 1):

**Defendant McCray-Pearson was unable to articulate even basic support for**

**the position, provided entirely by general counsel at Agrawal's request, taken**

**in her letter denying access to the University Judicial Board under F.S.R.R.**

**2.1.1.**

42

Q    Okay.  So then what rights does the first sentence of FSRR 2.1.1 give to the faculties of the various schools other than the right to establish policies for admission and readmission?

A    That's it.  That's what it says.

Q    Okay.

A    Gives the faculties --

Q    The rights to establish policies for the admission and readmission?

A    Uh-huh.

Q    That's all it gives them; correct?

MS. TROWER:  Objection.  Form.

Q    Correct?

MS. TROWER:  Objection.  Form.

A    I don't know.

BY MR. BROWN:

Q    Can you see from that sentence that it gives them anything else?

A    It's a pretty open sentence, but probably not.

Q    All right.  And then the next sentence says, "A statement of such requirements shall be published or filed with the Director of Admissions and the Secretary of Faculty Senate." So once they establish the policies for admission and readmission, they have to write them down somewhere, don't they?

MS. TROWER:  Objection.  Form.

A     Probably correct.  Correct.

BY MR. BROWN:

Q     Okay.  And so what you're telling me is that without reviewing those policies, you assumed that wherever they are, they must preclude jurisdiction in this case? --

MS. TROWER:  Objection.  Form.

Q     -- correct?

MS. TROWER:  Objection.  Form.

A     I'm going by what 2.1.1, that first sentence, says.

BY MR. BROWN:

Q     You just testified that it only gives them the power to establish policies for admission and readmission.

A     That's all we're talking about here.

Q     Okay.  What policy for admission or readmission removes jurisdiction in student matters?

A     2.1.1.

Q     So the right to establish policies for admission and readmission essentially gives the faculty unfettered license to do as they please then --

MS. TROWER:  Objection.

Q     -- correct?

44

**MS. TROWER:  Objection.  Form.**

**A    I disagree.**

**BY MR. BROWN:**

**Q    Okay.  I'm having trouble, then, understanding how the existence of the power to establish policies can affect jurisdiction in totally unrelated student procedures that have written guarantees.  Can you please explain that?**

**A    No.**

**Q    Why can you not explain it?**

**A    It's outside my purview.**

**Q    It's outside your purview of knowledge?**

**A    Perhaps.**

**(McCray-Pearson Dep 78:21-81:9)**

**McCray-Pearson simply followed orders when she should have been following the mandates of university governance.  The result was Brown's dismissal without process.  The procedures and policies of the University's system of governance are mandatory, not optional for McCray-Pearson.**

Defendants' reply:  Defendant objects to Brown including multiple argument and purported facts in this response in violation of the D. Kan. Rule 56.1 procedure for summary judgment.  Defendants also note that these same statements are contained in Brown's additional facts to which defendants responded below.  Defendants'

incorporate those responses here and controvert that Brown's response creates a genuine dispute of material fact.

72. McCray Pearson testified that at the time of ruling on Brown's requests before the Judicial Board, she had never seen Wendy Rohleder-Sook's February 17, 2010 academic misconduct complaint against Brown. S.F. ¶ 59.

   **Brown Response:  Uncontroverted**.

73. In response to interrogatories regarding involvement with other amended applications, defendant Joyce McCray Pearson testified that she had never been involved in any other situation involving an amended application to the School of Law. S.F. ¶ 49.

   **Brown Response:  Uncontroverted**.

74. In November of 2009, Chancellor Bernadette Gray-Little created an Admissions task force to pursue strategic initiatives of the University of Kansas in the area of Student Success. S.F. ¶ 45.

   **Brown Response:  Uncontroverted**.

75. Chancellor Gray-Little's charge to the Admissions task force stated that the overarching goal of this enrollment planning initiative was student success. S.F. ¶ 46.

   **Brown Response:  Uncontroverted**.

76. The University Director of the Office of Admissions has no record of the School of Law having filed with it the School of Law's policies for admission and readmission. S.F. ¶ 47.

**Brown Response**:  **Uncontroverted**.

77.  The School of Law's Honor Code, in part, states:

> IV. Sanctions:
>
> .       .       .       .
>
> 8. Permanent expulsion from the School of Law. Permanent expulsion should be reserved only for the most serious offenses, especially because disciplinary expulsion of a law student from a member of the Association of the American Law Schools prevents that student from enrolling in any other member schools.

S.F. ¶ 53.

**Brown Response**:  **Uncontroverted**.

78.  The University of Kansas School of Law Dispute Resolution procedure, states, in part:

Section 2: Rights of Parties

> (a)  The Dispute Resolution Procedures shall be applied so as to protect the due process and other rights of parties to the dispute.
>
> (b)  Parties to the dispute shall receive reasonable notice of any charges or allegations against them, of the time and place of any hearing, and of the material issues to be determined.
>
> (c)  With due regard for the authority of the hearing body to exclude irrelevant, immaterial, cumulative or improper evidence, parties to the dispute shall have a full and fair opportunity to present their version of

events, present and cross examine witnesses, or otherwise plead their case, and may be represented by counsel at their own expense.

(d)  Parties to the dispute are entitled to a decision by an impartial hearing body based upon the record of the proceedings. Members of the hearing body shall not communicate with each other or with any other person on matters material to the dispute except through the hearing process.

(e)  The hearing body and others administering the dispute resolution procedures shall respect the confidentiality of the proceedings. Confidentiality does not apply to information that is relevant to the investigation or prosecution of a disciplinary action by the Disciplinary Administrator of the Kansas Bar, any matter relating to the admission of an attorney to the bar of any state or federal jurisdiction or court, or in any case where disclosure is required by court order or other legal authority.

S.F. ¶ 54.

**Brown Response**:  **Uncontroverted**.

79. The University of Kansas Student Code of Rights and Responsibilities states, in part, that it "applies to all university students, administration, faculty and staff." S.F. ¶ 55.

**Brown Response**:  **Uncontroverted**.

80. The University of Kansas' University Senate Code states, in part, that it "applies to

48

faculty, staff and students." S.F. ¶ 57.

**Brown Response**: **Uncontroverted**.

81. The Faculty Senate Rules and Regulations, in pertinent part, state:

> 2.1.1. Policies for admission and readmission are established by the faculties of the various schools or the College, within the parameters of state laws and Regents regulations and within guidelines set by the Faculty Senate. A statement of such requirements shall be published or filed with the Director of Admissions and the Secretary of the Faculty Senate. For undergraduate admission, implementation of these policies by the Director of Admissions includes the initial evaluation of credentials presented by applicants covering academic work done elsewhere.

> S.F. ¶ 58.

**Brown Response**: Uncontroverted.

82. When Brown's notice of pending litigation arrived in the Chancellor's office, it was delivered to the Office of General Counsel, and it was the office of General Counsel that responded. S.F. ¶ 60.

**Brown Response**: **Uncontroverted**.

83. Brown was academically successful as a law student at the University of Kansas. S.F. ¶ 63.

**Brown Response**: **Uncontroverted**.

84. The School of Law permitted Brown to enroll in the Fall 2009, Spring 2010, Summer 2010, and Fall 2010 sessions before his removal from the School of Law. S.F. ¶ 64.

**Brown Response:  Uncontroverted**.

85.  Mr. Brown's deposition testimony made clear that his claim against the Board of Regents is premised not on the Regents having any direct knowledge of or involvement with his enrollment at and dismissal from the University of Kansas School of Law, but simply on the supervisory role that the Board of Regents has over the University of Kansas.

> Exhibit E, Brown deposition pp. 107:4-20.

> A My claim is that the Board of Regents is beholden to honor my enrollment contract, and perhaps they weren't involved in the minutiae of the enrollment process; hoever, they do oversee the chancellor, they oversee all the universities, they approve the regulations, they establish limits on what can and cannot be done. One important, one important limit that's of that nature is that the actions taken in the universities and regulations that they promulgate can't be contrary to state law and they can't be contrary to federal constitutional law and to the extent that that's happened here the Regents are beholden to correct it and to the extent that the Board of Regents condones what's happened here, then they're in breach of the contract.

**Brown Response:  Controverted that this is the entire reason for the Regents' involvement.  K.S.A. 76-713 provides that "The board of regents may be sued and may defend any action brought against the board of regents or any state**

**educational institution." Brown wants to be sure that whatever Judgment may be forthcoming is not inoperative for want of the proper power to implement that judgment. The involvement of the Board of Regents assures that it will be**.

<u>Defendants' Reply</u>:  This is legal argument, not a factual response.  As such it is inappropriate under Rule 56 and should be ignored.  Moreover, Brown's testimony is accurately quoted in the factual statement and Brown cannot dispute that testimony now.

86.   At deposition, Brown admitted that the Board of Regents had no knowledge of him or his claims until it was served with the lawsuit. Exhibit E, Brown deposition pp. 115:22 – 116:17

> Q Tell me specifically what facts you can point to that say that the Board of Regents members knew of your specific application to the School of Law before this lawsuit was filed.
>
> A I don't have any facts that say they knew of what was in my application before the lawsuit was filed.
>
>  Q And you don't have any facts that they even knew that they had applied to the School of Law; correct? A No, correct, specifically me, no.
>
> Q Yes. And you don't have any facts at all which show that Andy Tomkins knew anything about your dismissal from the School of Law before this lawsuit was filed, correct?

A  Not before the lawsuit.

Q  And similarly you don't have any facts which say that any of the
individual members of the Board of Regents knew anything
about your dismissal from the law school before this lawsuit was
filed; correct?

A  No, not before the lawsuit was filed.

**Brown Response:  Uncontroverted that this is the testimony.  Controverted
that this testimony in any was affects the propriety of the Regents'
involvement.  K.S.A. 76-713 provides that "The board of regents may be sued
and may defend any action brought against the board of regents or any state
educational institution."  Brown wants to be sure that whatever Judgment
may be forthcoming is not inoperative for want of the proper power to
implement that judgment.  The involvement of the Board of Regents assures
that it will be**.

Defendants' Reply:  This is legal argument, not a factual response.  As such it is
inappropriate under Rule 56 and should be ignored.  Moreover, Brown's response
acknowledges the testimony is accurate.

87.  At deposition, Mr. Brown admitted that the Kansas Board of Regents does not
admit students to the University of Kansas, and that he did not submit his
application or amended application materials to the Kansas Board of Regents,
stating that "the Board of Regents took no overt action" against him, and that his

reason for naming them as defendants was solely "legal" because he believed it to be the correct official capacity defendants. Exhibit E, Brown depo. 111:1 – 112:25.

**Brown Response:  Uncontroverted that this is the testimony.  Controverted that this testimony in any was affects the propriety of the Regents' involvement.  K.S.A. 76-713 provides that "The board of regents may be sued and may defend any action brought against the board of regents or any state educational institution."  Brown wants to be sure that whatever Judgment may be forthcoming is not inoperative for want of the proper power to implement that judgment.  The involvement of the Board of Regents assures that it will be**.

Defendants' Reply:  This is legal argument, not a factual response.  As such it is inappropriate under Rule 56 and should be ignored.  Moreover, Brown's response acknowledges the testimony is accurate.

88. At deposition, Mr. Brown stated that his Count V, state claim for gross and wanton negligence, was against the individual defendants, Agrawal, Mazza, Rohleder-Sook, and McCray Pearson and the University. Exhibit E, Brown depo. pp. 116:23 – 117:12.

**Brown Response:  Uncontroverted**.

89. At deposition, Mr. Brown stated that his Count VI, state claim for tortious interference with respect to business advantage, was against the same defendants as Count V. Exhibit E, Brown depo. pp. 119:8-14.

53

**Brown Response:  Uncontroverted**.

90. At deposition, Mr. Brown stated that his Count VIII, state claim for civil conspiracy, was against the individual defendants, and explained the factual basis for his claim was his supposition that they were aware of his due process rights and dismissed him without a personal appearance. Exhibit E, Brown depo. pp. 120:19 – 122:5.

**Brown Response:  Controverted that this is the entire basis of the conspiracy claim. Mazza and Rohleder-Sook conspired to misrepresent Mazza's writings Rohleder-Sook's to give the false impression that the process was being administered in an even handed way. (Def. Rohleder-Sook Dep. 48:2-7; 53:8-17)  Mazza and Rohleder-Sook conspired to provide incomplete information to the Admissions committee with regard to testimony from the transcript the School of Law received from Johnson County. (Defs.' Bates Brown, Robert v. KU, et al 000237-000238)**

**Further, Mazza and Rohleder-Sook omitted from the complaint they had collaborated on that multiple members of the admissions committee believed Brown deserved due process before disciplinary action was taken (Def. Rohleder-Sook Dep. 23:21-24:8), and that one of the members of the admissions committee actually came to Mazza and Sook recommending that Brown's expulsion not be pursued (McKenzie Dep. 61:18-23) because the School of Law had taken so long to pursue the complaint  (McKenzie Dep. 56:21-24).  This misled the hearing panel to believe that every member of the**

admissions committee supported dismissal without process.   After the decision was communicated to them, neither Mazza nor Rohleder-Sook did anything to correct this misconception.

Mazza and Agrawal conspired to have Agrawal dismiss Brown at a time when Mazza was acting Dean. (Brown v. KU - - Revised Redactions 000576; Mazza Dep. Ex 10) and then misrepresented the timeframes of their tenure in their sworn declarations. (Defs.' Mem. Ex. D, Mazza Decl. ¶ 1; Defs.' Mem. Ex. A, Agrawal Decl. ¶ 7) Mazza and Agrawal were both parties to Agrawal's email directing the University's General Counsel to "craft[] a response" to Brown's requests to be heard before the Judicial Board on behalf of the Joyce McCray-Pearson. (Defs.' Bates Brown v. KU - - Revised Redactions 630). General counsel informed Agrawal, again with copy to Mazza, that they would "formulate a strategy to deal with this issue."   The very next day, McCray-Pearson issued a letter to Brown denying Jurisdiction in the matter, and using the precise language regarding F.S.R.R. 2.1.1 that had appeared in Agrawal's dismissal letter.  (Mazza Dep. Ex. 4, Mazza Dep. Ex. 10)  When deposed, McCray Pearson was unable to explain or defend the language, and finally admitted she did not understand it.  (McCray-Pearson Dep 78:21-81:9) As a result, the Judicial Board ignored the procedures that should have been followed in the case of Brown's Judicial Board requests, which raised questions of conflict between various governance documents (Joyce McCray

**Pearson Deposition Exhibit 27, ¶¶ 9, 13, 14, 46).  The correct procedure from the current University Senate Code appears in the Current University Senate Code, Preface, Page 1.**

Defendants' Reply:  This is legal argument, not a factual response.  As such it is inappropriate under Rule 56 and should be ignored.  Moreover, Brown's response cannot be used to deny his actual deposition testimony.

91.   At deposition, Mr. Brown was unable to identify any specific date or event evidencing a meeting of the minds between the alleged conspirators; rather in describing the factual basis for his claim against each, he identified their having taken an action with which he disagreed. Exhibit E, Brown depo. pp. 122:8 - 132:2.

**Brown Response:  Uncontroverted that the cited passage does not evince a meeting of the minds.  Controverted that the cited passage is in any way representative of the weight of the evidence regarding conspiracy in this case**.

Defendants' Reply:  This is legal argument, not a factual response.  As such it is inappropriate under Rule 56 and should be ignored.

92.  Since his dismissal from the School of Law, Mr. Brown has not sought admission to any other law school. Exhibit E, Brown Depo. 154:23 – 155:1.

**Brown Response:  Uncontroverted**.

## DEFENDANTS' REPLY TO
## PLAINTIFF'S ADDITIONAL FACTS SHOWING
## MATERIAL ISSUES IN DISPUTE[2]

---

[2] In order to more easily distinguish between Mr. Brown's statements and the defendants' facts, the same construct

<u>Defendants' introductory reply comment</u>:   Plaintiff in his Memorandum in Response to Defendants' Motion for Summary Judgment has included an additional 303 paragraphs of additional facts.  Plaintiff has done this in an effort to create the appearance of disputed fact issues.

*Facts Regarding University Rules and Regulations*

**1.     The University of Kansas has its own system of government, which was available to the general public on the internet at the time of the filing of Brown's complaint. [Pl.'s Compl. ¶ 37]**

<u>Defendants' reply</u>:  Controverted that the University of Kansas has its own system of government; rather the University has a process in which constituent groups within the university may provide recommendations to the University administration on various matters.   In academe, such a process for input is referred to as shared governance. Moreover, the fact is irrelevant and immaterial.

**2.     The main governing body of defendant The University of Kansas is the University Senate, and the main governing document of this body is the University Senate Code (U.S.C.), which was published online and available to the general public at the time Brown's complaint was filed. [Pl.'s Compl. ¶ 38]**

<u>Defendants' reply</u>:  Controverted.  Irrelevant and immaterial to the legal claims in this case.  Moreover, Mr. Brown cites to his complaint for this proposition and provides

---

followed above in responding to Mr. Brown's responses to the uncontroverted facts stated in the Motion for Summary Judgment will be followed in this section; Mr. Brown's additional facts below are shown in bold type while the defendants' replies are shown in regular type.

no evidence to support it, which is improper under Rule 56.  Rule 56 provides that "an opposing party may not rely merely on allegations in its own pleading; rather -- its response must, by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).

**3.      University Senate Code, Art. XIV, Section 2 provides procedural due process guarantees for every member of the University Community who is involved in a grievance or dispute. [Pl.'s Compl. ¶ 39, Mazza Dep. Ex. 6, University Senate Code, Art. XIV, Section 2]**

Defendants' reply:  Uncontroverted that the University Senate Code contains such a provision.  However, the express language omitted by Mr. Brown from this factual statement makes clear that these guarantees are limited:  "Every member of the University community with a grievance or complaint that comes within the jurisdiction of an established University body shall be entitled to a hearing before a disinterested panel."  As determined by the Law School hearing panel in its May 3, 2013, Memorandum decision, Mr. Brown's failure to provide truthful and accurate answers on his law school application was not within the jurisdiction of an established University body.  Rather, it was subject to the express terms of the application and the LSAC letter certifying his application, which provided for "denial of [his] application or dismissal from the School of Law" for "falsification, misrepresentation or failure to supply required information."  *See* Uncontroverted SOF ¶ 48.

**4.      The University Senate Code applies to "Faculty, Staff and Students".**

**[Mazza Dep. Ex. 6, University Senate Code, Top of Page 1]**

<u>Defendants' reply</u>:   Uncontroverted that the quoted language is in the code. However, it is irrelevant and immaterial to this case.

**5.     Subject to and in accordance with the control of the Chancellor and the Board of Regents as provided by law, the Student Senate is empowered to formulate such Rules and Regulations as it shall deem wise and proper for the control and government of such affairs of the University as directly and primarily affect the students of the University and to take such steps as it shall deem necessary for their implementation and administration.   Affairs of the University include, but are not limited to, student rights, privileges, and responsibilities, student organizations and activities, student publications, and student housing and health. [Pl.'s Compl. ¶ 41, Mazza Dep. Ex. 6, University Senate Code, Art. III, Section 5]**

<u>Defendants' reply</u>:   Uncontroverted that the quoted language is in the code. However, it is irrelevant and immaterial to this case.

**6.     The body of rules and regulations by which the University Senate Code as it pertains to the Student Senate is administered is The University Senate Rules and Regulations, which was published online and available to the general public at the time Brown filed his complaint.   [Pl.'s Compl. ¶ 42, Mazza Dep. Ex. 7, University Senate Rules and Regulations]**

<u>Defendants' reply</u>:  Uncontroverted, but it is irrelevant and immaterial to this case.

**7.     Disputes involving alleged violations by a student of the Code of Student**

59

**Rights and Responsibilities (nonacademic misconduct) [fall under the jurisdiction of the] Vice Provost for Student Success. (Procedures of the Office of the Vice Provost for Student Success.)  [Mazza Dep. Ex. 7, University Senate Rules and Regulations, Section 6.4.9.1]**

Defendants' reply:   Uncontroverted that University Senate Rules contain such a statement, but it is irrelevant and immaterial to this case.

**8.     The Code of Student Rights and Responsibilities applies to "[a]ll university students, administration, faculty and staff". [Mazza Dep. Ex. 3, Student Code, Top of Page 1]**

Defendants' reply:   Uncontroverted that the Student Code contains the quoted passage.  However, it is controverted as incomplete.  Under "Limitations" the Student Code expressly states:  "Students or applicants who gain admission to the University through false information may have their enrollment cancelled by the University Registrar in consultation with the academic dean and the Director of Admissions or their designees."  *See* Plaintiff Brown's Exhibit O, Mazza Dep. Ex. 3, Student Code, page 11 @ F.5.  Plaintiff Brown is an individual who gained admission to the School of Law through false information.  Therefore, by the express language of the limitations in the Student Code, he was not subject to the Code which authorized the cancellation of his admission and dismissal by the Law School.

**9.     The Kansas University Code of Student Rights and Responsibilities was published online and available to the general public at the time Brown filed his**

complaint.   [Pl.'s Compl. ¶ 48]

Defendants' reply:   Controverted as irrelevant and immaterial.   See defendants'
reply stated in response to Brown's additional facts ¶ 8.

**10.   The USRR applies to "Faculty, Staff and Students". [Mazza Dep. Ex. 7, University Senate Rules and Regulations, Top of Page 1]**

Defendants' reply:  Irrelevant and immaterial.

**11.   Article 22 of the Code of Student Rights and Responsibilities is entitled "Non-Academic Misconduct".   [Mazza Dep. Ex. 3, Code of Student Rights and Responsibilities]**

Defendants' reply:  Irrelevant and immaterial.

**12.   Article 22 (C), "Offenses Against the Orderly Process of the University", states in relevant part that "An offense against the orderly process of the university is committed when [a] student or applicant knowingly furnishes false or misleading information to the University."   [Mazza Dep. Ex. 3, Code of Student Rights and Responsibilities, Art. 22 (C)(2)]**

Defendants' reply:   Controverted as irrelevant and immaterial.   See defendants'
reply stated in response to Brown's additional facts ¶ 8.

**13.   The University Senate Rules and Regulations mandate that any subordinate unit which wishes to assume unit level jurisdiction over an area of dispute resolution must submit its unit level grievance procedure in writing, stating "Any organizational unit that has developed a grievance procedure shall submit it**

to the General Counsel of the University.  Unless the General Counsel determines that the procedure as submitted is in conflict with existing law, rules of the Board of Regents, or rules or regulations of the University, it shall become effective thirty calendar days after such submission or upon written approval of the General Counsel, whichever occurs first." [University Senate Rules and Regulations, Article V, Section 2, Subsection 5.2.1.3 Review and Approval (of Unit Level Grievance Procedures)]

Defendants' reply:  Irrelevant and immaterial.

14.   Any School of Law unit level grievance procedure which dealt with non-academic misconduct  would be published and in writing, would have been submitted to the office of General Counsel for approval (U.S.R.R. 5.2.1.3), would be on file in the Equal Opportunity Office, with the University Ombudsman, and the Judicial Board Chair (U.S.R.R. 5.2.3), would comply with the Procedural Guarantees of Article XIV, section 2, of the University Senate Code (U.S.R.R. 5.2.2), would provide for the opportunity for each side to submit supporting witnesses (U.S.R.R. 5.2.2(b)), would provide the opportunity for each side to be informed of material supporting the action or position of the other side (U.S.R.R. 5.2.2(c)), *would exclude any party involved in the complaint from the rendering of any decision* (U.S.R.R. 5.2.2(d), and would provide for the creation of a record of the proceeding, including audio tape recording of the hearing and a written decision of the hearing body. [Mazza Dep. Ex. 7, University Senate Rules and Regulations, Section 5.2

62

**(Emphasis Added)]**

Defendants' reply:  Irrelevant and immaterial.

**15.   The School of Law's Dispute Resolution Procedure specifically disclaims application to procedures that are within the exclusive jurisdiction of another body pursuant to the U.S.R.R. [Mazza Dep. Ex. 1, School of Law Dispute Resolution Procedure, Section 1, (a)]**

Defendants' reply:  Irrelevant and immaterial.

**16.   In Brown's case, application of the School of Law's Dispute Resolution Procedure was foreclosed by University Senate Rules and Regulations, Article VI, Section 4, Subsection 6.4.9.1 which placed complaints of nonacademic misconduct described in the Code of Student Rights and Responsibilities within the exclusive jurisdiction of the Vice Provost for Student Success. [Mazza Dep. Ex. 1, School of Law Dispute Resolution Procedure, Section 1, (a)]**

Defendants' reply:   Controverted.   This is Mr. Brown's construction and interpretation of the University's rules; however, it is not supported by the cited exhibit. Rule 56(e)(2) requires that evidence be in the form of affidavit or other admissible evidence under the rule.  Moreover, this is irrelevant and immaterial.

**17.   The Code of Student Rights and Responsibilities, Art. 22 (F)(1), provides as follows:  "A student or organization alleged to have violated provisions of Article 22 is entitled to a hearing in accordance with procedures established by the Office of the Vice Provost for Student Success. Any appeal from such a hearing shall be**

directed to the University Judicial Board." [Mazza Dep. Ex. 3, Student Code, Art 22 (F)(1)]

Defendants' reply:   Uncontroverted that the Student Code contains the quoted passage.   However, it is controverted as incomplete.   Under "Limitations" the Student Code expressly states:   "Students or applicants who gain admission to the University through false information may have their enrollment cancelled by the University Registrar in consultation with the academic dean and the Director of Admissions or their designees."   See Plaintiff Brown's Exhibit O, Mazza Dep. Ex. 3, Student Code, page 11 @ F.5.   Plaintiff Brown is an individual who gained admission to the School of Law through false information.   Therefore, by the express language of the limitations in the Student Code, he was not subject to the Code which authorized the cancellation of his admission and dismissal by the Law School.

**18.   The Code of Student Rights and Responsibilities, Art. 24, provides the Senate Code not be inconsistent with the University Senate Rules and Regulations as follows:  "Subject to the approval of the Chancellor, authority for the development of rules concerning student non-academic conduct resides in the Student Senate pursuant to Article V, Section 4, of the University of Kansas Senate Code. Nothing in this Code shall be construed to be inconsistent with the intent or purpose of the University of Kansas Senate Code." [Mazza Dep. Ex. 3, Student Code, Art 24]**

Defendants' reply:   Uncontroverted that the Student Code contains the quoted passage.   However, it is irrelevant and immaterial.   Moreover, it is controverted as

incomplete.   Under "Limitations" the Student Code expressly states:   "Students or applicants who gain admission to the University through false information may have their enrollment cancelled by the University Registrar in consultation with the academic dean and the Director of Admissions or their designees."   *See* Plaintiff Brown's Exhibit O, Mazza Dep. Ex. 3, Student Code, page 11 @ F.5.   Plaintiff Brown is an individual who gained admission to the School of Law through false information.   Therefore, by the express language of the limitations in the Student Code, he was not subject to the Code which authorized the cancellation of his admission and dismissal by the Law School.

**19.   The U.S.R.R. provides a specific avenue of appeal for a decision involving the misconduct of which Brown is accused, setting forth that "[t]he decision [in a dispute involving alleged violations by a student of the Code of Student Rights and Responsibilities (nonacademic misconduct)] may be reviewed by an appropriate administrative officer and/or an appeals panel of the Judicial Board may consider the appeal pursuant to section 6.7 of the University Senate Rules and Regulations." [Mazza Dep. Ex. 7, University Senate Rules and Regulations, Section 6.4.9.2 (regarding appeals)]**

Defendants' reply:   Controverted.   This is Mr. Brown's construction and interpretation of the University's rules with respect to his assertion that he was entitled to appeal the issue of his false statements on his Law School application to the University Judicial Board.   However, it is not supported by the cited exhibit.   Rule 56(e)(2) requires that evidence be in the form of affidavit or other admissible evidence under the rule and

Mr. Brown has provided no such evidence in support of his assertion.

**20.   Defendant Rohleder-Sook testified that compliance with the Code of Student Rights and Responsibilities is mandatory, not discretionary, for the School of Law faculty. [Def. Rohleder-Sook Dep. 67:20-25]**

Defendants' reply:   Controverted.   Mr. Brown has mischaracterized the cited testimony, which in response to the question whether the Code of Student Rights and Responsibilities has to be followed, Ms. Rohleder-Sook responded:   "I would suppose so."   *See* Brown's Ex. AK, Def. Rohleder-Sook Dep. 67:20-25.    Further controverted that the statement is relevant or material to this dispute.

**21.   The Office of the Vice Provost for Student Success (now the Office of the Vice Provost for Student Affairs), and not the School of Law, has the authority to administer the Code of Student Rights and Responsibilities. [Mazza Dep. Ex. 3, Student Code, Art 23]**

Defendants' reply:   Uncontroverted, but irrelevant and immaterial.   See also, defendants' reply to Brown's additional fact ¶ 8, which noted that the circumstance of a student acquiring admission to the University through false information is specifically exempted from coverage under the Code of Student Rights and Responsibilities.   Thus, contrary to Mr. Brown's assertion, the Code of Student Rights and Responsibilities, by its express limitation, was inapplicable to him.

**22.   Chancellor Bernadette Gray-Little testified that University employees do not have discretion to undermine established accepted University Policy, which**

**includes any policy that is formally adopted by the university and published for the general public at large to see. [Gray-Little Dep. 19:17-24]**

<u>Defendants' reply</u>:  Controverted because it misstates Chancellor Gray-Little's testimony, which simply stated:  "I would not condone a staff member undermining established accepted university policy."  *See* Brown's Ex. AF, Gray-Little Dep. 19:17-24. Further, the statement is irrelevant and immaterial to this case.

**23.   The University Senate Code establishes procedural guarantees which pervade the entire university system of Governance, stating in Section 2 (Procedural Guarantees) that "The 'due process' to be accorded shall include, but not be limited to, the following elements:**

**a)  Subject to Section 6.5.3 of the University Senate Rules and Regulations, every member of the University community with a grievance or complaint that comes within the jurisdiction of an established University body shall be entitled to a hearing before a disinterested panel. Specific procedures for each type of grievance or complaint that is within the jurisdiction of an established University body are set forth in this Code.**

**b)  Each party to a proceeding may represent itself or be represented by an advisor or counsel of his, her, or its choice.**

**c)  A party against whom a complaint or grievance is brought shall have the right to a written statement of the complaint or grievance against him or her, which statement shall set forth with particularity the facts upon which the complaint or grievance is based and shall indicate the provision or provisions of the University Rules and Regulations alleged to have been violated, or the acts of established University bodies or officials alleged to have been unlawful, arbitrary, or capricious. In cases involving alleged violations of University parking and traffic regulations the usual printed and completed summons or citation shall be deemed a sufficient written statement of the charge.**

**d)  A party against whom a complaint or grievance is brought shall have the privilege of remaining silent and refusing to give evidence, and he or she shall be informed of this privilege during the initial state of the proceedings.**

e) **Each party to a proceeding shall have the right to introduce into evidence all relevant testimony and documents. Each party to a proceeding shall be entitled to a full examination of the evidence presented by the other parties, including the opportunity to cross-examine witnesses. The hearing body shall base its recommendations solely on the evidence received at the hearing.**

f) **In any hearing or appeal, the parties are entitled to a decision based upon the record of the hearing or appeal. Decision making bodies shall avoid communication with a party or witness pertaining to the substance of a matter before that body unless all the parties have been duly notified of the nature and content of the contact. Copies of any written communications shall be provided to all parties. This provision shall not prevent the Judicial Board Chair from providing general information and assistance to the parties in accordance with the provisions of the University Senate Rules and Regulations.**

g) **When an audio tape or written record is made of a proceeding, each party to that proceeding is entitled to a copy. The cost of making the copy shall be born e by the requesting party or parties.**

h) **Each party to a proceeding shall be entitled to prompt, written notice of the decision of the hearing body hearing his or her complaint or grievance.**

i) **Where the procedures provide for an appeal beyond the hearing, a party aggrieved by a decision of the hearing body shall be entitled to appeal in accordance with such procedures.**

j) **In all proceedings, the party supporting the application of sanctions to individual members of the University community shall have the burden of persuading the hearing body of the facts upon which the application of such sanctions must be based.**

k) **Special procedures for hearings held by the Faculty Rights Board shall be developed, approved, and made publicly available according to applicable provisions of the Faculty Senate Rules and Regulations."**

**[Mazza Dep. Ex. 6, University Senate Code, Section Article XIV, Section 2 (Procedural Guarantees)]**

<u>Defendants' reply</u>:  Uncontroverted that the University Senate Code contains such language.  However, it is irrelevant and immaterial.   The express language makes clear that these guarantees are limited:  "Every member of the University community with a grievance or complaint that comes within the jurisdiction of an established University body shall be entitled to a hearing before a disinterested panel."  As determined by the

68

Law School hearing panel in its May 3, 2013, Memorandum decision, Mr. Brown's failure to provide truthful and accurate answers on his law school application was not within the jurisdiction of an established University body. Rather, it was subject to the express terms of the application and the LSAC letter certifying his application, which provided for "denial of [his] application or dismissal from the School of Law" for "falsification, misrepresentation or failure to supply required information." *See* Uncontroverted SOF ¶ 48.

**24.   The due process rights guaranteed in U.S.C. Art. XIV, § 2 apply to disputes within the jurisdiction of the U.S.R.R. [Pl.'s Compl. ¶ 42, Mazza Dep. Ex. 7, University Senate Rules and Regulations, Section 5.2.2]**

Defendants' reply:  Uncontroverted that the University Senate Code contains such language. However, it is irrelevant and immaterial.  The express language makes clear that these guarantees are limited:  "Every member of the University community with a grievance or complaint that comes within the jurisdiction of an established University body shall be entitled to a hearing before a disinterested panel."  As determined by the Law School hearing panel in its May 3, 2013, Memorandum decision, Mr. Brown's failure to provide truthful and accurate answers on his law school application was not within the jurisdiction of an established University body.  Rather, it was subject to the express terms of the application and the LSAC letter certifying his application, which provided for "denial of [his] application or dismissal from the School of Law" for "falsification, misrepresentation or failure to supply required information."  *See* Uncontroverted SOF ¶ 48.

**25.    The University Senate Code contains specific procedures for each type of grievance or complaint that is within the jurisdiction of an established University body. [Mazza Dep. Ex. 6, University Senate Code, Section Article XIV, Section 2 (a)]**

<u>Defendants' reply</u>:  Controverted as irrelevant and immaterial.

**26.    The Code of Student Rights and Responsibilities, Art. 2 (E), provides as follows: "Students will be exempt from disciplinary action that affects their status as students except for academic failure or violation of a published Student Senate, University Senate, University or Regents rule or regulation. Rules and regulations shall be fully and clearly disclosed in advance of the supposed violations."  [Mazza Dep. Ex. 3, Student Code, Art 2 (E)]**

<u>Defendants' reply</u>:   Uncontroverted that the Student Code contains the quoted passage.  However, it is irrelevant and immaterial.  Under "Limitations" the Student Code expressly states:  "Students or applicants who gain admission to the University through false information may have their enrollment cancelled by the University Registrar in consultation with the academic dean and the Director of Admissions or their designees."  *See* Plaintiff Brown's Exhibit O, Mazza Dep. Ex. 3, Student Code, page 11 @ F.5.  Plaintiff Brown is an individual who gained admission to the School of Law through false information.  Therefore, by the express language of the limitations in the Student Code, he was not subject to the Code which authorized the cancellation of his admission and dismissal by the Law School.

**27.   The Code of Student Rights and Responsibilities, Art. 2 (F), provides as follows: "No disciplinary sanctions resulting from a violation of rules and regulations, under Article 2(E), may be imposed upon any student without prior written notice of the nature and cause of the charges, and an opportunity to be heard at a fair hearing. A fair hearing shall include confrontation of witnesses against him or her and the assistance of a person of his or her own assistance or with the prior approval of the Office of the Vice Provost for Student Success, up to three persons of the student's choosing." [Mazza Dep. Ex. 3, Student Code, Art 2 (F)]**

Defendants' reply:   Uncontroverted that the Student Code contains the quoted passage.  However, it is irrelevant and immaterial.  Under "Limitations" the Student Code expressly states:  "Students or applicants who gain admission to the University through false information may have their enrollment cancelled by the University Registrar in consultation with the academic dean and the Director of Admissions or their designees." *See* Plaintiff Brown's Exhibit O, Mazza Dep. Ex. 3, Student Code, page 11 @ F.5. Plaintiff Brown is an individual who gained admission to the School of Law through false information.  Therefore, by the express language of the limitations in the Student Code, he was not subject to the Code which authorized the cancellation of his admission and dismissal by the Law School.

**28.   The Code of Student Rights and Responsibilities, Art. 2 (G), provides as follows: "A student, a student organization, or a campus organization charged with**

**violating University regulations is entitled to a hearing. A student or an organization may waive the right to a hearing when the party chooses to admit responsibility for misconduct and accept disciplinary sanctions from the University." [Mazza Dep. Ex. 3, Student Code, Art 2 (G) ]**

Defendants' reply:   Uncontroverted that the Student Code contains the quoted passage.  However, it is irrelevant and immaterial.  Under "Limitations" the Student Code expressly states:  "Students or applicants who gain admission to the University through false information may have their enrollment cancelled by the University Registrar in consultation with the academic dean and the Director of Admissions or their designees." *See* Plaintiff Brown's Exhibit O, Mazza Dep. Ex. 3, Student Code, page 11 @ F.5. Plaintiff Brown is an individual who gained admission to the School of Law through false information.  Therefore, by the express language of the limitations in the Student Code, he was not subject to the Code which authorized the cancellation of his admission and dismissal by the Law School.

**29.   The Code of Student Rights and Responsibilities, Art. 3 (B), provides as follows: "The term 'student' includes all persons enrolled at the Lawrence campus, Capitol Complex and Edwards Campus, either full time or part time, pursuing undergraduate, graduate, or professional studies, as well as nondegree students. This also includes individuals who confirm their intent to enroll in programs, those attending orientation sessions, and those that were enrolled at the date of an alleged incident. Persons who withdraw after allegedly violating the student code or who**

are not officially enrolled for a particular term but who have a continuing relationship with the university are considered 'students.'"   [Mazza Dep. Ex. 3, Student Code, Art 3 (B)]Sss

Defendants' reply:  Uncontroverted that the Student Code contains the quoted passage.  However, it is irrelevant and immaterial.  Under "Limitations" the Student Code expressly states:  "Students or applicants who gain admission to the University through false information may have their enrollment cancelled by the University Registrar in consultation with the academic dean and the Director of Admissions or their designees." *See* Plaintiff Brown's Exhibit O, Mazza Dep. Ex. 3, Student Code, page 11 @ F.5. Plaintiff Brown is an individual who gained admission to the School of Law through false information.  Therefore, by the express language of the limitations in the Student Code, he was not subject to the Code which authorized the cancellation of his admission and dismissal by the Law School.

**30.   In a complaint such as the one leveled against Brown, U.S.R.R. section 5.2.2 (a) provides that there is a time limit of thirty calendar days between the filing of a complaint and a hearing on the complaint. [Def. Rohleder-Sook Dep. 61:11-63:10]**

Defendants' reply:  Controverted.   The cited deposition testimony has been misstated.  Ms. Rohleder-Sook acknowledged that U.S.R.R. section 5.2.2.(a) provided that a grievance procedure must have a time limit of not more than 30 days.  However, she did not testify that this provision was applicable to the complaint against Mr. Brown

brought by her for lying on his application.   Also controverted as irrelevant and immaterial.

31.   There was a procedure, adopted 10/6/94, in place at the time of the School of Law's Complaint against Brown for interpretation and resolution of conflict among various University codes, which provided as follows: "Interpretation of, or Conflict among, Various Governance Documents:  On 10/6/94, the University Council approved the following procedure for interpretation of, or conflict among, the University Senate Code, University Senate Rules and Regulations, Faculty Senate Rules and Regulations, the Handbook for Faculty and Unclassified Staff, and the Student Senate Rules and Regulations:

1. **Contact the Office of University Governance, 864-5169, or via e-mail at govern@ku.edu, with questions about conflict or interpretation.**
2. **If the Governance Office cannot resolve the question, it will be referred to the chair of the Senate Executive Committee.**
3. **If the Senate Executive Committee cannot satisfactorily resolve the conflict, it may refer it to a committee of the following:**
    **1) Chair of the Judicial Board.**
    **2) Chair of the Academic Policies & Procedures Committee.**
    **3) Chair of the Faculty Rights, Privileges & Responsibilities Committee.**
    **4) Chair of the Organization & Administration Committee.**
    **5) Chair of the Student Rights Committee of Student Senate."**

**[University Senate Code as Currently Published, P.1, Preface]**

Defendants' reply:  Controverted as irrelevant and immaterial to this case.

### *Timeline of Events*

32.   **As a young child, plaintiff Brown fell victim to childhood sexual abuse by a trusted family member.  As a result, his adolescence and adulthood were filled**

with repressed memories, confusion, dysfunctional relationships exclusively with other victims of childhood sexual abuse, irrational fear, intense shame, periodic abuse of alcohol, depression, suicidal ideations, and a feeling that nothing was in its place unless everything was out of place.  [*See* Exhibit A – Wayne Witcher Report Dated March 12, 2012, Pl.'s Bates BROWN v. KU 000654-000656; Exhibit B – Wayne Witcher Curriculum Vitae, Pl.'s Bates BROWN v. KU 000654-000656; Pl.'s Decl. ¶ 2]

Defendants' reply:  Rule 56(e)(2) requires that evidence be admissible, which Wayne Witcher's report and curriculum vitae are not because they are hearsay. Controverted that the fact is relevant or material to this case and Mr. Brown's lying on his Law School application for admission.

33.  In Brown's late 30's, he discovered that he had been sexually abused as a child in therapy with Dr. Wayne Witcher, Ph.D., using guided imagery and hypnosis. [*See* attached Exhibit A – Wayne Witcher Report Dated March 12, 2012, Exhibit B – Wayne Witcher Curriculum Vitae, Pl.'s Bates BROWN v. KU 000600-000601; Pl.'s Decl. ¶ 3]

Defendants' reply:  Rule 56(e)(2) requires that evidence be admissible, which Wayne Witcher's report and curriculum vitae are not because they are hearsay. Controverted that the fact is relevant or material to this case and Mr. Brown's lying on his Law School application for admission.

34.  On April 15, 2008, Brown's dysfunctional past and failure to deal with

his family of origin issues in a meaningful way culminated in a nervous breakdown. [*See* **Brown Dep. 41:6-42:4; Pl.'s Decl. ¶ 4**]

Defendants' reply:  Rule 56(e)(2) requires that evidence be admissible, which Wayne Witcher's report and curriculum vitae are not because they are hearsay. Controverted that the fact is relevant or material to this case and Mr. Brown's lying on his Law School application for admission.

35.  **On April 18, 2008, Brown began daily AA meetings and regular therapy to address the family of origin issues which had caused his anxiety and controlled the first 47 years of his life. [Pl.'s Decl. ¶ 5]**

Defendants' reply:  Rule 56(e)(2) requires that evidence be admissible, which Wayne Witcher's report and curriculum vitae are not because they are hearsay. Controverted that the fact is relevant or material to this case and Mr. Brown's lying on his Law School application for admission.

36.  **Brown is a current member of AA, and his sobriety date is April 18, 2008. [Pl.'s Decl. ¶ 6]**

Defendants' reply:  Controverted that the fact is relevant or material to this case and Mr. Brown's lying on his Law School application for admission.

37.  **Approximately a year into his recovery, Brown made the decision to apply to the University of Kansas School of Law.  [Pl.'s Decl. ¶ 7]**

Defendants' reply:  Controverted that the fact is relevant or material to this case and Mr. Brown's lying on his Law School application for admission.

**38.   At that point in time, Brown was only in the beginning stages of being able to constructively deal with the intense feelings of shame which had characterized his entire life through that date. [Pl.'s Decl. ¶ 8]**

Defendants' reply:  Controverted that the fact is relevant or material to this case and Mr. Brown's lying on his Law School application for admission.

**39.   At the time Brown made application, he was still experiencing intense fear, shame, and denial about traumatic events in his past. [Pl.'s Decl. ¶ 9]**

Defendants' reply:  Controverted that the fact is relevant or material to this case and Mr. Brown's lying on his Law School application for admission.

**40.   Plaintiff Brown ("Brown") filed an application for admission to the University of Kansas School of Law on April 8, 2009. [Pl.'s Compl. ¶ 56; S.F. ¶ 15]**

Defendants' reply:  Uncontroverted.

**41.   In his application, Brown made irrational attempts to reason away the applicability of question 27 of the School of Law's application through conversations with family members and legal research which indicated that prior transgressions became too remote for consideration by the Bar association after the passage of a certain amount of time. [Pl.'s Decl. ¶10]**

Defendants' reply:  Controverted that this fact is relevant or material to Mr. Brown's lying on his Law School admission application given the express statements contained in the application and the LSAC certification.  Mr. Brown, as acknowledged in his deposition question 27c regarding arrests and convictions did not contain any time

limit [Defendants' Exhibit E, Brown depo. 71:20-24 "Q: On the application there is no statement on the application that any way limits or restricts the time frame that is being inquired to under question 27. Isn't that correct? A: Yes, that's correct."], and further, that he was applying to the Law School for Admission, not the Kansas Supreme Court for admission to the bar. [Defendants' Ex. E-1, Brown depo. 76:5-77:4]

**42. Brown ultimately convinced himself that convictions occurring more than 7 years in the past were too remote to be relevant based upon *In re Ketter*, 268 Kan. 146, 154-5 (1999) and *In Matter of Pistotnik*, 254 Kan. 294 (1993). [See Defs.' Bates Brown, Robert v. KU, et al 000170]**

Defendants' reply: Controverted that this fact is relevant or material to Mr. Brown's lying on his Law School admission application given the express statements contained in the application and the LSAC certification. Mr. Brown, as acknowledged in his deposition question 27c regarding arrests and convictions did not contain any time limit [Defendants' Exhibit E, Brown depo. 71:20-24 "Q: On the application there is no statement on the application that any way limits or restricts the time frame that is being inquired to under question 27. Isn't that correct? A: Yes, that's correct."], and further, that he was applying to the Law School for Admission, not the Kansas Supreme Court for admission to the bar. [Defendants' Ex. E-1, Brown depo. 76:5-77:4]

**43. Brown did not include his prior criminal history in his answer to question 27 of the School of Law application (regarding his prior criminal record) based upon his research indicated they were too remote in time to be relevant. [Pl.'s**

**Compl. ¶ 58; Mazza Dep. Ex. 8 Section 5(C)(ii); Brown Dep. 72:13-14, 75:22-76:4, 78:17-19; 83:25-84:7; Pl.'s Decl. ¶¶10-11]**

<u>Defendants' reply</u>:   Controverted that this fact is relevant or material to Mr. Brown's lying on his Law School admission application given the express statements contained in the application and the LSAC certification.  Mr. Brown, as acknowledged in his deposition question 27c regarding arrests and convictions did not contain any time limit [Defendants' Exhibit E, Brown depo. 71:20-24 "Q:  On the application there is no statement on the application that any way limits or restricts the time frame that is being inquired to under question 27.  Isn't that correct?  A:  Yes, that's correct."], and further, that he was applying to the Law School for Admission, not the Kansas Supreme Court for admission to the bar. [Defendants' Ex. E-1, Brown depo. 76:5-77:4]

**44.   In making his determination that the prior criminal history was too remote, Brown relied on _In re Ketter_, 268 Kan. 146, l54-55 (1999) and   _In re Pistotnik_, 254 Kan. 294, 296 (1993), which indicated that the passage of seven years rendered prior criminal activity too remote for consideration by the bar. [Mazza Dep. Ex. 8 Section 5(C)(ii); Brown Dep. 72:13-14, 75:22-76:4, 78:17-19; 83:25-84:7; Pl.'s Decl. ¶¶10-11]**

<u>Defendants' reply</u>:   Controverted that this fact is relevant or material to Mr. Brown's lying on his Law School admission application given the express statements contained in the application and the LSAC certification.  Mr. Brown, as acknowledged in his deposition question 27c regarding arrests and convictions did not contain any time

limit [Defendants' Exhibit E, Brown depo. 71:20-24 "Q:  On the application there is no statement on the application that any way limits or restricts the time frame that is being inquired to under question 27.  Isn't that correct?  A:  Yes, that's correct."], and further, that he was applying to the Law School for Admission, not the Kansas Supreme Court for admission to the bar. [Defendants' Ex. E-1, Brown depo. 76:5-77:4]

**45.   Brown was admitted to the University of Kansas School of Law on August 20, 2009. [Pl.'s Compl. ¶ 59]**

Defendants' reply:  Uncontroverted

**46.   During the first week of law school in August of 2009, Dean Wendy Rohleder-Sook (defendant Rohleder-Sook) spoke to the entering class of Fall 2009 regarding question 27 and application amendment, and made clear that the law school considered no transgression too remote in time. [Pl.'s Compl. ¶ 60; Def. Rohleder-Sook Dep. 24:18-28:3; Pl.'s Decl. ¶12]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's lying on his application.

**47.   Defendant Rohleder-Sook explained that the school of law sought to help amending applicants to avoid problems when it came time to take the bar.   [Pl.'s Compl. ¶ 61]**

Defendants' Reply:  Controverted.  Plaintiff cites his complaint for support of this allegation which is improper.  The alleged fact is not supported by affidavit or other evidence recognized as appropriate under Rule 56.  Therefore, it may not be considered.

**48.     Defendant Rohleder-Sook explained that students often think their past transgressions are a more serious problem than they really are, and that the most important thing was that students come forward and be honest with the law school. [Pl.'s Compl. ¶ 62]**

Defendants' Reply:  Controverted.  Plaintiff cites his complaint for support of this allegation which is improper.   The alleged fact is not supported by affidavit or other evidence recognized as appropriate under Rule 56.   Therefore, it may not be considered.

**49.     Through its various speakers, the School of Law expressed its intentions to work with applicants who amended to assure that they did not encounter difficulties when it came time to sit for the Bar Exam. [Pl.'s Compl. ¶¶ 63-64]**

Defendants' Reply:  Controverted.  Plaintiff cites his complaint for support of this allegation which is improper.   The alleged fact is not supported by affidavit or other evidence recognized as appropriate under Rule 56.   Therefore, it may not be considered.

**50.   Brown came forward and voluntarily amended his application 7 days after his admission on August 27, 2009. [S.F. ¶ 25, Defs.' Mem. P.10, Pl.'s Decl. ¶ 13]**

Defendants' reply:  Uncontroverted.

**51.   Brown's August 27, 2009 amendment came 50 days before the October 15, 2009 due date of tuition for the fall 2009 Semester. [Pl.'s Bates BROWN v KU 000492]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**52. Contemporaneously with his August 27th, 2009 Amendment, Brown provided Defendant Rohleder-Sook a copy of his Petition for Certiorari as filed in the Supreme Court of the United States with respect to the four charges of domestic violence. [Brown Dep. Ex. 5; Def. Rohlder-Sook Dep. 78:2-7]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**53. In Brown's August 27th Amendment, he disclosed every non-traffic and non-pet related charge which had ever been adjudicated against him, whether by conviction, diversion, or plea bargain. [Pl.'s Decl. ¶ 13]**

Defendants' reply:  Controverted.  *See* Defendants' uncontroverted facts ¶'s 28-35 and the evidence cited in support of those facts.

**54. At the time of his amendment, Brown stupidly rationalized that charges which had been dropped without consequence need not be disclosed in the amendment. [Pl.'s Decl. ¶ 14]**

Defendants' reply:  Controverted.  In his deposition, Mr. Brown did not so testify. Instead, he acknowledged that in his August 27, 2009, letter amending his application and in his September 11, 2009, letter further amending his application, he did not disclose complete and accurate information regarding his criminal history as requested in Question 27c of the application.  [*See* Defendant's Ex. E-1, Brown depo. 92:19-97-17]

**55. Upon receiving Brown's amended application, the decision on whether or not to take any further action was left to the sole discretion of defendant Rohleder-Sook. [Mazza Dep. 164:20-165:9]**

Defendants' reply:  Controverted.  The cited testimony shows that rather than speaking about Brown's amended application specifically, the question asked of Dean Mazza related to a general procedure that had been established regarding Associate Dean Rohleder-Sook's processing of amendments to applications.  Further, it is irrelevant and immaterial to Brown's lying on his application and the issues in this case.

**56.   Defendant Rohleder-Sook requested more information regarding the prior convictions. [Pl.'s Compl. ¶ 66, S.F. ¶ 26]**

Defendants' reply:  Uncontroverted.

**57.   Defendant Agrawal was involved in the August 27, 2009 decision to request more information from Brown after he amended his application. [Defs.' Bates Brown v. KU 000044]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**58.   On the same day Brown amended his application, defendant Agrawal authored email communications with general counsel regarding Brown's amendment. [Defs.' Bates Brown v. KU 000443]**

Defendants' reply:   Uncontroverted that the redacted e-mail shows that Dean Agrawal sent an e-mail to General Counsel with the subject:  "Confidential – request for legal advice; but that is irrelevant and immaterial.

**59.   On September 11, 2009, Brown provided the additional information requested. [S.F. ¶ 27]**

Defendant's reply:  Uncontroverted.

83

60.   Brown's September 11 letter to Rohleder-Sook, Brown explained in part "Robyn Barr Is the mother of my son, Kyler. She has a long history of false allegations of varying sorts In the Johnson County Kansas Court system, and a very questionable reputation for truth and veracity. Her allegations of domestic violence were untrue, and she so testified in open court. On the day of my trial, my counsel (Kevin Morlarty) left to attend to a matter in another courtroom and never returned, leaving in his stead the firm's most Junior associate, who was then only three months a lawyer and had just been handed the case file. I was found guilty in both cases in a bench trial despite the lack of direct evidence and the recantation of Ms. Barr on the witness stand."   [Defs.' Bates Brown, Robert v. KU, et al 000047-000048]

Defendant's reply:  Uncontroverted, but irrelevant and immaterial.

61.   Brown's September 11, 2009 letter and the Cert Petition previously submitted with his amendment made clear that his primary basis for mitigation with respect to the domestic battery charges was his innocence.   [Defs.' Bates Brown, Robert v. KU, et al 000047-000049; Brown Dep. Ex. 4 – Cert Petition]

Defendant's reply:  Uncontroverted, but irrelevant and immaterial.

62.  On September 30, 2009, defendant Agrawal directed defendant Rohleder-Sook to "get the procedural history of the cases, and touch base with Jim P's office about how to proceed." [Defs.' Bates Brown v. KU 000435]

Defendant's reply:  Uncontroverted, but irrelevant and immaterial.

**63.   On October 2, 2009, Rohleder-Sook emailed Brown with questions regarding two of the four counts of domestic battery which had been documented in the information provided to her with his Amended application and an arrest for which the charges had subsequently been dismissed, also involving Robyn Barr, on 04/23/2004. [S.F. ¶ 28]**

Defendant's reply:  Uncontroverted, but irrelevant and immaterial.

**64.   On October 2, 2009, Brown responded via email to Rohleder-Sook advising her that the two counts of domestic battery she had questions about had been included in the documentation he had originally provided with his amendment. [S.F. ¶ 29; Brown, Robert v. KU, et al 000162]**

Defendant's reply:  Uncontroverted, but irrelevant and immaterial.

**65.   Rohleder-Sook subsequently testified that contrary to her prior assertion, the documentation provided to her by Mr. Brown had disclosed all four incidents of domestic battery rather than just two as she had previously thought. [Def. Rohleder-Sook Dep. 77:19-78-11]**

Defendants' response:  Controverted as the testimony speaks for itself and is not as Mr. Brown has paraphrased it.  Further, it is irrelevant and immaterial to Mr. Brown's having lied on his application.

**66.   On October 2, 2009, Brown responded via email to Rohleder-Sook advising her that with respect to the criminal trespass charge, the Johnson County Prosecutor had subsequently determined that it's complaining witness, Robyn Barr,**

**was lying and had dropped the charges of its own initiative. [S.F. ¶ 29; Brown, Robert v. KU, et al 000162; Pl.'s Decl. ¶¶ 52-57 ]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**67.   Rohleder-Sook subsequently obtained documentation from the Johnson County prosecutor confirming that Criminal Trespass charge had been dismissed on 10/27/2004, by motion of the State, at a hearing Brown did not attend. [Defs.' Bates Brown, Robert v. KU, et al 000080-000081]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**68.   On October 7, 2009, Brown voluntarily provided a signed release for all information in the possession of the Johnson County Prosecutor to the School of Law. [Defs.' Bates Brown, Robert v. KU, et al 000094]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**69.   On November 18, 2009, Defendant Rohleder-Sook spoke to the assistant DA at the Johnson County DA's office who made her aware that "the victim did recant her story at trial", and communicated with Mazza and Agrawal about the results of her conversation via email, inquiring as to whether they wanted to order a copy of the transcript. [Defs.' Bates Brown v. KU 000448]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's

86

having lied on his application.

**70.   On November 30, 2009, Rohleder-Sook again inquired of Mazza and Agrawal regarding proceeding with obtaining the transcript. [Defs.' Bates Brown v. KU 000448]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**71.   On November 30, 2009, Defendant Agrawal made the decision as to whether and how to proceed by e-mailing Defendants Mazza and Rohleder-Sook "[w]e need to get this in front of the admissions committee, and I suspect a transcript will be requested. If I'm right, then we might as well go ahead, get the transcript, and complete the file." [Defs.' Bates Brown v. KU 000447]**

Defendants' reply:   Controverted as to Mr. Brown's characterizing Dean Agrawal's e-mail as having made a decision.  The quoted portions is uncontroverted. However, this fact is irrelevant and immaterial to Mr. Brown's having lied on his application.

**72.   On November 30, 2009, Defendants Agrawal and Rohleder-Sook made the decision to defer reconvening the admissions committee until after the break. [Defs.' Bates Brown v. KU 000446]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**73. Agrawal reasoned that action should be postponed until after Winter break "just because it's so hard to get a group together with faculty candidates coming through, exams being written, given, and graded, and time out of the building." [Defs.' Bates Brown v. KU 000446]**

<u>Defendants' reply</u>:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**74. Subsequent to November 30, 2009, Rohleder-Sook obtained the transcript of Brown's domestic battery trial. [Ex. C – Trial Transcript, Defs.' Bates Brown, Robert v. KU, et al 000193-000318]**

<u>Defendants' reply</u>:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**75. The transcript contained the following testimony from Barr regarding the reason she had made false allegations against Brown:**

> **A.  Bob wasn't really Bob to me. I mean, I don't see Bob as Bob. So when I fight with him, I'm not fighting with him; and I'll do anything to hurt him, get him in trouble, put him in jail.**
> **Q.  When you say he's not Bob, who is he?**
> **A.  He's my stepfather. What I was going to say before the recess is that I was molested and raped when I was --**
> **MR. HOWE: Judge, I object as nonresponsive to the question asked.**
> **THE COURT: The question was, why she gave false information to the police.**
> **MR. HARE: Uh-huh.**
> **THE COURT: I'll allow it.**
> **Q.  (By Mr. Hare) Go ahead, ma'am. Answer it.**
> **A.  Ever since I started getting into adult relationships with men, I found out -- well, I'm starting to find out now why -- but I've always had physical arguments, and I lose my temper. And if they try to leave me, I will grab them, I will hit them, I will lie, because I'm taking it all out**

on them. I mean, I don't know how to explain it. My therapist couldn't explain it better. But they become my abuser. And I called the police, because they're supposed to be protecting me. But it's not -- they weren't there when I was five, and I keep waiting for them to protect me.

   [Defs.'  Bates Brown, Robert v. KU, et al 000237-000238]

   Defendants' reply:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

   76.   Brown was not given notice that his status as a Student would be placed in jeopardy, but instead was allowed to continue in classes and was automatically re-enrolled by Defendants for the next semester. [Pl.'s Compl. ¶ 69, ¶ 73; Pl.'s Decl. ¶¶16-17]

   Defendants' reply:   Controverted as Brown himself in this document has acknowledged that he knew the School was looking at his application omissions, had requested additional information, and was aware of the statements contained on the application and the LSAC certification regarding falsification and failure to provide accurate and complete information.  Uncontroverted that Brown was allowed to continue in classes pending the Law School's review of his lying on his application, but it is irrelevant and immaterial.

   77.   After voluntary provision of the signed release on October 7, 2009 for all information in the possession of the Johnson County Prosecutor to the School of Law, Brown heard nothing from the School of Law regarding his application until he was contacted regarding the matter by Dean Rohleder-Sook and Dean Mazza in

February of 2010. [Pl.s' Decl. ¶ 16; Pl.'s Compl. ¶ 69, ¶ 73]

<u>Defendants' reply</u>:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**78.   Between October 7, 2009 and February of 2010, Brown continued in and satisfactorily completed all the requirements for his courses for the Fall 2009 semester, was allowed to sit for finals, and received grades in all his courses. [Pl.s' Decl. ¶ 17; Pl.'s Compl. ¶¶ 70,71; S.F. ¶¶ 31-32]**

<u>Defendants' reply</u>:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**79. Between October 7, 2009 and February of 2010, Brown was automatically enrolled in the next semester and his tuition automatically collected against a student loan by Dean Wendy Rohleder-Sook's office without the requirement of so much as a mouse click on Brown's part.  [Pl.s' Decl. ¶ 17; Pl.'s Compl. ¶ 73, 74]**

<u>Defendants' reply</u>:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**80.   Between October 7, 2009 and February of 2010, Brown was allowed to begin his fall semester classes in January of 2010. [Plt.'s Compl. ¶75]**

<u>Defendants' reply</u>:  Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**81.   Between October 7, 2009 and February of 2010, Brown continued to devote his full productive effort to the pursuit of his legal education at the School of Law.  [Plt.'s Compl. ¶76]**

Defendants' reply:  Controverted.  The factual assertion cites to the complaint and fails to provide appropriate authority to support the fact as required under Rule 56.

**82.   Between October 7, 2009 and February of 2010, Brown was given no indication that his status as a student was in jeopardy, or that his removal was being sought. [Pl.s' Decl. 17; Pl.'s Compl. ¶¶ 68-69, 78]**

Defendants' reply:   Controverted as Brown himself in this document has acknowledged that he knew the School was looking at his application omissions, had requested additional information, and was aware of the statements contained on the application and the LSAC certification regarding falsification and failure to provide accurate and complete information.  Uncontroverted that Brown was allowed to continue in classes pending the Law School's review of his lying on his application, but it is irrelevant and immaterial.

**83.   On January 19, 2010, the 2008-2010 Law School Admissions Committee convened to consider the status of Brown's application [S.F. ¶ 33, Defs.' Mem. ¶ 40]**

Defendants' reply:  Uncontroverted.

**84.   Rohlder-Sook was aware of Barr's powerful recantation [Defs.' Bates Brown, Robert v. KU, et al 000448; Defs.' Bates Brown, Robert v. KU, et al 000237-000238], but did not present it to the Admissions Committee, instead including only**

the finding of guilt [Def. Rohleder-Sook Dep. 78:16-79:7]

Defendants' reply:  Controverted.  Ms. Rohleder-Sook's deposition testimony speaks for itself.  Mr. Brown does not dispute that he was convicted and that conviction remains.  Accordingly, whether Ms. Barr, who had been in a domestic violence circumstance with Mr. Brown, recanted is irrelevant and immaterial.

**85.  Rohleder-Sook later testified she was aware that Barr's testimony indicated either that Barr had falsified the police reports or perjured herself on the witness stand. [Def. Rohleder-Sook Dep. 79:7-84:4]**

Defendants' reply:  Controverted.  Ms. Rohleder-Sook's deposition testimony speaks for itself.  Mr. Brown does not dispute that he was convicted and that conviction remains.  Accordingly, whether Ms. Barr, who had been in a domestic violence circumstance with Mr. Brown, recanted is irrelevant and immaterial.

**86.  Rohleder-Sook did not present Brown's Petition for Writ of Certiorari in the Supreme Court of the United States to the admissions committee  [Brown Dep. Ex. 4, Cert Petition], although it had been the most substantial part of the documentation presented to Rohleder-Sook in concert with Brown's amendment. [Brown Dep. Ex. 5; Def. Rohlder-Sook Dep. 78:2-7]**

Defendants' reply:  Controverted.  The cited testimony does not support this factual statement.

**87.  In Rohleder-Sook's four and a half years at the school of law, she estimated that she had received between 40 and 80 amended applications.  Of those,**

only Brown's had resulted in a complaint and only Brown's had resulted in dismissal. [Def. Rohleder-Sook Dep. 16:20-17:11]

    <u>Defendants' reply</u>:   Uncontroverted, but irrelevant and immaterial.

**88.   After Rohleder-Sook's presentation to the admissions committee, committee member Sandra Craig-McKenzie was unaware of whether there had been other amended applications in the five year period in proximity to Brown's amended application. [McKenzie Dep. 58:4-17]**

    <u>Defendant's reply</u>:   Controverted.  Ms. Craig McKenzie's testimony speaks for itself and is not accurately paraphrased here.  Instead, she testified in the cited testimony that she recalled one other individual who had amended their application.  However, it is irrelevant and immaterial.

**89.   Multiple members of the admissions committee that reconvened on January 19, 2010 believed Brown deserved due process before disciplinary action was taken.  [Def. Rohleder-Sook Dep. 23:21-24:8]**

    <u>Defendants' reply</u>:   Controverted as irrelevant and immaterial.   Also, this paraphrase does not accurately capture Ms. Rohleder-Sook's testimony, in which she responds to the question why she pursued a complaint, and states because she "believed" some members of the admissions committee "believed the Law School should afford some additional due process."

**90.   No unanimous decision was reached at the January 19, 2010 admissions committee, and no vote was taken with everybody present. [McKenzie Dep. 17:10-**

17]

Defendants' reply:  Controverted, the cited deposition testimony says nothing of the sort of what this paragraph purports to state.  Rather, it is a discussion of Mr. Brown's tuition and whether it was refunded.

**91.  The admissions committee did not ever agree on or make any recommendation as to what action should be taken regarding Brown's continued enrollment. [McKenzie Dep. 18:18-20]**

Defendants' reply:  Controverted, the cited deposition testimony says nothing of the sort of what this paragraph purports to state.

**92.  Defendant Rohleder-Sook later reported, after further communication with the committee members, that they would have rejected Brown's application if they had known of the criminal charges. [S.F. ¶ 33, Defs.' Mem. ¶ 40, McKenzie Dep. 17:10-18:20]**

Defendants' reply:  Defendants acknowledge stipulated fact 33, which is contained in paragraph 40 of Defendants' uncontroverted facts.  Defendants are uncertain why it is repeated here and also note that the cited McKenzie testimony does not say this.

**93.  Following the Admissions Committee's decision, Defendants Rohleder-Sook, Mazza, and Agrawal collectively decided that Brown would be afforded due process through the Law School Dispute Resolution Procedure, and that to initiate that process, a complaint regarding Brown's failure to disclose his criminal history in his application should be filed pursuant to that procedure. [Exhibit B, Rohleder-**

**Sook Decl. ¶ 3; Defs. Mem. Exhibit D, Mazza Decl. ¶ 5.; Def. Rohleder-Sook Dep. 19:10-17; Def. Rohleder-Sook Dep. 20:5-9]**

Defendants' reply:  Controverted that Dean Agrawal was involved in this, as the cited testimony of Rohleder-Sook does not say this.  Instead, her testimony references having discussed it with Mazza, and says she "perhaps" did so with Agrawal.  Her declaration, however, makes clear she did not do so.

**94.  Sandra Craig-McKenzie ("McKenzie"), the School of Law's Dispute Resolution Procedure Ombuds and a member of Brown's admissions committee, testified that she was unaware of any procedure which could allow the due process rights under the DRP to be withdrawn once afforded to a party, and further testified that "if the intent was to withdraw rights, that it would be in writing that they could be withdrawn." [McKenzie Dep. 54:17-55:1]**

Defendants' reply:  Uncontroverted as to the quoted statement.  However, it is taken out of context without the question provided.  Controverted that this general response to a hypothetical question is relevant or material.

**95.  McKenzie testified that she was unaware of any basis in procedure, equity, or common law which would permit the withdrawal of the Due Process rights under the DRP once they have attached.  [McKenzie Dep. 55:8-23]**

Defendants' reply:  Controverted as the referenced testimony does not state this fact.  In addition it is controverted that this is relevant or material.

**96.  McKenzie testified that Students who are the subject of a grievance**

under the DRP are entitled to the rights that given to students under the University Senate Code and the University Senate Rules and Regulations. [McKenzie Dep. 39:14-20]

Defendants' reply:  Controverted as irrelevant and immaterial.  In addition it is controverted that the testimony actually is as paraphrased here.

97.   McKenzie testified that she was competent to interpret the University's various codes.  [McKenzie Dep. 40:16-41:5]

Defendants' reply:  Controverted as irrelevant and immaterial.

98.   McKenzie testified that the due process protections for the parties in a dispute pursuant to the DRP become effective upon the filing of the complaint. [McKenzie Dep. 41:7-42:2]

Defendants' reply:  Controverted as irrelevant and immaterial.

99.   McKenzie testified that the rights afforded to parties under the DRP include the right to a full and fair opportunity to present their version of events, to present and cross examine witnesses, to be represented by counsel at their own expense, and to have a decision by an impartial hearing body based on the record of the proceedings. [McKenzie Dep. 43:2-44:7]

Defendants' reply:  Controverted as irrelevant and immaterial.

100.  McKenzie testified that under the DRP, parties have the right to the right to examine evidence and cross examine witnesses at a hearing.  McKenzie testified that at such hearing, the complainant would have the burden to establish

that a violation had occurred using the "clear and convincing evidence" standard. [McKenzie Dep. 47:5-48:17]

Defendants' reply:  Controverted as irrelevant and immaterial.

**101.  McKenzie testified that the DRP creates an avenue of appeal pursuant to U.S.R.R. 6.4 in the event a party is dissatisfied with the outcome.  [McKenzie Dep. 47:5-48:17]**

**102.** Defendants' reply:  Controverted as irrelevant and immaterial.

**103.  McKenzie testified that parties to complaints under the DRP had the right to examine prior decisions (properly redacted) on request. [McKenzie Dep. 47:5-48:17]**

Defendants' reply:  Controverted as irrelevant and immaterial.

**104.  Between January 19, 2010 and February 17, 2010, Defendants Rohleder-Sook and Mazza collaborated to jointly prepare a complaint against Brown under the Law School Dispute Resolution Procedure. [Def. Rohleder-Sook Dep. 35:14-36:5]**

Defendants' reply:  Controverted as irrelevant and immaterial.

**105.  Although it was the joint work product of both defendants Rohleder-Sook and Mazza, the complaint was signed only by Rohleder-Sook, who then "filed" it with co-author Mazza on February 17, 2010. [Brown, Robert v. KU, et al 000129-000163; S.F. ¶ 34; Defs.' Mem. Exhibit B, Rohleder-Sook Decl. ¶ 4; Defs.' Mem. Exhibit D, Mazza Decl. ¶ 6]**

Defendants' reply:  Controverted as the cited references do not support the purported factual statement.  In addition, controverted as irrelevant and immaterial.

**106. On February 23rd, 2010, nearly six months after Brown self-reported the omission of 13 year old misdemeanors from his law school application, defendant Mazza provided Brown with a copy of the School of Law's complaint under the DRP. [Joyce McCray Pearson Deposition Exhibit 27, ¶8; Pl.'s Compl. ¶ 79]**

Defendants' reply:  Controverted, the referenced support for this statement is not an affidavit or other evidence recognized under Rule 56.  Rather, each of these items is the unsworn statement of Mr. Brown, and therefore may not be considered under Rule 56.  In addition, controverted as irrelevant and immaterial.

**107. At the February 23rd meeting, Brown was provided with a copy of the University of Kansas School of Law Dispute Resolution Procedure (D.R.P.), which stated that he had due process rights which would be protected throughout the dispute (D.R.P. 2(a)), the right to a hearing before and impartial hearing body (D.R.P. 2(d)), the right to information and assistance from an impartial law school ombudsman (D.R.P. 3(a)), and the right to notice via a formal complaint that stated a violation of the University Code, University Senate Code, University Senate Rules and Regulations, the Honor code, or other applicable rule, regulation, or provision of law (D.R.P. 2(b) and 6(b)(4)). [Joyce McCray Pearson Deposition Exhibit 27, ¶9; Pl.'s Compl. ¶ 80]**

Defendants' reply:  Controverted, the referenced support for this statement is not an affidavit or other evidence recognized under Rule 56.  Rather, each of these items is the unsworn statement of Mr. Brown, and therefore may not be considered under Rule 56.  In addition, controverted as irrelevant and immaterial.

**108. At the February 23rd meeting, defendant Mazza stated to Brown that his permanent removal from School of Law, "the ultimate sanction" was being sought. [Joyce McCray Pearson Deposition Exhibit 27, ¶8; Pl.'s Compl. ¶ 80; Pl.s Dec. ¶ 19]**

Defendants' reply:  Controverted, the referenced support for this statement is not an affidavit or other evidence recognized under Rule 56.  Rather, the items other than the declaration are the unsworn statement of Mr. Brown, and therefore may not be considered under Rule 56.  Mr. Brown's declaration is contrary to his earlier deposition testimony and self-serving statement intended to manufacture the appearance of a disputed fact.  In addition, controverted as irrelevant and immaterial.

**109. At the February 23rd meeting, defendant Mazza explained that since the law school ombudsman had already ruled against Brown at a meeting organized by Rohleder-Sook to reconsider his application, there was no impartial law school ombudsman available for Brown. [Brown, Robert v. KU, et al 000319 ; Pl.'s Compl. ¶ 81; Pl.s Dec. ¶ 20]**

Defendants' reply:  Controverted, the referenced support for this statement is not an affidavit or other evidence recognized under Rule 56.  Rather, the items other than the

declaration are the unsworn statement of Mr. Brown, and therefore may not be considered under Rule 56.  Mr. Brown's declaration is contrary to his earlier deposition testimony and self-serving statement intended to manufacture the appearance of a disputed fact.  In addition, controverted as irrelevant and immaterial.

**110.  At the February 23rd meeting, defendant Mazza stated he would act in the stead of the law school ombudsman in an effort to see that Brown's due process rights were protected, and that he would hold in confidence everything said at the meeting. [McKenzie Dep, Ex. 36; Pl.'s Compl. ¶ 82; Pl.s Dec. ¶ 20]**

Defendants' reply:  Controverted, the referenced support for this statement is not an affidavit or other evidence recognized under Rule 56.  Rather, the items other than the declaration are the unsworn statement of Mr. Brown, and therefore may not be considered under Rule 56.  Mr. Brown's declaration is contrary to his earlier deposition testimony and self-serving statement intended to manufacture the appearance of a disputed fact.  In addition, controverted as irrelevant and immaterial.

**111.  At the February 23rd, 2010 meeting, Brown explained to Mazza that he had understood he would have the opportunity to amend if his assumptions regarding remoteness had been incorrect, and that he had never intended to mislead the School of Law. [Pl.s Decl. ¶ 21]**

Defendants' reply:  Controverted.  *See* Brown's testimony cited in Defendants' Uncontroverted facts ¶'s 36-37.

**112.  At the February 23rd, 2010 meeting between Brown and Mazza, Mazza**

mentioned to Brown on multiple occasions that the Complaint was an "Article 22"matter. [Pl.s Decl. ¶ 23]

Defendants' reply:  Controverted.  Irrelevant and immaterial.

**113. At the February 23rd, 2010 meeting with Dean Mazza, Brown did not make the statement "I knew I would not have been admitted if I had disclosed my criminal history", or any similar statement to that effect. [Pl.s Decl. ¶ 22]**

Defendants' reply:  Controverted, *See* Defendants Uncontroverted fact ¶ 37 and Brown's cited deposition testimony.  Further controverted as irrelevant and immaterial.

**114. At the February 23rd, 2010 meeting with defendant Mazza, Brown requested informal dispute resolution. [Pl.'s Compl. ¶ 85]**

Defendants' reply:  Controverted.  Plaintiff cites only to his complaint for authority for this statement which is unacceptable under Rule 56.

**115. The February 23rd, 2010 meeting between Brown and Mazza was the only meeting at which Brown and Mazza ever spoke face to face regarding the complaint. [Pl.s Decl. ¶ 18]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**116. On February 28th, 2010, Brown responded to the School of Law's complaint pursuant to the D.R.P. with his written notice that he intended to file a response to the complaint, which was delivered by email and subsequently hand delivered to defendant Mazza.  [Mazza Dep. Ex. 8, S.F. ¶ 35]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**117. Brown received no communication regarding letter of February 28ᵗʰ, 2010, which contained his procedural objections, for a month and a half following providing it to the School of Law. [Pl.'s Compl. ¶ 97]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**118. Brown's letter of February 28th, 2010, asserted that "[t]he Complaint fails to meet the requirements of 6.3.1.1 in that it does not specify the provision(s) of the Faculty Code of Conduct, University Senate Code, The University Senate Rules and Regulations, the Code of Student Rights and Responsibilities, or other applicable rule, regulation, or law allegedly violated and should be dismissed pursuant to U.S.R.R. 6.5.3.1(d)" [Mazza Dep. Ex. 8, P.1, S.F. ¶ 35]**

Defendants' reply:  Uncontroverted that the letter contained the quoted language, but does not create a genuine dispute of material fact.

**119. Brown's letter of February 28th, 2010, asserted that "[t]he Complaint fails to make allegations which, if proven, would constitute Academic Misconduct as defined within U.S.R.R. 6.2.6.1. and should be dismissed pursuant to 6.5.3.l(d)." [Mazza Dep. Ex. 8, P.1, S.F. ¶ 35]**

Defendants' reply:  Uncontroverted that the letter contained the quoted language, but does not create a genuine dispute of material fact.

**120. Brown's letter of February 28th, 2010, asserted that "[t]he action requested by the Complainant is foreclosed by Kansas common law [] and therefore the jurisdiction of the Judicial Board is superseded by U.S.R.R. 6.6.1.6. The**

**complaint should be dismissed pursuant to 6.5.3.1(c)." [Mazza Dep. Ex. 8, P.1, S.F. ¶ 35]**

Defendants' reply:  Uncontroverted that the letter contained the quoted language, but does not create a genuine dispute of material fact.

**121. Brown's letter of February 28th, 2010 pointed out that in months that elapsed between the University's last contact with him and the filing of the complaint, he had continued in and satisfactorily completed all requirements of all his Fall 2009 semester courses, sat for finals in December of 2009, received grades for Fall 2009 semester courses, been enrolled for the Spring 2010 semester pursuant to action taken directly by the Kansas University School of Law Admissions Office of their own initiative and without his personal request or intervention, had his tuition collected by the Kansas University School of Law Admissions Office (which was managed by defendant Rohleder-Sook) pursuant to University action of their own initiative and without his personal request or intervention, and begun classes in January of the following year, all the while receiving no indication that his amended application had not been accepted. [Mazza Dep. Ex. 8, §5.A., S.F. ¶ 35]**

Defendants' reply:  Uncontroverted, but does not create a genuine dispute of material fact.

**122. Brown's letter of February 28th, 2010 placed the University on notice that he had incurred tens of thousands of dollars in expenses in reliance on the actions the University had taken subsequent to his amended application.  [Mazza**

Dep. Ex. 8, §5.B., S.F. ¶ 35]

Defendants' reply:   Uncontroverted, but does not create a genuine dispute of material fact.

**123.  Brown's letter of February 28th, 2010, asserted that the Complaint was superseded by Kansas contract law regarding waiver and rescission, and supported this assertion with Kansas case law, as follows:**

1. **One who seeks to rescind a contract on the grounds of fraud must do so with reasonable promptness after discovery of the fraud.**
2. **If, after discovery or knowledge of facts which would entitle a party to a contract to rescind the contract, he treats the contract as binding and leads the other party to believe that the contract is still in effect, he will have waived his right to rescind.**
3. **In order to constitute such a waiver, it is not necessary that there be an express ratification of the contract after discovery of the fraud which might make the equitable remedy of rescission available. Acts or conduct inconsistent with an intention to rescind it, or in recognition of the contract, may have the effect of affirming it.**

**Morse v. Kogle, 162 Kan. 558, Syl. at 1-3 (1947)**

**[Mazza Dep. Ex. 8, §5.A., S.F. ¶ 35]**

Defendants' reply:   Uncontroverted, but does not create a genuine dispute of material fact as it is irrelevant and immaterial.

**124. When asked why its right to dismiss Brown had not become forfeit under Morse v. Kogle, the University responded "Morse v. Kogle, 162 Kan. 558 (1947) involved a dispute arising out of a contract to purchase real estate. That case, therefore, is inapposite to the facts and circumstances presented by Mr. Brown's failure to provide complete and accurate information regarding his criminal history**

in his application for admission to the School of Law." [Def. KU's Resp. to Brown's 3rd Interrogs., Int. 4]

Defendants' reply:   Uncontroverted that was the University's response to an interrogatory, but it does not create a genuine dispute of material fact as it is irrelevant and immaterial.

125. Brown's letter of February 28th, 2010, asserted that the Complaint was superseded by Kansas contract law regarding equitable and promissory estoppel, and supported this assertion with Kansas case law as follows:

> Whether the principle is described as equitable estoppel, quasi estoppel, waiver, ratification, election, or as a requirement of consistency in conduct, is not very important. The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced .... The rule is well recognized that where a party with full knowledge, or with sufficient notice or means of knowledge, of his rights and of all the material facts remains inactive for a considerable time or abstains from impeaching a contract or transaction, or freely does what amounts to a recognition thereof as existing, or acts in a manner inconsistent with its repudiation and so as to affect or interfere with the relation and situation of the parties, so that the other party is induced to suppose that it is recognized, this amounts to acquiescence and the transaction, although originally impeachable, becomes unimpeachable.

Schiffelbein v. Sisters of Charity of Leavenworth, 190 Kan. 278, 281-2 (1962)

[Mazza Dep. Ex. 8, §5.B., S.F. ¶ 35]

Defendants' reply:   Uncontroverted, but does not create a genuine dispute of material fact as it is irrelevant and immaterial.

126. When asked why its right to dismiss Brown had not become forfeit

under **Schiffelbein v. Sisters of Charity of Leavenworth, the University responded "Schiffelbein v. Sisters of Charity of Leavenworth, 190 Kan. 278 (1962), is a case that reverses dismissal of a complaint for failure to state a cause of action. The language quoted in Mr. Brown's February 28, 2012 letter is not the holding in Schiffelbein. That case, therefore, is inapposite to the facts and circumstances presented by Mr. Brown's failure to provide complete and accurate information regarding his criminal history in his application for admission to the School of Law." [Def. KU's Resp. to Brown's 3rd Interrogs., Int. 4]**

Defendants' reply:   Uncontroverted that was the University's response to an interrogatory, but it does not create a genuine dispute of material fact as it is irrelevant and immaterial.

**127. At deposition, defendant Rohleder-Sook could not provide any reason why the school of law's complaint was not superseded by Brown's arguments in Section 5 of his procedural objections. [Def. Rohleder-Sook Dep. 58:8-19]**

Defendants' reply:  Uncontroverted, but controverted that it is relevant or material.

**128.  In responding to Brown's case law, the University did not assert that it is not governed by Kansas Contract law. [Def. KU's Resp. to Brown's 3rd Interrogs., Int. 4]**

Defendants' reply:  Uncontroverted that the University made no such statement in its interrogatory response, but controverted that it is relevant or material.

**129. Defendant Mazza testified that administration of student admissions**

applications are governed by Kansas contract law. [Mazza Dep. 168:16-169:19]

Defendants' reply: Controverted, the cited testimony has not been accurately paraphrased. The actual testimony was: "It could be considered a question of a - - a contracts question." Controverted that it is relevant or material.

**130. On March 2, 2010, defendant Mazza informed Brown via email that in his case, there was little possibility of a "settlement of some sort". [Defs.' Bates Brown, Robert v. KU, et al 000328]**

Defendants' reply: Uncontroverted that the e-mail contained that quoted language. However, controverted as irrelevant and immaterial.

**131. On March 3, 2010, via email, brown inquired of defendant Mazza "When we initially spoke, you mentioned that this was an 'article 22' issue. I'm not finding article 22 anywhere in the U.S.R.R. Can you help point me to it?" [Pl.'s Compl. ¶ 88; Defs.' Bates Brown, Robert v. KU, et al 000323]**

Defendants' reply: Uncontroverted that Mr. Brown's e-mail contained that quoted language. However, controverted as irrelevant and immaterial.

**132. On March 3, 2010, in response to Brown's questions regarding Article 22, Defendant Mazza responded email, stating "I should have said 'Question' 22. That's the question on the application asking the applicant to disclose past activity." [Pl.'s Compl. ¶ 88; Defs.' Bates Brown, Robert v. KU, et al 000323]**

Defendants' reply: Uncontroverted that Mazza's e-mail contained that quoted language. However, controverted as irrelevant and immaterial.

**133. On March 3rd, 2010, Brown made a formal request for mediation to Dean Mazza pursuant to U.S.R.R. 6.2.3.1. [Defs.' Bates Brown, Robert v. KU, et al 000328; Mazza Dep. Ex 1, Section 14; Pl.'s Compl. ¶ 87]**

<u>Defendants' reply</u>:  Uncontroverted that such a request was made. However, controverted that the fact is relevant or material.

**134. On March 4th, 2010, Brown requested redacted copies of all prior decisions made pursuant to the Law School Dispute Resolution Procedure which were based on the same or similar allegations of fact as those charged in the February 17, 2010 complaint pursuant to Section 14 of the School of Law Dispute Resolution Procedure. [Defs.' Bates Brown, Robert v. KU, et al 00339; Mazza Dep. Ex 1, Section 14; Pl.'s Compl. ¶ 94]**

<u>Defendants' reply</u>:  Uncontroverted that such a request was made. However, controverted that the fact is relevant or material.

**135. Although U.S.R.R. section 5.2.2 (a) provided that there was a time limit of thirty calendar days between the filing of a complaint and a hearing on the complaint, the March 19, 2010 deadline for Brown's hearing passed with neither hearing nor request for an extension of time by the School of Law. [Def. Rohleder-Sook Dep. 61:11-63:10; Mazza Dep. Ex. 7 §5.2.2 (a)]**

<u>Defendants' reply</u>:  Controverted.  The cited testimony of Rohleder-Sook does not establish this fact.  Controverted that the USRR is applicable and controverted that this is either relevant or material.

**136. As of March 24, 2010, the responses to Brown's procedural objections had not yet been prepared and no hearing panel had yet been selected, although selection of the hearing panel is required upon receipt of the written complaint which occurred on February 17, 2010. [Brown, Robert v. KU, et al 000402; Mazza Dep. Ex. 1 Section 5; S.F. ¶ 34]**

Defendants' reply:  Controverted.  Stipulated fact 34 speaks for itself and is not what this paragraph states.  In addition, contrary to the requirements of Rule 56, the other two items identified in support of this contention are unsworn hearsay and may not be considered.  Finally, the alleged fact is controverted as irrelevant and immaterial.

**137. On April 14th, 2010, via email, defendant Mazza stated to Brown "We've heard back from the KU General Counsel's office and Dean Wendy will be filing very shortly a brief response denying all your procedural objections to her initial complaint. The next step is to schedule the hearing. I've gone through the process of identifying the members of the 3-judge panel. According to the disciplinary rules, a hearing involving a student cannot be held during the final examination period. As a result, unless you agree to waive this restriction, we'll need to hold the hearing sometime next week. If you'll let me know your availability next week and the availability of your representative, should you choose to have one, I would appreciate it. Alternatively, if you agree, we can hold the hearing after the exam period concludes. I must warn you, however, that just because the hearing is deferred until after the exam period does not mean that this additional delay will be**

taken into account when determining your guilt or innocence. Please let me know your thoughts about whether we should schedule the hearing next week or wait until finals conclude." [Defs.' Bates Brown v. KU 000800]

Defendants' reply:  Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**138.  On April 14th, 2010, via email, defendant Mazza stated to Brown "I understand that this process has been protracted.  We have not run across this situation before and, in an effort to preserve your due process rights to the greatest extent possible, we've had to consider matters very carefully and that has caused delay in processing the complaint." [Pl.'s Compl. ¶ 99; Defs.' Defs.' Bates Brown v. KU 000800]**

Defendants' reply:  Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**139.  On April 15th, 2010, via email, Brown responded to defendant Mazza "I presume the hearing will be regarding the procedural objections, correct? Also, what about my request for mediation?" [Defs.' Bates Brown v. KU 000800]**

Defendants' reply:  Uncontroverted the quoted statements of Brown's e-mail are accurate.  Controverted that is relevant or material as it does not create a genuine dispute of material fact.

110

**140. On April 15th, 2010, via email, defendant Mazza replied to Brown "We'll handle the procedural objections and the underlying substantive issue as part of the same hearing." [Defs.' Bates Brown v. KU 000800]**

Defendants' reply:    Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**141. On April 15th, 2010, Brown reiterated his request for mediation. Dean Mazza responded via email "We have decided to forego any mediation. That process is not required by the disciplinary procedures and we cannot think of any settlement other than voiding your admissions application." [Pl.'s Compl. ¶ 100; Defs.' Bates Brown v. KU 000800]**

Defendants' reply:    Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**142. On April 15th, 2010, via email, Brown responded to defendant Mazza "I intend to represent myself regarding the procedural objections. I intend to have paid representation regarding the substantive issues if the case is not dismissed on procedural grounds. It will cost me about $4,000 to prepare with my attorney in Kansas City and then have him travel here. I don't want to do that unless its [sic] necessary. I'm ready for the procedural hearing anytime you'd like, but I'd like to have that hearing before we proceed on the substantive questions. It may keep me**

from spending countless hours and thousands of dollars in hearing preparation." [Defs.' Bates Brown v. KU 000799]

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**143. On April 16th, 2010, via email, defendant Mazza replied to Brown "Based on advice from the KU General Counsel's office I am denying your request to hold separate hearings on the procedural and substantive matters. The Counsel's office agrees that the issues are sufficiently intertwined so that a separate hearing is unnecessary and would be unproductive. Please let me know whether you would prefer to the hold the hearing next week or wait until the final exam period. Once you and your representative talk about dates, I'll notify the General Counsel's office. It's my understanding that one of their representatives will participate in the hearing on behalf of Wendy Rohleder-Sook." [Defs.' Bates Brown v. KU 000799]**

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**144.  On April 16th, 2010, via email, Brown responded to defendant Mazza "I have not yet begun preparation of my response, as I have been waiting to hear from you regarding both the procedural objections and the request for prior decisions. As I have previously notified you in writing, I do intend to file a response if this action**

moves forward." [Defs.' Bates Brown v. KU 000798]

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**145. On April 16th, 2010, via email, Brown responded to defendant Mazza "Where are we on my March 4 request [regarding prior decisions on amended applications]?" [Defs.' Bates Brown v. KU 000798]**

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**146. On April 16th, 2010, via email, Brown responded to defendant Mazza "Please forward a copy of Dean Wendy's Response to the procedural objections as mentioned in your earlier email." [Defs.' Bates Brown v. KU 000798]**

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**147. On April 16th, 2010, via email, Brown responded to defendant Mazza "Absent your agreement, I will request a separate hearing on the procedural matters from the board directly as soon as you notify me of the identity of the chair." [Defs.' Bates Brown v. KU 000798]**

Defendants' reply:   Uncontroverted the quoted statements are accurate.

Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**148.  On April 16th, 2010, via email, Brown responded to defendant Mazza "I still have yet to be informed of what specific University Code, University Senate Rules and Regulations, [or] Honor Code provision I have violated. It will be impossible to prepare a response without that information. Notice of the specific violation is also a basic element of due process." [Defs.' Bates Brown v. KU 000799]**

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**149. On April 16th, 2010, via email, defendant Mazza replied to Brown "I have reviewed the Honor Code file in the Dean's Office and there are no prior decisions based on the same or similar allegations of fact." [Defs.' Bates Brown v. KU 000798]**

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**150. On April 16th, 2010, via email, defendant Mazza replied to Brown "I will forward you Dean Wendy's response as soon as I receive it. I expect to have it no later than Monday afternoon." [Defs.' Bates Brown v. KU 000798]**

Defendants' reply:   Uncontroverted the quoted statements are accurate.

Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**151. On April 16th, 2010, via email, defendant Mazza replied to Brown "It is my understanding that the provision upon which the charges are based will be included in Dean Wendy's response." [Defs.' Bates Brown v. KU 000798]**

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**152. On April 16th, 2010, via email, defendant Mazza replied to Brown "Given that you intend to file another response, can I assume that you will not have the response prepared in time for a hearing next week? The Dispute Resolution Procedures provide that a hearing involving a student may not be scheduled during the final examination period. As a result, if you would prefer to hold the hearing at a later time, I propose that we do it during the week of May l0th, after the conclusion of the examination period. As I mentioned to you before, it is the position of the Law School that your status as a student in good standing is unaffected by the fact that you will be allowed to sit for the spring exams." [Defs.' Bates Brown v. KU 000798]**

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**153. On April 16th, 2010, via email, Brown replied to defendant Mazza**

**"With regard to the hearing, I would be happy to agree to a hearing regarding the procedural issues anytime starting immediately. [I]f we cannot agree to hold this portion of the hearing separately, then I will request a separate preliminary determination personally from the chair of the board. I will not agree to any hearing on the merits until the 'Preliminary Matters' described in Section 6 of the Law School Dispute Resolution Procedures have been decided, or until the board denies my request for a hearing or consideration of a written motion on those matters. It is unfair to require me to expend thousands of dollars toward my defense before we have conclusively established that the dispute will proceed in this forum. The Procedures make clear not only that these matters should be decided before a hearing on the merits is scheduled, but also that the scheduling and control of hearings and communication with the parties is the province of the board and its chair." [Defs.' Bates Brown v. KU 000797]**

Defendants' reply:    Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**154.  On April 16th, 2010, via email, Brown requested information regarding all the amendments to question 27 of applications the admissions department had received during the semester he enrolled, characterizing them as prior decisions to take no action. [Defs.' Bates Brown v. KU 000797]**

Defendants' reply:    Uncontroverted the quoted statements are accurate.

Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**155. Rohleder-Sook testified that School of Law received between 10 and 20 amended applications per year. [Def. Rohleder-Sook Dep. 16:20-17:11]**

Defendants' reply:  Uncontroverted.  Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**156. Rohleder-Sook testified that although she was aware Brown had requested the prior decisions on amended applications pursuant to the DRP, they were never provided. [Def. Rohleder-Sook Dep. 42:20-43:12]**

Defendants' reply:  Uncontroverted; however it is controverted that it is relevant or material as it does not create a genuine dispute of material fact.

**157. On April 16th, 2010, via email, defendant Mazza replied to Brown stating "the Law School's position is that you are not entitled to a separate hearing and we will oppose your request." [Defs.' Bates Brown v. KU 000797]**

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**158. On April 18th, 2010, via email to defendant Rohleder-Sook, defendant Mazza stated "Here is a draft of your response to Brown's procedural objections. Could you take a look at it, make any changes you like, then print out and get an initialed copy to me tomorrow morning? The hearing panel will meet at 11:00 to**

elect a chair and consider preliminary issues surrounding this case. I'd like to have it prepared before then." [Defs.' Bates Brown v. KU 000375]

Defendants' reply:   Uncontroverted the quoted statements are accurate. Controverted that is relevant or material as it does not create a genuine dispute of material fact.

**159. On April 18th, 2010, via email regarding Brown's case to defendant Rohleder-Sook, defendant Mazza stated "What a nightmare." [Defs.' Bates Brown v. KU 000375]**

Defendants' reply:   Uncontroverted the quoted statement is accurate. Controverted that it is relevant or material as it does not create a genuine dispute of material fact.

**160. Rohleder-Sook testified that she and Mazza a "pretty informal relationship" with respect to their discussions surrounding the complaint against Brown. [Def. Rohleder-Sook Dep. 75:8-12]**

Defendants' reply:   Uncontroverted the quoted statement is accurate. Controverted that it is relevant or material as it does not create a genuine dispute of material fact.

**161. In an April 18, 2010 email to Sandra Craig McKenzie, Brown stated he had originally thought that Dean Mazza was acting in the role of ombudsman, but no longer believed this to be true. [McKenzie Dep. Ex. 36]**

Defendants' reply:  Controverted that it is relevant or material as it does not create

a genuine dispute of material fact.

**162.  McKenzie stated she could be impartial, and agreed to meet with Brown on April 19, 2010 after their class. [McKenzie Dep. Ex. 36]**

Defendants' reply:   Controverted.   No such exhibit is attached to Brown's Response; therefore this factual assertion is not properly supported under Rule 56 and should be disregarded.

**163.  McKenzie testified that she felt the School of Law had waited too long to proceed with its complaint against Brown. [McKenzie Dep. 56:21-24]**

Defendants' reply:  Controverted.  The cited testimony does not state this.  Rather, it states: "You indicated that there was a complaint file or process.  I believe I probably indicated that I thought it was somewhat late in the semester to be proceeding with that."

**164.  McKenzie, a member of the admissions committee who had re-examined Brown's application after amendment, went before Mazza and Rohleder-Sook without request from Brown to recommend that Brown's expulsion not be pursued. [McKenzie Dep. 61:18-23]**

Defendants' reply:   Controverted, inaccurate, irrelevant and immaterial.   Her testimony was:  "[I] just said that it might be a good idea not to pursue your expulsion. . . . I wasn't - - wasn't asking them for a decision.  I was simply offering in my ombuds capacity, I was just simply offering my thoughts."   [Brown Ex. AI, McKenzie Dep: 61:22-62:4]

**165.  After her requests for mediation on Brown's behalf, McKenzie reported**

**back to Brown that there was no hope for mediation in his case. [McKenzie Dep. 66:12-20; McCray-Pearson Dep. Ex 27, ¶ 31]**

Defendants' reply:  Uncontroverted McKenzie so testified, but it is controverted that the fact is relevant or material or that it creates a genuine dispute of material fact.

**166. On April 19th, 2010 defendant Rohleder-Sook placed a response to Brown's procedural objections dated April 16th, 2010 in his School of Law mailbox. [Mazza Dep. Ex. 16; Defs.' Bates Brown v. KU 000375]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**167. At deposition, Mazza produced Deposition Exhibit 39, which was identical in every way to Rohleder-Sook's procedural response to Brown's procedural objections except for her initials and the letterhead, and testified "I'm not sure whether I was the sole author[.]" [Mazza Dep Ex. 16; Mazza Dep Ex. 39; Mazza Dep. 180:9-16]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**168. Mazza and Rohleder-Sook's answers to Brown's procedural objections argued that the general language of the University of Kansas School of Law Dispute Resolution Procedure which describes the general scope of the procedure could be used as an independent basis for inclusion of complaints which are arguably within that scope, or alternatively, the University of Kansas School of Law Dispute**

**Resolution Procedure represents an "other applicable rule, regulation"'" within the meaning of U.S.R.R. 6.3.1.1, or alternatively, the conduct complained of represents Academic Misconduct within the meaning of U.S.R.R. section 2.6.1." [Mazza Dep Ex. 16, ¶ 3]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**169.  Mazza and Rohleder-Sook's answers to Brown's procedural objections did not address the assertions and case law within those objections that the Complaint was superseded by Kansas contract law regarding waiver, rescission, and estoppel; instead they simply stated  the conclusory opinion that the complaint was not superseded by proper application of any state or federal law pursuant to U.S.R.R. 6.1.6. [Mazza Dep. Ex. 16, ¶ 5]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**170.  When asked at deposition to comment on the application of the case law cited by Brown in his letter of February 28, 2010, defendant Mazza testified that for purposes of administering the Disciplinary procedure, he would not have been the one who would have reviewed Brown's letter, and that he would not have given an opinion on whether or not Brown's legal assertions were correct or incorrect. [Mazza Dep. 97:4-99:20].**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant

or material or creates a genuine dispute of material fact.

**171. The responses to Brown's letter, of which Mazza testified he may have been the sole author, stated "The provision in section 6.1.6. does not limit the jurisdiction of the panel to hear the complaint. No provision of federal or state law, including those cited by Mr. Brown in Section 5 of his objections supersedes the complaint." [Mazza Dep Ex. 16; Mazza Dep Ex. 39; Mazza Dep. 180:9-16]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**172. The School of Law's response to Brown's procedural objections bore only defendant Rohleder-Sook's name and initials as indicia of authorship. [Mazza Dep. Ex. 16]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**173. Rohleder-Sook initially testified that she was the sole author of the School of Law's response to Brown's procedural objections. [Def. Rohleder-Sook Dep. 48:2-7]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**174. Rohleder-Sook admitted in later testimony that defendant Mazza was the primary author of the School of Law's response to Brown's procedural objections. [Rohleder-Sook Dep. 53:8-17]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**175.  On April 19th, 2010, defendant Mazza provided Brown with the name of the panel chair and explained that all subsequent communications regarding this matter should be between Brown and the panel chair. [Defs.' Bates Brown v. KU 000464]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**176. After Brown's April 20, 2010 contact with Ombuds McKenzie, he studied and sat for his finals for the Spring Semester of 2010, and heard no more regarding the complaint until he received defendant Agrawal's May 26th, 2010 letter of pending dismissal 37 days later. [McCray-Pearson Dep. Ex. 27, ¶¶32-34 ]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**177. Between his last contact with Mazza on April 20, 2010 and Agrawal's May 26th, 2010 letter, Brown was allowed to enroll and pay tuition for the Summer and Fall 2010 terms by the University of Kansas School of Law, and began attending summer classes at the School of Law. [Pl.'s Compl. ¶ 98; S.F. ¶ 38]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**178. The School of Law permitted Brown to enroll in the Fall 2009, Spring**

**2010, Summer 2010, and Fall 2010 sessions before his removal from the School of Law [S.F. ¶ 64]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**179. Between the time the Hearing Panel in Brown's case was convened by defendant Mazza on April 19, 2010 and the time the Hearing Panel issued it's MEMORANDUM dated May 3, 2010, the Hearing Panel met on three to four different occasions. [Miller Dep. 5:21-6:2]**

Defendants' reply:  Uncontroverted, but it is controverted that this fact is relevant or material or creates a genuine dispute of material fact.

**180. Panel Member Robin Miller testified that the Hearing Panel, after reviewing Brown's statement that he had mistakenly believed the prior incidents too remote to be relevant, "applied [their] reasoning to the facts of Brown's case to determine that it was a misrepresentation rather than a misunderstanding[.]" [Miller Dep. 30:14-31:13]**

Defendants' reply:  Uncontroverted.

**181. Brown was never asked to appear before the Hearing Panel and was never given the opportunity to present any evidence, witnesses, or testimony. [Miller Dep. 31:18-32:1]**

Defendants' reply:  Uncontroverted that Brown himself never personally appeared before the committee.  Controverted that Brown was never given an opportunity to

present any evidence, witnesses or testimony as the documentation, including his multiple responses were submitted to and considered by the committee.

**182. The hearing panel never discussed student rights within the law school, and nobody worked with the hearing panel to explain or provide understanding of the various University Policies and Procedures that might come into play. [Miller Dep. 34:10-20]**

Defendants' reply:  Controverted that the testimony establishes that fact.  Also controverted that this is relevant or material because it does not establish a genuine dispute of material fact.

**183.  Panel Member Robin Miller testified that due process considerations did not apply to what the panel was doing in Brown's case, that due process was not a consideration in what the hearing panel was doing, and that due process was not discussed by the hearing panel. [Miller Dep. 35:24-36:5]**

Defendants' reply:  Controverted.  Ms. Miller's testimony does not so state.  Further controverted as irrelevant and immaterial.

**184. Panel Member Robin Miller testified that concerns of contract law were never discussed by the hearing panel in making its joint decision. [Miller Dep. 36:7-10]**

Defendants' reply:  Controverted as irrelevant and immaterial.

**185. Panel Member Robin Miller testified that she did not recall discussion of the University Senate Code, the University Senate Rules and Regulations or the**

Student Code of Rights and responsibilities during the Hearing Panel's deliberations in Brown's case. [Miller Dep. 36:11-21]

Defendants' reply:  Controverted as irrelevant and immaterial.

186. Panel Member Robin Miller testified that she did not recall the University Senate Code, the University Senate Rules and Regulations or the Student Code of Rights and responsibilities being made available as resources during the deliberations in Brown's case. [Miller Dep. 36:11-21]

Defendants' reply:  Controverted as irrelevant and immaterial.

187. On May 3rd, 2010 the Hearing Panel issued a MEMORANDUM decision dismissing the complaint of Academic Misconduct, stating "The complaint fails to allege a violation of section 2.6.1 or, to use the words of U.S.R.R. section 6.5.3.l(d), any other 'University rule'. Therefore, we hereby dismiss Dean Wendy Rohleder-Sook's complaint of feb. 17, 2010." [S.F. ¶¶36,37; Mazza Dep. Ex. 9, P.3]

Defendants' reply:  Uncontroverted.

188.  In its May 3rd MEMORANDUM decision, the hearing panel went on to state "While we are not aware of any University rule prohibiting misrepresentation on an application for admission, we do not believe that is the end of this matter. [] Mr. Brown's Aug. 27, 2009, Letter to Dean Wendy Rohleder-Sook's clearly concedes that he did in fact make misrepresentations on his application. Therefore, we recognize that the Law School has the right to dismiss Mr. Brown even though this Hearing Panel does not have the authority to hear this case."  [S.F. ¶¶36,37; Mazza

**Dep. Ex. 9, P.3]**

Defendants' reply:  Uncontroverted.

**189. Panel Member Robin Miller testified that she was unaware of any provision of the School of Law Dispute Resolution Procedures which empowered the Hearing Panel to give opinions beyond the bounds of the DRP complaint. [Miller Dep. 9:14-10:8]**

Defendants' reply:  Controverted as irrelevant and immaterial.

**190.  On May 24, 2010, Gail Agrawal critiqued the proposed draft of Brown's dismissal letter which had been provided to her by the School of Law's General Counsel, stating: "I have a couple of questions that I raise on the attached draft. I think I put each of them in all caps. My instinct is to keep this letter as brief and concise as possible, keeping in mind that [Brown] is very likely to sue. I deleted the two lead in paragraphs as a result; no use giving him cause to engage in a discussion about whether a law school is or is not a gatekeeper for the profession or even whether the Bar might consider his conduct as establishing lack of character and fitness to practice law. The key points for the law school's action seem to be the facts that he failed to disclose material information; that the law school application gives the law school the right to act on the basis of information later learned that should have been disclosed; and that he exacerbated his non-disclosure with his later incomplete disclosures. The relevant 'process' is the reconvening of the admissions committee, providing the members with the later disclosures and posing the**

question whether he would have been admitted, as well as the later hearing panel's acknowledgement that he could be dismissed for non-disclosure." [Defs.' Bates Brown v. KU 000591]

Defendants' reply: Uncontroverted.

**191. In a letter dated May 26, 2010, Dean Agrawal notified Brown that she planned to dismiss him from the school of law. [Mazza Dep. Ex. 18]**

Defendants' reply: Uncontroverted.

**192. Defendant Agrawal's May 26, 2010 letter stated "When Associate Dean Stephen Mazza discussed with you your failure to disclose in your application to the School of Law the criminal matters that subsequently came to light, you admitted that you knew that you would not have been admitted to the School of Law had you disclosed your criminal record." [Mazza Dep. Ex. 18; Defs.' Bates BROWN v KU 000136]**

Defendants' reply: Uncontroverted.

**193. Defendant Agrawal's May 26, 2010 letter stated "You admitted to Associate Dean Mazza that you knew that you would not have been admitted to the School of Law had you disclosed your criminal record when you made your application. Such an admission acknowledges a knowing and purposeful attempt by you to conceal and misrepresent the true nature of your qualifications for admission to the School of Law." [Mazza Dep. Ex. 18; Defs.' Bates BROWN v KU 000136-000137]**

Defendants' reply:  Uncontroverted.

**194.  Mazza, who was copied on Agrawal's letter proposing dismissal, testified regarding the only face to face meeting he ever had with Brown "I don't recall specifically what we discussed at the first meeting and I don't remember when the first meeting was and I don't remember when in the cycle, you know, when in the timeline we first met." [Mazza Dep. 55:24-56:3; Pl.s' Decl. ¶ 16]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**195. Mazza, who was copied on Agrawal's letter proposing dismissal, testified that he did not remember Brown's exact words, and had paraphrased to the best of his recollection Brown's statement regarding having knowledge of his dismissal. [Mazza Dep. 24:21-24]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**196. The statement attributed to Brown and communicated to Agrawal by Mazza regarding Brown's alleged knowledge that he would not have been admitted had he disclosed his criminal record was false and extremely prejudicial. [Brown Dep. 158:14-17; Compl. ¶ 238; Pl.s' Decl. ¶ 20]**

Defendants' reply:  Defendants object to plaintiff attempt to introduce his complaint in support of this statement and his self-serving declaration. Brown's deposition testimony was consistent with this same sentiment he expressed to Mazza. *See* Defendants' Exhibit E, Brown Depo. 77:8-21 cited in ¶ 37 of Defendants' uncontroverted material facts.

**197. The statement attributed to Brown and communicated to Agrawal by Mazza regarding Brown's alleged knowledge that he would not have been admitted had he disclosed his criminal record was based upon allegations of Brown's personal knowledge of facts Brown could not possibly have known. [Brown Dep. 158:14-17]**

Defendants' reply:  Objection this is argument rather than a statement of fact. Moreover, Brown's deposition testimony was consistent with this same sentiment he expressed to Mazza.  *See* Defendants' Exhibit E, Brown Depo. 77:8-21 cited in ¶ 37 of Defendants' uncontroverted material facts.

**198.  Defendant Agrawal's May 26, 2010 letter stated "I further find that your August 27, 2009 letter seeking to amend your application was also materially inaccurate and incomplete by failing to disclose the three additional criminal charges cited in Associate Dean Rohleder-Sook's communication with you."  [Mazza Dep. Ex. 18; Defs.' Bates BROWN v KU 000137]**

Defendants' reply:  Uncontroverted.

**199.  Rohleder-Sook, who was copied on Agrawal's letter proposing dismissal, testified that the documentation provided to her by Mr. Brown disclosed all four incidents of domestic battery, rather than only two as claimed by Agrawal. [Mazza Dep. Ex. 18; Def. Rohleder-Sook Dep. 77:19-78-11]**

Defendants' reply:  Controverted as this mischaracterizes Ms. ROhleder-Sook's testimony.  Further, it is controverted as irrelevant and immaterial.

**200.  Rohleder-Sook, who was copied on Agrawal's letter proposing dismissal, had obtained documentation from the Johnson County prosecutor confirming that Criminal Trespass charge had been dismissed on 10/27/2004, by motion of the State, at a hearing Brown did not attend. [Mazza Dep. Ex. 18; Defs.' Bates Brown, Robert v. KU, et al 000080-000081; Pl.s' Decl. ¶ 55]**

Defendants' reply:   Objection as this duplicates Brown's additional fact ¶ 67. Defendant incorporates the reply it made to that paragraph:     Uncontroverted, but irrelevant and immaterial to Mr. Brown's having lied on his application.

**201.  Every fact which was stated in Agrawal's letter as a basis of dismissal was already known to the School of Law by September 3, 2009 -  before Brown continued in and satisfactorily completed all requirements of all his Fall 2009 semester courses, before he sat for finals in December of 2009, before he received grades for Fall 2009 semester courses, before he was enrolled for the Spring 2010 semester pursuant to action taken directly by the Kansas University School of Law Admissions Office, before the School of Law Admissions Office collected his tuition for the Spring 2010 semester, and before he began classes in January without warning that a complaint was pending and that his status as a student might be in jeopardy. [Mazza Dep. Ex. 8, §5.A., S.F. ¶ 35; Brown, Robert v. KU, et al 000043-000046]**

Defendants' reply:  Objection, D. Kan. Rule 56.1(a) requires that facts be set out with particularity in individually numbered paragraphs.  This alleged factual contention

contains multiple factual statements and therefore violates that rule.  Controverted, the uncontroverted facts show that the University did not have all of the facts concerning Mr. Brown's criminal record until at the earliest October 2, 2009.  *See*  defendants' uncontroverted fact 32 above.

**202. Defendant Agrawal's May 26, 2010 letter stated "You may provide me with a written response to this letter by 2:00 p.m. on Thursday, June 3, 2010 if you believe your dismissal is inappropriate or if there are mitigating circumstances you believe I should consider before the effective date of the dismissal. If you fail to provide me with a written response by 2:00 p.m. on June 3, 2010, or if your written response fails to convince me that your dismissal is unwarranted, then your dismissal from the School of Law will be effective June 8, 2010. The School of Law's transcript will show that your dismissal was based on your falsification, misrepresentation, and failure to supply required information on your application to the School of Law." [Mazza Dep. Ex. 18; Defs.' Bates BROWN v KU 000137]**

Defendants' reply:  Uncontroverted.

**203. On May 27, 2010, Brown responded to Agrawal's letter proposing dismissal, stating**

> **"I believe my dismissal in this manner is inappropriate because it violates the Code of Student Rights and Responsibilities as promulgated by the University Senate. Article 2(E) states: 'Students will be exempt from disciplinary action that affects their status as students except for academic failure or violation of a published Student Senate, University Senate, University or Regents rule or regulation. Rules and regulations shall be fully and clearly disclosed in advance of the supposed violations.' Article 2(F) states: 'No disciplinary sanctions resulting from a violation of rules and regulations, under Article**

**2(E), may be imposed upon any student without prior written notice of the nature and cause of the charges, and an opportunity to be heard at a fair hearing. A fair hearing shall include confrontation of witnesses against him or her and the assistance of a person of his or her own assistance or with the prior approval of the Office of the Vice Provost for Student Success, up to three persons of the student's choosing.' Pursuant to the student bill of rights, I respectfully request written notice of the nature and cause of the charges, including what published Student Senate, University Senate, University or Regents rule or regulation you believe has been violated. By this writing, I also indicate that I wish to preserve my right to a fair hearing before an impartial hearing body which includes the assistance and participation of my legal counsel and the right to confront witnesses against me, and all other rights I may have under any and all Student Senate, University Senate, University or Regents rules. These are due process rights to which I am entitled as a matter of law. The summary dismissal you contemplate would unlawfully bypass them. I would also like to request a personal meeting with you to discuss this matter. I will attempt to reach you tomorrow, or I would welcome your call anytime. My number is 816-721-4512."**

**[Mazza Dep. Ex. 23]**

Defendants' reply:  Uncontroverted.

**204.  On May 28th, 2010, Agrawal declined Brown's request for a face to face meeting via email, stating "I see no need to meet with you, and therefore decline your request for a meeting." [S.F. ¶ 41; Defs.' Bates Brown v. KU - Revised Redactions 000644]**

Defendants' reply:  Uncontroverted, but also is irrelevant and immaterial and does not create a genuine dispute of material fact.

**205.  On May 28, 2010, Agrawal relegated the duty of responding to Brown to general counsel, stating via email "I would appreciate [counsel's] writing a response to [Brown's] letter for me.  Nothing he has said goes to the merits or persuades me that we should not proceed, unless you find merit in his process arguments.  I leave**

that assessment to the practicing, licensed lawyers. (Smile)" [Defs.' Bates Brown v. KU - - Revised Redactions 000647]

Defendants' reply:  Uncontroverted that the e-mail stated what is quoted. Controverted that it is relevant or material or that it creates a genuine dispute of material fact.

206.  On May 31st, 2010, Brown filed a Request For an Initial Hearing before the Judicial Board Pursuant to 6.4.3.1(b) of the University Senate Rules and Regulations and Election to Invoke the Jurisdiction of the University Judicial Board Pursuant to University of Kansas Law School Dispute Resolution Procedure Section (A)(4)(c) with the University Judicial Board. [McCray-Pearson Dep. Ex. 27; S.F. ¶ 42; Pl.'s Compl. ¶ 127]

Defendants' reply:  Uncontroverted.

207.  On May 31st, Brown filed a Request For Jurisdictional Ruling Pursuant to 6.5.2.1 of the University Senate Rules and Regulations with the University Judicial Board. [McCray-Pearson Dep. Ex. 28; S.F. ¶ 43; Pl.'s Compl. ¶ 128]

Defendants' reply:  Uncontroverted.

208. On May 31, 2010, after becoming aware of Brown's requests to the Judicial Board, Dean Agrawal expressed disbelief via email that Joyce McCray Pearson, "who is our library director", was actually the chair of the Judicial Board. [Defs.' Bates Brown v. KU - - Revised Redactions 000630]

Defendants' reply:  Uncontroverted that the e-mail stated what is quoted.

Controverted that it is relevant or material or that it creates a genuine dispute of material fact.

**209. In a May 31, 2010 email where Defendant Mazza was copied, Agrawal instructed General Counsel to "craft[] a response" to Brown's requests to McCray-Pearson on behalf of the Judicial Board.  In response, general counsel informed Agrawal, again with copy to Mazza, that they would "formulate a strategy to deal with this issue." [Defs.' Bates Brown v. KU - - Revised Redactions 000630]**

Defendants' reply:   Uncontroverted   the   quoted   portions   are   accurate. Controverted that it is relevant or material and controverted that it creates a genuine dispute of material fact.  Moreover, Brown fails to acknowledge that the Judicial Board rules provide that a respondent will be asked for a response when they are notified that  a complaint has been filed, which is what was being referenced in this e-mail exchange. *See* Defendants' Exhibit 11, Deposition Ex. 29, "Judicial Board Hearings on Appeal" at ¶ 6.7.2.2 Response.

**210. In her sworn Response to Brown's Second Set of Interrogatories regarding McCray-Pearson's June 3, 2010 response to Brown, Agrawal stated "I had no knowledge of or involvement with Joyce McCray Pearson's [] writing of the letter[] to Mr. Brown[.]" [Def. Agrawal's Resp. to Brown's 2nd Interrogs., Int. 1]**

Defendants' reply:  Uncontroverted.

**211. Brown notified the university Judicial Board in his Request for an Initial Hearing before the Judicial Board on May 31, 2010 that there was conflict**

among the various governance documents regarding his case, stating "There is evidence to suggest that the law school has known from the outset that these proceedings were not properly within the jurisdiction of the Law School at the unit level, but that it chose to pursue them as 'Academic Misconduct' in order to avoid relinquishing jurisdiction to the appropriate University hearing body.( 9, 13, 14)" [McCray-Pearson Dep. Ex. 27, ¶¶ 9, 13, 14, 46]

Defendants' reply:   Uncontroverted the quoted portions are accurate. Controverted that it is relevant or material and controverted that it creates a genuine dispute of material fact.

212. Paragraphs 9, 13, 14, and 46 of Brown's May 31, 2010 Request for an Initial Hearing before the Judicial Board dealt with Mazza's initial mention that this was a matter regarding Article 22 of the Student Code of Rights and Responsibilities, and Mazza's later statement that when he said "Article 22" he meant to say "question 27". [McCray-Pearson Dep. Ex. 27, ¶¶ 9, 13, 14, 46]

Defendants' reply:   Uncontroverted Brown's request said these things, but controverted that it is relevant or material and controverted that it creates a genuine dispute of material fact.

213. Procedures contained within the University Senate Code regarding interpretation and resolution of conflict among various University codes adopted 10/6/94 required that McCray-Pearson take following steps:

1. Contact the Office of University Governance, 864-5169, or via e-mail at govern@ku.edu, with questions about conflict or interpretation.

2. **If the Governance Office cannot resolve the question, consult the chair of the Senate Executive Committee.**
3. **If the Senate Executive Committee cannot satisfactorily resolve the conflict, assemble a committee of the following:**
   **1) Chair of the Judicial Board.**
   **2) Chair of the Academic Policies & Procedures Committee.**
   **3) Chair of the Faculty Rights, Privileges & Responsibilities Committee.**
   **4) Chair of the Organization & Administration Committee.**
   **5) Chair of the Student Rights Committee of Student Senate.**

**[University Senate Code as Currently Published, P.1, Preface]**

Defendants' reply:  Objection, this is a repeat of Brown's ¶ 31 above.  In addition, it is controverted that there in fact existed a conflict between the policies.  Brown has assumed that fact, but has failed to produce any evidence other than his own speculation and supposition which is insufficient under Rule 56.  Further controverted that this relevant or material.

**214. McCray-Pearson did not follow the procedure spelled out in the University Senate Code regarding interpretation and resolution of conflict among various University codes.  [Mazza Dep. Ex. 4]**

Defendants' reply:  Controverted.  The cited exhibit does not support this conclusion, which is Brown's own spin, speculation and conjecture.  Moreover, it is irrelevant and immaterial as a failure to follow a university policy does not establish a due process violation.  *Trotter v. Regents of Univ. of New Mexico*, 219 F.3d 1179, 1185 (10th Cir. 2000); *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 92 at n. 8, 98 S.Ct. 948, 55 L. Ed.2d 124 (1978)

**215. In a May 25, 2010 mail with the subject "RE:Confidential - - Robert Brown - - Caution", Agrawal notified the team she would only be present at the KU**

School of law one day at most during the entire month of June. [Brown v. KU - - Revised Redactions 000576]

Defendants' reply:   Controverted as the cited exhibit does not say that. Controverted as irrelevant and immaterial.

216. On June 1, 2010, Mazza began his tenure as acting interim Dean of the University of Kansas School of Law.  [Brown v. KU - - Revised Redactions 000576]

Defendants' reply:   Controverted as the cited exhibit does not say that. Controverted as irrelevant and immaterial.

217. In his sworn Declaration, Mazza stated "During the period 2007 through mid-June 2010, I was the Associate Dean for Academic Affairs." [Defs.' Mem. Ex. D, Mazza Decl. ¶ 1]

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

218. In her Sworn Declaration, Agrawal was vague regarding the exact date when she ceased to function as Dean of the Kansas University School of Law, stating "I assumed my duties as Dean the University of Iowa College of Law on July 1, 2010, and I know that I took some vacation leave between leaving the University of Kansas and that July 1, 2010 start date." [Defs.' Mem. Ex. A, Agrawal Decl. ¶ 7]

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

219. On June 3, 2010, defendant McCray-Pearson responded in writing to both Brown's Request for Initial Hearing and his Request for a Jurisdictional Ruling before the Judicial Board. [Mazza Dep. Ex. 4; S.F. 44]

Defendants' reply:  Uncontroverted.

**220.  McCray-Pearson's June 3, 2010 response began "I have reviewed your requests for a jurisdictional ruling and an initial hearing, both dated May 31, 2010. I have also reviewed University Regulations to determine whether they authorize the Judicial Board to exercise jurisdiction in your case. I regret to inform you that I have found no basis for jurisdiction by the Judicial Board." [Mazza Dep. Ex. 4]**

Defendants' reply:  Uncontroverted.

**221.  Regarding her knowledge of application of University Regulations to her decisions, McCray-Pearson testified as follows:**

> **Q   And what guidelines do you use for making your decisions?**
> **A   University governance documents.**
> **Q   Can you please list those?**
> **A   I just know them by tons of acronyms.**
> **Q   Okay.**
> **A   Well, let's see.  University Senate Rules and Regs, I think it's USRR -- this is going to be totally inaccurate because I just read them.**
> **Q   Okay.**
> **A   All sources of grievance faculty -- you know, I don't know anything other than just USRR and -- oh, gosh, what are the other ones?  I'd have to be looking at them.  And there's -- I have files of them in my office.**
>
> **[McCray-Pearson Dep. 17:16-18:5]**
>
> **[ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ]**
>
> **Q   So what does USRR stand for?**
> **A   I could take a guess of University Senate Rights and Responsibilities -- Student Rights and Responsibilities.**
>
> **[McCray-Pearson Dep. 18:16-19]**

Defendants' reply:   Uncontroverted that was her testimony from the cited two

page, but controverted that is relevant or material.

**222. In her June 3, 2010 letter denying Brown's Judicial Board Requests, defendant McCray-Pearson stated as follows:**

> **The Faculty Senate Rules and Regulations (FSRR) 2.1.1 gives the authority for policies on admission to the faculties of the various schools and the College (see excerpt below).**
>
> **The Faculty Senate Rules and Regulations**
> **Section 1. Policies and Procedures**
>
> **2.1.1 Policies for admission and readmission are established by the faculties of the various schools or the College, within the parameters of state laws and Regents regulations and within guidelines set by the Faculty Senate. A statement of such requirements shall be published or filed with the Director of Admissions and the Secretary of Faculty Senate. For undergraduate admission. implementation of these policies by the Director of Admissions includes the initial evaluation of credentials presented by applicants covering academic work done elsewhere.**
>
> **[Mazza Dep. Ex. 4]**

Defendants' reply:  Uncontroverted.

**223. At deposition, defendant McCray-Pearson was unable to articulate even basic support for the position taken in her letter denying access to the University Judicial Board under F.S.R.R. 2.1.1., testifying as follows:**

> **Q    Okay.  So then what rights does the first sentence of FSRR 2.1.1 give to the faculties of the various schools other than the right to establish policies for admission and readmission?**
> **A    That's it.  That's what it says.**
> **Q    Okay.**
> **A    Gives the faculties --**
> **Q    The rights to establish policies for the admission and readmission?**
> **A    Uh-huh.**
> **Q    That's all it gives them; correct?**
> **MS. TROWER:  Objection.  Form.**

Q    Correct?

MS. TROWER:  Objection.  Form.

A    I don't know.

BY MR. BROWN:

Q    Can you see from that sentence that it gives them anything else?

A    It's a pretty open sentence, but probably not.

Q    All right.   And then the next sentence says, "A statement of such requirements shall be published or filed with the Director of Admissions and the Secretary of Faculty Senate." So once they establish the policies for admission and readmission, they have to write them down somewhere, don't they?

MS. TROWER:  Objection.  Form.

A    Probably correct.  Correct.

BY MR. BROWN:

Q    Okay.  And so what you're telling me is that without reviewing those policies, you assumed that wherever they are, they must preclude jurisdiction in this case? --

MS. TROWER:  Objection.  Form.

Q    -- correct?

MS. TROWER:  Objection.  Form.

A    I'm going by what 2.1.1, that first sentence, says.

BY MR. BROWN:

Q    You just testified that it only gives them the power to establish policies for admission and readmission.

A    That's all we're talking about here.

Q    Okay.  What policy for admission or readmission removes jurisdiction in student matters?

A    2.1.1.

Q     So the right to establish policies for admission and readmission essentially gives the faculty unfettered license to do as they please then --

MS. TROWER:  Objection.

Q    -- correct?

MS. TROWER:  Objection.  Form.

A    I disagree.

BY MR. BROWN:

Q    Okay.  I'm having trouble, then, understanding how the existence of the power to establish policies can affect jurisdiction in totally unrelated student procedures that have written guarantees.  Can you please explain that?

A    No.

Q    Why can you not explain it?

A    It's outside my purview.

141

**Q   It's outside your purview of knowledge?**
**A   Perhaps.**

**[McCray-Pearson Dep. 78:21-81:9]**

<u>Defendants' reply</u>:  Controverted because the cited deposition testimony does not appear in Brown's Index of Exhibits or the documents provided with his response. Controverted as to Mr. Brown's editorial characterization of the cited testimony as "unable to articulate even basic support" as improper argument and not fact as required under Rule 56.  The cited testimony speaks for itself, and Mr. Brown's criticism of it reflects more his own dislike of her answers than any substantive deficiency in the answers.

**224. McCray-Pearson testified that the University General Counsel is a resource she uses in frequently in her decision-making as the Judicial Board Chair. [McCray-Pearson Dep. 17:4-7]**

<u>Defendants' reply</u>:  Controverted, because the cited deposition testimony does not appear in Brown's Index of Exhibits or the documents provided with his response.  In addition, controverted as irrelevant and immaterial.

**225.  On Friday, June 4, 2010, Brown called and spoke with Jane Tuttle at the Office of the Vice Provost for Student Success (now the office of the Vice Provost for Student Affairs) explaining that her office had proper jurisdiction in the matter and requesting the hearing to which Brown was entitled under the Student Code of Rights and Responsibilities. [Pl.s' Decl. ¶ 24]**

<u>Defendants' reply</u>:  Controverted as irrelevant and immaterial that Brown called

142

someone and indicated he thought they had jurisdiction.

**226. Brown was informed that since the Chair of the Judicial Board had already ruled on his case, there was nothing the Office of the Vice Provost for Student Success could do. [Pl.s' Decl. ¶ 25]**

Defendants' reply:  Controverted as inadmissible hearsay.

**227. On June 7, 2010, defendant Agrawal wrote Brown a letter dismissing him effective June 8, 2010. [Mazza Dep. Ex. 10]**

Defendants' reply:  Uncontroverted.

**228.  Agrawal's June 7, 2010 letter was originally drafted by General Counsel Sara Trower.  [Def. Agrawal's Resp. to Brown's 3rd Interrogs., Int. 1]**

Defendants' reply:  Controverted as this statement does not accurately paraphrase Dean Agrawal's answer.  Further controverted as irrelevant and immaterial whether Dean Agrawal had the assistance of counsel in drafting her letter.

**229. Agrawal's June 7, 2010 letter based Brown's dismissal without due process on the same University Regulation (F.S.R.R. 2.1.1) which McCray-Pearson had used to deny Brown Judicial Review at the University Judicial Board level. [Mazza Dep. Ex. 10]**

Defendants' reply:   Objection, the statement "letter based Brown's dismissal without due process on the same University Regulation" is an argumentative conclusion rather than a factual assertion.  Accordingly, under Rule 56, it is improper and should be disregarded.  Controverted because Dean Agrawal's June 7, 2010, letter is itself the best

evidence of its contents and this argumentative paraphrase is neither accurate nor complete.

**230. Brown, through his attorney, John P. Gerstle, appealed to the Chancellor's office, who replied through Danny J. Anderson on June 25, 2010. [Defs.' Bates Brown, Robert v. KU, et al 000409-000410]**

<u>Defendants' reply</u>: Uncontroverted that the two page letter from Danny Anderson, dated June 25, 2010, was in response to Brown's attorney John P. Gerstle. Controverted that the remainder of this statement is accurate as there is no evidence to support it. In addition, controverted because it is irrelevant and immaterial.

**231. Anderson's June 25, 2010 letter was written by General Counsel Sara Trower. [Def. KU's Resp. to Brown's 3rd Interrogs., Int. 1; S.F. ¶ 60]**

<u>Defendants' reply</u>: Controverted as this statement does not accurately paraphrase KU's interrogatory answer. Further controverted as irrelevant and immaterial whether Danny Anderson had the assistance of counsel in drafting his June 25, 2010, letter responding to Brown's attorney John P. Gerstle.

**232. Anderson's June 25, 2010 letter based Brown's dismissal without due process on the same University Regulation (F.S.R.R. 2.1.1) which McCray-Pearson and Agrawal had used in their responses to Brown. [Defs.' Bates Brown, Robert v. KU, et al 000409-000410]**

<u>Defendants' reply</u>: Controverted because Dean Agrawal's June 7, 2010, letter is itself the best evidence of its contents and this argumentative paraphrase is neither

accurate nor complete.  Further controverted because it is irrelevant and immaterial.

**233.  The University admits that the Office of the University Governance and the University Director of the Office of Admissions have no record of any admissions policies pursuant to F.S.R.R. 2.1.1 ever being filed as required by F.S.R.R. 2.1.1. [Def. KU's Resp. to Brown's 2nd RFA, Req. 2]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**234. The University admits that there is no provision in the FSRR which provides that the FSRR may override, nullify, cancel the effect of, or otherwise make meaningless provisions of other University Codes, Rules and/or Regulations. [Def. KU's Resp. to Brown's 2nd RFA, Req. 12]**

Defendants' reply:  Uncontroverted that there is no such statement in the Faculty Senate Rules and Regulations, but controverted that the fact creates a genuine dispute of material fact because it is irrelevant and immaterial.

**235. Ultimately, none of the due process rights enumerated in the University's written procedural documents were ever afforded to Brown. [Pl.'s Compl. ¶ 83]**

Defendants' reply:  Controverted.  The evidence and uncontroverted material facts show that Mr. Brown was provided notice and an opportunity to be heard.  Further controverted that this statement is an argumentative conclusion rather than a factual statement, and therefore is improper under Rule 56.

**236. During the pendency of the School of Law's Allegation of Academic**

Misconduct, Defendant Mazza communicated with plaintiff Brown via emails that had as the subject line: "Disciplinary Procedures." [S.F. ¶ 51]

Defendants' reply:  Uncontroverted, but controverted that it is relevant or material to this case.

**237.  Gail Agrawal's June 7, 2010 dismissal letter stated, in part, that the School of Law's transcript would show that plaintiff Brown's dismissal from the Law School was based on "falsification, misrepresentation, and failure to supply required information on [his] application to the School of Law." [S.F. ¶ 50]**

Defendants' reply:  Uncontroverted.

*Conflicting Accounts of Dean Agrawal's Involvement*

**238.  U.S.R.R. 5.2.2(d) excludes any party involved in the complaint from the rendering of any decision regarding the complaint. [Mazza Dep. Ex. 7, U.S.R.R. § 5.2.2(d)]**

Defendants' reply:  Uncontroverted, but it is irrelevant and immaterial to this case.

**239.  Rohleder-Sook testified that she had multiple conversations on a continuing basis with Agrawal regarding Brown from just after the amendment up until January, 2010. [Def. Rohleder-Sook Dep. 20:18-21:9]**

Defendants' reply:  Controverted because it inaccurately states Rohleder-Sook's testimony.  Further controverted because it is irrelevant and immaterial to this case, which involves Mr. Brown's lying on his law school application.

**240.  Records provided by Defendants in disclosure show the following emails**

146

**from Gail Agrawal in 2009, beginning on the day Brown amended his application:**

> **8/27/2009 (Communication with Counsel Regarding Brown) [Defs.' Bates Brown v. KU 000443]**
>
> **9/20/2009 (Investigation of Brown's Background) [Defs.' Bates Brown v. KU 000435]**
>
> **9/20/2009 (Strategy for Requesting Information from Brown) [Defs.' Bates Brown v. KU 000436]**
>
> **9/29/2009 (Strategy Discussion with Rohleder-Sook and Mazza) [Defs.' Bates Brown v. KU 000438]**
>
> **9/30/2009 (Authorization to Request Information from Brown) [Defs.' Bates Brown v. KU 000438]**
>
> **11/30/2009 (Getting in Front of the Admissions Committee) [Defs.' Bates Brown v. KU 000447]**
>
> **12/3/2009 (Reconvening Adm Committee) [Defs.' Bates Brown, Robert v. KU, et al 000191]**
>
> **12/3/2009 (Court Records Regarding Brown) [Defs.' Bates Brown v. KU 000445]**

Defendants' reply:  Uncontroverted that the listed e-mails were sent, however, the statements contained in parentheses do not appear in the e-mails and therefore are controverted as unsupported by any evidence.  It is further controverted that these e-mails are relevant or material to the claims in this case.

**241.  At deposition, Agrawal testified "My part in the dispute came relatively late.  So until that relatively late stage -- in other words, until it came to me for a final decision, I knew there was a student who had made misstatements on a law school application that were considered material.  I didn't know until relatively late who the student was, and I didn't know, as I recall, until relatively late exactly what was involved, but I knew there was an on-going matter that was being handled by my associate deans, which is typical.  That's what I knew." [Agrawal Dep. 10:25-**

11:13]

> Defendants' reply:  Uncontroverted.

**242. In her sworn declaration, Agrawal stated that Brown's matter first came to her for review and consideration "after the May 3, 2010 memorandum from the hearing panel." [Defs.' Mem. Ex. A, Agrawal Decl. ¶ 3]**

> Defendants' reply:   Uncontroverted that is a quote from Dean Agrawal's declaration.  However, it is controverted that it is relevant or material to this case.

### *The Individual Defendants' Knowledge of Student Rights*

**243.  When asked if everything listed in the Bill of Rights of the United States Constitution was a right, defendant Mazza testified "I'm not a constitutional scholar. I would think it would depend upon how you define a right." [Mazza Dep. 47:1-25]**

> Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**244. Defendant Mazza co-authored a work entitled "Constitutional Limitations on the Legislative Power to Tax in the United States" for which Mazza takes credit in his Curriculum Vitae, which contains a primer on fundamental protections of individual liberties and rights that exist under United States Constitutional law and the court and administrative agencies and systems that have primary responsibility for protecting those liberties and rights. [Def. Mazza's Resp. to Brown's 2nd RFA, Req. 2, Req. 1, 2; RFA Exhibit A, RFA Exhibit B]**

> Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**245. When asked why, in her opinion, the University did not forfeit its right to dismiss Plaintiff Brown from the School of Law based upon the defenses set out in Brown's letter dated February 28, 2010 (EXHIBIT B) under numbered section 5 (EXHIBIT B: BROWN v KU 000187 - BROWN v KU 000189), Agrawal answered "I did not formulate an opinion regarding the legal questions or authorities raised in your interrogatory. I sought the advice of the University's Office of General Counsel in the matter involving your application for admission to the School of Law and my decision." [Def. Mazza's Resp. to Brown's 3rd Interrogs., Int. 4]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**246. When asked at deposition why Brown's dismissal was not foreclosed by State Law as set forth in Section 5 of his February 28th letter containing his procedural objections, Agrawal testified "[i]f I were to independently examine and research the foundation for your argument, I would not be incapable of forming my own legal analysis because I'm a lawyer.  But in this case I was a client, and I relied on advice of counsel." [Agrawal Dep. 54:2-7]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**247. Defendant Gail Agrawal testified that she clerked for Justice Sandra Day O'Connor in the United States Supreme Court [Agrawal Dep. 4:24:5-1], that while clerking for Justice O'Connor she was in the Cert Pool on constitutional questions [Agrawal Dep. 9:16-20], and that her research has probably found its way into decisions of the Supreme Court of the United States [Agrawal Dep. 8:8-10].**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**248. In email communications regarding Counsel's proposed draft of her letter of intent to dismiss, Agrawal schooled General Counsel, admonishing that Brown was "very likely to sue" and explaining to her counsel what the School of Law's theory of "process" should be. [Defs.' Bates Brown v. KU - - Revised Redactions 000591]**

Defendants' reply:  The quoted phrases are uncontroverted.  The remainder of the paragraph is controverted as improper argument rather than fact and as irrelevant and immaterial.

**249. Initially in the amendment process, Rohleder-Sook was the sole arbiter of whether a student's academic standing would be placed in jeopardy after amending an application. [Def. Mazza Dep. 149:24-150:3]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**250. Rohleder-Sook testified she didn't know whether or not she had a duty to protect the due process rights of any of the University Students. [Def. Rohleder-Sook Dep. 86:16-22]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**251. Rohleder-Sook testified that she had no opinion on whether Brown had been afforded the due process set forth in the University's policies and procedures. [Def. Rohleder-Sook Dep. 84:8-85:3]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**252. Defendant McCray-Pearson testified that she did not know whether or not Section 2(F) of the Student Code of Rights and Responsibilities was a student right [McCray-Pearson Dep. 62:10-63:3], that due process protections involving the state were outside her purview [McCray-Pearson Dep. 14:4-9], and that she was unable to provide an exhaustive list of her responsibilities as the Judicial Board Chair. [McCray-Pearson Dep. 16:19-23]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

*The Sanction of Permanent Removal*

**253. Disciplinary expulsion of a law student from a member of the Association of the American Law Schools prevents that student from enrolling in any other member schools. [S.F. ¶ 53]**

Defendants' reply:  Uncontroverted that statement appears in the school's honor code, but it is controverted that it is accurate or that it is relevant or material in this case.

**254. In an adjudication involving Student [(name completely redacted)], an Honor Code Committee acknowledged that permanent removal from the School of law "would permanently prevent from attending any member school of the Association of American Law Schools." (Defs.' Bates Brown v.KU000954) [Defs.' Bates Brown v.KU000954]**

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**255. In an adjudication involving Student (name completely redacted), Dean Michael J. Davis acknowledged that permanent removal from the School of law**

"would prevent [(name completely redacted)] from ever becoming a lawyer[.]" [Defs.' Bates Brown v.KU000978-000980]

Defendants' reply:  Uncontroverted, but irrelevant and immaterial.

**256. Sandra Craig-McKenzie, the only Ombuds the School of Law has ever had in the history of the School's Dispute Resolution Procedure testified that she is unaware of any student other than Brown who has been permanently removed from the School of Law for any disciplinary reason. [McKenzie Dep. 8:11-20, 9:20-10:19]**

Defendants' reply:  Uncontroverted that Ms. McKenzie so testified, but it is irrelevant and immaterial.  In addition, as the other student records referenced by Brown in these additional facts show, her personal knowledge was not representative of the whole of the Law School's experience.

**257. Defendant Mazza testified that he is not aware of any other student in the history of the School of Law who has been removed after coming forward and amending his or her School of Law application.  [Mazza Dep. 108:24-109:10]**

Defendants' reply:  Uncontroverted that Dean Mazza so testified, but it is irrelevant and immaterial.  In addition, as the other student records referenced by Brown in these additional facts show, his personal knowledge was not representative of the whole of the Law School's experience.

*Other Disciplinary Cases within the School of Law – Student 1*

Defendants' reply to ¶'s 258 – 265:  Controverted as irrelevant and immaterial to the claims in this lawsuit.  Defendants object to these records as irrelevant and immaterial

to the issues in this case, which are Brown's due process claims arising from his dismissal. Brown has not asserted an equal protection claim or any other claim in which it would be relevant or material to compare his record and his failure to disclose his criminal record on his application to any other students' record.

**258. [Student 1] amended to disclose seventeen separate arrests, ten of which were dismissed and seven of which resulted in convictions. [Defs.' Bates Brown v. KU 001107]**

**259. In his amendment, [Student 1] disclosed adult convictions for Interference with the conduct of public business/building, driving w/out liability insurance (Kansas), Failure to appear on a misdemeanor, driving on a suspended license, and driving without liability insurance (State 2). [Defs.' Bates Brown v. KU 001107]**

**260. In his amendment, [Student 1] disclosed juvenile convictions for Running away from home and Running away from a group home facility. [Defs.' Bates Brown v. KU 001107]**

**261. In his amendment, [Student 1] disclosed dismissed arrests for Auto Tampering, Property Damage, Driving on suspended license, Driving w/out liability insurance, Assault, three separate counts of Minor in possession of alcohol, Fake ID, and Running from Police. [Defs.' Bates Brown v. KU 001107]**

**262. [Student 1]'s explanation was that he had run away first from his mother's home, then from a group home, had experienced a troubled childhood and**

early adulthood, and had at some point made the determination to change his life. [Defs.' Bates Brown v. KU 001108]

263. [Student 1]'s amended application went before the admissions committee, which could not agree on a proposed course of action. [Defs.' Bates Brown v. KU 001105]

264. In attempting to resolve the issue, Associate Dean Webb Hecker wrote "I'm also bothered, but one distinction that hasn't really been articulated is that it isn't a complete nondisclosure, it's a late disclosure. There is still plenty of culpability, but I think this case is essentially different than someone who never made disclosure and was found out in some other way. As soon as [Student 1] realized that it was a big deal, he came forward. In this respect he's no different than [redacted], [redacted], or [redacted]. The only difference between those three and [Student 1] is the number (not the nature--remember [redacted] beat up his girlfriend) of offenses, and maybe that's why two members of the Admissions Committee couldn't separate the omission from the offenses. As for the number (and nature) of his offenses, [Student 1]'s explanation speaks for itself. He doesn't come from a single-parent family, a blended family or a dysfunctional family. He comes from no family. How many kids could go through what he's gone through and not end up in Lansing or Leavenworth? He ended up, if memory serves, with a 3.8 UGPA and a 161 LSAT. Nothing has changed my mind from last week. This is an enormous turning point in [Student 1]'s life and an enormous responsibility for

**us. I think we need to keep him." [Defs.' Bates Brown v. KU 001105]**

**265.  Ultimately, no complaint was ever filed in [Student 1]'s case. [McKenzie Dep. 59:14-60:18]**

### *Other Disciplinary Cases within the School of Law – Student 2*

Defendants' reply to ¶'s 266 – 281:  Brown was dismissed from the School of Law effective June 8, 2010.  Paragraph's 266 – 281, deal with a student who amended his application March 2, 2011, which was nearly a year after Brown was dismissed from the law school.  Such evidence is inadmissible to show culpability on the part of these defendants.  These facts are further controverted as irrelevant and immaterial to the claims in this lawsuit.  Defendants object to these records as irrelevant and immaterial to the issues in this case, which are Brown's due process claims arising from his dismissal.  Brown has not asserted an equal protection claim or any other claim in which it would be relevant or material to compare his record and his failure to disclose his criminal record on his application to any other students' record.

**266. On March 2, 2011, Student [Student 2] amended his Law School application. [Defs.' Bates Brown v. KU Brown v. KU 000899].**

**267.  [Student 2]'s amendment came three years and sixty-seven days after his application to the School of Law. [Brown v. KU Brown v. KU 000916]**

**268.  [Student 2], while on Campus at UMKC during his undergraduate work, had unplugged the surveillance cameras and then proceeded to remove a ceiling tile near the door to the office of a University Professor.  When confronted by**

the University Professor, Student [Student 2] made up a lie and fled the scene. [Defs.' Bates Brown v. KU 000884]

269. [Student 2] was later confronted by campus police. In his March 08, 2011 explanation to defendants Rohleder-Sook and Mazza that he was "cited with tampering with campus security camera(s) and attempted unauthorized entry". [Defs.' Bates Brown v. KU 000884]

270. The campus police reports showed that [Student 2] had actually been investigated by the campus police for Attempted Burglary. [Defs.'Bates Brown v. KU 000904-000905]

271. Records subsequently obtained by the KU school of law showed that [Student 2] admitted and accepted discipline on charges that he had "[a]ttempted an unauthorized entry" to the room [Defs.' Bates Brown v. KU 000900], and that as part of his consequence at his prior State University, [Student 2] had written an essay explaining what the consequences of his actions would have been had the University charged him criminally in which he admitted that his conduct met the requirements of the Missouri statutes, section 569.170, Burglary in the Second Degree, which is a Class C Felony.  [Defs.' Bates Brown v. KU 000912; R.S.M.O. 569.170]

272. [Student 2] explained to defendants Rohleder-Sook and Mazza that he did not disclose this incident because he had been told by his prior State University that they "would have no records of this when [he] would apply to KU Law." [Defs.'

156

Bates Brown v. KU 000884]

273. Defendant Rohleder-Sook informed Student [Student 2] that his amended application would be put before the admissions committee, and offered Student [Student 2] the opportunity to submit "any other information [he] would like the admissions committee to consider as it reviews this matter." [Defs.' Bates Brown v. KU 000916- 000917]

274. The admissions committee met and found that the omission was material and had they known about it at the time of his application, they would have denied [Student 2] admission, as well as that "his continuing failure to disclose the information for three years was deceptive and itself provides an additional, alternative basis for voiding his admission." [Defs.' Bates Brown v. KU 000919]

275. The admissions committee summarized its findings regarding Student [Student 2] by stating "The committee unanimously found substantial grounds for questioning [Student 2's] candor and honesty, both because of his vague explanation of the offense even now after he has finally disclosed it, and his unpersuasive purported reasons for not disclosing this offense on his original application or during the past three years. Thus, the committee unanimously voted to void [Student 2's] admission and cancel his matriculation to the School of Law." [Defs.' Bates Brown v. KU 000919]

276. Defendant Mazza " made the decision that [Student 2] would get to appear before the Admissions Committee to reconsider its decision." [Mazza Dep.

150:19-21]

277.  **Defendant Mazza also met with [Student 2]'s wife. [Defs.' Bates Brown v. KU 000928]**

278.  **[Student 2] and his wife were given the opportunity to submit additional letters and documentation to both defendant Mazza and the admissions committee. [Defs.' Bates Brown v. KU 000920-000932]**

279.  **The School of Law facilitated [Student 2]'s personal appearance before the admissions committee, which resulted in reversal of the decision to cancel Student [Student 2]'s enrollment by a 3-2 majority vote of the admissions committee members. [Mazza Dep. 150:24-151:11]**

280.  **[Student 2] was notified by defendant Mazza that he would be permitted to graduate.  [Defs.' Bates Brown v. KU 000931]**

281.  **Sixty six days elapsed between the date [Student 2] amended his application and the date the final determination was made regarding his case. [Defs.' Bates Brown v. KU Brown v. KU 000899, Brown v. KU Brown v. KU 000916, Brown v. KU 000931]**

### *Other Disciplinary Cases within the School of Law – Various Examples*

Defendants' reply to ¶'s 282 – 302:  Controverted as irrelevant and immaterial to the claims in this lawsuit.  Defendants object to these records as irrelevant and immaterial to the issues in this case, which are Brown's due process claims arising from his dismissal.  Brown has not asserted an equal protection claim or any other claim in which it would be

relevant or material to compare his record and his failure to disclose his criminal record

on his application to any other students' record.

**282.  [Student 3] was a student who pled guilty to violating section III.A.2 and III.A.3 of the Honor Code of the University of Kansas School of Law (Honor Code), which invole cheating and plagerism, respectively. [Student 3] exacerbated these wrongdoings by, on multiple occasions, denying cheating and plagiarism in response to inquiries by his instructor and the director of the Lawyering program.  [Student 3] received the following punishment for cheating, plagerism, and subsequent dishonesty:**

1)  **a failing grade of "F" in the Fall 2008 Lawyering class;**
2)  **an oral reprimand from defendant Mazza;**
3)  **a permanent written reprimand in his or her official transcript;**
4)  **disciplinary probation for the remainder ofthe Spring 2009 semester;**
5)  **suspension from Law School for the Summer 2009 and Fall 2009 semesters; and**
6)  **exclusion from representing the K.U. School of Law on any moot court team or on any school-sanctioned organization, including without limitation the Kansas Law Review or the Kansas Journal of Law and Public Policy.**

**[Defs.' Bates Brown v. KU 000821]**

**283.  [Student 4] pled guilty of violating the Honor Code by cheating during**

**an in class final.  For cheating in class during a final, [Student 4] received the**

**following punishment:**

1)  **a grade of "F" in the course in which the violation occurred;**
2)  **the Honor Code proceeding becoming a permanent part of A.B.'s student file;**
3)  **exclusion from being a representative of the law school in any school sponsored activity or organization during the 2002-03 academic year, and**
4)  **a one semester suspension.**

**[Defs.' Bates Brown v. KU 000849]**

**284.  [Student 5] was charged by a Faculty Member with violating the Honor**

**Code of the K.U. School of Law. Since B.P. had already graduated by the time an**

Honor Code Committee could be convened, the complaint became moot and was dismissed on procedural grounds.  Upon inquiry from a Licensure Analyst from the Texas Board of Law Examiners, Dean Hecker  advised "It is important to note that although Mr. P is alleged to have violated the Honor Code, no hearing was held, no evidence was received, and there was no finding of guilt on the merits." [Defs.' Bates Brown v. KU 000857-000860]

285.  [Student 6] was charged and found guilty of plagiarism under the Law School Honor Code.  [Student 6] was given a hearing and found guilty.  For plagiarism, [Student 6] received the following punishment:

1) the record of this Honor Code violation became a permanent part of J.P.'s official law school file;
2) J.P. was not be permitted to complete the requirements for graduation during the Spring 2002 semester;
3) J.P. was removed from an academic team that was scheduled to compete nationally;
4) J.P. was removed from the editorial board of the Kansas Law Review; and
5) J.P. was excluded from  representing the KU Law School on any KU team or as the representative of any school-sanctioned organization.

[Defs.' Bates Brown v. KU 000865-000866]

286.  [Student 7] was found guilty of using unauthorized materials during a final exam under the Student Honor Code. For cheating, [Student 7] received the following punishment:

1) An "F" in the course [Student 7] cheated in.
2) A temporary written notice with [Student 7]'s transcript, to be removed when [Student 7] successfully completed the course [Student 7] cheated in and assuming that [Student 7] had no further Honor Code problems before that time.

**[Defs.' Bates Brown v. KU 000871-000872]**

287.  [Student 8] sent suggestive messages under the sexually explicit moniker "Mistah Bizsnatch" to two staff members and two students.   Determining that Mistah Bizsnatch was actually [Student 8] required an investigation performed by the University's IT department.  Sample repartee from [Student 8]'s emails includes the following: "We have yet to enjoy each other's conversation, but I am quite smitten with your delicious cuteness. If I may persuade you to e-mail me, then we can begin the dance. Mistah Bizsnatch -- I am as smooth as buttered yams."  For this behavior, [Student 8] received the following punishment:

1) [Student 8] was made to deliver written and in person apologies to the four victims;
2) [Student 8] was banned from using law school computer resources, except Lexis and Westlaw, for the remainder of the then current semester;
3) [Student 8] was placed on probation for one year with respect to his full tuition and fee scholarship, with the proviso that if he were to engage in any  misconduct during this probationary period, he might lose his scholarship;
4) the disciplinary memorandum was to remain in [Student 8]'s law school file for two years, at which time it would be removed.

**[Defs.' Bates Brown v. KU 000874-000882]**

288. [Student 9] was found guilty of making unwelcome sexual advances towards two of his legal aid clients and then misrepresenting those actions to the legal aid supervisors at the legal clinic where he was undertaking his internship. As punishment, [Student 9] agreed that a statement that he "was found guilty of an honor code violation which involved the intentional misrepresentation to a faculty member of facts regarding the course of his legal representation of a client while enrolled in the [redacted] Legal Aid clinical program" could be released to the Bar

and disclosed to the legal community. [Defs.' Bates Brown v. KU 000961-000969]

289.  Student [Student 10] admitted to falsifying his resume as distributed to prospective employers by the KU School of Law via an elevation of LSAT score from 605 to 705, elevation of his law school GPA from 2.95 to 3.10, elevation of his undergraduate GPA from 2.90 to 3.83, and increase of his pre-law employment from 6 months to 16 months.  As punishment, he was suspended for a year, had to send a letter of apology to the prospective employers who received the falsified resumes, was placed on disciplinary probation for the rest of his law school career, and had a temporary letter of reprimand placed in his file. [Defs.' Bates Brown v. KU 000976-000980]

290.  [Student 11] pled guilty to cheating on a Law School test, and as a consequence received an "F" in the course cheated in and a temporary written notice on his transcript.  [Defs.' Bates Brown v. KU 000983-000985]

291.  [Student 12] pled guilty to cheating on her Professional responsibility exam.  As a consequence, her professor was notified of the outcome of the disciplinary proceedings, she received an "F" in professional responsibility, she received a permanent written reprimand was attached to her transcript, and she was placed on disciplinary probation for a year. [Defs.' Bates Brown v. KU 000987 ]

292.  [Student 13] provided false information on a resume that was distributed by the School of Law to prospective employers, and as a consequence received

1)   an oral reprimand from the Dean;

2)   the requirement to clear up the false information with prospective employers; and

3)   the requirement to draft letters of apology to two Professors and a Dean.

[Defs.' Bates Brown v. KU 000991-000992]

293. [Student 14] amended on September 27, 2010 to disclose "minor consuming alcohol" and trespassing arrests, both of which were subsequently reduced.  No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001044]

294. [Student 15] amended to disclose charges of curfew violation.  [Student 15] additionally disclosed that "[t]he police also charged that my companions and I had performed malicious acts in an attempt to vandalize or damage the automobile or home of a Wichita resident".  No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001046]

295. [Student 16] amended to disclose cheating on a test during undergraduate work.  No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001048]

296. [Student 17] amended to disclose a diversion for "theft through purchasing stolen property." No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001050]

297. [Student 18] amended to disclose a finding of cheating by a professor in undergraduate work, and arrest for a Minor in Consumption charge for which community service was served, and a diversion for a second Minor in Consumption charge. No record of any further action with respect to this amendment was

provided in discovery. [Defs.' Bates Brown v. KU 001057-001058]

298. [Student 19] amended to disclose to episodes of alcohol related discipline occurring in the KU dorms during undergraduate work at K.U. No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001062]

299. [Student 20] amended to disclose prior charges of theft, DUI, and underage drinking. No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001063-001064]

300. [Student 21] amended to disclose a DWI arrest that was reduced to reckless driving.  The arrest was less than a year old.  No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001068]

301. [Student 22] amended to disclose a diversion for shoplifting. No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001070]

302. [Student 23] amended to disclose a DUI and alcohol related accident and an MIP.  No record of any further action with respect to this amendment was provided in discovery. [Defs.' Bates Brown v. KU 001077-001078]

### Missed Opportunities for Mitigation

303. Brown's Cert Petition, Barr's recantation, and Barr's mental instability, Barr's fraudulent common law divorce petition, Barr's fraudulent protection from

**abuse order, and the unique and well documented circumstances within Brown's declaration would all have been available for presentation to a hearing body.  [Pl.'s Decl ¶¶ 26-57, 72; Exhibit C – Trial Transcript,  Defs.'  Bates Brown, Robert v. KU, et al 000237-000238; Brown Dep. Ex. 4, Cert Petition]**

Defendants' reply:  Controverted.  The Uncontroverted facts of this case show that Brown had multiple opportunities to and did provide information and responses regarding his having lied on his law school application.  Some of the above information Brown did not include in his responses, therefore if it was not considered it is his responsibility not the law school's.  Controverted that this allegation is relevant or material to this case.

**304. Brown's  struggles  with  childhood  sexual  abuse  and  the  resultant carnage it wrought up on his life, including the testimony of Dr. Witcher would have been  available  for  a  hearing  panel.   [Pl.'s Decl ¶¶ 2-14,73; Exhibit A – Wayne Witcher Report Dated March 12, 2012, Pl.'s Bates BROWN v. KU 000654-000656; Exhibit B – Wayne Witcher Curriculum Vitae, Pl.'s Bates BROWN v. KU 000654-000656]**

Defendants' reply:  Controverted.  Brown as the record shows, had multiple opportunities to provide information and did so.  He did not disclose this information until in the course of litigation.  Controverted that it is relevant or material to his having lied on his law school application.

**305. Brown's contrition and acceptance of responsibility, as indicated both in his  statements  to  Dean  Mazza  and  his  deposition  testimony,  could  have  been**

considered by the hearing panel. [Pl.'s Decl ¶ 21; Brown Dep. 76:12-77:4]

Defendants' reply:   Objection, this is improper argument not factual statements contemplated by Rule 56.   Controverted.   Brown as the record shows, had multiple opportunities to provide information and did so.   His filings do not accept responsibility or show contrition.   Controverted that it is relevant or material to his having lied on his law school application.

**306.  Brown's willingness to raise Barr's child as his own and Barr's election to have Brown do so could have been considered in mitigation by a hearing panel. [Brown, Robert v. KU, et al 000048, 000061-000064]**

Defendants' reply:   Objection, this is improper argument not a factual statement contemplated by Rule 56.    Controverted; Brown as the record shows, had multiple opportunities to provide information and did so.   His filings did not choose to include this information.   Controverted that it is relevant or material to his having lied on his law school application.

**307.  The fact that Brown was but one of hundreds of amending KU School of Law applicants and that no one in the School of Law's history had ever been permanently expelled after coming forward and amending could have been considered by a hearing panel. [Def. Rohleder-Sook Dep. 16:20-17:11; McKenzie Dep. 8:11-20, 9:20-10:19; Mazza Dep. 108:24-109:10]**

Defendants' reply:   Objection, this assumes facts not in evidence and is also an improper argument rather than a factual statement contemplated by Rule 56.

**308.  The testimony of Robyn Barr and Wayne Witcher. [Pl.'s Decl. ¶¶ 72-73]**

Defendants' reply:  Objection, this is improper argument, not a factual statement contemplated under Rule 56; therefore, it should not be considered.

**309.  Even to the extent the mitigation raised in ASOF ¶¶ 302-306 may not be admissible in a court of law, it still would be admissible under the University Rules for hearings.  [Mazza Dep. Ex. 7, Section 6.6.4.3 ("Admissibility of Evidence . . . Strict rules of evidence do not apply[.]") ]**

Defendants' reply:  Objection, this is improper argument, not a factual statement contemplated under Rule 56; therefore, it should not be considered.

### *Brown's Academic Success*

**310.  Brown's GPA at the time he was permanently expelled was 3.12 and he was in the top half of his class.  [Pl.'s Decl. ¶¶ 69-70]**

Defendants' reply:  Uncontroverted, but controverted that it is relevant or material to Brown's having lied on his application for admission and the claims in this case.

**311.  It is uncontroverted that Brown was academically successful.  [S.F. ¶ 63]**

Defendants' reply:  Uncontroverted, but controverted that it is relevant or material to Brown's having lied on his application for admission and the claims in this case.

### *Representations of the University as an Inducement to Contract*

**312.  Before enrolling at the University of Kansas School of Law, Brown reviewed both the University and the School of Law website and the School of Law catalog at great length. [Pl.s' Compl. 152]**

Defendants' Reply:  Controverted.  Irrelevant and immaterial to the legal claims in

this case.  Moreover, Mr. Brown cites to his complaint for this proposition and provides no evidence to support it, which is improper under Rule 56.  Rule 56 provides that "an opposing party may not rely merely on allegations in its own pleading; rather -- its response must, by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).

**313.  The representations made therein led Brown to believe that enrollment contemplated an agreement with the University and the School of Law that he would be allowed to complete his studies there if he met the required academic standards and paid the requisite fees and tuition. [Pl.s' Compl. 153]**

<u>Defendants' Reply</u>:  Controverted.  Irrelevant and immaterial to the legal claims in this case.  Moreover, Mr. Brown cites to his complaint for this proposition and provides no evidence to support it, which is improper under Rule 56.  Rule 56 provides that "an opposing party may not rely merely on allegations in its own pleading; rather -- its response must, by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).

**314.  The law school's online catalog presented the curriculum in total (for the entire program) rather than singling out different years of enrollment. [Pl.s' Compl. 154] The messages on the Web Site of the Vice Provost for Student Success led Brown to believe that the University would help him in every way possible to succeed in his undertaking to Graduate and to succeed in his law career. [Pl.s' Compl. 155]**

<u>Defendants' Reply</u>:  Controverted.  Irrelevant and immaterial to the legal claims in

this case.  Moreover, Mr. Brown cites to his complaint for this proposition and provides no evidence to support it, which is improper under Rule 56.  Rule 56 provides that "an opposing party may not rely merely on allegations in its own pleading; rather -- its response must, by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).

**315.   The messages on the Web Site of the Vice Provost for Student Success led Brown to believe that the University would help him in every way possible to succeed in his undertaking to Graduate and to succeed in his law career. [Pl.s' Compl. 155]**

<u>Defendants' Reply</u>:  Controverted.  Irrelevant and immaterial to the legal claims in this case.  Moreover, Mr. Brown cites to his complaint for this proposition and provides no evidence to support it, which is improper under Rule 56.  Rule 56 provides that "an opposing party may not rely merely on allegations in its own pleading; rather -- its response must, by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).

*Valuation of Brown's Future Interests as an Attorney and Damages*

**315.  I am a Kansas CPA with decades of experience in valuation, sale, purchase, and Mergers and Acquisitions involvement regarding closely held businesses. [Pl. Decl. ¶ 64].**

<u>Defendants' Reply</u>:  Controverted.  Irrelevant and immaterial to the legal claims in this case and the pending summary judgment motion.

**316.  Since making my desire to complete Law School known, I have received a**

verbal offer of employment upon graduation from John P. Gerstle, a Johnson County Kansas attorney.  [Pl. Dec. ¶ 65]

Defendants' Reply:  Controverted.  Inadmissible hearsay, irrelevant and immaterial to the legal claims in this case and the pending summary judgment motion.

**317. Since making my desire to complete Law School known, I have received verbal commitments of the bulk of tax law, M&A, contract, and litigation work upon graduation from the principals of Accutype Medical Service, Inc., and NetStandard, Ins., both greater Kansas City area corporations.  [Pl. Decl. ¶ 66].**

Defendants' Reply:  Controverted.  Inadmissible hearsay, irrelevant and immaterial to the legal claims in this case and the pending summary judgment motion.

**318.  Based upon my expertise and experience, I prepare and produced to defendants in disclosure Exhibit I, a schedule of the estimated present value of my foregone compensation, assuming a retirement age of 71 years of age, and I will be testifying as a non-retained expert at trial regarding this matter. [Ex. I, Pl.'s Bates BROWN v. KU 000478; Pl.'s Decl. ¶ 67.**

Defendants' Reply:  Controverted.  Irrelevant and immaterial to the legal claims in this case and the pending summary judgment motion.

**319.  In the proposed Pretrial Order in this case, jointly prepared with counsel for defendants, I disclosed the following Summary of Damages.**

Defendants' Reply:  Controverted.  Irrelevant and immaterial to the legal claims in this case and the pending summary judgment motion.

*Availability of Witnesses*

**320.   Robyn Barr is on my witness list as disclosed to Defendants, and she agreed to testify on my behalf at any hearing I was able to obtain within the University of Kansas School of Law.**

<u>Defendants' Reply</u>:  Controverted.  Inadmissible hearsay, irrelevant and immaterial to the legal claims in this case and the pending summary judgment motion.

**321.  Dr. Wayne Witcher is on my witness list as disclosed to Defendants, and he agreed to testify on my behalf at any hearing I was able to obtain within the University of Kansas School of Law.**

<u>Defendants' Reply</u>:  Controverted.  Inadmissible hearsay, irrelevant and immaterial to the legal claims in this case and the pending summary judgment motion.

## <u>Arguments and Authorities in Further Support of Summary Judgment</u>

## I.   Summary Judgment Standard.

Summary judgment is "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Summary judgment is appropriate when the evidence is "so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

A party opposing a motion for summary judgment "cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  Nor can the party avoid summary judgment by "repeating conclusory opinions,

allegations unsupported by specific fact, or speculation." *Tadlock v. United States DOT*, 2013 U.S. Dist. LEXIS 30868; 2013 WL 823309 (March 6, 2018), *citing* Fed.R.Civ.P. 56(c)(4), *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). Instead, the party must provide reference "to an affidavit, a deposition transcript, or a specific exhibit incorporated therein" to establish the existence of a genuine disputed issue of material fact. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). A genuine disputed issue of material fact exists if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

## II.    Mr. Brown has failed his burden to prove the existence of a genuine dispute of material fact.

In an attempt to create the appearance of material factual disputes, Mr. Brown responded to the Defendants' statement of uncontroverted material facts with arguments and also included three hundred fourteen (314) paragraphs of purported "Additional Facts." However, as the Defendants' replies indicated, Mr. Brown's responses to the Defendants' Statement of Uncontroverted Facts and his "Additional Facts" do not alter the fundamental and inescapable reality of his circumstances, which have led to this lawsuit. Those circumstances are Mr. Brown's lie in response to Question 27c on the application for admission, which inquired of his criminal history. Rather than truthfully and accurately disclose his extensive criminal record, Mr. Brown instead determined that he would answer "No" to that question and fraudulently gain admission to the School of Law. Only after his deceit paid off with his admission and matriculation at KU School of

172

Law did Mr. Brown disclose that criminal record and amend his application to reveal his criminal record.

Continuing his pattern of excuse making and blame shifting, Mr. Brown in his response in opposition to summary judgment has claimed that he was mistaken in his actions and that there are mitigating circumstances that should excuse his fundamental lack of candor and honesty.  However, Brown's response ignores the uncontroverted facts that both the application and the LSAC certification he signed provided that his "admission [could] be voided and [his] matriculation cancelled" for providing false information.  Further, Brown ignores the uncontroverted facts that he was given notice and multiple opportunities to provide information to explain his lack of candor and honesty before he was dismissed from the Law School.  These incontrovertible facts dictate judgment for the defendants.

### A. Brown has failed his burden to prove his claim against the Regents is based on anything other than *respondeat superior*.

In his response to factual statements concerning the Regents, Brown acknowledges that the Board of Regents had no direct involvement in or knowledge of his application to the Law School of dismissal therefrom.  [Doc. 175 at pp. 126] Thus, he has failed to show any connection by the Board of Regents to the alleged injuries he has suffered.   Accordingly, Brown has conceded that their dismissal is appropriate and they are entitled to judgment as a matter of law because *respondeat superior* is an insufficient basis to support a claim under § 1983.  *See Ashcroft v. Iqbal,* 129 S.Ct. at 1948 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that

each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *McKee v. Heggy,* 703 F.2d 479, 483 (10th Cir. 1983).

### B.  Brown's Due Process Claims fail as a matter of Law.

In his response, Brown misapplies and misconstrues the law with respect to due process.   The exact argument is difficult to piece together because it is disjointed.  However, it is clear that he argues that the University has established policies and that the University's failure to follow those policies is itself a due process violation.

Unfortunately for Brown, the cases make clear that a violation of a policy does not give rise to a due process violation.   *Halverson v. Univ. of Utah Sch. of Med.*, No. 2:06CV228 DAK, 2007 U.S. Dist. LEXIS 72974; 2007 WL 2892633 (D. Utah September 28, 2007); *Trotter v. Regents of Univ. of New Mexico*, 219 F.3d 1179, 1185 (10th Cir. 2000) ("[E]ven assuming that the Medical School failed to follow its own regulations, we find that this failure would not, but itself, give rise to a constitutional claim under the Fourteenth Amendment."); *Board of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 92 at n. 8, 98 S.Ct. 948, 55 L. Ed.2d 124 (1978) (suggesting that a university's failure to follow its own academic rules does not, in itself, give rise to a due process violation.); *See also Powers v. St. John's Univ. School of Law*, ___ N.Y.S.2d ___, 2013 WL 5629652 (N.Y.Ad. 2 Dept.) October 13, 2013 (Law student dismissed for failing to disclose criminal convictions on his application was not entitled to invoke the grievance procedure set forth in the school's student handbook.  *citing Matter of Mitchell v. New York Med. Coll.*, 208 A.D. 2d 929, 930, 617 N.Y.S. 2d 894).

Brown also attempts to distinguish between an academic dismissal and a disciplinary dismissal. Such a distinction in the academic context, however, has little significance as Brown has failed to identify a single case that requires an in person, adversarial hearing be had for either type of dismissal. Instead, the cases make clear that what is required is notice and an opportunity to respond. "Courts overwhelmingly agree that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs." *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir. 1989) ("A school is an academic institution not a courtroom or administrative hearing room, and thus it should not be burdened with formalized procedural requirements imposed by actors estranged from the academic environment."); *see also Ezekwo v. New York City Health & Hosps. Corp*. 940 F.2d 775 (2nd Cir. 1991) (comparing medical resident to a student and applying the due process standard given to students who had been disciplined - - notice and an opportunity to be heard.)

The notice and opportunity provided to Brown in this case was consistent with that found sufficient in similar cases. *See Horowitz*, 435 U.S. at 90-91; *Fenje v. Feld*, 398 F.3d 620, 625 ("In the case of academic dismissals, procedural due process does not require any form of hearing before a decision making body, either before or after the termination decision is made."); *Martin v. Helstad*, 699 F.2d 387, 389 (7th Cir. 1983) (Opportunity to be heard by letter, affidavit or other documentary material was all the process due to a law school applicant who had failed disclose a conviction on his

application for admission.); *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976); *Gaspar v. Bruton*, 513 F.2d 843 (10th Cir. 1975).

In order to establish a due process violation, Brown must show that he did not receive "some meaningful notice and an opportunity to respond." *Davis*, 882 F.2d at 975. The uncontroverted facts, however, prove Brown did receive Dean's Agrawal's notice and he did provide a response. Thus, Brown received due process and his claim must fail as a matter of law. Therefore, defendants are entitled to judgment.

> **C. Defendants are entitled to qualified immunity because Brown has failed to identify any case that shows their actions were unconstitutional.**

In his response, Brown fails to understand what is required to defeat a claim of qualified immunity; which is "facts sufficient to show both that the defendant's alleged conduct violated the law and that [the] law was clearly established when the alleged conduct occurred." *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988). The District of Kansas has held that to satisfy that burden, a plaintiff must present cases from at least three other circuits. *Prison Legal News, Inc. v. Simmons*, 401 F.Supp.2d 1181, 1192 (D. Kan. 2005).

Brown has failed to identify a single case that shows, on facts similar to this case, a due process violation was found to have occurred. In contrast, the cases cited by defendants (*Halverson, Trotter, Davis, Horowitz*) all confirm that the defendants afforded Brown all the process that was due him. Accordingly, defendants, as a matter of law, are entitled to qualified immunity.

> **D. Brown's response proves his other claims without merit.**

Brown's response fails to address the arguments raised by Defendants in their Memorandum in Support of Summary Judgment.  Rather than burden the record with a recasting of those arguments, the defendants instead stand on the arguments raised in the Memorandum with respect to those claims and assert that those arguments show as a matter of law their entitled to judgment.

## Conclusion

Mr. Brown, knowing that his criminal history would cause his application for admission to the School of Law to be looked on unfavorably, chose to conceal that history in order to fraudulently obtain admission to the School of Law.  All of the consequences of which he now complains and which form the basis of his claims in this lawsuit flow from the circumstances that he himself created and set in motion.  The undisputed facts demonstrate that Mr. Brown's claims are without merit, and that defendants are entitled to judgment for the reasons outlined in the Memorandum in Support of Summary Judgment and  above.  Defendants, therefore, respectfully request that the Court grant them judgment and dismiss Mr. Brown's claims.

Respectfully submitted,

By:  /s  Sara L. Trower

Sara L. Trower, Ks. # 21514
Associate General Counsel and Special
Assistant Attorney General
Room 245 Strong Hall
1450 Jayhawk Blvd.
Lawrence, KS 66045
Tel:  (785) 864-3276
Fax:  (785) 864-4617
E-mail:  strower@ku.edu
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document was electronically filed with the clerk of the court on November 20, 2013, by using the CM/ECF system which will provide notice of filing to:

Robert M. Brown, Pro Se
6200 W. 74th Street
Overland Park, KS 66204
Phone: 816-721-4512
Fax: 866-610-4630
Email: robertmbrown@live.com

/s   Sara L.Trower_____
*Attorney for Defendants*

178